C

Any person responsible for any fire, leak or spill of hazardous material on public or private property.

## § 241-4. Period for payment.

Any responsible party, as set forth in **§ 241-3** hereof, shall reimburse the City of Englewood for the full price of any reimbursable items used to extinguish such a fire, stop or contain such a leak or control and clean up such a spill within 45 days after receipt of a bill for such items from the City of Englewood.

## § 241-5. Violations and penalties.

Any responsible party, as set forth in **§ 241-3** hereof, who fails to reimburse the City of Englewood for reimbursable items within the time set forth in **§ 241-4** hereof, shall be subject to a fine of not less than $100 nor more than $1,000 or imprisonment for a period of not more than 90 days or both. Upon the failure to reimburse the City for the cost of such items within said forty-five-day period, and in addition to any penalty provided in § 241-5 hereof, the City may take such action, as may be provided by law, to recover such costs from the responsible party.

# Chapter 250. Land Use

[HISTORY: Adopted by the City Council of the City of Englewood 3-17-1992 by Ord. No. 92-02. Amendments noted where applicable.]

**GENERAL REFERENCES**
Building design and appearance — See Ch. **134**.
Certificates of continuing occupancy — See Ch. **159**.
Uniform construction codes — See Ch. **167**.
Emergency housing permits — See Ch. **185**.
Fee schedule — See Ch. **191**.
Fire prevention — See Ch. **212**.
Flood damage prevention — See Ch. **222**.
Gasoline service stations — See Ch. **228**.
Laundries and dry-cleaning establishments — See Ch. **254**.
Property maintenance — See Ch. **317**.
Rental property — See Ch. **325**.
Retail establishments — See Ch. **330**.
Sewers — See Ch. **342**.
Soil erosion and sediment control — See Ch. **358**.
Storm sewers — See Ch. **367**.
Stormwater and surface drainage — See Ch. **370**.
Stormwater management — See Ch. **374**.
Streets and sidewalks — See Ch. **380**.
Swimming pools — See Ch. **385**.
Trees — See Ch. **425**.

**Attachment 1 - Zoning Map**
**Attachment 2 - Application for Development**
**Attachment 3 - Facade Alteration/Signage Checklist**

**Attachment 4 - Site Plan Checklist**
**Attachment 5 - Subdivision Checklist**
**Attachment 6 - Checklist for One- and Two-Family Residential Detached Construction, Additions and Accessory Structures**
**Attachment 7 - Environmental Questionnaire**
**Attachment 8 - Zoning Determination Form**
**Attachment 9 - Redevelopment Plans**
**Attachment 10 - DRL-Downtown Redevelopment Area, Lincoln School Site**

# Part 1. General Provisions

# Article I. Short Title; Purpose

## § 250-1. Short title.

This chapter shall be known and may be cited as the "Municipal Land Use Ordinance of the City of Englewood."

## § 250-2. Purpose.

The purpose of this chapter is to enact rules, regulations, and procedures governing municipal zoning, planning and land use in the City of Englewood which are in accord with the provisions of the Municipal Land Use Law (P.L. 1975, c. 291, N.J.S.A. 40:55D-1 et seq.) and to promote and further the purposes and intents set forth in said law.[1]

[1]  *Editor's Note: Original Article 2, Definitions, as amended, which immediately followed this section, was repealed 4-24-2012 by Ord. No. 12-14. See now § **250-58**.*

# Article II. Administration; General Procedures

## § 250-3. Applications.

A.  All applications for development shall be initially presented to the Zoning Officer, as heretofore designated in the Department of Building and Code Enforcement.

B.  The Zoning Officer shall refer the application to the appropriate municipal agency and shall assist the applicant in processing the application for development.

C.  The Zoning Officer shall collect all fees in connection with said application.

## § 250-4. Meetings.

A.  All meetings of any municipal agency established under this chapter shall be held as scheduled by the municipal agency, said meetings to be scheduled in compliance with the provisions of N.J.S.A. 40:55D-9.

Case 2:19-cv-14515-BRM-JAD   Document 2-5   Filed 06/28/19   Page 4 of 249 PageID: 245

B. Except as otherwise permitted by law, all regular and special meetings of any municipal agency established under this chapter shall be open to the public, with notice of all meetings provided as required by law.

C. Minutes of all regular and special meetings shall be kept as required by N.J.S.A. 40:55D-9.

# § 250-5. Hearings.

A. Municipal agencies established under this chapter shall hold hearings as required by N.J.S.A. 40:55D-10. All procedures governing said hearings shall be established by the municipal agency in compliance with N.J.S.A. 40:55D-10.

B. Public notice of a hearing on an application for development shall be given by an applicant pursuant to N.J.S.A. 40:55D-12. In addition, public notice of a hearing shall be required for any site plan review, for appeals of determinations of administrative officers pursuant to Subsection a of Section 57 of P.L. 1975, c. 291, as amended (N.J.S.A. 40:55D-70), and for requests for interpretations pursuant to Subsection b of Section 57 of P.L. 1975, c. 291, as amended (N.J.S.A. 40:55D-70). Upon request and upon payment of the appropriate fee, the Tax Assessor shall provide an applicant with the names and addresses of property owners who are required to receive notice pursuant to N.J.S.A. 40:55D-12.
[Amended 3-2-1999 by Ord. No. 99-03]

C. Municipal agencies established pursuant to this chapter shall provide for verbatim recordings of all hearings and shall make such records available to any interested party at his expense. Transcripts thereof may be provided by any interested party at his expense.

D. Any board, agency or department of the City of Englewood, or employee thereof, may, upon written request by the municipal agency, or as the result of its own review, submit a written report concerning any application pending before the municipal agency, or any specific issue or aspect thereof, within the time requested by the municipal agency. A copy of such report shall be sent by regular mail to the applicant or the applicant's attorney prior to the date of any hearing at which the said report is to be considered by the municipal agency or shall be provided to the applicant or applicant's attorney at said hearing. The municipal agency or the applicant or any interested parties may request that the author of said report testify before the municipal agency. In the event that no such request is made, the municipal agency shall consider said report in rendering any decision. If such request is made, however, the municipal agency may consider said report only if the municipal agency, applicant or interested party has an opportunity to cross-examine the author of said report. The secretary of the municipal agency shall provide copies of any such report to any interested person who requests same upon payment to the City of Englewood of the fee established pursuant to Chapter **191**, Fee Schedule, of the Code of the City of Englewood in effect.

# § 250-6. Decisions.

A. All decisions for development shall be in writing, with a copy filed with the Zoning Officer, the administrative officer of the respective municipal agency rendering the decision, and the office of the City Clerk, and a copy mailed to the applicant.

B.   A brief notice of each decision shall be published in a newspaper of general circulation in the City of Englewood, said notice to be arranged by and at the cost of the applicant.

C.   A decision granting exception or variance from the provisions of this chapter shall expire if no construction, alteration, or conversion has been commenced within one year from the date of the grant. Notwithstanding the foregoing, the municipal agency granting any exception or variance from the provisions of this chapter may, by resolution, grant an extension thereto, either at the time of the decision or at any time thereafter, upon public notice thereof as provided in § **250-5** hereof.
[Amended 3-2-1999 by Ord. No. 99-03]

D.   Except as otherwise provided by the resolution of the municipal agency, a decision granting any exception or variance from the provisions of this chapter shall expire if no construction, alteration, or conversion has been commenced within one year from the date of the grant.[1]

[1]   *Editor's Note: Original Section 5, regarding appeals to the governing body, which immediately followed this section, was repealed 3-2-1999 by Ord. No. 99-04.*

# § 250-7. Administrative officers.

A.   For purposes of the administration of this chapter, the City Planner is designated as the administrative officer to the Planning Board.

B.   For purposes of the administration of this chapter, the Zoning Officer is designated as the administrative officer to the Board of Adjustment.

C.   For purposes of the administration of this chapter not otherwise provided for herein, the City Clerk is designated as the administrative officer.

D.   The administrative officers designated above shall have the powers and duties set forth in the Municipal Land Use Law (N.J.S.A. 40:55D-1 et seq.) and such other duties as may hereafter be provided by ordinance.

# § 250-8. Fees.

[Amended 2-6-2001 by Ord. No. 01-01; 6-29-2004 by Ord. No. 04-22[1]]
Chapter **191**, Fee Schedule, shall apply to applications for development, said fees to be paid to the City of Englewood prior to any action being taken by any municipal agency respecting said application.

[1]   *Editor's Note: Amended at time of adoption of Code (see Ch. 1, General Provisions, Art. I).*

# § 250-9. Developer's agreement.

With respect to all applications from major subdivisions and site plan approvals, the municipal agency shall condition any such approval upon the execution of a developer's agreement between the municipal agency, the applicant and the City of Englewood specifying, in part, off-site, on-tract or off-tract improvements, public improvements, bonding requirements, escrow requirements, other conditions imposed by the municipal agency and such other terms and conditions as the City and the municipal agency deem appropriate.

The municipal agency may waive the requirement of a developer's agreement in appropriate circumstances, subject to the consent of the City Council. Unless so waived, no certificate of occupancy or building permit shall be issued respecting any application for development requiring major subdivision or site plan approval unless the applicant has entered into a developer's agreement of a form specified herein.

## § 250-10. Proof of payment of taxes required.

[Added 10-5-1992 by Ord. No. 92-28]

No application for development shall be approved by the municipal agency unless the applicant submits proof that no taxes or assessments for local improvements are due or delinquent on the property for which the application for development is made or unless such approval is conditioned upon submission of such proof prior to the issuance of any municipal permits for said development. Proof that no taxes or assessments for local improvements are due or delinquent on said property may be obtained from the Receiver of Taxes of the City of Englewood upon application therefor, in accordance with the provisions of Article 3 of Chapter 5 of Title 54 of the Revised Statutes (N.J.S.A. 54:5-11 et seq.) relating to official searches for municipal liens.

# Part 2. Planning Board and Zoning Board of Adjustment

# Article III. Planning Board

## § 250-11. Establishment; membership.

A.  There is hereby established a Planning Board of nine members and four alternate members of the following four classes:

(1)  Class I: the Mayor.

(2)  Class II: one of the officials of the City of Englewood, other than a member of the Council, to be appointed by the Mayor, provided that if both a member of the Board of Adjustment and a member of the Board of Education are Class IV members, then the Class II member shall be a member of the Environmental Commission. One alternate member of Class II shall be appointed by the Mayor. The alternate member may attend and participate in all meetings of the Board and shall vote during the absence or disqualification of the regular Class II member.

(3)  Class III: a member of the Council, to be appointed by it. One alternate member of Class III shall be appointed by the Council. The alternate member may attend and participate in all meetings of the Board and shall vote during the absence or disqualification of the regular Class III member.

(4)  Class IV: six other citizens of the City of Englewood, to be appointed by the Mayor. The members of Class IV shall hold no other municipal office, except that one Class IV member may be a member of the Board of Adjustment and one may be a member of the Board of Education. A member of the Environmental Commission who is also a member of the Planning Board, as required by law, shall be a Class IV

member unless both a member of the Board of Adjustment and a member of the Board of Education are Class IV members, in which case the member of the Environmental Commission shall be the Class II member of the Planning Board.

B.  Two other citizens of the City of Englewood shall be appointed by the Mayor as alternate members of Class IV. Alternate members may attend and participate in all meetings of the Board. Such alternate members shall be designated by the Chairperson as "Alternate No. 1" and "Alternate No. 2" and shall vote in rotation during the absence or disqualification of any regular Class IV member.

## § 250-12. Terms.

A.  The term of the Class I member shall correspond with his official tenure.

B.  The terms of the Class II and Class III members and alternate members of Classes II and III shall be for one year or shall terminate at the completion of their respective terms of office, whichever occurs first.

C.  The terms of a Class IV member who is also a member of the Board of Adjustment or the Board of Education shall terminate whenever he is no longer a member of such other body or at the completion of his Class IV term, whichever occurs first.

D.  Members of the Planning Board holding office on the effective date of this chapter shall continue in office until completion of their terms as provided by prior law.

E.  The term of the first Class IV member appointed after the effective date hereof shall be for a period of two years, commencing on January 1 next following the effective date hereof. The terms of all Class IV members appointed thereafter shall be for periods of four years.

F.  The terms of the first two Class IV alternate members appointed shall be for periods of one and two years, respectively. The terms of all Class IV alternate members appointed thereafter shall be for periods of two years.

G.  The term of a Class II or a Class IV member who is also a member of the Environmental Commission shall be for three years or shall terminate at the completion of his term of office as a member of the Environmental Commission, whichever occurs first.

H.  All terms shall commence on January 1 of the year in which the appointment is made.

## § 250-13. Vacancies.

Vacancies occurring otherwise than by expiration of term, in any class, shall be filled by appointment as above provided for the unexpired term.

## § 250-14. Officers.

The Planning Board shall elect a Chairperson and Vice Chairperson from the members of Class IV and select a Secretary who may be either a member of the Planning Board or a municipal employee designated by it.

## § 250-15. Planning Board Attorney.

There is hereby created the office of Planning Board Attorney. The Planning Board may annually appoint, fix the compensation of or agree upon the rate of compensation of the Planning Board Attorney, who shall be an attorney other than the Municipal Attorney, provided that such compensation shall not exceed the amount appropriated by the City Council.

## § 250-16. Experts and staff.

[Amended 6-29-2004 by Ord. No. 04-17]
The Planning Board may also employ or contract for the services of experts and other staff and services as it may deem necessary. The Board shall not, however, exceed, exclusive of gifts, grants and contributions, including developers escrows, the amount appropriated by the governing body for its use, as certified by the Chief Financial Officer.

## § 250-17. Powers and duties.

The Planning Board shall have all the powers and duties listed and enumerated in the Municipal Land Use Law (N.J.S.A. 40:55D-1 et seq.), including, specifically, the following powers and duties:

A.  To make and adopt and from time to time amend a Master Plan for the physical development of the municipality, which Master Plan shall include the specific policy statement referred to in N.J.S.A. 40:55D-28d.

B.  To administer the provisions of Article **VI**, Site Plan Review, and Article **VII**, Subdivision, of this chapter.

C.  To participate in the preparation and review of programs or plans required by state or federal law or regulation.

D.  To assemble data on a continuing basis as part of a continuous planning process.

E.  To prepare annually a program of municipal capital improvement projects projected over a term of six years, and amendments thereto, and recommend same to the governing body.

F.  To consider and report to the governing body, within 35 days after referral, on any proposed development regulation submitted to it and to pass upon other matters specifically referred to it by the governing body.

G.  To grant, to the same extent and subject to the same restrictions as the Board of Adjustment, the following types of relief when required in connection with subdivision, site plan review or conditional use review:

(1)  Variances, pursuant to N.J.S.A. 40:55D-70c, from lot area, lot dimensional, setback and yard requirements, provided that such relief from lot area requirements shall not be granted for more than one lot.

(2)

Authorization for issuance of permits for buildings or structures in the bed of a mapped street or public drainageway, in a flood control basin or in a public area reserved on the Official Map or in the Master Plan.

(3) Authorizations for issuance of permits for buildings or structures not related to a street.

H.  To grant conditional uses in accordance with the provisions of this chapter.

I.  To perform such other advisory duties as are assigned to it by ordinance or resolution of the governing body for the aid and assistance of the governing body or other agencies or officers.

J.  To administer the provisions of Chapter **358**, Soil Erosion and Sediment Control, to the extent provided by ordinance.

K.  To administer the provisions of the ordinances and laws relating to planned development.

L.  To exercise such powers and duties as the Planning Board may be given under Part **4**, Zoning, of this chapter.

M.  To recommend to the City Council acquisition, regulation, or preservation of sites of special historic or scenic value, preservation or regulation of existing natural resources, acquisition, regulation, or preservation of sites or areas involving special architectural design, and acquisition, regulation, or preservation of other public areas, as defined in N.J.S.A. 40:55D-1 et seq. (c. 291, P.L. 1975).

N.  To administer the provisions of such other ordinances and laws as may require review, report, or other action, including redevelopment plan ordinances adopted by the City Council pursuant to the State of New Jersey Local Redevelopment and Housing Law (N.J.S.A. 40A:12A-1 et seq.), including the review of site plans and the granting of variances from redevelopment plan ordinances pursuant to Subsection **G** above. [Amended 6-29-2004 by Ord. No. 04-17]

## § 250-18. Bylaws, rules and regulations.

The Board is hereby authorized to adopt such bylaws, rules and regulations not inconsistent with this chapter as may be necessary to carry into effect the provisions and purposes of this chapter.

## § 250-19. Quorum.

Five members shall constitute a quorum for the transaction of business; provided, however, that a smaller number may adjourn a meeting. Except as otherwise provided by law, the approval of any application for development by the Planning Board shall require the affirmative vote of a majority of those present and voting, but in no event less than three affirmative votes.

# Article IV. Board of Adjustment

## § 250-20. Establishment; membership.

A. There is hereby established a Board of Adjustment consisting of seven residents of the City of Englewood. Two residents of the City of Englewood shall be appointed and designated as alternative members of the Board of Adjustment. No member of the Board of Adjustment may hold an elective office or position under the municipality. The appointments shall be made by the Mayor, subject to the consent and confirmation of the City Council. If the Mayor fails to make such appointment within 30 days after the expiration of a member's or alternate member's term or creation of a vacancy, or if the City Council fails to confirm such appointment after the expiration of said 30 days, the City Council shall make such appointment.

B. Alternate members of the Board of Adjustment shall be designated by the Chairperson as "Alternate No. 1" and "Alternate No. 2" and may attend and participate in all meetings of the Board. Such alternate members shall vote in rotation during the absence or disqualification of any regular member or members.

## § 250-21. Terms.

A. The term of each member shall be for four years. The term of each alternate member shall be for two years.

B. Regular members of the Board of Adjustment holding office on the effective date of this chapter shall continue in office until completion of their three-year terms as provided under prior law.

C. The term of the sixth member, who is not holding office as a regular member on the effective date of this chapter, shall be for one year; the term of the seventh member shall be for two years. All other appointments made after the effective date hereof shall be for four years.

D. All terms shall commence on January 1 of the year in which the appointment is made.

## § 250-22. Vacancies.

Vacancies occurring otherwise than by expiration of term shall be filled by appointment for the unexpired term.

## § 250-23. Officers.

The Board of Adjustment shall elect a Chairperson and Vice Chairperson from its members and shall also select a Secretary who may or may not be a member of the Board or a municipal employee.

## § 250-24. Board of Adjustment Attorney.

There is hereby created the office of Attorney to the Board of Adjustment. The Board of Adjustment may annually appoint, fix the compensation of or agree upon the rate of

compensation of the Board of Adjustment Attorney, who shall be an attorney other than the Municipal Attorney, provided that such compensation shall not exceed the amount appropriated by the City Council.

# § 250-25. Experts and staff.

[Amended 6-29-2004 by Ord. No. 04-17]
The Board of Adjustment may also employ or contract for and fix the compensation of such experts and other staff and services as it may deem necessary. The Board shall not, however, exceed, exclusive of gifts, grants and contributions, including developers escrows, the amount appropriated by the governing body for its use, as certified by the Chief Financial Officer.

# § 250-26. Powers granted by state law.

The Board of Adjustment shall have the powers granted by N.J.S.A. 40:55D-70.

# § 250-27. Additional powers and duties.

In addition to the powers specified in **§ 250-26** of this article, the Board of Adjustment shall have all the powers and duties listed and enumerated in the Municipal Land Use Law (N.J.S.A. 40:55D-1 et seq.), including, specifically, the following powers and duties:

A.  To grant, to the same extent and subject to the same restrictions as the Planning Board, subdivision, site plan or conditional use approval when required in connection with a use variance properly before the Board of Adjustment pursuant to Subsection d of N.J.S.A. 40:55D-70.

B.  To grant variances from the requirements of law that no permit shall be issued for any building or structure in the bed of any street, public drainageway, flood control basin or public area reserved on the Official Map. Such variances may be approved only if:

(1)  Such variance is approved by a majority of the fully authorized membership of the Board;

(2)  Unless a variance is granted, the parcel or parcels of land on which the mapped street, drainageway, flood control basin or reserved area is located cannot yield a reasonable return to the owner; and

(3)  The variance required will cause the least practicable increase in the cost of opening the street or will tend to cause the least change in the Official Map. The Board shall impose such reasonable requirements as conditions for granting such a variance as will promote the health, morals, safety and general welfare of the public.

C.  To grant variances from the requirements of law that no permit for the erection of any building or structure be issued unless the lot abuts a street giving access to the proposed building or structure. Such a variance shall be granted only if the enforcement of such requirements of law would entail practical difficulties or undue hardship or where the circumstances of the case do not require the building or structure to be related to a street. Such variances may be granted subject to conditions that will provide adequate

access for fire-fighting equipment, ambulances and other emergency vehicles necessary for the protection of health and safety and that will protect any future street layout shown on the Official Map or on a general circulation plan element of the Master Plan.

## § 250-28. Bylaws, rules and regulations.

The Board shall adopt such bylaws, rules and regulations not inconsistent with this chapter as may be necessary to carry into effect the provisions and purposes of this chapter.

## § 250-29. Quorum.

Four members shall constitute a quorum for the transaction of business; provided, however, that a smaller number may adjourn a meeting. Except as otherwise provided by law, the approval of any application for development by the Board of Adjustment shall require the affirmative vote of a majority of those present and voting, but in no event less than three affirmative votes.

# Article V. Disclosure of Monetary Contributions to Board Members

[Added 9-16-2008 by Ord. No. 08-24]

## § 250-30. Disclosure required.

Any person or entity who submits an application to the City of Englewood Board of Adjustment and/or Planning Board shall disclose all contributions of anything of value, including money or a pledge of contribution, and in-kind contributions to any City candidate, elected official, holder of public office in the City, Board of Adjustment or Planning Board member, or to any Bergen County political committee or to any political action committee that is organized for the primary purpose of promoting or supporting City candidates or City office holders, including but not limited to appointees and members of such Boards within the City of Englewood.

## § 250-31. Form of disclosure; submission and public announcement.

The disclosure of such contributions shall be on a form approved by the City Manager and shall be submitted and announced publicly at the first appearance before the respective Board or Boards.

## § 250-32. Applicability; ongoing obligation to disclose.

The foregoing disclosure requirements shall apply to any such person or entity, including professionals, retained by an applicant in conjunction with any such application, and the applicant shall have an ongoing obligation to disclose any such contributions greater than $300 in cash or in kind for a period of three years from the date of the application.

## § 250-33. Definitions.

As used in this article, the following terms shall have the meanings indicated:

**PERSON or ENTITY**
An individual, including the individual's spouse and any unemancipated child living in the household of such person, a firm, corporation, a professional corporation, a partnership, a limited partnership, a limited-liability company, unincorporated association, or similar organization and encompasses all principals and partners, as well as employees of the entity, as well as any subsidiaries directly controlled by such entity.

# Part 3. Site Plan and Subdivision Regulations

# Article VI. Site Plan Review

## § 250-34. Site plan approval required; exceptions.

[Amended 7-22-2003 by Ord. No. 03-07; 8-8-2006 by Ord. No. 06-10; 8-16-2011 by Ord. No. 11-08[1]]

A. Except as provided in Subsection **B** below, site plan approval by the Planning Board or Board of Adjustment shall be required and no building permit or certificate of occupancy issued until a site plan therefor shall have first been approved by the Planning Board or the Board of Adjustment, in the event of any of the following:

(1) The construction of a new building or addition to an existing building.

(2) A development or redevelopment of any property, including any property located in a redevelopment area.

(3) A change in occupancy that requires the altering, increasing or decreasing, or any other change to parking facilities or vehicular storage or other exterior storage areas or vehicular access or vehicular travel ways or pedestrianways to comply with the City of Englewood's ordinance requirements.

(4) A change in occupancy of a site that includes exterior parking or exterior storage areas.

(5) A site that requires a substantial change in landscaping or lighting as a direct result of a new occupancy, as first determined by the Zoning Officer and then referred to the Planning Board for site plan approval or waiver.

(6) When steeped sloped areas are being developed or redeveloped, except for those applications for development which are exempt from site plan approval pursuant to the provisions of the Municipal Land Use Act (N.J.S.A. 40:55D-1 et seq.). With respect to any application for development which is exempt from site plan approval, the appropriate municipal agency shall be governed by the provisions of this chapter respecting steeped sloped areas in considering any variances in connection therewith.

B.  Site plan approval shall not be required for:

(1)  Construction or alteration or change in occupancy of a single one-family house or any lawful accessory use thereto.

(2)  An addition or extension to a building which conforms in all respects to applicable zoning requirements where:

(a)  The ground cover thereof does not exceed 5% of the ground coverage of the existing building and does not exceed 80 square feet; and

(b)  The provisions of Subsection **A** do not apply.

[1]  *Editor's Note: Original Section 1, Title, of Article 6, Site Plan Review, which immediately preceded this section, was repealed at time of adoption of Code (see Ch. **1**, General Provisions, Art. I). See now § **250-1**.*

# § 250-35. Application requirements.

A.  An application for site plan approval shall:

(1)  Include a survey certified by a professional engineer or licensed land surveyor.

(2)  State the scale used on the plan, which shall be 20 feet to the inch, unless the use of some other scale shall first have been approved by the City Engineer.

(3)  Identify the project by name of the project and the name and address of the owner of and all persons having an interest in the premises involved (including the names and addresses of the president and secretary of any corporation), designation of the premises on the City of Englewood Tax Assessment Map and street address, if any.

(4)  Contain a North arrow indication, the names, addresses, seals, and signatures of any licensed architect, engineer, or planner who shall have prepared the plan or part thereof, and the date of the plan and any revisions thereof.

(5)  Include a key map showing all buildings and structures within 200 feet of the boundary lines of the site, at a scale of one inch to 100 feet.

(6)  Include a Zoning Map of the City of Englewood showing the location of the site and a written identification of the existing zoning district(s) included within the boundaries of the site and the existing zoning districts within 200 feet of the site's boundaries.

(7)  Be accompanied by an environmental impact statement, if required by § **250-37** of this article.

(8)  Include or be accompanied by preliminary architectural plans for the proposed buildings or structures, indicating typical floor plans, elevations, height and general design or architectural styling.

(9)  Include copies of any easements, covenants, deed restrictions, or exceptions that cover or are to cover the tract or any part thereof.

B.

The plans and other materials submitted as an application for site plan approval shall show and identify:

(1) The names and addresses of the owners of all property within 200 feet of the premises.

(2) The boundaries of the property, existing and proposed street and setback lines, location of any existing or proposed buildings or other structures, including wall fences, culverts and bridges, with elevations of each such existing and proposed building or structure, and identification of any existing or proposed easement, including public easements, and identification of any area proposed to be dedicated to public use.

(3) Existing contours with intervals of two feet, locations of existing watercourses, marshes, rock outcrops, cliff faces, ponds, depressions, wooded areas, single trees with a diameter of eight inches or more as measured three feet above the base of the trunk and any other significant existing features, with previous flood elevations of watercourses, ponds and marsh areas, and with the plan referenced to United States Geodetic Survey data as a bench mark.

(4) The proposed use or uses of land and buildings and proposed location or locations of buildings and accessory structures, including dimensions of buildings showing location of all entrances, proposed finished grades of all open spaces and drainage swales and proposed grades of interior walks, driveways, and parking or other paved areas, if any. Building outlines shall indicate type of construction, aggregate floor area and height. Floor space of all buildings and the estimated number of employees, occupants, and/or users shall be submitted. If the precise use of the building is known at the time of application, an amended plan showing the proposed use shall be required prior to issuance of a certificate of occupancy.

(5) All means of vehicular ingress and egress from the site onto public streets; all proposed streets, with profiles, indicating grading; and cross sections showing the width of the roadway, location and width of sidewalks, walkways, driveways, and curb cuts, the proposed traffic channels, if any, additional width, if any, and any other means of controlling vehicular and pedestrian traffic.

(6) The location and layout of any off-street loading areas and/or parking areas and, if permitted, off-site parking facilities, showing the number of spaces required and the number proposed.

(7) The existing and proposed location, direction of illumination, type of fixture, color of lights, power and hours of operation of proposed outdoor lighting, including facade lighting and lighted signs.

(8) If proposed screening includes the use of walls and/or fences, the site plan shall indicate proposed materials and type of construction to be used. Where necessary, elevations and cross sections shall be submitted to indicate clearly architectural features of proposed walls and/or fences.

(9) All trees and shrubbery to be retained shall be delineated and identified on the plan. All new planting shall be located and identified on the plan and supplemented with a planting schedule, which shall provide a key member, both common and scientific names, planting size, root treatment and mature growth size.

(10) The location of any existing and/or proposed utilities.

(11) The location and size of any existing and/or proposed drainage and sanitary sewer lines, with pipe sizes, grades, and direction of flow, and the location and nature of facilities for garbage and refuse removal.

(12) The location of all existing and proposed waterlines, valves, fire alarm boxes and hydrants and all existing and proposed facilities and systems for protection against fire, including existing and proposed fire lanes.

(13) Existing and proposed stormwater drainage system, including existing drainage within 500 feet of the site in question if the size of the site is 50,000 square feet or more or within 200 feet of the site in question if the size of the site is less than 50,000 square feet, and including all areas such as paved areas, grassed areas, wooded areas, and any other area contributing to the calculations, and showing methods used in the drainage calculations.

(14) Details of all signs to be erected on the site, including:

(a) Sketch of all proposed signs, to scale, including graphics and lettering.

(b) Dimensioned elevation drawings showing the location of all existing and proposed signs on existing and proposed structures and buildings.

(c) Description of how all signs will be attached to the structure, buildings or ground.

(d) Illumination of the sign, if any.

(e) The color(s) of the signs.

(15) The location of all existing and proposed solid waste collection stations. A plan detail at a scale of one inch equals 10 feet shall be incorporated in the submission for each station or for a typical station. The containers at each station shall be delineated on the detail plan and described in tabular form.
[Added 12-7-1993 by Ord. No. 93-19]

(16) There shall be included in any new multifamily housing development containing three or more dwelling units occupied or intended to be occupied by persons living independently of each other an indoor/outdoor recycling area for the collection and storage of residentially generated, source-separated recyclable materials. A plan detail at a scale of one inch equals 10 feet shall be incorporated in the submission for each such station or for a typical station. The dimensions of the recycling area shall be sufficient to accommodate recycling bins or containers which are of adequate size and number and which are consistent with anticipated usage and with current methods of collection in the area in which the project is located. A separate container or containers shall be provided for each recyclable material specified by ordinance. The dimensions of the recycling area and the bins or containers shall be determined in consultation with the Municipal Recycling Coordinator and shall be consistent with a district recycling plan adopted pursuant to Section 3 of P.L. 1987, c. 102 (N.J.S.A. 13:1E-99.13), any applicable requirements of the Municipal Master Plan, adopted pursuant to Section 26 of P.L. 1987, c. 102, and any applicable requirements of Chapter **364**, Solid Waste and

Recycling. In addition, such recycling area shall comply with the following design criteria:
[Added 12-7-1993 by Ord. No. 93-19]

    (a)  The recycling area shall be conveniently located with the residential disposal of source-separated recyclable materials preferably near, but clearly separated from, a refuse dumpster.

    (b)  The recycling area shall be well lit and shall be safely and easily accessible by recycling personnel and vehicles. Collection vehicles shall be able to access the recycling area without interference from parked cars or other obstacles. Reasonable measures shall be taken to protect the recycling area, and the bins or containers placed therein, against theft of recyclable materials, bins or containers.

    (c)  The recycling area or the bins or containers placed therein shall be designed so as to provide protection against adverse environmental conditions which might render the collected materials unmarketable. Any bins or containers which are used for the collection of recyclable paper or cardboard and which are located in an outdoor recycling area shall be equipped with a lid, or otherwise covered, so as to keep the paper or cardboard dry.

    (d)  Signs clearly identifying the recycling area and the materials accepted therein shall be posted adjacent to all points of access to the recycling area. Individual bins or containers shall be equipped with signs indicating the materials to be placed therein.

    (e)  Landscaping and/or fencing shall be provided around any outdoor recycling area and shall be developed in an aesthetically pleasing manner.

C.  The Planning Board or the Board of Adjustment, with respect to an application for site plan approval submitted or to be submitted to it:

    (1)  May waive the requirements for submission of any of the above information, if it determines that such information is not necessary for proper review, evaluation, and action respecting such requested approval; or

    (2)  May require the submission of such additional information as it deems necessary for its proper review, evaluation and action respecting such requested approval.

# § 250-36. Approval standards.

A.  In acting upon an application for site plan approval, the Planning Board and Board of Adjustment shall consider and apply the standards set out in Subsection **B** below, all of which shall be construed and applied consistent with the overall objectives of this article, which is to insure and protect the public health, safety, security and general welfare, the comfort and convenience of residents and owners and occupiers of land in the City of Englewood, and the region in general, and residents of the immediate neighborhood in particular, and may require such changes in, or attach such conditions to approval of, any plan submitted as will, in its judgement, assure compliance with such standards and such overall intent and purpose.

B.

Before approving an application for site plan approval, the Planning Board or Board of Adjustment shall satisfy itself that the plan conforms with the following standards:

(1)  Access. All proposed traffic accessways to all parking spaces are adequate in width, grade, alignment and visibility, are not located too near street corners, other driveways, adjacent properties, schools or other places of public assembly, and do not present any traffic or safety hazard.

(2)  Circulation. The interior circulation system is adequate to provide safe accessibility to all required off-street parking, is adequate for fire apparatus and police vehicles, and provides for safe and adequate circulation of pedestrians and vehicles within the property.

(3)  Design review. There is a harmonious relationship between the development of contiguous land and adjacent neighborhoods, there is a harmonious location of principal and accessory buildings in relation to the site and in relation to one another, and the design and appearance of residential development is in accordance with applicable City ordinances.

(4)  Drainage. Provision has been made for the safe and adequate drainage of surface runoff waters in and from the premises so that flooding and erosion of the property and the property of others will be prevented, and drainage facilities have been designed on the basis of a ten-year storm, using a one-hour intensity of two inches, unless otherwise provided by the Planning Board.

(5)  Environmental review. Provision has been made for environmental review to minimize the adverse impact of air pollution, noise, water pollution, and other similar factors that may be generated by the proposed development.

(6)  Flooding. Provision has been made for the regulation of land in flood-prone areas.

(7)  Garbage and refuse. Provision has been made for the indoor or enclosed storage of garbage and refuse.

(8)  Illumination. The lighting of the building, the property and all signs on the property are such as not to produce any glare at the exterior lot lines of the premises, with the height of any lighting source within property used for residential purposes not in excess of 14 feet and the height of any lighting source within property used for commercial, industrial, or public facility purposes not in excess of 18 feet. Traffic circulation patterns are such as to eliminate, to the extent possible, any glare from the lights of automobiles onto adjacent property.

(9)  Improvements. Drainage, sewer lines, retaining walls, culverts and other capital improvements are adequate, measured by generally accepted engineering and construction design standards, and comply with all applicable codes, ordinances, regulations, and statutes, and all required improvements on the site plan are to be completed prior to final approval, or subsequent to approval after posting of adequate bonding.

(10) Landscaping and screening. All playground, parking and service areas are reasonably screened, at all seasons of the year, from the view of adjacent residential lots and streets or from those most likely to be exposed to the property, and the general landscaping of the site is in character with that generally prevailing in the neighborhood.

(11) Loading spaces. Each loading space conforms to the design requirements of Part **4**, Zoning, of this chapter as nearly as may be practicable and is located in such position as to cause the least hindrance to internal circulation of traffic and the least noise and aesthetic disturbance to the public and neighboring property owners, and no loading space is located in a position in which any vehicle using the space will block the free passage of pedestrians or vehicles.

(12) Master Plan. The site plan conforms to the objectives of the Master Plan of the City of Englewood as nearly as may be practicable.

(13) Open space. Provision has been made for required open spaces as set forth in Part **4**, Zoning, of this chapter.

(14) Parking. Proposed parking areas have been located in areas designated by the Planning Board or Board of Adjustment as the most appropriate locations on the site, or, if permitted by Part **4**, Zoning, of this chapter, off the site, in view of the size and topography of the property, considerations of safety and aesthetics, the requirement of adequate buffering, and the elimination of glare, dust and noise caused by traffic.

(15) Paving and curbs. Paving is of such material as shall be approved by the City Engineer as adequate for the intended use, and curbs are to be of concrete, adequate in size and location to direct surface water runoff away from neighboring properties and toward approved drainage systems.

(16) Preservation of natural resources. Natural resources are preserved, to the extent possible.

(17) Road improvements. Improvements to public streets or additional rights-of-way, if necessitated by the use for which site plan approval is sought, are provided, with such improvements to be in accordance with standards and specifications set forth in applicable ordinances of the City of Englewood.

(18) Retaining walls. Retaining walls have been designed to be safe and adequate for the purpose intended.

(19) Security. Provision has been made, to the extent possible, for the adequate security of persons who are employed, are residents of or visitors to the site, which provisions shall include adequate lighting in public open spaces and other improvements as are deemed necessary by the City's public safety agencies to minimize criminal activity.

(20) Sewage disposal. Provision has been made in accordance with applicable regulations of all government agencies and bodies having jurisdiction over the collection and disposal of sewage.

(21) Sidewalks. Sidewalks have been provided where needed to protect the safety of pedestrians.

(22) Soils. Provision has been made for the protection and conservation of soil from erosion by wind or water or from excavation or grading.

(23)

Storage. Outside storage is provided only in areas approved by the Board, if any, and such areas are, as nearly as may be practicable, shielded from public view and protected by adequate fencing or screening.

(24) Trees. No trees over 24 inches in circumference, measured three feet zero inches above grade, and no trees of unique value have been removed in contemplation of the application, and no trees are to be removed except the following:

(a) Trees located in the area of a proposed building, to a distance of 15 feet from exterior walls or eaves of porches.

(b) Trees located in areas designated for the installation of site structures, such as walks, parking areas, driveways, swimming pools, courts for games and sports and other related structures, where no alternative locations are feasible for such structures.

(c) Trees proposed to be removed to create an improved grading and landscape plan, which shall include trees in areas subject to grade changes affecting the life or safety of the tree, all of which are to be indicated on grading or site development plans submitted in conjunction with the site plan application.

(d) Diseased and dead trees, provided that no tree shall be girdled or poisoned in order to avoid compliance with these provisions.

(e) Trees that constitute hazards to safety, sanitation, and the general welfare.

C. Notwithstanding the provisions hereinabove set forth, there is herein incorporated by reference the New Jersey Residential Site Improvement Standards, appearing as N.J.A.C. 5:21-1.1 et seq., together with any amendments thereto, which shall govern any site improvements carried out or intended to be carried out or required to be carried out in connection with any application for residential subdivision, site plan approval or variance before any municipal agency created pursuant to the Municipal Land Use Law (N.J.S.A. 40:55D-1 et seq.) or in connection with any other residential development approval required or issued by the City of Englewood; provided, however, that such regulations shall not supersede any provision of Part **4**, Zoning, of this chapter. [Added 8-19-1997 by Ord. No. 97-25]

# § 250-37. Environmental impact statement.

A. A draft environmental impact statement (EIS) shall be required for preliminary site plan approval for any development which exceeds any of the following:

(1) Residential use: developments of 100 dwelling units or more.

(2) Nonresidential: buildings or structures with a gross aggregate floor area of 40,000 square feet.

B. The administrative officer shall determine if the draft EIS is complete. An incomplete EIS shall mean an incomplete application for preliminary site plan approval.

C. The draft EIS format shall be developed by the Planning Board and Board of Adjustment and shall include the following:

(1) A description of the proposed project.

(2) A description of the environment prior to the implementation of this project.

(3) The projected environmental impact of the project during the construction phase, throughout the life of the project and beyond. The long-range impact, i.e., beyond the life of the project, includes the effect of the proposal upon the character of the neighborhood, community and region and their populations. Irreversible or permanent affects will also be identified, which include the loss of natural resources or major changes in land use patterns.

(4) Recommended procedures, if any, to mitigate the environmental impacts for each time phase in Subsection **C(3)** above.

# § 250-38. Additional regulations for planned developments.

In addition to the requirements set forth elsewhere in this article, planned developments authorized pursuant to any provision of this chapter shall be required to obtain site plan approval with respect to any such development in accordance with the following additional regulations:

A. General development plan. With respect to any planned development authorized pursuant to any provision of this chapter of the Code of the City of Englewood, the Planning Board is hereby authorized to grant general development plan approval with respect thereto, which shall set forth, where applicable, the information required pursuant to N.J.S.A. 40:55D-45.1 and which may include, where applicable or when required by ordinance, the information specified in N.J.S.A. 40:55D-45.2.

B. Open space. With respect to any provision of this chapter requiring the set-aside of common open space in connection with a planned unit development, planned unit residential development or residential cluster, the developer shall provide for an organization for the ownership and maintenance of any open space for the benefit of owners or residents of the development, if said open space is not dedicated to the City of Englewood or other governmental agency, in accordance with the provisions of N.J.S.A. 40:55D-43.

C. Findings. Prior to approval of a planned development under this article, the Planning Board shall find the following facts and conclusions:

(1) That departures by the proposed development from zoning regulations otherwise applicable to the subject property conform to the standards established for the zoning districts in Part **4**, Zoning, of this chapter.

(2) That the proposals for maintenance and conservation of the common open space are reliable, and the amount, location and purpose of the common open space are adequate, to the extent that Part **4**, Zoning, of this chapter requires such common open space.

(3) That provisions, through the physical design of the proposed development, for public services, control over vehicular and pedestrian traffic, and the amenities of light and air, recreation and visual enjoyment are adequate.

(4)

That the proposed planned development will not have an unreasonably adverse impact upon the area in which it is proposed to be established.

 (5) In the case of a proposed development which contemplates construction over a period of years, that the terms and conditions intended to protect the interests of the public and of the residents, occupants and owners of the proposed development in the total completion of the development are adequate.

D. Where provisions are made for the construction of a development over a period of years, the Planning Board or the Board of Adjustment shall provide for the protection of the interests of the public and of the residents, occupants and owners of the proposed development until the total completion of the development.

E. Notwithstanding the contiguous acreage requirements set forth in Part **4**, Zoning, of this chapter for a planned development, the Planning Board may permit the establishment of individual lots of less than the minimum contiguous acreage required, provided that such individual lots meet the minimum lot requirements, that all land lying within the area to be developed for the planned development, including any such individual lots, shall form a part and be subject to one overall site plan covering the entire tract, that such site plan shall be reviewed and approved by the Planning Board, and that any such separately owned or subdivided lots or parcels of land shall be subject to and covered by the aforesaid comprehensive site plan covering the entire tract, whether pursuant to an agreement binding on the owners of all such separate lots or parcels, as well as their successors in title, which shall be approved by the Attorney for the Planning Board so as to assure that no part of the overall tract shall be developed in any manner except as a part of the comprehensive site plan.

F. The Planning Board is empowered to require performance and maintenance guarantees in the amounts and for the purposes and duration set forth in the Municipal Land Use Law (N.J.S.A. 40:55D-1 et seq.) to assure the installation and maintenance of landscaping, recreational facilities, common areas, and other on-site or necessary improvements.

G. Prior to the issuance of any site plan approval for a planned development, the Planning Board shall require a developer to enter into a developer's agreement, between the developer, the municipal agency, and the City of Englewood, which shall be binding on the developer and all successors in title and which shall detail the development, location, and time of site improvements and the responsibilities for and method of maintaining, repairing, and replacing the same, and any required performance guarantees, together with such other items required in connection with site plan approval, which developer's agreement shall be subject to the approval by the governing body.

H. Parking structures. Parking structures shall be designed in such a manner as to be consistent and complement the streetscape. They are to be designed with the following considerations:
[Added 7-16-2002 by Ord. No. 02-12]

 (1) All exposed facades are to have facades similar to the residential or office buildings nearest the parking structure.

 (2) Where parking structures are adjacent to residential structures, aesthetics, noise, light and facade treatment are to be considered by the Planning Board in determining the acceptability of the design.

(3) Driveway access to the parking structures that front a street shall be limited in number to the fullest extent possible.

(4) A planting strip, fully planted with shrubs and trees, shall be designed along all parking facilities fronting streets (either public or private streets).

(5) Vehicles shall be shielded or screened from view at grade level. Shielding may be provided by the building design, landscaping or fences and walls within the planned development.

I.  Circulation plan. The planned development shall create a streetscape for pedestrian and vehicular circulation that is pedestrian-friendly and provides:
[Added 7-16-2002 by Ord. No. 02-12]

(1) Pedestrian access throughout the development and particularly, with respect to any planned development south of Route No. 4, along the Overpeck Creek.

(2) Pedestrian access to and from all primary roadways immediately outside of the development.

(3) Pedestrian access to public transportation.

(4) Vehicular access to and from all public spaces and particularly, with respect to any planned development south of Route No. 4, along Overpeck Creek.

(5) Adequate public parking for visitors to public spaces.

J.  Sight lines. The overall plan shall provide unobstructed sight lines, to the fullest extent possible, for pedestrians and for occupants of the residential spaces. With respect to any planned development south of Route No. 4, these sight lines shall be for viewing Overpeck Creek and the Bergen County Golf Course directly to the west of the overlay zone. High-rise commercial structures shall be located such that residential sight lines to the west shall not be obscured. Pedestrian access to Overpeck Creek from the interior of the development site shall not be overly encumbered.
[Added 7-16-2002 by Ord. No. 02-12]

# § 250-39. Steep sloped areas.

[Added 4-17-2001 by Ord. No. 01-02]

A.  Purpose. The purpose of regulating steep sloped areas in the City of Englewood is to prevent, or reduce, the problems resulting from the development of such steep sloped areas, including, but not limited to, the following: increased soil erosion and stormwater runoff; loss of existing vegetation which stabilize the soils on steep sloped areas; increased costs for development, maintenance, and remediation of problems; blasting of bedrock; removal of topsoil and other soil; and degradation to the visual aesthetics of ridges and hillsides.

B.  Specific regulations.

(1) Development, including stripping of vegetation, grading, or other soil disturbances, through the City of Englewood shall occur only on those portions of a lot or tract

outside the steep sloped area, except as otherwise specifically permitted by ordinance, and except further as follows:

(a) No area with topographic slopes 25% or greater in grade shall be disturbed or developed.

(b) No area with topographic slopes from 15% to 25% may be disturbed or developed without the applicant submitting sufficient evidence to prove the following:

[1] Soil erosion, land disturbance, and other environmental concerns have been adequately addressed by the applicant.

[2] The performance standards in Subsection **C** herein below have been satisfied.

[3] The applicant has submitted grading, drainage, and landscaping plans for the entire lot or tract of land to be developed, each in accordance with the requirements specified in Subsection **D** herein below, which plans confirm conformance with the aforementioned performance standards and which further confirm that the rate and velocity of the surface water runoff from the entire site which will result following completion of the proposed development shall not exceed that which currently exists in the predevelopment conditions. Certification by a professional engineer will be required stating that the standards contained herein have been met.

(2) An applicant may seek relief from these requirements by variance granted by the Planning Board or by the Zoning Board of Adjustment, as the case may be.

C. Performance standards. The City Engineer, when reviewing an application to disturb slopes from 15% to 25% or when reviewing an application for variance relief from the requirements of this chapter, shall submit a report to the Planning Board or Board of Adjustment for each application. The Planning Board or Board of Adjustment shall be guided by, but not limited to, the following performance standards:

(1) The applicant shall demonstrate that the disturbance of the steep sloped area is necessary for the proposed development of the subject tract or lot and that such development is otherwise in accordance with the applicable ordinance provisions of the City of Englewood.

(2) The applicant shall demonstrate that the proposed development has utilized the noncritical areas of the tract to the extent reasonably practicable and that an attempt has been made to minimize the disturbance of the steep sloped areas by limiting development to either isolated areas of steep slopes and/or to those slopes with relatively less of a steep grade.

(3) The applicant shall demonstrate that appropriate revegetation and landscaping of the disturbed steep sloped areas has been provided to adequately stabilize the slopes and enhance the attractiveness of the site, all in accordance with accepted soil conservation and stormwater management techniques as promulgated by the Bergen County Soil Conservation District and the City Engineer.

(4) The applicant shall demonstrate that the proposed disturbance of the steep sloped area minimizes the impairment of the visual quality of the site and protects the

higher elevations along hillsides, ridges, and mountain tops which create visual amenities.

(5) The applicant also shall demonstrate that:

    (a) The geologic disturbance, including blasting, cutting, or excavating, resulting from the development of any steep sloped area will be satisfactorily mitigated; and

    (b) The cost of providing and maintaining public facilities and services to those areas where critical steep sloped areas may be disturbed will not be substantially increased as a result of such disturbance.

D. Submission of grading, drainage, and landscaping plans for steep sloped areas. Any applicant proposing to disturb topographic slopes equal to or exceeding a fifteen-percent grade in the City of Englewood shall submit the following information to the City Engineer and to the Planning Board or the Zoning Board of Adjustment, as the case may be, and all submitted plans, details, and calculations shall be prepared, signed, and sealed by a New Jersey licensed professional engineer:

(1) A steep slope analysis, including the following and utilizing the best available topographical information, provided that the City Engineer may require additional information, including, but not limited to, an on-site topographic survey utilizing a two-foot contour interval or spot elevations on the site to document steep sloped areas. Areas designated as steep sloped areas shall be shaded and the area calculated.

(2) The grading plan, which shall be prepared at a minimum scale of one inch equals 20 feet, including the following information in addition to all other applicable requirements of this chapter:

    (a) Plans showing the location of, and details for, all drainage devices, retaining walls, cribbing, dams, or other protective devices to be constructed, and any existing or proposed swales, ditches, brooks, or other drainage patterns;

    (b) Plans, profiles, cross sections, and details of all retaining walls showing the height of each wall, the elevation at the top and bottom of each wall, the materials to be used, a profile and cross section of each wall, any proposed plantings, any safety barriers, the calculations of anticipated earth and hydrostatic pressures and surcharges, and the calculations detailing the design of each wall; and

    (c) The limits of clearing and disturbance, which shall be held to be the maximum permitted on the site.

(3) Drainage plans and supporting computations for any storm drainage system, including the following information as may be required by the City Engineer:

    (a) All existing or proposed storm sewer lines within or adjacent to the tract, showing the profile, size, and slope of the lines, the direction of flow, and the location of each catch basin, inlet, manhole, culvert, headwall, and utility line, including pipe sizes and grades.

    (b) A map drawn to scale (minimum scale of one inch equals 100 feet) showing the contributing area to each inlet or cross-drain.

     (c)  The weighted runoff coefficient for each drainage area that was utilized in the submitted computations and a report by the design engineer containing the design criteria used, the alternatives considered, the reasons for the final selections and the design calculations.

  (4)  Landscaping plans, indicating the following information:

     (a)  The proposed limits of disturbance of the subject site.

     (b)  All existing and proposed vegetation within the area to be disturbed.

     (c)  A specific identification, with the area to be disturbed, of all individual trees or groups of trees which have a caliper of eight inches or more measured three inches above the ground level, with an indication of which trees are to be removed.

# § 250-40. Developmental impact statement.

[Added 4-17-2001 by Ord. No. 01-06]

A.  Applicability. A developmental impact statement (DIS) shall be required for preliminary site plan approval for any development which exceeds any of the following:

  (1)  Residential use: developments of 100 dwelling units or more.

  (2)  Nonresidential buildings or structures with a gross aggregate floor area of 40,000 square feet.

  (3)  Planned developments.

B.  Contents. A DIS shall include the following:

  (1)  A general land use plan, including the tract area, general locations of the land uses to be included, the total number of dwelling units, the amount of nonresidential floor area to be provided, the proposed land area to be devoted to residential and nonresidential uses, the proposed types of residential and nonresidential uses, the land area to be occupied by each proposed type of use, the density and intensity of use of the entire development, a residential density for each type of residential use and a nonresidential floor area ratio for each type of nonresidential use.

  (2)  A traffic study, including the general location and types of transportation facilities, including facilities for pedestrian access within the proposed development, any proposed improvements to the existing transportation system outside the proposed development, the number of vehicles anticipated to ingress and egress the site on a daily basis and during peak hours, the impact on local, county, and state roadways in the vicinity of the proposed development and the parking impact.

  (3)  The impact of the proposed development upon the operation and maintenance of parks and recreational lands.

  (4)  A utility impact, including stormwater, sewerage, water, electricity, gas, and solid waste disposal.

  (5)

The impact on public services, including police, fire protection, schools, libraries, hospitals, and ambulance service.

(6) A fiscal report describing the anticipated demand on municipal services to be generated by the proposed development and any other financial impacts to be faced by the municipality or school district as a result of the completion of the proposed development, including a detailed projection of property tax revenues which will accrue to the county, municipality, and school district, the current assessment of the site of the proposed development, the anticipated value of the land and improvements upon completion of the proposed development, the impact on the municipal budget and a cost-revenue analysis.

(7) The population impact.

(8) An assessment of the number of jobs to be generated or lost by the proposed development, including a description of the jobs either generated or lost, and whether the jobs generated are short term or long term in nature.

(9) An assessment of the proposed development's impact on entrepreneurial activity within the City of Englewood, including the number and types of businesses lost, the number and types of new anticipated businesses and the impact of existing businesses within the City of Englewood.

(10) Such additional impact information as may be required by the Planning Board or Board of Adjustment in consideration of an application for development.

C.   Completeness. The administrative officer shall determine if the DIS is complete. An incomplete DIS shall mean the application for preliminary site plan approval is incomplete pursuant to the Municipal Land Use Act (N.J.S.A. 40:55D-1 et seq.).

D.   Waiver. The Planning Board or Board of Adjustment, where applicable, may waive the requirements for submission of any of the above information, if it determines that such information is not necessary for proper review, evaluation, and action respecting the proposed development.

E.   Exclusion. Application for development under a redevelopment plan which is designated as a municipal project pursuant to Article **XIX** of this chapter shall be exempted from the requirements under this section.

# Article VII. Subdivision

## § 250-41. Purpose.

The purpose of this article shall be to provide rules, regulations and standards to guide land subdivision in the City of Englewood in order to promote the public health, safety, convenience and general welfare of the municipality. It shall be administered to insure the orderly growth and development, the conservation, protection and proper use of land and adequate provision for circulation, utilities and services.

[1]   *Editor's Note: Original Section 1, Title, of Article 7, Subdivision, which immediately preceded this section, was repealed at time of adoption of Code (see Ch. **1**, General Provisions, Art. **I**). See now § **250-1**.*

## § 250-42. Approval provisions.

The approval provisions of this article shall be administered by the City of Englewood Planning Board or by the Board of Adjustment whenever the Board of Adjustment has jurisdiction over a subdivision. Approval shall be by resolution of the Board as a condition for filing of such plats with the County Recording Officer.

## § 250-43. Definitions.

As used in this article, the following terms shall have the meanings indicated:

**MAJOR SUBDIVISION**
Any subdivision not classified as a minor subdivision. All other definitions shall be in accordance with N.J.S.A. 40:55D-3, 40:55D-4, 40:55D-5, 40:55D-6 and 40:55D-7.

**MINOR SUBDIVISION**
A subdivision of land for the creation of not more than three lots, provided that such subdivision does not involve a planned development, any new street or the extension of any off-tract improvement, the cost of which is to be prorated pursuant to N.J.S.A. 40:55D-42, or any amendment thereto.

**SUBDIVISION**

A.  The division of a lot, tract or parcel of land into two or more lots, tracts, parcels or other divisions of land for sale or development. The following shall not be considered subdivisions within the meaning of this article if no new streets are created:

(1)  Divisions of land found by the Planning Board or subdivision committee thereof appointed by the Chairman to be for agricultural purposes where all resulting parcels are five acres or larger in size;

(2)  Divisions of property by testamentary or intestate provisions;

(3)  Divisions of property upon court order, including but not limited to judgments of foreclosure;

(4)  Consolidation of existing lots by deed or other recorded instrument; and

(5)  The conveyance of one or more adjoining lots, tracts or parcels of land owned by the same person or persons and all of which are found and certified by the administrative officer to conform to the requirements of the municipal development regulations and are shown and designated as separate lots, tracts or parcels on the Tax Map or Atlas of the municipality.

B.  The term "subdivision" shall also include the term "resubdivision."

## § 250-44. Application requirements.

A.  An application for subdivision approval shall be made on forms provided by the Board Secretary.

B. The subdivision plat shall be prepared by a New Jersey licensed land surveyor and shall include the following items of information:

   (1) Title block, containing:

      (a) Name of project.

      (b) Name and addresses of owners or corporate officers.

      (c) Tax Assessment Map designation, by block and lot.

      (d) Street address.

      (e) Names, addresses, telephone numbers, seals, and signatures of the surveyors, date of survey and revisions.

      (f) Scale, one inch equals 20 feet or one inch equals 10 feet, or as directed by the City Planner or City Engineer.

   (2) Graphic presentation of:

      (a) North arrow indication.

      (b) Lot lines, with square footage of existing and proposed lots.

      (c) Existing contours at intervals of two feet, or one foot for grades of less than 5%, referenced to a USGS datum, and extending not less than 10 feet beyond the lot lines.

      (d) Geographic features, watercourses, marshes, rock outcrops, cliffs, ponds, wooded areas.

      (e) Location and identification of existing planting over eight inches in diameter.

      (f) Existing easements.

      (g) Location of existing buildings and structures, including walls, fences, culverts, and bridges.

      (h) Location of street center line, edge of pavement, curb openings and curb and gutter openings.

      (i) Location of existing utilities.

      (j) Location and size of existing sanitary lines, including pipe size, grades, and direction of flow.

      (k) Location and size of existing storm drainage, including pipe size, grades, and direction of flow.

      (l) Location of other existing drainage.

      (m) Location of existing waterlines, fire alarm boxes and hydrants.

   (3) Key map (use City Tax Map and City aerial tax photos), containing:

    (a)  Scale, one inch equals 100 feet.

    (b)  North arrow, with same orientation as subdivision plat.

    (c)  Property in question.

    (d)  All properties within 200 feet identified by lot and block number.

    (e)  The zoning districts applicable to those properties.

    (f)  Location of all principal structures on those properties.

    (g)  All watercourses within 200 feet.

    (h)  All drainage within 200 feet, or within 500 feet for lots larger than 50,000 square feet.

    (i)  All driveway intersections with the public streets within 200 inches.

(4)  Tabular presentation of:

    (a)  Names and addresses of all property owners and principal uses of all.

    (b)  Properties within 200 inches, keyed to key map.

C.  Except for minor subdivisions, in which the applicant elects to file a deed in lieu of a file map, the plat shall be in conformity with the provisions of the Map Filing Law (N.J.S.A. 46:23-9.9 et seq.).

D.  The applicant shall submit 24 prints of the subdivision plat, drafted to the specifications listed above and folded separately to a size no larger than 10 inches by 14 inches, with the title block showing.

E.  Concurrently with filing an application with the Englewood Board, a subdivision application shall be filed with the Bergen County Planning Board for either county subdivision approval or a waiver therefrom. Whenever County Planning Board approval is required, the Englewood Board shall condition any approval upon an approval by the County Planning Board.

F.  The Englewood Board Secretary will inform the applicant as to the date, time and place when the application will be on the Board's agenda.

# § 250-45. Classification of subdivisions.

At the time of application, the Board Secretary shall classify the application of either a minor or major subdivision and shall calculate the application fees therefor. The Board may reclassify such application at any time prior to final approval thereof, whereupon the fee shall be adjusted accordingly.

# § 250-46. Minor subdivision procedure.

A.

Upon receipt of a completed application and a satisfactory subdivision plat, the Board will schedule a public hearing for the application.

B.  The applicant shall notify by publication in the official newspaper at least 10 days prior to the date of the public hearing and shall notify by mail at least 10 days prior to the date of the public hearing all owners of real property within 200 feet of the extreme limits of the subdivision in accordance with the procedures established in N.J.S.A. 40:55D-12 or any amendments thereto. Said notice shall state the date, time and place of hearing, a description of the subdivision, which includes an identification of the property proposed for subdivision by street address, if any, and by reference to current lot and block numbers as shown on the current tax duplicate in the Municipal Tax Assessor's office, as well as the new block and lots proposed for subdivision, and that a copy of the subdivision map(s) and other documents filed in connection therewith are available for inspection at the Board's office in the Municipal Building during normal business hours of the City of Englewood. At the hearing, the applicant shall file proof of mailing the notice and also proof of publication thereof.

C.  Upon approval of the subdivision and the adoption of a memorializing resolution, the applicant shall submit the original plat and a duplicate reproducible plat and the original and a copy of a deed for signature by the Board Chairman and Secretary. The duplicates of the signed documents shall be filed with the Englewood Engineering Department.

D.  It is the responsibility of the applicant to file the approved document with the County Recording Officer within the time stipulated in N.J.S.A. 40:55D-47 and to publish notice of the Municipal Board decision.

# § 250-47. Major subdivision procedure.

A.  An application for major subdivision approval shall incorporate the following, as applicable:

(1)  Consistency of the layout or arrangement of the subdivision with the requirements of Part **4**, Zoning, of this chapter.

(2)  Streets in the subdivision of sufficient width and suitable grade and suitably located to accommodate prospective traffic and to provide access for fire-fighting and emergency equipment to buildings and coordinated so as to compose a convenient system consistent with the Official Map, the design elements contained herein, and the circulation element of the Master Plan, and so oriented as to permit, consistent with the reasonable utilization of land, the buildings constructed thereon to maximize solar gain, provided that no street of a width greater than 50 feet within the right-of-way lines shall be required unless said street constitutes an extension of an existing street of the greater width or already has been shown on the Master Plan at the greater width or already has been shown in greater width on the Official Map.

(3)  Adequate water supply, drainage, shade trees, sewerage facilities and other utilities necessary for essential services to residents and occupants.

(4)  Suitable size, shape and location for any area reserved for public use pursuant to N.J.S.A. 40:55D-44 or any amendment thereto.

(5) Reservation, pursuant to N.J.S.A. 40:55D-43 or any amendment thereto, of any open space to be set aside for the use and benefit of the residents of planned development resulting from the application of standards of density or intensity of land used contained in Part **4**, Zoning, of this chapter.

(6) Regulation of land designated as subject to flooding pursuant to N.J.S.A. 40:55D-65e, or any amendment thereto, to avoid danger to life or property.

(7) Protection and conservation of soils from erosion by wind or water or from excavation or grading.

(8) Conformity with standards promulgated by the Commissioner of Transportation pursuant to the "Air Safety and Hazardous Zoning Act of 1983," P.L. 1983, c. 260 (N.J.S.A. 6:1-80 et seq.), for any airport hazard areas delineated under that Act.

(9) Conformity with Chapter **364**, Solid Waste and Recycling.

(10) Provision for off-tract water, sewer, drainage and street improvements which are necessitated by a subdivision, subject to the provisions of N.J.S.A. 40:55D-42 and any amendments thereto.

B. An application for major subdivision approval shall comply with all of the submission requirements of § **250-44** of this chapter, and the document to be filed with the County Recording Officer shall be the subdivision plat prepared in conformity with the provisions of the Map Filing Law (N.J.S.A. 46:23-9.9 et seq.).

C. In addition to the requirements of § **250-44**, the following on-site and on-tract improvements shall be designed by a New Jersey licensed professional engineer:

(1) Streets.

(2) Curbs.

(3) Sidewalks.

(4) Driveway aprons.

(5) Drainage facilities.

(6) Sanitary sewers.

(7) Retaining walls and other site structures.

(8) Location of all proposed utilities.

(9) Grading plan, with existing contours shown as dashed lines and finished contours as solid lines.

(10) Profiles of streets, storm and sanitary sewers.

D. A soil and sediment erosion control plan, including a provision for the stockpiling of topsoil, shall be submitted.

E.

A landscape plan shall also be submitted and shall include a planting schedule, with street shade trees having a minimum caliper of three inches spaced no more than 35 feet apart.

F.  Design standards. The subdivider shall observe the following requirements and principles of land subdivision in the design of each subdivision or portion thereof:

(1)  General. The plat as subdivided shall conform to design standards that will encourage good development patterns within the municipality. Where either or both an Official Map or Master Plan has or have been adopted, the subdivision shall conform to the proposals and conditions shown thereon. The streets, drainage rights-of-way, school sites, public parks and playgrounds shown on an officially adopted Master Plan or Official Map shall be considered in approval of subdivision plats. Where no Master Plan or Official Map exists, streets and drainage rights-of-way shall be shown on the final plat in accordance with N.J.S.A. 40:55D-38 to 40:55D-41 and 40:55D-44 and shall be such as to lend themselves to the harmonious development of the municipality and enhance the public welfare in accordance with the following design standards.[1]

[1]  Editor's Note: Amended at time of adoption of Code (see Ch. 1, General Provisions, Art. I).

(2)  Streets.

(a)  The arrangement of streets not shown on the Master Plan or Official Map shall be such as to provide for the appropriate extension of existing streets.

(b)  Minor streets shall be so designed as to discourage through traffic.

(c)  Subdivisions abutting arterial streets shall provide a marginal service road or reverse frontage with a buffer strip for planting, or some other means of separation of through and local traffic as the Planning Board may determine appropriate.

(d)  The right-of-way width shall be measured from lot line to lot line and shall not be less than the following:

[1]  Arterial streets: 80 feet.

[2]  Collector streets: 60 feet.

[3]  Minor streets: 50 feet.

[4]  Marginal access streets: 40 feet.

[5]  The right-of-way width for internal roads and alleys in multifamily, commercial and industrial development shall be determined on an individual basis and shall in all cases be of sufficient width and design to safely accommodate the maximum traffic, parking and loading needs and maximum access for fire-fighting equipment.

(e)  No subdivision showing reserve strips controlling access to streets shall be approved except where the control and disposal of land comprising such strips has been placed in the governing body under conditions approved by the Planning Board.

(f) Grades of arterial and collector streets shall not exceed 4%. Grades on other streets shall not exceed 10%. No street shall have a minimum grade of less than 1/2 of 1%.

(g) Street intersections shall be as nearly at right angles as is possible and in no case shall be less than 60°. The block corners at intersections shall be rounded at the curbline with a curve having a radius of not less than 20 feet.

(h) Street jogs with center-line offsets of less than 125 feet shall be prohibited.

(i) A tangent at least 100 feet long shall be introduced between reverse curves on arterial and collector streets.

(j) When connecting street lines deflect from each other at any one point by more than 10° and not more than 45°, they shall be connected by a curve with a radius of not less than 100 feet for minor streets and 300 feet for arterial and collector streets.

(k) All changes in grade shall be connected by vertical curve of sufficient radius to provide a smooth transition and proper sight distance.

(l) Dead-end streets (culs-de-sac) shall not be longer than 600 feet and shall provide a turnaround at the end with a radius of not less than 50 feet and tangent whenever possible to the right side of the street. If a dead-end street is of a temporary nature, a similar turnaround shall be provided and provisions made for future extension of the street and reversion of the excess right-of-way to the adjoining properties.

(m) No street shall have a name which will duplicate or so nearly duplicate as to be confused with the names of existing streets. The continuation of an existing street shall have the same name.

(3) Blocks.

(a) Block length and width or acreage within bounding roads shall be such as to accommodate the size of lot required in the area by Part **4**, Zoning, of this chapter and to provide for convenient access, circulation control and safety of street traffic.

(b) In blocks over 1,000 feet long, pedestrian crosswalks may be required in locations deemed necessary by the Planning Board. Such walkway shall be at least 10 feet wide and be straight from street to street.

(c) For commercial, group housing or industrial use, block size shall be sufficient to meet all area and yard requirements for such use.

(4) Lots.

(a) Lot dimensions and area shall not be less than the requirements of Part **4**, Zoning, of this chapter.

(b) Insofar as is practical, side lot lines shall be at right angles to straight streets and radial to curved streets.

(c)

Each lot must front upon an approved street at least 50 feet in width, except lots fronting on streets described in Subsection **F(2)(d)[4]** and **[5]** and Subsection **F(2)(f)** of this section.

(d) Where extra width has been dedicated for widening of existing streets, lots shall begin at such extra width line, and all setbacks shall be measured from such line.

(e) Where there is a question as to the suitability of a lot or lots for their intended use due to factors such as rock formations, flood conditions or similar circumstances, the Planning Board may, after adequate investigation, withhold favorable approval of such lots.

(5) Public use and service areas.

(a) In large-scale developments, easements along rear property lines or elsewhere for utility installation may be required. Such easements shall be at least 15 feet wide and located in consultation with the companies or municipal departments concerned.

(b) Where a subdivision is traversed by a watercourse, drainageway channel or street, there shall be provided a stormwater easement or drainage right-of-way conforming substantially with the lines of such watercourse and such further width or construction, or both, as will be adequate for the purpose.

(c) Natural features such as trees, brooks, hilltops and views shall be preserved whenever possible in designing any subdivision containing such features.

(6) Drainage. Drainage facilities shall be designed to provide for a zero increase in drainage runoff for a one-hundred-year storm event.

(7) Sanitary sewers. Sanitary sewers shall be designed so as to provide for a zero net increase in the City's sanitary sewer flow as a result of the proposed subdivision and the proposed improvements thereon and, to the extent required to carry out the foregoing, shall include off-site or off-tract inflow and/or infiltration improvements.

G. Subdivisions shall comply with the applicable provisions of Part **4**, Zoning, of this chapter, constituting Articles **VIII** through **XVIII** hereof, unless an application is approved for a variance therefrom or unless the Englewood Board, in accordance with encouraging and promoting flexibility, economy and environmental soundness in layout and design, approves the varying of lot areas and dimensions and yards and setbacks otherwise required by Part **4**, Zoning, of this chapter in such a way that the average lot areas and dimensions, yards and setbacks within the subdivision conform to the norms of Part **4**, Zoning, of this chapter, provided that such variations are appropriate to the type of development permitted.

H. There shall be included in any new multifamily housing development containing three or more dwelling units occupied or intended to be occupied by persons living independently of each other an indoor/outdoor recycling area for the collection and storage of residentially generated, source-separated recyclable materials. A plan detail at a scale of one inch equals 10 feet shall be incorporated in the submission for each such station or for a typical station. The dimensions of the recycling area shall be sufficient to accommodate recycling bins or containers which are of adequate size and number and which are consistent with anticipated usage and with current methods of collection in the

area in which the project is located. A separate container or containers shall be provided for each recyclable material specified by ordinance. The dimensions of the recycling area and the bins or containers shall be determined in consultation with the Municipal Recycling Coordinator and shall be consistent with a district recycling plan adopted pursuant to Section 3 of P.L. 1987, c. 102 (N.J.S.A. 13:1E-99.13), any applicable requirements of the Municipal Master Plan, adopted pursuant to Section 26 of P.L. 1987, c. 102, and any applicable requirements of Chapter **364**, Solid Waste and Recycling. In addition, such recycling area shall comply with the following design criteria:
[Added 12-7-1993 by Ord. No. 93-19]

(1)  The recycling area shall be conveniently located with the residential disposal of source-separated recyclable materials preferably near, but clearly separated from, a refuse dumpster.

(2)  The recycling area shall be well lit and shall be safely and easily accessible by recycling personnel and vehicles. Collection vehicles shall be able to access the recycling area without interference from parked cars or other obstacles. Reasonable measures shall be taken to protect the recycling area, and the bins or containers placed therein, against theft of recyclable materials, bins or containers.

(3)  The recycling area or the bins or containers placed therein shall be designed so as to provide protection against adverse environmental conditions which might render the collected materials unmarketable. Any bins or containers which are used for the collection of recyclable paper or cardboard and which are located in an outdoor recycling area shall be equipped with a lid, or otherwise covered, so as to keep the paper or cardboard dry.

(4)  Signs clearly identifying the recycling area and the materials accepted therein shall be posted adjacent to all points of access to the recycling area. Individual bins or containers shall be equipped with signs indicating the materials to be placed therein.

(5)  Landscaping and/or fencing shall be provided around any outdoor recycling area and shall be developed in an aesthetically pleasing manner.

# § 250-48. Preliminary approval of major subdivisions.

Preliminary major subdivision approval shall be in accordance with the procedures of § **250-46A** and **B** and the applicable provisions of N.J.S.A. 40:55D-48 and any amendments thereto.

# § 250-49. Effect of preliminary approval.

A.  If the municipal agency acts favorably on a preliminary plat and adopts a memorializing resolution, a notation to that effect shall be made on the plat, and the chairperson of the municipal agency shall affix his signature to the plat. The plat and a copy of the memorializing resolution shall be returned to the subdivider for compliance with final approval requirements.

B.

Preliminary approval of a major subdivision shall confer upon the applicant, for a three-year period from the date of the preliminary approval, the rights set forth in N.J.S.A. 40:55D-49, except as otherwise provided by Subsection d thereof.

C.   If the applicant elects to make the on-site and on-tract improvements prior to final approval of the major subdivision, he shall first execute a developer's agreement with the Board and the City of Englewood, incorporating the requirements thereof and of a form approved by the City Solicitor.

# § 250-50. Final approval of major subdivisions.

A.   The granting of final subdivision approval shall be in accordance with the provisions of N.J.S.A. 40:55D-50.

B.   The municipal agency shall, after a public meeting following publication and notice as specified in **§ 250-46B**, approve the application for final subdivision approval, with or without conditions, provided that the following requirements are met:

   (1)   Detail drawings and specifications meet all applicable codes and ordinances.

   (2)   The final plat is substantially the same as the approved preliminary subdivision.

   (3)   If not submitted and approved at the time of preliminary approval, prior to the issuance of a building permit or permits, the applicant shall submit to the Board for approval plans for:

      (a)   The entire on-tract grading and landscaping, including all structures associated with these improvements and all buildings proposed to be erected.

      (b)   Elevations and floor plans of all buildings proposed to be erected.

   (4)   All improvements have been installed or bonds posted to ensure the installation of improvements, in an amount determined by the City Engineer.

   (5)   The applicant has a fully executed developer's agreement with the Board and the City of Englewood.

   (6)   Proof has been submitted that all taxes and assessments have been paid.

C.   All improvements shown or required with respect to a subdivision shall be performed in accordance with the approved final major subdivision, provided that the Englewood Board may permit a deviation from the final major subdivision if caused by a change in conditions beyond the control of the developer since the date of final approval and the deviation would not substantially alter the character of the development or substantially impair the intent and purpose of the Master Plan and Part **4**, Zoning, of this chapter.

# § 250-51. Effect of final approval.

Final approval of a major subdivision shall confer upon the applicant the rights set forth in N.J.S.A. 40:55D-52 and any amendments thereto.

## § 250-52. Filing and recording of final approval.

Final approval of major subdivisions shall be filed and recorded in accordance with the provisions of N.J.S.A. 40:55D-54 and any amendments thereto.

# Part 4. Zoning

# Article VIII. General Provisions

## § 250-53. Purposes.

There is hereby established a comprehensive zoning plan for the City of Englewood, New Jersey, which is set forth in the text and map that constitute this Part 4, which is adopted for the purposes stated in the Municipal Land Use Law of the State of New Jersey, and which, for the protection and promotion of the public health, safety and welfare, shall be deemed specifically to include the following purposes, among others:[1]

A.  To encourage and guide the appropriate use or development of all lands in the City, in a manner which will promote the public health, safety, morals and general welfare.

B.  To secure safety from fire, flood, panic, and other man-made and natural disasters.

C.  To provide adequate light, air and open space.

D.  To encourage the appropriate and efficient expenditure of public funds by the coordination of public development with land use policies.

E.  To provide sufficient space in appropriate locations for a variety of residential, commercial and industrial uses and to provide open space respecting such uses, according to their respective environmental requirements.

F.  To promote the free flow of traffic, to provide safe and adequate traffic access to uses generating a large number of vehicles, and to discourage location of such facilities in areas which will result in congestion or blight.

G.  To establish on-site parking standards and requirements to limit street congestion.

H.  To promote a desirable visual environment through creative development techniques and good civic design and arrangements.

I.  To promote the conservation of open space and valuable natural resources and to prevent the degradation of the environment through the improper use of land.

J.  To provide maximum protection from blighting influences for all residential areas.

K.  To accomplish the gradual elimination of nonconforming uses.

L.  To establish requirements for building heights and setbacks to prevent adverse impact on surrounding areas and minimize traffic congestion.

M.  To establish sound land use policies to minimize the danger and effects of potential flooding and land erosion.

[1]   *Editor's Note: Amended at time of adoption of Code (see Ch. 1, General Provisions, Art. I).*

# Article IX. Zoning Districts and Zoning Map

## § 250-54. Establishment of districts.

The City of Englewood is hereby divided into the following districts:

| | |
|---|---|
| One-Family Residence | R-AAA |
| One-Family Residence | R-AA |
| One-Family Residence | R-A |
| One-Family Residence | R-B |
| One-Family Residence | R-C |
| One-Family Residence | R-D |
| One-Family Residence | R-E |
| One- and Two-Family Residence Overlay [Added 5-19-1998 by Ord. No. 98-12] | R-E(2) |
| One-Family Residence [Added 4-9-2013 by Ord. No. 13-04] | R-F |
| Multiple Residence [Amended 5-7-2002 by Ord. No. 02-06] | RMA |
| Multiple Residence | RMB |
| Multiple Residence | RMC |
| Multiple Residence | RMD |
| Multiple Residence | RME |
| Multiple Residence | RMH |
| Multiple Residence [Added 10-14-2003 by Ord. No. 03-14] | RMF |
| Downtown District [Added 11-12-2014 by Ord. No. 14-35] | D-1 |
| Downtown District [Added 11-12-2014 by Ord. No. 14-35] | D-2 |
| Downtown District [Added 5-27-1992 by Ord. No. 92-13; 7-10-1996 by Ord. No. 96-24; 4-9-2013 by Ord. No. 13-04; 12-16-2014 by Ord. No. 14-44] | D-3 |
| Neighborhood Center District [Added 11-12-2014 by Ord. No. 14-39] | N-C |
| Service Business | SBD |
| Light Industrial | L-I |
| Attached Townhouse | ATH |
| Research, Industry and Medical | RIM |

[Added 11-12-2014 by Ord. No. 14-36]

Open Space                                              OS
[Added 7-16-1996 by Ord. No. 96-26]

Work/Live Overlay District                              W-L
[Added 11-12-2014 by Ord. No. 14-38]

Planned Unit Development 1 Overlay                       PUD-1
[Added 7-16-2002 by Ord. No. 02-12]

Downtown Redevelopment Overlay Zone                     DRL
[Added 8-12-2014 by Ord. No. 14-26A]

# § 250-55. Zoning Map.

A.  The boundaries of the said districts are hereby established as shown on the "Zoning
    Map, City of Englewood, New Jersey," dated February 1, 2001, last revised February
    18, 2009, which map accompanies and which, with all explanatory matter thereon, is
    hereby adopted and made a part of this chapter.[1]
    [Amended 4-24-2012 by Ord. No. 12-14]

    (1)  The boundaries of the zoning districts established by the map referred to in this
         section are amended so as to designate the following premises as being in the
         One-Family Residence (R-D) District rather than in the Multiple Residence (RMA)
         District:

         Lots 15, 16 and 17 in Block 704, as shown on the Tax Map of the City of
         Englewood, being premises located on the north side of West Hudson Avenue,
         east of Tenafly Road.

    (2)  The district boundaries established by the aforesaid map are amended so as to
         designate the following described premises as being in the One-Family Residence
         (R-A) District rather than in the One-Family (R-AA) District:

         Lots 14 through 30, that portion of Lot 31 lying easterly of the easterly boundary of
         a conservation easement shown on the Tax Map of the City of Englewood, and
         Lots 32 through 41, all in Block 3501, as shown on the Tax Map of the City of
         Englewood, being premises located west of Summit Street and south of East
         Palisade Avenue.

    (3)  The district boundaries established by the aforesaid map are amended so as to
         designate the following described premises as being in the Central Business
         (CBD-2) District rather than in the Service Business (SBD) District:

         Lots 14 and 15 in Block 2701, as shown on the Tax Map of the City of Englewood,
         located on the southeast corner of Palisade Avenue and Grand Avenue.

    (4)  The district boundaries established by the aforesaid map are amended so as to
         designate the following described premises as being in the Multiple Residence
         (RMB) District rather than in either the Service Business (SBD) District or the One-
         Family Residence (R-E) District:

Lots 3 through 15, inclusive, in Block 2905, as shown on the Tax Map of the City of Englewood, being premises located along Grand Avenue between Forest Avenue and Honeck Street.

(5) The district boundaries established by the aforesaid map are amended so as to designate the following described premises as being in the Multiple Residence (RMA) District rather than in the One-Family Residence (R-A) District:

Lots 28, 29 and 30 in Block 1601 and Lots 3, 4 and 5 in Block 2702, as shown on the Tax Map of the City of Englewood, being premises located along Palisade Avenue.

(6) The district boundaries established by the aforesaid map are amended so as to designate the following described premises as being in the Office Industrial (OI) District rather than the Light Industrial (LI) District:

All of Blocks 2509, 2515, 2517, 2518, 2602 and 2603, as shown on the Tax Map of the City of Englewood.

(7) The district boundaries established by the aforesaid map are hereby amended so as to designate the following described premises as being in the Light Industrial (LI) District rather than the One-Family Residence (R-E) District:

Lots 11.1 and 11.2 in Block 2501, as shown on the Tax Map of the City of Englewood, being premises located on the northeast corner of William Street and Columbus Avenue.

(8) The district boundaries established by the aforesaid map are amended so as to designate the following described premises as being in the Multiple Residence (RMD) District rather than the One-Family Residence (R-E) District:

Lots 1 and 2.2 in Block 2205; Lots 4 through 13 in Block 2103; and Lots 6 through 21 in Block 2104, all as shown on the Tax Map of the City of Englewood.

(9) The district boundaries established by the aforesaid map are amended so as to designate the following described premises as being in the Light Industrial (LI) District rather than the One-Family Residential (R-E) District:

Lot 32 in Block 2802, as shown on the Tax Map of the City of Englewood.

(10) The district boundaries established by the aforesaid map are amended so as to designate the following described premises as being in the One-Family Residence (R-E) District rather than the Service Business (SBD) District:

Lots 1 and 54 in Block 3007.

(11) The district boundaries established by the aforesaid map are amended so as to designate the following described premises as being in the Multiple Residence (RMA) District rather than the Service Business (SBD) District:

Lot 9 in Block 3005; Lots 8.1 and 9 in Block 2701.

(12) The district boundaries established by the aforesaid map are amended so as to designate the following described premises as being in the One-Family Residence (R-D) District rather than the Service Business (SBD) District:

Lot 1 in Block 2911.

(13) The district boundaries established by the aforesaid map are amended so as to designate the following described premises as being in the One-Family Residence (R-D) District rather than the Multiple Residence (RMB) District:

Lots 2 and 3 in Block 2707; Lots 1 and 25 in Block 2705.

(14) The district boundaries established by the aforesaid map are amended so as to designate the following described premises as being in the One-Family Residence (R-B) District rather than the Multiple Residence (RMB) District:

Lot 16 in Block 2707.

(15) The district boundaries established by the aforesaid map are amended so as to designate the following described premises as being in the One-Family Residence (R-E) District rather than in the Multiple Residence (RMB) District:

Lot 1 in Block 1103.

(16) The district boundaries established by the aforesaid map are amended so as to designate the following described premises as being in the One-Family Residence (R-C) District rather than in the Multiple Residence (RMB) District:

Lots 1, 20, and 21 in Block 1102.

(17) The district boundaries established by the aforesaid map are amended so as to designate the following described premises as being in the Multiple Residence (RME) District rather than the One-Family Residence (R-D) District:

Lot 13 in Block 2911.

(18) The district boundaries established by the aforesaid map are amended so as to designate a portion of Lot 1.01 in Block 2220, as more particularly described, as being in the Light Industrial (LI) District rather than in the One-Family Residence (R-E) District:

Beginning at a point in the westerly sideline of Harold Avenue a distance of 403.48 feet north of the point of curve on the westerly sideline of Harold Avenue leading into the northerly sideline of Tietjen Avenue having a radius of 25.00 feet and running

1. North 55 degrees 33' 05" West, a distance of 100.00 feet to a point, thence

2. North 34 degrees 26' 55" East a distance of 65.00 feet to the southerly sideline of Thomson Avenue (vacated), thence

3. South 55 degrees 33' 05" East along the southerly sideline of Thomson Avenue (vacated) a distance of 100.00 feet to the intersection of Harold Avenue, thence

4. South 34 degrees 26' 55" West along the westerly sideline of Harold Avenue a distance of 65.00 feet to the point or place of beginning.

(19) The boundaries of the zoning districts established by the map entitled "Zoning Map, City of Englewood, New Jersey," dated January 16, 1979, and revised through December 1986, are amended so as to designate the premises described as being in the CBD-3 District rather than either in the CBD-1 or CBD-2 Districts:

Beginning at the monument 4.00 feet easterly of the intersection of the southerly side of Tallman Place and the westerly side of West Street turning N 56° 43' 54" W 4.00 feet to a point of BEGINNING; hence 56° 43' 54" E 60.21 feet; hence S 61° 34' 17" E 123.53 feet; hence S 28° 25' 43" W 105.52 feet; hence S 58° 5' 12" E 102.97 feet; hence S 27° 0' 18" W 248.18 feet; hence N 52° 56' 13" W 102.15 feet; hence S 26° 50' 10" W 116.69 feet; hence N 51° 52' 17" W 92.77 feet; hence S 38° 8' 33" W 104.48 feet; hence S 52° 4' 17" E 49.30 feet; hence N 23° 26' 43" E 25.00 feet; hence S 51° 52' 17" E 45.20 feet; hence S 37° 15' 33" W 49.08 feet; hence S 51° 52' 17" E 50.00 feet; hence S 34° 43' 27" W 118.21 feet; hence N 51° 52' 17" W 79.90 feet; hence S 38° 11' 52" W 30.64 feet; hence N 51° 35' 37" W 64.63 feet; hence S 28° 25' 43" W 100.00 feet; hence N 52° 4' 17" W 104.90 feet; hence N 37° 55' 43" E 90.00 feet; hence N 52° 4' 17" W 63.92 feet; hence N 37° 55' 43" E 57.92 feet; hence N 52° 4' 17" W 228.91 feet; hence N 36° 3' 41" E 182.01 feet; hence S 53° 10' 55" E 2.20 feet; hence N 37° 5' 40" E 450.84 feet; hence S 58° 6' 17" E 213.98 feet to the point of beginning.

(20) The district boundaries established by the aforesaid map are amended so as to designate the following described premises as being in the One-Family Residence (R-B) District rather than in the One-Family Residence (R-D) District:

All of Block 1001; Lots 1, 2, 3, 17.01, 17.02, 18, 19 and 20 in Block 1003; Lots 2, 3, 4, 5, 6, 7, 8, 9 and 10 in Block 1105; and a portion of Lot 11 in Block 1105, lying east of the line parallel to the easterly sideline of Engle Street, set back a distance of 280 feet, all as shown on the Tax Map of the City of Englewood.

(21) The district boundaries established by the aforesaid map entitled "Zoning Map, City of Englewood, New Jersey," dated January 16, 1979, and revised through September 1986, are amended so as to designate the following described premises as being in the Multiple Residence (RMB) District rather than the One-Family (R-D) District:

Lot 3 in Block 0710.

(22) The district boundaries established by the aforesaid map are amended so as to designate the following described premises as being in the One-Family Residence (R-AA) District rather than in the One-Family Residence (R-A) District:

Lots 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26 and 27 in Block 1301; all of Block 1401; all of Block 1402; all of Block 1404; all of Block 1405; all of Block 1501; all of Block 1502; all of Block 1503; all of Block 1601, excepting therefrom Lot 28, 29, 30 and 31; Lots 4, 5, 6, 7, 8, 9, 10, 11.01, 11.02 and 12 in Block 1102; Lots 3, 4, 5, 6, 7, 8, 9, 10, 11 and 12 in Block 1104; all of Block 1106; all of Block 1107; all of Block 1205; all of Block 1210, excepting therefrom a portion of Lot 11, lying north of a line parallel to the northerly sideline of Palisade Avenue, set back a distance

of 325 feet; and Lots 12, 13, 14, 15, 16, 17, 19.01 and 20; Lots 2, 3, 4, 5, 6, 7, 8, and 9 in Block 3101; all of Block 3201; all of Block 3203; all of Block 3301; and Lot 26 in Block 1406, as shown on the Tax Map of the City of Englewood.

(23) The district boundaries established by the aforesaid map are amended so as to designate the following described premises as being in the One-Family Residence (R-AAA) District rather than in the One-Family Residence (R-AA) District:

All of Blocks 1801, 1808, 1504, 1602, 1901, 1902, 3102, 3103, 3202, 3204, 3205; Lots 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13.01, 8.04 and that portion of Lot 31 lying westerly of the easterly boundary of a conservation easement in Block 3501; and all of Block 3601, all as shown on the Tax Map of the City of Englewood.

(24) The district boundaries established by the aforesaid map are amended so as to designate the following described premises as being in the One-Family (R-AA) District rather than in the One-Family Residence (R-C) District:

Lots 2 and 3 in Block 1102 and Lot 13 in Block 1104, all as shown on the Tax Map of the City of Englewood.

(25) The district boundaries established by the aforesaid map are amended so as to designate the following described premises as being in the Open Space (OS) District:
[Added 7-16-1996 by Ord. No. 96-26]

Lot 1 in Block 305; Lot 9.01 in Block 312; Lot 1 in Block 411; Lot 1 in Block 706; portion of Lot 26 (east of Orchard Street) in Block 801; Lot 6 in Block 805; Lot 1 in Block 1201; Lot 1 in Block 1202; Lot 10.02 in Block 1204; Lot 4.01 in Block 2101; Lot 5.01 in Block 2105; Lot 1.01 in Block 2220; Lot 20 in Block 2309; Lot 17 in Block 2310; Lot 1 in Block 2604; Lot 35.02 in Block 2802; Lot 4 in Block 3012; Lot 1, Block 3403; Lots 1 and 3 in Block 3404; Lots 5.02, 8.04, 13.01, portion of 31 upon which a conservation easement is shown, portion of 9.01 upon which a conservation easement is shown in Block 3501; Lots 5 and 6 in Block 3601; Lot 1 in Block 3705; as shown on the Tax Map of the City of Englewood.

(26) The district boundaries established by the aforesaid map are amended so as to designate the following described premises as being in the R-E(2) One- and Two-Family Residence Overlay Zoning District:
[Added 5-19-1998 by Ord. No. 98-12]

Lot 9 in Block 609, as shown on the Tax Map of the City of Englewood.

(27) The district boundaries established by the aforesaid map are amended so as to designate the following described premises as being within the Retail/Commercial/Residential (RCR) Overlay Zoning District:
[Added 8-3-1999 by Ord. No. 99-17]

Lots 17 and 18 in Block 0610, as shown on the Tax Map of the City of Englewood.

(28) The district boundaries established by the aforesaid map are amended so as to designate the following described premises as being within the Planned Unit Development 1 (PUD-1) Overlay District:

[Added 7-16-2002 by Ord. No. 02-12]

Lot 3.02 in Block 2517; Lot 1 in Block 2518; Lots 1, 2, 3, 4, 5, 10, 11.01, 12.01, 12.02, 13.01 in Block 2602; Lots 2, 3, 4 in Block 2603, all as shown on the Tax Map of the City of Englewood.

(29) The district boundaries established by the aforesaid map are amended so as to designate the following premises as being within the Mixed-Use Residential/Retail (MURR) Overlay Zoning District:
[Added 11-27-2001 by Ord. No. 01-18]

Block 2401 (entire), as shown on the Tax Map of the City of Englewood.

(30) The district boundaries established by the aforesaid map are amended so as to designate the following premises as being within the Multiple Residence (RMA) Zoning District:
[Added 5-7-2002 by Ord. No. 02-06]

Block 2702, part Lot 1 and part Lot 2.

Beginning at a point on the southwesterly line of East Palisade Avenue (AKA Palisades Avenue, Bergen County, Routes 66 and 505, 100 foot wide right-of-way), said point being distant south 46 degrees - 01 minute - 55 seconds east, a distance of 471.85 feet from where said southwesterly line is intersected by the southwesterly line of Dwight Place (60 foot wide right-of-way), and from said point of beginning running thence; Along the southwesterly line of East Palisade Avenue, south 46 degrees - 01 minute - 55 seconds east, a distance of 246.43 feet to a point, thence; along the dividing line between Lot 2 and Lot 3 (N/F lands of Sutton Place, a condominium by MFM Realty). Block 2702, the following three courses; South 29 degrees - 57 minutes - 00 seconds west, a distance of 191.81 feet to a point, thence; South 39 degrees - 14 minutes - 00 seconds west, a distance of 103.50 feet to a point, thence; North 40 degrees - 52 minutes - 04 seconds west, a distance of 0.65 feet to a point; thence; Along the dividing line between lot 1 and aforementioned lot 3, block 2702, south 32 degrees - 12 minutes - 25 seconds west. A distance of 168.6 feet to a point, thence; Along the dividing line between lot 1 and lot 6 (N/F lands of Carmencity C. Santos), block 2702, north 44 degrees - 55 minutes - 35 seconds west, a distance of 15.94 feet to a point, thence; Continuing along same, south 21 degrees- 16 minutes - 00 seconds west, a distance of 4.12 feet to a point, thence along the dividing line between lot 1 and lot 14 (N/F lands of 45 Dwight Place, a condominium by 45 Dwight Place Corporation), block 2702, the following 5 courses;

North 44 degrees - 56 minutes - 10 seconds west, a distance of 164.70 feet to a point, thence; North 45 degrees - 26 minutes - 25 seconds west, a distance of 65.90 feet to a point, thence; North 44 degrees - 33 minutes - 35 seconds east, a distance of 30.00 feet to a point, thence; North 45 degrees - 26 minutes - 25 seconds west, a distance of 57.74 feet to an iron pipe found, thence; South 30 degrees - 05 minutes - 35 seconds west, to a distance of 30.90 feet to a point, thence; North 45 degrees - 26 minutes - 23 seconds west, a distance of 112 feet to a point, thence; along a proposed lint through lot 1, block 2702, the following 3 courses; North 44 degrees - 24 minutes - 13 seconds east, a distance of 85.24 feet to a point, thence; North 72 degrees - 08 minutes - 68 seconds east, a distance of 150.57 feet to a point, thence; North 43 degrees - 58 minutes - 05

seconds east, a distance of 234.38 feet to the point and place of beginning. Containing 142,789 square feet or 3.278 acres.

(31) The district boundaries established by the aforesaid map are amended so as to designate the following described premises as being within the Multiple Residence (RMF) District:
[Added 10-14-2003 by Ord. No. 03-14]

Block 2601, Lots 1 and 2.

(32) The district boundaries established by the aforesaid map are amended so as to designate the following described premises as being with the South Dean Street (SDS) Retail Zoning District:
[Added 11-12-2003 by Ord. No. 03-13]

Block 2403, Lots 7 and 8.

(33) The district boundaries established by the aforesaid map are amended so as to designate the following described premises as being within the Central Business (CBD-1) Zoning District:
[Added 6-29-2004 by Ord. No. 04-09]

Block 2303, Lot 6.

(34) The district boundaries established by the aforesaid map are amended so as to designate the following described premises as being within the Open Space (OS) Zoning District:
[Added 7-12-2005 by Ord. No. 05-06]

Block 1006, a portion of Lot 5.

Begianing at a point formed by the intersection of the westerly sideline of Lot 12, Block 1006, and the northerly sideline of Glenwood Road (50 foot right-of-way) and from said point of beginning running thence;

1. Along the northerly sideline of Glenwood Road, north 19 degrees -17 minutes -48 seconds west, a distance of 26.29 feet to a point thence;

2. Along a curve to the left, having a radius of 251.38 feet, a central angle of 18 degrees -22 minutes -31 seconds, an arc length of 80.62 feet, bearing a chord of north 28 degrees -29 minutes -03 seconds west, a chord distance of 80.27 feet to a point thence;

3. North 37 degrees -06 minutes -05 seconds east, a distance of 92.08 feet to a point thence;

4. South 52 degrees -52 minutes -44 seconds east, a distance of 31.81 feet to a point thence;

5. North 20 degrees -38 minutes -16 seconds east, a distance of 419.20 feet to a point thence;

6. South 60 degrees -38 minutes -45 seconds east, a distance of 283.17 feet to a point thence;

7. South 18 degrees -25 minutes -48 seconds east, a distance of 110.07 feet to a point thence;

8. South 68 degrees -06 minutes -18 Seconds west, a distance of 186.63 feet to a point thence;

9. South 55 degrees -17 minutes -48 seconds west, a distance of 120 feet to a point thence;

10. South 35 degrees -04 minutes -32 seconds east, a distance of 150 feet to a point thence;

11. Along a curve to the left, having a radius of 346.42 feet, a central angle of 8 degrees -27 minutes -59 seconds, an arc length of 51.19 feet, bearing a chord of south 42 degrees- 12 minutes -23 seconds west, a chord distance of 51.14 feet to a point thence;

12. South 37 degrees -54 minutes -12 seconds west, a distance of 48.81 feet to a point thence;

13. North 54 degrees -22 minutes -08 seconds west, a distance of 120 feet to a point thence;

14. South 74 degrees -46 minutes -32 seconds west, a distance of 120 feet to the point and place of beginning.

Containing approximately 130,000 square feet or 3 acres.

(35) The district boundaries established by the aforesaid map are amended so as to designate the following described premises as being within the One-Family Residence (R-F) District:
[Added 4-9-2013 by Ord. No. 13-04]

Block 610, Lots 21 through 31 (partial).

The rear portion of Block 610, Lots 21 through 31, is rezoned as CBD-3 District.

See attached zone map for location and relocation of zone district lines.[2]

[2]    *Editor's Note: A copy of the R-F District map is on file in the City offices.*

(36) Downtown Redevelopment Overlay (DRL) Zone; boundaries. The DRL Zone is an overlay zone bounded by two lots, Lots 12 and 13 on Block 2305, as shown on the appended map entitled "DRL-Downtown Redevelopment Area, Lincoln School Site", dated May 1, 2014.[3]
[Added 8-12-2014 by Ord. No. 14-26A]
[3]    *Editor's Note: See Ch. 250, Land Use, 250 Attachment 10.*

(37) The following properties shall be reclassified into the Downtown Districts according to the following table:

| Block | Lot | Existing Zoning | New Zoning | Overlay |
|-------|------|-----------------|------------|---------|
| 610 | 1 | CBD-2 | D-1a | |
| 610 | 2.01 | CBD-3 | D-1a | |
| 610 | 2.02 | CBD-3 | D-1a | |
| 610 | 2.03 | CBD-3 | D-1a | |
| 610 | 3 | CBD-2 | D-1a | |
| 610 | 4.01 | CBD-2 | D-1a | |
| 610 | 5 | CBD-2 | D-1a | |
| 610 | 6 | CBD-2 | D-1a | |

| Block | Lot | Existing Zoning | New Zoning | Overlay |
|-------|-----|-----------------|------------|---------|
| 1206 | 1 | CBD-2 | D-1a | |
| 1206 | 2 | CBD-2 | D-1a | |
| 1206 | 3 | CBD-2 | D-1a | |
| 1206 | 4 | CBD-2 | D-1a | |
| 1206 | 5 | CBD-2 | D-1a | |
| 1206 | 6 | CBD-2 | D-1a | |
| 1206 | 7 | CBD-1 | D-1a | |
| 1206 | 8.01 | CBD-2 | D-1a | |
| 1206 | 9 | CBD-2 | D-1a | |
| 1206 | 10 | CBD-2 | D-1a | |
| 1206 | 11 | CBD-2 | D-1a | |
| 1207 | 15 | CBD-2 | D-1a | |
| 1207 | 16 | CBD-2 | D-1a | |
| 1207 | 17.01 | CBD-2 | D-1a | |
| 1207 | 18 | CBD-2 | D-1a | |
| 1207 | 19 | CBD-2 | D-1a | |
| 1207 | 20 | CBD-2 | D-1a | |
| 1207 | 21 | CBD-2 | D-1a | |
| 1207 | 22.01 | CBD-2 | D-1a | |
| 1207 | 23.01 | CBD-2 | D-1a | |
| 1207 | 24 | CBD-2 | D-1a | |
| 1207 | 25 | CBD-2 | D-1a | |
| 1207 | 26 | CBD-2 | D-1a | |
| 1207 | 27 | CBD-2 | D-1a | |
| 1208 | 1.01 | CBD-1 | D-1a | |
| 1208 | 4.01 | CBD-1 | D-1a | |
| 1208 | 5.01 | CBD-1 | D-1a | |
| 1208 | 6 | CBD-1 | D-1a | |
| 1208 | 21 | CBD-1 | D-1a | |
| 1208 | 22 | CBD-1 | D-1a | |
| 610 | 7.01 | CBD-1 | D-1b | |
| 610 | 8 | CBD-1 | D-1b | |
| 610 | 9 | CBD-1 | D-1b | |
| 610 | 12.01 | CBD-3 | D-1b | |
| 610 | 13.01 | CBD-3 | D-1b | |
| 610 | 14 | CBD-1 | D-1b | |
| 610 | 15 | CBD-1 | D-1b | |
| 610 | 16.01 | CBD-1 | D-1b | |
| 610 | 16.02 | CBD-1 | D-1b | |
| 610 | 17.01 | CBD-1 | D-1b | |

| Block | Lot | Existing Zoning | New Zoning | Overlay |
|-------|-----|-----------------|------------|---------|
| 610 | 19.01 | CBD-1 | D-1b | |
| 614 | 4.01 | CBD-1 | D-1b | |
| 614 | 9.01 | CBD-1 | D-1b | |
| 614 | 10.01 | CBD-1 | D-1b | |
| 614 | 11 | CBD-1 | D-1b | |
| 614 | 12 | CBD-1 | D-1b | |
| 614 | 13 | CBD-1 | D-1b | |
| 614 | 14 | CBD-1 | D-1b | |
| 614 | 15 | CBD-1 | D-1b | |
| 614 | 16 | SBD | D-1b | |
| 614 | 17 | SBD | D-1b | |
| 1206 | 12 | CBD-1 | D-1b | |
| 1206 | 13 | CBD-1 | D-1b | |
| 1206 | 14 | CBD-1 | D-1b | |
| 1206 | 15 | CBD-1 | D-1b | |
| 1206 | 16 | CBD-1 | D-1b | |
| 1208 | 7.01 | CBD-1 | D-1b | |
| 1208 | 8.01 | CBD-1 | D-1b | |
| 1208 | 9 | CBD-1 | D-1b | |
| 1208 | 10 | CBD-1 | D-1b | |
| 1208 | 11 | CBD-1 | D-1b | |
| 1208 | 12 | CBD-1 | D-1b | |
| 1208 | 13 | CBD-1 | D-1b | |
| 1208 | 14 | CBD-1 | D-1b | |
| 1208 | 15 | CBD-1 | D-1b | |
| 1208 | 16.01 | CBD-1 | D-1b | |
| 1208 | 17.01 | CBD-1 | D-1b | |
| 1208 | 18.01 | CBD-1 | D-1b | |
| 1208 | 19.01 | CBD-1 | D-1b | |

(38) The following properties shall be reclassified into the RIM District according to the following table:
[Added 11-12-2014 by Ord. No. 14-36]

| Block | Lot | Existing Zoning | New Zoning | Overlay |
|-------|-----|-----------------|------------|---------|
| 2502 | 1 | L-I | RIM | |
| 2502 | 2 | L-I | RIM | |
| 2503 | 1 | L-I | RIM | |
| 2503 | 2 | L-I | RIM | |
| 2503 | 3 | L-I | RIM | |
| 2503 | 4 | L-I | RIM | |

City of Englewood, NJ

| Block | Lot | Existing Zoning | New Zoning | Overlay |
|-------|-----|-----------------|------------|---------|
| 2503 | 5 | L-I | RIM | |
| 2504 | 1 | L-I | RIM | |
| 2504 | 2 | L-I | RIM | |
| 2504 | 3 | L-I | RIM | |
| 2504 | 4 | L-I | RIM | |
| 2504 | 5 | L-I | RIM | |
| 2504 | 6 | L-I | RIM | |
| 2504 | 7 | L-I | RIM | |
| 2504 | 8 | L-I | RIM | |
| 2504 | 9 | L-I | RIM | |
| 2505 | 1.01 | L-I | RIM | |
| 2505 | 2 | L-I | RIM | |
| 2505 | 4 | L-I | RIM | |
| 2505 | 5 | L-I | RIM | |
| 2603 | 9.01 | OI | RIM | |
| 2603 | 10.01 | OI | RIM | |
| 2603 | 11 | OI | RIM | |
| 2603 | 12 | OI | RIM | |
| 2603 | 13 | OI | RIM | |
| 2603 | 14.01 | OI | RIM | |
| 2603 | 14.02 | OI | RIM | |
| 2603 | 15 | OI | RIM | |
| 2603 | 16 | OI | RIM | |
| 2604 | 2 | L-I | RIM | |
| 2604 | 3 | L-I | RIM | |
| 2604 | 4 | L-I | RIM | |
| 2605 | 1.01 | OI | RIM | PUD-1 |
| 2605 | 1.02 | OI | RIM | PUD-1 |
| 2605 | 2.01 | OI | RIM | PUD-1 |
| 2605 | 2.02 | OI | RIM | PUD-1 |
| 2605 | 2.03 | OI | RIM | PUD-1 |
| 2605 | 2.04 | OI | RIM | PUD-1 |

(39) The following properties along South Dean Street shall be reclassified from L-I to SBD: 150 South Dear Street (Block 2407, Lot 6); 112 South Dean Street (Block 2407, Lot 5); 100 South Dean Street (Block 2407, Lot 3); and 80 South Dean Street (Block 2407, Lot 2).
[Added 11-12-2014 by Ord. No. 14-37]

(40) The Work/Live Overlay (W-L) District shall apply to the following properties.
[Added 11-12-2014 by Ord. No. 14-38]

| Block | Lot | Overlay |
|---|---|---|
| 2407 | 7 | W-L |
| 2412 | 9 | W-L |
| 2412 | 10 | W-L |
| 2412 | 11 | W-L |
| 2801 | 1 | W-L |
| 2801 | 2 | W-L |
| 2801 | 3 | W-L |
| 2801 | 4 | W-L |
| 2801 | 5 | W-L |
| 2801 | 6 | W-L |
| 2802 | 21 | W-L |
| 2802 | 22 | W-L |
| 2802 | 23 | W-L |
| 2802 | 24 | W-L |
| 2802 | 25 | W-L |
| 2802 | 26 | W-L |
| 2802 | 27 | W-L |
| 2802 | 28 | W-L |
| 2802 | 29 | W-L |
| 2802 | 30 | W-L |
| 2802 | 31 | W-L |
| 2802 | 32 | W-L |
| 2802 | 33 | W-L |
| 2802 | 34 | W-L |
| 2802 | 35.01 | W-L |
| 2902 | 1 | W-L |
| 2902 | 2 | W-L |
| 2902 | 3 | W-L |

(41) The following properties shall be reclassified as Neighborhood Center (N-C) District according to the following table.
[Added 11-12-2014 by Ord. No. 14-39]

| Block | Lot | Old Zoning | New Zoning | Overlay |
|---|---|---|---|---|
| 701 | 18.01 | SBD | N-C | |
| 702 | 1 | SBD | N-C | |
| 702 | 2 | SBD | N-C | |
| 702 | 3 | SBD | N-C | |
| 702 | 4 | SBD | N-C | |
| 702 | 5 | SBD | N-C | |
| 704 | 11 | SBD | N-C | |

| Block | Lot | Old Zoning | New Zoning | Overlay |
|---|---|---|---|---|
| 705 | 4 | SBD | N-C | |
| 705 | 5 | SBD | N-C | |
| 705 | 6 | SBD | N-C | |
| 705 | 7 | SBD | N-C | |
| 705 | 8 | SBD | N-C | |
| 705 | 9 | SBD | N-C | |
| 705 | 10 | SBD | N-C | |
| 707 | 1 | SBD | N-C | |
| 709 | 9 | SBD | N-C | |
| 710 | 1 | SBD | N-C | |
| 710 | 2 | SBD | N-C | |
| 710 | 22.01 | SBD | N-C | |
| 2008 | 18 | SBD | N-C | |
| 2008 | 19 | R-E | N-C | |
| 2008 | 20 | SBD | N-C | |
| 2008 | 21 | SBD | N-C | |
| 2009 | 20 | SBD | N-C | |
| 2009 | 21 | SBD | N-C | |
| 2009 | 22 | SBD | N-C | |
| 2019 | 1 | SBD | N-C | |
| 2019 | 2 | SBD | N-C | |
| 2019 | 3 | SBD | N-C | |
| 2019 | 4 | R-E | N-C | |
| 2019 | 5.01 | R-E | N-C | |
| 2019 | 6.01 | R-E | N-C | |
| 2019 | 7.02 | R-E | N-C | |
| 2019 | 8 | R-E | N-C | |
| 2019 | 9 | R-E | N-C | |
| 2019 | 10 | R-E | N-C | |
| 2019 | 27 | SBD | N-C | |
| 2306 | 1 | SBD | N-C | |
| 2306 | 2 | SBD | N-C | |
| 2306 | 3 | SBD | N-C | |
| 2802 | 10.01 | SBD | N-C | |
| 2802 | 11.01 | SBD | N-C | |
| 2802 | 20 | R-E | N-C | |
| 2902 | 1 | L-I | N-C | W-L |
| 2902 | 2 | L-I | N-C | W-L |
| 2902 | 3 | R-E | N-C | W-L |

(42)

The following properties along Dean Street and West Street shall be reclassified from CBD-2 to Open Space (OS): 75-105 West Street (Block 1201, Lot 1.01); and 50-106 Dean Street (Block 1202, Lot 1.01).
[Added 12-16-2014 by Ord. No. 14-44]

[1]    *Editor's Note: The Zoning Map is included as an attachment to this chapter.*

# § 250-56. District boundaries.

A.    Unless otherwise shown, the district boundaries shall be construed to coincide with the center lines of streets, alleys, watercourses and the main track or tracks of railroads.

B.    Where a district boundary line is shown to be a certain specified distance from a street line, such boundary line shall be deemed to be parallel to such street line. Where such distance is not indicated and where two or more designations are shown within a block, the boundary shall be deemed to be the lot line of those lots in the more restrictive zone.

C.    Where such boundaries are indicated as approximately following the property lines of parks or other publicly or institutionally owned lands, such lines shall be construed to be such boundaries.

D.    Where a district boundary divides a lot, the following rules shall apply:

E.    For purposes of this section, the more restricted district shall be deemed that district which is subject to regulations which prohibit the particular use intended to be made of said lot or which regulations set higher standards with respect to setback, coverage, yards, screening, landscaping and similar requirements.

# Article X. Terminology

# § 250-57. Word usage.

A.    Unless otherwise expressly stated, the terms set out in **§ 250-55** shall, for the purpose of this chapter, have the meanings therein indicated.

B.    Words used in the present tense include the future tense, words in the singular include the plural, and words in the plural include the singular.

C.    The word "person" includes a corporation, partnership and any other legal entity, as well as an individual.

D.    The word "lot" includes the word "plot."

E.    The term "occupied or used," as applied to any building, shall be construed as though followed by the words "or intended, arranged or designed to be occupied or used."

F.    The word "shall" is mandatory; the word "may" is permissive.

G.    Terms not defined herein shall be interpreted in accordance with the definitions set forth in the Municipal Land Use Act (N.J.S.A. 40:55D-1 et seq.), and if not defined therein, then in accordance with their normal meaning and customary usage.

# § 250-58. Definitions.

As used in this chapter, the following terms shall have the meanings indicated:

**ACCESSORY RESTAURANT**
    An establishment for the sale of prepared food, following all applicable health code requirements, located within a facility whose primary function is food or beverage production.
    [Added 11-12-2014 by Ord. No. 14-34]

**ACCESSORY RETAIL**
    The retail sales of various products, including food service, in a store or similar facility that is located within a health care, hotel, office, industrial, or institutional complex. These uses include pharmacies, gift shops, and food service establishments within hospitals; gift shops, convenience stores and food service establishments within hotel, office, industrial, and institutional complexes. This use category also includes retail associated with commercial and industrial uses for the products sold, distributed or manufactured on site.
    [Added 11-12-2014 by Ord. No. 14-34]

**ADULT ARCADE**
    A place to which the public is permitted or invited wherein coin-operated or slug-operated or electronically, electrically, or mechanically controlled still or motion-picture machines, projectors, or other image-producing devices or viewing booths are maintained to show images or display live performances distinguished or characterized by the depicting or describing of specified sexual activities or specified anatomical areas.
    [Added 5-27-1992 by Ord. No. 92-13]

**ADULT NOVELTY STORE**
    A commercial establishment which, as one of its principal business purposes, offers for sale or rental for any form of consideration any sexual paraphernalia.
    [Added 5-27-1992 by Ord. No. 92-13]

**AMBULATORY SURGERY CENTER**
    A medical facility that provides same-day surgical care, including diagnostic and preventive procedures, to patients not requiring hospitalization.
    [Added 11-12-2014 by Ord. No. 14-34]

**ARCADE GAMES**
    All amusement games or devices of the type commonly known and designated as "bagatelle," "pinball machines," "video or electronic games," "computer games" or any similar amusement games or devices operated, maintained, used or activated by means of a token, coin or similar object for the purpose of amusement or skill for which a fee is charged.

**AUTOMATIC CAR WASH**
    A structure containing facilities for washing automobiles using a chain conveyor or other method of moving the cars along, and automatic or semiautomatic application of cleaner, brushes, rinse water or heat for drying.
    [Added 12-7-1993 by Ord. No. 93-20]

## BASEMENT

A portion of a building, the floor level of which is below grade at any point on the periphery of the building, having a height of six feet or more, as measured from floor to ceiling, and having more than 1/2 of its height above the average grade.

## BLOCK

An area bounded by any of the following or any combination thereof:

A.  Public street;

B.  Railroad right-of-way;

C.  Park boundary line;

D.  City boundary line.

## BOARD OF ADJUSTMENT

The Board established pursuant to Article **IV** of this chapter.

## BUILDING, ACCESSORY

A building detached from and subordinate to the principal building on a lot, used for purposes customarily incidental to those of the principal building.

## BUILDING ARTICULATION

The design of architectural details of a building facade that modulates the building mass in order to create a complementary pattern or rhythm that divides the facade into sections and creates visual interest.
[Added 11-12-2014 by Ord. No. 14-34]

## BUILDING LENGTH

The maximum horizontal dimension of a building.

## BUILDING PERMIT

The certificate issued by the chief inspector authorizing the erection or alteration of any building in the City.

## BUILDING, PRINCIPAL

The construction which contains the primary use on a lot, which shall include attached garages, attached carports (including those attached only by a roofed breezeway), and roofed porches.

## BUSINESS INCUBATOR

A facility that nurtures young startup firms during their early months or years, typically providing affordable space, shared offices and services, hands-on management training, marketing support and access to financing.
[Added 11-12-2014 by Ord. No. 14-34]

## BUSINESS OFFICE

The office of a business entity where its employees conduct their work. Retail sales are not conducted in a business office.
[Added 11-12-2014 by Ord. No. 14-34]

## CELLAR

A portion of a building, the floor level of which is below grade at any point on the periphery of the building, having 1/2 or less of its height, measured from floor to ceiling, above the average grade or having a height of less than six feet.

**COMMERCIAL VEHICLE**

A licensed motor vehicle which meets any one of the following criteria:

A.   The vehicle is licensed for commercial purposes;

B.   The vehicle contains a sign, advertisement or other graphic indicating that its use is for commercial purposes;

C.   The vehicle has a capacity in excess of 3/4 ton;

D.   The vehicle has a capacity in excess of 1/2 ton and less than four passenger seats;

E.   The design of the vehicle clearly indicates that its primary purpose is the transport of goods or produce.

**CONTINUING CARE COMMUNITY**

Retirement communities with accommodations for independent living, assisted living, and nursing home care offering residents a continuum of care in which they can move between levels of care if needed.
[Added 11-12-2014 by Ord. No. 14-34]

**CORNICE LINE**

The uppermost edge of a flat roof or projecting feature of the wall or architectural feature above a flat roof.
[Added 11-12-2014 by Ord. No. 14-34]

**COVERAGE**

That part of a lot covered by buildings, including accessory buildings.

**CO-WORKING SPACE**

Co-working space is a type of office space comprised of a shared working environment in which workers are typically self-employed or employed by different companies.
[Added 11-12-2014 by Ord. No. 14-34]

**DIPLOMATIC USE**

A use of any structure or premises as or for:

A.   The offices of a foreign mission involving diplomatic, consular or other governmental activities of a foreign government, an international organization as defined in Section 209(b) of the Foreign Missions Act [22 U.S.C. § 4309(b)] or any other organization representing a territory or political entity which has been granted diplomatic or other official privileges and immunities under the laws of the United States, together with any ancillary and support facilities to such offices; or

B.   Any purpose included within the term "mission," as defined in, or to which is extended the same privileges and immunities under, the Vienna Convention on Diplomatic Relations of April 18, 1961, or which is included within the meaning of Section 2(3) of the Diplomatic Relations Act [22 U.S.C. § 254a(3)], including, specifically, the residence of the head of any such mission.

**DRIVE-THROUGH OR DRIVE-UP FACILITIES**

Facilities through which an establishment, not including parking facilities, provides goods and/or services to customers while customers remain in their motor vehicles.
[Added 11-12-2014 by Ord. No. 14-34]

## DRUGSTORES

A retail establishment where the profession of pharmacy is practiced and/or where prescription medications and general merchandise are offered for sale.
[Added 11-12-2014 by Ord. No. 14-34]

## DWELLING, ONE-FAMILY

A building designed for, or occupied exclusively by, one family and not designed or used as either a rooming house as defined herein or as a group home or congregate living facility in which a person's continued occupancy is dependent upon the payment of a fixed rent or room charge.

## DWELLING, MULTIPLE-FAMILY OR MULTIFAMILY

A building designed for, or occupied exclusively by, two or more families living independently of each other.

## DWELLING, TWO-FAMILY

A multifamily building designed for or occupied exclusively by two families living independently of each other.

## DWELLING UNIT

A building, or a self-contained portion thereof, forming a single habitable unit which includes living, cooking, eating, sleeping, bathing and toilet facilities for only one family, including domestic servants employed on the premises, and having no enclosed space in common with any other dwelling unit other than vestibules, entrances or other hallways or porches, and laundry, heating and air-conditioning rooms and equipment, provided that a room within a boardinghouse, hotel, inn, lodging house, rooming house, or other similar structure shall not be deemed to constitute a dwelling unit.

## EAVE

The lower edge or edges of a roof, which, typically, project beyond the sides of the building.
[Added 11-12-2014 by Ord. No. 14-34]

## EXEMPT PARKING STRUCTURE and EXEMPT STORY

Floors, or portions of floors, accessory to the primary use of a building, which are constructed and used solely for parking spaces, or access aisles, lobbies, stairs and elevators connected therewith and which meet the requirements thereinafter set forth for exceptions from aggregate floor area and height limitations.

## FAMILY

One or more persons living together in a dwelling unit on a permanent basis as a bona fide single housekeeping unit sharing living, sleeping, cooking and sanitary facilities and jointly performing the ordinary tasks of operating and maintaining a household, such as cooking, cleaning and shopping, on a nonprofit or a nonremunerative basis, and which is noncommercial in character and does not require, as a condition of continued occupancy, the payment of a fixed room rent or a service charge.[1]

## FLOOR AREA, AGGREGATE

The sum of the gross horizontal areas of all the floors of a building (or buildings on a lot), measured from the exterior faces of exterior walls, or from the center line of walls common to two buildings, except that the floor area shall include only 75% of any basement or cellar space.

## GARDEN CENTER

A place of business where retail and wholesale products and produce are sold to the consumer. These centers, which may include a nursery and/or greenhouses, import most of the items sold, and may include plants, nursery products and stock, potting soil, hardware, power equipment and machinery, hoes, rakes, shovels, and other garden and farm variety tools and utensils.
[Added 11-12-2014 by Ord. No. 14-34]

## GRADE

A reference plane representing the average of finished ground level adjoining a building or structure at all exterior walls; provided, however:

A.  When the finished ground level slopes away from the exterior walls, the reference plane shall be established by the lowest point within the area between the building and the lot line or, when the lot line is more than six feet from the building, between the building and a point six feet from the building; or

B.  Where the natural contour of the ground level immediately adjacent to a building is interrupted by ditching, pits or trenching, then the adjoining ground level shall be the nearest contour line parallel to the exterior wall of the building or structure, without regard to the levels created by the ditching, pits or trenching.

## GREEN BUILDINGS

A structure that is environmentally responsible and resource-efficient throughout its lifecycle, from siting to design, construction, operation, maintenance, renovation, and demolition.
[Added 11-12-2014 by Ord. No. 14-34]

## GREEN ROOF

An engineered roofing system that allows for the propagation of rooftop vegetation and the retention of stormwater while maintaining the integrity of the underlying roof structure and membrane.
[Added 11-12-2014 by Ord. No. 14-34]

## HEALTH AND FITNESS CLUB

A commercial establishment that provides as its primary purpose facilities for individual physical health activities, such as aerobic exercise, running and jogging, use of exercise equipment, saunas, showers, lockers. Such establishments are typically on a membership basis and not open to the public at large. Personal training and group instruction in exercise may be provided.
[Added 11-12-2014 by Ord. No. 14-34]

## HEIGHT

The vertical dimension of a building or structure, measured in feet, from the grade to the highest point of the building or structure.

## HOSPICE

A facility that provides specified services to terminally ill individuals and their families, including nursing care, physician services, physical and speech therapy, home health

aide, homemaker services, pastoral counseling, social work services, occupational therapy, and dietary services in addition to bereavement counseling.
[Added 11-12-2014 by Ord. No. 14-34]

## HOTEL

Any building in which there are more than six rooms or suites of rooms other than dwelling units, rented for sleeping purposes or in which there are independent lavatory facilities for each such room or suite of rooms.

## HOUSE TRAILER

Any vehicle mounted or capable of being mounted on wheels, movable either by its own power or by being drawn by another vehicle, and equipped to be used for living or sleeping quarters, which is greater than 32 feet in length, or eight feet in width, including any such vehicle mounted on temporary or permanent foundations with the wheels removed.

## INSTRUCTIONAL STUDIO

A commercial establishment that provides individual and/or group instruction in the performing and visual arts or fitness, including dance, music, voice, drama, painting, martial arts, gymnastics, yoga, or other similar activities.
[Added 11-12-2014 by Ord. No. 14-34]

## LIGHT INDUSTRY

Manufacturing activity that uses moderate amounts of partially processed materials to produce items of relatively high value per unit weight, requiring only a small amount of raw materials, area and power. The value of the products is relatively low and the products themselves are easy to transport.
[Added 11-12-2014 by Ord. No. 14-34]

## LOT, CORNER

A lot at the junction of and abutting two or more intersecting streets.

## LOT DEPTH

The longest horizontal distance measured along a straight line perpendicular to the street line of such lot between the point where such line intersects the street line of such lot and the point where such line intersects another lot line of such lot, provided that, with respect to a corner lot, the greater dimension of the length or width shall be deemed the length of such lot.

## LOT LINE

Any boundary of a lot.

## LOT LINE, REAR

The lot line generally opposite and located farthest from the street line.

## LOT LINE, SIDE

The lot line or lines which intersect the street line of such lot.

## LOT, THROUGH

A lot (other than a corner lot) which abuts two street lines which are at opposite ends of the lot.

## LOT WIDTH

The shortest horizontal distance between the points formed by the intersection of the front yard line of such lot with the side lot lines of such lot, provided that, with respect to a corner lot, the lesser dimension of the length or width shall be deemed the width of such lot.

## MASSAGE PARLOR

Any premises which are used, in whole or part, to administer acupressure, massage, bodywork, or somatic therapy, or involving the act of holding, touching, positioning, mobilizing, applying friction or pressure manually and/or by mechanical or vibratory apparatus to body tissues, including, but not limited to, employing the procedures of acupressure, reflexology, moving, striking, pounding, rubbing, manipulating, kneading, and/or tapping, or the use of oil rubs, heat lamps, salt glow, hot or cold packs, vibration, percussion, medical gymnastics, heliotherapy, external application of topical preparations, or tub, shower, or cabinet baths, but excluding the practice of medicine, physical therapy, or chiropractic by an osteopath, medical doctor, physical therapist, or chiropractor licensed to practice in the State of New Jersey.
[Added 7-18-2000 by Ord. No. 00-03]

## MEDICAL CENTER

Two or more medical group practices or medical offices, or a combination thereof, operating in the same building, which may also contain associated principal or accessory uses such as diagnostic testing facilities, physical therapy, therapeutic counseling services, pharmacies, medical supply retailers, and similar uses. A medical center does not contain residential facilities.
[Added 11-12-2014 by Ord. No. 14-34]

## MEDICAL GROUP PRACTICE

A medical or dental practice, larger than a medical office, offering medical or dental services on an outpatient basis and including principal health care providers and other medical or dental professionals, exclusive of administrative or clerical staff, providing services on the premises. A medical group practice and its principal health providers shall offer medical services within one area of medical practice (e.g., general practice, orthopedics, cardiology, oncology, etc.) or within a small number of closely related areas of medical practice, and may also contain in-house diagnostic testing facilities, medical counseling services, and similar services, or may be associated with other similar accessory or complementary principal uses in the same building.
[Added 11-12-2014 by Ord. No. 14-34]

## MEDICAL OFFICE

A medical or dental practice offering medical or dental services on an outpatient basis and including a total of no more than the full time equivalent of three principal health care providers and two other medical or dental professionals, exclusive of administrative or clerical staff, providing services on the premises. A medical or dental office may also contain associated in-house ancillary services such as in-house diagnostic testing facilities, medical counseling services, and similar services.
[Added 11-12-2014 by Ord. No. 14-34]

## NUDITY or STATE OF NUDITY

The appearance of a human bare buttock, anus, male genitals, female genitals or areola of the female breast.
[Added 5-27-1992 by Ord. No. 92-13]

## OFFICIAL COUNTY MAP

The map, with changes and additions thereto, adopted and established, from time to time, by resolution of the Board of Chosen Freeholders of Bergen County pursuant to N.J.S.A. 40:27-5.

**PARKING SPACE**

An open or enclosed paved space which is accessible and available at all hours when the building to which it is accessory is in use, for the parking of one passenger automobile.

**PERFORMANCE FACILITY**

A structure designed to accommodate the assembly of persons attending musical performances, dance performances, dramatic performances, and other arts and entertainment-related events.
[Added 11-12-2014 by Ord. No. 14-34]

**PERSONAL SERVICES**

A use that provides a personal service that is nonmedical and may include accessory retail sales of products related to the services that are provided.
[Added 11-12-2014 by Ord. No. 14-34]

**PLACE OF ASSEMBLY**

A room or space accommodating 50 or more persons for religious, recreational, educational, political, social or amusement purposes, including all connected rooms or spaces with a common means of entrance and exit.

**PLANNED COMMERCIAL DEVELOPMENT**

An area with a minimum contiguous acreage specified in the regulations governing development within a district zoned for such development, to be developed as a single entity according to a plan containing mixed uses in such ranges of ratios, and subject to such specific conditions and limitations as may be set forth in Part **4**, Zoning, of this chapter.

**PLANNED UNIT DEVELOPMENT**

An area with a minimum contiguous or noncontiguous acreage of 10 acres or more to be developed as a single entity according to a plan containing one or more residential clusters or planned unit residential developments and one or more public, quasi-public, commercial or industrial areas in such ranges of nonresidential use to residential uses, as shall be specified in Part **4**, Zoning, of this chapter.
[Added 7-16-2002 by Ord. No. 02-12]

**PLANNING BOARD**

The Planning Board of the City of Englewood established pursuant to Article **III** of this chapter.

**PROFESSIONAL OFFICE**

Offices where services that are not of a medical nature are provided that require specialized training or professional certification.
[Added 11-12-2014 by Ord. No. 14-34]

**PUBLIC PARKING FACILITY**

An off-street parking lot or parking structure owned and operated by the City of Englewood.
[Added 11-12-2014 by Ord. No. 14-34]

**RECREATIONAL VEHICLE**

A vehicle designed primarily as temporary living quarters for recreational, camping, or travel use, which is less than 32 feet in length and eight feet in width.[2]

**REHABILITATION CENTER**

A nonresidential facility that provides comprehensive diagnostic, therapeutic, and restorative services to outpatients for the rehabilitation of injured, disabled, or sick persons by or under the supervision of a physician.
[Added 11-12-2014 by Ord. No. 14-34]

**RESEARCH AND DEVELOPMENT**

Study, research, and experimentation in one or more scientific fields, such as life sciences or biomedical research, communications, chemistry, computer science, electronics, medicine and physics. Research and development also includes the development of prototypes and the marketing of resultant products. Related activities include the manufacturing, mixing, fermentation, treatment, assembly, packaging, and servicing of products. Supporting services such as administrative offices, educational facilities, libraries, and data services are other examples of related activities.
[Added 11-12-2014 by Ord. No. 14-34]

**RESTAURANT, FULL SERVICE**

An establishment that provides food services to patrons who order and are served while seated and who pay after eating, which may provide as an ancillary or accessory function the takeout or delivery service of food or beverages for consumption at some other location away from the restaurant premises.
[Added 11-12-2014 by Ord. No. 14-34]

**RESTAURANT, LIMITED SERVICE**

Establishments primarily engaged in providing food services where patrons generally order items and pay before eating. Food and drink may be consumed on premises, taken out, or delivered to the customer's location.
[Added 11-12-2014 by Ord. No. 14-34]

**RIDGE LINE**

The uppermost edge of a sloped roof.
[Added 11-12-2014 by Ord. No. 14-34]

**ROOFTOP FARMING**

Growing, washing, and storage of fruits, vegetables, and other plant products on a principal building as an accessory use for education, donation, wholesale and retail sales. Typical operations include growing beds and growing trays.
[Added 11-12-2014 by Ord. No. 14-34]

**ROOMING HOUSE**

Any building, together with any related structure, accessory building, and land appurtenant thereto, and any part thereof, which contains two or more units of dwelling space arranged or intended for single-room occupancy, regardless of whether personal or financial services are provided to the residents thereof, including but not necessarily limited to any facility regulated pursuant to the provisions of the Rooming and Boarding House Act of 1979 (N.J.S.A. 55:13B-1 et seq.). For the purposes of this definition, the terms "financial services," "personal services," "single-room occupancy," and "unit of dwelling space" shall have the meanings provided in Section 3 of said Act (N.J.S.A. 55:13B-3).

**SEXUALLY ORIENTED BUSINESS**
An adult arcade or adult novelty store.
[Added 5-27-1992 by Ord. No. 92-13]

**SEXUAL PARAPHERNALIA**
Any instruments, devices, equipment or accessories which are designed for use in connection with specified sexual activities or which are designed to depict specified anatomical areas, including apparel or lingerie designed to expose the male or female genitals or the areola of the female breast, but excluding contraceptive and prophylactic devices.
[Added 5-27-1992 by Ord. No. 92-13]

**SKILLED NURSING FACILITY**
A healthcare facility that provides the skilled nursing care and supportive care to patients whose primary need is for skilled nursing care on an extended basis.
[Added 11-12-2014 by Ord. No. 14-34]

**SPECIFIED ANATOMICAL AREAS**
The male genitals in a state of sexual arousal and/or the vulva or more intimate parts of the female genitals.
[Added 5-27-1992 by Ord. No. 92-13]

**SPECIFIED SEXUAL ACTIVITIES**
Includes any of the following:
[Added 5-27-1992 by Ord. No. 92-13]

A.   The fondling or other erotic touching of human genitals, pubic region, buttocks, anus, or female breasts.

B.   Sex acts, normal or perverted, actual or simulated, including intercourse, oral copulation or sodomy.

C.   Masturbation, actual or simulated.

D.   Excretory functions as part of or in connection with any of the activities set forth in Subsections **A** through **C** above.

**STEEP SLOPED AREAS**
Any land areas with a topographic slope 15% or greater in grade, as calculated from the steepest grade over a minimum distance of 50 feet in the horizontal plane.
[Amended 4-17-2001 by Ord. No. 01-02]

**STORY**
That portion of a building included between the upper surface of any floor and the upper surface of the next floor next, except that the topmost story shall be that portion of a building included between the upper surface of the topmost floor and the ceiling above.
[Amended 11-12-2014 by Ord. No. 14-34]

**STORY, HALF**
A story in which a minimum of 25%, but not more than 50%, of the space between the top of the finished floor and the ceiling level has a clear height of seven feet four inches or more.

**STREET LINE**

The dividing line between a lot and a street. Where a proposed street widening is shown on the Official Map of either the county or the City, the street line shall be the line of the street as it would exist following such proposed widening.

**STRUCTURE, ACCESSORY**

A construction which is detached from, and is subordinate to, the principal building on the lot and used for purposes customarily incidental to those of the principal building.

**TECHNICAL SCHOOL**

A post-secondary vocational school offering instruction, training, and/or certification in trades or crafts such as auto repair, welding, bricklaying, machinery operation, culinary trades, health care, and computer technology.
[Added 11-12-2014 by Ord. No. 14-34]

**TOWNHOUSE**

A self-contained, one-family dwelling unit, attached to one or more other one-family dwelling units, but having no other dwelling units above it or below it, having direct access to the outside and sharing no interior facilities (such as hallways, vestibules, or stairs) with any other dwelling unit.

**URGENT CARE CENTER**

A facility that delivers medically necessary ambulatory medical care apart from a hospital emergency department setting, typically on a walk-in basis and for acute conditions that are not life-threatening.
[Added 11-12-2014 by Ord. No. 14-34]

**USABLE OPEN SPACE**

An unobstructed portion of a lot that is designed for active or passive recreational and leisure use, and is conveniently located and accessible.
[Amended 11-12-2014 by Ord. No. 14-34]

**USE, ACCESSORY**

A use customarily incidental and subordinate to the main use on a lot, whether such accessory use be conducted in a principal or in an accessory building.

**VETERINARY CLINIC**

A facility maintained by or for the use of a licensed veterinarian for the diagnosis, treatment, or prevention of animal diseases wherein the animals are limited to dogs, cats or other comparable household pets and wherein the overnight care of said animals is prohibited.
[Added 11-12-2014 by Ord. No. 14-34]

**VETERINARY HOSPITAL**

A facility where animals or pets are given medical or surgical treatment and are cared for during the time of such treatment and which includes overnight care related to such treatment.
[Added 11-12-2014 by Ord. No. 14-34]

**WELLNESS CENTER**

A facility staffed by medical and/or nonmedical healthcare professionals that promote healthy living and the prevention of illness and disease.
[Added 11-12-2014 by Ord. No. 14-34]

**WORK/LIVE**

A building or spaces within a building used jointly for commercial and residential purposes where the residential use of the space is secondary or accessory to the primary use as a place of work.
[Added 11-12-2014 by Ord. No. 14-34]

**YARD**
The ground area between a lot line and a yard line, unoccupied by buildings or accessory buildings and/or occupied only by such accessory structures as are permitted and regulated by this chapter.

**YARD, FRONT**
The ground area between the street line and front yard line, unoccupied by buildings or accessory buildings and/or occupied only by such accessory structures as are permitted and regulated by this chapter.

**YARD LINE**
A line drawn parallel to a street line or lot line at a distance therefrom equal to the yard dimension required by this chapter.

**YARD LINE, FRONT**
A line drawn parallel to a street line at a minimum distance from the street line required by this chapter.

**YARD LINE, REAR**
A line drawn parallel to a street line or lot line at a minimum distance from a rear lot line required by this chapter.

**YARD LINE, SIDE**
A line drawn parallel to a side lot line at a minimum distance from the side lot line required by this chapter.

**YARD, REAR**
The ground area between the rear lot line and the rear yard line, unoccupied by buildings or accessory buildings and/or occupied only by such accessory structures as are permitted and regulated by this chapter.

**YARD, SIDE**
The ground area between the side lot line and the side yard line, unoccupied by buildings or accessory buildings and/or occupied only by such accessory structures as are permitted and regulated by this chapter.

[1]   *Editor's Note: The former definition of "fast-food restaurant," which immediately followed this definition, was repealed 11-12-2014 by Ord. No. 14-34.*

[2]   *Editor's Note: The former definition of "restaurant," which immediately followed this definition, was repealed 11-12-2014 by Ord. No. 14-34.*

# Article XI. District Regulations

# § 250-59. One-family residence districts.

A.   Definition; purpose.

(1)

"One-family residence district," as used in this chapter, shall, unless a contrary meaning is indicated, include One-Family Residence Districts R-AAA, R-AA, R-A, R-B, R-C, R-D, R-E and R-F.
[Amended 4-9-2013 by Ord. No. 13-04]

(2) The purpose of this chapter with respect to one-family residence districts is to preserve and protect the integrity of such districts for one-family residential purposes, to establish one-family residence districts that provide for a range of lot sizes, and to permit in such districts only such other uses as will be compatible with one-family residential use.

B. Permitted uses. Within a one-family residence district, no land or building shall be used, nor shall any building be constructed, altered or designed to be used, for any purposes other than the following:

(1) A one-family dwelling, not to exceed one such dwelling on any one lot.

(2) Accessory uses, accessory buildings and accessory structures, as hereinafter defined and limited.

(3) Municipal purposes.

(4) Parks and playgrounds.

(5) Nature preserve and nature study area.

(6) Public schools and private nonprofit day schools accredited by the New Jersey State Department of Education, for grades not above high school, and day-care centers licensed by the State of New Jersey, as conditional uses, subject to the conditions and limitations set out in Subsection **F** hereof.

(7) Places of worship, including accessory religious instructional facilities, provided that any premises to be used for such purpose, together with the improvements thereon, shall comply with all applicable provisions of this chapter respecting the district in which the premises are located, together with the following additional requirements:

(a) The minimum required side yards and minimum required rear yard of such premises shall be not less than 25 feet greater than the required minimum set out in Subsection **I(1)** with respect to premises in the R-AAA, R-AA and R-A Districts, and not less than 15 feet greater than the required minimum set out in Subsection **I** with respect to premises in the R-B, R-C, R-D and R-E Districts.

(b) The minimum required planting areas of such premises shall be not less than five times greater than the minimum requirements set out in Subsection **I(4)** (but not more than 25 feet) and shall include evergreen plantings capable of growing to a height of six feet within one year or, if the Planning Board shall so direct, a fence or wall, the design and construction of which shall be approved by the Planning Board.

(c) The buildings on such premises, including accessory buildings, shall not cover more than 20% of the total area of the premises if the primary building is a one-story building, nor more than 15% of the total area of the premises if the primary building exceeds one story in height.

(d) No such premises may be used for residential or sleeping purposes, except that one dwelling unit for a custodian may be provided.

(e) No building on any such premises, including an accessory building, shall be located less than 45 feet from an existing residential building on any adjacent property.

(f) Such use shall require site plan approval.

(8) Permitted uses within the R-F District. No land or building shall be used, nor shall any building be constructed, altered or designed to be used, for any purpose other than the following:
[Added 4-9-2013 by Ord. No. 13-04]

(a) Detached single-family residential dwellings and other uses as permitted in, and regulated for, the R-E Zone.

(b) Accessory uses within a principle building as permitted in, and regulated for, the R-E Zone.

C. Accessory uses within a principal building. Within a one-family residence district, the following accessory uses shall be permitted within a principal residential structure, subject to the conditions and limitations set therefor, and subject to the obtaining of a certificate of occupancy specifying the particular accessory use and applicable restrictions and limitations:

(1) The professional office or studio of an architect, artist, clergyperson, dentist, engineer, land surveyor, lawyer, musician, physician, planner, psychologist, sculptor, or similar profession.

(a) The professional office or studio shall be operated by a person whose principal residence is within the building in which the studio or office is located.

(b) Not more than three persons, including the resident-operator or resident-operators, shall be employed or engaged in the operation of the office or studio at any one time.

(c) Not more than three clients, patients, customers, students or other persons shall be served at any one time.

(d) The office or studio shall not exceed 1,000 square feet in floor area or 30% of the aggregate floor area of the principal building in which it is located, whichever is smaller.

(e) No advertisement or sign shall be displayed on the exterior of the building or on the premises outside of the building, other than a nameplate not exceeding one square foot in area.

(f) Any such accessory use shall comply with all applicable off-street parking requirements.

(2) A studio for dancing or music instruction, subject to the conditions and limitations set forth in Subsection **C(1)** above, together with the additional condition and limitation that not more than two music or dancing concerts or recitals shall be conducted during any one calendar year.

(3) Home occupations, such as phone-answering services, typing, sewing, child care, tutoring, and individual music instruction, limousine services, carpenters, plumbers, electricians, and similar tradesmen, customarily conducted within a dwelling by the residents thereof, which is clearly secondary to the use of the dwelling for living purposes and does not change the character thereof, subject to the following conditions and limitations:

(a) No persons shall be employed or engaged in the operation of the home occupation on the premises other than the resident-operator or resident-operators.

(b) No merchandise shall be offered for sale upon the residential premises, nor shall there be any display of goods.

(c) No advertisement or sign shall be displayed on the exterior of the building, in any window, or on the premises outside of the building.

(d) Not more than one student or other person shall be served at any one time.

(e) Not more than one motor vehicle used in connection with said home occupation, such as a limousine, van, pickup truck or other similar vehicle, shall be stored on the premises. Such vehicles shall be stored in a fully enclosed garage, except while actually in use. No such vehicle shall be permitted to be stored on the premises unless said premises has the required number of additional off-street parking spaces so as to comply with all applicable off-street parking requirements.

(f) No exterior storage of any supplies, tools, merchandise, equipment, or other materials used in connection with said home occupation shall be permitted.

(g) Except for the storage of one motor vehicle as specified in Subsection **C(3)(e)** above, no home occupation shall be conducted other than within the principal building.

(h) The home occupation shall not exceed 1,000 square feet in floor area, nor more than 25% of the aggregate floor area of the principal building in which it is located, whichever is smaller.

D. Accessory buildings and structures.

(1) Within a one-family residence district, the following accessory buildings and structures incident to the primary use of the main structure on the premises shall be permitted, subject to the conditions and limitations set out in Subsection **D(2)** hereof:

(a) Garden house, toolhouse, bathhouse, playhouse, greenhouse and similar buildings customarily incident to a one-family residential use.

(b) Swimming pool, wading pool, tennis court.

(c) Garage or carport.

(d) Fences, garden walls and other landscape features, including decorative pools, fountains, statuary terraces, steps, benches and playground equipment.

(2) Except as provided in Subsection **E**, any such accessory building or structure shall be subject to the following conditions and limitations:

    (a) No such building or structure shall contain any permanent cooking facilities, provided that this provision shall not be deemed to prohibit a barbecue pit or building fireplace.

    (b) No such accessory structure or building shall contain sleeping facilities.

(3) Swimming pools, tennis courts, basketball courts, and all other paved or concreted play areas, including all supplemental uses such as sidewalks, patios, platforms, fencing, and lighting, shall comply with the following setback requirements and height limitations:
[Added 10-19-1993 by Ord. No. 93-09; amended 4-17-2001 by Ord. No. 01-03]

    (a) Front yard: not permitted.

    (b) Side yard (in feet):

| | |
|---|---|
| R-AAA | 35 |
| R-AA | 25 |
| R-A | 20 |
| R-B | 15 |
| R-C | 15 |
| R-D | 15 |
| R-E | 15 |

    (c) Rear yard (in feet):

| | |
|---|---|
| R-AAA | 50 |
| R-AA | 50 |
| R-A | 50 |
| R-B | 30 |
| R-C | 30 |
| R-D | 30 |
| R-E | 30 |

    (d) Fence height (feet): 10.

    (e) Light height (feet): 18.

    (f) Illumination on adjacent properties: 0.2 footcandle maximum.

(4) Accessory buildings and structures within the R-F District. As permitted in, and regulated for, the R-E Zone, except as specifically set forth herein.
[Added 4-9-2013 by Ord. No. 13-04]

    (a) Swimming pools, courts, and all paved areas such as interior sidewalks, driveways, patios, platforms, fencing, and lighting shall comply with the following setback requirements and height limitations:

      [1]   Front yard: Not permitted, except for sidewalks extending from the interior driveway to the front door of the dwelling, and vehicular driveways.

      [2]   Minimum side yard: three feet, provided that where the City approves an interior sidewalk for the purposes of providing pedestrian access from the street to the CBD-3 Zone, the sidewalk shall be permitted to be placed two feet from the side yard line.

      [3]   Minimum rear yard: 10 feet.

      [4]   Maximum fence height: six feet.

      [5]   Maximum light height: 12 feet.

      [6]   Maximum illumination on adjacent lots: 0.2 footcandles maximum.

E.   Accessory secondary buildings used for dwelling purposes.

  (1)  Within a one-family residence district, an accessory building which was constructed prior to January 1, 1976, may be used for dwelling purposes, provided that:

    (a)  Such building, on January 1, 1976, contained living quarters, including kitchen and bathroom facilities.

    (b)  There shall be no more than one dwelling unit in any such accessory building, and no more than one dwelling unit for any one principal building.

    (c)  Each such dwelling unit shall be provided with at least two on-site parking spaces.

    (d)  No such dwelling unit and/or accessory building shall be expanded or enlarged.

    (e)  Such dwelling unit and/or accessory building does not encroach on any yard required for a principal building as set forth in Subsection I.

F.   Conditional uses. The conditional uses described in Subsection **B(6)** shall be permitted in a one-family residence district only in the locations hereinafter described and subject to the following conditions and limitations:

  (1)  Such use shall be permitted only on premises which front on any of the following streets: Broad Avenue, Engle Street, Forest Avenue, Grand Avenue, Knickerbocker Road, Lafayette Place, Tenafly Road.

  (2)  Such use shall be permitted only if the premises and the improvements constructed or to be constructed thereon comply with all applicable provisions of this chapter respecting the district in which such premises are located, together with the following additional limitations, conditions and restrictions, and in the event of any inconsistency between the provisions of this section and any other section of this chapter, the more restrictive shall apply:

    (a)  The front yard of such premises shall conform to the required front yard setback prescribed by Subsection I for the district within which the premises are located.

    (b)

The minimum required side yards and minimum required rear yard of such premises shall not be less than 25 feet greater than the required minimum set out in Subsection I, with respect to premises in the R-AAA, R-AA and R-A Districts, and not less than 15 feet greater than the required minimum set out in Subsection I, with respect to premises in the R-B, R-C, R-D and R-E Districts.

(c) The buildings on such premises, including accessory buildings, shall not cover more than 20% of the total area of the premises if the primary building is a one-story building, nor more than 15% of the total area of the premises if the primary building exceeds one story in height.

(d) The width of such premises shall be not less than 200 feet.

(e) Any premises to be used for a public school or a private nonprofit day school accredited by the New Jersey State Department of Education shall have a total area of not less than two acres.

(f) No such premises may be used for residential or sleeping purposes, except that one dwelling unit for a custodian may be provided.

(g) No building on any such premises, including an accessory building, shall be located less than 90 feet from an existing residential building on any adjacent property.

(3) Such use shall require site plan approval.

(4) Application for approval of the use of premises in a one-family residence district for any conditional use described in Subsection B(6) shall be made to the Planning Board, and the Planning Board, in acting thereon, shall be governed by the conditions, specifications and standards hereinabove set out.

G. Garages; carports; parking and storage.

(1) In addition to all other provisions of this chapter or any other ordinance dealing with parking or storage of vehicles or boats, the following provisions shall be applicable to one-family residence districts:

(a) Not more than one commercial vehicle may be parked, stored, or left standing on any premises, subject to the following requirements:

[1] Such vehicle shall be parked or left standing within a garage or within a carport which is enclosed or screened on at least three sides; and

[2] No such vehicle shall exceed a three-quarter-ton load-carrying capacity.

(b) No boat or recreational vehicle may be parked, stored or left standing on any premises unless such boat or recreational vehicle:

[1] Is not more than 20 feet in length; and

[2] Is parked, stored or left standing within a garage or within a carport enclosed or screened on at least three sides or in a rear yard where it is screened from adjoining properties and streets by evergreen plantings or a solid fence at least five feet high.

H.  Minimum lot size requirements.
[Amended 4-9-2013 by Ord. No. 13-04]

(1)  Within a one-family residence district, no building or structure shall be constructed on any lot with less than the following minimum area, width and depth; provided, however, that if greater dimensions are required for any particular use pursuant to any other provision of this chapter, then such greater requirements shall apply:

| District | Minimum Lot Area (square feet) | Minimum Lot Width (feet) | Minimum Lot Depth (feet) |
|---|---|---|---|
| R-AAA | 88,000 | 225 | 250 |
| R-AA | 44,000 | 175 | 200 |
| R-A | 22,000 | 120 | 150 |
| R-B | 15,000 | 100 | 125 |
| R-C | 10,000 | 90 | 100 |
| R-D | 7,500 | 75 | 100 |
| R-E | 6,500 | 65 | 100 |

(2)  Within the R-F Zone, a principal building shall comply with the following minimum area, yard, bulk and height requirements; provided, however, that if greater dimensions are required for any particular use pursuant to other provisions of this chapter, then such greater requirements shall apply:

(a)  Minimum lot area: 6,500 square feet.

(b)  Minimum lot width: 80 feet.

(c)  Minimum lot depth: 80 feet.

I.  Yard requirements.
[Amended 12-7-1993 by Ord. No. 93-16]

(1)  Except where more extensive requirements are set out respecting particular uses, premises in a one-family residence district shall comply with the following requirements respecting minimum front yards (setback), side yards and rear yards:

| District | Minimum Required Yards (feet) | | |
|---|---|---|---|
| | Front Yard (setback) | Side Yard | Rear Yard |
| R-AAA | | | |
| Lots having an area of 88,000 square feet or more | 50 | 35 | 50 |
| Lots having an area of less than 88,000 square feet | 50 | 25 | 50 |
| R-AA | | | |
| Lots having an area of 44,000 square feet or more | 50 | 25 | 50 |
| | 40 | 15 | 50 |

**Minimum Required Yards**
**(feet)**

| District | Front Yard (setback) | Side Yard | Rear Yard |
|---|---|---|---|
| Lots having an area of less than 44,000 square feet | | | |
| R-A | 40 | 15 | 50 |
| R-B | 30 | 15 | 30 |
| R-C | 25 | 8 | 30 |
| R-D | 25 | 8 | 30 |
| R-E | 25 | 7 | 30 |

(2) Except as provided in Subsection **I(3)** hereof with respect to a corner lot, each lot in a one-family residence district shall have two side yards, each of which shall not be less than the minimum width set out in Subsection **I(1)** hereof, and the combined width of which shall be not less than 30% of the width of the lot.

(3) In the case of a corner lot, each yard which abuts a street shall be considered a front yard, and the lot shall comply with front yard setback requirements and all other front yard requirements and limitations set out in this chapter respecting each of such streets.

(4) A planting area, which, except as otherwise permitted by Subsection **J(3)**, shall consist entirely of grass or other living plants, shall be provided within all of the following described areas adjacent to each side lot line and the rear lot line of each lot:

| District | Area Adjacent to Each Side Lot Line (feet) | Area Adjacent to Rear Lot Line (feet) |
|---|---|---|
| R-AAA | 15 | 15 |
| R-AA | 10 | 10 |
| R-A | 6 | 6 |
| R-B | 6 | 6 |
| R-C | 4 | 4 |
| R-D | 3 | 3 |
| R-E | 3 | 3 |

(5) R-F District.

    (a) Yard requirements within the R-F District are as follows: [Added 4-9-2013 by Ord. No. 13-04]

        [1] Minimum front yard: 20 feet.

        [2] Minimum side yard: 10 feet; combined side yards, 40 feet.

        [3] Minimum rear yard: 25 feet.

    (b)

> In the case of a corner lot, each yard which abuts a street shall be considered a front yard, and all other yards shall be considered a side yard. In such case, the combined side yard requirement may be reduced by five feet, from 40 feet to 35 feet, provided that a minimum of 10 feet must be maintained for at least one side yard. Additionally, on corner lots a front yard may be reduced by 10 feet.

J.  Regulations concerning yards, planting areas, fences, etc.

    (1)  Within a required front yard, except for the projections permitted by Subsection **J(4)** hereof, no accessory building or structure shall be permitted, except for walls or fences not more than 4 1/2 feet high.

    (2)  Within a required rear yard, the aggregate ground area covered by all enclosed accessory buildings shall not exceed 40% of the required rear yard area or 20% of the ground area covered by the principal building, whichever is less; provided, however, that a garage not exceeding 440 square feet shall be permitted, notwithstanding its exceeding either or both such limitations.

    (3)  No paved terrace, steps, walk or similar improvement (other than those used for access to the premises or to a building on the premises), and no building or structure, including an accessory building or structure, shall be constructed or located within the planting areas required by Subsection **I(4)**, except for fences or walls not exceeding 6 1/2 feet in height and statuary, ornamental benches and similar ornamental devices.

    (4)  Notwithstanding any of the foregoing restrictions:

        (a)  Cornices and cantilevered roofs may project into any required yard in an R-AAA, R-A, R-B and R-C District a distance of not more than 24 inches and into any required yard in an R-D, R-E and R-F District a distance of not more than 12 inches.
[Amended 4-9-2013 by Ord. No. 13-04]

        (b)  Belt courses, windowsills and similar ornamental features may project into any required yard in a one-family residence district a distance of not more than 12 inches, and chimneys may so project a distance of not more than 18 inches.

    (5)  Retaining walls or open chain-link fences, not more than eight feet in height, may be erected on any premises used for public park or public or school playground purposes, or on any premises used for cemetery or stadium purposes (provided that such cemetery or stadium use shall be a lawfully permitted nonconforming use), without complying with the foregoing yard or planting area restrictions.

    (6)  Any fence which is designed or constructed so as to have a front side and a rear side shall be erected so that the front side faces abutting streets or abutting premises and the rear side faces the premises on which the fence is erected, unless the fence is totally screened from the view of abutting streets and properties by shrubbery or similar screening material located on the premises on which the fence is erected.

    (7)  Except as otherwise permitted by this chapter, no fence or wall in a one-family residence district shall exceed 6 1/2 feet in height.

(8) Regulations concerning yards, planting areas, fences, etc., within the R-F District. A planting area, which, except as otherwise permitted herein, shall consist entirely of grass or other living plants, shall be provided within all of the following described areas adjacent to each side lot line and the rear lot line of each lot; provided, however, that where the municipality approves an interior sidewalk for the purposes of providing pedestrian access from the street to the CBD-3 Zone, a sidewalk shall be permitted to be placed two feet from the side yard line:
[Added 4-9-2013 by Ord. No. 13-04]

(a) Minimum area adjacent to each side line: three feet.

(b) Minimum area adjacent to rear line: 10 feet.

(9) Emergency generators may be placed in the side yard setback, but outside of the required planting strip provided that:
[Added 7-23-2013 by Ord. No. 13-09]

(a) The generator is no larger than 50 kilowatts;

(b) The generator is no closer to the adjoining residential building than to the residential building on the generator site; and

(c) There shall be vegetative screening that is at least one foot higher than the height of the generator (screening for the adjoining property) and capable of growing at least three feet higher than the generator. Plant materials must be at least five feet from the generator.

K. Height limitations.

(1) Within a one-family residence district, no principal building shall be constructed in excess of the following height limitations:
[Amended 4-9-2013 by Ord. No. 13-04]

| District | Maximum Height (feet) |
| --- | --- |
| R-AAA | 35 |
| R-AA | 35 |
| R-A | 35 |
| R-B | 35 |
| R-C | 30 |
| R-D | 30 |
| R-E | 30 |
| R-F | 30 |

(2) No accessory building shall exceed a height of 12 feet.

(3) Chimneys, flues, towers, bulkheads, spires and similar decorative features on principal buildings or accessory buildings may exceed the aforesaid height limitations if the total area of all such features on any one building does not exceed 20% of the area of the roof of such building.

(4)

Receiving and transmitting antennas may exceed the aforesaid height limitations but shall not exceed a height of 45 feet above the ground.

L.  Prohibited uses.
[Amended 4-9-2013 by Ord. No. 13-04]

(1)  On any premises in a one-family residence district where there exists, as a nonconforming use, a use which is not a permitted use in a one-family residence district, no arcade game shall be installed, operated or made available for use by customers or the public, except as an accessory use to a tavern, restaurant or bar having a plenary retail consumption license; provided, however, that this prohibition shall not be deemed to prohibit the display of such devices for the purpose of sale.

(2)  R-F District.

(a)  In addition to the prohibition set forth in this section, there shall be a prohibition of front-loading garages facing a public right-of-way, except on a corner lot.

(b)  Maximum accessory building height: 12 feet, provided that the provisions applicable to chimneys, bulkheads, spires, and similar decorative features as regulated shall apply.

M.  Maximum coverage.
[Amended 4-17-2001 by Ord. No. 01-04]

(1)  Within a one-family district, the sum of all areas covered by all principal and accessory buildings shall not exceed the following:

| District | Maximum Coverage |
| --- | --- |
| One-Family Residence R-AAA | 10% |
| One-Family Residence R-AA | 15% |
| One-Family Residence R-A | 18% |
| One-Family Residence R-B | 20% |
| One-Family Residence R-C | 20% |
| One-Family Residence R-D | 27% |
| One-Family Residence R-E | 27% |

(2)  Within a one-family district, the sum of all areas covered with impervious materials, such as buildings, structures, asphalt, concrete, and other materials that prevent absorption of stormwater into the ground, shall not exceed the following:

| District | Maximum Coverage |
| --- | --- |
| One-Family Residence R-AAA | 25% |
| One-Family Residence R-AA | 37% |
| One-Family Residence R-A | 45% |
| One-Family Residence R-B | 50% |
| One-Family Residence R-C | 50% |
| One-Family Residence R-D | 67% |
| One-Family Residence R-E | 67% |

   (3) Maximum coverage within the R-F District.
     [Added 4-9-2013 by Ord. No. 13-04]

     (a) Maximum building coverage: 25%.

     (b) Maximum impervious coverage: 50%.

     (c) Buffer: Minimum six-foot rear yard buffer where adjacent to a nonresidential zone.

N. R-E(2) One- and Two-Family Residence Overlay Zoning District.
  [Amended 5-19-1998 by Ord. No. 98-12]

   (1) In addition to the uses permitted within the R-E One-Family Residence Zoning District, within the R-E(2) One- and Two-Family Residence Overlay Zoning District, permitted uses shall include two-family dwellings, not to exceed one such two-family dwelling on any one lot.

   (2) There shall be a minimum required rear yard of 15 feet.

   (3) Except as noted above, the R-E(2) One- and Two-Family Residence Overlay Zoning District shall be governed in accordance with the provisions of Part **4**, Zoning, of this chapter governing the R-E One-Family Residence Zoning District.

O. Steep sloped areas. Within a one-family residential district, no building or structure shall be constructed within any steep sloped area, as that term is defined and regulated in Articles **VI** and **X** herein.
  [Added 4-17-2001 by Ord. No. 01-02]

# § 250-60. Multiple Residence (RMA) District.

[Amended 5-7-2002 by Ord. No. 02-06]

A. Purpose. The purpose of this chapter with respect to the Multiple Residence (RMA) District is to provide for medium-density residential housing which is limited in height, density, and floor area ratio, compatible with the suburban character of the City of Englewood, with adequate open space provisions, and to permit uses which are also permitted in one-family residential districts, as well as limited office uses, all subject to specific conditions and limitations as set out in this chapter.

B. Permitted uses. Within the Multiple Residence (RMA) District, no land or building shall be used, nor shall any building be constructed, altered, or designed to be used, for any purpose other than the following:

   (1) A one-family dwelling, subject to all of the conditions and limitations set out in § **250-59** of this chapter pertaining to such one-family dwelling, as well as all of the applicable provisions of this § **250-60**, provided that, in the event of a conflict or inconsistency between the provisions of the said two sections, the more restrictive provisions shall apply.

   (2) Multifamily dwellings and townhouses as hereinafter defined and limited.

   (3) Accessory uses and accessory buildings and structures as hereinafter defined and limited.

(4)  Municipal purposes.

(5)  Parks and playgrounds.

(6)  Nature preserve and nature study area.

(7)  Places of worship, including accessory religious instructional facilities as conditional uses subject to the requirements of Subsection **E** hereof.

(8)  Offices or studios within a building primarily for multifamily dwelling purposes, limited to professional offices or studios of architects, artists, clergypersons, dentists, engineers, land surveyors, lawyers, musicians, physicians, planners, psychologists, sculptors, tutors, or similar professions, and studios for dancing or music instruction, subject to the following restrictions and limitations:

  (a)  Such office or studio shall be located on the street floor of the premises, with direct access from the exterior rather than through a public hall.

  (b)  No more than one such office or studio (other than a professional office or studio located within a dwelling unit and constituting a permitted accessory use thereto as permitted and limited by Subsection **C**) shall be permitted for each 25 dwelling units.

  (c)  No such office or studio shall exceed 1,200 square feet in floor area.

  (d)  No person shall conduct, nor utilize any premises for the purpose of conducting, a sexually oriented business, as that term is defined herein.

(9)  Public schools and private nonprofit day schools accredited by the New Jersey State Department of Education, for grades not above high school, and day-care centers licensed by the State of New Jersey, as conditional uses, subject to the conditions and limitations set out in Subsection **E** hereof.

C.  Accessory uses within a principal building.

  (1)  Within the Multiple Residence (RMA) District, the following accessory uses shall be permitted within a principal multifamily dwelling building:

    (a)  Laundry rooms, recreational rooms and other similar accessory uses which are for the common benefit of all residents of the multifamily dwelling.

  (2)  Within the Multiple Residence (RMA) District, the following accessory uses shall be permitted within a dwelling unit in a multifamily dwelling, subject to the conditions and limitations set out in Subsection **C(3)** hereof:

    (a)  The professional office or studio of an architect, artist, clergyperson, dentist, engineer, land surveyor, lawyer, musician, physician, planner, psychologist, sculptor, tutor, or similar profession.

    (b)  A studio for dancing or music instruction.

  (3)  The accessory uses permitted by Subsection **C(2)** hereof shall be subject to the following conditions and limitations:

    (a)

The professional office or studio shall be operated by a person whose principal residence is within the dwelling unit in which the studio or office is located.

 (b) Not more than three persons, including the resident-operator or resident-operators, shall be employed or engaged in the operation of the office or studio at any one time.

 (c) Not more than three clients, patients, customers, students or other persons shall be served at any one time.

 (d) The office or studio shall not exceed 400 square feet in floor area or 20% of the aggregate floor area of the dwelling in which it is located, whichever is smaller.

 (e) Not more than two music or dancing concerts or recitals shall be conducted during any one calendar year.

 (f) No advertisement or sign shall be displayed on the exterior of the building or on the premises outside of the building, other than a nameplate not exceeding one square foot in area.

 (g) Any such accessory use shall comply with all applicable off-street parking requirements for such a use.

D. Permitted accessory structures and buildings.

 (1) Within the Multiple Residence (RMA) District, the following accessory buildings and structures incident to the primary use of the main structure on the premises shall be permitted, subject to the conditions and limitations hereinafter set forth:

  (a) Garden house, toolhouse, bathhouse, playhouse, greenhouse, and similar buildings customarily incidental to residential use.

  (b) Swimming pool, wading pool, tennis court.

  (c) Garage or carport.

  (d) Fences, garden walls and other landscape features, including decorative pools, fountains, statuary, terraces, steps, benches and playground equipment.

 (2) Any such accessory building or structure shall be subject to the following conditions and limitations:

  (a) No such building or structure shall contain any permanent cooking facilities, provided that this provision shall not be deemed to prohibit a barbecue pit or picnic fireplace.

  (b) No such accessory structure or building shall contain sleeping facilities.

E. Conditional uses. The conditional uses described in Subsection **B(7)** shall be permitted in the Multiple Residence (RMA) District only in the locations hereinafter described, and subject to the following conditions and limitations:

 (1) Such use shall be permitted only on premises which front on any of the following streets: Broad Avenue, Engle Street, Forest Avenue, Grand Avenue, Knickerbocker Road, Lafayette Place, Tenafly Road.

(2) Such use shall be permitted only if the premises and the improvements constructed or to be constructed thereon comply with all applicable provisions of this chapter respecting the Multiple Residence (RMA) District, together with the following additional limitations, conditions, and restrictions, and in the event of any inconsistency between the provisions of this section and any other section of this chapter, the more restrictive shall apply:

(a) The front yard of such premises shall conform to the required front yard setback prescribed in this chapter for the Multiple Residence (RMA) District.

(b) The minimum required side yard and minimum rear yard of such premises shall be not less than 25 feet greater than the required minimum set out in this § **250-60** respecting the Multiple Residence (RMA) District.[1]

[1] *Editor's Note: Amended at time of adoption of Code (see Ch. 1, General Provisions, Art. I).*

(c) The buildings, including accessory buildings, on such premises shall not cover more than 20% of the total area of the premises if the primary building is a one-story building, nor more than 15% of the total area of the premises if the primary building exceeds one story in height.

(d) The width of such premises shall be not less than 200 feet.

(e) Any premises to be used for a public school or a private nonprofit day school accredited by the New Jersey State Department of Education shall have a total area of not less than two acres.

(f) No such premises may be used for residential or sleeping purposes, except that one dwelling unit for a custodian may be provided.

(g) No building on any such premises, including an accessory building, shall be located:

[1] Less than 90 feet from an existing residential building on any adjacent property.

[2] Less than 90 feet from an existing residential building on any adjacent property with respect to public or private nonprofit accredited day schools.

[3] Less than 45 feet from an existing residential building on any adjacent property with respect to places of worship.

(3) Such use shall require site plan approval.

(4) Application for approval of the use of premises in a Multiple Residence (RMA) District for any conditional use described in Subsection **B** shall be made to the Planning Board, and the Planning Board, in acting thereon, shall be governed by the conditions, specifications, and standards hereinabove set out.

F. Minimum lot size requirements.

(1) Within the Multiple Residence (RMA) District, no one-family house shall be constructed on any lot with less than the minimum area, width and depth prescribed in § **250-59H** of this chapter with respect to the one-family residence district nearest

to the premises, and in the event that more than one one-family residence district is equally distant from the premises, then the requirements of the more restrictive district shall apply.

(2) Within the Multiple Residence (RMA) District, no two-family house shall be constructed on any lot containing less than 7,500 square feet in area or having a street frontage of less than 75 feet.

(3) Within the Multiple Residence (RMA) District, no three-family or four-family house shall be constructed on any lot containing less than 15,000 square feet in area or having a street frontage of less than 100 feet.

(4) Within the Multiple Residence (RMA) District, no building or structure, other than a one-family, two-family, three-family or four-family house, shall be constructed on any lot containing less than 40,000 square feet in area or having a street frontage of less than 150 feet.

G. Dwelling unit density and floor area ratio.
[Amended 5-16-2006 by Ord. No. 06-07]

(1) Townhouse development shall be limited to one dwelling unit for each 7,260 square feet of lot area (6 units per acre).

(2) All other multifamily residences shall be limited to one dwelling unit for each 3,630 square feet of lot area (12 units per acre) and a maximum floor area ratio of 33%.

H. Lot coverage.

(1) For townhouse development, the sum of the area of all principal and accessory buildings shall not exceed 27%.

(2) For all other multifamily residences, the sum of the area of all principal and accessory buildings shall not exceed 22% of the area of the lot.

I. Yard requirements.

(1) Except where more extensive requirements are set out respecting particular uses, premises in a Multiple Residence (RMA) District shall comply with the following requirements respecting minimum front yards (setback), side yards, and rear yards:

| Minimum Required Yard (feet) | | |
|---|---|---|
| Front Yard (setback) | Side Yard | Rear Yard |
| 30 | 35 | 40 |

(2) In the case of a corner lot, each yard which abuts a street shall be considered a front yard, and the lot shall comply with front yard setback requirements and all other front yard requirements and limitations set out in this chapter respecting each of such streets.

(3) Decks and patios may encroach into side yards up to a maximum of eight feet.

J.

A planting area, which, except as otherwise permitted by Subsection **J**, shall consist entirely of grass or other living plants, shall be provided within all of the following described areas adjacent to each side lot line and the rear lot line of each lot:

(1) When adjacent to property used or zoned for residential purposes: 15 feet.

(2) When adjacent to property used for nonresidence purposes: eight feet.

K. Impervious surface coverage. The maximum impervious surface coverage for both townhouse and other multiple-family uses shall be 67% of the lot area.

L. Usable open space.

(1) Any premises used for multifamily dwelling purposes shall contain usable open space in an amount equal to 400 square feet times the number of dwelling units on the premises.

(2) Except as provided below with respect to townhouse development, required usable open space shall not be divided into portions consisting of less than 4,000 square feet each, nor shall any usable open space have a depth or width of less than 40 feet.

(3) With respect to townhouse development, required usable open space may be assigned to individual contiguous dwelling units as private yard areas of not less than 400 square feet each.

(4) Required usable open space shall be easily accessible to the occupants of all of the dwelling units on the premises, except that, with respect to townhouse development, open space which is allocated to individual dwelling units, as hereinabove provided, shall be easily accessible to the occupants of the units to which such space is allocated.

(5) No portion of any required front yard or any required planting area shall be used for required usable open space.

(6) No portion of any required usable open space shall be used for driveways or parking spaces.

(7) No structure of any kind shall be permitted within any required usable open space, except for swimming pools and other outdoor sport structures, provided that not more than 25% of any structure shall be covered by a roof.

(8) Required usable open space shall be subject to site plan review as to design and layout, shall be attractively landscaped and shall not exceed a grade of 5% and shall be of a design to accommodate the needs of the occupants or contemplated occupants of the dwelling units it is designed to serve.

(9) Roof space on accessory buildings or structures, including roof space on parking facilities, may be used as required usable open space, provided that:

(a) Such space shall be accessible to occupants of the dwelling units it is designed to serve, by pedestrian means of access other than stairs.

(b) Such space shall, on at least one side, be at the same grade as the land abutting it.

    (c)  Such space shall, on all sides, be not more than 12 feet above the grade of the land abutting it.

    (d)  Such space shall contain railings, fencing or similar treatment to make it safe and suitable for recreational use.

M.  Regulations concerning yards, planting areas, fences, etc.

  (1)  Within a required front yard, except for the projections permitted by Subsection **M(3)** hereof, no accessory building or structure shall be permitted, except for walls or fences not more than 4 1/2 feet high.

  (2)  No paved terrace, steps, walk or similar improvement (other than those used for access to the premises or to a building on the premises) shall be constructed or located within the required planting areas required by Subsection **J**, except for fences or walls not exceeding 6 1/2 feet in height, and statuary, ornamental benches and similar ornamental devices.

  (3)  Notwithstanding any of the foregoing restrictions:

    (a)  Cornices and cantilevered roofs may project into any required yard a distance of not more than 24 inches.

    (b)  Belt courses, windowsills and similar ornamental features may project into any required yard a distance of not more than 12 inches, and chimneys may so project a distance of not more than 18 inches.

    (c)  A required open fire escape or fireproof stairway may project into any required yard a distance of not more than eight feet.

  (4)  Retaining walls or open chain-link fences, not more than eight feet in height, may be erected on any premises used for public park or public or school playground purposes, or on any premises used for cemetery or stadium purposes (provided that such cemetery or stadium use shall be a lawfully permitted nonconforming use), without complying with the foregoing yard or planting area restrictions.

  (5)  Chain-link material used for any fence within a multiple-residence district shall be of dark-colored material, and the posts and other framework forming part of such fence shall be the same color as the chain-link material.

  (6)  Accessory buildings and structures may be erected in side or rear yards, provided that they do not encroach on any required planting area.

  (7)  Any fence which is designed or constructed so as to have a front side and a rear side shall be erected so that the front side faces abutting streets or abutting premises and the rear side faces the premises on which the fence is erected.

  (8)  Except as otherwise permitted by this chapter, no fence or wall in a multiple-residence district shall exceed 6 1/2 feet in height.

N.  Height limitations.
[Amended 5-16-2006 by Ord. No. 06-07]

  (1)

No principal building shall be erected to a height in excess of 35 feet, as measured from the average grade to the highest point of the roof, provided that no principal building shall exceed three stories, inclusive of at-grade parking.

(2) No accessory building shall exceed a height of 12 feet.

(3) Chimneys, flues, towers, bulkheads, spires, and similar decorative features may exceed the aforesaid height limitations if the total area of all such features on any one building does not exceed 20% of the area of the roof of such building.

(4) Receiving and transmitting antennas may exceed the aforesaid height limitations but shall not exceed a height of 45 feet above the ground.

O.  Length of buildings.

(1) No building used or to be used as a multifamily dwelling shall exceed 160 feet in length.

(2) No building used or to be used as a multifamily dwelling shall contain more than two dwelling units in a straight, unbroken row, and the exterior wall of each such building shall include a setback or break with a depth of not less than six feet after every two dwelling units.

P.  Distances between buildings; windows.

(1) No buildings on any single lot shall be located closer to each other than the following distances:

(a) Between two accessory buildings: 10 feet.

(b) Between a principal building, other than a one-family dwelling, and a one-story accessory building: 20 feet.

(c) Between any two other buildings: 25 feet.

(2) No window, other than a bathroom or kitchen window, shall be located within 25 feet of any other window on any other building or on the same building if one such window shall be visible from the other, unless the planes of the walls in which such windows are located intersect (or would intersect if extended) at an angle of 90° or more.

Q.  Prohibited uses. On any premises in a multiple-residence district where there exists, as a nonconforming use, a use which is not a permitted use in a multiple-residence district, no arcade game shall be installed, operated or made available for use by customers or the public, except as an accessory use to a tavern, restaurant or bar having a plenary retail consumption license; provided, however, that this prohibition shall not be deemed to prohibit the display of such devices for the purpose of sale.

# § 250-61. Multiple Residence (RMB) District.

A.  Purpose. The purpose of this chapter with respect to the Multiple Residence (RMB) District is to permit the same uses permitted in a Multiple Residence (RMA) District, subject to the same conditions and limitations as are applicable to the Multiple

Residence (RMA) District, and also to permit general and professional office building use, with limitations and safeguards designed to insure that such office use will, to the extent practicable, be compatible with existing uses in and adjacent to the Multiple Residence (RMB) District.

B.   Permitted uses. Within the Multiple Residence (RMB) District, no land or building shall be used, nor shall any building be constructed, altered or designed to be used, for any purpose other than the following:

(1)   Any use permitted in the Multiple Residence (RMA) District, subject to all of the terms, conditions and limitations set out in § **250-60** of this chapter respecting such use within an RMA District and, with respect to any such use permitted in an RMA District, and thus permitted in this chapter, including § **250-60A** through **M**, inclusive, which shall be deemed incorporated herein and shall be applicable to the Multiple Residence (RMB) District with the same effect as if set out in full herein.

(2)   In addition to the permitted uses described in Subsection **B(1)** above, professional and general office buildings shall be permitted within the Multiple Residence (RMB) District in accordance with the following regulations:

(a)   Unless the municipal agency determines that it is impracticable to do so, the architectural character and scale of existing one-family residential structures within 200 feet shall be reflected in proposed new construction, and alterations, repairs and additions to an existing structure originally constructed for residential use shall be consistent with the existing architectural style and scale of such structure.

(b)   Existing grades, foliage and vegetation, particularly where they serve as natural buffers between the lot on which the proposed use is to be located and adjacent one-family residence districts and uses, shall be preserved unless the municipal agency determines that it is not practicable to do so.

(c)   No building shall exceed a height of 35 feet.

(d)   No building shall be constructed on a lot having an area of less than 20,000 square feet or having a street frontage of less than 140 feet.

(e)   Yard requirements:

[1]   Front yard (setback): 30 feet.

[2]   Rear yard: 35 feet.

[3]   Side yards: a minimum of 12 feet with respect to each side yard and a minimum of 30% of lot width with respect to the total of both yards.

(f)   In the case of a corner lot, each yard which abuts a street shall be considered a front yard and shall comply with all front yard requirements and limitations set forth herein.

(g)   A planted buffer strip shall be provided around the entire perimeter of the property as follows:

[1]   Side and rear yards: five feet, except the planted buffer strip shall be increased to eight feet in width when the yard abuts a one-family

residential district. The buffer strip shall consist of living plant materials and the municipal agency may require evergreen plantings capable of reaching a height of eight feet within one year. The municipal agency may further require a fence not to exceed 6 1/2 feet in height.

[2]   A front yard shall be planted in its entirety, except for driveways and pedestrian walkways. Any fence within a front yard shall not exceed 4 1/2 feet in height.

(h)   Chain-link material used for any fence within a multiple-residence district shall be of dark-colored material, and the post and other framework forming part of such fence shall be the same color as the chain-link material.

(i)   Any fence which is designed or constructed so as to have a front side and a rear side shall be erected so that the front side faces abutting streets or abutting premises on which the fence is erected.

(j)   No building shall exceed 160 feet in length; provided, however, that the exterior wall of any building shall include a setback or break with a depth of not less than six feet for every 50 feet of building length. In addition, no building shall contain more than 20,000 square feet of aggregate floor space.

(k)   The total ground area covered by all principal and accessory buildings on any lot shall not exceed 20% of the total area of such lot.

(l)   All access driveways to parking and service areas shall be to and from public streets having a pavement width of not less than 30 feet, suitably improved in accordance with current street specifications, or with such improvements guaranteed by a suitable performance guaranty approved by the municipal agency.

(m)   No driveway shall be used to direct outbound traffic into a single-family residence zone, and driveways and parking areas shall be so located as to discourage use of public streets in single-family residence districts by traffic generated by the proposed office use.

(n)   Parking beneath any building is to be screened so that any parked vehicles shall not be visible from any abutting street; provided, however, that:

[1]   No parking shall be permitted beneath any building located on any lot within this district with frontage on the east side of Grand Avenue or Engle Street, except in a fully enclosed garage, nor shall any such building contain an exempt story, as defined in § 250-98 hereof; and

[2]   No parking shall be permitted beneath any building located on any lot within this district with frontage on the west side of Grand Avenue or Engle Street, unless the ceiling level of such parking shall be no higher than grade level as measured along the front building line and unless such parking is screened or enclosed in such a manner as not to be visible from either Grand Avenue or Engle Street.

(o)   The lot for an office use shall have frontage on Grand Avenue or Engle Street.

(p)

No person shall conduct, nor utilize any premises for the purpose of conducting, a sexually oriented business, as that term is defined herein. [Added 5-27-1992 by Ord. No. 92-13]

C.  Prohibited uses. With the Multiple Residence (RMB) District:

(1)  No facility established for the primary purpose of treatment, maintenance, counseling, rehabilitation or housing of persons addicted to narcotics, drugs or alcohol or having narcotic-, drug- or alcohol-related problems, including without limitation any methadone maintenance center, narcotic, drug, or alcohol treatment center, facility or clinic, or any narcotic, drug or alcohol halfway house, shall be permitted; provided, however, that nothing contained herein shall be deemed to prohibit the occasional use of premises by a nonprofit organization for the holding of meetings or counseling sessions related to narcotic, drug or alcohol problems, if such use is not the exclusive or primary use of such premises, nor shall anything contained herein be deemed to prohibit the treatment by a licensed physician, as an incidental part of his or her practice of medicine, of a patient with a narcotic-, drug- or alcohol-related problem or illness.

# § 250-62. Multiple Residence (RMH) District.

A.  Purpose. The purpose of this chapter with respect to the Multiple Residence (RMH) District is to provide for subsidized nonprofit housing for families and senior citizens, all subject to specific conditions and limitations as set out in this chapter.

B.  Permitted uses. Within the Multiple Residence (RMH) District, no land or building shall be used, nor shall any building be constructed, altered or designed to be used, for any purpose other than the following:

(1)  Multifamily dwellings, each containing more than three dwelling units, for the purpose of providing subsidized rental housing with financial aid from the United States Department of Housing and Urban Development and administered by a duly constituted local housing authority or a nonprofit or limited-distribution corporation constituted under state statutes and approved by the United States Department of Housing and Urban Development.

(2)  Accessory uses and accessory buildings and structures as hereinafter defined and limited.

(3)  Municipal purposes.

(4)  Parks and playgrounds.

C.  Accessory uses within a principal building.

(1)  Within the Multiple Residence (RMH) District, the following accessory uses shall be permitted within a principal multifamily dwelling building:

(a)  Laundry rooms, community rooms, recreational rooms and other similar accessory uses which are for the common benefit of all residents of the multifamily dwelling.

(2)

Within the Multiple Residence (RMH) District, the following accessory uses shall be permitted within a dwelling unit in a multifamily dwelling, subject to the conditions and limitations set out in Subsection **C(3)** hereof:

(a) The professional office or studio of an architect, artist, clergyperson, dentist, engineer, land surveyor, lawyer, musician, physician, planner, psychologist, sculptor, tutor or similar profession.

(b) A studio for dancing or music instruction.

(3) The accessory uses permitted by Subsection **C(2)** hereof shall be subject to the following conditions and limitations:

(a) The professional office or studio shall be operated by a person whose principal residence is within the dwelling unit in which the studio or office is located.

(b) Not more than one person (other than the resident-operator) shall be employed or engaged in the office or studio at any one time.

(c) Not more than two clients, patients, customers, students or other persons shall be served at any one time.

(d) The office or studio shall not exceed 400 square feet in floor area or 20% of the aggregate floor area of the dwelling in which it is located, whichever is smaller.

(e) Not more than two music or dancing concerts or recitals shall be conducted during any one calendar year.

(f) No advertisement or sign shall be displayed on the exterior of the building or on the premises outside of the building, other than a nameplate not exceeding one square foot in area.

(g) Any such accessory use shall comply with all applicable off-street parking requirements for such a use.

D. Permitted accessory structures and buildings.

(1) Within the Multiple Residence (RMH) District, the following accessory buildings and structures incident to the primary use of the main structure on the premises shall be permitted, subject to the conditions and limitations hereinafter set forth:

(a) Garden house, toolhouse, bathhouse, playhouse, greenhouse, and similar buildings customarily incidental to residential use.

(b) Swimming pool, wading pool, tennis court.

(c) Garage or carport.

(d) Fences, garden walls and other landscape features, including decorative pools, fountains, statuary, terraces, steps, benches and playground equipment.

(e) Community building, recreational building for the use of those residing on the premises.

(2)

Any such accessory building or structure shall be subject to the following conditions and limitations:

(a) No such building or structure shall contain any permanent cooking facilities, provided that this provision shall not be deemed to prohibit a barbecue pit or picnic fireplace.

E. Family dwelling units and senior citizen dwelling units.

(1) As used in this § **250-62**, the following terms shall have the following meanings:

**FAMILY DWELLING UNITS**
Buildings designed and intended to be occupied by families consisting of either two persons, both of whom are under 62 years of age, or consisting of three or more persons.

**SENIOR CITIZEN DWELLING UNITS**
Buildings designed and intended to be occupied by families consisting of not more than two persons, at least one of whom is 62 years of age or older.

(2) Family dwelling units shall conform with the following requirements:

(a) No single building used for family dwelling units shall contain more than 16 separate dwelling units.

(b) Each such dwelling unit shall have at least one exit door opening directly to the exterior or to a porch, balcony, or similar facility which is open to the exterior and, when above the first floor, is accessible by means of an exterior stairway.

(c) All family dwelling units shall contain separate bedroom facilities, and at least 2/3 of such units on any one lot shall contain more than one bedroom in each dwelling unit and at least 7 1/2% thereof shall contain either three or four bedrooms.

(d) No such dwelling unit shall be more than two rooms deep, from front to rear.

(3) Senior citizen dwelling units shall conform with the following:

(a) Any building containing senior citizen dwelling units which exceeds one story in height shall be equipped with at least one elevator for each 100 dwelling units or faction thereof.

(b) All such dwelling units shall either be efficiency apartments, with no separate bedroom, or shall contain not more than one bedroom.

(c) Community space, being space available for use by all occupants of a building or group of buildings, shall be provided, with an area equal to not less than 20 square feet per dwelling unit.

(d) Hallways, stairwells, and elevator lobbies shall be lighted by windows having an area equivalent to 8 1/2% of the floor area of such hallways and 10% of the horizontal area of such stairwells and elevator lobbies. No point in any hallway shall be more than 40 feet from a window.

F.

Minimum lot size requirements. Within the Multiple Residence (RMH) District, no building or structure shall be constructed on any lot containing less than 30,000 square feet in area or having a width or depth of less than 100 feet.

G.  Lot coverage. The sum of the area of all principal and accessory buildings shall not exceed 30% of the area of the lot, and each lot shall contain not less than the following amount of space per dwelling unit, which shall not be covered by any building, but which may include driveways, parking areas, walkways, and play areas:

| Use | Required Space Per Dwelling Unit (square feet) |
| --- | --- |
| Family units | 1,750 |
| Senior citizen units | |
| 1- or 2-story building | 1,750 |
| 3-story building | 1,425 |
| 4-story building | 1,100 |
| 5-story building | 775 |
| 6-story building | 450 |

H.  Yard requirements.

(1)  Premises in a Multiple Residence (RMH) District shall comply with the following requirements respecting minimum front yards (setback), side yards, and rear yards:

| | Minimum Required Yards (in feet) | | |
| --- | --- | --- | --- |
| Building Type | Front Yard (setback) | Side Yard | Rear Yard |
| Buildings not more than 2 stories in height | 30 | 15 | 20 |
| Buildings more than 2 stories in height | 60 | 30 | 30 |

(2)  In the case of a corner lot, each yard which abuts a street shall be considered a front yard, and the lot shall comply with front yard setback requirements and all other front yard requirements and limitations set out in this chapter respecting each of such streets, except that with respect to a building with a height of more than two stories, one such yard need not be in excess of 30 feet.

I.  Regulations concerning yards.

(1)  Within a required front yard, except for the projections permitted by Subsection I(4) hereof, no accessory building or structure shall be permitted, except for walls or fences not more than 4 1/2 feet high.

(2)  No fence or wall over five feet high, nor any other accessory building or structure of any kind, including paved terraces, steps, walks, or similar improvements (other than those used for access to the premises or to a building on the premises), shall be constructed or located within three feet of any lot line.

(3)

Accessory buildings shall not cover more than 40% of the area of any required rear yard, provided that no accessory building other than garages shall be located nearer than 10 feet to any rear lot line.

(4) Notwithstanding any of the foregoing restrictions:

(a) Cornices and cantilevered roofs may project into any required yard a distance of not more than 24 inches.

(b) Belt courses, windowsills and similar ornamental features may project into any required yard a distance of not more than 12 inches, and chimneys may so project a distance of not more than 18 inches.

(c) A required open fire escape or fireproof stairway may project into any required yard a distance of not more than eight feet.

(5) Chain-link material used for any fence shall be coated with colored vinyl, and the posts and other framework forming part of such fence shall be similarly coated or painted the same color as the chain-link material.

J. Usable open space. Usable open space in an amount equal to 100 square feet per dwelling unit for senior citizen dwelling units and 400 square feet per dwelling unit for family dwelling units shall be provided in the manner required and described in § 250-60L of this chapter.[1]

[1]  Editor's Note: Amended at time of adoption of Code (see Ch. 1, General Provisions, Art. I).

K. Height limitations.

(1) No principal building containing family dwelling units shall be erected to a height in excess of 35 feet or two stories.

(2) No principal building containing senior citizen dwelling units shall exceed a height of 65 feet or six stories.

(3) No accessory building shall exceed a height of 16 feet.

(4) Chimneys, flues, towers, bulkheads, spires and similar decorative features may exceed the aforesaid height limitations, if the total area of all such features on any one building does not exceed 20% of the area of the roof of such building.

L. Length of buildings.

(1) No one-story, two-story, or three-story building shall exceed 160 feet in length, nor shall any exterior wall on any such building exceed a length of 50 feet, unless there is a variation in the surface plane of such wall at least once every 50 feet, with such variation consisting of either a recess or protrusion of the surface plane for a minimum depth of four feet.

(2) No building which is four stories high or higher shall exceed 350 feet in length, nor shall any wing of any such building exceed 300 feet in length, nor shall any exterior wall on any such building exceed a length of 150 feet, unless there is a variation in the surface plane of such wall at least once every 150 feet, with each such variation

consisting of either a recess or protrusion of the surface plane for a minimum depth equal to 1/8 of the length of the longest abutting wall.

M.  Distances between buildings; windows.

   (1)  No buildings on any single lot shall be located closer to each other than the following distances:

      (a)  Between two accessory buildings: 10 feet.

      (b)  Between a principal building and an accessory building: 20 feet.

      (c)  Between two principal buildings, neither of which exceeds two stories in height: 35 feet.

      (d)  Between two principal buildings, one or both of which exceeds two stories in height: 35 feet, or a distance equal to the average height of such buildings at the point where they are closest to one another.

   (2)  No window, other than a bathroom or kitchen window, shall be located within 40 feet of any other window on any other building or on the same building if one such window shall be visible from the other, unless the planes of the walls in which such windows are located intersect (or would intersect, if extended) at an angle of 90° or more.

# § 250-63. Downtown Districts.

[Added 11-12-2014 by Ord. No. 14-35[1]]

A.  Purpose. The purpose of this section is to promote a vibrant, energetic eighteen-hour downtown and attract investment that accommodates new businesses and business growth, adds jobs, increases services, enhances arts and cultural offerings, allows for mixed uses and additional residential opportunities, and generates more pedestrian activity throughout downtown during the day and into the evening. The standards in this section are intended to ensure that future projects are sited and designed in ways that maintain or complement the traditional form and scale of downtown's buildings and blocks. Furthermore, this section intends to foster safe, lively, pedestrian-friendly streets.

B.  Downtown Districts. The following districts are hereby created:

   (1)  Downtown (D-1) District. This district is the focal point of city life and commerce. It serves a variety of types of users, including businesses, customers, employees, residents, and visitors and people using various modes of transportation. It serves the core retail function of downtown and the areas of most intense pedestrian activity. These regulations intend to support this district's role as the central retail and civic hub of the City, and to enhance the level of economic, cultural, and social activity by permitting mixed uses; residential and office space in upper floors; and arts, entertainment, recreational, and cultural uses. The standards contained in this district permit the greatest intensity of development/redevelopment among the Downtown Districts, yet they aim to ensure that it complements the traditional form and scale of downtown's buildings and blocks and promotes active ground floors that support pedestrian activity and safety during the day and into the night. Ground floors in the D-1 Districts must contain retail or commercial uses.

(2) Downtown (D-2) District. The D-2 District is intended to promote high-quality development and redevelopment that serves as a transition into downtown. The land uses permitted in this district are intended to increase the presence of people and pedestrian activity, stimulate business growth and development, and support downtown through functional and economic relationships to activity in the D-1 Districts and in the greater Engle/Grand corridor. As much of this district is located at the edges of downtown and in proximity to residential districts, bulk and setback requirements would result in a less intense, more open environment than in the D-1 Districts.

(3) Downtown (D-3) District. The intent of this district is to provide for the planned commercial development of an area as a single entity, according to a plan containing mixed retail and commercial office uses in such ratios, and subject to such specific conditions and limitations as set forth herein, so as to promote a desirable visual environment through good civil design and arrangement, relate the mixed development to the particular site, accommodate the movement of pedestrian and vehicular traffic safely and conveniently, promote economic growth and employment within business districts, foster the proper utilization of existing resources, eliminate blighting conditions and otherwise guide the development of land in a manner which will promote the public health, safety, morals and general welfare.

C. Permitted uses. Permitted uses by Downtown District are summarized in the table below. In the table, the letter "Y" stands for permitted use, "YC" stands for conditional use, and "N" stands for prohibited use. The letter "Y" with an asterisk, or "Y," indicates a use permitted only on upper floors of a multistory building. Conditions for conditional uses are listed in Subsection D. All other uses not expressly permitted in this section are prohibited.

| Land Use Categories and Land Uses | D-3** | D-2a | D-2b | D-2c | D-2d | D-2e | D-1a | D-1b |
|---|---|---|---|---|---|---|---|---|
| **Retail Trade** | | | | | | | | |
| Retail stores, with the exception of: | | | | | | | | |
| - Establishments open between the hours of 12:00 a.m. and 6:00 a.m. - Pawn shops - Sexually oriented retail - Medical equipment sales | Y | Y | Y | Y | Y | N | Y | Y |
| Banks | Y | YC | YC | YC | YC | YC | YC | YC |
| Shopping center | Y | N | N | N | N | N | N | N |
| Automobile sales | N | N | N | YC | N | YC | N | N |
| **Eating and Drinking Establishments** | | | | | | | | |
| Restaurants (limited service restaurants) | Y | YC | YC | YC | YC | YC | YC | YC |
| Restaurants (full service) | Y | N | N | N | YC | N | YC | YC |

| Land Use Categories and Land Uses | D-3** | D-2a | D-2b | D-2c | D-2d | D-2e | D-1a | D-1b |
|---|---|---|---|---|---|---|---|---|
| **Arts, Entertainment and Recreation** | | | | | | | | |
| Professional and artist studios, with the exception of: | | | | | | | | |
| - Body art, or tattoo, and body piercing studios | Y | Y | Y | Y | Y | Y | Y | Y |
| Art galleries | Y | Y | Y | Y | Y | Y | Y | Y |
| Performance facility | Y | Y | N | N | Y | N | Y | Y |
| Theaters | Y | N | N | N | N | N | Y | Y |
| Health clubs and instructional studios | Y | Y | Y | Y | Y | Y | Y | Y |
| **Personal and Consumer Services** | | | | | | | | |
| Personal services, with the exception of: - Fortune-telling and palm-reading establishments - Massage parlors with unlicensed personnel - Sexually oriented businesses - Tattoo and body piercing parlors | Y | Y | Y | Y | Y | Y | Y | Y |
| Pet grooming and training | Y | Y | Y | Y | Y | Y | N | N |
| Child care | Y | Y | Y | Y | Y | Y | Y* | Y* |
| Laundry and dry cleaning | Y | Y | Y | Y | Y | Y | Y | Y |
| Printing and reproduction | Y | N | Y | Y | Y | Y | Y | Y |
| Repair of consumer products | Y | N | Y | Y | Y | Y | Y | Y |
| **Offices (nonmedical)** | | | | | | | | |
| Professional offices | N | Y | Y | Y | Y | Y | Y | Y* |
| Business offices | N | Y | Y | Y | Y | Y | Y | Y* |
| **Medical and Health Care** | | | | | | | | |
| Medical offices | N | Y | Y | Y | Y* | Y | Y* | Y* |
| Medical and dental laboratories and diagnostic services | N | N | Y | Y | N | Y | N | Y* |
| Medical equipment sales | N | N | Y | Y | N | Y | N | N |
| Medical group practice | N | N | Y | Y | N | N | N | N |
| **Lodging** | | | | | | | | |

| Land Use Categories and Land Uses | D-3** | D-2a | D-2b | D-2c | D-2d | D-2e | D-1a | D-1b |
|---|---|---|---|---|---|---|---|---|
| Hotel | N | N | N | Y | Y | Y | Y | Y |
| **Education** | | | | | | | | |
| School (preschool) | N | Y | Y | Y | Y | N | N | N |
| Test preparation and learning centers | Y | N | Y | N | N | Y | N | N |
| **Residential** | | | | | | | | |
| Apartments and condominiums | N | Y | Y | Y* | Y | N | Y* | Y* |
| Townhouses (attached) | N | Y | Y | N | N | N | N | N |
| **Public Facilities** | | | | | | | | |
| Recreational facilities | N | Y | N | N | N | N | N | N |
| Government and community services | N | Y | Y | Y | Y | Y | Y* | Y* |
| Government offices | Y | Y | Y | Y | Y | Y | Y | Y |
| **Parking Facilities** | | | | | | | | |
| Public parking facility | Y | Y | Y | Y | Y | Y | Y | Y |
| **Accessory Uses** | | | | | | | | |
| Drive-through/drive-up facilities | Y | YC | YC | YC | N | N | N | N |

\*\*Permitted uses for D-3 are provided for the purpose of comparing the various Downtown Districts. See § 250-64 for specific uses permitted and prohibited in D-3.

D. Conditional uses in the Downtown D-1 and D-2 Districts. For areas within the Downtown D-1 and D-2 Districts, the Planning Board shall not approve any application for any of the following conditional uses unless the following enumerated specific conditions have been met:

(1) Restaurants.

    (a) Restaurants where food is prepared for retail sale on the premises are permitted conditionally upon obtaining site plan approval from the municipal agency. Approval may be subject to the execution of a maintenance agreement to include obligations on the part of the owner or operator of the premises to maintain the premises and the surrounding area free of litter and to minimize loitering on or about the premises.

    (b) Drive-through/drive-up facilities are not permitted.

(2) Banks.

    (a) D-1 Districts. Drive-through/drive-up facilities are not permitted.

    (b) D-2 Districts. Drive-through/drive-up facilities are permitted only in the D-2b District, provided that such facilities and associated lanes do not encroach on the public right-of-way or internal site circulation roadways. Drive-through/drive-up facilities will require site plan approval.

(3) Automobile sales.

    (a) Automobile sales will require site plan approval.

    (b) Automobile sales establishments shall consist of an enclosed showroom. Outdoor display and storage of vehicles shall not occupy more than 30% of the land area of the property.

    (c) Automobile service and repair is permitted as an accessory use.

E. Dimensional standards. As related to dimensional standards, the D-1 and D-2 Downtown Districts have the subdistricts "a," "b," "c" and "d" charted below.

| Dimension | D-3** | D-2a | D-2b | D-2c | D-2d | D-2e | D-1a | D-1b |
|---|---|---|---|---|---|---|---|---|
| **Lot Dimensions** | | | | | | | | |
| Minimum lot area (square feet) | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 2,000 | 2,000 |
| Minimum lot area (if building height > 45 feet | n/a | n/a | n/a | n/a | n/a | n/a | n/a | 25,000 square feet |
| Minimum lot width (feet) | 100 | 100 | 100 | 100 | 100 | 100 | 20 | 20 |
| Minimum lot width (if building height > 45 feet | n/a | n/a | n/a | n/a | n/a | n/a | n/a | 150 feet |
| Minimum lot depth (feet) | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| **Building Height and Number of Stories** | | | | | | | | |
| Maximum building height (feet) | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 60 |
| Maximum number of stories | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 5 |
| **Setbacks and Building Coverage** | | | | | | | | |
| Front yard setback (feet) | 0 | 0-15 | 0-10 | 0-10 | 0 | 0-10 | 0 | 0 |
| Minimum side yard setback (feet) | 0 | 6 | 0 | 0 | 0 | 6 | 0 | 0 |
| Minimum rear yard setback (feet) | 0 | 6 | 6 | 6 | 6 | 6 | 6 | 6 |
| **Setbacks when Abutting Residential District** | | | | | | | | |
| Minimum rear yard setback (feet) | 0 | 14 | 14 | 14 | 14 | 14 | 14 | 14 |
| Minimum side yard setback (feet) | 6 | 8 | 8 | 8 | 8 | 8 | 8 | 8 |

* See Subsection **F**.

| Dimension | D-3** | D-2a | D-2b | D-2c | D-2d | D-2e | D-1a | D-1b |
|-----------|-------|------|------|------|------|------|------|------|

** Dimensional standards for the D-3 District are shown here for comparing them with all of the Downtown Districts. See § 250-64 for detailed standards for the D-3 District.

F.  Additional side yard setback standards in the D-1b District. In the D-1b District, the side yard setback of the side of corner properties facing Bennett Street, Williams Street, Armory Street, and Humphrey Street shall be a minimum of six feet.

G.  Additional standards for buildings taller than 45 feet in the D-1b District.

   (1)  The front of a new building taller than 45 feet with a flat roof shall step back a minimum of six feet from the front setback line starting at a point in the height of the building between 45 feet and 49 feet.

   (2)  The eave height of a new building taller than 45 feet with a pitched roof shall be between 45 and 49 feet.

H.  General standards for the Downtown D-1 and D-2 Districts.

   (1)  Measurement of building height.

      (a)  Building height shall be measured as the vertical distance between the average finished grade and the highest point of a building or structure. The highest point shall be the coping of a flat roof without a parapet, the midpoint of the parapet on a flat roof, the deckline of a mansard roof, or the midpoint between the eaves and highest ridge of a gable, gambrel, or hipped roof.

      (b)  Elevator shafts, solar collectors, and mechanical equipment necessary for building functions and maintenance shall not be included in the calculation of the maximum building height, provided the shafts and equipment are screened or integrated into architectural rooflines so as not to be discernable from the public street level.

      (c)  The total area of all roof appurtenances and other features that exceed the maximum building height shall not exceed 33% of the total roof area of the structure.

      (d)  No roof structure shall be allowed for the purpose of providing additional interior floor space.

   (2)  Story heights.

      (a)  The ground floor shall have a maximum floor-to-floor height of 18 feet.

      (b)  Each story above the ground floor shall have a maximum floor-to-floor height of 14 feet.

      (c)  At-grade parking structures occupying a story shall count in the calculation of the number of stories in a building.

   (3)  Driveways. Driveways are not permitted in the D-1b District along Palisade Avenue.

   (4)  Parking. Parking shall be accessed by rear alleys, rear lanes, or side streets where available.

(5) Encroachments. Balconies and window bays shall provide a minimum of 10 feet of clearance over public sidewalks or rights-of-way and shall project no more than three feet over public sidewalks or rights-of-way.

(6) Entrances. Every street-facing, ground-level business shall have a separate entry.

(7) Green buildings.

    (a) All new buildings, additions, or renovations with gross area greater than 5,000 square feet are encouraged to be constructed to the U.S. Green Building Council's LEED certification standards or equivalent.

    (b) Green roofs are permitted and encouraged. The planting media and plant material comprising green roofs shall be maintained in accordance with generally accepted landscape maintenance practices, replacing each as necessary.

(8) Waste collection and storage areas. Trash, recycling, and any other refuse or recycling collection dumpsters or containers shall be located at the rear of the property and either screened, enclosed, or otherwise blocked from public view. Such screening or enclosure should be designed in conjunction with the primary building, may use similar materials and shall obscure views of waste collection and storage area.

I. Design standards for the Downtown D-1 and D-2 Districts.

(1) General design standards.

    (a) Buildings shall generally relate in scale and design features to surrounding buildings and to the traditional form and scale of Englewood's downtown blocks and buildings.

    (b) Buildings shall generally demonstrate continuity of treatment by maintaining cornice lines in buildings of similar height, by extending horizontal lines of fenestration, and by complementing architectural styles, details, features, design themes, building materials, and colors used in surrounding buildings where such buildings represent the traditional character and architecture of Englewood.

    (c) Buildings shall not have long, monotonous, uninterrupted walls or roof planes. Offsets including projections, recesses, and changes in floor level shall be incorporated to add architectural interest and variety. Roofline offsets shall be provided in order to add architectural interest and variety to the massing of a building.

    (d) The overall appearance of roofs in downtown should be varied and reinforce the rhythm and scale of facades and reflect variation in the area's natural topography.

    (e) To the extent the foregoing criteria do not impose an objective standard in feet, percentage or other objective criteria, a variance therefrom shall be considered a design waiver rather than a zoning variance and shall be considered as such in the discretion of the appropriate land use board.

(2) Detailed design standards.

(a) Building articulation.

    [1] Horizontal articulation. New buildings shall be articulated horizontally. Internal programs should be used to define building articulation. The maximum width of any articulated section shall be 45 feet along the street frontage. Sections can be expressed through bays, variations in setback, window patterns, changes in material, and other similarly effective techniques.

    [2] Vertical articulation. New buildings shall be articulated vertically to clearly define a base, middle, and top.

(b) Roof forms. Roofs shall be designed to relate to the structural system and architectural style of the building.

(c) Doors and windows.

    [1] All buildings shall include doors and windows facing the street. At ground level, buildings are not permitted to have blank walls facing public streets.

    [2] Buildings located at the corner of two public streets shall have either a principal entrance at the corner of the building or an entrance facing each street.

    [3] At least 70% of the wall surface area of the ground level for each wall facing a public street shall consist of transparent treatments. Tinted, reflective, or other types of glass or window treatments that diminish transparency are prohibited.

    [4] Multistory buildings shall be designed with a minimum transparent area of 25% of the surface area of each building wall above the ground floor. Each upper story building wall shall contain an approximately proportional amount of transparent area as each other story above the ground floor. Windows shall be aligned vertically and horizontally between floors and follow the same window rhythm.

(d) Buildings at prominent corners. The intersections of Palisade Avenue and Dean Street, Palisade Avenue and Engle Street/Grand Avenue, and Palisade Avenue and Tenafly Road/Lafayette Avenue/Bennett Road are prominent thresholds in downtown Englewood and, therefore, buildings at these intersections shall be considered significant structures. The Planning Board may deem appropriate that significant structures are designed with architectural features such as corner towers or other features to emphasize their location and serve as a visual focal point in downtown. Such architectural features shall be a maximum width of 24 feet and a maximum length of 24 feet. The approving authority also may deem appropriate that such features may exceed the maximum building height of the downtown subdistrict.

(e) To the extent the foregoing criteria do not impose an objective standard in feet, percentage or other objective criteria, a variance therefrom shall be considered a design waiver rather than a zoning variance and shall be considered as such in the discretion of the appropriate land use board.

J.

Visual buffers and screening. Buffers shall be provided to effectively protect residential property from the potential adverse effects of adjacent nonresidential land use activity that may result in nuisance, including visual blight, excessive light, threat to safety, noise, or odor encroachment to an adjacent parcel or one located across a public right-of-way.

(1) Landscaping.

    (a) All activities on any lot in the Downtown Districts that abut a residential zoning district shall be screened from such abutting residential district by landscaping consisting of lawn, massed evergreen and deciduous trees, and shrubs of such species and density as will provide, within two growing seasons, a solid and continuous screen throughout the full course of the year.

    (b) Evergreen and deciduous shrubs shall have a minimum height of three feet when planted and shall be of varieties that normally grow to a minimum height of six feet within two full growing seasons.

    (c) Deciduous trees shall have a minimum caliper of three inches at the time of planting.

(2) Fencing.

    (a) Fences are permitted in rear yards only.

    (b) Fences shall have a maximum height of six feet.

    (c) Fences shall be kept in good repair, consistent with the design thereof. The property owner shall be responsible for maintaining the area between the property line and the fence.

    (d) Chain-link material used for any fence shall be of dark-colored material, and the posts and other framework forming part of such fence shall be the same color as the chain-link material.

[1] *Editor's Note: This section also repealed former § 250-63, Central business districts, as amended.*

# § 250-64. Downtown (D-3) District.

[Amended 5-27-1992 by Ord. No. 92-13; 7-10-1996 by Ord. No. 96-24; 4-9-2013 by Ord. No. 13-04; 12-16-2014 by Ord. No. 14-44]

A. Purpose. The purpose of this chapter with respect to the Central Business (CBD-3) District is to provide for the planned commercial development of an area as a single entity according to a plan containing mixed retail and commercial office uses in such ratios, and subject to such specific conditions and limitations as set forth herein, so as to promote a desirable visual environment through good civil design and arrangement, relate the mixed development to the particular site, accommodate the movement of pedestrian and vehicular traffic safely and conveniently, promote economic growth and employment within business districts, foster the proper utilization of existing resources, eliminate blighting conditions and otherwise guide the development of land in a manner which will promote the public health, safety, morals and general welfare.

B. Permitted uses. Within the Central Business (CBD-3) District, no land or building shall be used, nor shall any building be constructed, altered or designed to be used, for any purpose other than the following (subject to the further specific conditions and limitations set forth in this section).

(1) Retail stores, excluding the outdoor display of any merchandise and the outdoor display of fruit, vegetables, and plants.

(2) Banks, including walk-up and drive-up windows, provided that such walk-up and drive-up windows and drive-up lanes do not encroach on the public right-of-way or internal site circulation roadways. Drive-up windows will require site plan approval.

(3) Personal service shops, including barbershops, beauty parlors, tailor shops, shoe repair shops and similar uses.

(4) (Reserved)[1]

    [1]   *Editor's Note: Former Subsection B(4), regarding business professional or governmental offices, was repealed 12-16-2014 by Ord. No. 14-44.*

(5) Theaters, but excluding amusement parks, shooting galleries, circuses or amusement arcades.

(6) Public parking lots and public parking garages.

(7) Studios for dancing and music instruction, including recital and concert halls.

(8) Studios and art galleries, including studios and galleries for paintings, photography, sculpture and ceramics.

(9) Restaurants, including the preparation of food for retail sale on the premises, but excluding fast-food restaurants.

(10) Offset printing, copying and duplicating of documents or papers, provided that such use shall not include any printing press, typesetting, linotype or other machinery other than offset printing or copying or duplicating machines, and provided further that, in order to assure that any such use is consistent and compatible with the general retail shopping character of the Central Business (CBD-3) District, such use shall comply with the following requirements:

   (a) If such use is to be located on the ground floor of a building, it shall include display windows, similar to store display windows used for retail sales purposes, and all windows shall be open to view from the public street and shall include displays similar to those generally used in retail stores within the Central Business (CBD-3) District.

   (b) Before a certificate of occupancy shall be issued to authorize such a use, the application therefor shall be referred to the Planning Board. Upon receiving such an application, the Board shall consider, evaluate and make recommendations respecting the manner by which the applicant proposes to insure that the use will be consistent and compatible with, and will not have an adverse effect upon, the general character of the Central Business (CBD-3) District, including proposals and plans for window treatment and design and for the layout and design of the interior of the premises, including the location of any offset printing, copying or duplicating machinery, any customer service

area, and any other facility or area within the premises. The Board shall thereafter submit its report and recommendation to the Chief Inspector.

(c) After consideration of the report and recommendation of the Board, if the Chief Inspector determines that the proposed use meets the requirements of this subsection, the Chief Inspector shall issue the requested certificate of occupancy, which may include such conditions and limitations, including conditions and limitations recommended by the Board, as he deems appropriate, respecting the design and layout of the premises in order to effect the purposes of this subsection with respect to the maintenance of the general character of the Central Business (CBD-3) District. Such conditions and limitations shall constitute an essential part of the said certificate of occupancy with which the operator of the premises shall comply so long as the aforesaid use shall continue.

(11) Printing, but excluding newspaper printing.

(12) Repairing of household appliances.

(13) Retail laundry and dry-cleaning establishments, including self-service automatic laundry and dry-cleaning establishments and outlets and pickup stations for laundry and dry-cleaning establishments.

(14) Shops for the sale of building, plumbing, and electrical supplies and household equipment and furnishings.

C.  Prohibited uses. Within the Central Business (CBD-3) District:

(1) Except as permitted for a licensed outdoor cafe pursuant to Chapter **180**, Article **I**, of the Code of the City of Englewood, and except as permitted by Subsection **B(2)** and **(6)** with respect to walk-up and drive-up bank facilities and parking lots, no use shall be permitted unless it is conducted entirely within a fully enclosed building. [Amended 7-10-1996 by Ord. No. 96-24]

(2) No use which is noxious or offensive by reason of emission of odor, dust, noise, smoke, gas, fumes, radiation or similar condition or which presents a hazard to public safety shall be permitted.

(3) No massage parlor or similar establishment shall be permitted.

(4) Except as permitted in Subsection **B(2)**, no drive-in facilities and no curbside or driveway over a public sidewalk shall be permitted, except for an off-street parking facility, for which site plan approval by the Planning Board shall be required.

(5) No arcade game shall be installed, operated or made available for use by customers or the public, except as an accessory use to a tavern, restaurant or bar having a plenary retail consumption license; provided, however, that this prohibition shall not be deemed to prohibit the display of such devices for the purpose of sale.

(6) No facility established for the primary purpose of treatment, maintenance, counseling, rehabilitation or housing of persons addicted to narcotics, drugs or alcohol or having narcotic-, drug- or alcohol-related problems, including without limitation any methadone maintenance center, narcotic, drug or alcohol treatment center, facility or clinic, or any narcotic, drug or alcohol halfway house, shall be

permitted; provided, however, that nothing contained herein shall be deemed to prohibit the occasional use of premises by a nonprofit organization for the holding of meetings or counseling sessions related to narcotic, drug, or alcohol problems, if such use is not the exclusive or primary use of such premises.

(7) No person shall conduct, nor utilize any premises for the purpose of conducting, the business or activity commonly known as "fortune-telling," including, but not necessarily limited to, conducting seances, interpreting horoscopes, preparing astrological charts, reading tarot cards, mind-reading, palm-reading, numerology or engaging in the activities of seers or soothsayers.

(8) No person shall conduct, nor utilize any premises for the purpose of conducting, a sexually oriented business, as that term is defined herein.
[Added 5-27-1992 by Ord. No. 92-13]

D. Minimum contiguous acreage. No site shall be developed for a planned commercial development unless it contains a minimum of seven acres of contiguous land and has access to a public or private street.

(1) With respect to the requirement that the land constituting such site shall be contiguous, private roads, internal streets and access driveways within the site shall not be deemed to divide the site so as to render portions thereof noncontiguous.

(2) Areas required to be dedicated to any public purpose, including street construction or street widening, shall not be deemed to reduce the size of the site for purposes of determining compliance with the minimum contiguous acreage requirements.

E. Minimum lot size requirements. Within the Central Business (CBD-3) District, no building or structure shall be constructed on a subdivided lot within a planned commercial development having less than the following minimum area, width and depth; provided, however that if greater dimensions are required for any particular use pursuant to any other provision of this chapter, then such greater requirements shall apply:

| Minimum Lot Area (square feet) | Minimum Lot Width (feet) | Minimum Lot Depth (feet) |
|---|---|---|
| 2,500 | 50 | 30 |

F. Yard requirements.

(1) Except where more extensive requirements are set out respecting particular uses, and except where the provisions of Subsection F(2) of this subsection apply, premises in the Central Business (CBD-3) District shall comply with the following requirements respecting minimum front yards (setback), side yards and rear yards:

| Minimum Required Yards (feet) | | |
|---|---|---|
| Front Yard (setback) | Side Yard | Rear Yard |
| None | None | None |

(2) Where a lot abuts a detached residential district, a yard of five feet shall be required on that side of any lot which abuts a detached residential district. However, where a lot abuts a residential district and a six-foot-wide planted evergreen buffer is

provided by means of an easement on the residential lot, the five-foot setback shall be construed as being met; provided, however, that the foregoing waiver shall not be applicable and shall be required to be met where it abuts parking. [Amended 4-9-2013 by Ord. No. 13-04]

(3)    Within a required yard, no building or structure shall be permitted except for walls or fences not more than 5 1/2 feet high, measured from grade at its highest point.

(4)    Chain-link material used for any fence within the Central Business (CBD-3) District shall be of dark-colored material, and the posts and other framework forming part of such fence shall be the same color as the chain-link material.

(5)    Cornices, awnings, signs, canopies, exitways, pedestrian arcades and other architectural or ornamental features, details or projections may be attached to buildings and extended up to a distance of 12 feet perpendicular to the lot line into adjoining property where such right has been granted by easement, but in no case closer than one foot to the face of the curb nor with a minimum vertical clearance less than nine feet.

G.    Height and story limitations.

(1)    Except as otherwise provided in this section, no building or structure, including any associated parking structure, shall exceed 45 feet in height.

(2)    Chimneys, flues, towers, including cooling towers, bulkheads, spires, and similar decorative features may exceed such height limitations if the total area of all such features on any one building does not exceed 20% of the area of the roof of such building.

(3)    Receiving or transmitting antennas may exceed such height limitations but shall not exceed a height of 45 feet above the ground.

(4)    No portion of a building used for office purposes shall exceed two stories, exclusive of exempt parking structures and ground-level entry foyers and service cores.

(5)    No portion of a building used for retail purposes shall exceed one story or 25 feet in height, provided that, for buildings in excess of 25,000 square feet, 15% of such building may exceed the twenty-five-foot height requirements, up to a maximum of 35 feet.

H.    Lots abutting residence district; screening. All activities on any lot in the Central Business (CBD-3) District which abuts a residence district shall be screened from such abutting residence district by an evergreen planting at least five feet wide and capable of growing to a height of eight feet within one year.

I.    Site coverage (ground area footprint).

(1)    The sum of the area of all principal and accessory buildings and structures, including parking structures, within a planned commercial development within the Central Business (CBD-3) District shall not exceed 40% of the area of the site.

(2)    The sum of the area of all principal and accessory buildings and structures, including parking structures, developed for retail use shall not exceed 33% of the area of the site.

    (3)  The sum of the area of all principal and accessory buildings and structures, including parking structures, developed for business, professional or governmental office use shall not exceed 7 1/2% of the area of the site.

J.  Floor area ratio.
[Amended 4-9-2013 by Ord. No. 13-04]

    (1)  The sum of the area of all principal and accessory buildings and structures, including parking structures, within a planned commercial development within the Central Business District (CBD-3) shall not exceed 45% of the area of the site.

    (2)  The sum of the area of all floors of buildings or structures, excluding parking structures and excluding common areas and stairs for office use, within a planned commercial development within the Central Business District (CBD-3) shall not exceed 45% of the area of the site.

    (3)  The sum of the area of all floors of buildings or structures developed for retail use shall not exceed 40% of the area of the site.

K.  Building length. No building shall exceed 350 feet in length.
[Amended 4-9-2013 by Ord. No. 13-04]

L.  Parking.

    (1)  Except as otherwise provided herein, off-street parking and related motor vehicle requirements shall be in accordance with the provisions of Article **XII** hereof.

    (2)  Notwithstanding anything in Article **XII** hereof to the contrary, the following off-street parking requirements shall be applicable within the Central Business (CBD-3) District:

        (a)  Required off-street parking.

            [1]  The minimum number of parking spaces required for all premises and uses within this district shall be one space for each 250 square feet of floor area; provided, however, that there shall be excluded from the floor area calculation for office building requirements common areas and stairways. The minimum number of parking spaces required for all retail and supermarket uses within this district shall be one space for each 275 square feet of floor area.
[Amended 4-9-2013 by Ord. No. 13-04]

            [2]  The off-street parking requirements of this section may be satisfied by providing the required number of spaces or having the required number of spaces available during the hours in which the premises are in use in an off-site facility, provided that such off-site facility is within 1,000 feet of the building or use served.

            [3]  Off-site facilities may include private or public parking facilities for which the owner or operator of the building or use has licensed, leased, or contracted for use during the hours in which the premises are in use from the owner or operator thereof.

            [4]  On-site parking spaces reserved for the use of the City of Englewood shall be counted toward satisfying the off-street parking requirements.

[5]  No on-grade parking stall or aisle shall exceed a grade of 6%, nor shall any driveway or ramp exceed a grade of 10%.

[6]  In addition to such other off-site improvements as may be required by the municipal agency pursuant to the site plan review process, the municipal agency may require, subject to the consent and approval of the governing body, that an application for development provide design alternatives for, and provide, if possible, additional off-site parking spaces as follows:

[a]  Within public roadways or public parking lots located within 1,000 feet of the proposed development; and

[b]  To the extent required to replace existing public parking which is displayed as a result of the proposed development, but not in excess of 25% of the number of parking spaces required pursuant to this section; and

[c]  Through the realignment and/or restriping of existing public parking spaces, together with any ancillary curbing, repaving, relocation and/or installation of existing or new parking meters, and traffic and parking signage or signalization required in connection therewith.

(b)  Road dimensions and location.

[1]  All roads other than parking aisles in this district shall be called "internal site circulation roadways" and shall be a minimum width of 25 feet.

(c)  Off-street delivery and loading.

[1]  No on-site loading spaces shall be required for any building having less than 30,000 square feet of gross floor area. For buildings having a gross floor area in excess thereof, there shall be at least two loading spaces, with an additional loading space for each additional 15,000 square feet of gross floor area or fraction thereof.

[2]  Where required or when provided, a loading space shall measure not less than 35 feet long, 12 feet wide and 14 feet high.

[3]  Required loading areas shall not be located upon any public right-of-way; provided, however, that vehicles may utilize the public right-of-way for the purpose of ingressing or egressing the loading area.

(d)  Landscaping requirements.

[1]  Within any parking facility, all areas which are not required for parking or access purposes shall be landscaped, and all landscaping, including planting islands, shall be protected from vehicle encroachment by continuous concrete curbing, with a total height of 20 inches and a face of six inches, or by some other curbing or barrier approved by the Planning Board.

[2]  Within any at-grade, nonleased parking facility, there shall be provided within the parking facility or its perimeter planting islands or a planting peninsula containing a minimum of 50 square feet of permeable space for

each 10 parking spaces provided in such locations as mutually agreed by the applicant, City Planner and City Engineer.

[3] Such permeable space shall be planted.

[4] At least one deciduous tree with a minimum three-inch caliper shall be planted for each 30 feet of building frontage along internal site circulation roadways.

M.  Signs.

(1)  Definitions. As used in this section, the following terms shall have the following meanings:

**AREA OF SIGN**
The total area of the space used for sign purposes, including the spaces between open-type letters, figures, numbers or symbols, and including the ground structure or other decoration which is in an integral part of the sign, but computed on the basis of one side only, and, in the event the area of the sides is unequal, the area of the larger side shall be used in determining the permitted area.

**AWNING SIGN**
A sign painted or secured to an awning, including such signs which are attached to sun-protection devices or canvas or metal coverings over windows.

**BANNER**
A sign or decoration made of cloth, paper, plastic or similar flexible material which is attached to a building or structure.

**BOARD**
The Planning Board.

**BUNTING**
A banner, usually in the form of draperies or wide streamers.

**CENTRAL BUSINESS (CBD-3) DISTRICT**
The CBD-3 District as defined in Part **4**, Zoning, of this chapter of the Code of the City of Englewood.

**GROUND SIGN**
A sign supported from the ground by one or more uprights or braces.

**ILLUMINATED SIGN**
A sign illuminated by lighting of any kind, including but not limited to lighting along the border of the sign, within the sign itself, in the rear of the sign, on the ground, or on poles.

**ITEM OF INFORMATION**
Any word, initial, abbreviation, number, symbol or geometric shape, but shall not include street numbers 20 inches or less in height or letters less than two inches in height.

**LIGHT BOX SIGN**

An illuminated sign in which the illumination comes from within the sign itself.

**MARQUEE SIGN**
A sign painted on, attached to or hung from a marquee, canopy or other covered structure extending from and supported by the building.

**MOVABLE SIGN**
A portable ground sign with an advertisement on either or both panels, either fixed or swinging, all within a frame and supported on standards permitting easy transport to any part of the premises.

**OFF-PREMISES ADVERTISING SIGN**
A sign, including a billboard, on which an advertisement is displayed which directs attention to a business, commodity, services or entertainment conducted, sold or offered elsewhere than on the premises upon which such sign is located.

**PROJECTING SIGN**
A sign attached to a building, any part of which extends more than 15 inches from the building.

**PUBLIC INFORMATION SIGN**
Traffic signs, street signs, directional signs and other noncommercial signs designed or intended to convey instructions to the public.

**ROOF SIGN**
A sign erected, constructed or maintained above or on the roof of a building.

**SIDEWALK SIGN**
A sign painted on sidewalks, curbs and similar places.

**SIGN**
Any word, letter, symbol, number or combination of the above which can be seen from the street and which is in the nature of an announcement, direction or advertisement.

**TEMPORARY SIGN**
A sign intended for a limited period of display, including decorative displays for holidays or public demonstration.

**WALL SIGN**
A sign painted on or attached to an exterior wall surface of a building, no part of which extends more than 12 inches from the building.

**WINDOW DISPLAY SIGN**
A sign located within a building and visible through a window but not attached to a window or exterior structure of the building.

**WINDOW SIGN**
A sign painted or otherwise attached to the inside or the outside of a window.

(2) Compliance with regulations. No person, including any owner, lessee, or other occupant of any premises, or any erector, shall erect, construct or display or permit

the erection, construction, or display of any sign within the Central Business (CBD-3) District other than in accordance with the provisions of this chapter.

(3)  Prohibited signs. The following signs are prohibited anywhere within the Central Business (CBD-3) District:

(a)  Off-premises advertising signs.

(b)  Sidewalk signs.

(c)  Roof signs, or any sign which extends above the roofline of a building to which it is attached.

(d)  Any sign carried or worn by a pedestrian which announces or calls attention to any goods, wares, merchandise or commodities or to any place of business and/or occupation.

(e)  Strung lights and windblown devices such as pennants, spinners and streamers.

(f)  Any sign which blinks on and off or contains moving lights or which is otherwise illuminated on an intermittent basis.

(g)  Any illuminated signs equipped with red, green or amber so as to confuse with traffic control or warning signs.

(h)  Signs having items of information larger than six inches in size displayed on motor vehicles or trailers parked for display purposes within 20 feet of a public right-of-way.

(i)  Projecting signs.

(j)  Ground signs, other than shopping center identification signs and public information signs, as hereafter provided, shall be prohibited.

(4)  Signs exempt from permit requirements. Subject to any applicable restrictions contained in other sections of this chapter, and the conditions and limitations hereinafter contained, the following signs may be erected on any premises within the Central Business (CBD-3) District without first obtaining a permit therefor:

(a)  Construction signs of building contractors or other artisans referring to work being performed on the premises, but only so long as such work is being performed, and provided that such signs shall not exceed an area of:

[1]  Thirty-two square feet in each of three locations for the shopping center;

[2]  Twenty-four square feet for each business establishment.

(b)  Signs erected by any governmental agency.

(c)  Signs concerning political candidates and public issues, not in excess of 20 square feet, for a period of not more than 45 days.

(d)  Holiday and seasonal decorations or displays containing no commercial advertising matter, for a period of not more than 45 days.

(e)  Window display signs for a commercial use permitted under Part **4**, Zoning, of this chapter.

(5)  Regulations applicable to all signs. In addition to such other restrictions as may be contained in this chapter, all signs shall comply with the following regulations:

(a)  No person shall affix any sign to any public building or erect any sign in any public place without the express approval of the City Council.

(b)  No sign shall be affixed to any tree, public utility pole or public information sign.

(c)  No sign shall contain more than 10 items of information.

(d)  All signs shall comply with all applicable provisions of the Uniform Construction Code.[2]

[2]    *Editor's Note: See Ch. **167**, Construction Codes, Uniform.*

(e)  Illuminated signs visible to and within 100 feet of residential properties shall be illuminated by white light only, not in excess of 150 watts.

(f)  No floodlight, flexible gooseneck fixture or bare light bulbs used with any sign shall be positioned in such a manner so as to shine onto adjoining property or into the eyes of passing pedestrians or motorists.

(g)  No sign shall be attached in any form or manner which will interfere with any opening required for ventilation.

(h)  No sign, including any supporting structures, shall be attached in any manner to a fire escape.

(i)  No sign shall be placed or located so as to obstruct the view of oncoming traffic.

(j)  All signs shall be maintained in good condition and appearance.

(6)  Regulations describing bulk limitations of signs. In addition to such other restrictions as may be contained in this chapter, any sign within the Central Business (CBD-3) District shall comply with the following regulations:

(a)  Regulations governing wall signs.

[1]  Wall signs for business establishments with a gross leasable area in excess of 25,000 square feet shall not exceed a vertical dimension of four feet and 150 square feet in area. A maximum of two wall signs, each on separate building faces, shall be allowed, provided that they are separated by a distance at least equal to the length of the sign. In addition, a single third logo identification sign shall not exceed 40 square feet or a diameter, height or width in excess of seven feet.

[2]  Wall signs for business establishments with gross leasable area between 10,000 square feet and 25,000 square feet shall not exceed a vertical dimension of three feet and 90 square feet in area. A maximum of two wall signs, each on separate building faces, shall be allowed, provided that they are separated by a distance at least equal to the length of the sign.

[3] Wall signs for business establishments with gross leasable area less than 10,000 square feet shall not exceed a vertical dimension of two feet and 40 square feet in area. A maximum of two wall signs, each on separate building faces, shall be allowed, provided that they are separated by a distance of at least equal to the length of the sign.

[4] No wall sign shall be erected on any wall of a building unless such wall fronts on and is immediately adjacent to a street or parking lot.

(b) Regulations governing banners and bunting.

[1] Banners and bunting shall not be permitted except in connection with the opening of a new business or a change in ownership or management.

[2] Banners or bunting shall not be permitted upon any premises for period more than 30 days nor more than once in any twelve-month period.

[3] No banners or bunting shall be installed or placed so as to extend upon or across any sidewalk or public street, internal site circulation roadway, parking aisle, or parking lot.

[4] All banners or bunting must be securely fastened to a building or structure.

(c) Regulations governing awning and marquee signs.

[1] The area of an awning or marquee sign shall not exceed 40% of the awning or marquee to which it is attached or of which it forms a part of not more than 10 square feet in area.

(d) Regulations governing time and/or temperature device.

[1] Time and/or temperature devices attached to a building shall not exceed 30 square feet in area, shall not project more than five feet from the face of the building to which they are attached, and shall provide at least nine feet of clearance above the ground.

[2] No time and/or temperature device shall be located within 50 feet of any other such device.

(e) Regulations governing window signs.

[1] Window signs shall not exceed 15% of the total area of the window to which they are affixed, nor more than 7 1/2% of the glass area of any door to which they are affixed.

(f) Regulations governing window display signs.

[1] Window display signs shall not contain more than 10 items of information; provided, however, that price cards not exceeding three inches by five inches in size and manufacturers packages shall not be counted as items of information.

(g) Regulations governing shopping center identification and logo signs.

[1] Shopping center identification signs shall not be placed in more than three locations nor exceed 40 square feet in each location. The height of the

sign shall not exceed 18 feet and shall provide at least nine feet of clearance above the ground.

[2]   In addition to shopping center identification signs permitted in Subsection **M(6)(g)[1]**, shopping center identification logos may be placed as follows:

[a]   On doors: area not to exceed 5% of window to which affixed.

[b]   On windows: area not to exceed 10% of window to which affixed.

[c]   Fixed fabric panels: area not to exceed 20% of panel to which affixed.

[d]   Streetscape accessories, refuse cans, etc.: area not to exceed four square feet per item.

(h)   Regulations governing public informational signs. Public informational signs shall not exceed 6.5 square feet, and individual letters shall not exceed five inches in height or as specified by the New Jersey Department of Transportation or according to FHWA standards.

(7)   Permit required.

(a)   Except as provided in Subsection **M(4)**, no signs shall hereafter be erected, altered, enlarged, relocated or replaced except in accordance with this chapter and unless a permit therefor has been issued.

(b)   Any permit to be issued pursuant to this chapter shall be issued by the Chief Inspector.

(c)   No permit shall be issued until the fee therefor has been paid and until any required insurance certificate has been filed with and approved by the Chief Inspector and until the written consent therefor of the owner or lessee of the property on which the sign is to be placed has been filed with the Chief Inspector.

(d)   The changing of movable parts of an approved sign or the repairing or requesting of display matter shall not be deemed an alteration, provided the conditions of the original approval and the requirements of this chapter are not violated.

(e)   An application for a sign permit shall be made to the Chief Inspector on forms provided for such purposes and shall be accompanied by a sketch of the proposed sign and specifications showing colors, letter heights, and materials to be incorporated in the sign, as well as materials to be used for supporting members, and manner of erecting or allowing the proposed sign to be displayed in its proposed location.

(f)   Any application for a sign permit, together with the aforesaid additional material, shall be referred by the Chief Inspector to the Board for its review and recommendations as to whether the permit should or should not be issued and whether and in what respect the proposed sign should be altered.

(g)   The Board shall submit its report and recommendation to the Chief Inspector within 45 days of its receipt of an application, after which the Chief Inspector

shall issue or deny the permit. In the event the Board shall not so act within such forty-five-day period, and unless the applicant has consented to an extension of such period, the Board shall be deemed to have recommended approval of the application as submitted.

(8) Maintenance and removal of signs.

    (a) All signs shall be maintained in good condition and repair, and specifically, but not by way of limitation, no person shall permit the following conditions to exist with respect to any sign owned by such person or with respect to any sign located on premises owned by such person or occupant:

        [1] Chipped or peeling paint.

        [2] Torn paper or broken or damaged lettering or material of any kind.

        [3] Illegible material, whether by reason of fading, obliteration or any other condition.

    (b) Within 30 days following the termination of any occupancy or use of any premises, any sign located on the premises which identified or advertised such occupancy or use shall be removed.

(9) Revocation of permit and/or removal of signs.

    (a) When any sign becomes insecure, in danger of falling or becoming otherwise unsafe, or if any sign shall be unlawfully installed, erected or maintained in violation of any of the provisions of this chapter, the owner thereof or the person or firm maintaining same shall, upon written notice of the Chief Inspector, forthwith in case of immediate danger and in any case within not more than 10 days, make such sign conform to the provisions of this chapter or shall remove it.

    (b) Written notice, as set forth above, shall be mailed by the Chief Inspector to the owner or lessee of the premises by certified mail, return receipt requested. If within 10 days following receipt of such letter, or in the case of emergencies within such shorter time as may be specified in the notice, the owner or lessee fails to comply with the order, the Chief Inspector may revoke the permit and remove or repair the sign at the expense of the owner as otherwise provided by law.

    (c) In case the Chief Inspector shall be required to remove any sign as herein provided, he shall keep a record of the cost of such removal, and the owner of such sign shall be liable therefor.

    (d) No act of the Chief Inspector in connection with the inspection and maintenance of signs shall relieve the owner of the premises or the sign owner from his own responsibility for maintaining signs in a safe condition or make the City of Englewood liable in case of damage or injury.

(10) Exclusive regulations. Unless or until repealed or modified, the foregoing requirements shall apply to signs within the Central Business (CBD-3) District notwithstanding the provisions of any other ordinance regulating signs within any other zoning district within the City of Englewood.

# § 250-65. Neighborhood Center (N-C) District.

[Added 11-12-2014 by Ord. No. 14-39]

A. Purpose. The purpose of this section with respect to the Neighborhood Center (N-C) District is to provide a mix of retail and commercial businesses that serve the needs of residents of the surrounding neighborhoods and visitors and passersby from other areas. Commercial activity should take place in a pedestrian-friendly and desirable visual environment that complements the character of the surrounding residential area. This district also permits upper story residential uses to enhance the character of this district as a neighborhood-serving place.

B. Permitted uses. Permitted uses in the N-C District are summarized in the table below. In the table, the letter "Y" stands for permitted use, "YC" stands for conditional use. The letter "Y" with an asterisk, or "Y," indicates a use permitted only on upper floors of a multi story building. Conditions for conditional uses are listed in Subsection **C**. All other uses not expressly permitted here, with or without conditions, are prohibited.

| Land Use Categories and Land Uses | N-C |
| --- | --- |
| **Retail Trade** | |
| Retail stores, with the exception of: <br>    - Pawn shops <br>    - Establishments open between the hours of 11:00 p.m. and 6:00 a.m. <br>    - Sexually oriented businesses | Y |
| Banks | YC |
| Drugstores | YC |
| **Eating and Drinking Establishments** | |
| Restaurant (limited service) | YC |
| Restaurant (full service) | YC |
| **Arts, Entertainment and Recreation** | |
| Health and fitness clubs | Y |
| Instructional studios | Y |
| **Personal and Consumer Services** | |
| Personal services, with the exception of: <br>    - Fortune-telling and palm-reading establishments <br>    - Sexually oriented businesses <br>    - Tattoo parlors <br>    - Massage parlors with unlicensed personnel | Y |
| Child care | Y |
| Funeral parlor | Y |
| Laundry and dry cleaning | Y |
| Pet grooming and training | Y |
| Printing and reproduction | Y |
| Repair of consumer products | Y |
| **Education** | |

| Land Use Categories and Land Uses | N-C |
|---|---|
| School (Preschool) | Y |
| **Offices (nonmedical)** | |
| Professional offices | Y |
| Business offices | Y |
| **Residential Uses** | |
| Apartments and condominiums | Y* |

C.  Conditional uses. For areas within the designated Neighborhood Center (N-C) Districts, the Planning Board shall not approve any conditional use application for any of the following uses under this section unless the following enumerated specific conditions have been met:

(1)  Restaurants.

(a)  Restaurants are permitted conditionally upon obtaining site plan approval from the municipal agency. Approval may be subject to the execution of a maintenance agreement to include obligations on the part of the owner or operator of the premises to maintain the premises and the surrounding area free of litter and to minimize loitering on or about the premises.

(b)  Hours of operation. When located on a site adjacent to or that includes any residentially zoned property, a restaurant shall not open prior to 7:00 a.m. nor shall it remain open after 8:00 p.m.

(c)  Drive-through/drive-up facilities are not permitted.

(2)  Banks and drugstores. Drive-through/drive-up facilities for banks and drugstores are permitted under the following conditions:

(a)  Drive-through/drive-up facilities and associated lanes shall not encroach on the public right-of-way or internal site circulation roadways. Drive-through/drive-up facilities will require site plan approval.

(b)  Such facilities shall be located on an arterial or collector street in an area least disruptive to pedestrian and vehicular traffic.

(c)  All access drives shall be located as far as practicable from an existing intersection in order to minimize congestion and constricted turning movements.

D.  Zoning district requirements.

| Dimension | N-C |
|---|---|
| **Lot Dimensions** | |
| Minimum lot area (square feet) | 1,500 |
| Minimum lot width (feet) | 20 |
| Minimum lot depth (feet) | 75 |
| **Building Dimensions** | |
| Maximum building height (feet) | 25 |

| Dimension | N-C |
|---|---|
| Maximum number of stories | 2 |
| **Setbacks and Building Coverages** | |
| Front yard setback (feet) | 0 |
| Side yard setback (feet) | 0 to 6 |
| **Setbacks when Abutting Residential District** | |
| Minimum rear yard setback (feet) | 10 |
| Minimum side yard setback (feet) | 10 |

*See Subsection **F**.

E.   General standards for the Neighborhood Commercial (N-C) District.

(1)   Measurement of building height. Building height shall be measured as the vertical distance between the average finished grade and the highest point of a building or structure. The highest point shall be the coping of a flat roof without a parapet, the midpoint of the parapet on a flat roof, the deckline of a mansard roof, or the midpoint between the eaves and highest ridge of a gable, gambrel, or hipped roof.

(2)   Entrances. Buildings located at the corner of two public streets shall have either a principal entrance at the corner of the building or an entrance facing each street.

(3)   Landscaping. Applicants shall submit a landscape plan detailing the location and types of plantings and other materials. Landscaping may include trees, bushes, shrubs, ground cover, perennials, annuals, plants, sculpture, art and/or the use of building and paving materials.

(4)   Exterior lighting.

(a)   Applicants shall submit a lighting plan detailing exterior lighting of facades and grounds.

(b)   All exterior light fixtures shall be fully shielded and direct light either downward toward the earth's surface and/or toward the building facade.

(c)   All exterior light fixtures shall be positioned in such a manner as to direct light away from adjacent property and public rights of way.

(d)   All lighting sources shall be directed away from reflective surfaces to minimize glare upon adjacent property and public rights-of-way.

(e)   Flashing lights and letterforms are prohibited.

(5)   Location of parking. Off-street parking areas shall be located to the side or rear of buildings.

(6)   Driveways.

(a)   Parking shall be accessed by rear alleys or rear lanes where available.

(b)   Shared driveways between two adjacent properties are encouraged. This shall be accomplished by creating an irrevocable offer of cross-easement between

the two properties. The owners of the two properties shall submit with their application for a site plan.

(7) HVAC. HVAC equipment shall not be visible from streets.

(8) Waste collection and storage areas. Trash, recycling, and any other refuse or recycling collection dumpsters or containers shall be located at the rear of the property and either screened, enclosed, or otherwise blocked from public view. Such screening or enclosure should be designed in conjunction with the primary building, may use similar materials and shall obscure views of waste collection and storage area.

F.  Design standards for the Neighborhood Commercial (N-C) District.

(1) Building massing and design.

(a) Buildings shall generally relate in scale and design features to surrounding buildings.

(b) Buildings shall generally demonstrate continuity of treatment by maintaining cornice lines in buildings of similar height, by extending horizontal lines of fenestration, and by complementing architectural styles, details, features, design themes, building materials, and colors used in surrounding buildings where such buildings represent the traditional character and architecture of Englewood.

(2) Doors and windows.

(a) All buildings shall include doors and windows facing the street. Blank walls are not permitted facing the street at ground level.

(b) At least 60% of the wall surface area of the ground level for each wall facing a public street shall consist of transparent treatments. Tinted, reflective, or other types of glass or window treatments that diminish transparency are prohibited.

G.  Visual buffers and screening. Buffers shall be provided to effectively protect residential property from the potential adverse effects of adjacent nonresidential land use activity that may result in nuisance, including visual blight, excessive light, threat to safety, noise, or odor encroachment to an adjacent parcel or one located across a public right-of-way.

(1) Landscaping.

(a) All activities on any lot in the Neighborhood Center (N-C) District that abut a residential district or a residence shall be screened from such abutting residence district or residence by landscaping consisting of lawn, massed evergreen and/or deciduous trees, and shrubs of such species and density as will provide, within two growing seasons, a solid and continuous screen throughout the full course of the year.

(b) Evergreen and deciduous shrubs shall have a minimum height of three feet when planted and shall be of varieties that normally grow to a minimum height of six feet within two full growing seasons.

(c)

Deciduous trees shall have a minimum three inches caliper at the time of planting.

(2) Fencing.

(a) Fences are permitted in rear yards at a maximum height of six feet.

(b) Fences shall be kept in good repair, consistent with the design thereof. The property owner shall be responsible for maintaining the area between the property line and the fence.

(c) Fences shall be constructed of wood, metal, bricks, masonry or other permanent materials designed for permanent fencing. Fences constructed of wood shall be resistant to decay.

(d) Chain-link material used for any fence shall be of dark-colored material, and the posts and other framework forming part of such fence shall be the same color as the chain-link material.

[1]    *Note: Section **250-65** became available for codification purposes with the elimination of the Retail/Commercial/Residential (RCR) Overlay District in favor of the Downtown District.*

# § 250-66. Work/Live Overlay (W-L) District.

[Added 11-12-2014 by Ord. No. 14-38]

A. Purposes.

(1) Provide flexibility for the creation of work/live units, specifically within existing buildings.

(2) Provide for the appropriate development of units that incorporate both living and working spaces.

(3) To provide locations where appropriate new businesses can start up or relocate.

(4) Serve as a transition between light industrial uses and residential uses.

(5) To assure that the division of space between living and working space within work/live space reflects the priority of work space.

B. Operating requirements.

(1) Occupancy. A work/live unit shall be occupied and used only by the operator of the business within the unit, or a household of which at least one member shall be the business operator.

(2) Sale or rental of portions of unit. No portion of a work/live unit may be separately rented or sold as a commercial space for any person not living in the premises or as a residential space for any person not working in the same unit.

(3) Notice to occupants. The owner or developer of any building containing work/live units shall provide written notice to all occupants and users that the surrounding area may be subject to levels of noise, dust, fumes, or other effects associated with

light industrial uses. State and federal health regulations notwithstanding, noise and other standards shall be those applicable to commercial or industrial properties in the applicable zone.

(4) Nonresident employees. Up to two persons who do not reside in the work/live unit may work in the unit. The employment of any persons who do not reside in the work/live unit shall comply with all applicable Building Code requirements.

(5) Client and customer visits. Client and customer visits to work/live units are permitted between the hours of 9:00 a.m. and 9:00 p.m.

(6) Business license. At least one resident in each work/live unit shall maintain at all times appropriate licenses as may be required by law for operating a business on the premises.

C. Residential use criteria. The residential component of a work/live unit must contain sleeping space, cooking facilities, and complete sanitary facilities. No more than 50% of the total floor area of a work/live unit shall be designed or used for residential purposes. The residential occupancy of a work/live unit must include at least one person who is employed or carries out an occupation in the unit.

D. Permitted uses.

(1) Arts and craft production activities including painting, sculpture, printmaking, ceramics, photography, film, writing, video, music, industrial design, graphic design, woodwork, metalwork, jewelry, and textiles.

(2) Studios for instruction in the arts and crafts and in health and wellness activities.

(3) Accessory retail.

(4) Professional offices, including practitioners in massage therapy and acupuncture. Practitioners shall show proof of possessing a valid State of New Jersey license for the practice of their respective profession.

(5) Other uses that, in the opinion of the Planning Board, are of a similar and compatible nature to the uses described above.

E. Prohibited uses.

(1) Storage of flammable liquids or hazardous materials beyond that normally associated with a residential use.

(2) Welding, machining, or any open flame work.

(3) Any other activity or use, as determined by the Zoning Official to not be compatible with residential activities and/or to have the possibility of affecting the health or safety of work/live unit residents and adjacent residents because of the potential for the use to create dust, glare, heat, noise, noxious gasses, odor, smoke, traffic, vibration or other impacts, or would be hazardous because of materials, processes, products, or wastes.

F. Parking requirements. Minimum required parking spaces for work/live space is one per living unit.

G.   General standards for the Work/Live Overlay District.

(1)   Separation and access. Each work/live unit shall be separated from other units and other uses in the structure. Access to each unit shall be provided from common access areas, corridors, halls, and/or the public street sidewalk; and the access to each unit shall be clearly separate from other work/live units or other uses within the structure.

(2)   Facilities to accommodate commercial or industrial activities. A work/live or unit shall be designed to accommodate commercial or industrial uses as evidenced by the provision of ventilation, interior storage, flooring, and other physical improvements of the type commonly found in exclusively commercial or industrial facilities used for the same work activity.

(3)   Integration of living and working space. Areas within a work/live or units that are designated as living space shall be an integral part of the work/live unit and not separated (or occupied and/or rented separately) from the work space, except that mezzanines and lofts may be used as living space subject to compliance with the other provisions of this section, and living and working space may be separated by interior courtyards or similar private space.

(4)   Mixed occupancy buildings. If a building contains mixed occupancies of work/live units and other nonresidential uses, occupancies other than work/live shall meet all applicable requirements for those uses, and proper occupancy separations shall be provided between the work/live or work/live units and other occupancies, as determined by the Building Inspector.

(5)   Usable open space.

(a)   A minimum of 40 square feet of usable exterior open space shall be provided for each work/live unit.

(b)   For those work/live projects established through a change of use of an existing building, the Planning Board may permit the creation of substitute interior space accessible to all residents for the required open space in the project, if it finds that it is not practical or desirable to provide exterior open space.

[1]   *Note: Section 250-66 became available for codification purposes with the elimination of the Mixed-Use Residential/Retail (MURR) Overlay District in favor of the Downtown District.*

# § 250-67. Service Business (SBD) District.

[Amended 4-7-1992 by Ord. No. 92-08; 5-27-1992 by Ord. No. 92-13; 7-10-1996 by Ord. No. 96-24; 11-12-2014 by Ord. No. 14-37]

A.   Purpose. The purpose of this section, with respect to the Service Business (SBD) District, is to provide a variety of retail, commercial and service generally serving the surrounding neighborhood in a desirable visual environment and located particularly along major thoroughfares where a general mixture of retail, commercial, and service activity now exist.

B.   Permitted uses. Permitted uses are summarized in the table below. In the table, the letter "Y" stands for permitted use and "YC" stands for conditional use. Conditions for

conditional uses are listed in Subsection **C**. All other uses not expressly permitted in this section are prohibited.

| Land Use Categories and Land Uses | SBD |
| --- | --- |
| **Retail Trade** | |
| Retail stores, with the exception of: | |
|    - Pawn shops<br>   - Establishments open between the hours of 12:00 a.m. and 6:00 a.m.<br>   - Sexually oriented businesses | Y |
| Banks | YC |
| Automobile sales | YC |
| **Eating and Drinking Establishments** | |
| Restaurant (limited service) | YC |
| **Arts, Entertainment and Recreation** | |
| Health and fitness clubs | Y |
| Instructional studios | Y |
| **Personal and Consumer Services** | |
| Personal services, with the exception of: | |
|    - Fortune-telling and palm-reading establishments<br>   - Sexually oriented businesses<br>   - Tattoo parlors<br>   - Massage parlors with unlicensed personnel | Y |
| Child care | Y |
| Funeral parlors | Y |
| Laundry and dry cleaning | Y |
| Pet grooming and training | Y |
| Printing and reproduction | Y |
| Repair of consumer products | Y |
| **Education** | |
| School (preschool) | Y |
| **Medical and Health Care** | |
| Medical offices | Y |
| Medical group practice | Y |
| Veterinary clinic | Y |
| **Offices (nonmedical)** | |
| Professional offices | Y |
| Business offices | Y |

C.  Conditional uses. For areas within the designated SBD Districts, the Planning Board shall not approve any conditional use application for any of the following uses under this section unless the following enumerated specific conditions have been met:

(1)  Automobile sales.

(a) Such establishments shall have a fully enclosed sales building with a showroom area accommodating at least three automobiles. Vehicle service or repair may be performed as an accessory use, but only within a totally enclosed building.

(b) Outdoor storage. An automobile sales establishment shall comply with the following requirements for outdoor storage:

[1] All outdoor display and service areas, including driveways and parking facilities, shall be paved.

[2] Motor vehicles and equipment shall be kept at least 15 feet from the right-of-way and property lines.

(c) On-site circulation. An automobile sales establishment shall comply with the following requirements for on-site circulation:

[1] There shall be sufficient area on site for all vehicle maneuvering and repositioning of inventory. No vehicles shall stand or be parked in the public right-of-way. All vehicle service must be performed on site.

[2] Driveways are limited to one driveway per street frontage per 100 linear feet of street frontage and the maximum width of each driveway is 24 feet.

[3] Driveways shall be at least 10 feet from any side lot line 50 feet from the intersection of street lines.

(2) Banks. Drive-through/drive-up facilities are permitted under the following conditions:

(a) Drive-through/drive-up facilities and associated lanes shall not encroach on the public right-of-way or internal site circulation roadways. Drive-through/drive-up facilities will require site plan approval.

(b) Such facilities shall be located on an arterial or collector street in an area least disruptive to pedestrian and vehicular traffic.

(c) All access drives shall be located as far as practicable from an existing intersection in order to minimize congestion and constricted turning movements.

(3) Restaurants.

(a) Restaurants where food is prepared for retail sale on the premises are permitted conditionally upon obtaining site plan approval from the municipal agency. Approval may be subject to the execution of a maintenance agreement to include obligations on the part of the owner or operator of the premises to maintain the premises and the surrounding area free of litter and to minimize loitering on or about the premises.

(b) Drive-through/drive-up facilities are not permitted.

D.  Dimensional standards.

| Dimension | SBD |
|---|---|
| Lot Dimensions | |

| Dimension | SBD |
|---|---|
| Minimum lot area (square feet) | 10,000 |
| Minimum lot width (feet) | 100 |
| Minimum lot depth (feet) | 100 |
| **Building Height** | |
| Maximum building height (feet) | 45 |
| **Setbacks and Building Coverage** | |
| Minimum front yard setback (feet) | 5 |
| Minimum side yard setback (feet) | 0 |
| Minimum rear yard setback (feet) | 6 |
| **Setbacks when Abutting Residential District** | |
| Minimum front yard setback (feet) | 15 |
| Minimum side yard setback (feet) | 10 |
| Minimum rear yard setback (feet) | 20 |

\* See Subsection **E(1)**.

E.  General standards for SBD Districts.

  (1)  Additional building height requirements.

    (a)  Cornices and cantilevered roofs may project into any required yard a distance of not more than 12 inches.

    (b)  Belt courses, windowsills and similar ornamental features may project into any required yard a distance of not more than 12 inches, and chimneys may so project a distance of not more than 18 inches.

    (c)  Chimneys, flues, towers, including cooling towers, bulkheads, spires, and similar decorative features may exceed such height limitations if the total area of all such features on any one building does not exceed 20% of the area of the roof of such building.

    (d)  Receiving or transmitting antennas may exceed such height limitations but shall not exceed a height of 45 feet above the ground.

  (2)  Additional setback requirements.

    (a)  In the case of a corner lot, each yard which abuts a street shall be considered a front yard, and the lot shall comply with front yard setback requirements and all other front yard requirements and limitations set out in this chapter respecting each of such streets.

    (b)  Front yards shall be landscaped in a manner approved by the Planning Board.

    (c)  The following additional yard requirements shall apply to any lot abutting a residential district or a residential use:

      [1]  A front yard setback shall be required with a depth of the lesser of either the average setback of existing buildings on the same side of the street,

within the same block; or the minimum depth required for front yards in the adjacent residence districts.

    (3) Driveways.

        (a) The aggregate width of all driveways into any such facility shall not exceed 70 feet, and no single curb cut shall exceed 35 feet in width.

        (b) No part of any driveway shall be located within 10 feet of any side lot line or within 25 feet of any street corner which is located in or which abuts a residential district.

F.    Visual buffers and screening. Buffers shall be provided to effectively protect residential property from the potential adverse effects of adjacent nonresidential land use activity that may result in nuisance, including visual blight, excessive light, threat to safety, noise, or odor encroachment to an adjacent parcel or one located across a public right-of-way.

    (1) Landscaping.

        (a) All activities on any lot in the Service Business (SBD) District that abut a residential zoning district shall be screened from such abutting residential district by landscaping consisting of lawn, massed evergreen and deciduous trees, and shrubs of such species and density as will provide, within two growing seasons, a solid and continuous screen throughout the full course of the year.

        (b) Evergreen and deciduous shrubs shall have a minimum height of three feet when planted and shall be of varieties that normally grow to a minimum height of six feet within two full growing seasons.

        (c) Deciduous trees shall have a minimum caliper of three inches at the time of planting.

    (2) Fencing.

        (a) Fences are permitted in rear yards only at a maximum height of six feet.

        (b) Fences shall be kept in good repair, consistent with the design thereof. The property owner shall be responsible for maintaining the area between the property line and the fence.

        (c) Chain-link material used for any fence shall be of dark-colored material, and the posts and other framework forming part of such fence shall be the same color as the chain-link material.

# § 250-68. Light Industrial (L-I) District.

[Amended 7-21-1998 by Ord. No. 98-15; 9-15-1998 by Ord. No. 98-18; 8-16-2011 by Ord. No. 11-09; 11-12-2014 by Ord. No. 14-36]

A.    Purpose. The purpose of this section, with respect to the Light Industrial (L-I) District, is to permit land uses that reflect contemporary light industrial economies and trends; to strengthen the identity of this district as a base of local and regional employment in the

distribution, production, and manufacturing of products; to broaden the presence of research and development enterprises; to promote creativity, entrepreneurship, and business development; and to improve the physical appearance of the district. This district also provides for certain medical and health care uses, in appropriate locations, that may complement the various types of medical and health care offerings already located throughout the City.

B.   Permitted uses. Permitted uses are summarized in the table below. In the table, the letter "Y" stands for permitted use and "YC" stands for conditional use. Conditions for conditional uses are listed in Subsection **C**. All other uses not expressly permitted in this section are prohibited.

| Land Use Categories and Land Uses | L-I |
| --- | --- |
| **Industrial Uses, light** | |
| Apparel manufacturing | Y |
| Beverage production and manufacturing | Y |
| Computer, electronic, and electrical product manufacturing | Y |
| Food production and manufacturing | Y |
| Scientific and medical instrument manufacturing | Y |
| Nonmetallic mineral product manufacturing | Y |
| Printing and related support activities | Y |
| Research and development | Y |
| Wood and furniture product manufacturing | Y |
| **Wholesale Trade, Warehousing, Distribution** | |
| Wholesale sales | Y |
| Warehousing or distribution of nonflammable, nonhazardous materials | YC |
| Moving and storage facilities | Y |
| **Agricultural Uses** | |
| Accessory rooftop farming and gardening | YC |
| **Motor Vehicle-Related Uses** | |
| Automobile sales | YC |
| Car wash facilities | YC |
| Motor vehicle service and repair | YC |
| **Arts, Entertainment and Recreation** | |
| Instructional studios | Y |
| Professional and artist studios | Y |
| Studios (television, film, production, recording, radio) | Y |
| **Offices, nonmedical** | |
| Business incubators | Y |
| Business offices | Y |
| Co-working space | Y |
| Professional offices | Y |
| **Medical and Health Care** | |

| Land Use Categories and Land Uses | L-I |
|---|---|
| Medical and dental laboratories and diagnostic services | Y |
| Medical offices | Y |
| Urgent care facility | Y |
| Wellness center | Y |
| Veterinary clinic | Y |
| **Retail Trade** | |
| Automobile sales | YC |
| Accessory retail | YC |
| Garden center | Y |
| **Personal and Consumer Services** | |
| Pet grooming and training | Y |
| Pet daycare facilities | YC |
| **Eating and Drinking Establishments** | |
| Accessory restaurant | YC |
| Education | |
| Technical school | Y |
| **Emergency Services** | |
| Police, Fire, EMT, and ambulance stations | Y |

C.  Conditional uses. For areas within the designated L-I Districts, the Planning Board shall not approve any conditional use application for any of the following uses under this section unless the following enumerated specific conditions have been met:

(1)  Accessory retail and restaurants. The area of accessory retail space shall not exceed 15% of a building's square footage. The area of accessory restaurant space shall not exceed 20% of a building's total square footage.

(2)  Automobile sales.

(a)  Such establishments shall have a fully enclosed sales building with a showroom area accommodating at least three automobiles. Vehicle service or repair may be performed as an accessory use, but only within a totally enclosed building.

(b)  Outdoor storage. An automobile sales establishment shall comply with the following requirements for outdoor storage:

[1]  All outdoor display and service areas, including driveways and parking facilities, shall be paved.

[2]  Motor vehicles and equipment shall be kept at least 15 feet from the right-of-way and property lines.

(c)  On-site circulation. An automobile sales establishment shall comply with the following requirements for on-site circulation:

[1]

There shall be sufficient area on site for all vehicle maneuvering and repositioning of inventory. No vehicles shall stand or be parked in the public right-of-way. All vehicle service must be performed on site.

[2]  Driveways are limited to one driveway per street frontage per 100 linear feet of street frontage and the maximum width of each driveway is 24 feet.

[3]  Driveways shall be at least 10 feet from any side lot line 50 feet from the intersection of street lines.

(3)  Accessory rooftop farming.

(a)  The primary activity to be performed with or without a greenhouse structure shall be the cultivation of plants.

(b)  Buildings with structures to contain accessory rooftop farming shall abide by the maximum building height.

(4)  Car wash facilities.

(a)  All car wash facilities shall be subject to site plan approval and shall provide sufficient off-street drainage so as to eliminate water runoff upon a public right-of-way or adjoining property.

(b)  Car wash facilities shall be conducted within a fully enclosed structure.

(c)  Car wash facilities shall contain on-site parking, computed on the basis of one parking space for each 400 square feet or part thereof of structure.

(d)  No part of the lot on which an automatic car wash facility is operated shall be located within 500 feet of a residential district or within 200 feet of an existing residential use.

(e)  An automatic car wash facility shall provide a paved driveway consisting of a minimum of 10 automobile spaces to accommodate automobiles waiting to be washed and an additional paved driveway consisting of a minimum of three automobile spaces to permit the drying of automobiles following washing. Each such automobile space shall measure not less than 20 feet in length and shall be set back not less than 10 feet from any lot line.

(f)  Automatic car wash facilities shall be screened from the street and from adjoining properties by fencing, evergreen landscaping, or other suitable screening, in such manner as shall be approved by the Planning Board.

(g)  Automatic car wash facilities shall not include a driveway within 50 feet of any street intersection.

(5)  Motor vehicle service and repair.

(a)  A motor vehicle service and repair station shall be completely enclosed for all operations in a building that meets the dimensions of the underlying zoning.

(b)  Storage areas for vehicles waiting for repair shall be provided on the site and shall not occur in the public right-of-way.

    (c)  All dismantled vehicles, equipment and parts and accessories thereof shall be stored within a building or behind a solid screen fence no less than six feet high. Such fence shall be least 15 feet from the right-of-way and property line.

    (d)  Outdoor storage areas shall not be permitted in any required yard.

(6)  Pet daycare facilities.

    (a)  Pet daycare facilities are prohibited adjacent to residential properties or medical facilities providing overnight care.

    (b)  Outdoor exercise yards and/or runs.

        [1]  Outdoor exercise yards and/or runs shall be surrounded by a fence of at least six feet in height. Fences must be maintained so as to prevent escape of pets.

        [2]  Outdoor exercise yards and/or runs shall provide an adequate exercise area, protection from the weather, and be landscaped with appropriate absorbent materials such as crushed stone or gravel.

        [3]  Outdoor exercise yards and/or runs shall be used only between 9:00 a.m. and 6:00 p.m.

    (c)  All animal quarters and runs are to be kept clean, dry, and in sanitary condition.

    (d)  Enclosures must be provided which shall allow adequate protection against weather extremes.

    (e)  Floors of buildings and walls shall be of an impervious material to permit proper cleaning and disinfecting.

    (f)  All animals shall have fresh water available at all times. Water vessels shall be mounted or secured in a manner that prevents tipping.

    (g)  On-site waste collection. All on-site waste shall be housed on site, and all waste shall be disposed of in a sanitary manner and on a regular basis to prevent odor and excess accumulation.

D.  Dimensional standards.

| Dimension | L-I |
| --- | --- |
| **Lot Dimensions** | |
| Minimum lot area (square feet) | 10,000 |
| Minimum lot width (feet) | 50 |
| Minimum lot depth (feet) | 100 |
| **Building Height** | |
| Maximum building height (feet) | 46* |
| **Setbacks and Building Coverage** | |
| Minimum front yard setback (feet) | 5** |
| Minimum side yard setback (feet) | 5 |

| Dimension | L-I |
|---|---|
| Minimum rear yard setback (feet) | 6 |
| **Setbacks when Abutting Residential District** | |
| Minimum front yard setback (feet) | 15 |
| Minimum side yard setback (feet) | 10 |
| Minimum rear yard setback (feet) | 20 |

\* See Subsection **E(1)(a)**

\*\* See Subsection **E(1)(b)**

E.   General standards for L-I Districts.

    (1)   Additional building height and setback requirements.

        (a)   When abutting a residential district, maximum building height shall be 30 feet.

        (b)   Front yard setbacks. In order to maintain a consistent appearance, front yard setbacks shall be similar to existing front yard setbacks on the block or on adjacent properties within the L-I District.

    (2)   Operational standards.

        (a)   Any activity permitted in this district shall be conducted in such a manner as not to have a detrimental effect on adjacent properties by reason of waste, noise, light, vibration, or lack of proper maintenance of grounds or buildings.

        (b)   Outdoor storage of materials, products, dumpsters, equipment or vehicles, shall be screened by a solid fence or wall no taller than eight feet in height. Materials, products or equipment stored outdoors shall not be piled higher than the height of the fence or wall, nor shall they encroach into required parking and landscape areas.

        (c)   Businesses adjacent to residential districts.

            [1]   Businesses adjacent to a residential district shall open no earlier than 7:00 a.m. and close no later than 9:00 p.m. Loading is permitted only between the hours of 8:00 a.m. and 8:00 p.m.

            [2]   Loading areas or docks shall not be located closer than 60 feet from a residential district.

            [3]   Loading docks shall be screened with a solid masonry wall at a height to be determined by the Zoning Official.

    (3)   Landscaping. Applicants shall submit a landscape plan detailing the location and types of plantings and other materials. Landscaping may include trees, bushes, shrubs, ground cover, perennials, annuals, plants, sculpture, art and/or the use of building and paving materials.

    (4)   Doors and windows.

        (a)   All buildings shall include doors and windows facing the street. Blank walls are not permitted facing the street at ground level.

    (b) Ground floors shall have a minimum transparency of at least 40% of the wall area of the ground level for each wall facing a public street.

  (5) Exterior lighting.

    (a) Applicants shall submit a lighting plan detailing exterior lighting of facades and grounds.

    (b) All exterior light fixtures shall be fully shielded and direct light either downward toward the earth's surface and/or toward the building facade.

    (c) All exterior light fixtures shall be positioned in such a manner as to direct light away from adjacent property and public rights-of-way.

    (d) All lighting sources shall be directed away from reflective surfaces to minimize glare upon adjacent property and public rights-of-way.

  (6) Location of parking. Off-street parking areas shall be located to the side or rear of the building.

  (7) Open space requirement.

    (a) A minimum of 10% of the lot area shall be designed as usable open space.

    (b) For the change of use of an existing building, the Planning Board may permit the creation of substitute interior space accessible to building occupants for the required open space in the project, if it finds that it is not practical or desirable to provide exterior open space.

  (8) Signs. Applicants shall comply with the sign regulations in Article **XV**.
[Amended 6-13-2017 by Ord. No. 17-05]

  (9) Street numbers. Buildings shall be clearly marked with their street number. Street numbers shall be internally or externally illuminated for visibility at night.

  (10) Green buildings.

    (a) All new buildings, additions, or renovations with gross area greater than 5,000 square feet are encouraged to be constructed to the U.S. Green Building Council's LEED certification standards or equivalent.

    (b) Green roofs are permitted and encouraged. The planting media and plant material comprising green roofs shall be maintained in accordance with generally accepted landscape maintenance practices, replacing each as necessary.

    (c) Waste collection and storage areas. Trash, recycling, and any other refuse or recycling collection dumpsters or containers shall be located at the rear of the property and either screened, enclosed, or otherwise blocked from public view. Such screening or enclosure should be designed in conjunction with the primary building, may use similar materials and shall obscure views of waste collection and storage area.

F.  Visual buffers and screening. Buffers shall be provided to effectively protect residential property from the potential adverse effects of adjacent nonresidential land use activity

that may result in nuisance, including visual blight, excessive light, threat to safety, noise, or odor encroachment to an adjacent parcel or one located across a public right-of-way.

(1) Landscaping.

    (a) All activities on any lot in the Light Industrial (L-I) District that abut a residential zoning district shall be screened from such abutting residential district by landscaping consisting of lawn, massed evergreen and/or deciduous trees, and shrubs of such species and density as will provide, within two growing seasons, a solid and continuous screen throughout the full course of the year.

    (b) Evergreen and deciduous shrubs shall have a minimum height of three feet when planted and shall be of varieties that normally grow to a minimum height of six feet within two full growing seasons.

    (c) Deciduous trees shall have a minimum caliper of three inches at the time of planting.

(2) Fencing.

    (a) Fences are permitted in side and rear yards at a maximum height of six feet.

    (b) Fences shall be kept in good repair, consistent with the design thereof. The property owner shall be responsible for maintaining the area between the property line and the fence.

    (c) Chain-link material used for any fence shall be of dark-colored material, and the posts and other framework forming part of such fence shall be the same color as the chain-link material.

# § 250-69. Attached Townhouse (ATH) District.

A. Purpose. The purpose of this chapter with respect to the Attached Townhouse (ATH) District is to provide for medium-density residential townhouses compatible with the suburban character of the City of Englewood, to permit and encourage the preservation of open space, and to mandate adequate highway and perimeter buffers as necessary to accomplish these purposes.

B. Permitted uses. Within the Attached Townhouse (ATH) District, no land or building shall be used, nor shall any building be constructed, altered or designed to be used, for any purpose other than the following:

(1) Attached townhouse dwellings.

(2) Parks and playgrounds.

(3) Nature preserve and nature study area.

(4) Accessory buildings and structures as hereinafter defined and limited.

C. Permitted accessory buildings and structures. Within the Attached Townhouse (ATH) District, the following accessory buildings and structures incident to the primary use of

the main structure on the premises shall be permitted, subject to the conditions and limitations set forth:

(1)  Garage or carport.

(2)  Fences, garden walls and other landscape features, including decorative pools, fountains, statuary, terraces, steps, benches and playground equipment. Any chain-link fence shall be clad in a dark-hued vinyl.

(3)  Fully enclosed storage space for maintenance equipment and supplies for serving the townhouse community.

(4)  Community building to permit gathering of residents for recreation or community business.

(5)  Bathhouse, playhouse, greenhouse and similar buildings customarily incidental to residential use, including one central facility for swimming, wading and tennis.

(6)  Construction office and sales office for use in connection with the construction and sale of the townhouse dwelling units on the premises, but only until such time as all such units have been completely constructed and initially sold.

D.  Minimum lot size and development requirements.

(1)  No site shall be developed for attached townhouse development unless it contains 25 or more acres of contiguous land and has access to a public street.

   (a)  With respect to the requirement that the land constituting such site shall be contiguous, private roads, internal streets and access driveways within the site shall not be deemed to divide the site so as to render portions thereof noncontiguous.

   (b)  Areas required to be dedicated to any public purpose, including street construction or street widening, shall not be deemed to reduce the size of the site for purposes of determining compliance with the twenty-five-acre minimum lot size.

(2)  The provisions of Subsection **D(1)** shall not be deemed to prohibit the subdivision of any site into individual lots of less than 25 acres in area, provided that all land lying within the area to be developed for attached townhouses, including any such individual lot, shall form part of and be subject to one overall site plan covering the entire tract of not less than 25 acres, such site plan to be reviewed and approved by the Planning Board, and provided that any such separately owned or subdivided lot or parcel of land shall be subject to and covered by the aforesaid comprehensive site plan covering the entire tract, either pursuant to an agreement binding on the owners of all such separate lots or parcels, as well as their successors in title, which shall be approved by the Attorney for the Planning Board, or in such other manner as shall be approved by the Attorney for the Planning Board, to assure that no part of the overall tract shall be developed in any manner except as part of the comprehensive site plan.

(3)  In evaluating and acting with respect to any site plan which proposes that all or part of such site is to be divided into individual lots of less than 25 acres, the Planning Board shall insure that each such lot either includes ownership of or has a common right to use such portion of the total area of the entire site as will insure that each

such individual lot shall have the benefit of the usable open space requirements set out in Subsection **G** hereof.[1]

[1]    *Editor's Note: Amended at time of adoption of Code (see Ch. **1**, General Provisions, Art. **I**).*

  (4)  The Planning Board is empowered, on site plan review, to require performance and maintenance guarantees in the amounts and for the purposes and durations set forth in N.J.S.A. 40:55D-53, to assure the installation and maintenance of landscaping, recreational facilities and other on-site or necessary improvements.

E.  Lot coverage and dwelling unit density.

  (1)  Attached townhouse development shall be limited to a maximum of one dwelling unit for each 10,890 square feet of lot area (four units per acre), subject to a density reduction of up to 15% during site plan review when necessary, in the opinion of the Planning Board, for protection of existing arcades, slopes, or other existing natural or topographical features, including preservation of trees, or to insure that the plan conforms with the site plan standards set forth in Article **VI**, § **250-36B**, of this chapter.

  (2)  The sum of the area of all principal and accessory buildings shall not exceed 17% of the area of the site.

  (3)  The sum of the area of all principal and accessory buildings and all pavement, including roads, parking areas and driveways, shall not exceed 40% of the area of the site.

F.  Buffer and yard requirements.

  (1)  A naturalistic landscape buffer strip with a maximum retention of existing trees and vegetation shall be provided around the entire perimeter of the Attached Townhouse (ATH) District for at least the following depths:

    (a)  West boundary (Route 4): a distance of 200 feet.

    (b)  North boundary: a distance of 75 feet.

    (c)  East boundary: a distance of 50 feet.

    (d)  South boundary: a distance of 50 feet.

  (2)  No building or structure shall encroach within any buffer strip except for points of ingress and egress, gate enclosures, walls, fences or utilities.

  (3)  No part of any building shall be constructed less than 25 feet from the paved portion of any street, including any interior or private street, and, for the purpose of permitting and encouraging a broken facade, or a facade which is not parallel to such street, the average distance from the face of such building to the nearest edge of such paving shall be not less than 30 feet.

  (4)  No portion of any principal building shall be constructed within 25 feet of any perimeter buffer strip required by Subsection **F(1)** hereof.

G.  Usable open space.

(1)  Any site used for attached townhouse purposes shall contain usable open space of an area equal to at least 400 square feet times the number of dwelling units on the site.

(2)  Required usable open space of not less than 400 square feet may be assigned as private yards to individual dwelling units to which such space is contiguous.

(3)  Required usable open space which is allocated to an individual dwelling unit shall be easily accessible to the occupants of such unit, and usable open space which is allocated to two or more dwelling units shall be easily accessible to the occupant of all such units.

(4)  No portion of any required front yard shall be used for required usable open space, and no portion of any required usable open space shall be used for driveways or parking spaces.

(5)  No structure of any kind shall be permitted within any required usable open space, except for a swimming pool or other outdoor sport structure, provided that not more than 25% of any such structure shall be covered by a roof.

(6)  At least one turf play area shall be provided on the site with a minimum area of 6,000 square feet, with no dimension less than 60 feet and with no finished grade of more than 4%.

H.  Regulations concerning yards and fences.

(1)  Within a required yard, except for the projections permitted by Subsection **H(2)** below, no accessory building or structure shall be permitted except for walls or fences not more than 4 1/2 feet high.

(2)  The following restrictions concerning yards shall apply:

(a)  Cornices, window boxes, and roof overhangs may project into any required yard a distance of not more than 24 inches.

(b)  Belt courses, windowsills, and similar ornamental features may project into any required yard a distance of not more than 12 inches, and chimneys may so project a distance of not more than 18 inches.

(3)  Any chain-link fence shall be clad in dark-hued vinyl.

I.  Height limitations.

(1)  No principal building shall exceed 32 feet in height.

(2)  No accessory building shall exceed 12 feet in height.

(3)  Chimneys and flues may exceed the aforesaid height limitations.

(4)  Receiving antennas may exceed the height limitation but shall not exceed a height of 45 feet above the ground.

J.  Length of buildings.

(1)  No building shall exceed 160 feet in length.

    (2)  No building shall contain more than two dwelling units in a straight, unbroken row, and the exterior wall of each such building shall include a setback or break with a depth of not less than six feet after every two dwelling units.

K.  Distances between buildings; windows.

    (1)  No buildings or groups of attached buildings shall be located closer to each other than a distance of 50 feet.

    (2)  No window, other than a bathroom or kitchen window, shall be located within 40 feet of any other window on any other building or on the same building, if one such window shall be visible from the other, unless the panels of the walls in which such windows are located intersect (or would intersect, if extended) at an angle of 90° or more.

L.  Off-street parking.

    (1)  A minimum of two parking spaces shall be provided for each dwelling unit, and the site plan shall clearly indicate the allocation of such spaces to the respective dwelling units.

    (2)  In addition to the parking spaces required by Subsection **L(1)** above, one parking space for each two dwelling units shall be provided for guest and visitor parking, which spaces may be in dispersed groupings, provided that such spaces are reasonably convenient to all dwelling units.

    (3)  Parking spaces, aisles and drives shall conform to the design requirements of Article **XII** of Part **4**, Zoning, of this chapter.

M.  Developer's agreement. A developer's agreement approved by the Planning Board and the Planning Board Attorney shall be executed prior to the issuance of any building permit.

N.  Street trees. Street trees of a species acceptable to the Planning Board, planted at least 50 feet on center and with a minimum planting caliper of three inches, shall be required.

# § 250-70. Regulation of diplomatic uses.

A.  Prohibited locations. No land or building shall be used, nor shall any building be constructed, altered or designed to be used, for the purpose of diplomatic use within any one-family residence district as defined in § **250-59A**.

B.  Permissible locations. Within any district as set forth in § **250-54** hereof, other than any one-family residence district, any land or building may be used for the purpose of a diplomatic use to the same extent permitted and subject to the same terms and conditions governing professional or governmental offices within such district.

# § 250-71. Multiple Residence (RMC) District.

A.  Purpose. The purpose of this chapter with respect to the Multiple Residence (RMC) District is to provide for the development of medium-density residential housing, subject to such specific conditions and limitations as set forth herein, so as to be compatible

Case 2:19-cv-14515-BRM-JAD   Document 2-5   Filed 06/28/19   Page 136 of 249 PageID: 377

with the suburban character of the City of Englewood, nearby residential areas and adjoining highways.

B. Permitted uses. Within the Multiple Residence (RMC) District and subject to the specific conditions and limitations set forth in this section, no land or building shall be used, nor shall any building be constructed, altered, or designed to be used, for any purpose other than the following:

(1) Multifamily dwellings.

(2) Parks and playgrounds.

(3) Municipal purposes.

(4) The following accessory uses and accessory buildings and structures incident to the primary use of the main structures on the premises, subject to the conditions and limitations hereinafter set forth:

(a) Garage or carport.

(b) Fences, garden walls and other landscaped features, including decorative pools, fountains, statuary, terraces, steps, benches and playground equipment.

(c) Fully enclosed storage space for maintenance equipment and supplies, a maintenance shop and a management office for servicing the multifamily community.

(d) Bathhouse, playhouse, greenhouse and similar buildings customarily incidental to residential use, including one central facility for swimming, wading and tennis.

(e) Community building to permit gathering of residents for recreation or community business.

(f) Construction office and sales office for use in connection with the construction and sale of units within the multiple-family dwellings on the premises, but only until such time as all such units have been completely constructed and initially sold.

C. Minimum contiguous acreage. No site shall be developed for multiple-residence development unless it contains a minimum of 30 acres of contiguous land and has access to a public street.

(1) With respect to the requirement that the land constituting such site shall be contiguous, private roads, internal streets and access driveways within the site shall not be deemed to divide the site so as to render portions thereof noncontiguous.

(2) Areas required to be dedicated to any public purpose, including street construction or street widening, shall not be deemed to reduce the size of the site for purposes of determining compliance with the thirty-acre minimum lot size.

(3) Notwithstanding the contiguous acreage requirements set forth above, the municipal agency may permit the establishment of individual lots of less than the minimum contiguous acreage required, provided that all land lying within the area to be developed for multiple-residence development, including any such individual

lots, shall form a part and be subject to one overall site plan covering the entire tract, that such site plan shall be reviewed and approved by the municipal agency and that any such separately owned or subdivided lots or parcels of land shall be subject to and covered by the aforesaid comprehensive site plan covering the entire tract, either pursuant to an agreement binding on the owners of all such separate lots or parcels, as well as their successors in title, which shall be approved by the attorney for the municipal agency, or in such other manner as shall be approved by the attorney for the municipal agency, so as to assure that no part of the overall tract shall be developed in any manner except as part of the comprehensive site plan.

D.   Dwelling unit density. Multiple-residence development shall require a minimum of one unit for each 4,840 square feet (nine per acre) and shall be limited to a maximum of one unit for each 4,356 square feet (10 per acre), subject to a density reduction of up to 10% during site plan review when necessary, in the opinion of the municipal agency, for protection of existing grades, slopes or other existing natural or topographical features, including preservation of trees, or to insure that the plan conforms with the site plan standards set forth in Article **VI**, Site Plan Review, of this chapter, as amended, provided that such density reduction shall not prohibit less than the minimum number of units required hereunder.

E.   Ground area. The sum of the ground area of all principal and accessory buildings and all pavement, including roads, parking areas and driveways, shall not exceed 45% of the ground area of the site.

F.   Buffer and yard requirements.

(1)   A naturalistic landscaped buffer strip with a maximum retention of existing trees and vegetation shall be provided around the entire perimeter of the Multiple Residence (RMC) District for at least the following depths:

(a)   Southern boundary along Interstate Highway 95: a distance of 100 feet; provided, however, that, beginning at a point 100 feet easterly from Broad Avenue, as measured along the southerly boundary line, to a point 500 feet easterly therefrom, as measured along said southerly boundary line, parking areas may encroach into the buffer strip to within 38 feet of said southern boundary line.

(b)   Eastern boundary adjoining the One-Family Residence (R-D) District: a distance of 75 feet.

(c)   Northern boundary adjoining the One-Family Residence (R-B) District: a distance of 30 feet.

(d)   Western boundary adjoining Broad Avenue: a distance measured along a line beginning at a point 100 feet easterly from Broad Avenue, as measured along the southerly boundary line, to a point 270 feet easterly from Broad Avenue, as measured along the northerly boundary line.

(2)   No building or structure or parking area, except as provided in Subsection **F(1)(a)** above, shall encroach within any buffer strip, except for points of ingress and egress, gate enclosures, walls, fences or utilities.

(3)

No part of any building shall be constructed less than 15 feet from the paved portion of any street or including any interior or private or parking area.

G.  Usable open space.

(1)  Any area devoted to multiple-family development shall contain usable open space of an area equal to at least 400 square feet times the number of dwelling units on the site.

(2)  Required usable open space of not less than 400 square feet may be assigned as private yards to individual dwelling units to which such space is contiguous.

(3)  Required usable open space which is allocated to an individual dwelling unit shall be easily accessible to the occupants of such unit, and usable open space which is allocated to two or more dwelling units shall be easily accessible to the occupants of all such units.

(4)  No portion of any required front yard shall be used for required usable open space, and no portion of any required usable open space shall be used for driveways or parking spaces.

(5)  No structure of any kind shall be permitted within any required usable open space, except for a swimming pool or other outdoor sport structure, provided that not more than 25% of any such structure shall be covered by a roof.

H.  Regulations concerning yards and fences.

(1)  Within a required yard, except for the projections permitted by Subsection **H(2)** below, no accessory building or structure shall be permitted except for walls or fences not more than 4 1/2 feet high.

(2)  The following restrictions concerning yards shall apply:

(a)  Cornices, window boxes, and roof overhangs may project into any required yard a distance of not more than 24 inches.

(b)  Belt courses, windowsills, and similar ornamental features may project into any required yard a distance of not more than 12 inches, and chimneys may so project a distance of not more than 18 inches.

(3)  Any chain-link fence shall be clad in dark-hued vinyl.

I.  Height limitations and stories.

(1)  No principal building shall exceed 40 feet in height, as measured from the entry level to the top of the ceiling joists of the top living level, with no more than an additional 10 feet from the top of these joists to the highest point of the exterior roof; provided, however, within 100 feet of the eastern boundary of the RMC District, no principal building shall exceed 30 feet in height, as measured from the entry level to the highest point of the exterior roof.

(2)  No accessory building shall exceed 12 feet in height.

(3)  Chimneys and flues may exceed the aforesaid height limitations.

(4)   Receiving antennas may exceed the height limitation but shall not exceed a height of 45 feet above the ground.

(5)   No principal building shall exceed four living levels; provided, however, that no facade of any principal building facing east shall exceed three living levels or exceed 40 feet in height, measured from the entry level to the highest point of the exterior roof.

J.   Length of buildings.

(1)   No building shall exceed 160 feet in length.

(2)   No building shall contain more than two dwelling units in a straight, unbroken row, and the exterior wall of each such building shall include a setback or break with a depth of not less than six feet after every two dwelling units.

K.   Distances between buildings; windows.

(1)   No buildings or groups of attached buildings shall be located closer to each other than a distance of 50 feet.

(2)   No window, other than a bathroom or kitchen window, shall be located within 40 feet of any other window on any other building or on the same building, if one such window shall be visible from the other, unless the panels of the walls in which such windows are located intersect (or would intersect, if extended) at an angle of 90° or more.

L.   Off-street parking.

(1)   A minimum of two parking spaces shall be provided for each dwelling unit, and the site plan shall clearly indicate the allocation of such spaces to the respective dwelling units.

(2)   In addition to the parking spaces required by Subsection **L(1)** above, three parking spaces per 10 dwelling units or part thereof shall be provided for guest and visitor parking, which spaces may be in dispersed groupings, provided that such spaces are reasonably convenient to all dwelling units.

M.   Developer's agreement. A developer's agreement approved by the Planning Board and the Planning Board Attorney shall be executed prior to the issuance of any building permits.

N.   Street trees. Street trees of a species acceptable to the municipal agency and having a minimum planting caliper of three inches shall be planted at no more than 50 feet on center along all public streets adjoining the Multiple Residence (RMC) District and along all interior and private roadways, with a minimum planting caliper of three inches.

# § 250-72. Research, Industry and Medical (RIM) District.

[Added 11-12-2014 by Ord. No. 14-36[1]]

A.   Purpose. The purpose of this section, with respect to the Research, Industry & Medical (RIM) District, is to permit land uses that reflect contemporary light industrial economies

and development trends in research and medicine; to strengthen the identity of this district as a base of local and regional employment; to broaden the presence of research, development, and manufacturing enterprises; and to foster the development of medical and health care facilities that complement the existing medical and health care services located throughout the City. Senior housing is permitted to complement future medical and health care services and to contribute to a sense of a health care village that offers care and living opportunities for older persons. This district already encompasses several multifamily residential complexes created through planned unit developments (PUDs). Therefore, this district also intends, through careful attention to site design and urban design principles appropriate for a city of Englewood's scale and the scale of the blocks and streets within the RIM, to improve the physical appearance of the area, create an orderly developed environment with an engaging public realm and active open spaces, and to foster internal connectivity, mobility, and safety for all modes of transportation within and between properties.

B.  Permitted uses. Permitted uses are summarized in the table below. In the table, the letter "Y" stands for permitted use and "YC" stands for conditional use. Conditions for conditional uses are listed in Subsection **C**. All other uses not expressly permitted in this section are prohibited.

| Land Use Categories and Land Uses | RIM |
| --- | --- |
| **Industrial Uses, light** | |
| Apparel manufacturing | Y |
| Beverage production and manufacturing | Y |
| Computer, electronic, and electrical product manufacturing | Y |
| Food production and manufacturing | Y |
| Scientific and medical instrument manufacturing | Y |
| Nonmetallic mineral product manufacturing | Y |
| Printing and related support activities | Y |
| Research and development | Y |
| Wood and furniture product manufacturing | Y |
| **Wholesale Trade, Warehousing, Distribution** | |
| Wholesale sales | Y |
| Warehousing or distribution of nonflammable, nonhazardous materials | Y |
| Moving and storage facilities | Y |
| **Agricultural Uses** | |
| Accessory rooftop farming and gardening | YC |
| **Motor Vehicle-Related Uses** | |
| Automobile sales and rental | YC |
| Car wash facilities | YC |
| Motor vehicle service and repair | YC |
| **Arts, Entertainment and Recreation** | |
| Studios (television, film, production, recording, radio) | Y |
| **Offices, nonmedical** | |
| Business offices | Y |

| Land Use Categories and Land Uses | RIM |
|---|---|
| Professional offices | Y |
| **Medical and Health Care** | |
| Ambulatory surgery center | Y |
| Assisted living facility | Y |
| Continuing care community | Y |
| Hospice | Y |
| Medical and dental laboratories and diagnostic services | Y |
| Medical offices | Y |
| Medical center | Y |
| Rehabilitation center | Y |
| Skilled nursing facility | Y |
| Urgent care facility | Y |
| Veterinary hospital | Y |
| Wellness center | Y |
| **Retail Trade** | |
| Accessory retail | YC |
| Medical equipment sales | Y |
| **Eating and Drinking Establishments** | |
| Accessory restaurant | YC |
| **Education** | |
| Technical school | Y |
| **Emergency Services** | |
| Police, Fire, EMT, and ambulance stations | Y |
| **Lodging** | |
| Hotel | Y |
| **Residential** | |
| Apartment and condominium communities for senior citizens | Y |

C.  Conditional uses. For areas within the designated RIM District, the Planning Board shall not approve any conditional use application for any of the following uses under this section unless the following enumerated specific conditions have been met:

(1)  Accessory retail and restaurants. The area of accessory retail space shall not exceed 15% of a building's total square footage. The area of accessory restaurant space shall not exceed 20% of a building's total square footage.

(2)  Automobile sales and rental.

(a)  Automobile sales establishments shall have a fully enclosed sales building with a showroom area accommodating at least three automobiles.

(b)  Vehicle service or repair may be performed as an accessory use, but only within a totally enclosed building.

(c)

Outdoor storage. An automobile sales or rental establishment shall comply with the following requirements for outdoor storage:

[1]   All outdoor display and service areas, including driveways and parking facilities, shall be paved.

[2]   Motor vehicles and equipment shall be kept at least 15 feet from the right-of-way and property lines.

[3]   Parking areas for rental vehicles shall be located behind the principal structure on the lot.

(d)  On-site circulation. An automobile sales or rental establishment shall comply with the following requirements for on-site circulation:

[1]   There shall be sufficient area on site for all vehicle maneuvering and repositioning of inventory. No vehicles shall stand or be parked in the public right-of-way. All vehicle service must be performed on site.

[2]   Driveways are limited to one driveway per street frontage per 100 linear feet of street frontage and the maximum width of each driveway is 24 feet.

[3]   Driveways shall be at least 10 feet from any side lot line 50 feet from the intersection of street lines.

(3)  Accessory rooftop farming. The primary activity to be performed with or without a greenhouse structure shall be the cultivation of plants.

D.  Dimensional standards.

| Dimension | RIM |
| --- | --- |
| **Lot Dimensions** | |
| Minimum lot area (square feet) | 20,000 |
| Minimum lot width (feet) | 200 |
| Minimum lot depth (feet) | 100 |
| **Building Height** | |
| Maximum Building height (feet) | 75 |
| **Setbacks and Building Coverage** | |
| Minimum front yard setback (feet) | 15 |
| Minimum side yard setback (feet) | 10 |
| Minimum rear yard setback (feet) | 20 |
| **Setbacks when Abutting Residential District** | |
| Minimum front yard setback (feet) | 25 |
| Minimum side yard setback (feet) | 20 |
| Minimum rear yard setback (feet) | 30 |

E.  General standards for RIM Districts.

(1)  Operational standards.

    (a)  Any activity permitted in this district shall be conducted in such a manner as not to have a detrimental effect on adjacent properties by reason of waste, noise, light, vibration, or lack of proper maintenance of grounds or buildings.

    (b)  Outdoor storage of materials, products, dumpsters, equipment or vehicles, shall be screened by a solid fence or wall no taller than eight feet in height. Materials, products or equipment stored outdoors shall not be piled higher than the height of the fence or wall, nor shall they encroach into required parking and landscape areas.

    (c)  Business adjacent to residential districts.

        [1]  Loading areas or docks shall not be located closer than 60 feet from a residential district.

        [2]  Loading docks shall be screened with a solid masonry wall at a height to be determined by the Zoning Official.

(2)  Landscaping. Applicants shall submit a landscape plan detailing the location and types of plantings and other materials. Landscaping may include trees, bushes, shrubs, ground cover, perennials, annuals, plants, sculpture, art and/or the use of building and paving materials.

(3)  Doors and windows.

    (a)  All buildings shall include doors and windows facing the street. Blank walls are not permitted facing the street at ground level.

    (b)  Ground floors shall have a minimum transparency of at least 50% of the wall area of the ground level for each wall facing a public street.

(4)  Exterior lighting.

    (a)  Applicants shall submit a lighting plan detailing exterior lighting of facades and grounds.

    (b)  All exterior light fixtures shall be fully shielded and direct light either downward toward the earth's surface and/or toward the building facade.

    (c)  All exterior light fixtures shall be positioned in such a manner as to direct light away from adjacent property and public rights-of-way.

    (d)  All lighting sources shall be directed away from reflective surfaces to minimize glare upon adjacent property and public rights of way.

(5)  Location of parking. Off-street parking areas shall be located to the side or rear of the building.

(6)  Open space requirement.

    (a)  A minimum of 10% of the lot area shall be designed as usable open space.

    (b)  For the change of use of an existing building, the Planning Board may permit the creation of substitute interior space accessible to building occupants for the

required open space in the project, if it finds that it is not practical or desirable to provide exterior open space.

(7) Signs. Applicants shall comply with the sign regulations in Article **XV**.
[Amended 6-13-2017 by Ord. No. 17-05]

(8) Street numbers. Buildings shall be clearly marked with their street number. Street numbers shall be internally or externally illuminated for visibility at night.

(9) Green buildings.

    (a) All new buildings, additions, or renovations with gross area greater than 5,000 square feet are encouraged to be constructed to the U.S. Green Building Council's LEED certification standards or equivalent.

    (b) Green roofs are permitted and encouraged. The planting media and plant material comprising green roofs shall be maintained in accordance with generally accepted landscape maintenance practices, replacing each as necessary.

(10) Waste collection and storage areas. Trash, recycling, and any other refuse or recycling collection dumpsters or containers shall be located at the rear of the property and either screened, enclosed, or otherwise blocked from public view. Such screening or enclosure should be designed in conjunction with the primary building, may use similar materials and shall obscure views of waste collection and storage area.

F. General building, site, circulation, and public realm design standards for RIM Districts.

(1) Building, site, and circulation design standards.

    (a) To create a sense of enclosure and defined space, buildings shall be arranged so that they frame and define the fronting streets, giving deliberate form to streets and sidewalk areas.

    (b) Buildings shall be set back a similar distance from the property line.

    (c) Exposure of the backs of buildings along major thoroughfares shall be avoided through appropriate building orientation and screening.

    (d) Sidewalks shall be designed to be part of an interconnected network of pedestrian paths within the property lines and shall connect to sidewalks outside of the property line.

    (e) Pedestrian walkways shall be provided along and/or through parking areas to building entrances.

    (f) Crosswalks shall be applied at appropriate locations where pedestrians might frequently cross a driveway or internal access road.

    (g) Traffic calming infrastructure such as raised crosswalks should be installed within driveways, parking areas, and internal access roads to promote safe passage for both pedestrians and motorists.

    (h)

Special treatments for bicycle circulation on site should be considered, including the provision of sheltered or unsheltered bicycle parking.

(i) Access to public transit should be considered in the design of the site, driveways, sidewalks, and access roads. Bus shelters should be provided.

(j) To the extent the forgoing criteria do not impose an objective standard in feet, percentage or other objective criteria, a variance therefrom shall be considered a design waiver rather than a zoning variance and shall be considered as such in the discretion of the appropriate land use board.

(2) Public realm design standards.

(a) Internal streetscapes and streetscapes along public streets should consist of street trees or and other appropriate landscape features, street furniture, and streetlights. The types/designs should complement existing streetscape features located throughout the City.

(b) Wayfinding elements such as gateway treatments, banners affixed to streetlights, and directional signs are encouraged and should be coordinated with existing or proposed wayfinding systems within the City of Englewood.

(c) To the extent the foregoing criteria do not impose an objective standard in feet, percentage or other objective criteria, a variance therefrom shall be considered a design waiver rather than a zoning variance and shall be considered as such in the discretion of the appropriate land use board.

G. Visual buffers and screening. Buffers shall be provided to effectively protect residential property from the potential adverse effects of adjacent nonresidential land use activity that may result in nuisance, including visual blight, excessive light, threat to safety, noise, or odor encroachment to an adjacent parcel or one located across a public right-of-way.

(1) Landscaping.

(a) All activities on any lot in the RIM District that abut a residential zoning district shall be screened from such abutting residential district by landscaping consisting of lawn, massed evergreen and/or deciduous trees, and shrubs of such species and density as will provide, within two growing seasons, a solid and continuous screen throughout the full course of the year.

(b) Evergreen and deciduous shrubs shall have a minimum height of three feet when planted and shall be of varieties that normally grow to a minimum height of six feet within two full growing seasons.

(c) Deciduous trees at the time of planting shall have a minimum caliper of three inches.

(2) Fencing.

(a) Fences are permitted in rear yards at a maximum height of six feet.

(b) Fences shall be kept in good repair, consistent with the design thereof. The property owner shall be responsible for maintaining the area between the property line and the fence.

        (c)  Chain-link material used for any fence shall be of dark-colored material, and the posts and other framework forming part of such fence shall be the same color as the chain-link material.

[1]    *Editor's Note: This ordinance also repealed former § 250-72, Office Industrial (OI) District, as amended.*

# § 250-73. Multiple Residence (RMD) District.

A.  Purpose. The purpose of this chapter with respect to the Multiple Residence (RMD) District is to provide for moderate-density residential housing and townhouses compatible with the suburban character of the City of Englewood, to provide additional new housing to persons of moderate income and to permit and encourage the preservation of open space and perimeter buffers as necessary to accomplish these purposes.

B.  Permitted uses. Within the RMD District, no land or building shall be used, nor shall any building be constructed, altered or designed to be used, for any purpose other than the following:

    (1)  Attached townhouse dwellings.

    (2)  Multifamily dwellings.

    (3)  Parks and playgrounds.

    (4)  Nature preserve and nature study area.

    (5)  Accessory buildings and structures as hereinafter defined and limited.

C.  Permitted accessory buildings and structures. Within the RMD District, the following accessory buildings and structures incident to the primary use of the main structure on the premises shall be permitted, subject to the conditions and limitations set forth:

    (1)  Garage or carport.

    (2)  Fences, garden walls and other landscape features, including decorative pools, fountains, statuary, terraces, steps, benches and playground equipment. Any chain-link fence shall be clad in a dark-hued vinyl.

    (3)  Fully enclosed storage space for maintenance equipment and supplies for serving the townhouse or multifamily community.

    (4)  Community building to permit gathering of residents for recreation or community business.

    (5)  Bathhouse, playhouse, greenhouse and similar buildings customarily incidental to residential use, including one central facility for swimming, wading and tennis.

    (6)  Construction, sales or rental office for use in connection with the construction, sale or rental of townhouse or multifamily dwelling units of the premises, but only until such time as all such units have been completely constructed and initially sold or rented.

D. Minimum lot size and development requirements.

(1) No site shall be developed for moderate-density housing or townhouse development unless it contains four or more acres of contiguous land and has access to a public street.

(a) With respect to the requirement that the land constituting such site shall be contiguous, private roads, internal streets and access driveways within the site shall not be deemed to divide the site so as to render portions thereof noncontiguous.

(b) Any area dedicated or conveyed to either the City of Englewood or the County of Bergen to any public purpose, including parklands, street construction or street widening, shall not be deemed to reduce the size of the site for the purposes of complying with the minimum lot size regulations, lot coverage and dwelling unit density regulations, yard requirements or usable open space requirements.

(2) The provisions of Subsection **D(1)** shall not be deemed to prohibit the subdivision of any site into individual lots of less than four acres in area, provided that all land lying within the area to be developed for attached townhouses, including any such individual lot, shall form part of and be subject to one overall site plan covering the entire tract of not less than four acres, such site plan to be reviewed and approved by the municipal agency, and provided that any such separately owned or subdivided lot or parcel of land shall be subject to and covered by the aforesaid comprehensive site plan covering the entire tract, either pursuant to an agreement binding on the owners of all such separate lots or parcels, as well as their successors in title, which shall be approved by the attorney for the municipal agency, or in such other manner as shall be approved by the attorney for the municipal agency, to assure that no part of the overall tract shall be developed in any manner except as part of the comprehensive site plan.

(3) In evaluating and acting with respect to any site plan which proposes that all or part of such site is to be divided into individual lots of less than four acres, the municipal agency shall insure that each such lot either includes ownership of or has a common right to use such portion of the total area of the entire site as will insure that each such individual lot shall have the benefit of the usable open space requirements set out in Subsection **G** hereof.

(4) The municipal agency is empowered, on site plan review, to require performance and maintenance guarantees in the amounts and for the purposes and durations set forth in N.J.S.A. 40:55D-53, to assure the installation and maintenance of landscaping, recreational facilities and other on-site or necessary improvements.

E. Lot coverage and dwelling unit density.

(1) Moderate-density townhouse development shall be limited to a maximum of one dwelling unit for each 6,222 square feet of lot area (seven units per acre).

(2) Moderate-density multifamily residences shall be limited to one dwelling unit for each 3,630 square feet of lot area (12 units per acre), subject to a density reduction of up to 15% during site plan review when necessary, in the opinion of the municipal agency, for protection of existing grades, slopes, or other existing natural or

topographical features, including preservation of trees, or to insure that the plan conforms with the site plan standards set forth in Article **VI**, § **250-36B**, of this chapter.

(3) The sum of the area of all principal and accessory buildings shall not exceed 25% of the area of the site.

(4) The sum of the area of all principal and accessory buildings and all pavement, including roads, parking areas, driveways and walks, shall not exceed 45% of the area of the site.

F. Buffer and yard requirements.

(1) Every effort shall be made to save and preserve existing trees within 20 feet of the entire perimeter of any site in the Multiple Residence (RMD) District.

(2) No principal building or accessory structure shall be constructed unless in compliance with the following yard requirements:

(a) Front yard from an existing public street: a distance of 30 feet.

(b) Side yard from a perimeter property line: a distance of 25 feet or building height, whichever is greater.

(c) Rear yard from a perimeter property line: a distance of 35 feet.

(3) No part of any building shall be constructed less than 20 feet from the paved portion of any interior street. Any enclosed garages shall be set back a minimum of 23 feet from the paved portion of any interior street. No exterior, at-grade parking, unrelated to a garage, shall be constructed less than 15 feet from a building.

(4) A perimeter planting buffer area, consisting entirely of grass or other living plants, shall be provided for a width of eight feet adjacent to the side lot lines and rear lot line of the site.

G. Usable open space.

(1) Any site used for moderate-density multifamily residential or townhouse purposes shall contain usable open space of an area equal to at least 400 square feet times the number of dwelling units of the site.

(2) With respect to townhouse development, required usable open space of not less than 400 square feet may be assigned as private yards to individual dwelling units to which such space is contiguous.

(3) Required usable open space which is allocated to an individual dwelling unit shall be easily accessible to the occupant of such unit, and usable open space which is allocated to two or more dwelling units shall easily be accessible to the occupants of all such units.

(4) No portion of any required front yard shall be used for required usable open space, and no portion of any required usable open space shall be used for driveways or parking spaces.

(5)

No structure of any kind shall be permitted within any required usable open space, except for a swimming pool or other outdoor structure, provided that not more than 25% of any such structure shall be covered by a roof.

H.  Regulations concerning yards and fences.

(1)  Within a required yard, except for the projections permitted by Subsection **H(2)** below, no accessory building or structure shall be permitted, except for walls or fences not more than 4 1/2 feet high.

(2)  The following restrictions concerning yards shall apply:

(a)  Cornices, window boxes, and roof overhangs may project into any required yard a distance of not more than 24 inches.

(b)  Belt courses, windowsills, and similar ornamental features may project into any required yard a distance of not more than 12 inches, and chimneys may so project a distance of not more than 18 inches.

(c)  All parts of any chain-link fence shall be clad in dark-hued vinyl.

I.  Height limitations.

(1)  No principal building shall exceed 35 feet in height.

(2)  No accessory building shall exceed 12 feet in height.

(3)  Chimneys and flues may exceed the aforesaid height limitation, but shall not exceed a height of 45 feet above the ground.

(4)  Receiving antennas may exceed the height limitation, but shall not exceed a height of 45 feet above the ground.

J.  Length of buildings.

(1)  No building shall exceed 160 feet in length.

(2)  No building shall contain more than two dwelling units in a straight, unbroken row, and the exterior wall of each such building shall include a setback or break with a depth of not less than three feet after every two dwelling units.

K.  Distance between buildings; windows.

(1)  No buildings or groups of attached buildings shall be located closer to each other than a distance of 35 feet.

(2)  No window, other than a bathroom or kitchen window, shall be located within 35 feet of any other window on any other building or on the same building, if one such window shall be visible from the other, unless the panels of the walls in which such windows are located intersect (or would intersect, if extended) at an angle of 90° or more.

L.  Off-street parking.

(1)

A minimum of two parking spaces shall be provided for each dwelling unit, and the site plan shall clearly indicate the allocation of such spaces to the respective dwelling units.

(2) In addition to the parking spaces required by Subsection **L(1)** above, one parking space for each two dwelling units shall be provided for guest and visitor parking, which spaces may be in dispersed groupings, provided that such spaces are reasonably convenient to all dwelling units.

(3) Parking spaces, aisles and drives shall conform to the design requirements of Article **XII** of Part **4**, Zoning, of this chapter.

M. Developer's agreement. A developer's agreement approved by the municipal agency and the governing body shall be executed prior to the issuance of any building permit.

N. Street trees. Street trees shall be required along public and private roadways of a species and specimen shape acceptable to the Planning Board, planted no further apart than 45 feet, and with a minimum planting caliper of three inches.

# § 250-74. Multiple Residence (RME) District.

A. Purpose. The purpose of this chapter with respect to the Multiple Residence (RME) District is to provide for low-density multifamily residential housing compatible with the suburban character of one-family residential districts within the City of Englewood and to permit and encourage the preservation of open space and perimeter buffers as necessary to accomplish these purposes.

B. Permitted uses. Within the RME District, no land or building shall be used, nor shall any building be constructed, altered or designed to be used, for any purpose other than the following:

(1) Multifamily dwellings.

(2) Parks and playgrounds.

(3) Nature preserve and nature study area.

(4) Accessory structures as hereinafter defined and limited.

(5) Home professional office or studio of an architect, artist, clergyperson, engineer, land surveyor, attorney, musician, planner, psychologist, sculptor, tutor or similar profession, excluding dentists and physicians, as conditional accessory uses, subject to the conditions and limitations set forth below:

(a) The professional office or studio shall be operated by a person whose principal residence is within the dwelling unit in which the studio or office is located.

(b) Not more than three persons, including the resident-operator or resident-operators, shall be employed or engaged in the operation of the office or studio at any one time.

(c) Not more than three clients, patients, customers, students or other persons shall be served at any one time.

> (d)  The office or studio shall not exceed 400 square feet in floor area, or 20% of the aggregate floor area of the dwelling in which it is located, whichever is smaller.
>
> (e)  Any such conditional accessory use shall comply with all applicable off-street parking requirements for such a use.

C.  Permitted accessory buildings and structures. Within the RME District, the following accessory structures incident to the primary use of the main structure on the premises shall be permitted, subject to the conditions and limitations set forth:

> (1)  Fences, garden walls and other landscape features, including decorative pools, fountains, statuary, terraces, steps, benches and playground equipment. Any chain-link fence shall be clad in a dark-hued vinyl.
>
> (2)  Fully enclosed storage space for maintenance equipment and supplies for serving the multifamily community, within the principal structure.
>
> (3)  Community rooms to permit gathering of residents for recreation or community business, within the principal structure.
>
> (4)  Outdoor swimming pools.
>
> (5)  Construction, sales or rental office for use in connection with the construction, sale or rental of the multifamily dwelling units on the premises, but only until such time as all such units have been completely constructed and initially sold or rented.

D.  Minimum lot size and development requirements.

> (1)  No site shall be developed for low-density multifamily residential development unless it contains three or more acres of contiguous land and has access to a public street.
>
> > (a)  With respect to the requirement that the land constituting such site shall be contiguous, private roads, internal streets and access driveways within the site shall not be deemed to divide the site so as to render portions thereof noncontiguous.
> >
> > (b)  Areas required to be dedicated to any public purpose, including parks, street construction or street widening, shall not be deemed to reduce the size of the site for purposes of determining compliance with the three-acre minimum lot size.
>
> (2)  The municipal agency is empowered, on site plan review, to require performance and maintenance guarantees in the amounts and for the purposes and durations set forth in N.J.S.A. 40:55D, to assure the installation and maintenance of landscaping, recreational facilities and other on-site or necessary improvements.

E.  Lot coverage and dwelling unit density.

> (1)  Low-density multifamily residential development shall be limited to a maximum of one dwelling unit for each 7,260 square feet of lot area (six units per acre). In computing the maximum number of units, any fractions shall be rounded downward to the nearest whole number.

(2) The sum of the area of all buildings shall not exceed 15% of the area of the site.

(3) The sum of the area of all buildings and all pavement, including roads, parking areas, driveways and walks, and other impervious surfaces shall not exceed 45% of the area of the site.

(4) No more than one principal building shall be permitted on the site.

F.  Buffer and yard requirements.

(1) Every effort shall be made to save and preserve existing trees within the perimeter planting buffer area, as hereinafter defined, of any site in the Multiple Residence (RME) District.

(2) No principal building or accessory structure shall be constructed unless in compliance with the following yard requirements:

(a) Front yard from an existing public street: a distance of 70 feet.

(b) Side yard from a perimeter property line: a distance of 35 feet or building height, whichever is greater.

(c) Rear yard from a perimeter property line: a distance of 250 feet.

(3) A perimeter planting area, consisting entirely of grass or other living plants, shall be provided for a width of eight feet adjacent to the side lot lines and rear lot line of the site.

G.  Usable open space.

(1) Any site used for low-density multifamily residential purposes shall contain usable open space of an area equal to at least 2,000 square feet times the number of dwelling units on the site.

(2) Required usable open space which is allocated to an individual dwelling unit shall be easily accessible to the occupant of such unit, and usable open space which is allocated to two or more dwelling units shall be easily accessible to the occupants of all such units.

(3) No portion of any required front yard shall be used for required usable open space, and no portion of any required usable open space shall be used for driveways or parking spaces.

(4) No structure of any kind shall be permitted within any required usable open space, except for a swimming pool.

H.  Regulations concerning yards and fences.

(1) Within a required yard, except for the projections permitted by Subsection **H(2)** below, no accessory building or structure shall be permitted, except for walls or fences not more than 4 1/2 feet high.

(2) The following restrictions concerning yards shall apply:

(a)

Cornices, window boxes, and roof overhangs may project into any required yard a distance of not more than 24 inches.

(b) Belt courses, windowsills, and similar ornamental features may project into any required yard a distance of not more than 12 inches, and chimneys may so project a distance of not more than 18 inches.

(c) All parts of any chain-link fence shall be clad in dark-hued vinyl.

I.  Height and length limitations.

(1) No building shall exceed 40 feet in height.

(2) Chimneys and flues may exceed the aforesaid height limitations.

(3) Receiving antennas may exceed the height limitation but shall not exceed a height of 45 feet above the ground.

(4) No building shall exceed 160 feet in length.

J.  Off-street parking.

(1) A minimum of two parking spaces shall be provided for each dwelling unit, and the site plan shall clearly indicate the allocation of such spaces to the respective dwelling units.

(2) In addition to the parking spaces required by Subsection **J(1)** above, one parking space for each two dwelling units shall be provided for guest and visitor parking, which spaces may be in dispersed groupings, provided that such spaces are reasonably convenient to all dwelling units.

(3) Parking spaces, aisles and drives shall conform to the design requirements of Article **XII** of Part **4**, Zoning, of this chapter.

(4) No parking spaces shall be permitted within the required front yard; provided, however, that, in the case of a corner lot, parking may be permitted within the front yard of the less-traveled street, provided it is set back at least 20 feet from the street line.

K.  Developer's agreement. A developer's agreement approved by the municipal agency and the governing body shall be executed prior to the issuance of any building permit.

L.  Street trees. Street trees shall be required along public and private roadways of a species and specimen shape acceptable to the Planning Board, planted no further apart than 45 feet, and with a minimum planting caliper of three inches.

# § 250-75. Open Space (OS) District.

[Added 7-16-1996 by Ord. No. 96-26]

A.  Purpose. The purpose of this chapter with respect to the Open Space (OS) District is to preserve open space within the City of Englewood for outdoor recreation or parkland, to enhance the visual perception of openness, and to provide and preserve adequate light, air, and open space within the City of Englewood.

B. Permitted uses. Within the Open space (OS) District, no land or building shall be used, nor shall any building be constructed, altered, or designed to be used, for any purpose other than the following:

   (1) Public parks and other public recreational facilities intended to remain in perpetuity.

   (2) Public or private natural conservation areas intended to remain as such in perpetuity.

C. Permitted accessory buildings and structures. The following accessory structures and buildings incident to the primary use shall be permitted, subject to the conditions and limitations hereinafter set forth:

   (1) Living quarters for a watchperson or caretaker and family employed in such capacity.

   (2) Nature conservancy interpretive buildings.

   (3) Accessory structures and buildings customarily incidental to the permitted uses, including storage buildings, rest rooms, open-sided shelter areas, such as gazebos, benches, and pedestrian walkways.

D. Yard and height requirements. Principal and accessory structures and buildings shall comply with the yard requirements and the height limitations governing the R-AA One-Family Residence District (for lots having an area of 44,000 square feet or more), regardless of lot size, as same is set forth in § 250-59I and K of Article XI of Part 4, Zoning, of this chapter.

# § 250-76. Planned Unit Development 1 (PUD-1) Overlay District.

[Added 7-16-2002 by Ord. No. 02-12; amended 9-13-2011 by Ord. No. 11-11]

A. Zoning standard for PUD-1 Overlay District.

   (1) Purpose.

      (a) The purpose of this chapter with respect to the Planned Unit Development 1 (PUD-1) Overlay District is to provide for the development of an area as a single entity according to a plan containing both residential and nonresidential uses, subject to such specific conditions and limitations as set forth herein, so as to foster mixed-use development in appropriate locations within the City of Englewood specified in the underlying zoning district.

      (b) The further purpose of this chapter, as amended, is to continue the regulation of certain areas formerly zoned PUD-1 for which some development approvals have previously been granted but to modify the conditions and limitations upon which further development may be permitted so as to foster mixed-use development in appropriate locations within the City of Englewood specified in the underlying zoning district. Among other things, the purpose of this chapter is to permit certain further residential and nonresidential development within two areas within the PUD-1 Overlay District, defined and designated in Subsection B(2) as the Supplemental Development Area and the North Office

Pad, but only subject to specific conditions and limitations set forth herein which are intended to foster mixed development in the overlay zone.

(2) Permitted uses. Within the Planned Unit Development 1 (PUD-1) Overlay District and subject to the specific conditions and limitations set forth in this section, no land or building shall be used, nor shall any building be constructed, altered or designed to be used, for any purpose other than the following:

    (a)  Multifamily dwellings.

    (b)  Attached townhouse dwellings.

    (c)  Business, professional or governmental offices.

    (d)  Hotels and conference centers.

    (e)  Ancillary retail uses, including banks, restaurants and retail sales and services.

    (f)  Accessory parking decks and structures.

    (g)  Accessory uses to permitted principal uses.

(3) General site zoning. Any planned unit development shall comply with the following specific conditions and limitations:

    (a)  Minimum aggregate area: 12 acres. Contiguous lot or lots separated by public streets or rights-of-way, other than divided highways, may be combined for the purpose of calculating aggregate area.

    (b)  Maximum impervious coverage: 80%.

    (c)  Floor area ratio is calculated on the basis of the total aggregated lot size (minimum size is 12 acres) of the site plan.

    (d)  Maximum floor area ratio for combined commercial development and hotel/conference center (ratio of total gross floor area constructed to total lot area): 0.72 (Floor area ratio excludes parking and parking decks.), except as hereinafter provided.

    (e)  Maximum floor area ratio for residential development (ratio of total gross residential floor area constructed to total lot area): 0.75. (Maximum floor area ratio includes all levels of parking decks.)

    (f)  Density of residential units (attached townhouse or multifamily dwellings):

        [1]  Twenty-five multifamily dwelling units per acre of total aggregated lot size.

        [2]  Seven and one-half attached townhouse units per acre of total aggregated lot size.

        [3]  For any combination of multifamily dwelling units and attached townhouse units, the permissible number of multifamily dwelling units shall be reduced by 25 for each 7.5 attached townhouse units or part thereof.

    (g)  Minimum ten-inch planting buffer between any existing industrial use.

    (h)   Minimum twenty-percent landscaped pervious area.

    (i)   Signage shall comply with the provisions of **§ 250-64M** of Part **4**, Zoning, of this chapter.

(4)   Office zoning. The development of business, professional and governmental office uses shall comply with the following specific conditions and limitations:

    (a)   Maximum height. Building height shall be limited to 10 stories and 120 feet (including parking deck structures).

    (b)   Maximum gross square footage of ancillary retail space: the lesser of 5% of total gross floor area or 30,000 square feet.

    (c)   Office buildings may not be constructed within 100 feet of Overpeck Creek channel walls.

    (d)   Parking: 4.0 spaces for every 1,000 square feet of gross floor area, including retail areas for buildings under 100,000 square feet, or 3.5 spaces for every 1,000 square feet of gross floor area, including retail areas for buildings having 100,000 square feet or more.

    (e)   Setback from existing hotel and/or office use: 30 feet.

    (f)   Setback from existing residential use: 50 feet.

    (g)   Notwithstanding the maximum height and maximum floor area ratio for combined commercial development and hotel/conference center, for each one-percent increase in landscaped pervious area over and above the 20% required, an increase in floor area ratio will be permitted of 0.01, and one story and 12 feet will be added to the permitted height, up to a maximum floor area ratio for combined commercial development and hotel/conference center of 0.75, a maximum number of 12 stories and a maximum height of 144 feet.

(5)   Hotel and conference center zoning. The development of hotel and conference center uses shall comply with the following specific conditions and limitations:

    (a)   Maximum height: the lesser of 10 stories or 120 feet.

    (b)   A hotel or conference center may not be constructed within 100 feet of Overpeck Creek channel walls.

    (c)   Parking: 1.2 spaces for each room, plus 10 spaces per 1,000 square feet of conference center. "Conference center" is defined as the gross square footage of all space encompassing conference rooms and auxiliary rooms that service the conference rooms (excluding kitchen area).

    (d)   Setback from existing hotel and/or office use: 30 feet.

    (e)   Setback from existing residential use: 50 feet.

    (f)   Notwithstanding the maximum height and maximum floor area ratio for combined commercial development and hotel/conference center, for each one-percent increase in landscaped pervious area over and above the 20% required, an increase in floor area ratio will be permitted of 0.01, and one story

and 12 feet will be added to the permitted height, up to a maximum floor area ratio for combined commercial development and hotel/conference center of 0.75, a maximum number of 12 stories and a maximum height of 144 feet.

(6) Multifamily zoning. The development of multifamily residential dwellings shall comply with the following specific conditions and limitations:

(a) Maximum height: the lesser of five stories or 59 feet in height.

(b) Maximum area of single building coverage: 48,000 square feet.

(c) Parking: in accordance with the New Jersey Residential Site Improvement Standards (RSIS), plus 3.5 spaces for each 1,000 square feet of ancillary retail gross floor area.

(d) Maximum ancillary retail space shall not exceed the lesser of 15% of the gross floor area or 30,000 square feet, whichever is less.

(e) Setback from existing hotel and/or office use: 30 feet.

(7) Townhouse zoning. The development of attached townhouse dwelling units shall comply with the following specific conditions and limitations:

(a) Maximum height: 35 feet, not to exceed three stories.

(b) Maximum area of single building: 4,500 square feet.

(c) Maximum gross floor area: 13,500 square feet.

(d) Parking: three spaces for each townhouse unit.

(e) Setback from another townhouse building: minimum 20 feet.

(f) Setback from multifamily residential, office or hotel/conference center: minimum 30 feet.

(8) Parking deck zoning. The development of parking decks shall comply with the following specific conditions and limitations:

(a) Maximum height: the lesser of seven stories or 84 feet.

(b) Parking decks may not be constructed within 100 feet of Overpeck Creek channel walls.

(c) Setback from residential use: 30 feet, unless used to serve residential units.

(9) Required ranges between residential and nonresidential. To insure an appropriate balance of nonresidential to residential uses within a planned unit development, the following range of nonresidential uses to residential uses is hereby required and shall be specified and depicted on any site plan required in connection therewith.

(a) There shall be no more than 30 residential units (either multiple-family dwelling units or attached townhouse dwelling units) for each 20,000 square feet of nonresidential development (excluding parking).

       (b)  The land area within a planned unit development designated for residential development shall not exceed 75% of the total land area within the planned unit development, inclusive of parking.

**B.**  Zoning standards for further development in the Supplemental Development Area and North Office Pad within the PUD-1 Overlay Zone.

    (1)  Title and scope. This subsection may be referred to as the "PUD Supplemental Development Area Standards (PUD-SDA Standards)." It establishes standards for further development in the Supplemental Development Area and North Office Pad areas within the PUD-1 Overlay Zone as defined and designated in Subsection **B (2)**.

    (2)  Definitions. Except as otherwise expressly stated in this section, the following terms shall have the following meanings:

**FURTHER DEVELOPMENT**
    Development which receives preliminary or final site plan approval after June 1, 2011.

**GROSS FLOOR AREA**
    The sum of the gross horizontal internal areas of all the floors of a building (or buildings), measured from the exterior faces of exterior walls or from the center line of walls common to two buildings, except that the floor area shall include only 75% of any basement or cellar space and shall exclude any parking or parking structures.

**NORTH OFFICE PAD**
    Block 2518, Lot 1.01.

**QUALIFIED RETAIL USES**
    Facilities for the sale of goods or services to the public, but excluding facilities in which the predominant good or service sold is:

    (a)  Paint.

    (b)  Hardware.

    (c)  Appliances.

    (d)  Clothing.

    (e)  Shoes.

    (f)  Jewelry.

    (g)  Cameras.

    (h)  Finished works of art.

    (i)  Liquor, but not excluding:

        [1]  Qualified retail uses in which wine, beer or liquor is sold for consumption on site; and

[2]   Qualified retail uses which sell wine, beer or liquor for external consumption, but whose predominant business on site is the sale of other goods or services, provided that no more than 20% of the shelf space is devoted to wine, beer or liquor products.

(j)   Bicycles.

(k)   Eyeglasses or contact lenses (optician).

(l)   Stationary or greeting cards.

**SUPPLEMENTAL DEVELOPMENT AREA**
The area encompassed by Block 2602, Lot 3.01, Block 2602, Lot 3.02, Block 2602, Lot 3.03, Block 2602, Lot 3.04, Block 2605, Lot 1.01, and Block 2605, Lot 1.02, as designated on the official Tax Map of the City of Englewood.

**SUPPLEMENTAL MULTIFAMILY HOUSING**
One hundred ninety five multifamily residential dwellings, excluding those that had received preliminary or final site plan approval prior to January 1, 2007.

(3)   Applicability. Except as otherwise provided within the PUD-SDA Standards, further development within the Supplemental Development Area and North Office Pad shall be governed by the PUD-1 Overlay Zone [codified as § 250-76A(1) et seq.] and the PUD-SDA Standards. Where there is any conflict or inconsistency as to the standards governing such development, the PUD-SDA Standards shall control. The PUD-SDA Standards do not govern development in the PUD-1 Overlay Zone other than within the Supplemental Development Area and the North Office Pad.

(4)   Additional permitted and nonpermitted uses.

(a)   Within the Supplemental Development Area and North Office Pad, and subject to the specific conditions and limitations set forth in this section, the following uses shall be permitted in addition to those permitted in the PUD-1 Overlay Zone:

[1]   Qualified retail uses.

(b)   Within the Supplemental Development Area and North Office Pad, ancillary retail uses as defined in Subsection **A(2)(e)** are prohibited.

(5)   Supplemental multifamily housing.

(a)   Supplemental multifamily housing shall be permitted only in the Supplemental Development Area.

(b)   Except as expressly stated to the contrary, supplemental multifamily housing shall comply with the standards set forth in the PUD-1 Overlay Zone for multifamily housing and shall also comply with the following standards:

[1]   Maximum number of units: 195.

[2]   Maximum gross floor area: 257,400 square feet.

[3]

Twenty percent of the 15 units reserved for low and moderate income households shall be three bedroom units. The remainder of the 195 units shall not include any units with more than two bedrooms.
[Amended 6-10-2014 by Ord. No. 14-18]

[4]   Parking: in accordance with the New Jersey Residential Site Improvement Standards (RSIS). Because of the location, anticipated demographic characteristics of residents, and availability of mass transit, an applicant for development approval of supplemental multifamily housing shall have the right, upon request, to utilize an alternative parking standard under the RSIS of 1.6 parking spaces for each dwelling unit.

(c)   Supplemental multifamily housing shall not be included in the maximum floor area ratio for residential development set forth in the PUD-1 Overlay Zone standards, but the aggregate gross floor area for all supplemental multifamily housing shall not exceed 257,400 square feet.

(d)   Supplemental multifamily housing shall not be subject to the standards for density of residential units (attached townhouse or multifamily dwellings) set forth in the PUD-1 Overlay Zone, but the total number of supplemental multifamily housing units shall not exceed 195 units.

(e)   Supplemental multifamily housing shall not be subject to the standards for maximum area of single building coverage for multifamily housing in the PUD-1 Overlay Zone.

(f)   Supplemental multifamily housing shall not be subject to standards for parking for multifamily housing in the PUD-1 Overlay Zone.

(6)   Office buildings.

(a)   Office buildings shall be permitted within the North Office Pad and the Supplemental Development Area, including medical offices.

(b)   The gross floor area of any office building within the Supplemental Development Area or the North Office Pad shall not be less than 40,000 square feet nor exceed 200,000 square feet.

(7)   Qualified retail zoning. The development of qualified retail uses shall comply with the following specific conditions and limitations:

(a)   Qualified retail uses shall be permitted only in the Supplemental Development Area.

(b)   Maximum aggregate gross floor area: 15,000 square feet.

(c)   Maximum gross floor within a single store:

[1]   Restaurant or specialty grocery store: 15,000 square feet.

[2]   Other qualified retail use: 10,000 square feet.

(d)   Maximum height: the lesser of two stories or 30 feet.

(e)   Parking: one space per 250 square feet of floor area.

C. Zoning standards for existing north residential pad parcel and north existing retail pad parcel.

(1) Title and scope. This subsection may be referred to as the "PUD Existing North Development Area (PUD-ENDA) Standards." It establishes standards for the current developed areas in the North Residential Pad parcel and the North Retail Pad parcel as defined and designated in Subsection **C(2)**.

(2) Definitions. Except as otherwise expressly stated in this section, the following terms shall have the following meanings:

**NORTH RESIDENTIAL PAD**
Block 2517, Lot 3.03.

**NORTH RETAIL PAD**
Block 2518, Lot 1.02.

(3) Applicability.

(a) Except as otherwise provided within the PUD-ENDA Standards, development within the North Residential Pad and the North Retail Pad, the PUD-ENDA, shall be governed by the PUD-1 Overlay Zone [codified as § **250-76A(1)** et seq.] and the PUD-ENDA Standards. Where there is any conflict or inconsistency as to the standards governing such development, the PUD-ENDA Standards shall control. The PUD-ENDA Standards do not govern development in the PUD-1 Overlay Zone other than within the North Residential Pad and the North Retail Pad.

(b) Zoning compliance for applications for development for parcels in the PUD-ENDA shall be calculated without reference to any parcels in the Supplemental Development Area or the North Office Pad, and the owners of any parcels in the Supplemental Development Area or of the North Office Pad need not be parties to any such applications, regardless of the existence of any approvals involving those parcels prior to the adoption of this provision. However, calculations for parking in the PUD-ENDA may include parking spaces in the Supplemental Development Area or the North Office Pad, if there is a permanent easement of record which provides parking rights pursuant to any such prior approval.

(4) Specific standards for PUD-ENDA. Notwithstanding anything to the contrary set forth in the PUD-1 Overlay District [codified as § **250-76A(1)** to **(9)**], the following provisions shall replace and supersede, only in the PUD-ENDA, the density and linkage requirements of the PUD-1 Overlay District:

(a) Density of residential units (multifamily dwellings): 30 multifamily dwelling units per acre of total aggregated lot size.

(b) Required ranges between residential and nonresidential: Deleted in the PUD-ENDA.

# § 250-77. Multiple Residence (RMF) District.

[Added 10-14-2003 by Ord. No. 03-14]

A. Purpose. The purpose of this chapter with respect to the Multiple Residence (RMF) District is to provide for the development of an area for multiple-family housing compatible with the adjacent Planned Unit Development 1 (PUD-1) Overlay Zoning District, subject to such specific conditions and limitations as set forth herein, consistent with the recommendations set forth in the 2003 Englewood Master Plan.

B. Permitted uses. Within the Multiple Residence (RMF) District and subject to the specific conditions and limitations set forth in this section, no land or building shall be used, nor shall any building be constructed, altered or designed to be used, for any purpose other than the following:

(1) Multifamily dwellings.

(2) Recreational uses, provided no building used therefor shall exceed a lot coverage of 5%.

(3) Parks and playgrounds.

(4) Municipal purposes.

(5) The following accessory uses within a principal multifamily dwelling building:

(a) Laundry rooms.

(b) Garages and on-site parking.

(c) Recreational rooms.

C. General site zoning. Within the Multiple Residence (RMF) District, no multifamily dwelling building shall be constructed, except in compliance with the following specific conditions and limitations:

(1) Minimum lot area: seven acres.

(2) Maximum impervious coverage: 70% of lot area.

(3) Building coverage:

(a) A single building shall not exceed a coverage of 24,000 square feet.

(b) The total building coverage shall not exceed 25% of the lot area.

(4) Minimum yard requirements:

(a) Front yard setback from Cedar Lane: 125 feet.

(b) Side yard setback: 30 feet.

(c) Combined side yard setback: 100 feet.

(d) Rear yard setback: 75 feet (exclusive of access easements to State Highway Route 4).

(5)

Maximum residential floor area ratio (ratio of total residential floor area to total lot area): 80%.

(6) Density of multifamily dwellings: 25 multifamily dwelling units per acre of total lot size.

(7) Access. A residential development shall have pedestrian and vehicular access to an improved county or City of Englewood public street with direct access to a county or local roadway network (exclusive of divided state highways). In addition, there shall be a second pedestrian access to another improved county or City of Englewood public street with direct access to a county or local roadway network (exclusive of divided state highways).

(8) Buffer. A minimum twenty-foot planting buffer is required on all side yards and shall be fully landscaped and approved by the Planning Board. A pedestrian walkway shall be permitted within the required buffer strip abutting the canal.

(9) Maximum height: the lesser of 59 feet or five stories (inclusive of parking levels).

(10) Roadways. No more than one interior roadway shall be constructed on a lot.

D. Landscaping. Landscaping of the site must be reviewed and approved by the Planning Board. Landscaping shall be utilized to enhance the appearance of the development both from on-site viewpoints and off-site viewpoints. Existing vegetation, wherever deemed desirable by the Planning Board, shall be preserved to the extent practicable.

E. Design considerations.

(1) The residential building designs shall be reviewed by the Planning Board and approval based on the compatibility of the design with the anticipated mix-use design of the overlay zone to the east of the subject lot and the golf course to the west of the lot.

(2) Architectural review shall be performed by the Planning Board and shall include color, texture, materials as well as overall design.

F. View lines. View lines from the east of the canal facing west to the golf course shall be preserved in the following manner:

(1) No single building shall exceed 350 feet in length.

(2) No single building shall exceed 24,000 square feet of coverage.

(3) A minimum of 110 feet shall exist between any two buildings.

(4) A minimum of 30% of the lot depth and width shall be open, without obstruction.

G. Available pedestrian access. Pedestrian access shall be provided along 100% of the canal frontage. Pedestrian access shall be provided to and from the site to the mixed-use overlay district.

# § 250-78. (Reserved)

[1]    *Editor's Note: Former § 250-78, South Dean Street (SDS) Retail Zoning District, added 11-12-2003 by Ord. No. 03-13, was repealed 11-12-2014 by Ord. No. 14-35.*

# § 250-78.1. Downtown Redevelopment Overlay (DRL) Zone.

[Added 8-12-2014 by Ord. No. 14-26A]

A.    Zoning criteria. The following zoning criteria apply to the DRL Zone.

   (1)    Permitted uses: Multifamily residential and associated ground floor retail/commercial space.

   (2)    Minimum lot size: two acres.

   (3)    Minimum frontage on a City street: 200 feet.

   (4)    Maximum building height: five stories and 60 feet to the top of roof parapet, excluding typical rooftop appurtenances, such as required elevator and stair bulkheads, chimneys, all of which may exceed the maximum height by no more than 10 feet for a maximum of 15% of the roof area. Along Englewood Avenue, the above shall apply to no more than 100 lineal feet. Any frontage above 100 lineal feet along Englewood Avenue shall be no more than four stories or 46 feet in height to the top of the roof parapet, for a step-back distance of 35 feet from the property line. At 35 feet stepped back from the property line, the maximum building height shall be five stories and 60 feet.

   (5)    Minimum front yards:

      (a)    William Street: five feet.

      (b)    Englewood Avenue: 15 feet.

      (c)    Humphrey Street: six feet.

   (6)    Maximum building coverage: The maximum building coverage shall not exceed 88% of the lot size.

   (7)    Maximum density: The maximum density shall not exceed 80 dwelling units per acre or 197 dwelling units in total for the site, whichever is less. The minimum density shall be 165 dwelling units.

   (8)    Minimum parking requirement: The minimum parking requirement shall be 1.7 vehicles per dwelling unit. There shall be no parking requirement for commercial or other nonresidential space.

   (9)    Parking space dimensions.

      (a)    For indoor residential parking garages or at-grade parking the following shall apply:

         [1]    Minimum size parking space: nine feet by 18 feet for perpendicular parking;

[2]  Minimum size compact parking space: eight feet, six inches by 16 feet for perpendicular parking;

[3]  Maximum number of compact size spaces: 40% of the total parking spaces;

[4]  Tandem spaces for use for the same household only: 10% maximum of the total parking spaces may be tandem spaces; and

(b)  Aisle width: Minimum aisles shall be 22 feet for full-size vehicles and 20 feet for compact aisles.

B.  Design criteria. The goal of DRL Zone is to encourage high-quality, exemplary architectural design. Traditional and vernacular building architecture and urban design patterns of Englewood shall serve as references for design of new buildings within the redevelopment area. The design of new structures shall not replicate architectural styles and detailing found in nearby buildings and new structures shall substantially vary from one another to create diversity within the facades. Building designs shall comply with the following:

(1)  Scale and massing.

(a)  Architectural variety is encouraged among the new buildings. Building facades should be broken down into vertical segments or bays. Regardless of height, designs should be "wall dominant" with the roof elements less prominent in the overall design. A variety of architectural scales and styles shall be incorporated along frontages.

(b)  Human scale elements should be employed at ground level, especially along street frontages and adjacent to entryways. Use of doors, windows, columns, canopies, ornamental grills, and awnings can help establish pedestrian scale.

(2)  Articulation and vertical rhythm.

(a)  The relationship of width to height of windows and door openings at ground level should be visually compatible with openings in same building. A clear visual division between the ground floor and upper level floors shall be established using cornice lines, band coursing, windows or similar horizontal architectural elements. There shall be a clearly defined base, middle and top of building, as defined below:

[1]  BASE — Shall be defined by a horizontal articulation between grade and second-floor windows. The articulation can be through a change in materials, change in detail of materials (i.e., brick work and patterning), or introduction of horizontal band course to separate base of building from second and third floors. Linking first two floors of windows into oversized opening with detailed panels between the windows creates a larger scale at the base of the building.

[2]  MIDDLE — Shall be defined by regular rhythm of windows, clearly defined bays that are divided into vertical elements through window alignments and groupings. Windows may be joined together to create larger scale opening at the middle of the building.

[3]

TOP — May be defined by cornice lines, mansard roof with dormers or a change in window type or style on top floor. Mansard roof and dormers may be used to combine two or more floors at the top of the building to reduce perceived building height by incorporting roof materials on the building facade.

(b) Ground floor storefronts should be distinguished from upper floors. Structural rhythms along the streetscape should be maintained even though the architectural design and style of individual stores may vary. Rhythm of ground floor architectural features shall harmonize with rhythm of upper stores. Accordingly, base facades of buildings shall not be continuous and monolithic, but shall incorporate articulation and rhythm from upper stories.

(3) Horizontal rhythm.

(a) Long horizontal street frontages shall be broken down in scale into vertically proportionally pieces with a variety of window types and patterns. Use of bay windows and balconies as architectural features is permitted and can help provide scale and rhythm, but shall not be repetitive. Vertical modulation shall be 12 feet to 15 feet and vertical modules shall be organized into two, three, four, and five groupings to create variety across the street facade. No more than 30% of each facade may be compromised of bays. Bays may project up to four feet. The design of balconies shall be consistent with the overall architectural design and be compatible with facade materials. No balcony, bay window or other permanent building construction shall extend into any public right-of-way.

(b) Vertical rhythm can be defined using columns, piers, and window design/placement or similar architectural features spaced generally between no less than 20 feet and no greater than 40 feet to create breaks at regular intervals.

(4) Pedestrian-scaled building height articulation.

(a) To ensure consistency with the surrounding neighborhood district scale and mass, particularly for buildings over four stories above street level or over 40 feet, no less than three of the following architectural elements shall be incorporated into street-facing facades:

[1] Significant horizontal element, such as a cornice or a similar horizontal member, separating fourth and fifth stories with different masonry course work, material and/or above cornice line or horizontal member.

[2] Mansard roof.

[3] Decorative window heads and sills.

[4] Decorative corbels and brackets for cornices and bay windows.

[5] Decorative bay windows with panels and trim work.

[6] Brick pattern work and panels.

[7] Precast concrete or masonry details at columns, piers and keystones.

[8]   Precast concrete or masonry water tables at the building base.

[9]   Decorative precast or brick belt courses.

[10] Decorative metal fences and railings.

[11] Juliet balconies.

[12] Decorative window surrounds.

[13] Decorative gutters, downspouts and scuppers.

[14] Awnings and canopies.

[15] Parapets and chimneys.

(b)   A special top floor step-back is required along a portion of the Englewood Avenue frontage. Except for 100 lineal feet along the Englewood Avenue frontage the top floor shall step back at least 35 feet from the property line and the maximum building height in the step-back area shall not exceed four stories or 46 feet.

(5)   Fenestration and garage openings.

(a)   Windows of similar design, size and material should be similar in design to those in adjacent buildings and conform to the pattern and rhythm of other buildings of similar context. Each building facade shall contain a variety of window styles, groupings, colors and/or mullion patterns. Windows that are in brick facades to be set back from face of brick approximately four inches. Windows in siding to be wrapped in a four-inch (minimum) trim with head and sill detail.

(b)   Garage openings, where applicable, will be treated with similarly scaled openings as the windows above them. Garage openings shall be located in the same vertical alignment as windows or decorative grills that relate in color and scale to the windows above them.

(6)   Street facade treatment; materials.

(a)   Front facades which front directly on a street shall have materials which are similar or complementary to those found in traditional and vernacular buildings in Englewood. A variety of materials and colors shall be applied across the building facade to modulate facades into smaller pieces and give each piece an individual appearance and cohesive theme. Facade materials shall be selected and assembled so that the building appears heavier at the base and lighter at the top. Materials shall be used to define the top, middle and base of the building as follows:

[1]   Base: stone or brick.

[2]   Middle: brick or masonry (bays and panels may be metal).

[3]   Top: brick, metalwork or cement siding boards.

(b)

The only primary materials permitted are brick, stone, precast stone, and fiber cement planks. The only secondary materials permitted are stucco, fiber cement panels, other masonry, spandrel glass and metal detail. Secondary materials shall be permitted on interior courtyards not visible from public or private streets. The Planning Board, in its sole discretion, may permit additional facade materials on interior courtyards. Any materials not specifically listed as permitted, notwithstanding those facade materials within the Planning Board's discretion, are prohibited. No more than three different material types should be used on a building's exterior. Color, texture, and pattern variations of primary materials are permitted. All sides of a building within public view shall use the same materials and colors as the primary facades. Metal louvers are permitted to be placed on exterior elevations but cannot become a dominant element in the design of elevations; any louvers must be integrated into the overall design and meet color restrictions as defined herein.

(7) Street facade treatment; Colors. Colors commonly described with terms such as neon, fluorescent, Day-Glo, iridescent and similar terms shall not be applied to the exterior surface of any structure. Color palette selection for facade materials should usually be no more than three primary colors. Facade colors should match adjacent colors used for metal flashing paint, caulk and other miscellaneous building components. Exterior colors shall be compatible with adjacent structures. Color schemes shall be used consistently, including both the upper and lower portions of buildings, all sides of buildings, and on elements and details.

C. General administrative provisions.

(1) No building shall be constructed over public rights-of-way in the project area with the exception of freestanding structures ancillary to public plazas and/or pedestrian walkways, which shall be subject to review by the Planning Board.

(2) Prior to commencement of construction, site plans for the construction and/or rehabilitation of improvements to the redevelopment area shall be submitted by the developer to the Planning Board of the City of Englewood for review and approval so that compliance of such plans with the redevelopment objectives can be determined. Site plan review shall be conducted by the Planning Board pursuant to N.J.S.A. 40:55D-1 et seq.

(3) As part of any site plan approval, the Planning Board may require a developer to furnish performance guarantees pursuant to N.J.S.A. 40:55D-53 et seq. Such performance guarantees shall be in favor of the City in a form approved by the City Solicitor. The amount of any such performance guarantee shall be determined by the City Engineer and shall be sufficient to assure completion of site improvements within two years of final site plan approval.

(4) All traffic impact studies shall incorporate, as part of the study, all projects approved or proposed in the immediate area. A listing of the projects may be obtained from the City Construction Official.

(5) No use or reuse shall be permitted, which, when conducted under proper safeguards, will produce corrosive, toxic or noxious fume, glare, electromagnetic disturbances, radiation, smoke, cinders, odors, dust or waste, undue noise or vibration (60 decibels), or other objectionable features so as to be detrimental to the public health, safety or general welfare.

(6)   All residential redevelopment proposals and construction plans shall meet or exceed applicable FHA minimum room size requirements prior to approval by the Planning Board.

(7)   The provisions of this plan specifying the redevelopment of the project area and the requirements and restrictions with respect thereto shall be in effect for a period of 10 years from the date of approval of this plan by the City Council of the City of Englewood; provided, however, that any development or redevelopment projects that are commenced and/or completed within said ten-year period shall be deemed to comply with all applicable laws, so long as they comply with the provisions of this redevelopment plan. At the end of this ten-year period, the zoning regulations contained herein shall be incorporated into the zoning ordinance of the City of Englewood in accordance with the appropriate state statutes.

(8)   Any subdivision of lots and parcels of land within the redevelopment area shall be in accordance with the requirements of this plan and Chapter **250** (entitled "Land Use") of the Code of the City of Englewood (hereafter "Chapter 250").

(9)   Upon demolition of existing structures and in the interim period prior to construction of new buildings (if any), the site shall be graded and planted or sodded, with a durable dust-free surface.

(10) Deviation requests. The Planning Board may grant minor deviations from the regulations where the purposes of this redevelopment plan would be advanced by a deviation from the strict requirements of this plan and the benefits of the deviation would outweigh any detriments. No relief may be granted under the terms of this section unless such deviation or relief can be granted without substantial detriment to the public good and will not substantially impair the intent and purpose of the redevelopment plan. No deviations may be granted which will result in an increase in height or a decrease in setbacks. Further, no deviations may be granted which will result in permitting:

   (a)   A use or principal structure in a district which does not permit such use or principal structure;

   (b)   An expansion of a nonconforming use;

   (c)   An increase in height of more than 10 feet or 10% of the permissible height in feet, whichever is less.

   (d)   An increase in the height of the building base exceeding 5% in feet;

   (e)   An increase in the permitted floor area ratio;

   (f)   An increase in the parking ratio of 10%;

   (g)   Breach the minimum or maximum number of permitted stories.

   (h)   Right-of-way width, and pavement width beyond normal adjustments encountered during survey synchronization;

   (i)   Noncompletion of minimum open space, parks, or other type of phased improvements required to be implemented; or

     (j)   Deviation from the impact fees provisions set forth in this plan.

(11) The redeveloper shall provide adequate water, sewer and other necessary utilities to the site, to the satisfaction of the City Engineer and the respective utility authority. All costs necessary for infrastructure improvements associated with a development project, off site as well as on site, are the responsibility of the redeveloper.

(12) This redevelopment plan may be amended at the initiative of the City, consistent with the Local Redevelopment and Housing Law N.J.S.A. 40A:12A-1 et seq., and the Municipal Land Use Law, N.J.S.A. 40:55D-1 et seq., and subject to the vested rights of a redeveloper. This redevelopment plan may also be amended from time to time at the initiative of a property owner within the redevelopment area, consistent with the foregoing statutory procedures. A fee of $5,000 plus all costs for copying and transcripts shall be payable to the City of Englewood for any request by a property owner to amend this redevelopment plan.

# Article XII. Off-Street Parking and Related Motor Vehicle Requirements

[Amended 11-12-2014 by Ord. No. 14-40]

## § 250-79. Purpose.

The purpose of this article is to establish requirements for off-street facilities for parking of motor vehicles and also to provide such off-street facilities for loading of and making deliveries from motor vehicles, in recognition of the fact that a primary function of public streets is to move traffic safely and conveniently and that parking, loading, and delivery functions performed within the public street can conflict with that function. Furthermore, the provision of off-street parking is essential to support all types of land uses, but it must be balanced with the spatial constraints of urban areas; the mixed-use nature of urban areas, which can reduce the need to utilize the automobile for transportation; and the recognition that people are increasingly utilizing alternate modes of transportation — which can reduce the need for each person to own an automobile. Therefore, this article requires off-street parking and related facilities for new development, changes in occupancy of existing structures, and expansion of existing structures, with several exceptions in certain Downtown Districts, where spatial constraints, the dense pattern of downtown development, and the proximity to transit may make them impractical. This article also sets standards for the design and functioning of such off-street parking facilities with a view toward making the same safe, functional, and attractive, with minimal adverse effect on pedestrians, surrounding properties, and the traditional structure and form of Englewood's blocks.

## § 250-80. Use of parking spaces.

Required off-street parking spaces shall be used for parking purposes only and shall not be used for storage, loading, or delivery purposes or any other nonparking purposes.

## § 250-81. Off-street parking requirements.

A. Purpose of off-street parking requirements in the D-1, D-2, N-C, SBD, L-I, and RIM districts.

    (1) Downtown (D-1) Districts. Minimum parking requirements in the D-1 Districts ensure that new residential and certain commercial uses offer residents, employees, visitors, and/or customers traveling by motor vehicle the convenience of on-site parking while not overwhelming the on-street parking system with additional motor vehicles.

    (2) Downtown (D-2) Districts. Minimum parking requirements in the D-2 Districts ensure that new residential and certain commercial uses offer residents, employees, visitors, and/or customers traveling by motor vehicle the convenience of on-site parking while not overwhelming the on-street parking system with additional motor vehicles.

    (3) Neighborhood Center (N-C) Districts and Service Business (SBD) Districts. Minimum parking requirements in the N-C and SBD Districts ensure that new residential, retail, and commercial uses offer residents, employees, visitors, and/or customers traveling by motor vehicle the convenience of on-site parking while not overwhelming the on-street parking system and adjacent residential neighborhood streets with additional motor vehicles.

    (4) Light (L-I) Industrial Districts. Minimum parking requirements in the L-I District ensure that new uses provide sufficient off-street parking for employees traveling by motor vehicle while also deploying available and appropriate on-street parking for this purpose as well as to conserve lot area for pervious services and/or building space.

    (5) Research, Industry & Medical (RIM) Districts. Minimum parking requirements in the RIM Districts ensure that new uses provide sufficient, safe, and convenient off-street parking for employees, customers, visitors, medical patients, and/or residents.

B. Provisions for all districts.

    (1) Surface parking lots shall be located to the side or rear of the principal structure on the lot.

    (2) Except as hereinabove provided or except as may be otherwise specifically provided in this article, the off-street parking requirements hereof shall apply to all new construction and all modifications or expansions of existing buildings. Exemptions shall be granted for minor additions of new floor area of up to 1,000 square feet of gross floor area. For changes of use, commercial uses with a total gross floor area of 5,000 square feet or less in existing nonresidential buildings are exempt from parking requirements.

    (3) In case of a combination of different uses in a building, the required number of parking spaces for each of such uses shall be added together, and the sum thereof shall represent the total number of spaces required. References in this article to square feet shall mean gross square footage devoted to or accessory to the use described.

    (4)

When the computation to determine the number of off-street parking spaces results in a fractional number, the fractional number shall be rounded upward to the next whole number to determine the number of parking spaces required.

(5) If, in the course of site plan review, the municipal agency determines that more than 15% of the gross floor area of the building or buildings on which the parking requirements are computed is devoted to common areas, including but not necessarily limited to lobbies, stairways, elevators, lavatories, washrooms, common storage areas, utility rooms and basements, the municipal agency shall exclude the square footage of such common areas in excess of 15% from the computations used in calculating the required number of parking spaces.

(6) No parking shall be permitted within any required front yard in any direction.

(7) The provision of sheltered or unsheltered parking for bicycles is encouraged.

C. Parking requirements for the D-1, D-2, N-C and SBD Districts premises to which this Article **XII** is applicable shall be as follows:

| Use of Building or Site | D-1 Districts Min. No. of Required Parking Spaces | D-2 Districts Min. No. of Required Parking Spaces | N-C Districts Min. No. of Required Parking Spaces | SBD Districts Min. No. of Required Parking Spaces |
|---|---|---|---|---|
| **Residential Uses** | | | | |
| Apartments and condominiums | 1 per unit for each studio or 1 bed room unit; 1.5 per unit for each unit with 2 bed room or more | 1 per unit for each studio or 1 bedroom unit; 1.5 per unit for each unit with 2 bed room or more | 1 per unit for each studio or 1 bed room unit; 1.5 per unit for each unit with 2 bed room or more | n/a |
| Townhouses (attached) | n/a | 1.7 per townhouse | n/a | n/a |
| **Retail** | | | | |
| Retail stores | 0 | 1 per 400 sq. ft. | 1 per 400 sq. ft. | 1 per 400 sq. ft. |
| Bank | 0 | 1 per 300 sq. ft. | 1 per 300 sq. ft. | 1 per 300 sq. ft. |
| **Eating and Drinking Establishments** | | | | |
| Restaurant (limited service) | 0 | 1 per 300 sq. ft. | 1 per 300 sq. ft. | 1 per 300 sq. ft. |
| Restaurant (full service) | 1 per 250 sq. ft. | 1 per 250 sq. ft. | 1 per 300 sq. ft. | n/a |
| **Personal and Consumer Services** | | | | |
| Personal and consumer services | 0 | 1 per 800 sq. ft. | 1 per 800 sq. ft. | 1 per 800 sq. ft. |
| Child care | n/a | 1 per 800 sq. ft. | | 1 per 800 sq. ft. |

| Use of Building or Site | D-1 Districts Min. No. of Required Parking Spaces | D-2 Districts Min. No. of Required Parking Spaces | N-C Districts Min. No. of Required Parking Spaces | SBD Districts Min. No. of Required Parking Spaces |
|---|---|---|---|---|
| | | | 1 per 800 sq. ft. | |
| Funeral parlor | n/a | n/a | 1 per 500 sq. ft. | 1 per 300 sq. ft. |
| Pet grooming and training | 0 | 1 per 800 sq. ft. | 1 per 800 sq. ft. | 1 per 800 sq. ft. |
| Printing and reproductions | 0 | 1 per 800 sq. ft. | 1 per 1,000 sq. ft. | 1 per 800 sq. ft. |
| Repair of consumer products | 0 | 1 per 800 sq. ft. | 1 per 1,000 sq. ft. | 1 per 800 sq. ft. |
| **Lodging** | | | | |
| Hotel | 1.3 per room | 1.3 per room | n/a | 1.3 per room |
| **Office Uses (nonmedical)** | | | | |
| Business office | 1 per 400 sq. ft. | 1 per 400 sq. ft. | 1 per 500 sq. ft. | 1 per 400 sq. ft. |
| Professional office | 1 per 500 sq. ft. | 1 per 500 sq. ft. | 1 per 600 sq. ft. | 1 per 500 sq. ft. |
| **Medical and Health Care** | | | | |
| Medical and dental laboratories and diagnostic services | 1 per 250 sq. ft. | 1 per 250 sq. ft. | n/a | n/a |
| Medical equipment sales | n/a | 1 per 600 sq. ft. | n/a | n/a |
| Medical group practice | n/a | 1 per 250 sq. ft. | n/a | 1 per 250 sq. ft. |
| Medical office | 1 per 250 sq. ft. | 1 per 250 sq. ft. | n/a | 1 per 250 sq. ft. |
| **Arts, Entertainment and Recreation** | | | | |
| Professional and artist studios | 0 | 1 per 800 sq. ft. | n/a | n/a |
| Performance facility | 1 per 8 seats | n/a | n/a | n/a |
| Art galleries | 0 | 1 per 800 sq. ft. | n/a | n/a |
| Theaters | 1 per 6 seats | n/a | n/a | n/a |
| Health and fitness clubs | 1 per 250 sq. ft. | 1 per 250 sq. ft. | 1 per 350 sq. ft. | 1 per 250 sq. ft. |
| Instructional studios | 0 | 1 per 400 sq. ft. | 1 per 500 sq. ft. | 1 per 400 sq. ft. |

| Use of Building or Site | D-1 Districts Min. No. of Required Parking Spaces | D-2 Districts Min. No. of Required Parking Spaces | N-C Districts Min. No. of Required Parking Spaces | SBD Districts Min. No. of Required Parking Spaces |
|---|---|---|---|---|
| **Motor Vehicle-Related Uses** | | | | |
| Automobile sales | n/a | 1 per 1,000 sq. ft. of sales area | n/a | 1 per 1,000 sq. ft. of sales area |
| **Education** | | | | |
| Schools (preschool) | 0 | 1 per 1,000 sq. ft. | 1 per 1,000 sq. ft. | 1 per 1,000 sq. ft. |
| Test preparation and learning centers | n/a | 1 per 400 sq. ft. | n/a | n/a |
| **Public Facilities** | | | | |
| Recreational facilities | n/a | 1 per 300 sq. ft. | n/a | n/a |
| Government and community services | 0 | 1 per 500 sq. ft. | n/a | n/a |
| Government offices | 0 | 1 per 500 sq. ft. | n/a | n/a |

D.  Reduction of minimum required parking in the D-1, D-2, N-C, and SBD Districts. The minimum required number of parking spaces in the D-1, D-2, N-C, SBD districts may be reduced upon approval by the Planning Board. Approval shall be granted only if the applicant cites evidence that fewer parking spaces will not cause excessive congestion, endanger public safety, substantially reduce parking availability for other uses, or otherwise adversely impact the neighborhood, or that such fewer parking spaces will provide positive environmental or other benefits to the users of the lot and the neighborhood. The applicant shall also present to the Planning Board evidence that a reduction is reasonable in light of the following:

(1)  For residential uses only, the availability of surplus off-street parking in the vicinity of the residential use being served. If the applicant for site plan approval demonstrates to the Planning Board that existing parking facilities are reasonably and conveniently accessible to, and not farther than 300 feet from proposed use are, in whole or in part, unused during his parking demand and are available to applicant for such use during such period, the Planning Board, in granting site plan approval, may waive the requirement for all or any portion of the number of parking spaces which would otherwise be required for such use, provided that the Planning Board is satisfied that such joint use of parking facilities will provide adequate off-street parking for the proposed use.

(2)  The ability of the applicant to enter into an agreement to share parking in a parking facility with other developments.

(3)  The ability of the applicant to demonstrate that parking can be shared among different uses in a mixed-use project based on a study of the utilization of parking by land use and time of day.

(4)   The availability of on-street parking in the vicinity of the use being served if peak times of business occur after 5:30 p.m.

(5)   Age or other occupancy restrictions that are likely to result in a lower level of motor vehicle usage.

(6)   The availability of car sharing services on site or in the vicinity of the uses being served.

(7)   Proximity to transit stops and the percentage of employees and/or customers utilizing transit.

(8)   Impact of the parking requirement on the physical environment of the affected lot or the adjacent lots including reduction in green space, destruction of significant existing trees and other vegetation, destruction of existing dwelling units, significant negative impact on historic resources on the lot, impairment of the urban design objectives of the city as set forth in the Master Plan, or loss of pedestrian amenities along public ways.

E.   Parking requirements for the L-I and RIM Districts premises to which this Article **XII** is applicable shall be as follows:

| Land Use Categories and Land Uses | L-I* Min. No. of Required Parking Spaces | RIM Min. No. of Required Parking Spaces |
| --- | --- | --- |
| **Industrial Uses, light** | | |
| Apparel manufacturing | 1 per 400 sq ft | 1 per 400 sq ft |
| Beverage production and manufacturing | 1 per 400 sq ft | 1 per 400 sq ft |
| Computer, electronic, and electrical product manufacturing | 1 per 400 sq ft | 1 per 400 sq ft |
| Food production and manufacturing | 1 per 400 sq ft | 1 per 400 sq ft |
| Scientific and medical instrument manufacturing | 1 per 400 sq ft | 1 per 400 sq ft |
| Nonmetallic mineral product manufacturing | 1 per 400 sq ft | 1 per 400 sq ft |
| Printing and related support activities | 1 per 400 sq ft | 1 per 400 sq ft |
| Research and development | 1 per 400 sq ft | 1 per 400 sq ft |
| Wood and furniture product manufacturing | 1 per 400 sq ft | 1 per 400 sq ft |
| **Wholesale Trade, Warehousing, Distribution** | | |
| Wholesale sales | 1 per 700 sq ft | 1 per 700 sq ft |
| Warehousing or distribution of nonflammable, nonhazardous materials | 1 per 700 sq ft | 1 per 700 sq ft |
| Moving and storage facilities | 1 per 1,000 sq ft | 1 per 1,000 sq ft |
| **Agricultural Uses** | | |

| Land Use Categories and Land Uses | L-I*<br>Min. No. of Required Parking Spaces | RIM<br>Min. No. of Required Parking Spaces |
| --- | --- | --- |
| Accessory rooftop farming | n/a | n/a |
| **Motor Vehicle-Related Uses** | | |
| Automobile sales and rental | 1 per 1,000 sq ft of sales area | n/a |
| Car wash facilities | 1 per 1,000 sq ft | n/a |
| Motor vehicle service and repair | 1 per 1,000 sq ft | n/a |
| **Arts, Entertainment and Recreation** | | |
| Instructional studios | 1 per 400 sq ft | n/a |
| Professional and artist studios | 1 per 800 sq ft | n/a |
| Studios (television, film, production, recording, radio) | 1 per 400 sq ft | 1 per 400 sq ft |
| **Offices, nonmedical** | | |
| Business incubators | 1 per 500 sq ft | n/a |
| Business offices | 1 per 300 sq ft | 1 per 300 sq ft |
| Co-working space | 1 per 500 sq ft | n/a |
| Professional offices | 1 per 500 sq ft | 1 per 500 sq ft |
| **Medical and Health Care** | | |
| Ambulatory surgery center | n/a | 1 per 200 sq ft |
| Assisted living facility | n/a | 1 per 2 beds |
| Continuing care community | n/a | 1 per 2 beds |
| Hospice | n/a | 1 per 3 beds |
| Medical and dental laboratories and diagnostic services | 1 per 300 sq ft | 1 per 250 sq ft |
| Medical offices | 1 per 300 sq ft | 1 per 250 sq ft |
| Medical center | n/a | 1 per 250 sq ft |
| Rehabilitation center | n/a | 1 per 250 sq ft |
| Skilled nursing facility | n/a | 1 per 2 beds |
| Urgent care facility | 1 per 250 sq ft | 1 per 250 sq ft |
| Veterinary clinic | 1 per 300 sq ft | n/a |
| Veterinary hospital | n/a | 1 per 250 sq ft |
| Wellness center | 1 per 300 sq ft | 1 per 250 sq ft |
| **Retail Trade** | | |
| Automobile sales and rental | 1 per 1,000 sq ft of sales area | 1 per 1,000 sq ft of sales area |
| Accessory retail | 0 | 1 per 1,000 sq ft |
| Garden center | 1 per 800 sq ft | n/a |
| **Personal and Consumer Services** | | |
| Pet grooming and training | 1 per 800 sq ft | n/a |
| Pet daycare facility | 1 per 800 sq ft | n/a |
| **Education** | | |

| Land Use Categories and Land Uses | L-I*<br>Min. No. of Required Parking Spaces | RIM<br>Min. No. of Required Parking Spaces |
| --- | --- | --- |
| Technical school | 1 per 300 sq ft | 1 per 300 sq ft |
| **Eating and Drinking Establishments** | | |
| Accessory restaurant | 1 per 400 sq ft | 1 per 350 sq ft |
| **Emergency Services** | | |
| Police, Fire, EMT, and ambulance stations | 1 per 400 sq ft | 1 per 400 sq ft |
| **Lodging** | | |
| Hotel | n/a | 1.3 per room |
| **Residential** | | |
| Apartment and condominium community for senior citizens | n/a | 1 per unit |

\* See Subsection **F** for additional parking provisions for the L-I Districts.

F.   Additional provisions for the Light Industrial (L-I) District. In the Light Industrial (L-I) District, on-street parking along the frontage of a property may be counted towards the provision of employee and/or customer parking spaces at the rate of one parking space for every 20 feet of frontage where on-street parking is permitted and sufficient paved width is present.

G.   Reduction of minimum required parking in the L-I and RIM Districts. The minimum required number of parking spaces in the L-I and RIM Districts may be reduced upon approval by the Planning Board. Approval shall be granted only if the applicant cites evidence that fewer parking spaces will not cause excessive congestion, endanger public safety, substantially reduce parking availability for other uses, or otherwise adversely impact the neighborhood, or that such fewer parking spaces will provide positive environmental or other benefits to the users of the lot and the neighborhood. The applicant shall also present to the Planning Board evidence that a reduction is reasonable in light of the following:

(1)   The availability of surplus off-street parking in the vicinity of the use being served. If the applicant for site plan approval demonstrates to the Planning Board that existing parking facilities are reasonably and conveniently accessible to, and not farther than 300 feet from proposed use are, in whole or in part, unused during his parking demand and are available to applicant for such use during such period, the Planning Board, in granting site plan approval, may waive the requirement for all or any portion of the number of parking spaces which would otherwise be required for such use, provided that the Planning Board is satisfied that such joint use of parking facilities will provide adequate off-street parking for the proposed use.

(2)   The ability of the applicant to enter into an agreement to share parking in a parking facility with other developments.

(3)   The availability of on-street parking in the vicinity of the use being served if peak times of business occur after 5:30 p.m.

(4)   Age or other occupancy restrictions that are likely to result in a lower level of motor vehicle usage.

(5) Proximity to transit stops and the percentage of employees and/or customers utilizing transit.

(6) Impact of the parking requirement on the physical environment of the affected lot or the adjacent lots including reduction in green space, destruction of significant existing trees and other vegetation, destruction of existing dwelling units, significant negative impact on historic resources on the lot, impairment of the urban design objectives of the city as set forth in the Master Plan, or loss of pedestrian amenities along public ways.

H. Parking requirements for all other districts to which this Article **XII** is applicable shall be as follows:

| Use of Building or Site | All Other Districts Min. No. of Required Parking Spaces |
|---|---|
| **Residential Uses** | |
| One-family use: | |
| less than 4 bedrooms | 2 spaces |
| five or more bedrooms | 3 spaces |
| Multifamily residences: | |
| efficiency or 1 bedroom unit | 1.2 per unit |
| 2 bedrooms or more | 1.6 per unit |
| housing for the elderly (with no more than 1 bedroom/unit) | 0.5 per unit |
| Rooming house and boardinghouse | 1 per bedroom |
| Permitted accessory use within a dwelling unit in a one-family residence district or multiple residence district | 2 spaces, plus the number of spaces required for dwelling unit |
| **Retail** | |
| Retail and service business | 1 per 400 sq. ft. |
| Bank | 1 per 250 sq. ft. |
| **Eating and Drinking Establishments** | |
| Eating and drinking establishments | 1 per each 2 seats |
| **Lodging** | |
| Rooming house and boardinghouse | 1 per bedroom |
| **Office Uses (nonmedical)** | |
| General office use, without counter or similar facilities designed to service customers | 1 per 250 sq. ft. |
| General office use, with counter or similar facilities designed to service customers | 1 per 250 sq. ft. plus 5 additional spaces clearly marked "customers only" |
| Office portion of an industrial building | 1 per 300 sq. ft. |
| **Medical and Health Care** | |
| Doctor's or dentist's office in an office building | 1 per 200 sq. ft. |
| Hospital | 1.5 per bed |

| Use of Building or Site | **All Other Districts**<br>**Min. No. of Required Parking Spaces** |
|---|---|
| Hospitals for dogs, cats, and other household pets | 1 per 400 sq. ft. |
| Nursing home | 0.5 per bed |
| **Arts, Entertainment and Recreation** | |
| Studios and art galleries | 1 per 400 sq. ft. |
| Bowling alley | 4 per alley |
| Tennis courts (other than a single court on a single-family residential property, for which no additional parking space is required) | 2 per court |
| **Motor Vehicle-Related Uses** | |
| Gasoline service station | 1 per 1,000 sq. ft. of lot area, plus 2 spaces clearly marked "customers only" |
| New automobile sales, including on-site accessory service and repair facilities | 1 per 1,000 sq. ft. of lot area, plus 6 spaces clearly marked "customers only" |
| Used automobile sales, including on-site accessory service and repair facilities | 1 per 1,000 sq. ft. of lot area, plus 4 spaces clearly marked "customers only" |
| Vehicle repair or service, other than gasoline service station | 1 per 1,000 sq. ft. of lot area, plus 2 spaces clearly marked "customers only" |
| **Education** | |
| Schools - grades pre-K to 9 | 1.2 per classroom, plus 1 per 10 students |
| Schools - grades 10 and up | 1.2 per classroom, plus 0.2 per student |
| **Industrial** | |
| Manufacturing | 1 per 400 sq. ft. |
| **Wholesale Trade, Warehousing, Distribution** | |
| Warehousing and wholesaling | 1 per 600 sq. ft. for the first 3,000 sq. ft. in a building or unit of a building for separate tenancy; 1 per 900 sq. ft. for the next 3,000 to 12,000 sq. ft. in a building or unit of a building for separate tenancy; 1 per 1,200 sq. ft. for over 12,000 sq. ft. |
| **Places of Assembly** | |
| Places of assembly | 1 per each 3 seats in the largest place of assembly on the premises |

I.   Reduction of required parking in all other districts, which does not include D-1, D-2, D-3, N-C, SBD, L-I, and RIM. The minimum required number of parking spaces may be reduced upon approval of the Planning Board. Approval shall be granted only if the Planning Board determines and cites evidence in its decision that fewer parking spaces will not cause excessive congestion, endanger public safety, substantially reduce parking availability for other uses, or otherwise adversely impact the neighborhood, or that such fewer parking spaces will provide positive environmental or other benefits to the users of the lot and the neighborhood. In making such a determination the Planning

Board shall also consider whether or not permitting fewer off-street parking spaces is reasonable in light of the following:

(1) The availability of surplus off-street parking in the vicinity of the use being served. If an applicant for site plan approval demonstrates to the Planning Board that existing parking facilities are reasonably and conveniently accessible to, and not farther than 300 feet from proposed use are, in whole or in part, unused during his parking demand and are available to applicant for such use during such period, the Planning Board, in granting site plan approval, may waive the requirement for all or any portion of the number of parking spaces which would otherwise be required for such use, provided that the Planning Board is satisfied that such joint use of parking facilities will provide adequate off-street parking for the proposed use.

(2) The ability of an applicant to enter into an agreement to share parking in a parking facility with other developments.

(3) Age or other occupancy restrictions that are likely to result in a lower level of motor vehicle usage.

(4) The availability of car sharing services on site or in the vicinity of the uses being served.

(5) Impact of the parking requirement on the physical environment of the affected lot or the adjacent lots including reduction in green space, destruction of significant existing trees and other vegetation, destruction of existing dwelling units, significant negative impact on the historic resources on the lot, impairment of the urban design objectives of the city as set forth in the Master Plan, or loss of pedestrian amenities along public ways.

# § 250-82. Design standards and dimensions.

A. Driveway dimensions and location.

(1) A driveway for a one-family, two-family, three-family, or four-family residence shall have a minimum width of eight feet and a minimum curb cut width of 10 feet and a maximum width of 20 feet.

(2) No circular driveway shall be permitted on any property used for residential use, unless the property has a width of not less than 100 feet.

(3) Driveways on property used for any use other than a one-family, two-family, three-family, or four-family residence shall have the following minimum widths:

(a) For a two-way driveway: 22 feet.

(b) For a one-way driveway: 12 feet.

(4) No driveway shall intersect a public street within 25 feet of the intersection of that street with any other public street.

B. Maneuvering area. Except for premises used for one-family residence use, any off-street parking area shall be so designed, either by use of one-way driveways or by providing

sufficient maneuvering space within the parking facility, so that vehicles can exit the parking area without backing into any street.

C.  A parking area with a single driveway for both ingress and egress and without an on-site turnaround facility shall provide only ninety-degree parking stalls.

D.  Access to all parking stalls shall be provided by a driveway or driveways completely within the property, and no such access to any parking stall shall be provided directly from any public street.

E.  Dimensions of parking stalls.

   (1)  In any case in which this article requires parking facilities for 30 or more vehicles, 1/3 of the required parking spaces may be designed for small cars and may conform to the dimensions hereinafter set forth for small cars.

   (2)  Except with respect to small cars and parking spaces for the handicapped, parking spaces shall conform with the following minimum requirements:

      (a)  The minimum width shall be nine feet.

      (b)  The minimum length for parallel parking spaces shall be 22 feet.

      (c)  The minimum length for angle parking spaces shall be 19 feet.

   (3)  Parking spaces for small cars shall conform with the following minimum dimensions:

      (a)  The minimum width shall be eight feet.

      (b)  The minimum length for parallel parking spaces shall be 20 feet.

      (c)  The minimum length for angle parking spaces shall be 16 feet.

   (4)  Parking spaces reserved for the handicapped shall conform with the following minimum dimensions:

      (a)  The minimum width shall be 12 feet.

      (b)  The minimum length for parallel parking spaces shall be 22 feet.

      (c)  The minimum length for angle parking spaces shall be 19 feet.

F.  Minimum combined width of parking areas and aisles. In any parking facility, the combined width of parking areas and adjacent aisles serving such parking areas shall be not less than the following:

| Type of Parking | Min. Combined Width of Aisles and Parking Spaces (feet) |
| --- | --- |
| 1.  Angle parking on both sides of the aisles: | |
| One or both angles exceeding 60° | 62 |
| One or both angles exceeding 45°, but neither angle exceeding 60° | 60 |
| Neither angle exceeding 45° | 53 |

| Type of Parking | Min. Combined Width of Aisles and Parking Spaces (feet) |
| --- | --- |
| 1. Parallel parking on one side and angle parking on the other side: | |
| Angle exceeding 60° | 52 |
| Angle exceeding 45°, but not exceeding 60° | 48 |
| Angle not exceeding 45° | 42 |
| 2. Parallel parking on both sides | 32 |
| 3. Angle parking on one side only: | |
| Angle exceeding 60° | 43 |
| Angle exceeding 45°, but not exceeding 60° | 39 |
| Angle not exceeding 45° | 33 |
| 4. Parallel parking on one side only; two-way aisle | 26 |
| 5. Parallel parking on one side only; one-way aisle | 20 |

G.  Sight distance. Exit driveways from parking areas shall be designed to provide clear visibility for drivers exiting the parking area.

    (1)  Driveways that cross public sidewalks shall be designed to provide a clear sight triangle from a point within the driveway, eight feet from the sidewalk, to all points on the sidewalk within a distance of eight feet from the driveway, in both directions.

    (2)  Driveways that exit to public streets without crossing public sidewalks shall be designed to provide a clear sight triangle from a point within the driveway, 20 feet from the curbline (or, if there is no curb, then from the beginning of the roadway), to all points in the roadway within a distance of 20 feet from the driveway, in both directions.

    (3)  Planting within required clear sight triangles shall be limited to ground cover or low-growing dwarf shrubs not exceeding 24 inches in height at maturity.

H.  No parking stall or aisle shall exceed a grade of 6%, nor shall any driveway exceed a grade of 10%.

I.  On-site parking structures shall meet the following design requirements.

    (1)  Provide for vertical breaks along the facade along any street frontage.

    (2)  Facades shall incorporate building materials aesthetically complementary to the greater structure on street-facing facades.

    (3)  The view of parked vehicles shall be obscured from the street. Such methods of obscuring vehicles may include transparent or translucent wall treatments and decorative wall openings. Blank walls are not permitted along public streets.

    (4)  Entrances shall be located toward the side or rear of the property whenever possible.

# § 250-83. Off-street delivery and loading.

All property used for manufacturing, warehousing, industrial or funeral home purposes shall include on-site facilities for loading and delivery as follows:

A.  Such facilities shall contain adequate space for on-site maneuvering without encroaching on any required front yard or parking space and, to the extent practicable, without requiring maneuvering within any public street.

B.  One on-site loading space shall be provided for each 15,000 square feet of gross floor area or any fraction thereof.

C.  Each such loading space shall be not less than 35 feet long, 12 feet wide and 14 feet high, except that required loading spaces for a funeral home may not be less than 20 feet long, 10 feet wide and eight feet high.

D.  All loading spaces shall be located so that loading and unloading operations may take place entirely within the site and shall not encroach upon any public street or sidewalk.

# § 250-84. Paving and landscaping requirements.

A.  Pervious pavement treatments, bioswales, rain gardens, and other methods to reduce stormwater runoff through green infrastructure are encouraged in the design of off-street surface parking facilities.

B.  Within any off-street surface parking facility, all areas that are not required for parking or access purposes shall be landscaped, and all landscaping, including planting islands, shall be protected from vehicle encroachment by continuous concrete curbing, with a depth of 20 inches and a face of six inches, or by some other curbing or barrier approved by the Planning Board.

C.  Any off-street surface parking facility designed to accommodate five or more vehicles shall be screened from the street and from adjacent properties with landscaping materials at least five feet in height in side yards and rear yards and, except as otherwise limited by this article, three feet in height in front yards.

D.  Such landscaped areas shall include deciduous trees with a minimum three-inch caliper to be planted in a ratio of one tree for each 30 linear feet of perimeter area; provided, however, that the Planning Board may waive all or any part of such requirements if such planting of trees shall be impractical.

E.  No off-street surface parking facility shall have more than 10 parking spaces in any one row without having the same interrupted by a planting island or planting peninsula containing a minimum of 50 square feet of permeable space with a minimum planting width of four feet. Planning Board may waive all or any part of such requirements if such plantings shall be impractical.

F.  Such permeable space shall be either planted or covered with organic material such as wood chips or some similar permeable material approved by the Planning Board.

G.  At least one deciduous tree with a minimum three-inch caliper shall be planted in each required planting island.

## § 250-85. through § 250-91. (Reserved)

# Article XIII. Nonconforming Uses and Conversion of Uses

## § 250-92. Alteration of structures in one-family residential zones.

[Amended 12-7-1993 by Ord. No. 93-16]

A.  Generally. A one-family dwelling in a one-family residential zone which is nonconforming by reason of minimum required lot size, minimum required lot width or depth, coverage, height, or yard or setback regulations may be altered or enlarged, provided that any such alteration or enlargement shall not encroach within any required yard or setback, not exceed the applicable height limitation, nor result in an increase in coverage in excess of the permissible coverage limitations; provided, however, that the nature of the use shall not be changed from a one-family residential use, and provided further that any such alteration or enlargement shall itself fully comply with all other applicable zoning regulations for one-family residential uses.

B.  Within the R-AA and R-AAA Zoning Districts. A one-family dwelling in the R-AA and R-AAA Zoning Districts which was rendered nonconforming as to yard or setback requirements by reason of the adoption of this chapter may be altered or enlarged, provided that such alteration or enlargement shall not encroach within the following yard or setback requirements, nor encroach within the required yard or setback requirements specified in § **250-59I** hereof beyond that extent of the encroachment of the existing structure prior to such enlargement or alteration, nor exceed the applicable height limitation, nor result in an increase in coverage in excess of the permissible coverage limitations; provided, however, that the nature of the use shall not be changed, and provided further that any such alteration or enlargement shall, itself, comply with all other applicable zoning regulations for one-family residential uses:

| District | Front Yard | Side Yard | Rear Yard |
|---|---|---|---|
| R-AAA | 50 | 25 | 50 |
| R-AA | 40 | 15 | 50 |

## § 250-93. Alteration of structures in central business districts.

An existing building in the central business district whose aggregate floor area exceeds 1.6 times the area of the lot on which it is located or which does not conform with the minimum lot area, lot width, lot depth or yard requirements of this chapter may be altered, renovated, or rehabilitated, and, so long as the aggregate floor area following such alteration, renovation or rehabilitation does not exceed the aggregate floor area as it existed prior thereto, such alteration, renovation or rehabilitation shall not be deemed to be a substantial enlargement of or change in an existing nonconforming use.

# § 250-94. Alteration of structures in Light Industrial District.

No building in the Light Industrial District which, on the effective date of this chapter, is used, in whole or in part, for residential purposes shall be altered so as to provide for occupancy by a larger number of families than the number occupying such building on the effective date of this chapter, nor, so long as any part of such building remains used for residence purposes, shall the use of any part of such building be altered so as to introduce a new use which is prohibited in one-family and multiple-residence districts.

# § 250-95. Conversion of use.

No existing building in any district shall be converted to any different use, notwithstanding that such proposed new use is a permitted use within the district in which the building is located, unless such building complies with all provisions of this chapter and all other codes and ordinances applicable to such proposed use, to the same extent as if such proposed conversion were the construction of a new building, provided that nothing contained herein shall be deemed to prohibit the granting of any variance from any such applicable code or ordinance provisions.

# § 250-96. Substantial destruction of nonconforming structures and uses.

A.  Continuation of use or repair or reconstruction prohibited. A lawful preexisting nonconforming use may not be continued on the lot, nor within a structure so occupied thereon, nor may a lawful preexisting nonconforming structure be restored or repaired in the event of substantial destruction thereof, except as otherwise provided herein.

B.  Definitions. As used herein, the following terms shall have the following meanings:

**PARTIAL DESTRUCTION**
Includes the destruction of a structure to a lesser extent than would constitute substantial destruction as that term is defined herein.

**STRUCTURE**
Includes one or more structures on a lot or adjoining lots which are under common ownership or control and which form an integral part of a common usage such that the inability to restore or repair such structure renders all of the remaining structures unusable for the prior purpose.

**SUBSTANTIAL DESTRUCTION**
Includes the damage or destruction of a structure to the extent which either:

(1)  Renders the remaining portion of the structure, if any, totally uninhabitable or unusable for its prior purpose;

(2)  Required the complete reconstruction of the structure with the exception of the foundation, driveways, paving, drainage and sewer systems and similar site improvements;

(3)

Requires the substantial replacement or repair of the structural members of the structure;

(4) Prevents the structure from being lawfully reconstructed to its preexisting condition without substantial alterations or additional improvements required by the Uniform Construction Code[1] in order to bring the structure into compliance with said code; or

(5) Results in damages to the preexisting structure in excess of 50% of the replacement cost.

[1] *Editor's Note: See Ch. 167, Construction Codes, Uniform.*

C. Exceptions. Notwithstanding the prohibitions set forth in Subsection **A** above, nothing contained herein shall be construed to prohibit:

(1) The continuation of a lawful preexisting nonconforming use or the repair or restoration of a lawful preexisting nonconforming structure in the event of partial destruction thereof.

(2) The repair or restoration of a lawful preexisting nonconforming structure, provided the use thereof does not violate any provisions of Part **4**, Zoning, of this chapter and that such repair or restoration does not increase the degree of nonconformity of the remaining portion of the structure with respect to parking, height, coverage and/or setback regulations.

(3) The repair and restoration of a lawful preexisting nonconforming one-family residential structure, provided the use thereof does not violate any provisions of Part **4**, Zoning, of this chapter, and provided that such repair or restoration does not increase the degree of nonconformity of such structure.

# § 250-97. New construction on nonconforming lots.

New one-family residential structures may be constructed on any lawful preexisting nonconforming lot within the R-AA and R-AAA Zoning Districts as established herein, notwithstanding that such lot is nonconforming as to lot size, width or depth, provided that:

A. Such lot meets the following minimum lot size requirements:

| District | Lot Area (square feet) | Lot Width (feet) | Lot Depth (feet) |
|---|---|---|---|
| R-AAA | 44,000 | 175 | 200 |
| R-AA | 22,000 | 120 | 150 |

B. Such lot does not require subdivision approval.

C. Any such construction shall be fully in accordance with all of the applicable provisions of Part **4**, Zoning, of this chapter.

# Article XIV. Miscellaneous Provisions

# § 250-98. Exempt stories.

A.  In computing the height of a building, with respect to the height limitations contained in this chapter, that portion of the building which constitutes an exempt story, as defined and prescribed in this chapter, shall not be counted.

B.  In order to qualify as an exempt story, a story in a building must meet the following requirements:

(1)  At least 90% of the floor area of the story shall be used for parking spaces, access aisles, lobbies, stairs and elevators.

(2)  Not more than 50% of the parking spaces provided on such floor shall be devoted to commercial garage use, including the parking or storage of vehicles for sale, hire, servicing or repair and the garaging of fleets of commercial vehicles.

(3)  The story shall have a minimum height, from finished floor to the bottom of overhead girders, beams or flat ceilings, of seven feet six inches.

(4)  No columns or posts shall be located so as to interfere with the free flow of traffic.

(5)  Such story shall either be enclosed by a solid wall at least four feet high or be enclosed from the bottom of the story to the top of the story with walls or paneling, of which at least 50% shall be composed of solid material.

# § 250-99. Obstructions to vision at street intersections.

A.  No building or structure of any kind exceeding 30 inches in height, including fences, walls, decorative structures or any other kind of improvement, and no planting of any kind exceeding 30 inches in height, including trees, bushes, hedges, or any other kind of planting, and no other obstructions of any kind exceeding 30 inches in height shall be placed or located at any point within the triangle formed by the lines of two streets from the points, on each street, 25 feet from their point of intersection.

B.  The existence of any such obstruction prior to the effective date of this chapter shall not be deemed to permit the continued existence thereof in the event that the Chief of Police determines that such obstruction constitutes a traffic safety hazard, and in the event of such determination by the Chief of Police, such obstruction shall be forthwith removed.

# § 250-100. Display of certain merchandise.

[Added 5-27-1992 by Ord. No. 92-13; amended 3-21-2017 by Ord. No. 17-01]

A.  No person shall display within any premises within the City of Englewood any visual representation which depicts or describes specified sexual activities, specified anatomical areas or a state of nudity or any sexual paraphernalia in such a manner so as to be visible from any public street, sidewalk or public place or within the interior of any premises used for retail or commercial purposes and to which the public is invited.

B.  With respect to art galleries, they shall be exempt from the "state of nudity" restriction in the subsection above provided that any display containing a state of nudity as defined in

§ **250-58** is displayed within the premises and is displayed not less than 10 feet from the front window to the premises or from an imaginary line parallel to the sidewalk beginning at the point of the exterior wall of the premises closest to the sidewalk. The remaining restrictions in the subsection above shall apply to art galleries.

# Article XV. Signs

[Amended 10-19-1993 by Ord. No. 93-08; 7-18-1995 by Ord. No. 95-15; 7-18-1995 by Ord. No. 95-16; 2-6-1996 by Ord. No. 96-03; 12-18-1996 by Ord. No. 96-34; 6-3-1998 by Ord. No. 98-05; 4-11-2007 by Ord. No. 07-09; 4-24-2012 by Ord. No. 12-14; 6-13-2017 by Ord. No. 17-05]

## § 250-101. Purpose.

This article regulates all signs within the City of Englewood visible from public rights-of-way and those that are visible from adjacent properties to ensure that they are appropriate for their respective uses in keeping with the appearance of the affected property and surrounding environment and protective of the public health, safety, and general welfare. The purposes of this chapter with respect to signs are to:

A.  Ensure public safety by providing for the proper maintenance of signs, sign materials, and supporting structures.

B.  Ensure public safety by preventing hindrances and distractions to pedestrians and drivers of motor vehicles.

C.  Encourage quality in sign design and construction and to promote a desirable visual environment.

D.  Promote and encourage signs that reflect the appropriate scale, character, and architectural features of Englewood.

E.  Ensure readability of signs and relative consistency among signs within zoning districts.

## § 250-102. Severability.

If any word, sentence, section, chapter or any other provision or portion of this article or rules adopted hereunder is invalidated by any court of competent jurisdiction, the remaining words, sentences, sections, chapters, provisions, or portions will not be affected and will continue in full force and effect.

## § 250-103. Definitions.

Words and terms used in this article have the following meanings given. Unless expressly stated otherwise, any pertinent word or term not part of this listing but vital to the interpretation of this ordinance shall be construed to have their legal definition, or, in absence of a legal definition, their meaning as commonly accepted by practitioners including civil engineers, surveyors, architects, landscape architects, and planners.

**A-FRAME SIGN**

A double-faced portable sign with an A-shaped frame composed of a sign board on each face that is attached at the top and separated at the bottom.

## ABANDONED SIGN
Any sign that remains on a building or front yard 20 or more days after the signed business has vacated the premises.

## AWNING
A light roof-like structure, supported entirely by the exterior wall of a building, that consists of a fixed or movable frame covered with cloth, plastic or metal and extends over doors and/or windows with the purpose of providing protection from sun and rain and/or embellishment of the facade.

## AWNING SIGN
A type of sign applied to an awning.

## BACK-LIT AWNING
An awning comprised of translucent covering material that contains a lighting source within its framework.

## BANNER
A sign made of cloth, paper, plastic, canvas or other fabric or flexible material.

## BEACON LIGHTING
Any source of electric light, whether portable or fixed, the primary purpose of which is to cast a concentrated beam of light generally skyward as a means of attracting attention to its location rather than to illuminate any particular sign, structure, or other object.

## BILLBOARD
A sign that directs attention to a business, commodity, service, entertainment or attraction that is sold, offered or existing elsewhere than upon the same lot where such sign is displayed. Billboards offer space that is generally leased or rented by the owner thereof to others for the purpose of conveying a commercial or noncommercial message. For the purposes of these regulations, a billboard shall be considered an off-premises sign.

## BUILDING FRONTAGE
The linear width of a building measured in a single straight line parallel, or essentially parallel, with the abutting public street.

## BUILDING-MOUNTED SIGN
A type of sign that is attached onto a building wall or onto an awning, canopy, or marquee that is attached to or supported from a building wall.

## CANOPY
A light, roof-like structure, other than an awning, made of fabric, metal, or other material that is supported by columns or posts affixed to the ground and may also be connected to a building.

## CANOPY SIGN
A type of sign that is part of, or attached to, a canopy.

## CHANNEL LETTER SIGN

A type of wall-mounted sign consisting of fabricated or formed three-dimensional letters, applied to a wall, that may accommodate an internal light source.

**CLEARANCE**

The distance between the lowest edge of a sign, including any framework or other structural elements, and another specified surface below such as a sidewalk or the ground.

**CUTOUT LETTER SIGN**

A type of wall sign consisting of letters and/or shapes that are individually attached to a wall or that are applied, printed, or etched, onto a panel that is then attached to a wall.

**DIGITAL DISPLAY**

The portion of a sign message made up of internally illuminated components capable of changing the message periodically. Digital displays may include but are not limited to LCD, LED, or plasma displays.

**DIRECTIONAL SIGN**

A type of sign that provides direction to pedestrian and vehicular traffic into and out of, or within a site.

**DIRECTORY SIGN**

A type of sign mounted on a building that lists the names of tenants within a building containing multiple tenants.

**EAVE**

The part of a roof that meets or overhangs the walls of a building.

**ELECTRONIC MESSAGE DISPLAY**

A computer programmable part of a sign capable of displaying words, symbols, figures, or picture images that can be altered or rearranged on site or by remote means without altering the face or surface of the sign.

**EXTERNAL ILLUMINATION**

Artificial light generated from a source not integrated into a sign that lights a sign.

**FESTOON LIGHTING**

A type of illumination comprised of either a group of incandescent lightbulbs hung or strung overhead or on a building or other structure, or lightbulbs not shaded or hooded or otherwise screened to prevent direct rays of light from shining on adjacent properties or rights-of-way.

**FOOTCANDLE**

A unit of illumination equal to one lumen per square foot (10.764 lux), or the amount of light from a source of one candela directly thrown on a square foot of surface at a distance of one foot.

**FORMAL WINDOW DISPLAY**

A coordinated, three-dimensional display placed inside a building behind a storefront window whose purpose is to showcase to passersby the types of merchandise available for purchase or the types of services offered within the building. Such displays may include associated graphics providing information on seasonal or other periodic sales.

**FREESTANDING SIGN**

A sign supported by structures or supports that are placed on, or anchored in, the ground, and that is independent and detached from any building or other structure.

## HALO LIGHTING (or BACKLIGHTING)

A type of external illumination that produces a halo effect around an object that emanates from behind the object.

## HOLIDAY DECORATIONS (or SEASONAL DECORATIONS)

Signs or displays including lighting which are a nonpermanent installation celebrating national, state, and local holidays, religious or cultural holidays, or other holiday seasons.

## ILLUMINATED SIGN

A sign illuminated by lighting of any kind, including, but not limited to, lighting along the border of the sign, within the sign itself, behind the sign, on the ground, or on poles.

## ILLUMINATION

A source of any artificial or reflected light, either directly from a source of light incorporated in, or indirectly from an artificial source.

## INTERNAL ILLUMINATION

A light source that is concealed or contained within the sign and becomes visible in darkness through a translucent surface.

## ITEM OF INFORMATION

A word, abbreviation, initial, number, symbol, logo, or shape.

## LANDSCAPE WALL SIGN

A type of freestanding sign with text and/or graphics affixed or etched onto a single side of a solid surface that serves as a landscape or retaining wall.

## LED SIGN

An illuminated sign that utilizes light-emitting diode technology.

## LIGHT BOX SIGN (or CABINET SIGN)

A type of illuminated sign in which the light source is enclosed or encased within the interior of the sign structure.

## LIMITED-DURATION SIGN

A nonpermanent sign that is displayed on a property for more than 30 days, but not intended to be displayed for an indefinite period.

## LINEAR LIGHTING

The use of visible or concealed light sources, including neon tubes, fluorescent tubing and other surface-mounted or recessed light sources which describe or outline the features of a structure such as the roofline; all or part of the perimeter, the facade, walls, soffit or other structural component; or a sign, which results in the attraction of attention to the feature or structure.

## LOGO

A pictorial symbol, device or other visual representation commonly utilized by, and associated with, a commercial business or commercial service entity as a means of identifying or advertising such entity.

**MARQUEE**
    A permanent structure, other than an awning or canopy, attached to, supported by, and projecting from a building and providing protection from the elements.

**MARQUEE SIGN**
    A type of sign attached to a marquee.

**MESSAGE BOARD**
    A type of sign that consists of either letters or words that are changed manually or digital messages and graphics that can be programmed by computer to change.

**MONUMENT SIGN (or GROUND SIGN)**
    A type of freestanding sign permanently affixed to the ground at its base, supported entirely by a base structure, and not mounted on a pole or attached to any part of a building.

**MURAL**
    A hand-produced work of visual art that is tiled or painted by hand directly to an exterior wall of a building. A mural that contains the name or logo of a business or a specific brand of merchandise sold within the building on which the mural is applied is considered a sign.

**NAMEPLATE**
    A sign that identifies the resident of a house or the occupant of a building.

**NEON SIGN**
    A sign illuminated by a neon tube, or other visible light-emanating gas tube, that is bent to form letters, symbols, and/or other graphics.

**NIT**
    A photometric unit of measurement referring to luminance, where one nit is equal to one $cd/m^2$.

**OBSOLETE SIGN**
    A sign that remains on a building or front yard within 20 days from when the signed business vacated the premises.

**OFF-PREMISES SIGN**
    A sign that directs attention to a business, commodity, service or entertainment conducted, sold, or offered elsewhere than on the premises upon which the sign is located.

**ON-PREMISES SIGN**
    A sign whose message and design relate to an individual business, profession, product, service, event, point of view, or other commercial or noncommercial activity sold, offered, or conducted on the same property where the sign is located.

**OUTDOOR DISPLAY CASE**
    A type of sign consisting of a lockable metal or wood framed cabinet with transparent windows, typically containing a menu, map, event poster, or other material, and mounted onto a building.

**PAINTED SIGN**

A type of sign drawn or applied directly onto a building or structure with paint, ink, or dyes.

**PENNANT**

A triangular or irregular piece of fabric or other material, commonly attached in strings or strands, or supported on small poles intended to flap in the wind.

**POLE SIGN (or PYLON SIGN)**

A type of freestanding sign that is permanently supported in a fixed location by a structure of one pole, post, or upright from the ground and not supported by a building or a base structure.

**POLITICAL SIGN**

A temporary sign intended to advance a political statement, cause, or candidate for office.

**PORTABLE SIGN**

A type of sign designed to be transported or moved and not permanently attached to the ground, a building, or other structure.

**POST AND PANEL SIGN**

A type of freestanding sign consisting of a sign panel supported along both sides by uprights or posts that are firmly attached to or staked into the ground.

**PRIMARY SIGN**

The most prominent sign on a facade and/or property.

**PROJECTING SIGN (or BLADE SIGN)**

A type of building-mounted, double-sided sign with the two faces generally perpendicular to the building wall, not to include signs located on an awning, canopy, or marquee.

**RESIDENTIAL DISTRICT**

Any single-family, multiple-family or townhouse residential zoning district.

**REVERSE CHANNEL LETTER SIGN**

A type of channel letter sign comprised of individual letters that are independently mounted to a wall or other surface, with lights mounted behind the letters that face the wall behind. Lights illuminate the space around the channel letters rather than the channel letters themselves, creating a halo effect.

**ROOF SIGN**

A sign erected, constructed, painted, or maintained on or above the roof of a building, including any sign the top of which extends above the roofline of a building to which it is attached.

**SECONDARY SIGN**

Any sign on a facade and/or property other than the primary sign.

**SIDEWALK SIGN**

A sign cast, painted, or embedded on a sidewalk, or a sign consisting of messages and graphics projected onto the sidewalk using light.

**SIGHT LINES (or LINES OF SIGHT)**

A clear line of vision at an intersection provided by a sight triangle.

**SIGHT TRIANGLE**

A triangle at an intersection, formed by the two roads or rights-of-way and a third line, which must be kept clear of obstructions so that motorists on one road can see cars approaching on the other road.

**SIGN**

Any object, device, display, structure, or part thereof, situated outdoors or indoors, which is used to advertise, identify, display, direct or attract attention to an object, person, institution, organization, business, produce, service, event, or location by any means, including words, letters, figures, designs, symbols, fixtures, colors, illumination, or projected images. For the purposes of these regulations, formal window displays and works of art, including murals and sculptures, are not considered signs.

**SIGN BAND (or ARCHITECTURAL SIGN BAND)**

The flat, horizontal area on a building facade located above the storefront and below the second story window sills where signs are typically attached.

**SIGN COPY**

The physical sign message including any words, letters, numerals, figures, symbols, logos and graphic elements comprising the message of a sign.

**SIGN FACE**

The part of a sign on which sign copy is customarily placed.

**STREAMERS**

A display made of lightweight, flexible materials, consisting of long, narrow, wavy strips hung individually or in a series, with or without a logo or advertising message printed or painted on them and typically designed to move in the wind.

**TEMPORARY SIGN**

A sign intended for a limited period of display, including a decorative display for a holiday or public demonstration.

**WALL SIGN**

A type of building-mounted sign attached parallel to an exterior wall surface of a building.

**WIND SIGN**

A double-faced portable sign composed of a vertical panel supported by a base structure that may be weighed down or configured so as to maintain its standing position.

**WINDOW SIGN**

A type of sign applied onto or attached to the inside or outside of a window or a transparent door. A sign within a building and visible through a window or door but not attached to the window or door is also considered a window sign.

**YARD SIGN**

A type of freestanding sign consisting of a sign panel supported by one upright or post firmly attached to or staked into the ground.

# § 250-104. General requirements.

A. Permitting requirements.

(1) No sign shall be erected, placed, altered, relocated or replaced except in accordance with this article and unless a permit has been issued or the sign is exempt as per Subsection **D** hereof.

(2) Alterations to an existing conforming sign shall require a permit when the alterations are to the size, shape, and/or illumination of the sign or to the name of the business on the sign.

B. Permitting process.

(1) Zoning Officer. An application for a sign permit shall be made to the Zoning Officer on forms provided for such purposes. The application shall include, but not necessarily be limited to, the required fee and all information required on the application and attendant forms. Additionally and if not required on the forms, the application shall be accompanied with photographs of the subject property, illustrations of the proposed sign, written consent of the owner of the property on which the sign is to be placed (if not the applicant), insurance certifications, certificate of flame resistance for awnings and canopies, signed contractor's registration, and electrical permits for sign illumination.

(2) Completeness determination. An application shall be reviewed for completeness by the Zoning Officer. The Zoning Officer shall advise the applicant in writing if the application is deficient within 45 days of submission. Resubmission shall initiate another 45 days for the Zoning Officer's review.

(3) Issuance of sign permit. The Planning Board (or the Zoning Board of Adjustment under its ancillary power of granting site plan approval) shall have the ultimate authority to approve signs, alone or as part of site plan review of a development project, upon public notice and hearing.

(4) Automatic approval. The failure of the Zoning Officer or Planning Board/Zoning Board to render a timely decision within the applicable time period shall be deemed to constitute an approval of the application, unless applicant has consented to an extension of such time period.

C. Site plan requirements; exemption from site plan review.

(1) If no sign permit is required, site plan review is not required.

(2) Notwithstanding the requirement of a sign permit, site plan review shall not be required with respect to alterations to or the replacement of existing signage in the D-1, D-2, SBD, N-C, L-I, RIM and RM-B Districts, so long as the alteration or replacement does not exceed or conflict with design criteria set forth herein, as determined by the Zoning Officer.

(3) The foregoing exemption shall not apply if the building facade on which existing signage is placed undergoes a renovation or rehabilitation, and it is determined by the Zoning Officer that the proposed renovation or rehabilitation is tantamount to new construction that would not preserve existing nonconforming signs.

(4)   In all other instances, site plan review shall be required for signs.

D.   Exempt signs. Subject to all applicable restrictions listed below or anywhere else in this article, the following signs may be erected on any premises within the City of Englewood without first obtaining a permit. Exempt signs shall not be included in the determination of the total allowable number of signs or total allowable sign area for a site or project. However, exempted signs shall be required to adhere to the regulations established for each sign type. Exemption from a sign permit shall not relieve the owner of the sign from the responsibility for its erection and maintenance in good and safe condition and for complete compliance with the requirements of this article.

(1)   Signs erected by a government agency.

(2)   Address signs and nameplates in residential districts, not exceeding two square feet in area.

(3)   Address signs in nonresidential districts, as per § **250-105**.

(4)   Directional signs designating or calling attention to entrances, exits, parking areas, and loading areas. Building-mounted directional signs and the sign panels of any freestanding directional signs shall be no larger than two square feet in area. The height of any freestanding directional sign shall not exceed seven feet.

(5)   Flags and insignia of any government, except when displayed in connection with commercial promotion.

(6)   Historical markers and tablets.

(7)   Holiday and seasonal decorations.

(8)   Names of buildings and dates of erection when cut into any masonry surface or when constructed of wood, bronze, stainless steel or similar material.

(9)   Personal expression signs of any sign type, including flags, that do not exceed three square feet in area, are noncommercial in nature, and are not illuminated.

(10) Security and warning signs.

(a)   In residential districts, such signs shall not exceed two square feet in area.

(b)   In nonresidential districts, one such sign is permitted per property, not to exceed four square feet in area. All other posted security and warning signs may not exceed two square feet in area.

(11) Signs inside a building, or other enclosed facility, which are not meant to be viewed from the outside, and are located more than three feet from the window.

(12) Temporary and limited-duration signs.

E.   Prohibited signs and sign types. The following signs are prohibited anywhere within the City of Englewood:

(1)   Billboards, except in the Light Industrial (L-I) District as per § **250-105**.

(2)

Signs carried or worn by a pedestrian that announces or calls attention to any service, event, product, or to any place of business and/or occupation.

(3)   Signs that contain lights that flash, blink, move, or that change in color or intensity.

(4)   Signs that contain mirrors.

(5)   Signs that emit smoke, visible vapors, particulate matter, sound, or odor or contain open flames.

(6)   Signs that exhibit statements, words, or pictures of obscene or pornographic subjects as determined by City Council.

(7)   Signs that imitate, resemble, interfere with, or obstruct official traffic lights, signs, or signals.

(8)   Signs mounted, attached, or painted on a trailer, boat, or motor vehicle when parked, stored, or displayed conspicuously on private premises in a manner intended to attract attention of the public for the purpose of advertising or identifying the business premises. This provision excludes signs indicating the name of the owner or business that are permanently painted or wrapped on the surface of the vehicle or to the interior or exterior surface of a vehicle window, or signs magnetically attached to vehicles or that are actively used in the daily conduct of the business.

(9)   Signs incorporating beacon, festoon, or strobe lighting.

(10) Signs tacked, nailed, posted, pasted, glued, or otherwise attached to trees, poles, stakes, fences, public benches, streetlights, or other objects, or placed on any public property or in the public right-of-way or on any private property without the permission of the property owner.

(11) Signs extending above the roofline of the building to which it is attached.

(12) Inflatable signs.

(13) Linear lights.

(14) Pennants, spinners, and streamers.

(15) Sidewalk signs.

(16) Pylon signs.

(17) Video displays.

F.   Temporary signs. Temporary signs are exempt from standard permit requirements. Temporary signs that comply with the requirements in this subsection shall not be included in the determination of the type, number, or area of signs allowed on a property.

(1)   Duration. Temporary signs may be displayed up to a maximum of 30 days.

(2)

Labeling. Temporary signs shall have a sticker and/or label indicating, in permanent or weather-resistant ink, the date the sign was erected and the name, address, and phone number of the party responsible for posting the sign.

(3)  Construction and maintenance. All temporary signs must be made of durable materials and shall be well-maintained. Temporary signs that are frayed, torn, broken, or that are no longer legible will be deemed unmaintained and required to be removed.

(4)  Placement and limitations.

   (a)  Temporary signs shall only be allowed on private property with permission of the property owner.

   (b)  Temporary signs shall be limited to not more than one per private property tax parcel per activity or event. In multitenant commercial buildings, individual tenants may erect one temporary sign to be displayed on a building face or window that abuts a public street or designated access drive.

   (c)  All prohibited signs and sign types as indicated in Subsection **E** apply to temporary signs.

(5)  Dimensions.

   (a)  D-1, D-2, N-C, RM-B Districts.

      [1]  The area of any temporary sign shall not exceed five square feet.

      [2]  The height of a temporary sign that is freestanding shall not exceed six feet.

      [3]  A wall-mounted temporary sign on a multistory building shall not be placed higher than the ground floor height of the building.

   (b)  SBD, L-I Districts.

      [1]  The area of a temporary sign shall not exceed 12 square feet.

      [2]  The height of a temporary sign that is freestanding shall not exceed seven feet.

      [3]  A wall-mounted temporary sign on a multistory building shall not be placed higher than the ground floor height of the building.

   (c)  RIM District.

      [1]  The area of a temporary sign shall not exceed 16 square feet.

      [2]  The height of a temporary sign that is freestanding shall not exceed eight feet.

      [3]  A wall-mounted temporary sign on a multistory building shall not be placed higher than the ground floor height of the building.

G.

Limited-duration signs. Limited-duration signs are exempt from standard permit requirements. Such signs that comply with the requirements in this subsection shall not be included in the determination of the type, number, or area of signs allowed on a property.

(1) Duration. Limited-duration signs may be displayed up to a maximum of six months.

(2) Labeling. Limited-duration signs shall have a sticker and/or label indicating, in permanent or weather-resistant ink, the date the sign was erected and the name, address, and phone number of the party responsible for posting the sign.

(3) Construction and maintenance. All limited-duration signs must be made of durable materials and shall be well-maintained. Signs that are frayed, torn, broken, or that are no longer legible will be deemed unmaintained and required to be removed.

(4) All prohibited signs and sign types as indicated in Subsection **E** apply to temporary "for sale" or "for lease" signs.

(5) Dimensions.

    (a) D-1, D-2, N-C, RM-B and all other multifamily residential and residential districts.

        [1] The area of the sign shall not exceed eight square feet.

        [2] The height of the sign, if it is freestanding, shall not exceed six feet.

        [3] If wall-mounted on a multistory building, the sign shall not be placed higher than the ground floor height of the building.

    (b) SBD, L-I Districts.

        [1] The area of the sign shall not exceed 12 square feet.

        [2] The height of the sign, if it is freestanding, shall not exceed seven feet.

        [3] If wall-mounted on a multistory building, the sign shall not be placed higher than the ground floor height of the building.

    (c) RIM District.

        [1] The area of the sign shall not exceed 16 square feet.

        [2] The height of the sign, if it is freestanding, shall not exceed eight feet.

        [3] If wall-mounted on a multistory building, the sign shall not be placed higher than the ground floor height of the building.

H. Sign construction, safety and maintenance standards. The following shall apply to all signs and sign structures.

(1) Signs shall be constructed of durable materials and noncorrosive fastenings.

(2) Signs shall be structurally safe and erected or installed in strict accordance with the applicable construction code.

(3) Signs shall be maintained in safe condition and in good repair at all times, with all sign information being clearly legible. Signs of deterioration may include chipped or peeling surfaces; torn materials or broken or damaged lettering or material of any kind; illegible messages, whether by reason of fading or any other condition; and a faded, dirty, torn, broken, or otherwise damaged awning, canopy, or marquee.

(4) Signs and their supporting structures shall not interfere with surface and underground utility and communications lines or equipment.

(5) Signs shall not prevent free ingress or egress from any door, window, fire escape, or prevent free access from one part of a roof to any other part. No sign other than a safety sign shall be attached to a standpipe or fire escape.

(6) Signs shall not be erected, constructed, painted, or maintained on or above the roof of a building. No part of any sign shall extend above the eave line of the building to which it is attached.

(7) No sign or part thereof may interfere with sight triangles at the intersection of any combination of rights-of-way, alleys, or driveways.

I.  Removal of unsafe or unlawful signs.

(1) When a sign becomes insecure, in danger of falling, or otherwise unsafe, the owner of the sign or the person or firm maintaining the sign shall, upon written notice of the Zoning Officer, immediately remove it.

(2) If a sign is unlawfully installed, erected, or maintained in violation of any of the provisions of this article, the owner of the sign or the person or firm maintaining the sign shall, upon written notice of the Zoning Officer, remove the sign within 10 days.

(3) Written notice, as set forth above, shall be mailed by the Zoning Officer to the owner or lessee of the premises by certified mail, return receipt requested. If within 10 days following receipt of such letter, or in the case of emergencies within such shorter time as may be specified in the notice, the owner or lessee fails to comply with the order, the Zoning Officer may revoke the permit and remove or repair the sign at the expense of the owner as otherwise provided by law.

(4) In case the Zoning Officer shall be required to remove any sign as herein provided, a record of the cost of such removal shall be kept, and the owner of such sign shall be liable therefor.

(5) No act of the Zoning Officer in connection with the inspection and maintenance of signs shall relieve the owner of the premises or the sign owner from his own responsibility for maintaining signs in a safe condition or make the City of Englewood liable in case of damage or injury.

J.  Obsolete and abandoned signs.

(1) A sign shall be considered obsolete after the business occupying a property ceases to operate or vacates the property. Obsolete signs shall be removed from the property upon which the sign is located within 20 days of becoming obsolete. Removal of an obsolete sign shall include the removal of the entire sign including the sign face, supporting structure, and structural trim.

(2) An obsolete sign shall be considered abandoned if has not been removed within 20 days of becoming obsolete. The City may remove an abandoned sign and charge the owner of the property for expenses directly incurred by the City to remove the sign. If the owner fails to reimburse the City for such expenses, the City may file a lien upon the property for the purpose of recovering all reasonable costs associated with the removal of the sign.

K.  Enforcement, violations and penalties.

(1) This article shall be enforced by the Property Maintenance Division of the Building Department of the City of Englewood.

(2) Any person or entity found in violation of the provisions of this article shall be subject to a fine as per § **317-79**.

L.  Nonconforming signs.

(1) Any sign that lawfully existed prior to the effective date of this chapter and that does not comply with the provisions of this chapter will be considered a nonconforming sign.

(2) All nonconforming signs and sign structures shall be brought into conformance with the sign regulations when and if the following occurs:

(a) The sign is removed, relocated, or significantly altered. Significant alterations include changes in the size or dimensions of the sign. Changes to the sign copy or the replacement of a sign face on a nonconforming sign shall not be considered a significant alteration.

(b) If more than 50% of the sign area is damaged.

(c) An alteration in the structure of a sign support.

(d) A change in the mechanical facilities or type of illumination.

(e) A change in the material of the sign face.

(f) The property on which the nonconforming sign is located submits a subdivision or land development application requiring site plan review.

(g) The property on which the nonconforming sign is located undergoes a change of land use requiring the issuance of either a use and occupancy permit or a change of use and occupancy permit.

(3) Nonconforming signs shall be exempt from these provisions, under the following conditions:

(a) The nonconforming sign possesses documented historic value.

(b) The nonconforming sign is of a unique nature or type by virtue of its architectural value or design, as determined by the National Park Service, State of New Jersey Historic Preservation Office, or local historical commission.

(c)

When a nonconforming sign is required to be moved because of public right-of-way improvements.

(4) Any nonconforming sign must always comply with all applicable provisions of the Uniform Construction Code and with Chapter **317**, Property Maintenance, of the Code of the City of Englewood and with all provisions of this chapter pertaining to proper and safe maintenance, operation, and abandonment procedures.

M. Measurement of sign dimensions.

(1) Measuring the area of a sign.

(a) The area of a sign shall mean the area of all lettering, wording, and accompanying designs, logos, and symbols. The area of a sign shall not include any supporting framework, bracing or trim which is incidental to the display, provided that it does not contain any lettering, words, or symbols.

(b) Where the sign consists of individual letters, designs, or symbols attached to a building, awning, wall, or window, the area shall be that of the smallest rectangle that encompasses all of the letters, designs, and symbols.

(c) Two-sided signs. Only one side shall be considered when determining the sign area, provided that the faces are equal in size.

(d) Signs that consist of, or have attached to them, one or more three-dimensional or irregularly shaped objects, shall have a sign area of the sum of two adjacent vertical sign faces of the smallest cube encompassing the sign or object.

(2) Measuring the height of a sign. Sign height shall be measured as the vertical distance from the finished surface of the ground at the base of a sign to the highest point of the sign.

N. Illumination of signs. Signs may be illuminated, where permitted in § **250-105**, in accordance with the following standards.

(1) Externally illuminated signs.

(a) External light sources for illuminating signs shall be directed at the signs.

(b) External light sources for illuminating signs shall be shielded so that light is not visible from any public thoroughfare or residential use and so that light does not cause glare to pedestrians, drivers of motor vehicles, and occupants of adjacent properties through windows or within their outdoor areas.

(c) The intensity of external light sources for signs shall not exceed that necessary to illuminate and make legible a sign from the adjacent travel way or closest right-of-way.

(d) External light sources for illuminating signs shall not flash, blink, move, or change in color or intensity.

(2) Internally illuminated signs.

(a) The following types of internally illuminated signs are permitted:

[1]

Channel letters with translucent faces containing lighting elements inside each letter.

[2] Reverse channel letters with halo lighting.

[3] A cabinet sign, or light box sign, with an opaque background and translucent letters and symbols such that only the letters and symbols appear illuminated.

[4] LED signs and neon signs as window signs, as per § **250-105**.

[5] Signs incorporating electronic message displays, as per § **250-105**.

(b) The light within internally illuminated signs shall not flash, blink, move, or change in color or intensity.

(3) Permits. Permits for illuminated signs shall not be issued without an approved electrical permit. Applications for electrical permits shall be filed at the same time as the sign permit application.

(4) Construction.

(a) All work shall be completed in full compliance with the applicable electrical and construction codes. Signs with electrical components shall be constructed, inspected, and approved by the Underwriters Laboratory (UL), or equal, and a label of approval from the laboratory shall be affixed to the sign.

(b) The electrical supply to all exterior signs, whether to the sign itself or to lighting fixtures positioned to illuminate the sign, shall be provided by means of concealed electrical cables. Electrical supply to freestanding signs shall be provided by means of underground cables.

O. Sign composition, content, and language.

(1) Signs shall not contain more than 10 items of information.

(2) Signs shall not consist of more than four colors.

(3) Signs with non-Latin/Roman letters, characters, or symbols. Signs containing copy in non-Latin/Roman letters, characters, or symbols shall include a generic description written in English, of the nature of such business, in order to address the health, safety, and welfare of vehicular and pedestrian customers trying to find the location of said premises, as well as all emergency services personnel responding to said premises.

# § 250-105. Signs in the D-1, D-2, SBD, N-C, L-I, RIM and RM-B Districts.

A. Permitted sign types by zoning district.

(1) The following table includes illustrations that are intended only to help the reader visualize the general characteristics of various sign types regulated within the sign regulations. The illustrations are provided for convenience and reference only. In

case of any real or apparent difference between any illustration and the text of the sign regulations, the text prevails.







**ILLUSTRATIVE EXAMPLES OF SIGN TYPES**

Outdoor Display Case

Directory Sign

Directional Sign
*Building-Mounted*

Directional Sign
*Freestanding*

Portable Sign

Electronic Message Display

(2) The following table indicates permitted sign types by zoning district. The letter "Y" indicates a permitted sign type, "N" indicates a sign type that is not permitted, and "YC" indicates a sign type that is permitted only under certain physical or other specified conditions.

| Zoning District→ | D-1 Downtown | D-2 Downtown | N-C Neighborhood Center | SBD Service Business District | L-I Light Industrial | RIM Research, Industry, Medical | RM-B Multi-family Res. |
|---|---|---|---|---|---|---|---|
| **Primary Building-Mounted Signs** | | | | | | | |
| Wall sign | Y | Y | Y | Y | Y | Y | YC[1] |
| Projecting sign | Y | Y | Y | Y | N | N | N |
| Awning and awning sign | Y | Y | Y | Y | Y | Y | Y |

| Zoning District→ | D-1 Downtown | D-2 Downtown | N-C Neighbor-hood Center | SBD Service Business District | L-I Light Industrial | RIM Research, Industry, Medical | RM-B Multi-family Res. |
|---|---|---|---|---|---|---|---|
| Canopy and canopy sign | N | N | N | N | YC[2] | YC[2] | Y |
| Marquee and marquee sign | Y | Y | N | N | Y | Y | Y |
| Painted sign | N | N | N | N | Y | Y | N |
| **Primary Freestanding Signs** | | | | | | | |
| Monument sign | N | YC[3] | N | YC[3] | YC[2] | YC[2] | Y |
| Landscape wall sign | N | N | N | N | YC[2] | YC[2] | N |
| Post and panel sign | N | YC[3] | N | YC[3] | N | N | Y |
| Yard sign | N | YC[3] | N | YC[3] | N | N | Y |
| **Secondary Signs** | | | | | | | |
| Address sign | Y | Y | Y | Y | Y | Y | Y |
| Directional sign[4] | Y | Y | Y | Y | Y | Y | Y |
| Directory sign | Y | Y | Y | Y | Y | Y | Y |
| Electronic message display | N | N | N | N | YC[5] | Y | N |
| Outdoor display case | Y | Y | Y | N | N | N | N |
| Portable sign | Y (in D-1b, D-2b and D-2c only) | N | Y | N | N | N | N |
| Window sign | Y | Y | Y | Y | Y | Y | N |

NOTES:

[1]     Permitted only on purpose-built office buildings with a flat roof as per § **250-105C**.

2    Permitted only on properties where the principal structure has a front yard setback of at least 10 feet.

3    Permitted only on properties where the principal structure has a front yard setback of at least six feet.

4    Directional signs less than two square feet in area are exempt from permitting requirements, as per § **250-104**. Directional signs larger than two square feet require permits and are subject to the standards in this article and in § **250-105C**.

5    Permitted only on properties fronting roads on which the speed limit is 50 mph or greater.

B.    **Standards by sign type.** The table below lists standards for each sign type. Additional standards for sign types within specific zoning districts are indicated in Subsection **C**. Where standards regulate illumination, the reader should also review the general illumination standards in § **250-104**. For awnings, canopies, and marquees, the reader should first refer to Chapter **380**, Article **IV**, for permitting requirements and standards. For the convenience of the reader of these sign regulations, some of the standards from Chapter **380**, Article **IV**, are repeated in the table in Subsection **B(1)**.

(1)    Primary building-mounted signs. The following table contains standards for primary building-mounted signs by sign type.

| Sign Type | | Standards |
|---|---|---|
| Wall sign | (a) | Types of wall signs. The following types of wall signs are permitted: |
| | | 1. Flat panel sign. The sign copy is applied, printed, or etched onto a panel or board, which is then mounted to a wall. |
| | | 2. Channel letters. The sign consists of three-dimensional letters and/or shapes that each may contain a lighting source. The letters and/or graphic elements are typically attached to a raceway that is then mounted to a wall. Reverse channel letters are also permitted. Open face channel letters are not permitted. |
| | | 3. Cut out letters. The sign content consists of letters and/or shapes that are individually attached to a wall or that are applied, printed, or etched, onto a panel that is then attached to a wall. |
| | | 4. Light box sign, or cabinet sign. The sign content is applied, printed, or etched onto the face of a box, or cabinet that contains a lighting source, which is then mounted to a wall. The face of a light box, or cabinet, shall be opaque and the sign content shall be translucent. |
| | (b) | Placement. |
| | | 1. Wall signs shall be placed to coordinate with architectural features or elements of the facade. Wall signs shall not cover or interrupt prominent architectural features of a building, including, but not |

| Sign Type | | Standards |
|---|---|---|
| | | limited to, transoms, bays, pilasters, prismatic glass, and insignias. |
| | 2. | Wall signs shall not interfere with the operation of doors or windows. |
| | (c) | Clearance. Wall signs shall have a minimum clearance of eight feet from the ground. |
| | (d) | Depth/projection. A wall sign, including any mounting panel or raceway, shall not extend more than 12 inches from a building facade. |
| | (e) | Sign copy. Wall signs shall consist only of the business name and/or logo and any decorative trim. |
| | (f) | Illumination. Wall signs may be externally or internally illuminated. |
| | (g) | Buildings with multiple tenants with storefronts. Wall signs for each ground floor tenant of a multitenant building shall be coordinated in terms of dimensions, placement, materials, and type of wall sign. |
| Projecting sign | (a) | Placement. Projecting signs shall be on a single plane and project at a ninety-degree angle from the face of the building. Sign panels may be double-sided. |
| | (b) | Projection. A projecting sign shall not extend more than four feet from the building on which it is attached. |
| | (c) | Clearance. Projecting signs shall have a minimum clearance of eight feet above the ground. |
| | (d) | Sign copy. Projecting signs shall consist only of the business name and/or logo. |
| | (e) | Illumination. Projecting signs may be externally or internally illuminated. |
| Awning and awning sign | (a) | Projection. Awnings shall not project more than four feet from the building on which they are attached. |
| | (b) | Clearance. Awnings shall have a minimum clearance of eight feet above the ground. |
| | (c) | Sign copy. An awning sign shall contain only the business name, logo, and/or address number. |
| | (d) | Illumination. Awnings and signs on awnings may be externally illuminated. Internally illuminated awnings, or back-lit awnings, are prohibited. |
| | (e) | Multitenant buildings. Awnings and awning signs on a multitenant building with ground floor storefronts shall be similar in terms of dimensions, placement, materials, color, and shape across all tenants in the building. |
| Canopy and canopy sign | (a) | Projection. Canopies are prohibited from projecting over a public sidewalk. |
| | (b) | Clearance. Canopies shall have a minimum clearance of eight feet above the ground. |

| Sign Type | Standards | |
|---|---|---|
| | (c) | Sign copy. Canopy signs shall consist only of the business name, logo, and/or address number. |
| | (d) | Illumination. The canopy may contain lighting underneath the canopy to light the surface below. Internally illuminated canopies and canopy signs are not permitted. |
| Marquee and marquee sign | (a) | Construction. Marquees, including anchors, bolts, supporting rods, and braces thereof, shall be constructed of noncombustible materials and shall be designed by a structural engineer and approved by the Construction Code Official. |
| | (b) | Placement. A marquee shall be located above the principal entrance of a building and shall be no wider than the entrance bay. |
| | (c) | Clearance. A marquee shall have a minimum clearance of 10 feet above the ground. |
| | (d) | Projection. A marquee shall not project more than four feet over a public sidewalk. |
| | (e) | Sign copy. A marquee sign shall consist of the business name and/or address number only. |
| Painted sign | (a) | Placement. |
| | | 1. A painted sign on the front of a building shall only be applied to the sign band on the ground floor facade. |
| | | 2. A painted sign on the side of a building shall only be applied to the wall of the ground floor. |
| | (b) | Sign copy. |
| | | 1. A painted sign on the front facade of a building shall consist only of the business name and/or logo, along with any decorative trim or patterns. |
| | | 2. A painted sign on the side of a building shall consist of the business name and/or logo. Additional artwork related to the services provided or types of products sold by the business is permitted. Such artwork shall not consist of depictions of specific brands of products or services. |
| | (c) | Illumination. Painted signs may be externally illuminated. |

(2) Primary freestanding signs. The following table contains standards for primary freestanding signs by sign type.

| Sign Type | Standards | |
|---|---|---|
| Monument sign | (a) | Placement. |
| | | 1. Monument signs shall be set back at least five feet from the edge of a public sidewalk and at least five feet from the edge of a driveway. |
| | | 2. |

| Sign Type | | | Standards |
|---|---|---|---|
| | | | Monument signs shall be placed so as not to block sight lines. |
| | (b) | | Sign content. Monument signs shall only contain the business name and/or logo and the address number of the property. |
| | (c) | | Landscaping. |
| | | 1. | The base of the sign shall be landscaped. |
| | | 2. | Landscaping shall not obscure any sign content. |
| | | 3. | Landscaping shall not block sight lines of the driveway or circulation aisles. |
| | (d) | | Multitenant buildings. |
| | | 1. | Sign copy. A monument sign on the property of a multitenant building may include the names of tenants. |
| | | 2. | Sign design. The information shall be presented in a clear and consistent manner. Letter heights should be coordinated across a monument sign. |
| Landscape wall sign | (a) | | Sign copy. Landscape wall signs shall only contain the business name, logo, and/or address number. |
| | (b) | | Sign types. |
| | | 1. | Landscape wall signs shall consist of a wall-mounted sign, channel letters, or letters that are painted, applied, etched, or carved directly into the wall. |
| | | 2. | Light-box signs, or cabinet signs, are not permitted. |
| | (c) | | Illumination. Landscape wall signs may be externally or internally illuminated. |
| Post and panel sign | (a) | | Placement. |
| | | 1. | Post and panel signs shall be set back at least three feet from the edge of a public sidewalk and at least five feet from the edge of a driveway. |
| | | 2. | Post and panel signs shall be placed so as not to block sight lines. |
| | (b) | | Sign copy. Post and panel signs shall consist only of the business name and/or logo. |
| | (c) | | Multitenant commercial buildings. Post and panel signs are permitted to include names of building tenants. |
| Yard sign | (a) | | Placement. |
| | | 1. | Yard signs shall be set back at least two feet from the edge of a public sidewalk and at least five feet from the edge of a driveway. |
| | | 2. | Yard signs shall be placed so as not to block sight lines. |

| Sign Type | | Standards |
|---|---|---|
| | (b) | Sign copy. Yard signs shall consist of the business name and/or logo. |
| | (c) | Multitenant commercial buildings. Yard signs are permitted to include names of building tenants. |

(3) Secondary signs. The following table contains standards for secondary signs by sign type.

| Sign Type | | | Standards |
|---|---|---|---|
| Window sign | (a) | | Definition of window sign. A sign applied onto or attached to the inside or outside of a window or a transparent door. A sign within a building that is visible through the front window or door, but not attached to the window or door, is also considered a window sign. |
| | (b) | | Additional provisions. Products, screening, or other objects that are located inside within three feet of the window, but that are not part of a formal window display, shall be considered window signs, subject to all provisions regulating window signs. |
| Address sign | (a) | | Construction. |
| | | 1. | Address signs shall be constructed of durable materials and affixed firmly onto a surface. |
| | | 2. | Address signs shall consist of a wall-mounted panel, channel letters and numbers, or cut out numbers and letters applied to a building face. |
| | (b) | | Placement. |
| | | 1. | Address signs shall be visible and legible from the street on which the address is located. |
| | | 2. | Address signs shall be placed above or near the primary entrance of a building. If such location for the address sign is not visible and legible from the street, the address sign may be placed at one edge of the building. |
| | | 3. | Address signs shall not be placed higher than the ground floor of a building. |
| | | 4. | Properties with a freestanding sign shall include the address number on the top of the sign. |
| | (c) | | Illumination. Address signs may be externally illuminated. |
| Outdoor display case | (a) | | Placement. Outdoor display cases shall not be attached to storefront windows. |
| | (b) | | Sign copy. The contents of outdoor display cases shall be maintained and kept current. Outdated content shall be replaced with up-to-date content. |
| | (c) | | Illumination. An outdoor display case may contain lighting only to illuminate the content within the case. |
| | (a) | | Placement and dimensions by sign type. |

| Sign Type | Standards | | |
|---|---|---|---|
| Directional sign | 1. | Wall-mounted directional signs shall have a minimum clearance of four feet from the ground. | |
| | 2. | Freestanding directional signs shall have a maximum height of four feet. | |
| | 3. | Projecting directional signs | |
| | | a. | Projecting directional signs are only permitted on the side and/or rear walls of buildings. |
| | | b. | Projecting directional signs shall project no more than three feet from the building wall. |
| | | c. | Projecting directional signs shall have a minimum clearance of eight feet. |
| | (b) | Sign copy. Directional signs shall consist of copy necessary for on-site circulation, parking and other site information, such as, but not limited to, service entrances and loading docks. Directional signs may contain the business name if critical to providing circulation information. | |
| | (c) | Illumination. Directional signs may be externally illuminated. | |
| Directory sign | (a) | Placement. Wall-mounted directory signs shall be attached to a wall within 10 feet of the building entrance. | |
| | (b) | Sign copy. Directory signs shall consist of business names and suite numbers or floor numbers. | |
| Portable sign | (a) | Specifications. Portable signs shall consist of freestanding "A-frame" signs where each face of the sign consists of a surface for writing by hand a nonpermanent message to prospective customers. | |
| | (b) | Placement. The edge of a portable sign closest to the building shall be located no more than four inches from the building facade. | |
| | (c) | Duration of display. Portable signs shall be displayed only during business hours. | |
| | (d) | Adverse weather conditions. Portable signs shall not be displayed during high winds or other adverse weather conditions where the sign may become unsafe to the public. | |
| | (e) | Illumination. Portable signs shall not contain any illumination. | |

C.  Standards by zoning district. This article identifies sign standards by zoning district. It is recommended that the reader review § **250-104**, which contains rules on how signs are measured.

(1)  Downtown (D-1) Districts. Signs in D-1 Districts, which includes the D-1a and D-1b Districts, are subject to the following standards:

(a)  Quantity and/or area of signs allowed by sign type in the D-1 Districts. The quantity and/or area of signs allowed by sign type in the D-1 Districts is indicated in the table below.

**Primary Building-Mounted Signs**

The total area of all primary building-mounted signs on the front facade of a building shall not exceed 40 square feet

**Primary Freestanding Signs**

Freestanding signs are not permitted in D-1 Districts.

**Secondary Signs**

Address signs. One address sign is required.

Window signs.

1.  Maximum coverages. The maximum coverage of window signs on any window shall not exceed 15% of the surface area of the window. The maximum coverage of window signs on any door shall not exceed 10% of the surface area of the door.

2.  Illuminated window signs.

    a.  The total area of illuminated window signs on the windows and doors on the front facade of a building shall be a maximum of six square feet. The area of any illuminated window sign shall not exceed four square feet.

    b.  The area of illuminated window signs shall be included in the calculation of maximum coverage of window signs.

    c.  Illuminated window signs shall consist of white light only.

    d.  Flashing, blinking, intermittent, and/or moving lights are prohibited.

Outdoor display case. One outdoor display case is permitted per business.

Directional signs. One directional sign is permitted for properties with on-site parking.

Directory signs. See "Additional Signs Permitted" in this subsection.

Portable signs. One portable sign is permitted per business in the D-1b District only.

(b)  Additional signs permitted in the D-1 Districts. The following additional signs are permitted in D-1 Districts.

   [1]  Corner properties. Corner properties are permitted an additional 40 square feet of primary building-mounted signs on the second facade that faces a public street. Windows signs may be placed on windows and doors on the second facade with a maximum coverage of 15% of the surface of any window and a maximum of 10% of the surface area of any door.

   [2]  Second-floor commercial tenants.

      [a]  Window signs. Commercial tenants on the second floor are permitted window signs on no more than two windows on the second floor.

         [i]  Illuminated window signs are not permitted on or behind second-floor windows.

         [ii]  Window signs are not permitted above the second floor.

      [b]  Directory signs. One directory sign is permitted on a building with second-floor commercial tenants.

[c]   Projecting signs.

[i]   One projecting sign is permitted on the second floor of a building with a second-floor commercial tenant. Such sign shall have a maximum projection of two feet from the building surface and a maximum height of four feet.

[ii]   The area of such signs shall not be included in the calculation of the total area of primary building-mounted signs as per Subsection **C(1)(b)[2]** [a].

[iii]   Projecting signs shall not extend below the second-floor windows.

[3]   Buildings with multiple ground-floor commercial tenants.

[a]   The storefront of each ground floor tenant in a building with multiple ground-floor commercial tenants is permitted a maximum total area of primary building-mounted signs of 40 square feet.

[b]   Signs for each ground-floor tenant in a building with multiple ground-floor tenants shall be coordinated in terms of dimensions, placement, and materials, and sign type.

[c]   Additional signs are permitted for corner properties and second floor commercial tenants as indicated in Subsection **C(1)(b)[1]** and **[2]** hereof.

(c)   Dimensional standards by sign type in the D-1 Districts. Dimensional standards by sign type in the D-1 Districts are indicated in the table below.

| Primary Building-Mounted Signs | | |
|---|---|---|
| The total area of all primary building-mounted signs on the front facade of a building shall not exceed 40 square feet. | | |
| **Sign Type** | **Dimension** | **Dimensional Standard** |
| Wall sign | Letter height | Maximum 8 inches |
| | Logo height | Maximum 12 inches |
| Projecting sign | Area of sign face | Maximum 9 square feet |
| | Letter height | Maximum 8 inches |
| | Logo height | Maximum 12 inches |
| Awning sign | Letter height | Maximum 8 inches |
| | Logo height | Maximum 12 inches |
| Marquee sign | Letter height | Maximum 8 inches |
| | Logo height | Maximum 12 inches |
| **Primary Freestanding Sign Types** | | |
| Freestanding signs are not permitted in D-1 Districts. | | |
| **Secondary Signs** | | |
| Address sign | Letter height | Minimum 3 inches |
| Window sign | Letter height | |

| | | Maximum 6 inches on windows |
| | | Maximum 4 inches on doors |
| Outdoor display case | Area | Maximum 6 square feet |
| Directional sign | Area | Maximum 4 square feet |
| Directory sign | Area | Maximum 4 square feet |
| Portable sign | Height | Maximum 3 feet |
| | Width | Maximum 2 feet |

   (d)  Additional standards for signs in D-1 Districts.

       [1]  Minimum letter height. The minimum height of letters on any primary sign shall be two inches.

       [2]  Dimensions of wall signs with sign panels.

          [a]  Sign panels shall have a maximum height of 24 inches.

          [b]  A sign panel shall be the same width as the architectural sign band of the facade on which it is being placed.

          [c]  Only the area of the sign content shall be included in the measurement of the area of a wall sign with a sign panel.

       [3]  Wall signs on multistory buildings.

          [a]  Wall signs shall not be placed above the ground floor.

          [b]  Wall signs shall have a minimum clearance of four inches below second-story windows.

(2)  Downtown (D-2) Districts. Signs in D-2 Districts, which includes the D-2a, D-2b, D-2c, D-2d, and D-2e Districts, are subject to the following standards:

   (a)  Quantity and/or areas of signs in the D-2 Districts. The quantity of signs allowed by sign type in the D-2 Districts is indicated in the table below.

**Primary Building-Mounted Signs**

The total area of all primary building-mounted signs on the front facade of a building shall not exceed 40 square feet.

**Primary Freestanding Signs**

Properties with a front yard setback of six feet or more are permitted one primary freestanding sign. An address sign shall be incorporated into the top of any primary freestanding sign.

**Secondary Signs**

Address signs. One address sign is required.

Window signs.

      1.  Maximum coverages. The coverage of window signs on any window shall not exceed 15% of the surface area of the window. The

coverage of window signs on any door shall not exceed 10% of the surface area of the door.

    2.  Illuminated window signs.

       a.  The total area of illuminated window signs on the windows and doors on the front facade of a building shall be a maximum of six square feet. The area of any single illuminated window sign shall not exceed four square feet.

       b.  The area of illuminated window signs shall be included in the calculation of maximum coverage of window signs.

       c.  Illuminated window signs shall consist of white light only.

       d.  Flashing, blinking, intermittent, and/or moving lights are prohibited.

Outdoor display case. One outdoor display case is permitted per business.

Directional signs. One directional sign is permitted for properties with on-site parking.

Directory signs. See "Additional signs permitted" within this subsection.

Portable signs. One portable sign is permitted per business in the D-2b and D-2c Districts only.

(b)  Additional signs permitted in the D-2 Districts. The following additional signs are permitted in the D-2 Districts.

    [1]  Corner properties. Corner properties are permitted an additional 40 square feet of primary building-mounted signs on the second facade that faces a public street. Window signs may be placed on windows and doors on the second facade with a maximum coverage of 15% of the surface of any window and a maximum of 10% of the surface area of any door.

    [2]  Second-floor commercial tenants.

      [a]  Window signs. Commercial tenants on the second floor are permitted window signs on no more than two windows on the second floor.

        [i]  Illuminated window signs are not permitted on or behind second-floor windows.

        [ii]  Window signs are not permitted above the second floor.

      [b]  Directory signs. One directory sign is permitted on a building with second-floor commercial tenants.

      [c]  Projecting signs. One projecting sign is permitted per tenant on the second floor of a building with a second-floor commercial tenant. Such sign shall have a maximum projection of two feet from the building surface and a maximum height of four feet. Such signs shall not extend above the eaveline or below second story windows.

    [3]  Buildings with multiple ground-floor commercial tenants.

      [a]  The storefront of each ground floor tenant in a building with multiple ground-floor commercial tenants is permitted a maximum total area of primary building-mounted signs of 40 square feet.

[b]  Signs for each ground-floor tenant in a building with multiple ground-floor tenants shall be coordinated in terms of dimensions, placement, and materials, and sign type.

[c]  Additional signs are permitted for corner properties and second floor commercial tenants as indicated in Subsection **C(2)(b)[1]** and **[2]** hereof.

(c)  Dimensional standards by sign type in the D-2 Districts. Dimensional standards by sign type in the D-2 Districts are indicated in the table below:

| Sign Type | Dimension | Dimensional Standard |
| --- | --- | --- |
| **Primary Building-Mounted Signs** | | |
| The total area of all primary building-mounted signs on the front facade of a building shall not exceed 40 square feet. | | |
| Wall sign | Letter height | Maximum 8 inches |
| | Logo height | Maximum 12 inches |
| | Area of sign face | Maximum 9 square feet |
| Projecting sign | Letter height | Maximum 8 inches |
| | Logo height | Maximum 12 inches |
| Awning sign | Letter height | Maximum 8 inches |
| | Logo height | Maximum 12 inches |
| Marquee sign | Letter height | Maximum 8 inches |
| | Logo height | Maximum 12 inches |
| **Primary Freestanding Sign Types** | | |
| Monument sign | Height | Maximum 6 feet |
| | Area | Maximum 30 square feet |
| | Letter height | Maximum 6 inches |
| | Logo height | Maximum 12 inches |
| Post and panel sign | Height | Maximum 6 feet |
| | Area of sign panel | Maximum 30 square feet |
| | Letter height | Maximum 6 inches |
| | Logo height | Maximum 12 inches |
| Yard sign | Height | Maximum 6 feet |
| | Area of sign panel | Maximum 8 square feet |
| | Letter height | Maximum 6 inches |
| | Logo height | Maximum 12 inches |
| **Secondary Signs** | | |
| Address sign | Letter height | Minimum 3 inches |
| Window sign | Letter height | Maximum 6 inches on windows |
| | | Maximum 4 inches on doors |

| Sign Type | Dimension | Dimensional Standard |
|-----------|-----------|---------------------|
| Outdoor display case | Area | Maximum 6 square feet |
| Directional sign | Area | Maximum 4 square feet |
| Directory sign | Area | Maximum 4 square feet |
| Portable sign | Height | Maximum 3 feet |
| | Width | Maximum 2 feet |

(d)   Additional standards for signs in D-2 Districts.

[1]   Minimum letter height. The height of letters on any primary building-mounted or freestanding sign shall be a minimum of two inches.

[2]   Dimensions of wall signs with sign panels.

[a]   Any sign panel shall have a maximum height of 24 inches.

[b]   Any sign panel shall be the same width as the architectural sign band of the facade on which it is being placed.

[c]   Only the area of the sign content shall be included in the measurement of the area of a wall sign with a sign panel.

[3]   Wall signs on multistory buildings.

[a]   Wall signs shall not be placed above the ground floor.

[b]   Wall signs shall have a minimum clearance of four inches below second-story windows.

(3)   Neighborhood Center (N-C) District. Signs in the N-C District are subject to the following standards:

(a)   Quantity and/or area of signs allowed by sign type in the N-C District. The quantity and/or area of signs allowed by sign type in the N-C District is indicated in the table below.

**Primary Building-Mounted Signs**

The total area of all primary building-mounted signs on the front facade of a building shall not exceed 40 square feet.

**Primary Freestanding Signs**

Primary freestanding signs are not permitted in the N-C District.

**Secondary Signs**

Address signs. One address sign is required.

Window signs.

1.   Maximum coverages. The coverage of window signs on any window shall not exceed 15% of the surface area of the window. The coverage of window signs on any door shall not exceed 10% of the surface area of the door.

2.   Illuminated window signs.

a.

The total area of illuminated window signs on the windows and doors on the front facade of a building shall be a maximum of six square feet. The area of any single illuminated window sign shall not exceed four square feet.

b.   The area of illuminated window signs shall be included in the calculation of maximum coverage of window signs.

c.   Illuminated window signs shall consist of white light only.

d.   Flashing, blinking, intermittent, and/or moving lights are prohibited.

Outdoor display case. One outdoor display case is permitted per business.

Directional signs. One directional sign is permitted for properties with on-site parking.

Directory signs. See "Additional signs permitted" section of this subsection.

Portable signs. One portable sign is permitted per business.

(b)   Additional signs permitted in the N-C District. The following additional signs are permitted in N-C Districts.

[1]   Corner properties. Corner properties are permitted an additional 40 square feet of primary building-mounted signs on the second facade that faces a public street. Window signs may be placed on windows and doors on the second facade with a maximum coverage of 15% of the surface of any window and a maximum of 10% of the surface area of any door.

[2]   Second-floor commercial tenants.

[a]   Window signs. Commercial tenants on the second floor are permitted window signs on no more than two windows on the second floor.

[i]   Illuminated window signs are not permitted on or behind second-floor windows.

[ii]   Window signs are not permitted above the second floor.

[b]   Directory signs. One directory sign is permitted on a building with second-floor commercial tenants.

[c]   Projecting signs. One project sign is permitted on the second floor of a building with a second-floor commercial tenant. Such sign shall have a maximum projection of two feet from the building surface and a maximum height of four feet.

[3]   Buildings with multiple ground-floor commercial tenants.

[a]   The storefront of each ground floor tenant in a building with multiple ground-floor commercial tenants is permitted a maximum total area of primary building-mounted signs of 40 square feet.

[b]   Signs for each ground-floor tenant in a building with multiple ground-floor tenants shall be coordinated in terms of dimensions, placement, materials, and sign type.

[c]

Additional signs are permitted for corner properties and second floor commercial tenants as indicated in Subsection **C(3)(b)[1]** and **[2]** hereof.

(c)   Dimensional standards by sign type in the N-C District. Dimensional standards by sign type in the N-C District are indicated in the table below.

| **Primary Building-Mounted Signs** | | |
|---|---|---|
| The total area of all primary building-mounted signs on the front facade of a building shall not exceed 40 square feet. | | |
| **Sign Type** | **Dimension** | **Dimensional Standard** |
| Wall sign | Letter height | Maximum 8 inches |
| | Logo height | Maximum 12 inches |
| Projecting sign | Area of sign face | Maximum 9 square feet |
| | Letter height | Maximum 8 inches |
| | Logo height | Maximum 12 inches |
| Awning sign | Letter height | Maximum 8 inches |
| | Logo height | Maximum 12 inches |
| Marquee sign | Letter height | Maximum 8 inches |
| | Logo height | Maximum 12 inches |
| **Primary Freestanding Sign Types** | | |
| Primary freestanding signs are not permitted in the N-C District. | | |
| **Secondary Signs** | | |
| Address sign | Letter height | Minimum 3 inches |
| Window sign | Letter height | Maximum 6 inches on windows |
| | | Maximum 4 inches on doors |
| Outdoor display case | Area | Maximum 6 square feet |
| Directional sign | Area | Maximum 4 square feet |
| Directory sign | Area | Maximum 4 square feet |
| Portable sign | Height | Maximum 3 feet |
| | Width | Maximum 2 feet |

(d)   Additional standards for signs in the N-C District.

[1]   Minimum letter height. The minimum height of letters on any primary sign shall be two inches.

[2]   Dimensions of wall signs with sign panels.

[a]   Sign panels shall have a maximum height of 24 inches.

[b]   A sign panel shall be the same width as the sign band of the facade on which it is being placed.

[c]  Only the area of the sign content shall be included in the measurement of the area of a wall sign with a sign panel.

[3]  Wall signs on multistory buildings.

[a]  Wall signs shall not be placed above the ground floor.

[b]  Wall signs shall have a minimum clearance of four inches below second-story windows.

(4)  Service Business District (SBD). Signs in the SBD District are subject to the following standards:

(a)  Quantity and/or area of signs allowed by sign type in the SBD District. The quantity and/or area of signs allowed by sign type in the SBD District is indicated in the table below.

**Primary Building-Mounted Signs**

The total area of primary building-mounted signs on the front facade of a building shall not exceed 1.5 square feet per linear foot of building frontage. All properties are permitted a minimum total area of such signs of 40 square feet.

**Primary Freestanding Signs**

Quantity. Properties with a front yard setback of six feet or more are permitted one primary freestanding sign.

**Secondary Signs**

Address signs. One address sign is required. An address sign shall be incorporated into the top of any primary freestanding sign.

Window signs.

1.  Maximum coverages. The coverage of window signs on any window shall not exceed 15% of the surface area of the window. The coverage of window signs on any door shall not exceed 10% of the surface area of the door.

2.  Illuminated window signs.

    a.  The total area of illuminated window signs on the windows and doors on the front facade of a building shall be a maximum of six square feet. The area of any single illuminated window sign shall not exceed four square feet.

    b.  The area of illuminated window signs shall be included in the calculation of maximum coverage of window signs.

    c.  Illuminated window signs shall consist of white light only.

    d.  Flashing, blinking, intermittent, and/or moving lights are prohibited.

Outdoor display case. One outdoor display case is permitted per business.

Directional signs. One directional sign is permitted for properties with on-site parking.

Directory signs. See "Additional signs permitted" in this subsection.

Portable signs. One portable sign is permitted per business.

(b)

Additional signs permitted in the SBD District. The following additional signs are permitted in the SBD District.

[1]    Corner properties. Corner properties are permitted the same area of primary building-mounted signs on the second facade that faces a public street as on the front facade. Window signs may be placed on windows and doors on the second facade with a maximum coverage of 15% of the surface of any window and a maximum of 10% of the surface area of any door.

[2]    Second-floor commercial tenants.

[a]    Window signs. Commercial tenants on the second floor are permitted window signs on no more than two windows on the second floor.

[i]    Illuminated window signs are not permitted on or behind second-floor windows.

[ii]    Window signs are not permitted above the second floor.

[b]    Directory signs. One directory sign is permitted on a building with second-floor commercial tenants.

[3]    Buildings with multiple ground-floor commercial tenants.

[a]    The storefront of each ground-floor tenant in a building with multiple ground-floor commercial tenants is permitted a maximum total area of primary building-mounted signs of 1.5 square feet per linear foot of frontage.

[b]    Signs for each ground-floor tenant in a building with multiple ground-floor tenants shall be coordinated in terms of dimensions, placement, materials, and sign type.

[c]    Additional signs are permitted for corner properties and second floor commercial tenants as indicated in Subsection **C(4)(b)[1]** and **[2]** hereof.

(c)    Dimensional standards by sign type in the SBD District. Dimensional standards by sign type in the SBD District are indicated in the table below. Within the table below, "frontage" shall refer to building frontage.

| Primary Building-Mounted Signs | | |
|---|---|---|
| The total area of primary building-mounted signs on the front facade of a building shall not exceed 1.5 square feet per linear foot of building frontage. All properties are permitted a minimum total area of primary building-mounted signs of 40 square feet. | | |
| **Sign Type** | **Dimension** | **Dimensional Standard** |
| Wall sign | Letter height | Maximum 10 inches |
| | Logo height | Maximum 14 inches |
| Projecting sign | Area of sign face | Maximum 9 square feet |
| | Letter height | Maximum 10 inches |

|  | | |
|---|---|---|
|  | Logo height | Maximum 12 inches |
| Awning sign | Letter height | Maximum 10 inches |
|  | Logo height | Maximum 14 inches |
| Marquee sign | Letter height | Maximum 10 inches |
|  | Logo height | Maximum 14 inches |
| **Primary Freestanding Sign Types** | | |
| Monument sign | Height | Maximum 8 feet |
|  | Area | Maximum 40 square feet |
|  | Letter height | Maximum 8 inches |
|  | Logo height | Maximum 12 inches |
| Post and panel sign | Height | Maximum 8 feet |
|  | Area of sign panel | Maximum 40 square feet |
|  | Letter height | Maximum 8 inches |
|  | Logo height | Maximum 12 inches |
| Yard sign | Height | Maximum 6 feet |
|  | Area of sign panel | Maximum 8 square feet |
|  | Letter height | Maximum 6 inches |
|  | Logo height | Maximum 12 inches |
| **Secondary Signs** | | |
| Address signs | Letter height | Minimum 3 inches |
| Window signs | Letter height | Maximum 8 inches on windows |
|  |  | Maximum 6 inches on doors |
| Directional sign | Area | Maximum 4 square feet |
| Directory sign | Area | Maximum 6 square feet |

(d)   Additional standards for signs in the SBD District.

[1]   Maximum height of logos containing acronyms and/or words. Logos containing acronyms, names, and/or words shall have a maximum height as specified under "Letter Height" in Subsection **C(4)(c)**.

[2]   Minimum letter height. The minimum height of letters on any primary building-mounted or freestanding sign shall be two inches.

[3]   Dimensions of wall signs with sign panels.

[a]   Any sign panel shall be the same width as the architectural sign band of the facade on which it is placed.

[b]   Only the area of the sign content shall be included in the measurement of the area of a wall sign with a sign panel.

[4]   Wall signs on multistory buildings.

> > [a]   Wall signs shall not be placed above the ground floor.
> >
> > [b]   Wall signs shall have a minimum clearance of four inches below second-story windows.

> (5)   Signs in the Light Industrial (L-I) District. Signs in the L-I District are subject to the following standards.

> > (a)   Quantity and/or area of signs allowed by sign type in the L-I District. The quantity and/or area of signs allowed by sign type in the L-I District is indicated in the table below.

> > **Primary Building-Mounted Signs**
> >
> > The total area of primary building-mounted signs on the front facade of a building shall not exceed 1.5 square feet per linear foot of building frontage.
> >
> > **Primary Freestanding Signs**
> >
> > Properties with a front yard setback of 10 feet or more are permitted one primary freestanding sign.
> >
> > **Secondary Signs**
> >
> > Address signs. One address sign is required. An address sign shall be incorporated into the top of any primary freestanding sign.
> >
> > Window signs.
> >
> > > 1.   Maximum coverages. The coverage of window signs on any window shall not exceed 15% of the surface area of the window. The coverage of window signs on any door shall not exceed 10% of the surface area of the door.
> > >
> > > 2.   Illuminated window signs.
> > >
> > > > a.   The total area of illuminated window signs on the windows and doors on the front facade of a building shall be a maximum of 6 square feet. The area of any single illuminated window sign shall not exceed 4 square feet.
> > > >
> > > > b.   The area of illuminated window signs shall be included in the calculation of maximum coverage of window signs.
> > > >
> > > > c.   Illuminated window signs shall consist of white light only.
> > > >
> > > > d.   Flashing, blinking, intermittent, and/or moving lights are prohibited.
> >
> > Directional signs.
> >
> > > 1.   Three directional signs are permitted for properties with on-site parking.
> > >
> > > 2.   Two directional signs are permitted for properties without on-site parking.
> >
> > Directory signs. See "Additional signs permitted" in this subsection.

> > (b)   Additional signs permitted in the L-I District. The following additional signs are permitted in the L-I District.

> > > [1]   Corner properties. Corner properties are permitted the same area of primary building-mounted signs on the second facade that faces a public street as on the front facade. Window signs may be placed on windows

and doors on the second facade with a maximum coverage of 15% of the surface of any window and a maximum of 10% of the surface area of any door.

[2] Billboards. Billboards are only permitted on properties along roads with a speed limit of 50 mph or greater.

[3] Second-floor commercial tenants.

[a] Window signs. Commercial tenants on the second floor are permitted window signs on no more than two windows on the second floor.

[i] Illuminated window signs are not permitted on or behind second-floor windows.

[ii] Window signs are not permitted above the second floor.

[b] Directory signs. One directory sign is permitted on a building with second-floor commercial tenants.

[4] Buildings with multiple ground-floor commercial tenants.

[a] The facade of each ground-floor tenant in a building with multiple ground-floor commercial tenants is permitted a maximum total area of primary building-mounted signs of 1.5 square feet per linear foot of frontage.

[b] Signs for each ground-floor tenant in a building with multiple ground-floor tenants shall be coordinated in terms of dimensions, placement, materials, and sign type.

[c] Additional signs are permitted for corner properties and second-floor commercial tenants as indicated above within this subsection.

[5] Side and rear doors.

[a] One sign is permitted on each side and rear door of a building.

[b] The maximum coverage of such sign shall not exceed 10% of the surface area of the door.

(c) Dimensional standards by sign type in the L-I District. Dimensional standards by sign type in the L-I District are indicated in the table below. Within the table below, "frontage" shall refer to building frontage.

| Primary Building-Mounted Signs | | |
|---|---|---|
| The total area of primary building-mounted signs on the front facade of a building shall not exceed 1.5 square feet per linear foot of building frontage. | | |
| **Sign Type** | **Dimension** | **Dimensional Standard** |
| Wall sign | Letter height | Maximum 14 inches |
| | Logo height | Maximum 18 inches |
| Awning sign | Letter height | Maximum 14 inches |
| | Logo height | Maximum 18 inches |

| | | |
|---|---|---|
| Canopy sign | Letter height | Maximum 14 inches |
| | Logo height | Maximum 18 inches |
| Marquee sign | Letter height | Maximum 14 inches |
| | Logo height | Maximum 18 inches |
| **Primary Freestanding Sign Types** | | |
| Monument sign | Height | Maximum 8 feet |
| | Area | Maximum 40 square feet |
| | Letter height | Maximum 10 inches |
| | Logo height | Maximum 14 inches |
| Landscape wall sign | Area of sign | Maximum 40 square feet |
| | Letter height | Maximum 10 inches |
| | Logo height | Maximum 14 inches |
| **Secondary Signs** | | |
| Address sign | Letter height | Minimum 4 inches |
| Window sign | Letter height | Maximum 10 inches on windows |
| | | Maximum 8 inches on doors |
| Directional sign | Area | Maximum 8 square feet |
| Directory sign | Area | Maximum 6 square feet |

(d)   Additional standards for signs in the L-I District.

   [1]   Maximum height of logos containing acronyms and/or words. Logos containing acronyms, names, and/or words shall have a maximum height as specified under "Letter height" in Subsection **C(5)(c)**.

   [2]   Minimum letter height. The height of letters on any primary building-mounted or freestanding sign shall be a minimum of three inches.

   [3]   Wall signs.

      [a]   On single-story buildings, wall signs shall have a minimum clearance of four inches below the eaveline.

      [b]   On multistory buildings, wall signs may be placed either on the ground-floor facade or the top-floor facade. Wall signs on the ground floor shall be placed a minimum of four inches below the eaveline. Wall signs on the top floor facade shall be placed a minimum of 10 inches below the eaveline.

   [4]   Address signs.

      [a]   Address signs may be internally or externally illuminated.

      [b]   Address signs are not permitted above the ground floor.

   [5]

Directional signs. Directional signs may be internally or externally illuminated.

[6] Signs on properties along roads with a speed limit of 50 mph or more. The following additional provisions apply to signs on properties along roads where the posted speed limit is 50 mph or more.

[a] Primary building-mounted signs.

[i] One building-mounted sign is permitted per property.

[ii] The total area of primary building-mounted signs on the front facade of all buildings shall not exceed 80 square feet.

[iii] Letters on any primary building-mounted sign shall have a maximum height of 16 inches.

[iv] A logo on any primary building-mounted sign shall have a maximum height of 22 inches.

[b] Primary freestanding signs.

[i] One monument sign is permitted per property with a maximum height of 16 feet and maximum width of five feet. A static electronic message display is permitted to be integrated into any monument sign for the purpose of communicating consumer information.

[ii] Freestanding canopies and canopy signs are permitted. A sign on a freestanding canopy shall not exceed 25% of the area of the side of the canopy upon which it is located. No side shall contain more than one sign.

[iii] Letters on any primary freestanding sign shall not exceed a height of 16 inches.

[c] Secondary signs. Secondary signs are permitted as per the table in Subsection **C(5)(a)** hereof.

[d] Signs as required by state and/or federal regulations are permitted.

(6) Signs in the Research, Industry, Medical (RIM) District. Signs in the RIM District are subject to the following standards:

(a) Quantity of signs allowed by sign type in the RIM District. The quantity of signs allowed by sign type in the RIM District is indicated in the table below.

**Primary Building-Mounted Signs**

The total area of primary building-mounted signs on the front facade of a building shall not exceed 1.5 square feet per linear foot of building frontage.

**Primary Freestanding Signs**

Properties with a front yard setback of 10 feet or more are permitted one primary freestanding sign. An address sign shall be incorporated into the top of any primary freestanding sign.

**Secondary Signs**

Address signs. One address sign is required.

Window signs. Window signs are permitted on transparent doors. The coverage of window signs on any door shall not exceed 10% of the surface area of the door.

Directional signs.

1. Three directional signs are permitted for properties with on-site parking.
2. Two directional signs are permitted for properties without on-site parking.

Directory signs. See "Additional signs permitted" in this subsection.

(b) Additional signs permitted in the RIM District. The following additional signs are permitted in the RIM District.

[1] Wall signs on single-story buildings. Wall signs on single-story buildings shall have a minimum clearance of at least four inches below the eaveline.

[2] Wall signs on the top floor of buildings with two or more stories.

[a] Quantity, placement, and dimensions. One wall sign consisting of channel letters or cutout letters only is permitted to be placed on the top floor of the front facade of a building. One such sign is also permitted to be placed on the top floor of a side facade of the same building. Such signs shall be placed a minimum of 10 inches below the eaveline and shall have a maximum letter height of 24 inches and a maximum logo height of 36 inches. Logos containing acronyms, names, or words shall have a maximum height of 24 inches.

[b] Sign copy. The sign copy shall consist of the name of the principal tenant or owner, which shall occupy at least 50% of the leasable floor area of the building, and the tenant or owner's logo. In lieu of the preceding, the sign copy may consist of the name and associated logo of the building, provided that the name generally pertains to the products and/or services of its tenants (e.g., "Englewood Design Center"), does not conflict with any definitions included in § **250-34A**, and does not create any confusion or misdirection that may harm public safety.

[3] Signs on side facades. One side facade of a non-corner property is permitted a total area of building-mounted signs of 0.75 per linear foot of the length of the side wall.

[4] Corner properties. Corner properties are permitted the same area of primary building-mounted signs on the second facade that faces a public street as on the front facade. Windows signs may be placed on transparent doors on the second facade with a maximum coverage of 10% of the surface area of any door.

[5] Buildings with multiple ground-floor commercial tenants.

[a]

The facade of each ground-floor tenant in a building with multiple ground-floor commercial tenants is permitted a maximum total area of primary building-mounted signs of 1.5 square feet per linear foot of frontage.

[b]  Signs for each ground-floor tenant in a building with multiple ground-floor tenants shall be coordinated in terms of dimensions, placement, materials, and sign type.

[6]  Side and rear doors.

[a]  One sign is permitted on each side and rear door of a building.

[b]  The maximum coverage of such sign shall not exceed 10% of the surface area of the door.

(c)  Dimensional standards by sign type in the RIM District. Dimensional standards by sign type in the RIM District are indicated in the table below. Within the table below, "frontage" shall refer to building frontage.

| Sign Type | Dimension | Dimensional Standard |
|---|---|---|
| **Primary Building-Mounted Signs** | | |
| The total area of primary building-mounted signs on the front facade of a building shall not exceed 1.5 square feet per linear foot of building frontage. | | |
| | Width | See (c) |
| Wall sign | Letter height | Maximum 14 inches |
| | Logo height | Maximum 20 inches |
| Awning sign | Letter height | Maximum 14 inches |
| | Logo height | Maximum 20 inches |
| Canopy sign | Letter height | Maximum 14 inches |
| | Logo height | Maximum 20 inches |
| Marquee sign | Letter height | Maximum 14 inches |
| | Logo height | Maximum 20 inches |
| **Primary Freestanding Sign Types** | | |
| Monument sign | Height | Maximum 8 feet |
| | Area | Maximum 48 square feet |
| | Letter height | Maximum 10 inches |
| | Logo height | Maximum 14 inches |
| Landscape wall sign | Area of sign copy | Maximum 48 square feet |
| | Letter height | Maximum 10 inches |
| | Logo height | Maximum 14 inches |
| **Secondary Signs** | | |
| Address sign | Letter height | Minimum 4 inches |
| Window sign | Letter height | Maximum 6 inches on doors |

| Sign Type | Dimension | Dimensional Standard |
|---|---|---|
| Directional sign | Area | Maximum 8 square feet |
| Directory sign | Area | Maximum 6 square feet |
| Electronic message display | Area | Maximum 60% of the area of the sign on which it is installed |

(d)   Additional standards for signs in the RIM District.

[1]   Maximum height of logos containing acronyms and/or words. Logos containing acronyms, names, and/or words shall have a maximum height as specified under "Letter height" in Subsection **C(6)(b)**.

[2]   Minimum letter height. The height of letters on any primary building-mounted or freestanding sign shall be a minimum of three inches.

[3]   Address signs.

[a]   Address signs may be internally or externally illuminated.

[b]   Address signs are not permitted above the ground floor of multistory buildings.

[4]   Directional signs. Directional signs may be internally or externally illuminated.

[5]   Signs on properties along roads with a speed limit of 50 mph or more. The following additional provisions apply to signs on properties along roads where the posted speed limit is 50 mph or more.

[a]   Primary building-mounted signs.

[i]   One building-mounted sign is permitted per property.

[ii]   The total area of primary building-mounted signs on the front facade of all buildings shall not exceed 80 square feet.

[iii]   Letters on any primary building-mounted sign shall have a maximum height of 16 inches.

[iv]   A logo on any primary building-mounted sign shall have a maximum height of 22 inches.

[b]   Primary freestanding signs.

[i]   One monument sign is permitted per property with a maximum height of 16 feet and maximum width of five feet. A static electronic message display is permitted to be integrated into any monument sign for the purpose of communicating consumer information.

[ii]   Freestanding canopies and canopy signs are permitted. A sign on a freestanding canopy shall not exceed 25% of the area of the

side of the canopy upon which it is located. No side shall contain more than one sign.

[iii]  Letters on any primary freestanding sign shall not exceed a height of 16 inches.

[c]  Secondary signs. Secondary signs are permitted as per the table in Subsection **C(6)(a)** hereof.

[d]  Signs as required by state and/or federal regulations are permitted.

(7)  Signs in the Multifamily Residence (RM-B) District. Signs in the RM-B District are subject to the following standards:

(a)  Quantity of signs allowed by sign type in the RM-B District. The quantity of signs allowed by sign type in the RM-B District is indicated in the table below.

**Primary Building-Mounted Signs**

The total area of all primary building-mounted signs on the front facade of a building shall not exceed 40 square feet.

**Primary Freestanding Signs**

One primary freestanding sign is permitted. An address sign shall be incorporated into the top of any primary freestanding sign.

**Secondary Signs**

Address signs. One address sign is required.

Directional signs. One directional sign is permitted for properties with on-site parking.

Directory signs. See "Additional signs permitted" in this subsection.

(b)  Dimensional standards by sign type in the RM-B District. Dimensional standards by sign type in the RM-B District are indicated in the table below.

| Sign Type | Dimension | Dimensional Standard |
|---|---|---|
| **Primary Building-Mounted Signs** | | |
| The total area of all primary building-mounted signs on the front facade of a building shall not exceed 40 square feet. | | |
| Wall signs | Letter height | Maximum 10 inches |
| | Logo height | Maximum 14 inches |
| Awning sign | Letter height | Maximum 10 inches |
| | Logo height | Maximum 14 inches |
| Canopy sign | Letter height | Maximum 10 inches |
| | Logo height | Maximum 14 inches |
| Marquee sign | Letter height | Maximum 10 inches |
| | Logo height | Maximum 14 inches |
| **Primary Freestanding Sign Types** | | |
| Monument sign | Height | Maximum 7 feet |
| | Area | Maximum 35 square feet |

| Sign Type | Dimension | Dimensional Standard |
|---|---|---|
| | Letter height | Maximum 8 inches |
| | Logo height | Maximum 12 inches |
| Post and panel sign | Height | Maximum 7 feet |
| | Area of sign panel | Maximum 35 square feet |
| | Letter height | Maximum 8 inches |
| | Logo height | Maximum 12 inches |
| Yard sign | Height | Maximum 6 feet |
| | Area of sign panel | Maximum 16 square feet |
| | Letter height | Maximum 8 inches |
| | Logo height | Maximum 12 inches |
| **Secondary Signs** | | |
| Address sign | Letter height | Minimum 3 inches |
| Directional sign | Area | Maximum 4 square feet |
| Directory sign | Area | Maximum 8 square feet |

(c)  Additional standards for signs in the RM-B District.

   [1]  Minimum letter height. The height of letters on any primary sign shall be a minimum of two inches.

   [2]  Wall signs.

      [a]  Wall signs are only permitted on purpose-built office buildings.

      [b]  Wall signs shall consist of channel letters or cutout letters. Lightbox or cabinet wall signs are not permitted.

      [c]  Wall signs shall be placed on either the top floor facade and at a minimum of four inches below the eaveline.

      [d]  Wall signs may be externally illuminated only.

   [3]  Address signs.

      [a]  Address signs may be externally illuminated.

      [b]  Address signs shall be placed above the front door, but not above ground level.

   [4]  Directional signs. Directional signs may be externally illuminated.

# § 250-106. Sign regulations in Multifamily and Single-Family Residential Districts.

The following regulations apply to all multifamily and single-family residential districts, except for the RM-B District, which is regulated in § **250-105**.

A. Single-family dwelling units.

   (1) Every single-family dwelling unit shall display an address sign indicating its street number on the building or property where it is clearly visible from the street on which it is located.

   (2) Address signs shall be made of weather-resistant material and attached securely.

B. Institutional uses within a residential district.

   (1) Quantity of signs allowed by sign type. The quantity of signs allowed for institutional uses are indicated in the table below.

**Primary Building-Mounted Signs**

One building-mounted sign is permitted on the front facade of a building.

**Primary Freestanding Signs**

One primary freestanding sign is permitted. An address sign shall be incorporated into the top of any primary freestanding sign.

**Secondary Signs**

Address signs. One address sign is required.

Window signs. Window signs are permitted on transparent doors. The coverage of window signs on any door shall not exceed 10% of the surface area of the door.

Directional signs

    1.   Three directional signs are permitted for properties with on-site parking.

    2.   Two directional signs are permitted for properties without on-site parking.

   (2) Dimensional standards by sign type. Dimensional standards by sign type for institutional uses are indicated in the table below.

| Sign Type | Dimension | Dimensional Standard |
|---|---|---|
| **Primary Building-Mounted Signs** | | |
| Wall sign | Area of sign | Maximum 15 square feet |
| | Letter height | Maximum 10 inches |
| | Logo height | Maximum 14 inches |
| Awning sign | Area of sign | Maximum 15 square feet |
| | Letter height | Maximum 10 inches |
| | Logo height | Maximum 14 inches |
| Canopy sign | Area of sign | Maximum 15 square feet |
| | Letter height | Maximum 10 inches |
| | Logo height | Maximum 14 inches |
| Marquee sign | Area of sign | Maximum 15 square feet |
| | Letter height | Maximum 10 inches |
| | Logo height | Maximum 14 inches |
| **Primary Freestanding Sign Types** | | |
| Monument sign | Height | Maximum 6 feet |

| Sign Type | Dimension | Dimensional Standard |
|---|---|---|
| | Area | Maximum 30 square feet |
| | Letter height | Maximum 10 inches |
| | Logo height | Maximum 14 inches |
| | Height | Maximum 6 feet |
| Post and panel sign | Area | Maximum 30 square feet |
| | Letter height | Maximum 10 inches |
| | Logo height | Maximum 14 inches |
| **Secondary Signs** | | |
| Address sign | Letter height | Minimum 3 inches |
| Window sign | Letter height | Maximum 6 inches on doors |
| Directional sign | Area | Maximum 8 square feet |

    (3)  Additional standards for signs in Multifamily and Residential Districts.

        (a)  Wall signs shall be placed on the ground-floor facade only.

        (b)  Signs may be externally illuminated only.

        (c)  Electronic message displays are not permitted.

C.  Nonconforming business or industrial establishment in a residential district. Wall-mounted signs or window signs are permitted subject to the following limitations:

    (1)  Wall-mounted signs shall be a maximum of 15 square feet in area.

    (2)  Signs may be externally illuminated.

    (3)  Except as provided for in Subsection **C(3)**, immediately hereafter, only one sign may face each street on which the premises is located.

    (4)  For a building accommodating more than one business or industrial establishment on the ground floor, the limitations set out in Subsection **C(1)** and **(2)**, immediately above, will be applied separately to each establishment.

    (5)  The area of a window sign shall not exceed 15% of the window on which it is located.

D.  A sign within a residential district may be illuminated by a maximum of 150 watts of white light only.

# § 250-107. through § 250-110. (Reserved)

# Article XVI. Telecommunications Facilities

[Added 4-8-2003 by Ord. No. 03-01]

# § 250-111. Definitions.

For the purposes of this article, the following terms shall have the meanings indicated below:

**ANTENNA**
A device used for communication by which electromagnetic waves, digital signals, analog signals, radio frequencies, wireless telecommunications signals or other communications signals are radiated or received, excluding television reception or satellite receiving dishes.

**ANTENNA STRUCTURE**
A structure used to mount antennas as part of a telecommunications facility.

**EQUIPMENT SHELTER OR CABINET**
A structure containing equipment designed to be used as part of a telecommunications facility.

**MONOPOLE**
An antenna structure consisting of a single pole.

**ROOFLINE**
On a flat roof, the level of the roof deck, and on a pitched roof, the average elevation between the eave and peak.

**TELECOMMUNICATIONS FACILITIES**
All structures, including antennas, monopoles, towers, equipment shelters or cabinets and equipment, used for the transmission and reception of wave frequencies for the purpose of any wireless communications.

**TOWER**
An antenna structure consisting of a lattice structure or frame.

# § 250-112. Purpose.

The purpose of this article is to provide zoning conditions and standards for the regulation of the location, placement, construction or modification of telecommunications facilities within the City of Englewood so as to:

A.   Not unreasonably discriminate among providers of functionally equivalent services.

B.   Not prohibit or have the effect of prohibiting the provision of personal wireless services within the City of Englewood.

C.   Safeguard the public good.

D.   Preserve the intent and purpose of the Englewood Master Plan and Part **4**, Zoning, of this chapter.

E.   Provide adequate protection of the visual environment of residential and commercial areas within the City of Englewood.

F.

Further the purposes of the Municipal Land Use Act (N.J.S.A. 40:55D-1 et seq.) and comply with the Federal Telecommunications Act.

G.  Encourage the location or co-location of antennas on existing buildings whenever reasonably possible or, if not reasonably possible, co-location of antennas upon antenna structures, discourage the construction of new antenna structures which do not have the likelihood of being used by a number of wireless telecommunications carriers and minimize the total number of wireless telecommunications facilities within the City of Englewood.

# § 250-113. Applicability.

The provisions of this article shall govern the construction, installation or modification of all telecommunications facilities, including antennas, monopoles, towers and equipment shelters or cabinets, whether affixed to a building or to the ground, except for:

A.  Antennas that project less than five feet above the roofline of new or existing buildings;

B.  Equipment shelters or cabinets that do not exceed 50 square feet in area and six feet in height either above grade or above the roofline of new or existing buildings;

C.  Stations licensed by the Federal Communications Commission in the amateur radio service, citizens band radio service, public safety radio service or land-mobile radio service, but only to the extent such service is exempted from the provisions hereof pursuant to applicable federal law; or

D.  Parabolic satellite receiving antennas and radio and television reception antennas.

# § 250-114. Use regulations.

Telecommunications facilities are permitted as conditional uses within the following zoning districts and in accordance with the following conditions, restrictions and limitations:

A.  Towers and monopoles are prohibited from all zoning districts except the LI Zoning District.

B.  Antennas affixed to buildings are permitted in all zoning districts, except for the Open Space (OS) Zoning District, provided that the building to which they are affixed exceeds four stories or 45 feet in height.

C.  Height limitations.

   (1)  At-grade antenna structures (e.g., monopoles and towers) may not exceed a height of 110 feet from grade.

   (2)  Antennas affixed to buildings shall not exceed a height of 10 feet above the roofline.

   (3)  Equipment shelters or cabinets shall not exceed a height of eight feet from grade or the roofline.

D.  Setbacks.

   (1)

At-grade antenna structures shall be set back from residential zoning districts a distance not less than the height of the antenna structure.

    (2)  All antenna structures shall meet the yard setback requirements for the zoning district in which they are located and shall not encroach within any required planting or landscaped area.

E.  Separation. The minimum distance between at-grade antenna structures shall be 500 feet.

F.  As a further condition for a telecommunications facility, the applicant shall have the burden to affirmatively demonstrate that:

    (1)  The area to be served by the telecommunications facility does not currently have industry-wide adequate wireless telecommunications service pursuant to the Federal Telecommunications Act and that the proposed location of the antennas, any antenna structures, or equipment shelters or cabinets, is necessary to remedy such deficiency and has been planned to result in the fewest number of antenna structures within the City of Englewood and the least possible detrimental impact upon the residential and commercial areas within the City of Englewood.

    (2)  The applicant is licensed by the Federal Communications Commission to operate a telecommunications facility.

    (3)  The telecommunications facility is in compliance with all applicable radio frequency (RF) emission standards.

G.  Parking. At least one off-street parking space shall be provided to provide maintenance at the site, unless the reviewing agency determines that sufficient parking exists on the site of the telecommunications facility to meet this need.

# § 250-115. Site plan approval.

All construction, installation or modification of telecommunications facilities requires site plan approval. In addition to the requirements and criteria set forth in Article **VI**, Site Plan Review, telecommunications facilities shall comply with the design criteria set forth herein. Moreover, any application for site plan approval shall indicate the following:

A.  The mapped location and written description of all existing antenna structures within one mile of the subject site.

B.  The mapped location and written description of all existing buildings in excess of four stories or 45 feet in height within one mile of the subject site.

C.  How the proposed location of the proposed antenna(s) specifically relates to the suitability or unsuitability of such existing antenna structures or buildings to be utilized to provide the intended wireless communications.

D.  How the proposed location of the proposed antenna(s) specifically relates to the anticipated need for additional antennas and supporting structures within and near the City of Englewood by the applicant and by other providers of wireless communications services within the City of Englewood.

E. How the proposed location of the proposed antenna(s) specifically relates to the overall objective to encourage the location or co-location of antennas on existing buildings whenever reasonably possible or, if not reasonably possible, co-location of antennas upon antenna structures, discourage the construction of new antenna structures which do not have the likelihood of being used by a number of wireless telecommunications carriers and minimize the total number of wireless telecommunications facilities within the City of Englewood.

F. How the proposed location of the proposed antenna(s) specifically relates to the objective to provide adequate protection of the visual environment of residential and commercial areas within the City of Englewood.

## § 250-116. Design criteria.

A. Towers and monopoles shall be landscaped with evergreen trees capable of reaching 60 feet in height. The minimum planting size shall be determined by the municipal agency performing site plan review (hereinafter "Board") but shall be at least 12 feet in height at the time of planting. Other shrubbery or vegetative materials shall be determined by the Board based on the site location.

B. Towers and monopoles shall be fully enclosed in protective fencing consisting of eight-foot-high one-inch vinyl-clad chain-link nonclimbable mesh, which shall be fully screened by the required landscaping.

C. Rooftop antennas shall be designated in a manner that they create the least visual impact on the surrounding areas. No signage shall be permitted that is visible from the public right-of-way.

D. At-grade equipment shelters shall be subject to site plan approval by the Board and subject to appropriate landscape requirements based on the size and location of the equipment shelter. If located in visual proximity to a residential neighborhood, the entire shelter shall be screened. Facade review shall also be required. At-grade equipment shelters or cabinets shall use materials, textures and colors that, together with the required screening and landscaping, will cause them to blend into the surroundings.

E. Rooftop equipment shelters shall be subject to site plan approval by the Board and subject to appropriate screening requirements based on the size and location of the equipment shelter. Facade review shall be required. Rooftop equipment shelters shall use materials, textures and colors and sight lines that will cause them to blend into the surroundings.

F. Lighting shall be limited to that specifically required by the Federal Aviation Administration or otherwise required for public safety and shall be focused and shielded to the greatest extent possible so as not to create spillover to the public right-of-way or adjoining or nearby properties.

G. No signage shall be permitted other than that required for public safety.

## § 250-117. Inoperative antennas; removal.

A.

Any telecommunications facility not used for its intended and approved purpose for a period of one year shall be considered no longer operative and shall be removed by the responsible party within 60 days thereof.

B. In addition to the regular application fee, the applicant (or landowner in the instance of leased property) shall provide a performance bond that will cause the antennas, any supporting antenna structure, associated equipment cabinets, any building enclosing associated equipment cabinets, and all other related improvements to the land to be removed, at no cost to the City, when the antennas are no longer operative. The amount of the performance bond shall not be less than 120% of the cost (as determined by the City Engineer at the time of application) of such demolition, removal, and restoration of the site to a state required under all applicable City ordinances, including, but not limited to, Chapter **317**, Property Maintenance.

# Article XVII. Development Fees

[Added 3-13-2007 by Ord. No. 07-03]

## § 250-118. Purpose.

In Holmdel Builders Association v. Holmdel, 121 N.J. 550 (1990), the New Jersey Supreme Court determined that mandatory development fees are authorized by the Fair Housing Act of 1985, N.J.S.A. 52:27D-301 et seq., and the State Constitution, subject to the Committee on Affordable Housing development rules. The purpose of this article is to establish standards for the collection, maintenance, and expenditure of development fees pursuant to COAH's rules. Fees collected pursuant to this article shall be used for the sole purpose of providing low- and moderate-income housing. This article shall be interpreted within the framework of COAH's rules on development fees.

## § 250-119. Definitions.

As used in this article, the following terms shall have the meanings indicated:

COAH
    The New Jersey Council on Affordable Housing established under the Fair Housing Act of 1985.

DEVELOPMENT FEE
    Money paid by an individual, person, partnership, association, company, or corporation for the improvement of property as permitted by COAH rules and regulations, N.J.A.C. 5:94-6 et seq.

EQUALIZED ASSESSED VALUE
    The value of property determined by the Municipal Tax Assessor through a process designed to ensure that all property in the City of Englewood is assessed at the same assessment ratio or ratios required by law. Estimates at the time of a construction permit may be obtained by the Tax Assessor utilizing estimates for construction cost.

FINAL EQUALIZED ASSESSED VALUE
    Will be determined at project completion by the Tax Assessor.

# § 250-120. Residential fees; nonresidential fees; additional fees.

A. Residential development fees.

    (1) Within residential zoning districts, developers shall pay a development fee of 1% of the equalized assessed value for residential development.

    (2) If a "d" variance is granted pursuant to N.J.S.A. 40:55D-70d(5), then the additional residential units realized (above what is permitted by right under the existing zoning) will incur a bonus development fee of 6% rather than the development fee of 1%. However, if the zoning on a site has changed during the two-year period preceding the filing of the "d" variance application, the density for purposes of calculating the bonus development fee shall be the highest density permitted by right during the two-year period preceding the filing of the "d" variance application.

B. Nonresidential development fees. All nonresidential developers shall pay a development fee of 2% of the equalized assessed value for nonresidential development. If a "d" variance is granted pursuant to N.J.S.A. 40:55D-70d(4), then the additional floor area realized (above what is permitted by right under the existing zoning) will incur a bonus development fee of 6% of the equalized assessed value of the nonresidential development.

C. Additional development fees. The City of Englewood may provide for additional development fees as allowed by N.J.S.A. 5:94-6 et seq., as currently adopted or as may be amended in the future.

# § 250-121. Exemptions.

A. Developers of low- and moderate-income units shall be exempt from paying development fees.

B. Developers of existing residential structures shall be exempt from paying a development fee.

C. Developers that have received preliminary or final approval prior to the effective date of this article shall be exempt from paying a development fee, unless the developer seeks a substantial change in the approval.

D. Developers of any church, library, school, college, governmental facility, hospital for humans, nursing home, or public utility shall be exempt from paying a development fee.

# § 250-122. Collection of fees.

A. Developers shall pay $500 to the City of Englewood at the issuance of building permits. The developer shall submit to the Housing Officer an estimate of the assessed value of the new construction and lot to be verified, if required, by the Tax Assessor.

B. Developers shall pay the remaining fee to the City of Englewood upon the issuance of certificates of occupancy. At the issuance of certificates of occupancy, the Tax Assessor

shall calculate the equalized assessed value, and the developer shall submit the Homeowner's Warranty Act evaluation to the Assessor. The developer (or owners upon default) shall be responsible for paying the difference between the fee calculated at certificate of occupancy and the amount paid at building permit, which amount shall be paid as a condition of issuance of the certificate of occupancy.

# § 250-123. Housing trust fund.

A.  There is hereby created a separate interest-bearing housing trust fund in the name of the City of Englewood for the purpose of receiving development fees from developers. All development fees paid by developers pursuant to this article shall be deposited in this fund. No money shall be expended from the housing trust fund unless the expenditure conforms to a spending plan approved by COAH.

B.  If COAH determines that the City of Englewood is not in conformance with COAH's rules on development fees, COAH is authorized to direct the manner in which all development fees collected pursuant to this article shall be expended. Such authorization is pursuant to this article, COAH's rules on development fees, and the written authorization from the City Council.

# § 250-124. Use of funds.

A.  Money deposited in the housing trust fund, including all accrued interest, may be used for any activity approved by COAH for addressing the City of Englewood's low- and moderate-income housing obligation. Such activities may include, but are not necessarily limited to, housing rehabilitation, new construction, regional contribution agreements, the purchase of land for low- and moderate-income housing, extensions, and/or improvements of roads and infrastructure to low- and moderate-income housing sites, assistance designed to render units more affordable to low- and moderate-income households, and administrative costs necessary to implement the City of Englewood's housing element. The expenditure of all money shall conform to a spending plan approved by COAH.

B.  At least 30% of the revenues collected shall be devoted to render units more affordable. Examples of such activities include, but are not limited to, down payment, closing cost assistance, low-interest loans, and rental assistance. No more than 20% of the revenues collected each year shall be expended on administrative costs necessary to develop, revise, or implement the housing plan element of the City of Englewood Master Plan. Examples of eligible administrative activities include personnel, consultant services, space costs, consumable supplies, and rental or purchase of equipment directly associated with plan development or plan implementation.

C.  Development fee revenue shall not be expended to reimburse the City of Englewood for housing activities that preceded a first or second round of substantive certification.

# § 250-125. Monitoring.

The City of Englewood shall complete and return to COAH all monitoring forms included in the annual monitoring report related to the collection of development fees from residential and nonresidential developers, payments in lieu of constructing affordable units on site, and

funds from the sale of units with extinguished controls, and the expenditure of revenues and implementation of the plan certified by COAH. All monitoring reports shall be completed on forms designed by COAH.

# § 250-126. Expiration of provisions.

This article shall expire if:

A.   COAH dismisses or denies the City's petition for substantive certification.

B.   COAH revokes substantive certification or this article.

C.   The substantive certification expires prior to the City's filing an adopted housing element with COAH, petitioning for substantive certification, or receiving COAH's approval of this article.

# Article XVIII. Enforcement and Penalties

[Amended 6-29-2004 by Ord. No. 04-17]

# § 250-127. Zoning permits.

A.   No building or structure in any district shall be erected or structurally altered without a zoning permit duly issued, upon application, by the Chief Inspector or such other official or employee designated by the City Manager.

B.   Every application for a zoning permit shall be accompanied by the fee prescribed by ordinance and by a plot plan drawn to scale showing:

   (1)   The shape, dimensions, radii, angles and area of the lot on which the building is proposed to be erected, or of the lot on which it is situated if an existing building;

   (2)   The Tax Map block and lot numbers;

   (3)   The exact size and location on the lot and the area covered by the proposed building or buildings or the building or buildings to be altered and other existing buildings on the same lot;

   (4)   The dimensions of all open spaces in relation to the subject building, the distances between such building and any other building(s) on the same lot and the percentage of lot coverage;

   (5)   The existing and intended use of the land and all existing or proposed buildings, and the number of dwelling units, if any, that the building is designed to accommodate; and

   (6)   Such topographic or other information with regard to the building, the lot or neighboring lots as may be necessary to determine that the proposed construction will conform with the provisions of this chapter.

C.

No zoning permit shall be issued for any construction or development for which site plan approval by the Planning Board is required, except in conformity with the plans approved by the said Board.

D.  The application and all supporting documentation shall be made in duplicate. On the issuance of a zoning permit, the Chief Inspector, or such other official or employee designated by the City Manager, shall return one copy of all documents filed to the applicant.

E.  If a zoning permit is denied, the Chief Inspector, or such other official or employee designated by the City Manager, shall state in writing the reasons for such denial.

# § 250-128. Filing of survey of building.

As soon as the foundation of a building (or of any addition to an existing building for which a zoning permit is issued) is completed, and before first-story framing or wall construction is begun, there shall be filed with the Chief Inspector, or such other official or employee designated by the City Manager, a certified survey prepared by a licensed surveyor, showing the exact location of such foundation with respect to the street and other property lines of the lot.

# § 250-129. Certificate of occupancy.

A.  Occupancy and use of a building, or part of a building, hereafter erected, structurally altered or moved, or any change in the use of an existing building, shall be unlawful until a certificate of occupancy shall have been applied for and issued by the Chief Inspector, or such other official or employee designated by the City Manager.

B.  Every certificate of occupancy in connection with which a variance has been granted shall contain a detailed statement of such variance and of any conditions to which the same is subject.

C.  Application for a certificate of occupancy shall be made for a new building, or for an existing building which has been altered, on a form furnished by the Chief Inspector, or such other official or employee designated by the City Manager. Such application shall accompany the application for a zoning permit and shall be issued within 10 days after a written request for inspection of the completed work, but only if all requirements of this and other applicable ordinances or codes have been complied with.

D.  No certificate of occupancy for any building shall be issued by the Chief Inspector, or such other official or employee designated by the City Manager, until parking spaces, access facilities and landscape planting required by this chapter and by the Planning Board as part of site plan review have been completed. Where, by reason of adverse weather conditions, it is impracticable to complete the parking spaces and access facilities and/or landscape planting, the certificate of occupancy may be issued upon the posting of a performance guarantee approved as to form by the City Solicitor and as to sufficiency by the City Engineer. Said performance guarantee shall run for a period not to exceed six months.

E.  Every application for a certificate of occupancy, for a temporary certificate of occupancy, or for copies of either shall be accompanied by the fee prescribed by ordinance.

F. Every certificate of occupancy shall state that the building or the proposed use of a building or land complies with all provisions of law and of this chapter and all other ordinances of the City.

G. A certificate of occupancy shall be deemed to authorize, and is required for, both initial and continued occupancy and use of the building or land to which it applies.

H. Upon written request by the owner, the Chief Inspector, or such other official or employee designated by the City Manager, shall, after inspection, issue a certificate of occupancy for any building or use thereof existing at the time of the adoption of this chapter, certifying such use and whether or not the same, and the building, conforms to the provisions of this chapter.

I. A record of all certificates of occupancy shall be kept in the office of the Chief Inspector, or such other official or employee designated by the City Manager, and copies shall be furnished, on request, to any agency of the City or to any person having a proprietary or tenancy interest in the building or land affected.

J. If a certificate of occupancy is denied, the Chief Inspector, or such other official or employee designated by the City Manager, shall state in writing the reasons for such denial.

## § 250-130. Duties of Chief Inspector.

A. It shall be the duty of the Chief Inspector, or such other official or employee designated by the City Manager, to enforce the provisions of this chapter and all rules, conditions and requirements adopted or specified pursuant thereto. Nothing in this chapter shall prevent any property owner or resident of the City, the City itself or any board or agency of the City from availing themselves of any lawful remedy in preventing or abating any violation of any provision of this chapter.

B. The Chief Inspector, or such other official or employee designated by the City Manager, or his duly authorized assistant(s) shall have the right to enter any building or enter upon any land at any reasonable hour in the course of their duties. The Chief Inspector, or such other official or employee designated by the City Manager, shall maintain files of all applications for zoning permits and plans submitted therewith and for certificates of occupancy and records of all zoning permits and certificates of occupancy issued by him, which files and records shall be open to public inspection.

C. The Chief Inspector, or such other official or employee designated by the City Manager, shall keep a record of every identifiable complaint of a violation of any of the provisions of this chapter and of the action taken as a result of each such complaint, which records shall be public records.

## § 250-131. Violations and penalties.

Any owner, lessee, contractor, agent or other person who uses or maintains, or causes to be used or maintained, any building or premises or any part thereof in the City for any purpose other than the uses permitted therefor in this chapter, or who erects, enlarges, or alters or causes to be erected, enlarged or altered, any building or any part thereof in the City except in conformity with the provisions of this chapter, or who fails to maintain any building or

premises consistent with and in compliance with the terms and conditions of any approved site plan shall be guilty of a violation of this chapter and shall be subject to the penalties set out in Article **XX**, § **250-145**, of this chapter.

# § 250-132. Applicability of Uniform Construction Code.

Nothing contained herein shall be deemed to supersede or modify the provisions of New Jersey's Uniform Construction Code. The requirements of Article **XVIII** shall be in addition to such other requirements as may exist under the Uniform Construction Code or other applicable law or ordinance.[1]

[1]    *Editor's Note: See Ch. **167**, Construction Codes, Uniform.*

# Part 5. Miscellaneous Regulations

# Article XIX. Municipal Projects

# § 250-133. Subdivision and site plan approval not required.

Notwithstanding any other provisions of this chapter, neither subdivision approval nor site plan approval shall be required for any acquisition or sale of lands by the City of Englewood, or for any development undertaken by the City of Englewood on lands owned, leased or to be owned or leased by the City of Englewood, provided that such acquisition, sale or development is authorized by resolution or ordinance adopted by the City Council.

# § 250-134. Referral to Planning Board.

Any proposal for acquisition, sale or development as described in § **250-133** of this article which, if undertaken by someone other than the City of Englewood, would require subdivision and/or site plan approval shall be referred by the City Council, or by such officer or officers of the City as shall be designated by the City Council, to the Planning Board for its review, comments and recommendations prior to effecting such acquisition or sale or commencing construction of such development, and the Planning Board shall review and evaluate the same and apply the same criteria thereto as if such acquisition, sale or development did in fact require subdivision and/or site plan approval.

# § 250-135. Report and recommendations by Planning Board.

Within 45 days of a referral to the Planning Board of any such proposed acquisition, sale or development, the Planning Board shall submit to the City Council its report and recommendations respecting same.

# § 250-136. Rejection or disapproval of Planning Board recommendations.

The City Council shall be guided by and shall proceed pursuant to the report and recommendations of the Planning Board, unless, by resolution duly adopted, it shall reject or disapprove all of any of same. Adoption of any such resolution of rejection or disapproval shall require the votes of three Council members or, in the event of a tie vote among the Council members, a vote of two Council members and the Mayor.

## § 250-137. Failure of Planning Board to submit report.

Failure of the Planning Board to submit its report and recommendations within the aforesaid forty-five-day period shall be deemed to constitute and be the equivalent of a favorable report and recommendation from the Planning Board.

## § 250-138. Redevelopment plans.

A. Applicability. This section shall be applicable to all applications for development pursuant to the provisions of N.J.S.A. 40A:12A-1 et seq. and authorized pursuant to a developer's agreement between a redeveloper and the City Council or a redevelopment agency established by the City of Englewood.
[Amended 4-24-2012 by Ord. No. 12-14]

B. Submission of application for development. A redeveloper may submit an application for development notwithstanding the failure to either own the proposed site or have a fully executed contract of purchase of the proposed site from the owner thereof at the time of application, provided that the agreement entered into between the redeveloper and the City Council or the redevelopment agency provides for the acquisition of the site by eminent domain, if necessary, and the subsequent conveyance thereof by the City or redevelopment agency to the redeveloper, whether or not subject to conditions precedent.

C. Except as otherwise provided herein, an application for development filed under this section shall be processed and administered in accordance with the same procedures and pursuant to the same criteria established by ordinance for application for development of nonmunicipal projects.

D. The City Council may, in the exercise of its sound discretion and in furtherance of a redevelopment plan, designate, by resolution adopted by a majority of the City Council, the application for development by the redeveloper as a municipal project. Upon the filing of a certified copy of such resolution with the Planning Board, the Planning Board shall conduct a review and evaluation of the application for development pursuant to the provisions of §§ **250-134** and **250-135** of this article. Upon completion of the Planning Board review, the City Council may approve or disapprove the report or recommendation of the Planning Board and may approve the proposed development notwithstanding the report, recommendations or approval of the Planning Board in accordance with §§ **250-136** and **250-137** of this article.

[1]    *Editor's Note: The redevelopment plans adopted by the City Council are included as an attachment to this chapter.*

# Article XX. Interpretation; Invalidity; Penalties

## § 250-139. Interpretation.

A. In their interpretation and application, the provisions of this chapter shall be held to be the minimum requirements adopted for the promotion of the public health, safety, comfort, convenience and general welfare. Wherever the requirements of this chapter differ from the requirements of another ordinance, the provisions of that ordinance which impose greater restrictions upon the use of buildings or require larger yards or other open spaces shall govern.

B. In the event of any conflict in the terminology of any section of part thereof, or between different sections of this chapter, the more restrictive provisions shall control.

## § 250-140. Invalidity.

A. Should any section or provision of this chapter be decided by any court of competent jurisdiction to be unconstitutional or invalid, such decision shall not affect the validity of the ordinance as a whole or any part thereof other than the part so decided to be unconstitutional or invalid. The City Council hereby declares that it would have passed this chapter and each section and subsection thereof, irrespective of the fact that any one or more parts, subsections, sentences, clauses or phrases may be declared unconstitutional or invalid.

B. Should this chapter in its entirety be decided by any court of competent jurisdiction to be unconstitutional or invalid, Part 4, Zoning, of this chapter of the City of Englewood, including all amendments thereto, as it existed immediately prior to the adoption of this chapter, shall be deemed to have remained in effect.

## § 250-141. Repeal of inconsistent ordinances.

All ordinances or parts thereof either inconsistent with the provisions hereof or with the provisions of the Municipal Land Use Law, N.J.S.A. 40:55D-1 et seq., are hereby repealed to the extent of such inconsistency.

## § 250-142. Matters not covered.

Any matter specifically required to be provided for by the provisions of the Municipal Land Use Law, N.J.S.A. 40:55D-1 et seq. and not otherwise provided for herein, is hereby incorporated by reference and made a part hereof.

## § 250-143. Severability.

If any section, sentence, clause or other provision of this chapter, or the application thereof to any person or circumstance, is for any reason adjudged by a court of competent jurisdiction to be invalid, such judgement shall not effect, impair or invalidate the remainder of this chapter.

## § 250-144. Preexisting development applications.

All applications for development made pursuant to any land use ordinance or regulation in effect prior to the effective date hereof may be continued pursuant to the provisions of said prior ordinance or regulation, provided that the procedural provisions of the Municipal Land Use Law, N.J.S.A. 40:55D-1 et seq., shall be adhered to in the processing thereof following the effective date of this chapter to the maximum extent practicable.

## § 250-145. Violations and penalties.

[Amended 3-14-2006 by Ord. No. 06-04]
Any person violating any provision of this chapter shall be subject to a fine not to exceed the sum of $1,250 and/or imprisonment for a term not to exceed 90 days and/or community service for a period not to exceed 90 days. A separate violation shall occur for each day upon which a violation exists or continues.

# Chapter 254. Laundries and Dry-Cleaning Establishments

[HISTORY: Adopted by the City Council of the City of Englewood as indicated in article histories. Amendments noted where applicable.]

**GENERAL REFERENCES**
Uniform construction codes — See Ch. **167**.
Fee Schedule — See Ch. **191**.
Land use — See Ch. **250**.
Noise — See Ch. **286**.
Retail establishments — See Ch. **330**.

# Article I. Dry-Cleaning Establishments

[Adopted 10-5-1978 by Ord. No. 2335 as §§ 10-23 to 10-32 of the 1978 Revised General Ordinances]

## § 254-1. Definitions.

As used in this article, the following terms shall have the meanings indicated.

**DRY-CLEANING ESTABLISHMENT**
An establishment where the business of cleaning clothes or other material in a dry manner is conducted and shall include self-service types of dry cleaning, and also any establishment where a combination of laundering and dry cleaning is conducted.

## § 254-2. License required; application; compliance with other regulations; fee; expiration date.

A.