F

## SECOND AMENDMENT TO CONTRACT OF SALE AND PURCHASE

THIS SECOND AMENDMENT TO PURCHASE AND SALE AGREEMENT (this "Second Amendment") dated as of October _9_, 2017, is made and entered into by and between **HAN MOORY CHURCH** ("Seller") and 7 **NORTH WOODLAND STREET, LLC** ("Buyer"). The following recitals form the basis for, and are made a material part of, this Amendment:

### RECITALS:

WHEREAS, Seller and Green Field, LLC, entered into that certain Contract of Sale and Purchase dated as of April 20, 2017, and Seller, Green Field, LLC, and Buyer entered into that certain Assignment and Assumption of Agreement of the Contract of Sale and Purchase dated April 28, 2017, assigning the Contract of Sale and Purchase from Green Field, LLC to 7 North Woodland Street LLC, and Buyer and Seller entered into that certain First Amendment to Contract of Sale and Purchase dated as of August 18, 2017 (collectively referred to herein as the "Contract") for the purchase and sale of certain Property (as defined in the Contract) having addresses at 7 North Woodland Street and 405 East Palisade Avenue, Englewood, New Jersey. Capitalized terms not defined herein shall have the meanings ascribed to such terms in the Agreement; and

WHEREAS, as a result of Buyer's due diligence review, Buyer requested a Purchase Price reduction; and

WHEREAS, by letter dated September 18, 2017, Buyer terminated the Contract to preserve its termination rights under the Contract but agreed to reinstate in the event the parties could reach an agreement as to the Purchase Price; and

WHEREAS, Buyer and Seller have reached an agreement and desire to reinstate the Contract, as amended herein below; and

WHEREAS, Buyer and Seller now wish to amend the Contract to reduce the Purchase Price, extend the Approval Period, and to otherwise modify the Contract, all as more particularly set forth below.

### AGREEMENT:

NOW THEREFORE, in consideration of ONE DOLLAR ($1.00) and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Contract is hereby amended as follows:

1. <u>Reinstatement of Contract</u>.   This Contract is hereby reinstated.

2. <u>Inspection Period</u>.   The Inspection Period under Section 3.2 of the Contract shall be extended from September 18, 2017 to the date of this Second Amendment (representing the date when a fully executed copy of this Amendment has been circulated to Buyer and Seller).

3. <u>Purchase Price</u>.   The Purchase Price under Section 2.1 of the Contract shall be reduced to

◡). The Buyer shall not be entitled to request any further reductions to the Purchase Price, except for any standard adjustments provided for under the Contract.

4.      Approval Period.   The initial Approval Period under Section 4.1 of the Contract shall be increased from twelve (12) months to fourteen (14) months.

5.      Approvals. In Section 4.1 of the Contract, after "assisted living facility" add "and any other senior care or residential housing facility," and delete "("Assisted Living Facility")" and replace with "("Project")."

6.      Miscellaneous. Upon delivery to counsel for both Seller and Buyer by e-mail in pdf format or by confirmed facsimile, this Amendment shall be binding upon the parties hereto and their respective personal representatives, heirs, successors and assigns. Except as expressly modified herein, all other terms, provisions and conditions of the Contract shall remain in full force and effect. This Amendment may be executed by facsimile or electronic transmission and in counterparts, in which such case such faxed or electronically transmitted signatures shall be deemed originals and all such counterparts, when taken together, shall be deemed a single instrument. In the event of a conflict between the provisions of the Contract and the provisions of this Amendment, the provisions of this Amendment shall govern. If any provision of this Amendment shall be unlawful, then such provision shall be null and void, but the remainder of this Amendment shall remain in full force and effect and be binding on the parties. This Amendment contains all of the agreements of the parties relative to the subject matter of this Amendment. This Amendment shall be governed by, and construed in accordance with the terms of, the laws of the State of New Jersey.

[Signatures on Following Page]

IN WITNESS WHEREOF, the parties hereto, by their duly authorized representatives, have signed this Amendment as of the date and year first above written.

SELLER:

**HAN MOORY CHURCH**, a New Jersey corporation

By: _____
Name: John S. Park
Title: Senior Pastor

BUYER:

**7 NORTH WOODLAND STREET, LLC,**
a Delaware limited liability company

By: _____
Name: Joseph Straus
Title:   Authorized Signatory

213248041v5

## FIRST AMENDMENT TO CONTRACT OF SALE AND PURCHASE

THIS FIRST AMENDMENT TO PURCHASE AND SALE AGREEMENT (this "First Amendment") dated as of August $\underline{18^{th}}$, 2017, is made and entered into by and between **HAN MOORY CHURCH** ("Seller") and **7 NORTH WOODLAND STREET, LLC** ("Buyer"). The following recitals form the basis for, and are made a material part of, this Amendment:

### RECITALS:

WHEREAS, Seller and Green Field, LLC, entered into that certain Contract of Sale and Purchase dated as of April 20, 2017, and Seller, Green Field, LLC, and Buyer entered into that certain Assignment and Assumption of Agreement of the Contract of Sale and Purchase dated April 28, 2017, assigning the Contract of Sale and Purchase from Green Field, LLC to 7 North Woodland Street LLC (collectively referred to herein as the "Contract") for the purchase and sale of certain Property (as defined in the Contract) having addresses at 7 North Woodland Street and 405 East Palisade Avenue, Englewood, New Jersey. Capitalized terms not defined herein shall have the meanings ascribed to such terms in the Agreement; and

WHEREAS, Buyer's title review revealed the existence of a deed restriction imposing a fifty-foot setback on construction within fifty feet of North Woodland Street, which deed restriction reduces the buildable area of the Property and requires the Seller to redesign its proposed Project;

WHEREAS, Buyer's due diligence investigations have revealed, amongst other items, the presence of asbestos and mold on the Property;

WHEREAS, Seller is in the process of providing additional due diligence materials in its possession or control to Buyer in order to permit Buyer's surveyor to complete its survey of the Property;

WHEREAS, Buyer has requested (i) an extension of the Inspection Period from August 18, 2017 to September 18, 2017; and

WHEREAS, Buyer and Seller now wish to amend the Contract to extend the Inspection Period to September 18, 2017, and to otherwise modify the Contract, all as more particularly set forth below.

### AGREEMENT:

NOW THEREFORE, in consideration of ONE DOLLAR ($1.00) and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Contract is hereby amended as follows:

1. **Inspection Period.** The Inspection Period under Section 3.2 of the Contract of Sale and Purchase shall be extended from August 18, 2017 to September 18, 2017.

2.    <u>Miscellaneous</u>. Upon delivery to counsel for both Seller and Buyer by e-mail in pdf format or by confirmed facsimile, this Amendment shall be binding upon the parties hereto and their respective personal representatives, heirs, successors and assigns. Except as expressly modified herein, all other terms, provisions and conditions of the Contract shall remain in full force and effect. This Amendment may be executed by facsimile or electronic transmission and in counterparts, in which such case such faxed or electronically transmitted signatures shall be deemed originals and all such counterparts, when taken together, shall be deemed a single instrument. In the event of a conflict between the provisions of the Contract and the provisions of this Amendment, the provisions of this Amendment shall govern. If any provision of this Amendment shall be unlawful, then such provision shall be null and void, but the remainder of this Amendment shall remain in full force and effect and be binding on the parties. This Amendment contains all of the agreements of the parties relative to the subject matter of this Amendment. This Amendment shall be governed by, and construed in accordance with the terms of, the laws of the State of New Jersey.

[Signatures on Following Page]

6258974.1

IN WITNESS WHEREOF, the parties hereto, by their duly authorized representatives, have signed this Amendment as of the date and year first above written.

**SELLER:**

**HAN MOORY CHURCH**, a New Jersey corporation

By:_____
Name:
Title:

**BUYER:**

**7 NORTH WOODLAND STREET, LLC,**
a Delaware limited liability company

By:_____
Name: Joseph Straus
Title:   Authorized Signatory

213026088v2

IN WITNESS WHEREOF, the parties hereto, by their duly authorized representatives, have signed this Amendment as of the date and year first above written.

**SELLER:**

**HAN MOORY CHURCH**, a New Jersey corporation

By: _JINSOO PARK_ (signature)
Name: JINSOO PARK
Title: Chair of Building Committee

**BUYER:**

**7 NORTH WOODLAND STREET, LLC,**
a Delaware limited liability company

By: _____
Name: Joseph Straus
Title: Authorized Signatory

213026088v2

## CONTRACT OF SALE AND PURCHASE

THIS CONTRACT OF SALE AND PURCHASE ("Contract") is made as of April 20, 2017 (the "Effective Date"), by and between HAN MOORY CHURCH, a New Jersey corporation designated as a non-profit religious organization ("Seller"), and GREEN FIELD, LLC, a New Jersey limited liability company, or its designee ("Purchaser"). The "Effective Date" of this Contract shall be the date that a fully executed copy of the same is delivered to counsel for Purchaser and Seller.

In consideration of the agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser hereby agree as follows:

### ARTICLE I
### SALE OF THE PROPERTY

1.1     The Property.  Seller agrees to sell and convey unto Purchaser, and Purchaser agrees to purchase and accept from Seller, for the price and subject to the terms, covenants, conditions and provisions herein set forth, (i) that certain 1.33 acre tract of land located in the City of Englewood, County of Bergen, State of New Jersey, and denoted as Block 1902, Lot 5.01 ("Parcel 1"), known as 7 North Woodland Street, and being more particularly described on Exhibit "A-1" attached hereto and incorporated herein for all purposes, and (ii) that certain 0.9425 acre tract of land located in the City of Englewood, County of Bergen, State of New Jersey, and denoted as Block 1902, Lot 7 ("Parcel 2"), known as 405 East Palisade Avenue, and being more particularly described on Exhibit "A-2" attached hereto and incorporated herein for all purposes (Parcel 1 and Parcel 2 are collectively referred to herein as the "Land"), together with all right, title and interest of Seller in and to all (x) improvements upon the Land ("Improvements"), (y) licenses, permits, approvals and entitlements with respect to the Land, and (z) appurtenances belonging or in anywise pertaining to the Land including, but not limited to, all of Seller's right, title and interest in and to appurtenant easements, adjacent streets, alleys, rights-of-way, and any adjacent strips or gores of real estate (collectively, the "Property").  If Exhibits "A-1" and "A-2" consists of a site depiction rather than a metes and bounds legal description, the legal description for the Property shall be in accordance with the Survey obtained pursuant to the provisions of Article 4.2 herein.

1.2     Adjacent Property.  Purchaser's purchase of that certain 2.38 acre tract of land located in the City of Englewood, County of Bergen, State of New Jersey, and denoted as Block 1902, Lot 8, and known as 431 East Palisade Avenue, ("Adjacent Property") shall be a condition precedent to Purchaser's obligation to proceed to Closing (hereinafter defined). Purchaser shall have the right to terminate this Contract if the contract to purchase the Adjacent Property is terminated or the Closing of title does not occur, in which event, Purchaser shall be refunded the Earnest Money (hereinafter defined), and neither Seller nor Purchaser shall have any further rights, obligations or liabilities hereunder, except as otherwise expressly set forth herein.

1

## ARTICLE II
## CONSIDERATION

2.1     Purchase Price.   The purchase price ("Purchase Price") for the Property is

which shall be payable by Purchaser to Seller at the consummation of the transactions contemplated hereby (the "Closing") all in cash, by wire transfer of Federal funds, by cashier's or certified check, or by closing attorney's escrow account check, at Purchaser's election, provided that such amount shall be adjusted for closing prorations described hereinbelow.

2.2     Earnest Money.

2.2.1     Within eight (8) days of the Effective Date, Purchaser shall deposit with Lakeland Property Title Group (the "Title Company") the sum of ') (the "Earnest Money") in good funds.  The Earnest Money, together with any interest earned thereon is hereinafter referred to collectively as the "Earnest Money".

2.2.2     If the transaction contemplated by this Contract is consummated in accordance with the terms and provisions hereof, the Earnest Money shall be credited against the Purchase Price and paid to Seller at Closing.  If the transaction is not so consummated, the Earnest Money shall be held and delivered by the Title Company as hereinafter provided in this Contract.

2.2.3     The parties hereby acknowledge and agree that the Title Company shall promptly deposit the Earnest Money into an interest bearing escrow account having as the beneficiary thereof the Purchaser, whose Taxpayer ID or Social Security No. is as follows: 20-0436256.

## ARTICLE III
## INSPECTION

3.1     Matters to be Submitted.  If not delivered to Purchaser prior to the Effective Date, then within ten (10) days following the Effective Date ("Submission Notice Deadline"), Seller shall deliver to Purchaser copies of all existing surveys, environmental reports, soil reports, land use approvals, and other reports in Seller's possession with respect to the Property (collectively, the "Submission Matters").

3.2     Inspection Period.  Purchaser shall have the period commencing on the Effective Date of this Contract and ending one hundred twenty (120) days thereafter ("Inspection Period") to review the Submission Matters and to enter or to have its authorized representatives and its and their agents, employees and representatives enter upon the Property or any part thereof at any reasonable time for the purpose of conducting physical and

2

environmental inspections of the Property and making, at Purchaser's sole risk and expense, such other inspections, examinations, investigations and tests as Purchaser considers appropriate, provided that Purchaser shall be responsible for and shall and does hereby agree to indemnify and hold harmless Seller and its agents, employees and representatives from liability for any loss, cost, expense, claim, injury or damage (collectively, "Claims") arising out of or in any manner connected with such activities on the Property, and such indemnification shall survive the termination of this Contract and the Closing. Notwithstanding anything to the contrary contained in this Contract, (i) the indemnity and hold harmless provision contained in this Article shall not apply to the extent such Claims arise in connection with Seller's negligence, fraud, bad faith or willful misconduct, and (ii) Purchaser shall have no liability to Seller or to any other person or entity by reason of, nor shall Purchaser have any duty to indemnify, defend or hold any person or entity harmless from or against, any Claims, including, without limitation, any claim for diminution in value of the Property or for environmental remediation or clean-up costs, arising out of or in connection with the mere fact of having discovered and/or reported (as may be required by law) any adverse physical condition, title condition, environmental condition or other defect with respect to the Property. Any claim for indemnification must be made within six (6) months after the date of Closing or termination of this Contract.

3.3.1   Authorization for Environmental Sampling.   Seller hereby specifically authorizes Purchaser and its representatives and its and their agents, employees and representatives to enter upon the Property for the purpose of conducting the reviews, inspections and environmental assessments described above and agrees that in connection with any environmental assessments authorized by Article 3.2, such parties may test and take such samples as may be necessary, in the reasonable opinion of such parties, to conduct an environmental assessment of the Property.

3.3.2   Authorization for Appraisal of the Property.   Seller hereby specifically authorizes the Purchaser and its representatives, and its and their agents, to enter upon the Property, at any time for the purpose of Purchaser obtaining an appraisal of the Property in order to determine the current fair market value of the subject Property.

3.4   Right of Termination.   During the Inspection Period, Purchaser shall have the right for any reason or no reason at all in Purchaser's sole discretion to terminate this Contract by giving written notice to Seller on or before the expiration of the Inspection Period, whereupon all of the provisions of this Contract shall terminate and the Earnest Money shall be returned to Purchaser. Upon such termination, neither Seller nor Purchaser shall have any further rights, obligations or liabilities hereunder, except as otherwise expressly set forth herein. In the event Purchaser does not elect to terminate this Contract pursuant to the terms of this Article 3.4, then the Earnest Money shall be non-refundable to Purchaser except as otherwise expressly set forth in this Contract, and in all instances such Earnest Money shall be applicable to the Purchase Price at Closing.

ARTICLE IV
APROVALS

115791845v7

4.1  Approvals.  Purchaser's obligations under this Contract are contingent upon Purchaser obtaining a satisfactory environmental and soils survey and satisfactory final variances, site plan, land use and zoning approval, and all licenses and all other authorizations (except building permits) for any applicable governmental entity as necessary in the sole discretion of the Purchaser to construct and operate an assisted living facility, ("Assisted Living Facility") on the Property and the Adjacent Property, and any applicable appeal periods have expired (all of the foregoing approvals, licenses, permits and authorizations are hereinafter referred to as the "Approvals").  Such Approvals shall be received within twelve (12) months from the expiration of the Inspection Period, as extended as herein provided ("Approval Period"), or this Contract shall be null and void at Purchaser's election and all Earnest Money shall be returned to Purchaser by the Title Company. Purchaser represents that it will proceed with reasonable effort to obtain all of the Permits.  Seller agrees to cooperate with Purchaser, at no cost to Seller, in good faith and to execute such documents as may be necessary for Purchaser to secure the Permits described herein.

4.2  Termination.  Should Purchaser be unable to obtain all Approvals prior to the expiration of the Approval Period, as may be extended as herein provided, Purchaser may terminate the Contract at any time prior to 5:00 p.m., local time where the Property is located, on the last day of the Approval Period (as previously extended, if applicable) by delivering written notice to Seller, in which event the Earnest Money shall be returned to Purchaser, and Seller and Purchaser shall have no further obligations, one to the other, with respect to the subject matter of this Contract.

4.3  Extension of Approval Period.  Notwithstanding anything to the contrary provided herein, Purchaser shall be entitled to extend the Approval Period for up to two (2) additional periods of four (4) months each by giving written notice of such election to Seller no later than 5:00 p.m., local time where the Property is located, on the last day of the Approval Period (as previously extended, if applicable).  Within two (2) business days of exercising each such extension, Purchaser shall deposit TWENTY FIVE THOUSAND AND 00/100 DOLLARS ($25,000) (each, an "Additional Deposit") with the Title Company.  The Additional Deposit(s) shall be nonrefundable to Purchaser unless Closing does not occur due to a Seller default.  The Additional Deposit(s) shall be credited against the Purchase Price at Closing.

ARTICLE V
TITLE AND SURVEY

5.1  Title Commitment and Title Policy.  During the Inspection Period, Purchaser, at Purchaser's expense, may cause the Title Company to furnish to Purchaser a commitment for title insurance (the "Commitment") at then current, standard rates under the standard form of ALTA owner's policy of title insurance currently in effect at the time of Closing, and listing Purchaser as the proposed insured and showing the Purchase Price as the insured amount.  Purchaser shall be solely responsible for the cost of such Commitment and the cost of an owner's title policy in the amount of the Purchase Price, together with

4

the cost of any title endorsements thereto and any simultaneous issue charges in connection with a lender's title policy, if applicable, at Closing.

5.2    Survey.    Purchaser, at Purchaser's expense, may obtain a current boundary or ALTA/ACSM Survey of the Property prepared in accordance with current standards (the "Survey") by a Registered Professional Land Surveyor.    If there is any material discrepancy between the legal description from Seller's vesting deed and the metes and bounds description of the Property contained in the Survey, then in addition to the Deed (as defined below), provided the Survey is certified to Seller, Seller shall also execute and deliver to Purchaser at Closing a Quitclaim Deed with the legal description necessary to cure such discrepancy.

5.3    Review of Title and Survey.    Purchaser shall have a period (the "Title Review Period") ending sixty (60) days after the date on which Purchaser receives the last to be received of the (i) Commitment, (ii) legible copies, to the extent available, of all instruments referred to in the Commitment, or (iii) Survey, in which to notify Seller of any objections Purchaser has to any matters shown or referred to in the Commitment or on the Survey. Except for any Monetary Liens (as defined below), any title encumbrances or exceptions which are referred to in the Commitment or on the Survey and to which Purchaser does not object during the Title Review Period shall be deemed to be "Permitted Encumbrances" (herein so called) to the status of Seller's title.    Provided however, Purchaser shall have a continuing right to update the Commitment and Survey after the Title Review Period up until Closing, and Seller shall have the obligation to cure any title defect revealed by such updates occurring during or after the Title Review Period, subject to Article 5.4 below.

5.4    Objections to Status of Title.    In the event Purchaser objects to any matters referred to in the Commitment or on the Survey during the Title Review Period, Seller shall have a period of ten (10) business days ("Notice Period") within which to decide whether to satisfy Purchaser's objections prior to Closing.    In the event Seller notifies Purchaser within the Notice Period that Seller is unable or unwilling to satisfy Purchaser's objections prior to Closing, Purchaser shall have the option to either waive Purchaser's objections and purchase the Property as otherwise contemplated by this Contract, in which event such waived objections shall become Permitted Encumbrances, or terminate this Contract by written notice to Seller, in which event the Earnest Money shall be returned to Purchaser and, except as otherwise expressly set forth in this Contract, neither Seller nor Purchaser shall have any further rights, obligations or liabilities hereunder. Except as herein provided, Seller shall have no obligation to cure any objection raised by Purchaser during the Title Review Period and may elect to notify Purchaser in writing at any time during the Cure Period that it is unable or unwilling to satisfy any of Purchaser's objections.    Provided however, if a title exception or title encumbrance is created during or after the Title Review Period, Seller shall be obligated to cure such defect and Closing shall be adjourned for up to thirty (30) days to permit Seller to cure such defect.

5.5    Mandatory Cure Items.    Notwithstanding anything to the contrary contained in this Contract, Seller covenants and agrees that at or prior to Closing, Seller shall (i) pay in full

and cause to be canceled and discharged all mechanics' and contractors' liens which encumber the Property as of the Closing Date and which have been placed on the Property through no fault of Purchaser, (ii) pay in full all past due ad valorem taxes and assessments of any kind constituting a lien against the Property; and (iii) cause to be released any loan security documents which encumber the Property (collectively, the "Monetary Liens"), and in no event shall any Monetary Lien be deemed a Permitted Encumbrance under this Contract.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES

6.1    <u>Seller's Representations</u>.  Seller represents and warrants to Purchaser as of the Effective Date and as of the Closing Date, as follows:

6.1.1    Seller has the right, power and authority to enter into this Contract and to sell the Property to Purchaser in accordance with the terms and conditions hereof and will deliver satisfactory evidence of such right, power and authority to Purchaser at Closing.

6.1.2    Seller has not received any written notice concerning violations or alleged violations of applicable laws in connection with the Property, and to Seller's knowledge, there exists no writ, injunction, decree, order, or judgment outstanding relating to the ownership, use, maintenance, or operation of the Property by any person in violation of or from alleged violations of applicable laws.

6.1.3    There are no actions, suits, or proceedings pending or, to Seller's knowledge, threatened in any court or before or by any governmental authority against or affecting the Property.

6.1.4    There are no pending eminent domain or condemnation proceedings against the Property or any part thereof and Seller has not received any verbal or written notice that any such proceedings are presently threatened or contemplated by any authority with the power of eminent domain.

6.1.5    None of the persons comprising Seller is a foreign person subject to withholding tax as required by Section 1445 of the Internal Revenue Code.

6.1.6    There are no leases, subleases, licenses or other rental agreements or rights to occupancy in effect covering all or any portion of the Property.

6.1.7    Seller warrants that there is no pending proceeding or inquiry by any governmental authority with respect to the presence of, nor does there exist now or has there existed in the past any Hazardous Materials on the Property or the migration of Hazardous Materials from or to other property.    The term

6

"Hazardous Materials" means any substance, material or waste which becomes regulated by any local or state governmental authority of the United States Government. The term "Hazardous Material" includes, without limitation, any material or substance which is: (A) defined as a "hazardous substance" or "hazardous material" by any local or state law; (B) oil and petroleum products and their by-products; (C) Asbestos; (D) designated as a "hazardous substance" pursuant to the Federal Water Pollution Control Act; (E) defined as a "hazardous waste" pursuant to the Federal Resource Conservation and Recovery Act; or (F) defined as a "hazardous substance" pursuant to the Comprehensive Environmental Response, Compensation and Liability Act. Seller further represents and warrants that there is no hazardous material located on the Property.

6.1.8   Except as herein provided, the Property will be in the same condition as of the date of Closing as it is as of the Effective Date.

6.1.9   Seller represents that the Property constitutes legally subdivided parcel(s) and a separately assessed tax parcel(s) in accordance with all laws and regulations of the State, County and Municipality in which the Property is located.

6.1.10  Seller represents that the Property is not currently subject to a water or sewer moratorium agreement and Seller has no knowledge of any previous water or sewer moratorium agreement.

6.1.11  Except as disclosed in writing to Purchaser on the Effective Date, the Property is not subject to any operating or maintenance agreements that cannot be terminated by Purchaser (as Seller's assignee), without charge or penalty, upon thirty (30) days' or less notice.

6.1.12  Seller represents that the Property is not subject to assessment for any common area maintenance charges ("CAM") or any property owner's association dues or assessments.

6.2     Purchaser's Representations.   Purchaser represents and warrants to Seller as of the Effective Date and as of the Closing Date, as follows:

6.2.1   Purchaser is a duly organized limited liability company in good standing in its state of formation and is authorized to business in the State of New Jersey.

6.2.2   Purchaser has the right, power and authority to enter into this Contract and to purchaser the Property in accordance with the terms and conditions hereof.

6.3     Survival.   The representations and warranties made by Seller in this Article 6.1 shall survive Closing.

7

ARTICLE VII
CLOSING

7.1     Closing Date.  The Closing shall be held at the offices of the Purchaser's counsel (or such
        other location as may be mutually agreed upon by Seller and Purchaser) at 10:00 a.m. on
        (i) the later of the first (1st) business day following the expiration of forty-five (45) days
        after (x) the expiration of the Approval Period as the same may be extended as herein
        provided, and (y) the date that all of the conditions precedent to the closing of the
        purchase of Adjacent Property have been satisfied, or (ii) such earlier date and time as
        may be designated in writing by Purchaser (the "Closing Date").  Provided however, at
        the election of Purchaser, the Closing may be accomplished by a so-called "escrow
        closing" pursuant to Article 7.4 below.

7.2     Closing Matters.

        7.2.1   At Closing, Seller shall:

                (a)     Deliver possession of the Property to Purchaser, subject only to the
                        Permitted Encumbrances;

                (b)     Deliver such evidence of the authority and capacity of Seller and its
                        representatives as Purchaser, Purchaser's counsel or the Title Company
                        may reasonably require; and

                (c)     Affirm all representations, warrants and covenants contained herein.

        7.2.2   At Closing, Seller shall execute, deliver and acknowledge the following
                documents:

                (a)     A Bargain and Sale Deed With Covenant Against Grantor's Acts
                        ("Deed"), subject only to the Permitted Encumbrances;

                (b)     An affidavit with respect to Seller's status as a United States taxpayer in
                        form satisfactory to Seller and Purchaser, and an affidavit of residence or
                        other appropriate evidence that Seller is exempt from the withholding
                        requirements, if any, of the state in which the Property is located;

                (c)     Such other documents as may be reasonably required by the Title
                        Company; and

                (d)     A closing statement duly prepared by the Title Company and executed by
                        Seller setting forth in reasonable detail the financial transaction contemplated
                        by this Contract, including without limitation the Purchase Price, all
                        prorations, the allocation of costs specified herein, and the source,
                        application and disbursement of all funds.

7.2.3   At Closing, Purchaser shall:

(a)   Deliver the Purchase Price to the Title Company (less the amount of Earnest Money and Additional Deposit(s) on deposit), subject to all prorations and the allocation of costs specified herein;

(b)   Deliver such evidence of the authority and capacity of Purchaser and its representatives as Seller, Seller's counsel or the Title Company may reasonably require;

(c)   Execute and deliver such other documents as may be reasonably required by the Title Company; and

(d)   Execute and deliver a closing statement prepared by the Title Company setting forth in reasonable detail the financial transaction contemplated by this Contract, including without limitation the Purchase Price, all prorations, the allocation of costs specified herein, and the source, application and disbursement of all funds.

7.2.4   At Closing, all prepaid expenses and ad valorem taxes (real and personal), assessments and other similar charges for the year of Closing shall be prorated in cash as of the Closing Date.  If such ad valorem taxes, assessments and other similar charges for the year of Closing are not known or cannot be reasonably estimated, taxes shall be estimated based on taxes for the year prior to Closing. After taxes for the year of Closing are known, adjustments, if needed, will be made between the parties following Closing.  Should any governmental authority charge any roll back taxes against the Property that are for any period of time prior to Closing but are due and payable subsequent to Closing ("Roll Back Taxes"), Seller shall be responsible for and shall pay such Roll Back Taxes after Closing, with the estimated amount of such Roll Back Taxes due after Closing to be escrowed at Closing, and with Seller's obligation to pay Roll Back Taxes to survive Closing.  In the event the amount of such property tax is not ascertainable at time of closing, then the estimated amount of such taxes shall be held in escrow by the Title Company until the amount of such taxes is known, at which time they will be paid out of the funds held for escrow, and the balance, if any, paid to Seller, and if such estimated amount is insufficient the additional amount due for Seller's pro rata amount due will be paid by Seller to the Title Company.  The provisions of this Article 7.2.4 shall survive Closing.

7.3   Closing Costs.  Seller shall pay Seller's transfer taxes (but not any so-called "Mansion Tax") and/or documentary stamp taxes), its share of the prorations as set forth in Article 7.2.4 hereof, and its own attorney's fees.  Purchaser shall pay the settlement closing fees charged by the Title Company, costs of all inspections undertaken pursuant to Article III hereof, its share of the prorations as set forth in Article 7.2.4 hereof, the Commitment and title policy fees as set forth in Article 5.1 above, any applicable Mansion Tax, and its own attorneys' fees.  Except as otherwise provided in this Article, all other expenses incurred

9

in connection with the purchase and sale contemplated hereby shall be paid by the party incurring such expenses.

7.4 <u>Escrow Closing</u>. Notwithstanding anything in this Contract to the contrary, Seller and Purchaser agree that the Closing may be accomplished by delivery into escrow with the Title Company of all documents and instruments required to be delivered at Closing, together with the Purchase Price and all other funds necessary to accomplish the purchase and sale contemplated hereby, whereupon the Title Company shall disburse such documents, the Purchase Price and any other funds to be disbursed hereunder in accordance with the terms of this Contract and such additional escrow instructions as Seller and Purchaser may agree upon consistent with the terms hereof.

7.5 <u>IRS Reporting</u>. Seller and Purchaser each hereby designate the Title Company as the "Reporting Person" as such term is utilized in Section 6045 of the Internal Revenue Code and the regulations promulgated thereunder. Seller agrees to provide the Title Company with such information as may be required for the Title Company to file a Form 1099 or other required form relative to the Closing with the Internal Revenue Service. A copy of the filed Form 1099 or other filed form shall be provided to Seller and Purchaser simultaneously with its being provided to the Internal Revenue Service.

ARTICLE VIII
REMEDIES AND PURCHASER'S CONDITIONS TO CLOSING

8.1 <u>Seller's Remedies</u>. In the event Purchaser defaults in or fails to perform all or any part of its obligations under this Contract, Seller shall be entitled as its sole and final remedy to terminate this Contract and recover the Earnest Money as liquidated damages and not as a penalty, in full satisfaction of claims against Purchaser hereunder. Seller and Purchaser agree that Seller's damages resulting from Purchaser's default will be difficult to determine and that the Earnest Money is a fair estimate of those damages which has been agreed upon in an effort to cause the amount of said damages to be certain.

8.2 <u>Purchaser's Remedies</u>. In the event Seller defaults in or fails to perform all or any part of its obligations pursuant to this Contract, Purchaser may, as its sole and exclusive remedy, either (i) terminate this Contract by giving Seller timely written notice of such election prior to or at Closing, or (ii) proceed at law or equity to enforce this Contract, including, but not limited to, an action for specific performance, and/or an action for damages. In the event Purchaser elects to terminate this Contract, (A) the Earnest Money shall be returned to Purchaser, (B) Seller shall reimburse Purchaser for Purchaser's actual third-party costs incurred in connection with its negotiation of this Contract and its due diligence costs in furtherance thereof, and (C) thereafter, except as otherwise expressly set forth herein, neither Purchaser nor Seller shall have any further rights or obligations hereunder.

8.3 <u>Attorney's Fees</u>. In the event either party hereto is required to employ an attorney because of the other party's default, the defaulting party shall pay the non-defaulting party's reasonable attorney's fees incurred in the enforcement of this Contract.

10

8.4     <u>Disposition of Earnest Money and Additional Deposit(s)</u>.  In the event of a termination of this Contract by either Seller or Purchaser, the Title Company is authorized to deliver the Earnest Money and Additional Deposit(s) to the party entitled to same pursuant to the terms hereof on or before the tenth (10th) day following receipt by the Title Company and the non-terminating party of written notice of such termination from the terminating party, unless the other party hereto notifies the Title Company that it disputes the right of the other party to receive the Earnest Money or Additional Deposit(s) prior to the expiration of such ten (10) day period.  In such event, unless otherwise instructed by both Seller and Purchaser, the Title Company shall interplead the Earnest Money or Additional Deposit(s), as applicable, into a court of competent jurisdiction in the County and State where the Property is located.  All attorneys' fees and costs and expenses of the Title Company incurred solely in connection with such interpleader shall be assessed against the party that is not awarded the Earnest Money or Additional Deposit(s), as applicable, in the event that such Earnest Money or Additional Deposit(s) are interpleaded, or if the Earnest Money or Additional Deposit(s) are distributed in part to both parties, then in the inverse proportion of such distribution.

8.5     <u>Conditions Precedent to Purchaser's Obligations</u>.  Purchaser shall not be obligated to consummate the transaction described in this Contract unless, as of the date of Closing:

(a)     Seller shall have performed in all material respects all of the agreements, covenants and obligations contained in this Contract to be performed or complied with by Seller on or prior to the date of Closing;

(b)     All representations and warranties made by Seller hereunder shall be true, complete and accurate in all material respects as of the date of Closing;

(c)     From and after the last day of the Inspection Period, there shall have occurred no new, material adverse change to the Property (or any material portion thereof) which is continuing at the date and time scheduled for Closing which could have an adverse impact on Purchaser's intended use of the Property as an Assisted Living Facility; and

(d)     All Improvements shall be in the same condition as of the Effective Date of this Contract, normal wear and tear expected, and no fixtures shall be removed prior to Closing.

(e)     Purchaser shall have purchased and be the owner of the Adjacent Property.

(f)     Purchaser shall have obtained the Approvals or waived the Approvals contingency.

If any of the foregoing conditions are not satisfied as of the date of Closing, Purchaser may waive the unsatisfied condition in writing and proceed to Closing or terminate this Contract, in which event the Title Company shall refund the Earnest Money to Purchaser, or if such non-satisfaction of one or more conditions results from Seller's default,

Purchaser shall have those rights and remedies provided in Article 8.2, in addition to being entitled to the the return any of Additional Deposit(s).

ARTICLE IX
MISCELLANEOUS

9.1   <u>Entire Contract</u>.  This Contract contains the entire agreement of the parties hereto.  There are no other agreements, oral or written, with respect to the transaction contemplated hereby.  This Contract can be amended only by a written agreement signed by both the parties hereto.

9.2   <u>Binding</u>.  This Contract and the terms, covenants and conditions herein contained, shall be covenants running with the Property and shall inure to the benefit of and be binding upon the successors and permitted assigns of each of the parties hereto.

9.3   <u>Notice</u>.  Any notice, communication, request, reply or advice (collectively, "Notice") provided for or permitted by this Contract to be made or accepted by either party must be in writing.  Notice may, unless otherwise provided herein, be given or served by depositing the same in the United States mail, postage paid, registered or certified, and addressed to the party to be notified, with return receipt requested or by delivering the same to such party, or an agent of such party, or by delivery by overnight courier such as Federal Express, or by fax (provided actual receipt of such transmission by the intended party is concurrently confirmed by the person sending same) or by email.  Notice deposited in the mail in the manner hereinabove described shall be effective two (2) business days following such deposit.  Notice by overnight courier, or fax (provided actual receipt of such transmission by the intended party is concurrently confirmed by the person sending same) or by email, shall be effective the day it is sent.  For the purposes of notice, the addresses of the parties shall, until changed as hereinafter provided, be as follows:

Purchaser:          Green Field, LLC
                    173 Bridge Plaza
                    Fort Lee, NJ 07024
                    Attn: Joseph Straus
                    Phone No. 201-242-4938
                    Fax No. 201-242-4000
                    E-mail address: jstraus@strausgroup.com

Copy to:            Thomas J. Herten Esq.
                    Archer & Greiner P.C.
                    Court Plaza South, West Wing
                    21 Main Street, Suite 353
                    Hackensack, NJ 07601-7095
                    Direct Dial: 201-498-8502
                    Fax: 201-342-6611
                    Email address: therten@archerlaw.com

115791845v7

Seller:               Han Moory Church
405 East Palisade Avenue
Englewood, NJ 07631
Attn: Rev. John S. Park
Phone No. 201-440-4588
Fax No._____
E-mail address: hanmoorychurch@gmail.com

Copy to:          Daniel S. Suh, Esq.
Law Office of Daniel S. Suh
1 Bridge Plaza North, Suite 275
Fort Lee, NJ 07024
Phone No.  201-429-3933
Fax No.  201-515-5070
E-mail address: daniel@danielsuhlaw.com

The parties hereto shall have the right from time to time to change their respective addresses, and each shall have the right to specify as its address any other address within the United States of America by at least five (5) days written notice to the other party.

9.4     Time.  Time is of the essence in all things pertaining to the performance of this Contract.

9.5     Place of Performance.  This Contract is made and shall be construed in accordance with the laws of the State in which the Property is located.

9.6     Currency.  All dollar amounts are expressed in United States currency.

9.7     Article Headings.  The Article Headings contained in this Contract are for convenience only and shall in no way engage or limit the scope or meaning of the various and several Articles hereof.

9.8     Business Days.  In the event that any date or any period provided for in this Contract shall end on a Saturday, Sunday or federal holiday, the applicable date or period shall be extended to the first business day following such Saturday, Sunday or federal holiday.

9.9     Parties in Interest.  This Contract is made solely for the benefit of the parties hereto and their respective permitted successors and assigns, and no other person will acquire or have any right under or by virtue of this Contract or any Exhibit hereto.

9.10   Assignment.  At Closing only, Purchaser may assign this Contract without the consent of Seller to any affiliate of Purchaser.

9.11   Counterparts.  This Contract may be executed in any number of counterparts, each of which shall constitute an original but all of which, taken together, shall constitute but one (1) and the same instrument.

9.12    Liability. Purchaser's obligations and liability to Seller with respect to this Contract shall be limited solely to Purchaser. Accordingly, Purchaser's affiliates, subsidiaries and controlling persons/entities, and all shareholders, directors, members, partners, agents, representatives and employees of such parties and Purchaser shall have no personal liability whatsoever with respect to this Contract. This Article 9.12 shall survive Closing or any earlier termination of this Contract.

9.13    Counterparts and Electronic Delivery. This Contract may be executed in one or more counterparts, each of which shall be deemed one instrument and all of the counterparts together shall constitute one and the same instrument. To expedite the transaction contemplated herein, electronic or facsimile signatures may be used in place of original signatures on this Contract and any amendments thereto. Seller and Purchaser intend to be bound by the signatures on such document, are aware that the other party will rely on such signatures, and hereby waive any defenses to the enforcement of the terms of this Contract based on the form of signature.

ARTICLE X
SPECIAL STIPULATIONS

10.1    Sign. Purchaser shall at all times after the Permit Date and prior to Closing, have the right to place a "Coming Soon" type of sign on the Property.

10.2    Condemnation. If the Property or any portion thereof shall be taken by condemnation or conveyed under the threat of condemnation prior to Closing, or if there is any pending or threatened condemnation against the Property as of the date of Closing, Purchaser may, at its sole election, either: (i) terminate this Agreement by notifying Seller in writing on or before the last date for Closing as provided for above, in which case the Earnest Money shall be refunded to Purchaser, and all rights and obligations of the parties under this Contract shall expire, and this Contract shall become null and void; or (ii) proceed to Closing, in which event the Purchase Price shall be reduced by the total of any awards or other proceeds received by Seller on or before the date of Closing with respect to any taking, and, at Closing, Seller shall assign to Purchaser all of its right to any and all awards or other proceeds paid or payable thereafter by any reason of any taking. Seller shall notify Purchaser of the existence of threat of eminent domain proceedings within five (5) days after Seller learns thereof.

10.3    Bulk Sale Compliance. Purchaser shall have the right to comply with the applicable provisions of state law with respect to bulk sales, including, but not limited to N.J.S.A. 54:32B-22(c) and N.J.S.A. 54:50-38, and Seller shall cooperate in connection with such compliance. In furtherance thereof: (i) Seller shall prepare and deliver to Purchaser the Asset Transfer Tax Declaration Form TTD (the "TTD") in the form prescribed by the New Jersey Division of Taxation (the "Division"), so that such form is received by Purchaser not less than twenty (20) days prior to the Closing; and (ii) Purchaser may deliver a notification of Sale, Transfer, or Assignment in Bulk (Form C-9600), together with the completed TTD and a fully executed copy of this Agreement (the "Tax

14

Notification") to the Division by registered or certified mail or overnight delivery so that the Tax Notification is received by the Division not less than fifteen (15) days prior to Closing. Seller shall provide all information requested by Purchaser to enable Purchaser to complete the Tax Notification as soon as practicable. If, at any time prior to Closing, the Division informs Purchaser that a possible claim (the "Claim") for taxes of any nature imposed or to be imposed on Seller, including any interest or penalties thereon, any cost or fees imposed by the Division related thereto and any tax on the gain from the sale of the property being sold ("Property") pursuant to this Agreement (collectively, "Taxes"), exists and the amount thereof (the "Deficiency"), then Purchaser and Seller shall close as scheduled and without delay, and Purchaser shall withhold the portion of the Purchase Price equal to the amount of the Deficiency, which amount so withheld shall be placed in an escrow account (the "Tax Escrow"), which Tax Escrow shall be held pursuant to this Article 10.3 by the Escrow Agent, and is herein also referred to as "Tax Escrow Agent". If, after Closing, the Division or Seller requests that Purchaser pay all or any portion of the Deficiency on behalf of Seller, then Purchaser shall direct Tax Escrow Agent to, and Tax Escrow Agent shall, promptly release to the Division of Taxation such amount from the Tax Escrow. If the Director informs Purchaser that the Deficiency has been fully paid or that Purchaser has no further liability for the Deficiency, then Purchaser shall direct the Tax Escrow Agent to, and Tax Escrow Agent shall, promptly release such difference to Seller. If the Director gives notice to Purchaser that Seller is liable for Taxes in an amount that is greater than the Tax Escrow, Seller shall promptly pay the difference to the Division of Taxation and shall provide Purchaser with evidence of such payment. In no event shall Tax Escrow Agent fail to make any distribution provided for hereunder, including, without limitation, on the grounds that Seller contests any finding of the Division. Notwithstanding anything to the contrary contained herein, Purchaser shall not be liable for any Taxes (including but not limited to, Taxes owed in connection with the use and operation of the Property prior to closing, or any Taxes on any gain realized upon the sale, transfer or assignment of the Property) and Seller shall indemnify and hold Purchaser harmless from any liability or cost incurred in connection with any claim for any such Taxes, including any interest and penalties thereon and cost and fees imposed by the Director relating thereto. The indemnification provision contained in this Article 10.3 shall survive the termination of the Agreement and/or the Closing under the Agreement. Seller and Purchaser shall sign a separate escrow agreement. This Article 10.3 has superseding effect to the extent that same is inconsistent with any other provision of this Agreement.

ARTICLE XI
REAL ESTATE COMMISSIONS

11.1   <u>Commissions</u>. Seller and Purchaser hereby represent and warrant to each other that it has not contacted any agent, broker or other similar party with respect to the transactions contemplated by this Contract other than Marvin Anhalt of Anhalt Realty LLC, having an address of 240 Grand Ave., Englewood, NJ 07631 ("Broker"), which Broker has operated as disclosed dual agent for the parties in the transaction contemplated by this Contract. Purchaser and Seller each hereby agree to indemnify and hold the other harmless from any and all claims, loss, liability, cost and expenses (including reasonable counsel fees)

15

resulting from the claims of any other agent, broker or other similar party claiming by, through or under the indemnifying party. This Article 11.1 shall survive Closing for a period equal to the applicable Statute of Limitations.

(SIGNATURES APPEAR ON FOLLOWING PAGE)

115791845v7

IN WITNESS WHEREOF, this Contract has been duly executed in multiple counterparts (each of which is to be deemed an original for all purposes) by the parties hereto on the date appearing below each party's signature.

SELLER:

HAN MOORY CHURCH, a New Jersey corporation designated as a non-profit religious organization

By:

Name: Jinsoo Park

Title: Trustee Member

Date: 04/19/2017

PURCHASER:

GREEN FIELD, LLC, a New Jersey limited liability company

By:

Name: Joseph Straus

Title: Member

Date: 4/19/17

JOINDER OF TITLE COMPANY AS ESCROW AGENT

THE UNDERSIGNED Title Company, being the Earnest Money and Additional Deposit(s) escrow agent named in the foregoing Contract, hereby joins in such Contract to evidence its agreement to hold the Earnest Money and Additional Deposit(s) pursuant to and to perform its obligations as provided in the Contract and agrees to be bound by the terms of the Contract.

TITLE COMPANY

LAKELAND PROPERTY TITLE GROUP LLC

Name: MARILYN HENSHAW

Title: OPERATING MANAGER

Date: 4-20-17

17

115791845v7

**EXHIBIT "A-1"**
**DESCRIPTION OF PARCEL 1**

**[To Be Provided]**

18

**EXHIBIT "A-2"**
**DESCRIPTION OF PARCEL 2**

# STEWART TITLE GUARANTY COMPANY
## COMMITMENT

## AMENDED

File Number:  FAP-3030

### SCHEDULE A
### DESCRIPTION

All that certain tract or parcel of land, situate, lying and being in the City of Englewood, County of Bergen, State of New Jersey, bounded and described as follow:

Beginning at a capped pin on the northeasterly sideline of Eagle Palisade Avenue (100 feet wide), said pin being distant southeasterly 215.00 feet from the intersection of said sideline with the southeasterly sideline of North Woodland Street (50 feet wide), and running, thence:

(1)     Leaving East Palisade Avenue, north 54 degrees 04 minutes 00 seconds east a distance of 270.70 feet to a point, thence;

(2)     South 45 degrees 52 minutes 00 seconds east a distance of 49.62 feet to a point; thence;

(3)     North 54 degrees 04 minutes 00 seconds east a distance of 75.00 feet to a point; thence

(4)     South 45 degrees 44 minutes 00 seconds east a distance of 81.85 feet to a concrete monument, thence;

(5)     South 54 degrees 04 minutes 00 seconds west, a distance of 345.51 feet to a point on the northeasterly sideline of said East Palisade Avenue, thence;

(6) Along said sideline, north 45 degrees 52 minutes 00 seconds west a distance of 131.52 feet to the point and place of beginning.

The above description being drawn in accordance with a survey prepared by Donald P. Sweeney & Assoc. dated 09/04/2003.

FOR INFORMATION ONLY:

Commonly known as:    405 E Palisade Avenue
                                        Englewood, New Jersey 07631
                                        Lot:  7 Block:  1902

End of Schedule A Description

Schedule C - Legal Description                                                CMS Form No. NJ-C7

20

115791845v7