J



Thomas J. Herten
*Member of New Jersey
and New York Bars*
therten@archerlaw.com
201-498-8502 (Ext. 7502) Direct
201-342-6611 Direct

Archer & Greiner, P.C.
Court Plaza South, West Wing
21 Main Street, Suite 353
Hackensack, NJ 07601-7095
201-342-6000 Main
201-342-6611 Fax
www.archerlaw.com

May 2, 2019

**HAND DELIVERY**

Honorable Mayor Michael Wildes
Council President Katharine Glynn
Honorable Englewood City Council Member
Charles Cobb, Cheryl Weiner Rosenberg,
Michael D. Cohen, Wayne Hamer
City of Englewood Municipal Building
2-10 North Van Brunt Street
Englewood, NJ 07631

      Re:    Rezone Application - May 7, 2019 Presentation

Dear Mayor Wildes, Council President Glynn, and Englewood City Council Members:

      As stated in my letter dated January 14, 2019 in which we submitted a formal application to rezone my client's property (the "Rezone Application"), this firm represents both 431 East Palisade Avenue, Englewood, New Jersey ,the owner of Block 1902 ,Lot 8 and 7 North Woodland Street, LLC, the contract purchaser of Block 1902, Lots 5.01 and Lot 7 in the City of Englewood. Both entities are affiliated with CareOne, a well-recognized healthcare provider. These assembled parcels (the "Parcels") encompass 4.96 acres and are bordered on the west by the Dwight Englewood/Elizabeth Morrow School complex, on the east by the Borough of Englewood Cliff and on the north by a single family residence. The parcels, located in the R-AAA zone, are the easterly most properties in the City.

      We have been advised through your City Attorney, William Bailey, Esq., that the Council has invited our professional team to make a presentation in further support of the Rezone Application filed with the City. For your ready reference, a copy of that application (including exhibits) is attached as Exhibit A-1. We are further advised that we are to appear on Tuesday, May 7, 2019 at 7:30 P.M. It is our understanding that we were allotted 30 minutes on the agenda for that meeting.

      We appreciate the opportunity to address the Council. While we submit that 30 minutes does not provide adequate time to fully present all of the information and reasons why a rezone of my client's property is both warranted and mandated, we intend to be as time efficient as possible.

May 2, 2019
Page 2


     In that regard, I am providing you with certain materials in advance of Tuesday's presentation for your prior review. To preserve as much presentation time as possible, I intend to mark the following into the record on May 7, 2019 before the oral presentation commences:

A-2    Presentation summary letter dated 1 May, 2019 from the Project Engineer, Michael J. Fowler, P.E.

A-3    Resume of Michael J. Fowler

A-4    Full Site Plans prepared by Langan Engineering dated April 30, 2019, 17 Sheets

A-5    Site Plan Rendering dated 15 August, 2018 prepared by Langan Engineering

A-6    Aerial Map dated 9/12/2017, prepared by Langan Engineering

A-7    Resume of Ronald A. Fuerst, PLA, RLA, ASLA, Managing Principal of Langan Engineering

A-8    Traffic and Parking Statement dated 29 April, 2019, prepared by Daniel D. Disario, P.E., PTOE of Langan Engineer

A-9    Resume of Daniel D. Disario

A-10    Presentation Summary letter dated May 1, 2019 from Dan E. King, AIA, principal, Meyer Design, Inc.

A-11    Resume of Dan E. King, AIA

A-12    Architectural Elevations for the proposed project developed by Meyer Design, Inc., consisting of four slides

A-13    Floor plans for the proposed project developed by Meyer Design, Inc., consisting of four slides

A-14    Planning statement dated May 1, 2019 prepared by Richard M. Preiss, Vice President of Phillips, Preiss, Grygiel, Leheny Hughes, LLC

A-15    Resume of Richard M. Preiss, P.P.

A-16    Legal analysis of the applicability of the Fair Housing Amendments Act ("FHAA") and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), dated May 1, 2019 prepared by A. Kimberly Hoffman, Esq.

May 2, 2019
Page 3


We had previously made an informal presentation to the entire Council on August 21, 2018 and provided significant information with respect not only about the expertise of CareOne in assisted living/memory care, but also site plan, traffic and architecture information, as well. However, some of that informally presented detail needs to be included in the formal record. Accordingly, to utilize our time wisely, I expect to offer brief testimony from Joseph Straus on behalf of CareOne, Ron Fuerst (Engineering/Site Plan); Dan Disario (traffic); and Dan King (architecture, and DOH/DCA requirements).  Richard Preiss will then testify on planning/site suitability issues and the impact of this project on the City's COAH obligations.

Finally, A. Kimberly Hoffman, Esq., a well-recognized attorney in FHA matters and RLUIPA matters, will discuss the City's obligations mandated by those statutes as they relate to this Rezone Application.

We reserve the right to introduce additional exhibits as and if the need arises.

We are hopeful that our presentation can be completed within an uninterrupted 30 minute session.  We would thereafter be in a position to answer any questions from the Council.

We look forward to appearing before you on May 7th and, if requested, working with your City professionals to further the rezone process.  We are also hopeful that the Council will deliberate based on the evidence you receive (together with whatever information that you may further request) and  expeditiously render a favorable decision on our request.  To advance that request, we will arrange to have a certified shorthand reporter present at the presentation who will transcribe the proceedings and provide transcripts for your review by Friday, May 10, 2019.

As stated in the Rezone Application, our client views this application as one which is a "win-win" for the City as well as for it.

Respectfully submitted,

THOMAS J. HERTEN

TJH
cc:    Yancy Wazirmas, City Clerk
       William Bailey, Esq., City Attorney
       CareOne Management, LLC
216347505v1

0003

A-1



Thomas J. Herten
Member of New Jersey
and New York Bars
therten@archerlaw.com
201-498-8502 (Ext. 7502) Direct
201-342-6611 Direct Fax

Archer & Greiner, P.C.
Court Plaza South, West Wing
21 Main Street, Suite 353
Hackensack, NJ 07601-7095
201-342-6000 Main
201-342-6623 Fax
www.archerlaw.com

January 14, 2019

<u>**VIA HAND DELIVERY**</u>

Honorable Mayor Michael Wildes
Council President Katharine Glynn
Honorable Englewood City Council Members:
Charles Cobb, Cheryl Weiner Rosenberg, Michael D.
Cohen, Wayne Hamer
City of Englewood Municipal Building
2-10 North Van Brunt Street
Englewood, NJ 07631

     Re:   7 North Woodland Street, LLC

Dear Mayor Wildes, Council President Glynn, and Englewood City Council Members:

     This firm represents both 431 East Palisade Avenue Real Estate, LLC, the owner of Block 1902, Lot 8, commonly known as 431 Palisade Avenue, Englewood, New Jersey and 7 North Woodland Street, LLC, the contract purchaser of Block 1902, Lots 5.01 and Lot 7 in the City of Englewood (Lot 5.01 is a vacant parcel and Lot 7 is commonly known as 405 E. Palisades Avenue). Both entities are affiliated with CareOne, a well recognized healthcare provider. These assembled parcels (the "Parcels") encompass 4.96 acres and are bordered on the west by the Dwight Englewood/Elizabeth Morrow School complex, on the east by the Borough of Englewood Cliff and on the north by a single family residence. The parcels, located in the R-AAA zone, are the easterly most properties in the City.

     On August 21, 2008, on behalf of CareOne and its affiliates, we made an informal presentation to the Council at a public meeting. We provided information concerning our client's intention to develop the Parcels for an assisted living/memory care facility, an inherently beneficial use that is well settled and well recognized under zoning standards and zoning law.

     We further advised that the facility was architecturally designed to "fit" into the neighborhood scheme. Following one of the goals of the Master Plan adopted by the City of Englewood in 2014 (the "Master Plan") -- to protect the neighborhood character through comparable building types and character defining features -- we explained how the architectural design, shown on Exhibit A, was a work in progress not only developed by studying comparable

Honorable Mayor Michael Wildes
Council President Katharine Glynn
Honorable Englewood City Council Members:
Charles Cobb, Cheryl Weiner Rosenberg, Michael D. Cohen, Wayne Hamer
January 14, 2019
Page 2

architecture in the zone but also by obtaining input directly from neighbors in the area.  It is, in
fact, a cooperative neighborhood design.

Referring to the Master Plan, we suggested that because of its unique location at the easterly
limits of the City, the proposed development was an appropriate transition use, and was located on
an appropriately identified arterial road.  We presented engineering testimony, traffic testimony
and architectural testimony to inform the Council that the proposed use would be adequately
screened; would respect the setbacks of the R-AAA zone; and because of the nature of the use,
would have minimal impact to the existing traffic patterns in the area.  Consistent with the Master
Plan's goal to encourage private land owners to cooperate with the City to advance community
needs, we pointed out that the proposed facility would have a community room with a separate
entrance that would be available for community events.

Further, consistent with the Master Plan's observation that there was a "graying"
population in the City of Englewood (the "City") whose needs and those of their families begged
to be accommodated by appropriate housing opportunities, we explained how the proposed facility
would cater to the growing need of individuals who needed attentive care and who, as the Master
Plan suggests, either wanted to remain in their neighborhoods or whose families wanted their
senior and disabled loved ones to receive a high level of personal care in a facility within walking
distance of their neighborhood.  The Master Plan anecdotally refers to an individual named Irving
who visits has wife on a daily basis.  We suggest that there are many individuals who are similarly
situated to Irving who would benefit from the proposed facility.

We also suggested that the well-conceived and neighborhood vetted plan (a copy of which
is enclosed as Exhibit B), follows the "good neighbor" references in Englewood's Master Plan.

Now that the Council has reorganized for 2019, our client formally requests that the Parcels
be rezoned either to allow assisted living/memory care as a permitted use in the R-AAA zone or
to allow the parcels to be developed as a conditional use in the R-AAA zone with appropriate
standards adopted to allow building coverage and lot coverage for its development.  Suggested
standards are respectfully set forth on Exhibit C.

Such a request supports the goals of zoning by both making available to aging and disabled
individuals a quality facility and also by fulfilling a need that is becoming more and more an
essential step in the continuum of the life cycle of residents in Englewood and in the region.  This
necessity is also recognized under the Fair Housing Amendments Act 42 U.S.C.A. §3601, et seq.

We had previously submitted a memorandum of law to William Bailey, Esq., your City
Attorney, detailing the propriety of our request (attached as Exhibit D) and I will not restate what
is presented there.  We do point out, however, that your most recent Master Plan, while
acknowledging that the issue of the "graying" residents of Englewood needed to be addressed,
neither specifically mentioned nor specifically considered the growing need in the community for
assisted living/memory care facilities.  Such an oversight does not, however, render the use which
we propose inconsistent with the Master Plan.  On the contrary, the lack of mention in the Master

Honorable Mayor Michael Wildes
Council President Katharine Glynn
Honorable Englewood City Council Members:
Charles Cobb, Cheryl Weiner Rosenberg, Michael D. Cohen, Wayne Hamer
January 14, 2019
Page 3

Plan combined with the requirement of the Fair Housing Amendment Act, provide an affirmative basis to support the rezoning request made herein.

Additionally, by virtue of the Certificate of Need required to operate the proposed assisted living/memory care facility, and its 10% Medicaid obligation, the goals of zoning are further fostered by providing additional avenues for affordable housing and its resultant credits within the City.

CareOne acknowledges that the City of Englewood, without specific reference to its Master Plan, permits assisted living/skilled nursing in the RIM zone. While this recognition is laudatory, the limitation of the use to that particular zone does not, in our opinion, fully advance the overaching zoning goals of the Municipality Land Use Law, (See N.J.S.A. 40:55D-66.1), the State's affordable housing goals, or the requirements of the Fair Housing Amendments Act as it relates to the zoning amendment which we seek. In appropriate circumstances, the law recognizes that when developments intending to aid those who fit within the definition of N.J.S.A. 40:55D-66.1(f) and (g), the isolation of a use to a particular limited area of the community or an outright denial to allow such use in a particular zone can be and has been considered as disparate treatment to those families who choose to seek a higher level of care for themselves or their loved one in their neighborhood but for religious reasons or otherwise only have the ability to walk to the facility to visit or celebrate with family members. See generally, Assisted Living Associates of Moorestown, LLC v. Moorestown Township, 996 F. sup. 409 (D.N.J. 1998). See also, Blake Gardens, LLC v. New Jersey, 309 F. Supp. 3d 240 (D.N.J. 2018).

Since, your decision could not be made in a vacuum, we came before you in August to make an informal presentation to give some context to our proposal. We are prepared to again make a more formal presentation at a council meeting to provide whatever additional information which you may require. We are prepared to meet with your professionals including your Attorney and City Planner to initiate the rezoning process and its necessary referral to the City's Planning Board for a consistency determination. In that regard, we welcome the opportunity to address any questions which you may have with respect to this request and we will timely respond to any request for additional information.

We stand ready to appear at any public session of the Mayor and Council to which we are invited and look forward to working with your professionals in what we submit is a "win-win" for the City and our client. To the extent required, CareOne shall post an appropriate escrow to address the City's professional fees incurred with respect to the application.

Respectfully submitted,

THOMAS J. HERTEN

TJH:ev
Attachments
cc:    Edward Hynes, City Manager
       Yancy Wazirmas, City Clerk
       CareOne Management, LLC

# EXHIBIT A







CARE ONE - RENDERING
East Palisade Avenue, Englewood, NJ







CARE ONE - RENDERING
East Palisade Avenue, Englewood, NJ



# EXHIBIT B



# EXHIBIT C

# SITE STATISTICS

7 NORTH WOODLAND AVE, 435, 431 AND 471 EAST PALISADE AVE.
BLOCK 1802, LOTS 8.01, 7, AND 8 (ENGLEWOOD),
BLOCK 601, LOT 1.01 (ENGLEWOOD CLIFFS)
CITY OF ENGLEWOOD, BERGEN COUNTY, NEW JERSEY
R-AAA (DISTRICT) RESIDENTIAL DISTRICT

| DESCRIPTION | REQUIRED/PERMITTED | PROPOSED |
|---|---|---|
| | R-AAA DISTRICT | |
| | SINGLE FAMILY RESIDENTIAL | ASSISTED LIVING FACILITY**** |
| **AREA, YARD, & BUILDING REQUIREMENTS** | | |
| MIN. LOT AREA, §250-84(A1) | BLOCK 601 | 216,628 SF (4.97 AC) |
| MIN. LOT WIDTH, §250-84(A1) | 225 FT | 235 FT |
| MIN. LOT DEPTH, §250-84(A1) | 200 FT | 831 FT |
| MIN. FRONT YARD BLDG. SETBACK, §250-84(A1) | 60 FT | 63 FT |
| MIN. SIDE YARD BLDG. SETBACK, §250-84(A1) | 35 FT | 198 FT |
| MIN. REAR YARD BLDG. SETBACK, §250-84(A1) | 50 FT | 59 FT |
| MAX. BUILDING COVERAGE, §250-84(A1) | 10% | 9.8% |
| MAX. LOT COVERAGE, §250-84(A1) | 25% | 23.82%** |
| MAX. BLDG. HEIGHT, §250-84(A1) | 35 FT | 32.85%** |
| MAX. GENERATOR SIZE, §250-58A(15)(d) | 39 FT | 40 FT |
| MIN. GENERATOR SCREENING, §250-58A(15)(f) | 80 KILOWATTS | XXX KILOWATTS |
| | 14 FOOT HIGHER THAN GENERATOR | X FT |
| **OFF-STREET PARKING** | | |
| MIN. NUMBER OF PARKING SPACES REQ'. (SEE NOTE 1) | | |
| MAXIMUM HOME §-1-9(A) | 78 SPACES | 111 TOTAL SPACES |
| PLACE OF ASSEMBLY (1 SPACE/3 SEATS) | 22 SPACES | |
| OVERALL | 87 TOTAL SPACES | |
| MIN. PARKING SPACE, §250-58-8(E) | 9 FT X 18 FT | 9 FT X 18 FT |
| MIN. ADA PARKING SPACE DIMENSIONS, §250-58-8(E) | 12 FT X 18 FT | 12 FT X 18 FT |
| MIN. SMALL CAR PARKING SPACE DIMENSIONS, §250-58-8(E) | 8 FT X 16 FT | 8 FT X 16 FT |
| MIN. COMBINED WIDTH OF AISLE AND PARKING SPACES, §250-58-8(F) | 62 FT | 62 FT |
| MAX. WIDTH OF SMALL CAR PARKING, §250-58-8(H) | 10% OF TOTAL | 22 SPACES |
| MAX. GRADE IN PARKING STALL OR AISLE §250-58-8-8 | 6% | 6.60* |
| MAX. GRADE IN DRIVEWAY §250-82-8 | 10% | 11.9%** |
| MIN. WIDTH OF TWO-WAY DRIVEWAY §250-82-8(C) | 22 FT | 24 FT |
| MIN. DISTANCE BETWEEN DRIVEWAY AND TREE INTERSECTION §250-82-8(A) | 25 FT | 60 FT |
| **LANDSCAPE AND BUFFER REQUIREMENTS** | | |
| MAX. FENCE HEIGHT §250-56(A1) | 4.5 FT | 6.5 FT |
| MIN. REAR YARD PLANTING AREA, §250-58-46 | 15 FT | 15 FT |
| MIN. REAR YARD PLANTING AREA, §250-58-6(E) | 15 FT | 15 FT |
| **SIGNAGE REQUIREMENTS** | | |
| MAX. NO. OF FREESTANDING SIGNS §250-19(D-1) | 1 | 2* |
| FREESTANDING SIGN DIMENSIONS, §250-19(D-1) | | |
| HEIGHT | 3 FT | 3 FT |
| AREA | 20 SF | X SF |
| **LIGHTING REQUIREMENTS** | | |
| MIN. INTENSITY AT GROUND LEVEL, §250-74.3 | 13 INCHES | X INCHES |
| | 13 INCHES | X INCHES |
| **MIN. INTENSITY AT GROUND LEVEL, §250-74.3** | 0.3 FOOT-CANDLES | 0.3 FOOTCANDLES |
| # EXISTING NONCONFORMITY | 1.0 FOOT-CANDLES | 1.0 FOOTCANDLES |

* EXISTING VARIANCE
** VARIANCE IS REQUIRED
*** 0.1 LUME VARIANCE REQUIRED

EXHIBIT D

## Memorandum

TO:              William J. Bailey, Esq.

FROM:            Thomas J. Herten, Esq.

DATE:            March 16, 2018

RE:              Care One: **Englewood Zoning: Assisted Living**

OUR FILE NO.:    CAR479.00402

   This memorandum addresses the question whether a rezoning of residentially zoned parcels in Englewood to permit assisted living or nursing home uses would be subject to a successful challenge under the "spot zoning" doctrine.  The authorities discussed below illustrate why this zoning change would not be viewed as impermissible spot zoning, because it will advance important public policies, including those mandated by Congress in the 1988 Fair Housing Amendments Act, which require municipalities to make reasonable accommodations in their land use ordinances for housing for people with disabilities.  See, Assisted Living Associates of Moorestown, LLC v. Moorestown Twp., 996 F. Supp. 409, 433-438 (D.N.J. 1998).

   We begin with the basic underlying principles that inform the spot zoning analysis.  The New Jersey legislature has, through the Municipal Land Use Law, N.J.S.A. 40:55D-1 et seq. ("MLUL"), delegated to municipalities the power to "adopt or amend" zoning ordinances.  See, N.J.S.A. 40:55D-62(a); Riya Finnegan v. S. Brunswick Tp., 197 N.J. 184, 191 (2008).  The New Jersey constitution provides that this, like all other legislative delegations of authority to municipalities, are to be "liberally construed" in favor of the municipalities.  N.J. Const. art. IV, § 7, ¶ 11; Rumson Est. v. Mayor of Fair Haven, 177 N.J. 338, 349-351 (2003).  Accordingly, "municipal actions enjoy a presumption of validity. [citations omitted]."  A party challenging municipal action "must overcome the presumption of validity – a heavy burden. [citations

1

omitted]." Witt v. Borough of Maywood, 328 N.J. Super. 432, 442 (Law Div. 1998), aff'd o.b., 328 N.J. Super. 343 (App. Div. 2000); see, 515 Assocs. v. City of Newark, 132 N.J. 180, 185 (1993).

The courts thus presume that municipal legislative enactments rest upon some rational basis within the knowledge and experience of the members of the governing body.  This presumption can be overcome only by proofs that preclude the possibility that there could have been any set of facts known to the legislative body that would rationally support a conclusion that the enactment is in the public interest. "The underlying policy and wisdom of ordinances are the responsibility of the governing body, [citations omitted], and if any state of facts may reasonably be conceived to justify the ordinance, it will not be set aside.  [citation omitted]." Quick Chek Food Stores v. Springfield Tp., 83 N.J. 438, 447 (1980); see, also, e.g., Hutton Pk. Gardens v. West Orange Town Council, 68 N.J. 543, 564–565 (1975).

The courts apply these principles to zoning ordinances, and hold that "the judicial role in reviewing a zoning ordinance is tightly circumscribed.  There is a strong presumption in favor of its validity, and the court cannot invalidate it, or any provision thereof, unless this presumption is overcome by a clear showing that is arbitrary or unreasonable.  [citations omitted]." Harvard Enterprises, Inc. v. Bd. of Adj. of Madison, 56 N.J. 362, 368 (1970).  A plaintiff asserting a substantive challenge to a zoning ordinance may overcome the presumption of validity "through an affirmative showing that the ordinance 'in whole or in application to any particular property' is 'clearly arbitrary, capricious or unreasonable, or plainly contrary to fundamental principles of the [zoning] statute.' [citations omitted]." Pheasant Bridge Corp. v. Township of Warren, 169 N.J. 282, 290 (2001), cert. denied, 535 U.S. 1077, 122 S. Ct. 1959, 152 L. Ed. 2d 1020 (2002), quoting Bow & Arrow Manor v. Town of West Orange, 63 N.J. 335, 343 (1973); see, e.g., Riya Finnegan

2

v. S. Brunswick Tp., 197 N.J. at 191-192; Taxpayers Assn. of Weymouth Tp. v. Weymouth Tp., 80 N.J. 6, 20 (1976).

The "court's role is not to pass on the wisdom of the ordinance[.]" Pheasant Bridge Corp. v. Township of Warren, 169 N.J. at 290. "Rather, a court engages in a review of the relationship between the means and the ends of the ordinance." Ibid., citing, e.g., Taxpayers Assn. of Weymouth Tp. v. Weymouth Tp., 80 N.J. at 21 (upholding ordinance as not spot zoning). "[I]n assessing community needs, the court must allow a wide latitude to the expertise and judgment of a governing body, just as it does to a board of adjustment or planning board, because of the members' peculiar knowledge of local conditions. [citation omitted]." Lakewood Res. v. Cong. Zichron Schneur, 239 N.J. Super. 89, 96 (Law Div. 1989).

With these principles in mind, the courts define "spot zoning" as the use by the municipality "of the zoning power to benefit particular private interests rather than the collective interests of the community." Taxpayers Assn. of Weymouth Tp. v Weymouth Tp., 80 N.J. at 18. A party alleging that an ordinance is spot zoning carries the burden of proof. Id. at 19; see, W. Cox & S. Koenig, New Jersey Zoning & Land Use Administration §10-8.2 at 199 (2017)(citing cases).

An ordinance permitting assisted living facilities or nursing homes would not be spot zoning because it will promote "the collective interests of the community" as recognized by Congress. Congress adopted the 1988 Fair Housing Amendments Act to prohibit discrimination in the sale or rental of housing, or the provision of services or facilities in connection with housing, because of handicap. See, 42 U.S.C. § 3604(f). These provisions apply to land use ordinances. Even otherwise neutral land use rules and regulations may result in unlawful discrimination if the municipality refuses "to make reasonable accommodations" to afford people with handicaps equal opportunities for housing. See, Assisted Living Associates of Moorestown, LLC, 996 F. Supp. at

3

434-436 (holding that developer of proposed assisted living facility was entitled to a preliminary injunction when Township did not provide a reasonable accommodation for this use).

Therefore, a zoning ordinance creating housing opportunities for those in need of assisted living serves these salient public interests that the community must advance. It follows, that the ordinance would not be spot zoning. For example in Taxpayers Ass'n of Weymouth, the New Jersey Supreme Court rejected a spot zoning challenge to a zoning ordinance creating a district permitting mobile home parks "for the exclusive use of the elderly." See, Taxpayers Ass'n of Weymouth, 80 N.J. at 15. The court found that the ordinance advanced public policies that vitiated the spot zoning challenge. See, Id. at 19-37. And in a persuasive decision, a New York Supreme Court judge rejected a spot zoning challenge to an ordinance that created a "floating zone" permitting multi-family dwellings designed for elderly families and families with physically handicapped residents. The court held that the plaintiffs did not sustain their burden to prove that the ordinance was for the benefit of the owners of the property on which the development was proposed. Instead, the court held that the ordinance was intended "to benefit the community by providing low cost senior citizen housing pursuant to a comprehensive plan." See, Beyer v. Burns, 567 N.Y.S. 2d 599, 601 (Sup. Ct., Albany County 1991).

Moreover, the Fair Housing Amendments preclude municipal discrimination in zoning, even if a municipality's master plan allows for assisted living uses in restricted zones in the municipality. A municipality's failure to respond to a rezoning request is not only actionable but indefensible under this Act.

The assisted living use will provide a tangible benefit to Englewood because all new assisted living facilities in New Jersey are required to attain and retain 10% of their beds for Medicaid-eligible persons. See, N.J.S.A. 26:2H-12.16 to -12.21. Englewood thus will receive the

4

benefit of affordable housing unit credits for these beds. These beds also will provide a benefit to the community as a whole in meeting a need for affordable assisted living for those in need of this care.

As we have discussed, the rezoning of a particular parcel to allow for a use which provides the opportunity for affordable housing is also a justification which precludes a "spot zoning" challenge. The Township of Teaneck recently rezoned several isolated parcels in residential zoning districts to allow for the development of projects with affordable housing components after being advised by the Township's professionals that it was not only permissible but also advantageous to do so. That such projects are insulated from claims of spot zoning is a general principle of planning and is not a subject for debate.

In conclusion, the proposed zoning change would provide a benefit to the community that would advance public policies that Congress and our state constitution has mandated municipalities must advance, thus negating the contention that it is a spot zoning ordinance.

214218623v1

5

0019



Technical Excellence
Practical Experience
Client Responsiveness

A-2

1 May 2019

Honorable Mayor Michael Wildes and
Members of the Council
City of Englewood
2-10 North Van Brunt Street
Englewood, NJ 07631

Re:   **Proposed CareOne at Englewood**
**East Palisade Ave and North Woodland Street**
**Englewood, New Jersey**
**Langan Project No.: 100642201**

Honorable Mayor & Members of the Council:

CareOne, our client, is proposing to construct a 150 bed assisted living facility on the easterly corner of East Palisade Avenue and North Woodland Street in Englewood, New Jersey. The site will be a merger of four lots, three in Englewood and one in Englewood Cliffs.  The lot in Englewood Cliffs will not be developed but will remain an environmental buffer, east of Flat Rock Brook.  Currently, the site is improved with two residential buildings, one being used by the Han Moory Church and the other a vacant single family home with tennis court and swimming pool. Flat Rock Brook traverses the easterly side of the site. The westerly lot, adjacent to North Woodland Street, is predominantly wooded.

The site is currently located in a single family residential zone (zone R-AAA in Englewood) as are the adjacent Englewood properties. Single family uses adjoin the site to the north and east, as well as across Palisade Avenue. The Dwight Englewood School is located to the west across North Woodland Street. An assisted living facility is not a permitted use in the R-AAA zone. This use is only permitted in the Research, Industry and Medical (RIM) district.

The proposed assisted living facility is a three story building with a partial basement. The facility will contain 150 assisted living and memory care beds and amenity spaces. Amenities will include dining areas, laundry, a non-denominational chapel, community space, outdoor courtyards and other common areas. Although located in a single family residential zone, the site, as presently designed, complies with several of the R-AAA and general zoning requirements including lot size, setbacks, parking, buffers, lighting and landscaping. The site exceeds the requirements for building and lot coverage and for building height in the R-AAA zone but does comply with the coverage and height allowed in the RIM district.

The site design complies with stormwater rules and regulations regarding stormwater quality and quantity. The proposed design will also provide for restoration of the riparian zone buffer associated with Flat Rock Brook and will preserve a fifty-foot wooded buffer adjacent to North

300  Kimball  Drive          Parsippany,  NJ  07054          T:  973.560.4900          F:  973.560.4901          www.langan.com

New Jersey • New York • Connecticut • Pennsylvania • Washington, DC • Virginia • West Virginia • Ohio • Florida • Texas • Arizona • California
Abu Dhabi • Athens • Doha • Dubai • London • Panama

*Proposed CareOne at Englewood*
*East Palisade Ave and North Woodland Street*
*Englewood, New Jersey*
*Langan Project No.: 100642201*

*1 May 2019*
*Page 2 of 2*

Woodland Street and the intersection with Palisades Avenue. By preserving these buffers and by inclusion of generous additional landscaped buffer around the site, the design is sensitive to views from neighboring properties and the traveling public.

Submitted by

Michael J. Fowler, P.E.
New Jersey Lic. #24GE03393

216338706v2

NJ Certificate of Authorization No. 24GA27996400
\\langan.com\data\PAR\data2\100642201\Office Data\Testimony\(216338706 - 2) - Michael J. Fowler Letter re Proposed CareOne at Englewood (2)-FINAL.docx

*LANGAN*

# MICHAEL J. FOWLER, PE, LEED AP

### SENIOR ASSOCIATE/VICE PRESIDENT
### LAND DEVELOPMENT ENGINEERING

Mr. Fowler has 30 years of design and management experience from project inception through construction in site design engineering and construction. He has performed site design functions for a variety of projects. Mr. Fowler has intensive exposure to site engineering, utility design and construction including storm water management, water quality management, sanitary sewers, pump stations, water, etc.

During the execution of his work, Mr. Fowler has had the opportunity to secure many regulatory permits including planning board approvals, sewer extension permits, soil conservation permits, department of transportation permits, and wetlands permits. This process involved working closely with regulatory personnel from local planning boards, utility entities, regional regulators and state environmental and highway agencies and providing testimony at public hearings. Because of his involvement with a wide range of regulatory permitting, Mr. Fowler has acquired a broad understanding of the overall approval process and how to plan a project accordingly.

Mr. Fowler has designed and has provided inspection for a Sub-Slab Depressurization System and vapor barrier envelope for two New York City Schools. He has also provided site design for a 20+ acre landfill project which included extensive grading, stormwater management and erosion control planning.



**EDUCATION**

M.S., Engineering Management Stevens Institute of Technology

B.E., Mechanical/Hydraulic Engineering Stevens Institute of Technology

**PROFESSIONAL REGISTRATION**

Professional Engineer (PE) in NJ

LEED Accredited Professional (LEED AP)

**AFFILIATIONS**

American Society of Civil Engineers

International Council of Shopping Centers (ICSC)

## SELECTED PROJECTS

- 11 Patton Drive, North Caldwell, NJ
- 300 Kimball Drive Generator Improvements, Parsippany, NJ
- 445 South Street Generator Improvements, Morristown, NJ
- A Condominiums, Jersey City, NJ
- Canoe Brook Country Club Improvements and Renovations, Summit, NJ
- Care Cardiology of Mt. Laurel, NJ
- CareOne Facilities, Multiple Locations, NJ
- CarMax, Edison, NJ
- Cumberland Mall Expansion, Vineland NJ
- Deptford Mall Expansion, Deptford, NJ
- Essex Green Shopping Center Redevelopment, West Orange, NJ
- Franklin Square, Bloomfield, NJ
- Hackensack Golf Club, Emerson, NJ
- Hardees, Bay Harbor Plaza, Brick, NJ
- Harmon Meadow, 500 Plaza Drive, Secaucus, NJ
- Hillview Retail Center, Cherry Hill, NJ
- K-Mart Shopping Center, Linden, NJ
- Kuser Mansion, High Point State Park, NJ
- Livingston Mall Renovations, Livingston, NJ
- Lowe's Stores, Various Locations, NJ, NY, and CT

*LANGAN*

## MICHAEL J. FOWLER, PE, LEED AP

- Monmouth Shores Corporate Park, Wall, NJ
- Newport Centre Mall ADA Services, Jersey City, NJ
- Rutgers University Dormitory, Newark, NJ
- Shops at Riverside, South Renovations, Hackensack, NJ
- Stop & Shop, Multiple Locations, NJ, NY, and CT
- The Courtyard, Hillsborough, NJ
- The One: 110 First Street, Jersey City, NJ
- The Portal at Edgewater, NJ
- Watchung Square Mall, Modells ADA Evaluation, Watchung, NJ
- Waterview Plaza, Parsippany, NJ

*LANGAN*

# MICHAEL J. FOWLER, PE, LEED AP

## SENIOR ASSOCIATE/VICE PRESIDENT
## LAND DEVELOPMENT ENGINEERING



Mr. Fowler has 30 years of design and management experience from project inception through construction in site design engineering and construction. He has performed site design functions for a variety of projects. Mr. Fowler has intensive exposure to site engineering, utility design and construction including storm water management, water quality management, sanitary sewers, pump stations, water, etc.

During the execution of his work, Mr. Fowler has had the opportunity to secure many regulatory permits including planning board approvals, sewer extension permits, soil conservation permits, department of transportation permits, and wetlands permits. This process involved working closely with regulatory personnel from local planning boards, utility entities, regional regulators and state environmental and highway agencies and providing testimony at public hearings. Because of his involvement with a wide range of regulatory permitting, Mr. Fowler has acquired a broad understanding of the overall approval process and how to plan a project accordingly.

Mr. Fowler has designed and has provided inspection for a Sub-Slab Depressurization System and vapor barrier envelope for two New York City Schools. He has also provided site design for a 20+ acre landfill project which included extensive grading, stormwater management and erosion control planning.

### SELECTED PROJECTS

- 11 Patton Drive, North Caldwell, NJ
- 300 Kimball Drive Generator Improvements, Parsippany. NJ
- 445 South Street Generator Improvements, Morristown, NJ
- A Condominiums, Jersey City, NJ
- Canoe Brook Country Club Improvements and Renovations, Summit, NJ
- Care Cardiology of Mt. Laurel, NJ
- CareOne Facilities, Multiple Locations. NJ
- CarMax, Edison, NJ
- Cumberland Mall Expansion, Vineland NJ
- Deptford Mall Expansion, Deptford, NJ
- Essex Green Shopping Center Redevelopment, West Orange, NJ
- Franklin Square, Bloomfield, NJ
- Hackensack Golf Club, Emerson, NJ
- Hardees, Bay Harbor Plaza, Brick, NJ
- Harmon Meadow. 500 Plaza Drive, Secaucus, NJ
- Hillview Retail Center, Cherry Hill, NJ
- K-Mart Shopping Center, Linden, NJ
- Kuser Mansion, High Point State Park, NJ
- Livingston Mall Renovations, Livingston, NJ
- Lowe's Stores, Various Locations, NJ, NY, and CT

**EDUCATION**

M.S., Engineering Management Stevens Institute of Technology

B.E., Mechanical/Hydraulic Engineering Stevens Institute of Technology

**PROFESSIONAL REGISTRATION**

Professional Engineer (PE) in NJ

LEED Accredited Professional (LEED AP)

**AFFILIATIONS**

American Society of Civil Engineers

International Council of Shopping Centers (ICSC)

*LANGAN*

## MICHAEL J. FOWLER, PE, LEED AP

- Monmouth Shores Corporate Park, Wall, NJ
- Newport Centre Mall ADA Services, Jersey City, NJ
- Rutgers University Dormitory, Newark, NJ
- Shops at Riverside, South Renovations, Hackensack, NJ
- Stop & Shop, Multiple Locations, NJ, NY, and CT
- The Courtyard, Hillsborough, NJ
- The One: 110 First Street, Jersey City, NJ
- The Portal at Edgewater, NJ
- Watchung Square Mall, Modells ADA Evaluation, Watchung, NJ
- Waterview Plaza, Parsippany, NJ

*LANGAN*



### APPLICATION FOR PRELIMINARY & FINAL SITE PLAN
# CareOne at ENGLEWOOD
### 7 NORTH WOODLAND STREET & 431 EAST PALISADE AVENUE, ENGLEWOOD, NJ 07631
### BLOCK 1902, LOTS 5.01, 7 & 8 - CITY OF ENGLEWOOD
### BLOCK 601, LOT 13 - BOROUGH OF ENGLEWOOD CLIFFS
### BERGEN COUNTY, NEW JERSEY

A-4

LOCATION MAP

ZONING MAP

TAX MAP

SITE PLAN

CS001

CareOne
A Senior Care Company





CAREONE AT ENGLEWOOD

SITE PLAN

CS101

0028



0029



STORM DRAINAGE PLAN

CAREONE AT ENGLEWOOD

CG102



0031



SOIL EROSION & SEDIMENT CONTROL PLAN

CE101

0032



LANDSCAPE PLAN

CAREONE AT ENGLEWOOD

LP101

NOTE: REFER TO LP501 AND LP502 FOR LANDSCAPE NOTES AND DETAILS.

0033



**PLANTING SOIL SPECIFICATIONS**

**TREE PROTECTION NOTES**

**SEEDING NOTES**

LANGAN

CareOne
A Senior Care Company

CAREONE AT
ENGLEWOOD

LANDSCAPE NOTES
& DETAILS II

LP502

0034



0035



NOTE: REFER TO LL501 AND LL502 FOR LIGHTING NOTES AND DETAILS.

LIGHTING PLAN

LL101

CAREONE AT ENGLEWOOD

0036





0038



0039



0040





CAREONE ENGLEWOOD
CONCEPTUAL PLAN RENDERING
ENGLEWOOD, NEW JERSEY

15 AUGUST 2018

0042



# RONALD A. FUERST, PLA, RLA, ASLA

MANAGING PRINCIPAL

## LAND DEVELOPMENT PLANNING AND URBAN REDEVELOPMENT

Mr. Fuerst has 32 years of industry experience with Langan involving a large variety of land development projects ranging from initial site evaluations and planning stages through construction for both public and private organizations.

Mr. Fuerst's primary expertise lies in overall initial site evaluations and feasibility studies, site programming and planning, permitting requirements/pursuits and preliminary cost and pro forma budget development from small to large land developments for retail, residential, corporate and institutional clients. These projects have involved land planning and site design, site engineering including layout, storm water management, regulatory permitting, surveying, utility design and layout; and construction management and inspection involving earthwork, foundation, hardscape/streetscape and landscaping. Mr. Fuerst has also amassed a great deal of management experience at the construction level and is well versed in construction administration, contracting, bidding, and overall project and construction management. Over the past 20 years, Mr. Fuerst has also been extensively involved in national retail store and facility build-out programs in the Northeast including such prominent retailers as Lowes Home Improvement and Stop & Shop/Ahold supermarkets as well as CareOne health care systems. Recent experience has also included mix-used developments in repurposing office campuses and large scale industrial warehouse projects.

In addition, Mr. Fuerst has extensive experience in the field of large urban and antiquated industrial renewal projects and has been extensively involved in large scale demolition design, material management and related environmental issues including asbestos, underground tanks, PCBs, lead-based paint and soil remediation. These projects were often integrated with proposed redevelopment plans where Mr. Fuerst provides a unique, broad based expertise benefiting the overall design interest as well as bottom line costs.

## SELECTED PROJECTS

- CareOne Expansion Program, Multiple Locations, NJ, CT and NY
- Connell "District" Redevelopment, Berkeley Heights, NJ
- Essex Green Shopping Center Redevelopment, West Orange, NJ
- Over 100 Regional Lowe's Home Improvement Centers in CT, NY, NJ, MA
- Carquest Distribution Center, Armonk, NY
- Over 100 Stop & Shop Projects in CT, NJ, and NY
- 2 and 3 Shore Road, Edgewater, NJ
- 295 Corporate Park, Hamilton Township, NJ
- 5 Hanover Square, New York, NY
- American President Lines, Kearny, NJ
- Bayonne Shopping Center, Bayonne, NJ



**EDUCATION**

B.S., Landscape Architecture Rutgers University

**PROFESSIONAL REGISTRATION**

Professional Landscape Architect (PLA) in NJ

Certified Landscape Architect (CLA) in CT

Registered Landscape Architect (RLA) in NY, DE

**AFFILIATIONS**

American Society of Landscape Architects (ASLA)

Professional Planning Association (PPA)

International Council of Shopping Centers (ICSC)

Society for College and University Planning

Society for Marketing Professional Services

*LANGAN*

### RONALD A. FUERST, PLA, RLA, ASLA

- Briad Spring Suite Hotels, Islip, NY
- Campbell Soup, Camden, NJ
- Capital Center, Trenton, NJ
- Clinical Academic Building, New Brunswick, NJ
- Costco Wholesale Store, Clifton, NJ
- Former Macy's Distribution Center/Stop & Shop, Bellville, NJ
- Former Wyeth Redevelopment, West Windsor, NJ
- Homart Office/Hotel Complex, North Bergen, NJ
- Kajima International Headquarters, Englewood, NJ
- Lawrence Farm Corporate Center, Lawrence Township, NJ
- Maxwell High School, Brooklyn, NY
- Mita Copystar America, Fairfield, NJ
- Residential/Retail Rowhouses, Trenton, NJ
- Seton Hall University, South Orange, NJ
- Bishop Walsh Homes, Newark, NJ
- Curries Woods, Jersey City, NJ
- Hayes Homes, Newark, NJ
- John E. Sofield Apartments, Perth Amboy, NJ
- Kretchmer Homes, Newark, NJ
- Scudder Homes, Newark, NJ

*LANGAN*

0045

# RONALD A. FUERST, PLA, RLA, ASLA

## MANAGING PRINCIPAL

### LAND DEVELOPMENT PLANNING AND URBAN REDEVELOPMENT

Mr. Fuerst has 32 years of industry experience with Langan involving a large variety of land development projects ranging from initial site evaluations and planning stages through construction for both public and private organizations.

Mr. Fuerst's primary expertise lies in overall initial site evaluations and feasibility studies, site programming and planning, permitting requirements/pursuits and preliminary cost and pro forma budget development from small to large land developments for retail, residential, corporate and institutional clients. These projects have involved land planning and site design, site engineering including layout, storm water management, regulatory permitting, surveying, utility design and layout; and construction management and inspection involving earthwork, foundation, hardscape/streetscape and landscaping. Mr. Fuerst has also amassed a great deal of management experience at the construction level and is well versed in construction administration, contracting, bidding, and overall project and construction management. Over the past 20 years, Mr. Fuerst has also been extensively involved in national retail store and facility build-out programs in the Northeast including such prominent retailers as Lowes Home Improvement and Stop & Shop/Ahold supermarkets as well as CareOne health care systems. Recent experience has also included mix-used developments in repurposing office campuses and large scale industrial warehouse projects.

In addition, Mr. Fuerst has extensive experience in the field of large urban and antiquated industrial renewal projects and has been extensively involved in large scale demolition design, material management and related environmental issues including asbestos, underground tanks, PCBs, lead-based paint and soil remediation. These projects were often integrated with proposed redevelopment plans where Mr. Fuerst provides a unique, broad based expertise benefiting the overall design interest as well as bottom line costs.



**EDUCATION**

B.S., Landscape Architecture Rutgers University

**PROFESSIONAL REGISTRATION**

Professional Landscape Architect (PLA) in NJ

Certified Landscape Architect (CLA) in CT

Registered Landscape Architect (RLA) in NY, DE

**AFFILIATIONS**

American Society of Landscape Architects (ASLA)

Professional Planning Association (PPA)

International Council of Shopping Centers (ICSC)

Society for College and University Planning

Society for Marketing Professional Services

## SELECTED PROJECTS

- CareOne Expansion Program, Multiple Locations, NJ, CT and NY
- Connell "District" Redevelopment, Berkeley Heights, NJ
- Essex Green Shopping Center Redevelopment, West Orange, NJ
- Over 100 Regional Lowe's Home Improvement Centers in CT, NY, NJ, MA
- Carquest Distribution Center, Armonk, NY
- Over 100 Stop & Shop Projects in CT, NJ, and NY
- 2 and 3 Shore Road, Edgewater, NJ
- 295 Corporate Park, Hamilton Township, NJ
- 5 Hanover Square, New York, NY
- American President Lines, Kearny, NJ
- Bayonne Shopping Center, Bayonne, NJ

*LANGAN*

## RONALD A. FUERST, PLA, RLA, ASLA

- Briad Spring Suite Hotels, Islip, NY
- Campbell Soup, Camden, NJ
- Capital Center, Trenton, NJ
- Clinical Academic Building, New Brunswick, NJ
- Costco Wholesale Store, Clifton, NJ
- Former Macy's Distribution Center/Stop & Shop, Bellville, NJ
- Former Wyeth Redevelopment, West Windsor, NJ
- Homart Office/Hotel Complex, North Bergen, NJ
- Kajima International Headquarters, Englewood, NJ
- Lawrence Farm Corporate Center, Lawrence Township, NJ
- Maxwell High School, Brooklyn, NY
- Mita Copystar America, Fairfield, NJ
- Residential/Retail Rowhouses, Trenton, NJ
- Seton Hall University, South Orange, NJ
- Bishop Walsh Homes, Newark, NJ
- Curries Woods, Jersey City, NJ
- Hayes Homes, Newark, NJ
- John E. Sofield Apartments, Perth Amboy, NJ
- Kretchmer Homes, Newark, NJ
- Scudder Homes, Newark, NJ

*LANGAN*

A-8

**LANGAN**

Technical Excellence
Practical Experience
Client Responsiveness

29 April 2019

Honorable Mayor Michael Wildes and
Members of the Council
City of Englewood
2-10 North Van Brunt Street
Englewood, NJ 07631

**Re:   Traffic & Parking Statement for
Proposed CareOne at Englewood
405 East Palisade Avenue, Englewood, NJ
Langan Project No. 100642201**

Honorable Mayor and Members of the Council:

Langan Engineering & Environmental Services has prepared this traffic and parking statement as part of the site application for CareOne at Englewood along East Palisade Avenue in the City of Englewood, New Jersey. Specifically, we performed the following major tasks:

- Reviewed the development proposal;
- Examined existing traffic conditions in the surrounding area;
- Estimated site trip generation;
- Prepared analyses of the study intersections;
- Evaluated the adequacy of the parking supply; and
- Reviewed the site plan for the adequacy of access and circulation.

We expect area traffic operations will not significantly change because of the development proposal. Moreover, the site design is consistent with current standards and will provide adequate access, circulation and parking.

**DEVELOPMENT PROPOSAL**

The applicant proposes to construct an assisted living/dementia care facility that will provide 150 beds and be served by 111 parking spaces. The facility will also include a chapel, consisting of approximately 66 seats. The chapel will be used by residents and their families for services.

Access to the facility is proposed via one full-access driveway along E. Palisade Avenue, and one limited-access driveway along Woodland Street, restricting egress to left-turns only.

Figure 1 shows the site location.

300 Kimball Drive        Parsippany, NJ 07054        T: 973.560.4900        F: 973.560.4901        www.langan.com

New Jersey • New York • Connecticut • Pennsylvania • Washington, DC • Virginia • West Virginia • Ohio • Florida • Texas • Arizona • California
Abu Dhabi • Athens • Doha • Dubai • Istanbul • London • Panama

0048

to the manual traffic count data collected, the weekday morning peak hour occurs between 7:45 AM and 8:45 AM and the weekday evening peak hour occurs between 5:00 PM and 6:00 PM.

Figure 2 illustrates the existing weekday morning and evening peak hour traffic volumes. Traffic count summaries are included as an attachment.

**TRIP GENERATION AND DISTRIBUTION**

We used trip generation data contained in Trip Generation, 10th Edition, published by the Institute of Transportation Engineers (ITE) to estimate trip generation for the proposed facility. Table 1 shows the estimated trip generation for the weekday peak hours, based on the ITE data.

**Table 1 - Trip Generation Estimates**

| Time Period | Proposed 150-Bed Facility |
|---|---|
| Weekday Morning Peak Hour | |
| Enter | 18 |
| Exit | 11 |
| Total | 29 |
| Weekday Evening Peak Hour | |
| Enter | 15 |
| Exit | 24 |
| Total | 39 |

We determined the directional distribution of site-generated trips based on existing travel patterns in the study area and demographic data. The directional distribution of site traffic is shown in Table 2.

**Table 2 – Trip Distribution**

| Direction (To/From) | Arrival & Departure Distributions |
|---|---|
| E. Palisade Avenue – CR 505 (North) | 50% |
| E. Palisade Avenue – CR 505 (South) | 50% |

**ANALYSES OF TRAFFIC OPERATIONS**

We have prepared future traffic projections for the study intersections. Specifically, we projected the existing traffic volumes to the design year of 2021 utilizing a 1 percent per year growth rate for local and collector roads and a 1.25 percent growth rate for principal arterial roads. Figure 3 illustrates the 2021 No-Build weekday morning and evening peak hour traffic volumes.

The site-generated traffic was added to the adjacent roadway system as per the trip distribution, as shown on Figures 4 and 5. We derived the 2021 Build traffic volumes by adding the total site-generated trips to the 2021 No-Build traffic volumes. Figure 6 illustrates the 2021 Build weekday morning and evening peak hour traffic volumes.

*LANGAN*

**Table 3 – Intersection Capacity Analysis Summary**

| Location | Movement | | 2021 No-Build Condition | | 2021 Build Condition | |
|---|---|---|---|---|---|---|
| | | | AM | PM | AM | PM |
| **Signalized Intersections** | | | | | | |
| E. Palisade Avenue (CR 505) and Woodland Street | EB | L | A (6.7) | A (4.5) | A (6.8) | A (4.7) |
| | | T,R | B (13.0) | B (11.2) | B (13.0) | B (11.9) |
| | WB | L | A (6.0) | A (4.5) | A (6.0) | A (4.7) |
| | | T,R | B (16.5) | B (12.1) | B (16.6) | B (12.3) |
| | NB | L,T | C (28.6) | C (21.5) | C (28.7) | C (21.6) |
| | | R | A (6.2) | A (7.4) | A (6.2) | A (7.5) |
| | SB | L,T | C (23.0) | C (24.1) | C (23.3) | C (24.9) |
| | | R | A (6.6) | A (7.3) | A (6.6) | A (7.3) |
| | **Overall** | | **B (14.4)** | **B (11.0)** | **B (14.4)** | **B (11.4)** |
| **Unsignalized Intersections** | | | | | | |
| Woodland Street and Dwight-Englewood School Driveway/Site Driveway 2 | EB | L,R | A (0.0) | A (7.7) | - | - |
| | | L,T,R | - | - | A (0.0) | B (10.5) |
| | WB | L | - | - | D (27.7) | B (11.9) |
| | NB | L,T | A (8.7) | B (10.2) | - | - |
| | | L,T,R | - | - | A (8.7) | A (7.7) |
| | SB | L,T,R | - | - | A (0.0) | A (0.0) |
| E. Palisade Avenue (CR 505) and Site Driveway 1 | EB | L,T | - | - | A (8.9) | B (10.2) |
| | SB | L,R | - | - | C (22.4) | D (31.3) |

The following are discussions pertaining to each of the intersections analyzed for the project. Note that all capacity analyses worksheets are included as attachments.

E. Palisade Avenue (CR 505) and Woodland Street

The signalized intersection of E. Palisade Avenue and Woodland Street is expected to operate at an overall LOS B during both the weekday morning and evening peak hours under the No-Build condition, with all individual movements operating at LOS C or better. Under the Build condition, the intersection is expected to continue to operate at an overall LOS B during both the weekday morning and evening peak hours, with all individual movements operating at LOS C or better.

Woodland Street and Dwight-Englewood School Driveway/Site Driveway 2

All movements at the unsignalized intersection of Woodland Street and the Dwight-Englewood School Driveway are expected to operate at LOS B, or better, during both the weekday morning and evening peak hours under the No-Build condition.

The proposed Site Driveway 2 will intersect Woodland Street directly across from the existing Dwight-Englewood School driveway to form a new 4-leg "stop" controlled intersection. The eastbound Dwight-Englewood School driveway approach will provide a single shared left-turn/through/right-turn lane under "stop" control. The westbound Site Driveway 2 approach will provide an exclusive left-turn lane under "stop" control. Right-turn movements will not be

*LANGAN*

## CONCLUSION

We have concluded that the site traffic impacts of the proposed facility will not be significant. Moreover, we expect the proposed driveways will operate efficiently during weekday peak hours. The site design is also consistent with current standards, and will provide adequate access and circulation. Finally, adequate parking that complies with the city's parking requirement will be provided for the proposed facility.

Should you have any questions or comments concerning this traffic statement, please do not hesitate to contact our office.

Very truly yours,

**Langan Engineering and Environmental Services, Inc.**

Daniel D. Disario, P.E., PTOE
Principal/Vice President

\\langan.com\data\PAR\data2\100842201\Office Data\Reports\Traffic\Traffic & Parking Statement 2019-04-29.docx
NJ Certificate of Authorization No: 24GA27996400

*LANGAN*

0051



SITE

*DWIGHT–ENGLEWOOD SCHOOL DRWY*

107 (10)
184 (184)

(2) 0
(2) 0

(26) 131
(157) 279

83 (93)
71 (54)
30 (39)

90 (33)
438 (686)
43 (162)

*C.R. 505*

*E. PALISADE AVENUE*

(121) 181
(510) 661
(4) 41

(10) 50
(29) 139
(81) 156

*WOODLAND STREET*

*LEGEND*

—— EXISTING ROADWAY
– – – SITE DRIVEWAY
← AM (PM) PEAK HOUR
◑ TRAFFIC SIGNAL

**LANGAN**
Langan Engineering and
Environmental Services, Inc.
300 Kimball Drive
Parsippany, NJ 07054
T: 973.560.4900  F: 973.560.4901  www.langan.com
NJ Certificate of Authorization No.24GA27996400

| Project | Drawing Title | Project No. | Drawing No. |
|---|---|---|---|
| **CAREONE AT ENGLEWOOD** BLOCK No. 1902, LOT No. 5.01, 7, 8 CITY OF ENGLEWOOD BERGEN COUNTY     NEW JERSEY | **2019 EXISTING TRAFFIC VOLUMES** | 100642201 Date 04/29/2019 Drawn By EJV Submission Date MAY 2019 | **FIGURE 2** Sheet 2 of 6 |

© 2019 Langan

Filename: \\langan.com\data\PAR\data2\100642201\Engineering Data\Traffic\Figures & Tables\TIS Figures 02-2019.dwg  Date: 4/29/2019  Time: 15:05  User: evlloria  Style Table: Langan.stb  Layout: 2-EXISTING

0052





0054



**TRI-STATE**
TRAFFIC DATA
www.TSTData.com
184 Baker Rd
Coatesville, Pennsylvania, United States 19320
610-466-1469
Serving Transportation Professionals Since 1995

Bergen County, NJ
N Woodland St & E Pallisade Ave
Thursday, February 9, 2019
Location: 40.886251, -73.961259

Count Name: N. Woodland St-East Palisade Ave
Site Code:
Start Date: 02/07/2019
Page No: 2



Turning Movement Data Plot



**TRI-STATE** TRAFFIC DATA

www.TSTData.com
184 Baker Rd

Coatesville, Pennsylvania, United States  19320
610-466-1469
Serving Transportation Professionals Since 1995

Bergen County, NJ
N Woodland St & E Pallisade Ave
Thursday, February 9, 2019
Location: 40.886251, -73.961259

Count Name: N. Woodland St-East Palisade Ave
Site Code:
Start Date: 02/07/2019
Page No: 4



Turning Movement Peak Hour Data Plot (7:45 AM)

0056



**TRI-STATE**
TRAFFIC DATA
www.TSTData.com
184 Baker Rd
Coatesville, Pennsylvania, United States  19320
610-466-1469
Serving Transportation Professionals Since 1995

Bergen County, NJ
N Woodland St & E Pallisade Ave
Thursday, February 9, 2019
Location: 40.886251, -73.961259

Count Name: N. Woodland St-East Palisade Ave
Site Code:
Start Date: 02/07/2019
Page No: 6



Turning Movement Peak Hour Data Plot (5:00 PM)



www.TSTData.com
184 Baker Rd

Coatesville, Pennsylvania, United States  19320
610-466-1469
Serving Transportation Professionals Since 1995

Bergen County, NJ
N Woodland St & Dwight
Englewood School Driveway
Thursday, February 7, 2019
Location: 40.886797, -73.960514

Count Name: N. Woodland St-
Dwight Englewood School Dwy
Site Code:
Start Date: 02/07/2019
Page No: 2



**Turning Movement Data Plot**



**TRI-STATE**
TRAFFIC DATA

www.TSTData.com
184 Baker Rd

Bergen County, NJ
N Woodland St & Dwight
Englewood School Driveway
Thursday, February 7, 2019
Location: 40.886797, -73.960514

Coatesville, Pennsylvania, United States  19320
610-466-1469
Serving Transportation Professionals Since 1995

Count Name: N. Woodland St-
Dwight Englewood School Dwy
Site Code:
Start Date: 02/07/2019
Page No: 4



Turning Movement Peak Hour Data Plot (7:30 AM)



**TRI-STATE**
TRAFFIC DATA

www.TSTData.com
184 Baker Rd

Bergen County, NJ
N Woodland St & Dwight
Englewood School Driveway
Thursday, February 7, 2019
Location: 40.886797, -
73.960514

Coatesville, Pennsylvania, United States 19320
610-466-1469
Serving Transportation Professionals Since 1995

Count Name: N. Woodland St-
Dwight Englewood School Dwy
Site Code:
Start Date: 02/07/2019
Page No: 6



Turning Movement Peak Hour Data Plot (2:45 PM)

Lanes, Volumes, Timings
2: Woodland Street & E. Palisade Avenue (CR 505)

2021 No-Build
AM Peak Hour

| Lane Group | EBL | EBT | EBR | WBL | WBT | WBR | NBL | NBT | NBR | SBL | SBT | SBR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Permitted Phases | 2 | | | 6 | | | 8 | | 8 | 4 | | 4 |
| Detector Phase | 5 | 2 | | 1 | 6 | | 8 | 8 | 8 | 4 | 4 | 4 |
| Switch Phase | | | | | | | | | | | | |
| Minimum Initial (s) | 5.0 | 24.0 | | 5.0 | 24.0 | | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 |
| Minimum Split (s) | 10.0 | 45.5 | | 10.0 | 45.5 | | 29.5 | 29.5 | 29.5 | 29.5 | 29.5 | 29.5 |
| Total Split (s) | 15.0 | 45.5 | | 15.0 | 45.5 | | 29.5 | 29.5 | 29.5 | 29.5 | 29.5 | 29.5 |
| Total Split (%) | 16.7% | 50.6% | | 16.7% | 50.6% | | 32.8% | 32.8% | 32.8% | 32.8% | 32.8% | 32.8% |
| Maximum Green (s) | 12.0 | 39.0 | | 12.0 | 39.0 | | 24.0 | 24.0 | 24.0 | 24.0 | 24.0 | 24.0 |
| Yellow Time (s) | 3.0 | 4.5 | | 3.0 | 4.5 | | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 |
| All-Red Time (s) | 0.0 | 2.0 | | 0.0 | 2.0 | | 2.5 | 2.5 | 2.5 | 2.5 | 2.5 | 2.5 |
| Lost Time Adjust (s) | 0.0 | 0.0 | | 0.0 | 0.0 | | | 0.0 | 0.0 | | 0.0 | 0.0 |
| Total Lost Time (s) | 3.0 | 6.5 | | 3.0 | 6.5 | | | 5.5 | 5.5 | | 5.5 | 5.5 |
| Lead/Lag | Lead | Lag | | Lead | Lag | | | | | | | |
| Lead-Lag Optimize? | Yes | Yes | | Yes | Yes | | | | | | | |
| Vehicle Extension (s) | 3.0 | 3.0 | | 3.0 | 3.0 | | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 |
| Recall Mode | None | Min | | None | Min | | None | None | None | None | None | None |
| Walk Time (s) | | 24.0 | | | 24.0 | | 7.0 | 7.0 | 7.0 | 7.0 | 7.0 | 7.0 |
| Flash Dont Walk (s) | | 15.0 | | | 15.0 | | 17.0 | 17.0 | 17.0 | 17.0 | 17.0 | 17.0 |
| Pedestrian Calls (#/hr) | | 0 | | | 0 | | 0 | 0 | 0 | 0 | 0 | 0 |
| Act Effct Green (s) | 40.0 | 31.1 | | 34.2 | 24.4 | | | 13.8 | 13.8 | | 13.8 | 13.8 |
| Actuated g/C Ratio | 0.64 | 0.50 | | 0.55 | 0.39 | | | 0.22 | 0.22 | | 0.22 | 0.22 |
| v/c Ratio | 0.32 | 0.44 | | 0.10 | 0.44 | | | 0.57 | 0.36 | | 0.31 | 0.21 |
| Control Delay | 6.7 | 13.0 | | 6.0 | 16.5 | | | 28.6 | 6.2 | | 23.0 | 6.6 |
| Queue Delay | 0.0 | 0.0 | | 0.0 | 0.0 | | | 0.0 | 0.0 | | 0.0 | 0.0 |
| Total Delay | 6.7 | 13.0 | | 6.0 | 16.5 | | | 28.6 | 6.2 | | 23.0 | 6.6 |
| LOS | A | B | | A | B | | | C | A | | C | A |
| Approach Delay | | 11.7 | | | 15.7 | | | 18.4 | | | 15.6 | |
| Approach LOS | | B | | | B | | | B | | | B | |
| 90th %ile Green (s) | 12.0 | 29.6 | | 7.5 | 25.1 | | 21.1 | 21.1 | 21.1 | 21.1 | 21.1 | 21.1 |
| 90th %ile Term Code | Max | Gap | | Gap | Hold | | Gap | Gap | Gap | Hold | Hold | Hold |
| 70th %ile Green (s) | 10.3 | 27.7 | | 6.6 | 24.0 | | 15.8 | 15.8 | 15.8 | 15.8 | 15.8 | 15.8 |
| 70th %ile Term Code | Gap | Hold | | Gap | Min | | Gap | Gap | Gap | Hold | Hold | Hold |
| 50th %ile Green (s) | 8.7 | 26.6 | | 6.1 | 24.0 | | 12.6 | 12.6 | 12.6 | 12.6 | 12.6 | 12.6 |
| 50th %ile Term Code | Gap | Hold | | Gap | Min | | Gap | Gap | Gap | Hold | Hold | Hold |
| 30th %ile Green (s) | 8.4 | 35.4 | | 0.0 | 24.0 | | 10.7 | 10.7 | 10.7 | 10.7 | 10.7 | 10.7 |
| 30th %ile Term Code | Gap | Hold | | Skip | Min | | Gap | Gap | Gap | Hold | Hold | Hold |
| 10th %ile Green (s) | 6.8 | 33.8 | | 0.0 | 24.0 | | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 |
| 10th %ile Term Code | Gap | Hold | | Skip | Min | | Min | Min | Min | Hold | Hold | Hold |
| Queue Length 50th (ft) | 23 | 98 | | 5 | 76 | | | 67 | 0 | | 34 | 0 |
| Queue Length 95th (ft) | 64 | 183 | | 20 | 152 | | | 133 | 41 | | 76 | 30 |
| Internal Link Dist (ft) | | 297 | | | 293 | | | 146 | | | 101 | |
| Turn Bay Length (ft) | 231 | | | 150 | | | | | | | | |
| Base Capacity (vph) | 662 | 2202 | | 620 | 2073 | | | 627 | 699 | | 619 | 667 |
| Starvation Cap Reductn | 0 | 0 | | 0 | 0 | | | 0 | 0 | | 0 | 0 |
| Spillback Cap Reductn | 0 | 0 | | 0 | 0 | | | 0 | 0 | | 0 | 0 |
| Storage Cap Reductn | 0 | 0 | | 0 | 0 | | | 0 | 0 | | 0 | 0 |
| Reduced v/c Ratio | 0.29 | 0.34 | | 0.07 | 0.27 | | | 0.32 | 0.24 | | 0.18 | 0.13 |

Intersection Summary

## Lanes, Volumes, Timings
## 2: Woodland Street & E. Palisade Avenue (CR 505)

**2021 Build**
AM Peak Hour

| Lane Group | EBL | EBT | EBR | WBL | WBT | WBR | NBL | NBT | NBR | SBL | SBT | SBR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Lane Configurations | ↰ | ↑↑↱ | | ↰ | ↑↑↱ | | | ↴ | ↱ | | ↴ | ↱ |
| Traffic Volume (vph) | 190 | 682 | 42 | 44 | 452 | 92 | 51 | 142 | 160 | 34 | 72 | 88 |
| Future Volume (vph) | 190 | 682 | 42 | 44 | 452 | 92 | 51 | 142 | 160 | 34 | 72 | 88 |
| Ideal Flow (vphpl) | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 |
| Storage Length (ft) | 231 | | 0 | 150 | | 0 | 0 | | 0 | 0 | | 0 |
| Storage Lanes | 1 | | 0 | 1 | | 0 | 0 | | 1 | 0 | | 1 |
| Taper Length (ft) | 85 | | | 60 | | | 25 | | | 25 | | |
| Lane Util. Factor | 1.00 | 0.95 | 0.95 | 1.00 | 0.95 | 0.95 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| Frt | | 0.991 | | | 0.975 | | | | 0.850 | | | 0.850 |
| Flt Protected | 0.950 | | | 0.950 | | | | 0.987 | | | 0.984 | |
| Satd. Flow (prot) | 1787 | 3497 | 0 | 1719 | 3295 | 0 | 0 | 1820 | 1538 | 0 | 1852 | 1583 |
| Flt Permitted | 0.373 | | | 0.363 | | | | 0.877 | | | 0.839 | |
| Satd. Flow (perm) | 702 | 3497 | 0 | 657 | 3295 | 0 | 0 | 1617 | 1538 | 0 | 1579 | 1583 |
| Right Turn on Red | | | No | | | No | | | Yes | | | Yes |
| Satd. Flow (RTOR) | | | | | | | | | 168 | | | 93 |
| Link Speed (mph) | | 25 | | | 25 | | | 25 | | | 25 | |
| Link Distance (ft) | | 377 | | | 373 | | | 226 | | | 181 | |
| Travel Time (s) | | 10.3 | | | 10.2 | | | 6.2 | | | 4.9 | |
| Peak Hour Factor | 0.95 | 0.95 | 0.95 | 0.95 | 0.95 | 0.95 | 0.95 | 0.95 | 0.95 | 0.95 | 0.95 | 0.95 |
| Heavy Vehicles (%) | 1% | 2% | 7% | 5% | 8% | 1% | 6% | 2% | 5% | 3% | 0% | 2% |
| Adj. Flow (vph) | 200 | 718 | 44 | 46 | 476 | 97 | 54 | 149 | 168 | 36 | 76 | 93 |
| Shared Lane Traffic (%) | | | | | | | | | | | | |
| Lane Group Flow (vph) | 200 | 762 | 0 | 46 | 573 | 0 | 0 | 203 | 168 | 0 | 112 | 93 |
| Enter Blocked Intersection | No | No | No | No | No | No | No | No | No | No | No | No |
| Lane Alignment | Left | Left | Right | Left | Left | Right | Left | Left | Right | Left | Left | Right |
| Median Width(ft) | | 12 | | | 12 | | | 0 | | | 0 | |
| Link Offset(ft) | | 0 | | | 0 | | | 0 | | | 0 | |
| Crosswalk Width(ft) | | 16 | | | 16 | | | 16 | | | 16 | |
| Two way Left Turn Lane | | | | | | | | | | | | |
| Headway Factor | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| Turning Speed (mph) | 15 | | 9 | 15 | | 9 | 15 | | | 15 | | 9 |
| Number of Detectors | 1 | 2 | | 1 | 2 | | 1 | 2 | 1 | 1 | 2 | 1 |
| Detector Template | Left | Thru | | Left | Thru | | Left | Thru | Right | Left | Thru | Right |
| Leading Detector (ft) | 20 | 100 | | 20 | 100 | | 20 | 100 | 20 | 20 | 100 | 20 |
| Trailing Detector (ft) | 0 | 0 | | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0 |
| Detector 1 Position(ft) | 0 | 0 | | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0 |
| Detector 1 Size(ft) | 20 | 6 | | 20 | 6 | | 20 | 6 | 20 | 20 | 6 | 20 |
| Detector 1 Type | Cl+Ex | Cl+Ex | | Cl+Ex | Cl+Ex | | Cl+Ex | Cl+Ex | Cl+Ex | Cl+Ex | Cl+Ex | Cl+Ex |
| Detector 1 Channel | | | | | | | | | | | | |
| Detector 1 Extend (s) | 0.0 | 0.0 | | 0.0 | 0.0 | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Detector 1 Queue (s) | 0.0 | 0.0 | | 0.0 | 0.0 | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Detector 1 Delay (s) | 0.0 | 0.0 | | 0.0 | 0.0 | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Detector 2 Position(ft) | | 94 | | | 94 | | | 94 | | | 94 | |
| Detector 2 Size(ft) | | 6 | | | 6 | | | 6 | | | 6 | |
| Detector 2 Type | | Cl+Ex | | | Cl+Ex | | | Cl+Ex | | | Cl+Ex | |
| Detector 2 Channel | | | | | | | | | | | | |
| Detector 2 Extend (s) | | 0.0 | | | 0.0 | | | 0.0 | | | 0.0 | |
| Turn Type | pm+pt | NA | | pm+pt | NA | | Perm | NA | Perm | Perm | NA | Perm |
| Protected Phases | 5 | 2 | | 1 | 6 | | | 8 | | | 4 | |

Lanes, Volumes, Timings
2: Woodland Street & E. Palisade Avenue (CR 505)

2021 Build
AM Peak Hour

| | |
|---|---|
| Area Type: | Other |
| Cycle Length: 90 | |
| Actuated Cycle Length: 62.7 | |
| Natural Cycle: 85 | |
| Control Type: Semi Act-Uncoord | |
| Maximum v/c Ratio: 0.57 | |
| Intersection Signal Delay: 14.4 | Intersection LOS: B |
| Intersection Capacity Utilization 67.1% | ICU Level of Service C |
| Analysis Period (min) 15 | |
| 90th %ile Actuated Cycle: 73.3 | |
| 70th %ile Actuated Cycle: 65.4 | |
| 50th %ile Actuated Cycle: 60.6 | |
| 30th %ile Actuated Cycle: 58.2 | |
| 10th %ile Actuated Cycle: 55.9 | |

Splits and Phases:    2: Woodland Street & E. Palisade Avenue (CR 505)

0063

**Lanes, Volumes, Timings**
**2: Woodland Street & E. Palisade Avenue (CR 505)**

**2021 No-Build**
PM Peak Hour

| Lane Group | EBL | EBT | EBR | WBL | WBT | WBR | NBL | NBT | NBR | SBL | SBT | SBR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Permitted Phases | 2 | | | 6 | | | 8 | | 8 | 4 | | 4 |
| Detector Phase | 5 | 2 | | 1 | 6 | | 8 | 8 | 8 | 4 | 4 | 4 |
| Switch Phase | | | | | | | | | | | | |
| Minimum Initial (s) | 5.0 | 24.0 | | 5.0 | 24.0 | | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 |
| Minimum Split (s) | 10.0 | 45.5 | | 10.0 | 45.5 | | 29.5 | 29.5 | 29.5 | 29.5 | 29.5 | 29.5 |
| Total Split (s) | 15.0 | 45.5 | | 15.0 | 45.5 | | 29.5 | 29.5 | 29.5 | 29.5 | 29.5 | 29.5 |
| Total Split (%) | 16.7% | 50.6% | | 16.7% | 50.6% | | 32.8% | 32.8% | 32.8% | 32.8% | 32.8% | 32.8% |
| Maximum Green (s) | 12.0 | 39.0 | | 12.0 | 39.0 | | 24.0 | 24.0 | 24.0 | 24.0 | 24.0 | 24.0 |
| Yellow Time (s) | 3.0 | 4.5 | | 3.0 | 4.5 | | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 |
| All-Red Time (s) | 0.0 | 2.0 | | 0.0 | 2.0 | | 2.5 | 2.5 | 2.5 | 2.5 | 2.5 | 2.5 |
| Lost Time Adjust (s) | 0.0 | 0.0 | | 0.0 | 0.0 | | 0.0 | 0.0 | | 0.0 | 0.0 | |
| Total Lost Time (s) | 3.0 | 6.5 | | 3.0 | 6.5 | | 5.5 | 5.5 | | 5.5 | 5.5 | |
| Lead/Lag | Lead | Lag | | Lead | Lag | | | | | | | |
| Lead-Lag Optimize? | Yes | Yes | | Yes | Yes | | | | | | | |
| Vehicle Extension (s) | 3.0 | 3.0 | | 3.0 | 3.0 | | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 |
| Recall Mode | None | Min | | None | Min | | None | None | None | None | None | None |
| Walk Time (s) | | 24.0 | | | 24.0 | | 7.0 | 7.0 | 7.0 | 7.0 | 7.0 | 7.0 |
| Flash Dont Walk (s) | | 15.0 | | | 15.0 | | 17.0 | 17.0 | 17.0 | 17.0 | 17.0 | 17.0 |
| Pedestrian Calls (#/hr) | | 0 | | | 0 | | 0 | 0 | 0 | 0 | 0 | 0 |
| Act Effct Green (s) | 35.6 | 28.5 | | 35.9 | 28.7 | | | 11.2 | 11.2 | | 11.2 | 11.2 |
| Actuated g/C Ratio | 0.67 | 0.54 | | 0.68 | 0.54 | | | 0.21 | 0.21 | | 0.21 | 0.21 |
| v/c Ratio | 0.22 | 0.29 | | 0.24 | 0.40 | | | 0.12 | 0.21 | | 0.30 | 0.24 |
| Control Delay | 4.5 | 11.2 | | 4.5 | 12.1 | | | 21.5 | 7.4 | | 24.1 | 7.3 |
| Queue Delay | 0.0 | 0.0 | | 0.0 | 0.0 | | | 0.0 | 0.0 | | 0.0 | 0.0 |
| Total Delay | 4.5 | 11.2 | | 4.5 | 12.1 | | | 21.5 | 7.4 | | 24.1 | 7.3 |
| LOS | A | B | | A | B | | | C | A | | C | A |
| Approach Delay | | 10.0 | | | 10.7 | | | 12.0 | | | 15.7 | |
| Approach LOS | | A | | | B | | | B | | | B | |
| 90th %ile Green (s) | 9.8 | 26.9 | | 9.5 | 26.6 | | 12.8 | 12.8 | 12.8 | 12.8 | 12.8 | 12.8 |
| 90th %ile Term Code | Gap | Hold | | Gap | Gap | | Hold | Hold | Hold | Gap | Gap | Gap |
| 70th %ile Green (s) | 7.8 | 24.0 | | 8.2 | 24.4 | | 10.1 | 10.1 | 10.1 | 10.1 | 10.1 | 10.1 |
| 70th %ile Term Code | Gap | Min | | Gap | Hold | | Hold | Hold | Hold | Gap | Gap | Gap |
| 50th %ile Green (s) | 7.0 | 24.0 | | 7.4 | 24.4 | | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 |
| 50th %ile Term Code | Gap | Min | | Gap | Hold | | Min | Min | Min | Min | Min | Min |
| 30th %ile Green (s) | 6.5 | 24.0 | | 6.9 | 24.4 | | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 |
| 30th %ile Term Code | Gap | Min | | Gap | Hold | | Min | Min | Min | Min | Min | Min |
| 10th %ile Green (s) | 0.0 | 24.0 | | 0.0 | 24.0 | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 10th %ile Term Code | Skip | Min | | Skip | Min | | Skip | Skip | Skip | Skip | Skip | Skip |
| Queue Length 50th (ft) | 12 | 62 | | 17 | 93 | | | 12 | 0 | | 30 | 0 |
| Queue Length 95th (ft) | 30 | 110 | | 38 | 160 | | | 37 | 31 | | 72 | 34 |
| Internal Link Dist (ft) | | 297 | | | 293 | | | 146 | | | 101 | |
| Turn Bay Length (ft) | 231 | | | 150 | | | | | | | | |
| Base Capacity (vph) | 729 | 2600 | | 836 | 2611 | | | 788 | 830 | | 762 | 836 |
| Starvation Cap Reductn | 0 | 0 | | 0 | 0 | | | 0 | 0 | | 0 | 0 |
| Spillback Cap Reductn | 0 | 0 | | 0 | 0 | | | 0 | 0 | | 0 | 0 |
| Storage Cap Reductn | 0 | 0 | | 0 | 0 | | | 0 | 0 | | 0 | 0 |
| Reduced v/c Ratio | 0.18 | 0.21 | | 0.21 | 0.29 | | | 0.05 | 0.10 | | 0.13 | 0.12 |

**Intersection Summary**

## Lanes, Volumes, Timings
### 2: Woodland Street & E. Palisade Avenue (CR 505)

**2021 Build**
PM Peak Hour

| Lane Group | EBL | EBT | EBR | WBL | WBT | WBR | NBL | NBT | NBR | SBL | SBT | SBR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Lane Configurations | ↰ | ↑↑↾ | | ↰ | ↑↑↾ | | | ↴ | ↾ | | ↴ | ↾ |
| Traffic Volume (vph) | 127 | 526 | 4 | 165 | 709 | 34 | 10 | 30 | 83 | 46 | 55 | 101 |
| Future Volume (vph) | 127 | 526 | 4 | 165 | 709 | 34 | 10 | 30 | 83 | 46 | 55 | 101 |
| Ideal Flow (vphpl) | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 |
| Storage Length (ft) | 231 | | 0 | 150 | | 0 | 0 | | 0 | 0 | | 0 |
| Storage Lanes | 1 | | 0 | 1 | | 0 | 0 | | 1 | 0 | | 1 |
| Taper Length (ft) | 85 | | | 60 | | | 25 | | | 25 | | |
| Lane Util. Factor | 1.00 | 0.95 | 0.95 | 1.00 | 0.95 | 0.95 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| Frt | | 0.999 | | | 0.993 | | | | 0.850 | | | 0.850 |
| Flt Protected | 0.950 | | | 0.950 | | | | 0.988 | | | 0.978 | |
| Satd. Flow (prot) | 1770 | 3536 | 0 | 1805 | 3551 | 0 | 0 | 1793 | 1615 | 0 | 1814 | 1615 |
| Flt Permitted | 0.356 | | | 0.417 | | | | 0.895 | | | 0.834 | |
| Satd. Flow (perm) | 663 | 3536 | 0 | 792 | 3551 | 0 | 0 | 1624 | 1615 | 0 | 1547 | 1615 |
| Right Turn on Red | | | No | | | No | | | Yes | | | Yes |
| Satd. Flow (RTOR) | | | | | | | | | 86 | | | 105 |
| Link Speed (mph) | | 25 | | | 25 | | | 25 | | | 25 | |
| Link Distance (ft) | | 377 | | | 373 | | | 226 | | | 181 | |
| Travel Time (s) | | 10.3 | | | 10.2 | | | 6.2 | | | 4.9 | |
| Peak Hour Factor | 0.96 | 0.96 | 0.96 | 0.96 | 0.96 | 0.96 | 0.96 | 0.96 | 0.96 | 0.96 | 0.96 | 0.96 |
| Heavy Vehicles (%) | 2% | 2% | 0% | 0% | 1% | 0% | 10% | 3% | 0% | 3% | 2% | 0% |
| Adj. Flow (vph) | 132 | 548 | 4 | 172 | 739 | 35 | 10 | 31 | 86 | 48 | 57 | 105 |
| Shared Lane Traffic (%) | | | | | | | | | | | | |
| Lane Group Flow (vph) | 132 | 552 | 0 | 172 | 774 | 0 | 0 | 41 | 86 | 0 | 105 | 105 |
| Enter Blocked Intersection | No | No | No | No | No | No | No | No | No | No | No | No |
| Lane Alignment | Left | Left | Right | Left | Left | Right | Left | Left | Right | Left | Left | Right |
| Median Width(ft) | | 12 | | | 12 | | | 0 | | | 0 | |
| Link Offset(ft) | | 0 | | | 0 | | | 0 | | | 0 | |
| Crosswalk Width(ft) | | 16 | | | 16 | | | 16 | | | 16 | |
| Two way Left Turn Lane | | | | | | | | | | | | |
| Headway Factor | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| Turning Speed (mph) | 15 | | 9 | 15 | | 9 | 15 | | 9 | 15 | | 9 |
| Number of Detectors | 1 | 2 | | 1 | 2 | | 1 | 2 | 1 | 1 | 2 | 1 |
| Detector Template | Left | Thru | | Left | Thru | | Left | Thru | Right | Left | Thru | Right |
| Leading Detector (ft) | 20 | 100 | | 20 | 100 | | 20 | 100 | 20 | 20 | 100 | 20 |
| Trailing Detector (ft) | 0 | 0 | | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0 |
| Detector 1 Position(ft) | 0 | 0 | | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0 |
| Detector 1 Size(ft) | 20 | 6 | | 20 | 6 | | 20 | 6 | 20 | 20 | 6 | 20 |
| Detector 1 Type | CI+Ex | CI+Ex | | CI+Ex | CI+Ex | | CI+Ex | CI+Ex | CI+Ex | CI+Ex | CI+Ex | CI+Ex |
| Detector 1 Channel | | | | | | | | | | | | |
| Detector 1 Extend (s) | 0.0 | 0.0 | | 0.0 | 0.0 | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Detector 1 Queue (s) | 0.0 | 0.0 | | 0.0 | 0.0 | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Detector 1 Delay (s) | 0.0 | 0.0 | | 0.0 | 0.0 | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Detector 2 Position(ft) | | 94 | | | 94 | | | 94 | | | 94 | |
| Detector 2 Size(ft) | | 6 | | | 6 | | | 6 | | | 6 | |
| Detector 2 Type | | CI+Ex | | | CI+Ex | | | CI+Ex | | | CI+Ex | |
| Detector 2 Channel | | | | | | | | | | | | |
| Detector 2 Extend (s) | | 0.0 | | | 0.0 | | | 0.0 | | | 0.0 | |
| Turn Type | pm+pt | NA | | pm+pt | NA | | Perm | NA | Perm | Perm | NA | Perm |
| Protected Phases | 5 | 2 | | 1 | 6 | | | 8 | | | 4 | |

Lanes, Volumes, Timings
2: Woodland Street & E. Palisade Avenue (CR 505)

2021 Build
PM Peak Hour

| | |
|---|---|
| Area Type: | Other |
| Cycle Length: 90 | |
| Actuated Cycle Length: 55 | |
| Natural Cycle: 85 | |
| Control Type: Semi Act-Uncoord | |
| Maximum v/c Ratio: 0.40 | |
| Intersection Signal Delay: 11.4 | Intersection LOS: B |
| Intersection Capacity Utilization 54.6% | ICU Level of Service A |
| Analysis Period (min) 15 | |
| 90th %ile Actuated Cycle: 65.4 | |
| 70th %ile Actuated Cycle: 57.7 | |
| 50th %ile Actuated Cycle: 56.4 | |
| 30th %ile Actuated Cycle: 55.9 | |
| 10th %ile Actuated Cycle: 39.7 | |

Splits and Phases:    2: Woodland Street & E. Palisade Avenue (CR 505)



0066

HCM 6th TWSC  
10: Woodland Street & School Driveway/Site Driveway 2

2021 Build  
AM Peak Hour

| Intersection | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Int Delay, s/veh | 1.8 | | | | | | | | | | | |

| Movement | EBL | EBT | EBR | WBL | WBT | WBR | NBL | NBT | NBR | SBL | SBT | SBR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Lane Configurations | | ↔ | | ↰ | | | | ↔ | | | ↔ | |
| Traffic Vol, veh/h | 0 | 0 | 0 | 6 | 0 | 0 | 131 | 285 | 5 | 0 | 188 | 107 |
| Future Vol, veh/h | 0 | 0 | 0 | 6 | 0 | 0 | 131 | 285 | 5 | 0 | 188 | 107 |
| Conflicting Peds, #/hr | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Sign Control | Stop | Stop | Stop | Stop | Stop | Stop | Free | Free | Free | Free | Free | Free |
| RT Channelized | - | - | None | - | - | None | - | - | None | - | - | None |
| Storage Length | - | - | - | 0 | - | - | - | - | - | - | - | - |
| Veh in Median Storage, # | - | 0 | - | - | 0 | - | - | 0 | - | - | 0 | - |
| Grade, % | - | 0 | - | - | 0 | - | - | 0 | - | - | 0 | - |
| Peak Hour Factor | 73 | 92 | 73 | 92 | 92 | 92 | 73 | 73 | 73 | 92 | 73 | 73 |
| Heavy Vehicles, % | 0 | 2 | 0 | 2 | 2 | 2 | 0 | 2 | 2 | 2 | 2 | 0 |
| Mvmt Flow | 0 | 0 | 0 | 7 | 0 | 0 | 179 | 390 | 5 | 0 | 258 | 147 |

| Major/Minor | Minor2 | | | Minor1 | | | Major1 | | | Major2 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Conflicting Flow All | 1083 | 1085 | 332 | 1083 | - | - | 405 | 0 | 0 | 395 | 0 | 0 |
| Stage 1 | 332 | 332 | - | 751 | - | - | - | - | - | - | - | - |
| Stage 2 | 751 | 753 | - | 332 | - | - | - | - | - | - | - | - |
| Critical Hdwy | 7.1 | 6.52 | 6.2 | 7.12 | - | - | 4.1 | - | - | 4.12 | - | - |
| Critical Hdwy Stg 1 | 6.1 | 5.52 | - | 6.12 | - | - | - | - | - | - | - | - |
| Critical Hdwy Stg 2 | 6.1 | 5.52 | - | 6.12 | - | - | - | - | - | - | - | - |
| Follow-up Hdwy | 3.5 | 4.018 | 3.3 | 3.518 | - | - | 2.2 | - | - | 2.218 | - | - |
| Pot Cap-1 Maneuver | 197 | 217 | 714 | 195 | 0 | 0 | 1165 | - | - | 1164 | - | - |
| Stage 1 | 686 | 644 | - | 403 | 0 | 0 | - | - | - | - | - | - |
| Stage 2 | 406 | 417 | - | 681 | 0 | 0 | - | - | - | - | - | - |
| Platoon blocked, % | | | | | | | - | - | | - | - | |
| Mov Cap-1 Maneuver | 167 | 174 | 714 | 165 | - | - | 1165 | - | - | 1164 | - | - |
| Mov Cap-2 Maneuver | 167 | 174 | - | 165 | - | - | - | - | - | - | - | - |
| Stage 1 | 551 | 644 | - | 324 | - | - | - | - | - | - | - | - |
| Stage 2 | 326 | 335 | - | 681 | - | - | - | - | - | - | - | - |

| Approach | EB | | WB | | NB | | SB | |
|---|---|---|---|---|---|---|---|---|
| HCM Control Delay, s | 0 | | 27.7 | | 2.7 | | 0 | |
| HCM LOS | A | | D | | | | | |

| Minor Lane/Major Mvmt | NBL | NBT | NBR | EBLn1 | WBLn1 | SBL | SBT | SBR |
|---|---|---|---|---|---|---|---|---|
| Capacity (veh/h) | 1165 | - | - | - | 165 | 1164 | - | - |
| HCM Lane V/C Ratio | 0.154 | - | - | - | 0.04 | - | - | - |
| HCM Control Delay (s) | 8.7 | 0 | - | 0 | 27.7 | 0 | - | - |
| HCM Lane LOS | A | A | - | A | D | A | - | - |
| HCM 95th %tile Q(veh) | 0.5 | - | - | - | 0.1 | 0 | - | - |

0067

HCM 6th TWSC
10: Woodland Street & School Driveway/Site Driveway 2

2021 Build
PM Peak Hour

| Intersection | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Int Delay, s/veh | 0.9 | | | | | | | | | | | |

| Movement | EBL | EBT | EBR | WBL | WBT | WBR | NBL | NBT | NBR | SBL | SBT | SBR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Lane Configurations | | ↔ | | ↱ | | | | ↔ | | | ↔ | |
| Traffic Vol, veh/h | 2 | 0 | 2 | 12 | 0 | 0 | 26 | 160 | 4 | 0 | 188 | 10 |
| Future Vol, veh/h | 2 | 0 | 2 | 12 | 0 | 0 | 26 | 160 | 4 | 0 | 188 | 10 |
| Conflicting Peds, #/hr | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Sign Control | Stop | Stop | Stop | Stop | Stop | Stop | Free | Free | Free | Free | Free | Free |
| RT Channelized | - | - | None | - | - | None | - | - | None | - | - | None |
| Storage Length | - | - | - | 0 | - | - | - | - | - | - | - | - |
| Veh in Median Storage, # | - | 0 | - | - | 0 | - | - | 0 | - | - | 0 | - |
| Grade, % | - | 0 | - | - | 0 | - | - | 0 | - | - | 0 | - |
| Peak Hour Factor | 97 | 92 | 97 | 92 | 92 | 92 | 97 | 97 | 97 | 92 | 97 | 97 |
| Heavy Vehicles, % | 0 | 2 | 0 | 2 | 2 | 2 | 0 | 2 | 2 | 2 | 2 | 0 |
| Mvmt Flow | 2 | 0 | 2 | 13 | 0 | 0 | 27 | 165 | 4 | 0 | 194 | 10 |

| Major/Minor | Minor2 | | | Minor1 | | | Major1 | | | Major2 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Conflicting Flow All | 420 | 422 | 199 | 421 | - | - | 204 | 0 | 0 | 169 | 0 | 0 |
| Stage 1 | 199 | 199 | - | 221 | - | - | - | - | - | - | - | - |
| Stage 2 | 221 | 223 | - | 200 | - | - | - | - | - | - | - | - |
| Critical Hdwy | 7.1 | 6.52 | 6.2 | 7.12 | - | - | 4.1 | - | - | 4.12 | - | - |
| Critical Hdwy Stg 1 | 6.1 | 5.52 | - | 6.12 | - | - | - | - | - | - | - | - |
| Critical Hdwy Stg 2 | 6.1 | 5.52 | - | 6.12 | - | - | - | - | - | - | - | - |
| Follow-up Hdwy | 3.5 | 4.018 | 3.3 | 3.518 | - | - | 2.2 | - | - | 2.218 | - | - |
| Pot Cap-1 Maneuver | 547 | 523 | 847 | 543 | 0 | 0 | 1380 | - | - | 1409 | - | - |
| Stage 1 | 807 | 736 | - | 781 | 0 | 0 | - | - | - | - | - | - |
| Stage 2 | 786 | 719 | - | 802 | 0 | 0 | - | - | - | - | - | - |
| Platoon blocked, % | | | | | | | | - | - | | - | - |
| Mov Cap-1 Maneuver | 538 | 511 | 847 | 533 | - | - | 1380 | - | - | 1409 | - | - |
| Mov Cap-2 Maneuver | 538 | 511 | - | 533 | - | - | - | - | - | - | - | - |
| Stage 1 | 789 | 736 | - | 764 | - | - | - | - | - | - | - | - |
| Stage 2 | 769 | 703 | - | 800 | - | - | - | - | - | - | - | - |

| Approach | EB | | | WB | | | NB | | | SB | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| HCM Control Delay, s | 10.5 | | | 11.9 | | | 1 | | | 0 | | |
| HCM LOS | B | | | B | | | | | | | | |

| Minor Lane/Major Mvmt | NBL | NBT | NBR | EBLn1 | WBLn1 | SBL | SBT | SBR |
|---|---|---|---|---|---|---|---|---|
| Capacity (veh/h) | 1380 | - | - | 658 | 533 | 1409 | - | - |
| HCM Lane V/C Ratio | 0.019 | - | - | 0.006 | 0.024 | - | - | - |
| HCM Control Delay (s) | 7.7 | 0 | - | 10.5 | 11.9 | 0 | - | - |
| HCM Lane LOS | A | A | - | B | B | A | - | - |
| HCM 95th %tile Q(veh) | 0.1 | - | - | 0 | 0.1 | 0 | - | - |

HCM 6th TWSC
14: E. Palisade Avenue (CR 505) & Site Driveway 1

2021 Build
PM Peak Hour

| Intersection | | | | | | |
|---|---|---|---|---|---|---|
| Int Delay, s/veh | 0.2 | | | | | |

| Movement | EBL | EBT | WBT | WBR | SBL | SBR |
|---|---|---|---|---|---|---|
| Lane Configurations | | �555 | ↑ | | ⍦ | |
| Traffic Vol, veh/h | 3 | 652 | 903 | 8 | 6 | 6 |
| Future Vol, veh/h | 3 | 652 | 903 | 8 | 6 | 6 |
| Conflicting Peds, #/hr | 0 | 0 | 0 | 0 | 0 | 0 |
| Sign Control | Free | Free | Free | Free | Stop | Stop |
| RT Channelized | - | None | - | None | - | None |
| Storage Length | - | - | - | - | 0 | - |
| Veh in Median Storage, # | - | 0 | 0 | - | 0 | - |
| Grade, % | - | 0 | 0 | - | 0 | - |
| Peak Hour Factor | 92 | 92 | 92 | 92 | 92 | 92 |
| Heavy Vehicles, % | 2 | 2 | 2 | 2 | 2 | 2 |
| Mvmt Flow | 3 | 709 | 982 | 9 | 7 | 7 |

| Major/Minor | Major1 | | Major2 | | Minor2 | |
|---|---|---|---|---|---|---|
| Conflicting Flow All | 991 | 0 | - | 0 | 1702 | 987 |
| Stage 1 | - | - | - | - | 987 | - |
| Stage 2 | - | - | - | - | 715 | - |
| Critical Hdwy | 4.12 | - | - | - | 6.42 | 6.22 |
| Critical Hdwy Stg 1 | - | - | - | - | 5.42 | - |
| Critical Hdwy Stg 2 | - | - | - | - | 5.42 | - |
| Follow-up Hdwy | 2.218 | - | - | - | 3.518 | 3.318 |
| Pot Cap-1 Maneuver | 698 | - | - | - | 101 | 300 |
| Stage 1 | - | - | - | - | 361 | - |
| Stage 2 | - | - | - | - | 485 | - |
| Platoon blocked, % | | - | - | - | | |
| Mov Cap-1 Maneuver | 698 | - | - | - | 100 | 300 |
| Mov Cap-2 Maneuver | - | - | - | - | 100 | - |
| Stage 1 | - | - | - | - | 358 | - |
| Stage 2 | - | - | - | - | 485 | - |

| Approach | EB | WB | SB |
|---|---|---|---|
| HCM Control Delay, s | 0 | 0 | 31.3 |
| HCM LOS | | | D |

| Minor Lane/Major Mvmt | EBL | EBT | WBT | WBR | SBLn1 |
|---|---|---|---|---|---|
| Capacity (veh/h) | 698 | - | - | - | 150 |
| HCM Lane V/C Ratio | 0.005 | - | - | - | 0.087 |
| HCM Control Delay (s) | 10.2 | 0 | - | - | 31.3 |
| HCM Lane LOS | B | A | - | - | D |
| HCM 95th %tile Q(veh) | 0 | - | - | - | 0.3 |

# RONALD A. FUERST, PLA, RLA, ASLA
### MANAGING PRINCIPAL
## LAND DEVELOPMENT PLANNING AND URBAN REDEVELOPMENT

Mr. Fuerst has 32 years of industry experience with Langan involving a large variety of land development projects ranging from initial site evaluations and planning stages through construction for both public and private organizations.

Mr. Fuerst's primary expertise lies in overall initial site evaluations and feasibility studies, site programming and planning, permitting requirements/pursuits and preliminary cost and pro forma budget development from small to large land developments for retail, residential, corporate and institutional clients. These projects have involved land planning and site design, site engineering including layout, storm water management, regulatory permitting, surveying, utility design and layout; and construction management and inspection involving earthwork, foundation, hardscape/streetscape and landscaping. Mr. Fuerst has also amassed a great deal of management experience at the construction level and is well versed in construction administration, contracting, bidding, and overall project and construction management. Over the past 20 years, Mr. Fuerst has also been extensively involved in national retail store and facility build-out programs in the Northeast including such prominent retailers as Lowes Home Improvement and Stop & Shop/Ahold supermarkets as well as CareOne health care systems. Recent experience has also included mix-used developments in repurposing office campuses and large scale industrial warehouse projects.

In addition, Mr. Fuerst has extensive experience in the field of large urban and antiquated industrial renewal projects and has been extensively involved in large scale demolition design, material management and related environmental issues including asbestos, underground tanks, PCBs, lead-based paint and soil remediation. These projects were often integrated with proposed redevelopment plans where Mr. Fuerst provides a unique, broad based expertise benefiting the overall design interest as well as bottom line costs.

### SELECTED PROJECTS

- CareOne Expansion Program, Multiple Locations, NJ. CT and NY
- Connell "District" Redevelopment, Berkeley Heights, NJ
- Essex Green Shopping Center Redevelopment, West Orange, NJ
- Over 100 Regional Lowe's Home Improvement Centers in CT, NY, NJ, MA
- Carquest Distribution Center, Armonk, NY
- Over 100 Stop & Shop Projects in CT, NJ, and NY
- 2 and 3 Shore Road, Edgewater, NJ
- 295 Corporate Park, Hamilton Township, NJ
- 5 Hanover Square, New York, NY
- American President Lines, Kearny, NJ
- Bayonne Shopping Center, Bayonne, NJ



**EDUCATION**

B.S., Landscape Architecture Rutgers University

**PROFESSIONAL REGISTRATION**

Professional Landscape Architect (PLA) in NJ

Certified Landscape Architect (CLA) in CT

Registered Landscape Architect (RLA) in NY, DE

**AFFILIATIONS**

American Society of Landscape Architects (ASLA)

Professional Planning Association (PPA)

International Council of Shopping Centers (ICSC)

Society for College and University Planning

Society for Marketing Professional Services

*LANGAN*

## RONALD A. FUERST, PLA, RLA, ASLA

- Briad Spring Suite Hotels, Islip, NY
- Campbell Soup, Camden, NJ
- Capital Center, Trenton, NJ
- Clinical Academic Building, New Brunswick, NJ
- Costco Wholesale Store, Clifton, NJ
- Former Macy's Distribution Center/Stop & Shop, Bellville, NJ
- Former Wyeth Redevelopment, West Windsor, NJ
- Homart Office/Hotel Complex, North Bergen, NJ
- Kajima International Headquarters, Englewood, NJ
- Lawrence Farm Corporate Center, Lawrence Township, NJ
- Maxwell High School, Brooklyn, NY
- Mita Copystar America, Fairfield, NJ
- Residential/Retail Rowhouses, Trenton, NJ
- Seton Hall University, South Orange, NJ
- Bishop Walsh Homes, Newark, NJ
- Curries Woods, Jersey City, NJ
- Hayes Homes, Newark, NJ
- John E. Sofield Apartments, Perth Amboy, NJ
- Kretchmer Homes, Newark, NJ
- Scudder Homes, Newark, NJ

*LANGAN*

## Daniel D. Disario, PE, PTOE

**Principal**
**Traffic Engineering**



### 27 years in the industry ~ 14 years with Langan

Mr. Disario has over twenty-seven years of management, planning, and design experience with land development and transportation projects. His experience allows him to identify the critical access and circulation issues at the conceptual stage of each land development project and to develop cost-effective solutions to those issues during project design. Mr. Disario's land development projects have included almost every conceivable land use in all types of settings. His primary areas of expertise include transportation operations, state and local permitting procurement, preparation of traffic impact studies, and traffic signal design. He has prepared well over 1,000 traffic studies for various developments throughout the Northeast and has extensive expert witness experience before various Boards in NJ, NY, CT, PA, MA, NH, and RI.

### Selected Projects

1515 Route 10 Redevelopment, Parsippany, NJ
350 Central Ave, Kearny, NJ
Acacia Development, Bayonne, NJ
ADJ Land Developers – Cranbury, NJ
Amazon Fulfillment Center, SDF8, Jeffersonville, IN
Amboy National Bank, South Brunswick, NJ
Bentall Kennedy, Daffys Way, North Bergen, NJ
Bijou Properties - Grand Adams, Hoboken, NJ
Celgene Cafeteria Expansion, Somerset, NJ
Circuit City, South Brunswick, NJ
Clarion Former Hercules Site, Burlington Township, NJ
Cooper Crossings Residential Development, Trenton, NJ
Costco, Monroe, NJ
CareOne – Various Locations, NJ
E&A Ventures, 900 Fairmount, Elizabeth, NJ
Fashion Outlets of Philadelphia, PA
Frankford Arsenal, Philadelphia, PA
Garden Commercial – Crossroads, Mahwah, NJ
Garden Commercial – Union, NJ
Garden Homes - Edison, NJ
GGP - Cumberland Mall - Atlanta, GA
Goya, 100 Seaview Permitting, Secaucus, NJ
Hamilton Marketplace, Hamilton, NJ
Hampshire- Various Locations
Hampton Inn - Yonkers, NY
Hanes Building Redevelopment, Newark, NJ
Hawthorne Mixed Use, Hawthorne, NJ
Heinz Field TMP Update, Pittsburgh, PA
Henry Street Vacation, Elizabeth, NJ
Hess Terminal – Edgewater, NJ
Home Depot Plaza Redevelopment, Bensalem, PA

### Education

M.Sc., Transportation
New Jersey Institute of Technology

B.Sc., Civil Engineering
Temple University

### Professional Registration

Professional Engineer in NY, NJ, PA, and WI

Professional Traffic Operations Engineer

### Affiliations

Institute of Transportation Engineers

International Council of Shopping Centers

*LANGAN*

## Daniel D. Disario, PE, PTOE

IDI EastPointe -South Brunswick, NJ
Industrial Income Trust, Piscataway, NJ
K Hov Vintage Park Due Diligence, East Brunswick, NJ
Kendall Park Shopping Center, South Brunswick, NJ
KTR, Edward Curry Ave, Staten Island, NY
KTR, Encap, Lyndhurst, NJ
KTR, Key Logistics, Newville, PA
LMT Mercer Group, Ewing, NJ
Logan Pointe, Philadelphia, PA
Main Street Belleville, NJ
Major Oil Companies, Northeast, USA
Maple Avenue Multifamily Development, Marlton, NJ
Mattress Warehouse at Lacey Retail Center, Forked River, NJ
Mayfair Shopping Center, Town of Commack, NY
McDonald's Corporation, Northeast, USA
MM Management, B. Steel Site, North Arlington, NJ
MOD Pizza at Marlton, Marlton, NJ
MPV Properties - Lawrenceville, NJ
New Center for Downtown Newark, NJ
North Brunswick Town Center, North Brunswick, NJ
North Penn Marketplace Zoning Support, Lansdale, PA
Norwalk Retail Development, Norwalk, CT
Petco, Town of Selden, NY
Petrucci, Accurate Box, Paterson, NJ
Pittsburgh Steelers, Pittsburgh, PA
Plaza 27, North Brunswick, NJ
Premium Outlets at Gloucester Township, NJ
Princeton Tennis Academy, Monmouth Junction, NJ
Proposed Distribution Facility, Elmsford, NY
PSE&G Former New Brunswick MGP, New Brunswick, NJ
Raritan Plaza, Bridgewater, NJ
Red Robin at Cumberland Mall, Millville, NJ
Retail Pharmacy Companies, NJ and PA
Route Nine Plaza, Old Bridge, NJ
Saratoga Gaming, Orange County, NY
Sharp Plaza, Mahwah, NJ
Skymark Corporate Center, Ridgefield Park, NJ
South Philadelphia Shopping Center, Philadelphia, PA
Stone Post Meadow, Easton, PA
Streeter - Deptford Plaza, Deptford, NJ
Suncap Yonkers, NY
SV Temple Master Plan, Monroeville, PA
SW Park Hoboken, NJ
Tanger Outlet Center, City of Industry, CA
The Great Atlantic & Pacific Tea Co., Inc. (A&P), Town of Hempstead, NY
The Southland Corporation (7-Eleven), Northeast, USA
The Stop & Shop Supermarket Company, NJ
University of Pittsburgh Panthers Traffic, Pittsburgh, PA
Verizon Horizontal Directional Drill, Keyport, NJ
Village Properties, Trenton, NJ
Vista Center, Trenton, NJ
Wal-Mart – Various Locations
Warehouse Development Companies, NJ
Washington Village Apartments, Trenton, NJ
West Chester - Flint Hill Road Site, Bridgeport, PA
West Manor Way, Robbinsville, NJ
Woodmont Place at Lower Nazareth, PA

Technical Excellence   ·   Practical Experience   ·   Client Responsiveness      *LANGAN*



May 1, 2019

Honorable Mayor Michael Wildes and
Members of the Council
City of Englewood
2-10 North Van Brunt Street
Englewood, NJ 07631

Re:   Architectural Narrative
      Proposed CareOne at Englewood
      East Palisade Ave and North Woodland Street
      Englewood, New Jersey

Honorable Mayor and Members of the Council:

In anticipation of my testimony on May 7, 2019, I have prepared this brief architectural overview of the proposed CareOne at Englewood facility.

I look forward to discussing this project with you and answering any questions which you may have when we meet on May 7, 2019.

Englewood with its proximity to New York City is a sophisticated city which combines historic grace and charm with a cosmopolitan atmosphere. Meyer, as is our custom, has spent time in the town getting to know its neighborhoods and talking to individuals in the building department to understand the vernacular and environment of the Englewood Community. We have also taken into consideration in our design feedback from the neighbors through CareOne, and our client's own feedback on the area. As a result, Meyer has settled on a French style Tudor mansion look whose flavor and style captures the essence of the neighborhood surrounding this proposed Assisted Living and Memory Care Community.

The structure will be 3 stories with a partial basement at 136,546 SF. There are total of 150 units with the same number of beds. The building will be constructed of non-combustible materials and meet all of the codes and regulations for an I-2 Use Group. As stated previously the building is designed with a French Tudor style to create a dramatic residential feel along Palisade Avenue. Two turret structures anchor the ends of the building while the center entrance will have large entrance canopy and glass areas with diamond mullions. Exterior materials will make use of residential materials including fiber cement planks, stone veneer, and some limed heavy timber.

On the interior the program will include an entrance lobby, public gathering spaces, dining areas, a synagogue and multi-purpose room, wellness areas, public restrooms, and back-of-house spaces to house MEP systems, commercial laundry and kitchen, and receiving. The size of the building is predicated on meeting all of the New Jersey building code and Assisted Living operational requirements, which dictate minimum corridor sizes, unit square footage, and total common space to resident bed ratios. The facility will offer a warm, residential environment with an emphasis on hospitality and care for those who want to continue living out their day to day lives but require some assistance with daily living activities.

Dan King, Principal

*Together, we deliver your vision.*

610.649.8500   |   227 E Lancaster Ave, Ardmore, PA 19003   |   www.meyerdesigninc.com

216345555v1

0074



# Dan King, AIA, NCARB
## PRINCIPAL & SENIOR LIVING PRACTICE LEADER

**CAREER EXPERIENCE**
27 years

**TENURE**
24 years

**AFFILIATIONS**
American Institute of Architects

**EDUCATION**
BArch, Kent State University, Architecture

As Meyer's Living Studio Leader, Dan is a nationally recognized expert in the Senior Living and Multi-Family industry. He and his team regularly speak at and attend conferences and seminars nationwide. Dan grew Meyer's Living Studio from a small niche team to a current team of 25 professionals solely focused on senior living and multi-family architecture and interior design. His passion for architecture combined with his compassion for others carries him biannually overseas to perform pro-bono architectural work in underdeveloped countries.

## PROJECT EXPERIENCE

**Allegro**

**Allegro at Parkland** | Parkland, FL
187,500 SF | 177 Units | Master Planning

**Smith Packett**

**The Crossings at West Shore** | Mechanicsburg, PA
185,000 SF | 192 Units | New Construction

**The Crossings at State College** | State College, PA
92,000 SF | 112 Units | New Construction

**The Crossings at Morgantown** | Morgantown, WV
185,000 SF | 172 Units | New Construction

**The Crossings at Hershey** | Hershey, PA
178,630 SF | 178 Units | New Construction

**Atria Senior Living**

**Atria Center City** | Philadelphia, PA | 171,140 SF
Exterior and Interior Renovation

**Atria Darien** | Darien, CT | Interior Renovation

**Atria Springfield** | Springfield, PA | Interior Renovation

**Brandywine Living**

**Brandywine Living at Livingston** | Livingston, NJ
120,000 SF | 120 Units | New Construction

**Brandywine Living at Moorestown Estates**
Moorestown, NJ | 97,000 SF | 108 Units | Addition

**Brandywine Living at Upper Providence** | Oaks, PA
95,000 SF | 96 Units | New Construction

**Brandywine Living at Voorhees** | Voorhees, NJ
90,000 SF | 102 Units | New Construction
Awarded LEED for NC Silver Certification

**Brandywine Living at Mahwah** | Mahwah, NJ
90,000 SF | 85 Units | New Construction

**Brandywine Living at Middlebrook Crossing**
Boundbrook, NJ | 85,000 SF | 90 Beds | New Construction

**Brandywine Living at Fenwick Island**
Rehoboth Beach, DE | 82,900 SF | 110 Units | New Construction

**Brandywine Living at The Gables** | Brick, NJ
63,000 SF | 80 Units | New Construction

**Brandywine Living at Longwood** | Kennett Square, PA
54,000 SF | 84 Units | New Construction

**Brandywine Living at Haddonfield** | Haddonfield, NJ
51,000 SF | 52 Units | Renovation and Addition

**Brandywine Living at Litchfield** | Litchfield, CT
34,000 SF | Addition and Site Work

**Brandywine Living at Seaside Pointe**
Rehoboth Beach, DE | 20,000 SF | 28 Units | Addition

**Brandywine Living at Wall** | Wall, NJ
12,213 SF | 18 Units | Renovation

**Formation Shelbourne**

**The Solana Doylestown** | Doylestown, PA
80,000 SF | 98 Units | New Construction

**The Solana Willistown** | Willistown, PA
79,000 SF | 86 Units | New Construction

**Capital Senior Housing**

**Arbor Terrace Morris Plains** | Morris Plains, NJ
69,000 SF | 85 Units | New Construction

**The Chelsea at Shrewsbury** | Shrewsbury, NJ
67,000 SF | 82 Units | New Construction

**Capitol Seniors Housing at Mt. Laurel** | Mt. Laurel, NJ
71,500 SF | 88 Units | New Construction & Interiors

**Stonegate at Greenburgh** | Greenburgh, NY
85,000 SF | 100 Units | Master Planning

**Arbor Terrace Mountainside** | Mountainside, NJ
65,000 SF | 82 Units | New Construction

**Atria Norwood** | Norwood, NJ
65,000 SF | 80 Units | New Construction

**Frederick Living**

**Frederick Living** | Upper Frederick Township, PA
73,000 SF | 102 Units | Campus Expansion

**Main Line Senior Care**

**Saunders House** | Wynnewood, PA
90,000 SF | Building Renovation

**Bryn Mawr Terrace** | Bryn Mawr, PA
10,300 SF | 21 Units | Renovation



*Together, we deliver your vision.*

A-12





**CARE ONE - EXTERIOR RENDERING**
East Palisade Avenue, Englewood, NJ



0076





**CARE ONE - EXTERIOR RENDERING**
East Palisade Avenue, Englewood, NJ

August 2016 | 856.599.6800 | www.meyerdesigninc.com
(c) Copyright 2016 Meyer Design, Inc. / Meyer Architects, Inc. All Rights Reserved



0077





**CARE ONE - EXTERIOR RENDERING**
East Palisade Avenue, Englewood, NJ



0078







**CARE ONE - EXTERIOR RENDERING**
East Palisade Avenue, Englewood, NJ

0079





FIRST FLOOR PLAN

MEYER
ARCHITECTURE · INTERIORS

CARE ONE
ENGLEWOOD
EAST PALISADE AVENUE,
ENGLEWOOD, NJ

BERGEN COUNTY

1ST FLOOR - OVERALL
PLAN

FIRST FLOOR

A1.01

0081



0082



3RD FLOOR - OVERALL PLAN

MEYER

CARE ONE
ENGLEWOOD
EAST PALISADE AVENUE,
ENGLEWOOD, NJ

BERGEN COUNTY

3RD FLOOR -
OVERALL PLAN

A1.03

0083

A-14



PHILLIPS
PREISS
GRYGIEL
LEHENY
HUGHES

Planning & Real Estate Consultants

May 1, 2019

Thomas J. Herten, Esq.
Archer & Greiner, PC
Court Plaza South, West Wing
21 Main Street, Suite 353
Hackensack, New Jersey 07601-7065

Re:     Planning and Zoning Considerations in Care One Application for
        Rezoning

Dear Mr. Herten:

Per your request, the following is a synopsis of the planning and zoning
issues relating to the application of 7 North Woodland Street, LLC and
431 East Palisade Avenue Real Estate LLC for a rezoning to permit the
development of a Care One Assisted Living Facility ("ALF") in
Englewood. The synopsis also indicates why the proposed
development should be accommodated via a rezoning by the City
Council as opposed to having the Zoning Board entertain an
application for a use variance.

1.  Englewood Master Plan and Zoning Ordinance

    The City of Englewood Municipal Master Plan of 2014
    acknowledges the aging of the City's population, including the
    existence of "a relatively large senior population... more
    than14% of its population is 65 and above" and the fact that
    this represented the largest increase, "more than 20% over the
    past ten years" (at page 27). It also recognizes that this "graying
    of Englewood" requires the City's Master Plan to provide
    housing choices for such a population (at page 30). Senior-
    oriented developed is set forth as a major objective (No. 6) of
    the Master Plan. The Master Plan indicates that an "assisted
    care facility development ... can provide positive fiscal returns
    for the City". However, the City's 2014 Master Plan failed to
    identify specific locations or zones where such development
    could be accommodated.

    As discussed in Kimberly Hoffman Esq.'s letter to the you (dated
    May 1, 2019), while the City's zoning ordinance does allow such

33-41 Newark Street
Third Floor, Suite D
Hoboken, NJ  07030
201.420.6262
www.phillipspreiss.com

0084



PHILLIPS
PREISS
GRYGIEL
LEHENY
HUGHES

Planning & Real Estate Consultants

developments in the RIM Research, Industrial and Manufacturing Zone, a more appropriate location for ALFs would be the City's residential areas or zones. The proposed location of the Care One Assisted Living Facility in Englewood would provide for such an opportunity. Further, as I read Ms. Hoffman's legal analysis, the law supports and mandates that conclusion.

2. Compatible Uses & Appropriate Location

The proposed Care One facility is located at the corner of two appropriate streets – Palisade Avenue and North Woodland Street – which have the capacity to handle traffic and provide access to the project. Palisade Avenue is a major collector/arterial street in Englewood. It runs eastward from the downtown, through an area which is predominantly multi-family, transitioning to an area of larger single family residential lots, but with a number of larger institutional uses in the area – Dwight Englewood School on the opposite corner of North Woodland and Palisade, and the Moriah Hebrew School, a short distance to the south on South Woodland Avenue.

Assisted Living Facilities are extremely benign land uses from a land use viewpoint, with low traffic generation (especially at peak hours), low parking needs, and very little outdoor use or noise/activity generation. They are predominantly residential in nature, and are very often found in the midst of single family residential areas, or adjacent and close to neighboring single family homes, upon which historically they have had little impact.

3. Obligation/Illegal Spot Zoning

There are two overriding mandates related to the rezoning of the subject property for an Assisted Living Facility.

(1) The first is per the Federal Fair Housing Amendments Act (FHAA), where communities are under an obligation to make accommodations for the frail elderly. (Kimberly Hoffman, Esq. addresses this in her letter of May 1, 2019).

(2) The second is the obligation of municipalities to provide for their fair share of low and moderate income housing. With respect to the latter, Englewood's repose, its

2



Planning & Real Estate Consultants

immunity from builder's remedy lawsuits, expires this month (May 2019).

Englewood faces a very substantial third round prospective need obligation. For the period of 1999-2025, FSHC planner, Dr. David Kinsey calculated Englewood's obligation as 1,331 units (which would be lowered to 1,000 units by virtue of a COAH cap). Alternatively, per Judge Jacobson, in the Mercer County Court decision which is now being followed by FSHC and municipalities seeking a declaratory judgement, the third round prospective need for Englewood's 819 units.

ALF's have been considered as "inclusionary housing projects" which help a municipality to meet its Fair Share obligation, because of the requirement that 10% of all units must be for Medicaid-eligible residents, which meet the income threshold for low income households.

When communities rezone individual properties, or individual sites specifically to meet such an obligation, such actions are not considered as illegal spot zoning, because the public health and welfare is being advanced. Moreover, meeting such an affirmative obligation is a necessary legislative action which must be undertaken by the governing body, that is, to create the opportunity for such projects. In other words, it must be undertaken by rezoning and cannot and should not be referred to the Zoning Board of Adjustment for a discretionary decision within the context of d(1) a use variance.

The Care One site meets all of the Site Suitability Criteria set forth in that portion of COAH's Third Round Substantive Rules (amended through April 2009) which are still in effect, NJSA 5:97-3.13 indicates as follows:

(a) Sites designated to provide affordable housing shall be available, approvable, developable and suitable, according to the following criteria:

(1) Site has clear title and is free of encumbrances which preclude development of affordable housing

(2) The site is adjacent to compatible land uses and has access to appropriate streets

(3) Adequate sewer and water capacity

3



PHILLIPS
PREISS
GRYGIEL
LEHENY
HUGHES

Planning & Real Estate Consultants

(4)   The site can be developed consistent with RSIS Sites designated to produce affordable housing are also required to be consistent with the State Development and Redevelopment Plan. The site is in Planning Area 1, the preferred location for municipalities to address their fair share obligation. Finally, the site should not be constrained by wetlands, steep slopes, flood hazards, and the like, so as to preclude such development. The subject property meets all of COAH's site suitability criteria

Clearly the proposed Care One facility site and location is extremely well suited to assist Englewood in meeting the mandates of the Federal Fair Housing Amendments Act and the low and moderate income obligation of the New Jersey's Housing Act.

Yours sincerely,

Richard M. Preiss, P.P.
Principal, Vice-President

Encl: Resume.

17380

216345774v2

4

0087



PHILLIPS
PREISS
GRYGIEL
LEHENY
HUGHES
LLC

Planning & Real Estate Consultants

## RICHARD M. PREISS, PP

Mr. Preiss has been with PPGLH since 1981 and has served as a Vice President since 1984. Mr. Preiss directs most of the firm's land use regulation and physical planning related work, including site plan and variance applications, zoning ordinance updates, master plans, feasibility analyses, affordable housing and urban design studies. Mr. Preiss has testified in several trials and before planning boards, zoning boards and governing bodies on over 2,500 occasions as an expert planning and zoning witness. Mr. Preiss has drafted zoning ordinances for entire municipalities, including the City of Yonkers, City of Rahway and the Village of Roslyn Harbor. Mr. Preiss's clients include the Village of Larchmont, the Borough of Woodcliff Lake, Cranbury Township, and the Radburn Association. In 2012 Mr. Preiss received the Achievement in Planning Award from the New Jersey Planning Officials. Mr. Preiss is also the co-author of the *Illustrated Book of Development Definitions* (4th edition).

**Professional Experience**

Phillips Preiss Grygiel Leheny Hughes LLC
    Vice President, 1984 – present
    Senior Planner, 1981 – 1984
Bureau of Governmental Research and Service,
    Eugene, Oregon
    Senior Planner, 1978 – 1980
Overseas work, 1976 – 1978:
    Israel, Lesotho, South Africa, Swaziland

**Education**

University of Oregon
    Master of Urban Planning, 1980
University of Witwatersrand, Johannesburg
    Bachelor of Science in Town and Regional
    Planning, 1976
    (Degree recognized by the Royal Town
    Planning Institute)

**Professional Licenses and Memberships**

Licensed Professional Planner, State of New Jersey

**Academic Activities**

University of Oregon
    Graduate Teaching Fellow, 1979 – 1980
Juror or Lecturer:
    Pratt Institute, Cook College, School for
    International Training

**Workshops and Conferences**

New Jersey Federation of Planning Officials
Westchester Municipal Planning Federation
Cook College Land Planning and Utilization
    Conference
New Jersey Chapter, American Planning Association
Appraisal Institute, Metro New Jersey Chapter
New Jersey League of Municipalities



A. Kimberly Hoffman
302.888.5209
khoffman@morrisjames.com

May 2, 2019

**VIA: U.S. MAIL**

Thomas J. Herten, Esquire
Archer & Greiner, P.C.
Court Plaza South, West Wing
21 Main Street, Suite 353
Hackensack, NJ 07601-7065

RE:   CITY OF ENGLEWOOD REZONING APPLICATION of
      7 NORTH WOODLAND STREET, LLC and
      431 E PALISADE AVENUE REAL ESTATE, LLC

Dear Mr. Herten:

You have asked on behalf of our mutual clients 431 E Palisade Avenue Real Estate, LLC and 7 North Woodland Street, LLC (collectively, "Developers") that this firm offer analysis of the Fair Housing Amendments Act implications should the City of Englewood (the "City") deny Developer's pending application to rezone certain parcels to allow an assisted living and memory care facility (the "Application"), as more fully described in your letter of January 14, 2017, previously submitted to Council, incorporated as part of the record, and referred to herein as the "Letter". I also include similar analysis of the Religious Land Use and Institutionalized Persons Act ("RLUIPA").

For the reasons stated below, Developer would have a viable federal cause of action in such an event, and may pursue injunctive relief against enforcement of such a denial, as well as its reasonable counsel fees as well as provable damages. I incorporate the facts stated in your Letter in support of this analysis, and the work product submitted by the project's architect, land planner, traffic engineer and the principals of CareOne, LLC, the experienced healthcare developers who will build and manage the project, as further detailed in the submissions of other professionals, including the planner, architect, landscape designer, and civil engineer concurrently submitted with this letter on May 2, 2019 (collectively, the "Submission"), and will in turn discuss: (1) the City's present zoning scheme and master plan; (2) the City's geography, demographics, and current ability of citizens to access services the Application provides; (3) a summary of Developer's attempts to approve the Application to date; and then (4) apply the Fair Housing Act

500 Delaware Avenue, Suite 1500   Wilmington, DE 19801-1494   T 302.888.6800   F 302.571.1750
Mailing Address   P.O. Box 2306   Wilmington, DE 19899-2306   www.morrisjames.com

0089

Thomas J. Herten, Esquire
May 2, 2019
Page 2

Morris James LLP

and RLUIPA as interpreted by the Federal Courts to those facts, demonstrating the City's opportunities for compliance by approval of the Application.

I.    City Zoning Code and Master Plan

In 2014, the City adopted the present Municipal Master Plan ("Master Plan"). Pursuant to the Master Plan, the City amended portions of the Code of the City of Englewood.[1] The Code describes allowed land uses within various zoning districts. No residential zoning district allows assisted living or memory care (the "Proposed Uses") as a matter of right, or even as a conditional use. Code § 250 (generally). The Research, Industry and Medical District (RIM) does allow the Proposed Uses. Code § 250-72(B) (Medical and Healthcare/Assisted Living Facility/Skilled Nursing Facility). While schools and religious uses *are* allowed in one-family residence districts, despite being non-residential, the uses the Application proposes are not. Code § 250-59(B)(6)(T) (the subject lots are zoned R-AAA, which is a one-family residence district designation). The Multiple Residence (RMH) District allows for "senior citizen dwelling units," but without the skilled nursing care or support services the RIM district would allow. Code § 250-62. In short, care of the elderly/disabled is zoned out of all City residential districts as the Code describes them.[2]

The zoning map for the City demonstrates the exclusion of handicapped persons whom the Application would serve from residential areas when the Code's exclusionary standards apply to adopted zoning district designations. Code §§ 250-3 – 250-7. Land in RIM districts where the Proposed Uses are allowed is geographically distant from many City residential neighborhoods. Today the Proposed Uses do not exist in any City residentially zoned district. One similar use is under construction in the RIM district, along a Highway designated as Route 4, to be called the "Bristal." The Bristal is not in or adjacent to a residential neighborhood or residentially zoned district.

As more fully discussed in Section V below, the Code does not provide a reasonable accommodation for housing serving handicapped persons. To locate the Proposed Uses in any residential district requires the Developer to pursue a use variance. *See* Code §§ 250-3 - 250-7 (rezoning maps); 250-17(6) (Planning Board Powers); 250-26 – 250-27 (Board of Adjustment Powers). The Code does not allow for the use, nor does it articulate bulk standards appropriate to the Proposed Uses in a residential district. Thus, any attempt to pursue a use variance is an effort which lacks standards and guidance for anyone in the shoes of applicant. This problem is not unique to the proposed site. Handicapped persons are therefore denied reasonable accommodation necessary to afford them an opportunity to live in a residential neighborhood. Simply put, legislative action, as requested by Applicant, is required to create that opportunity. To implement the objectives of the Master Plan related to housing and services for seniors, Council must act, as has been the case in the adoption of ordinances to implement other portions of the Master Plan.

---

[1] Hereafter "Code" with a section reference. All references are to the version codified at ecode360.com. The City Clerk also maintains a version of the Code.

[2] See Section V below as to why elderly persons also qualify as handicapped persons under the FHA.

10901750/5

Thomas J. Herten, Esquire
May 2, 2019
Page 3

**Morris James** LLP

The Board of Adjustment does not implement the Master Plan, is quasi-judicial, not legislative in nature, and cannot reasonably be expected to create standards on its own to craft a reasonable accommodation for the Proposed Uses to exist in a residential zone, which the Code simply does not contemplate.

II.     City Geography, Demographics and Present Assisted Living/Memory Care

        According to the Master Plan, the City's population is aging.[3] "In Englewood, the largest increases – more than 20% over the first ten years – are in 'active adult' and 'senior citizens' demographics." The figure shows increases in the 65 and over population, with the 85 and over population increasing 15% from 2000-2010.[4] The number of elderly in the City living alone also increased. The Master Plan cites "the 'graying of Englewood'" as an important planning consideration and asks rhetorically, "For long-standing residents who are now seniors, can they 'age in place?'"[5] The answer depends, of course, on whether the Application and others like it can succeed in obtaining City approval.

        To address its aging population, the Master Plan contains objective N6.2, "Consider senior-oriented development."[6] The text mentions "age-restricted, senior independent living and assisted care facility developments."[7] However, the Master Plan fails to recommend creation of a by-right zoning category for such uses, as it does for the hospital, so the hospital campus can be a by-right use. Lack of access to the Proposed Uses, and other forms of care, has been the result.

III.    Developer's Proposal

        The Letter and concurrent Submission contain details regarding bulk requirements, aesthetics, traffic, site and building configuration, as well as the uses and nature of the surrounding community. For purposes of this letter, I highlight the presence of large institutional uses proximate to the site: the Dwight Englewood School on the opposite corner of North Woodland and Palisade Avenue, and the Moriah Hebrew School on South Woodland Street, which is presently expanding.

        Also, the Proposed Uses will facilitate religious practice by future residents, religious leaders, and community members for whom visiting family and the sick is an article of faith. The Proposed Uses will incorporate a non-denominational chapel that will allow worship by residents of all faiths and visits by officiants who will conduct services, visit congregants, and generally help handicapped residents remain integrated in the religious life of the community. A number of community churches and synagogues are nearby. Elderly persons face barriers participating in religious services and practicing faith due to lack of mobility. Jewish Orthodox residents in

---

[3] Master Plan at p. 27, fig. 7
[4] Id.
[5] Id. at 28, fig. 8
[6] Id. at 30
[7] Id. at 72

Thomas J. Herten, Esquire
May 2, 2019
Page 4

**Morris James** LLP

particular must walk to services on Shabbat, which the Application will facilitate both for residents and community members alike. Several congregations rely on proximity in this way, including Kehilat Kesher, Congregation Shomrei Emunah, Congregation Ahavath Torah, and the East Hill Synagogue.

IV.     Developer's Attempts to Obtain Approval

Developer has submitted a rezoning application as described in the Letter, proposing a number of conditions to approval, which address bulk requirements and other health, safety, and welfare matters. Since 2017, representatives of the Developer have met with City staff, addressed concerns raised by the City attorney regarding potential challenges to a rezoning, and discussed the Application with the Council at a public meeting and with community leaders and local neighbors. Other than the Code's use restriction, all other concerns with the Application have been addressed, and formal plan review can proceed after the rezoning is complete. It has been suggested to Developer's representatives that the Application should proceed as a use variance, but for the reasons stated herein, such a requirement is not a reasonable accommodation as to housing for the elderly/handicapped, and is an impermissible burden on religious practice in the City.

V.      Fair Housing Amendments Act Analysis

One of the core functions of the Fair Housing Act, as updated by the Fair Housing Amendments Act, ("FHA") is to ensure that zoning authorities do not employ land use regulations to hinder the residential choices of disabled individuals, including the individuals' choice to live in communal or congregate residential settings, such as assisted living facilities.[8] As the Third Circuit has recognized, this protection extends to residents of such facilities because those residents are presumptively disabled, and those interests may be protected by parties like Developer.[9] In addition to prohibiting disparate treatment, the FHA also prohibits zoning ordinances that have a disparate impact upon the disabled and refusals by a municipality to make

---

[8] *See* H.R. Rep. No. 100–711, at 24 (1988), *as reprinted in* 1988 U.S.C.C.A.N. 2173, 2185 ("The [FHA] is intended to prohibit the application of special requirements through land-use regulations, restrictive covenants, and conditional or special use permits that have the effect of limiting the ability of such individuals to live in the residence of their choice in the community."); *Helen L. v. DiDario*, 46 F.3d 325, 333 n. 14 (3d Cir. 1995) (quoting H.R. Rep. No. 100-711), *cert. denied*, 516 U.S. 813 (1995). *See also, Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999) (holding, under the Americans with Disabilities Act, that unjustified isolation of the disabled is discriminatory).

[9] *Wagner v. Fair Acres Geriatric Ctr.*, 49 F.3d 1002, 1010 (3d Cir. 1995) ("Obviously, everyone that applies for admission to a nursing home does so because of his or her disabilities. Indeed, no one would be able to meet a nursing home's admissions requirements in the absence of some handicapping condition necessitating nursing home care."). *See also, Horizon House Development Servs., Inc. v. Twp. of Upper Southampton*, 804 F. Supp. 683, 694 (E.D. Pa. 1992) (zoning codes may not single out individuals unable to live independently), *aff'd*, 995 F.2d 217 (3d Cir. 1993).

Thomas J. Herten, Esquire
May 2, 2019
Page 5

Morris James LLP

reasonable accommodations in zoning ordinances.[10] In brief, either through policy or accommodation, municipalities must afford the elderly disabled with an equal opportunity to use and enjoy housing in residential districts — including the Proposed Uses.[11] The use variance procedure, while neutral on its face, causes the Code to have a disparate impact on the handicapped, and forcing Developer to follow it does not constitute a reasonable accommodation.

Disparate treatment, often called intentional discrimination, is just that — zoning ordinances targeted at a protected group. Such ordinances need not be intentionally malicious; rather, it is enough to show that the disability "was a motivating factor behind the challenged action or decision."[12] Developer would be entitled to further development of the record in this respect, but Council has thus far entirely ignored its Master Plan obligations regarding senior housing. The elderly have thus been singled out and denied a housing benefit the FHA protects and the Master Plan requires.

By contrast, disparate impact claims address those actions and decisions which, although not intentionally discriminatory, actually or predictably result in discrimination. Even otherwise neutral ordinances may violate the FHA if the ordinances disparately impact the disabled, by, for instance, preventing the disabled from living in certain areas of the City. There is no dispute that to date, there are no assisted living facilities in the City's residential districts.

Reasonable accommodations involve a request that an otherwise-applicable rule, procedure or ordinance be waived or amended to afford disabled persons "equal opportunity to use and enjoy a dwelling."[13] While the reasonableness of any accommodation is a case-by-case determination, it is clearly established that municipalities cannot segregate the elderly or disabled. Rather, municipal zoning authorities have an affirmative duty "to accommodate the elderly disabled who are in need of nursing home care and desire to live in one of the [municipality's] residential zones."[14]

For example, in *Hovsons,* the Third Circuit ruled in favor of a nursing home developer and found that the municipality had violated the FHA by its refusal to grant the developer a variance to build a nursing home in a predominantly residential area. The Brick Township zoning code did

---

[10] *Cmty. Servs., Inc. v. Wind Gap Mun. Auth.*, 421 F.3d 170, 177 (3d Cir. 2005).
[11] The FHA draws no distinction between nursing homes, assisted living and skilled nursing centers, for purposes of this analysis, so long as they house the disabled. Case law discussing nursing homes applies equally to the Proposed Uses. *See* A.K. Hoffman and J. Landon, "Zoning and the Aging Population: Are Residential Communities Zoning Elder Care Out," *At the Cutting Edge 2012: Land Use Law From Urban Lawyer* at 634-35 & fn. 29 (2012, ABA).
[12] *Id.* (quotation omitted).
[13] 42 U.S.C. § 3604(f)(3)(B). *Lapid–Laurel, L.L.C. v. Zoning Bd. of Adjustment of the Twp. of Scotch*, 284 F.3d 442, 449, 456 (3d Cir. 2002).
[14] *Hovsons, Inc. v. Twp. of Brick*, 89 F.3d 1096, 1106 (3d Cir. 1996). Notably, the Board of Adjustment has no such duty, and therefore a decision on the Application should not be committed to it, rather than to Council.

10901750/5

Thomas J. Herten, Esquire                                             Morris James LLP
May 2, 2019
Page 6

not allow nursing homes to be built in residential areas, but only within a "hospital support zone."
Much of the remaining land in the hospital support zone was unsuitable for development, so the
developer applied for a variance. After seventeen public hearings and two years, the township's
zoning board denied the variance. On appeal, the Third Circuit flatly rejected the township's
arguments that nursing homes were incompatible with its zoning code or general residential use
because such a conclusion was "precisely the type of land use planning that the [FHA] was enacted
to prevent and, if necessary, overrule."[15] The facts on *Hovsons* mirror the Developer's present
predicament: no City residential zone allows the Application to proceed. Furthermore, requiring
Developer to pursue a variance will not save the City from FHA liability.

   Other examples abound. In *Community Services, Inc. v. Heidelberg Township*,[16] the federal
district court ruled in favor of a regional healthcare provider that sought an injunction against a
township which refused a reasonable accommodation to permit housing for disabled persons. As
the court noted, a municipality that refuses to permit disabled housing or a convalescent home as
a matter of right in any zoning classification is likely committing "intentional discrimination
through . . . application of facially discriminatory zoning ordinances."[17] The Code falls into this
same category by zoning the Proposed Uses out of all residential districts, and Council must
address that deficiency through the rezoning process.

   Similarly, in *Assisted Living Associates of Moorestown, L.L.C. v. Moorestown Township*,[18]
cited also in the Letter, the district court rejected a municipality's deliberate attempt to rezone an
area to prevent construction of a nursing home. Even though there were other available nursing
homes in the area, the court granted an injunction against the township's enforcement of the new
ordinance because the court found that the developer and the potential residents were likely to
prevail on claims of intentional discrimination or disparate impact. The other assisted living
facility being developed in the non-residential RIM district does not relieve the City of the
obligation to provide a reasonable accommodation in a residentially zoned district.

   Just as a municipality may not segregate the elderly disabled, a municipality may not
impose more onerous requirements under the guise of a reasonable accommodation. "'Reasonable
accommodation' means changing some rule that is generally applicable to everyone so as to make
its burden less onerous on the handicapped individual."[19] Imposing a more onerous process on
those seeking an accommodation "stands the concept [of reasonable accommodation] on its head"
because it is analogous to arguing that "a rule requiring only handicapped people to pay a special
fee before entering a building constitutes a reasonable accommodation."[20] When City officials or
legislators admonish Developer to seek a use variance it is doing exactly that, as the Board of

---

[15] *Id.* at 1105.
[16] 439 F. Supp. 2d 380 (M.D.Pa. 2006).
[17] *Id.* at 397.
[18] 996 F. Supp. 409 (D.N.J. 1998)
[19] *Oxford House, Inc. v. Twp. of Cherry Hill*, 799 F. Supp. 450, 462 n.25 (D.N.J. 1992).
[20] *Id.*

Thomas J. Herten, Esquire
May 2, 2019
Page 7

Morris James LLP

Adjustment does not have the statutory authority to implement the Master Plan or oversee FHA compliance.[21]

Under this reasoning, courts have rejected municipalities' claims that providing an alternate, more onerous pathway is a reasonable accommodation. For instance, in *Oxford House, Inc.*, the court found that the town had failed to provide a reasonable accommodation when rather than simply waive a minor requirement and grant a certificate of occupancy, the town instead suggested that the developer undertake a variance process. Likewise, in *Sunrise Development, Inc. v. Town of Huntington, New York*, the court rejected a town's position that it had provided a reasonable accommodation because the developer of a nursing home could apply for a full zoning change even though other applicants would have been entitled to apply for a special use.[22] Applicant has instead offered to collaborate with the City to create a new, appropriate zoning category to accommodate the Proposed Uses, while generally respecting the same health, safety and welfare requirements the RIM district uses for similar facilities.

Not surprisingly, given the FHA's remedial purposes, litigation over these issues frequently requires the municipality to bear the burden of proof. Faced with a claim of disparate impact, the town must offer a legitimate reason for its actions once the plaintiff establishes a disparate impact.[23] Similarly, in a reasonable accommodation case, the plaintiff must show that the accommodation is necessary to afford a disabled person the equal opportunity to use and enjoy a dwelling. Then, the burden shifts to the municipality to prove the accommodation is unreasonable because it poses undue financial or administrative burden, it imposes an undue hardship of the town, or it requires "a fundamental alteration in the nature of the zoning program."[24] Submissions made by Phillips Preiss and others demonstrate that the City would not be able to make such a showing, because the City has already allowed nearby institutional uses, traffic will not appreciably increase, the design fits in with the community, and all health, safety and welfare obligations have been met by the Application. Developer will also integrate the use into the community by locating it on an arterial road and buffering the single family uses by enhancing landscaping substantially.

The Code also has a disparate impact on the handicapped by failing to allow the Proposed Uses in any residential district. While it is true that Developer can apply for a use variance in any district it chooses, Englewood has a limited number of arterial and collector roads which are also in residentially zoned areas. Failure to locate the Proposed Uses on an arterial or collector road would likely cause a substantial encroachment into a single family neighborhood, whereas the Proposed Uses will front on East Palisade Avenue. The Proposed Uses will back up to existing residential homes; this is the optimal scenario for the City to fulfill its obligation to afford

---

[21] Notably, the City's repose from fair-share housing litigation expires on May 31, 2019. *See, Order, ERA South, LLC v. City of Englewood*, Sup. Ct. N.J., Berg-L-233-09 at ¶ 3 (Oct. 15, 2014).
[22] 62 F. Supp. 2d 762, 777 (E.D. N.Y. 1999).
[23] *See Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly*, 658 F.3d 375, 385-86 (3d Cir. 2011), *cert. dismissed*, 571 U.S. 1020 (2013).
[24] *Cmty. Servs., Inc. v. Heidelberg Twp.*, 439 F. Supp. 2d 380, 398 (3d Cir. 2006).

10901750/5

Thomas J. Herten, Esquire
May 2, 2019
Page 8

Morris James ʟʟᴘ

residential housing opportunities to handicapped seniors, and another site will not present a better
scenario given the committed development pattern of the City today.[25]  Therefore, even without
discriminatory intent, there is an adverse disproportionate impact on handicapped persons because
all use variances will involve the same community compatibility issues.[26]  This renders the use
variance alternative meaningless, and mandates a legislative solution to avoid running afoul of the
FHA.

        Claims under the FHA are not mutually exclusive, either.  So, a disabled plaintiff whose
religion is also burdened could bring multiple FHA claims at once.  Also, a plaintiff can bring
other non-FHA claims, too, such as claims under state fair housing law and claims under other
federal schemes, such as the Americans with Disabilities Act.  Obviously, courts are not a desirable
forum for resolving land use disputes, but Developer would have multiple avenues of recovery if
the Application is denied.

        In sum, municipalities whose zoning codes seek to restrict assisted living facilities to
certain areas, or that fail to provide an accommodation so that assisted living can be located near
the elderly, disabled persons it intends to serve, face a distinct chance of liability under the FHA.
As the Third Circuit has recognized, the FHA "is intended to prohibit the imposition of terms or
conditions which have the effect of excluding congregate living arrangements for persons with
handicaps," and "strict adherence to a rule which has the effect of precluding handicapped
individuals from residing in the residence of their choice was precisely the type of conduct which
the [FHA] sought to overcome[.]"[27]  Approving the Application will obviate those infirmities in
the Code, as regards federal FHA compliance.[28]

VI.     Religious, Land Use and Institutionalized Persons Act Analysis

        Bergen County has 44 Jewish Orthodox congregations with 18,500 adherents or 20% of
the County's population.[29]  Orthodox congregations in the City include Congregation Ahavath
Torah, which is 1.1 miles from the site, and others listed in Section III above.  Members of the
temple, including the rabbi, cannot feasibly walk to a nursing home located in the RIM district,
impairing the exercise of religion for congregants both living at the assisted living facility, and the
rabbis and families with whom they may wish to worship.

---

[25]  The Application requires a height variance, for example.
[26]  *Cf. Lapis-Laurel, LLC*, 284 F.3d at 467-8 (containing no findings on realistic alternate locations
for use where the area variances requested would not also be required, or the traffic impacts would
be avoided.)
[27]  *Hovsons, Inc.*, 89 F.3d at 1106 (quotations and punctuation omitted).
[28]  This analysis does not address the City's fair share obligations as described in the Third Round
Housing Element and Fair Share Plan, City of Englewood: 2014 Revision (on file with City Clerk).
[29]  *See* usreligiouscensus.org/orthodoxjudaism (based on the most recent 2010 census), and the
Association of Religious Data Archives (http;//www.thearda.com).

10901750/5

Thomas J. Herten, Esquire
May 2, 2019
Page 9

Morris James LLP

Both the FHA and the Religious Land Use and Institutionalized Persons Act ("RLUIPA") prohibit zoning ordinances which, though neutral, nonetheless impose a substantial burden on religious exercise. RLUIPA is implicated when the individualized implementation of a land use regulation substantially burdens a person's exercise of religion.[30] RLUIPA covers almost all zoning functions because zoning ordinances, by nature, impose individualized assessments and case-by-case evaluations of a proposed activity against land use regulations.[31] Further, RLUIPA defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief,"[32] with the understanding that the definition is to be construed broadly "to the maximum extent permitted by the [RLUIPA] and the Constitution."[33]

A violation of RLUIPA occurs when evidence demonstrates that the land use regulation at issue as implemented: (1) imposes a substantial burden (2) on the "religious exercise" (3) of a person, institution, or assembly.[34] Once a plaintiff identifies a substantial burden, the City bears the burden of proving the ordinance "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest."[35] Because the definition of what constitutes "religious exercise" is broad, the range of restrictions that constitute a substantial burden is similarly broad.[36] And numerous courts have recognized that "a burden need not be found insuperable to be held substantial."[37]

With regard to certain Jewish communities, for example, courts and commentators have recognized that RLUIPA is frequently implicated. Under their religious tenets, Orthodox Jews are forbidden from riding or driving in cars from sundown on Friday until sundown on Saturday, but Orthodox Jews also have a duty to visit the sick on the Shabbat. So, local zoning ordinances which segregate care facilities to certain areas like the City does (rather than allow care facilities to be near the populations they serve) cause exactly the choice that RLUIPA prohibits -- accessing community services versus complying with religious tenets. In *Midrash Sephardi, Inc. v. Town of Surfside*, for example, a Florida federal court accepted that zoning which forced Jewish residents to walk distances of more than "a few extra blocks" out of their way might pose a substantial burden.[38] Such a burden might be even more substantial if the affected individuals are elderly or

---

[30] 42 U.S.C. § 2000cc(2)(C).

[31] *Freedom Baptist Church of Delaware County v. Twp. of Middletown*, 204 F. Supp. 2d 857, 868–69 (E.D. Pa. 2002).

[32] 42 U.S.C. § 2000cc–5(7)(A)

[33] 42 U.S.C. § 2000cc–3(g).

[34] 42 U.S.C. § 2000cc(a)(1).

[35] 42 U.S.C. § 2000cc(a)(1)(A)-(B).

[36] *See Congregation Kol Ami v. Abington Twp.*, 2004 WL 1837037, at *8 (E.D. Pa. Aug. 17, 2004), *amended* 2004 WL 2137819 (E.D. Pa. Sept. 21, 2004).

[37] *See, e.g., Int'l Church of the Foursquare Gospel v. City of San Leandro*, 634 F.3d 1037, 1046 (9th Cir. 2011), *cert. denied*, 132 S. Ct. 251 (2011); *Westchester Day Sch. v. Vill. of Mamaroneck*, 504 F.3d 338, 349 (2d Cir. 2007); *Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d 895, 901 (7th Cir. 2005), *reh'g and reh'g en banc denied*, Mar. 7, 2005.

[38] 366 F.3d 1214, 1228 (11th Cir. 2004), *cert. denied*, 543 U.S. 1146 (2005).

10901750/5

Thomas J. Herten, Esquire
May 2, 2019
Page 10

Morris James LLP

disabled.[39] Another commentator has even suggested that RLUIPA might be implicated any time a zoning code prevents a Jewish community from having access to all essential services, including congregates' dwellings, within a 1.2 mile radius.[40]

Given this, it is questionable as to whether the Code, which restricts locations of care facilities and effectively undermines their use by a particular religious community would survive a RLUIPA challenge. This is especially true if the City refuses to grant the relief the Application requests, or attempts to commit the Application to a quasi-judicial process that does not account for RLUIPA. After all, as the United States Supreme Court recently reminded us, RLUIPA requires Courts to "scrutinize the asserted harm of granting specific exemptions to particular religious claimants and to look to the marginal interest in enforcing the challenged government action in that particular context."[41] The City's substantial number of Jewish schools and Bergen County's high Jewish Orthodox population make this issue especially urgent as it relates to the Application, and residents of all faiths will have equal access to residential housing that integrates religious practice (the Application proposes a non-denomination chapel as part of the facility), to address problems with mobility that prevent the handicapped from accessing services elsewhere. As the Master Plan found, the City's elderly increasing live alone and as such have barriers to participating in religious life in the City. To date, the City has alleged no compelling interest to justify exclusion of the proposed project based on existing Code categories, and should grant the Application.

In summary, Council has the opportunity to grant this Application and fulfill the City's obligations under both the Fair Housing Act and the Religious Land Use and Institutionalized Persons Act, as well as implementing key tenants of the Master Plan. On the other hand, should it shirk these responsibilities by denying the Application or sending the Developer to the Board of Adjustment, the federal courts may well order the Application approved anyway, in addition to granting other relief such as damages and attorneys' fees. Please let me know if you require further analysis, or if additional facts should be incorporated into this letter. Thank you for your kind attention.

Sincerely,

A. Kimberly Hoffman Feal

A. Kimberly Hoffman

AKH/met

---

[39] See id.
[40] See Charis G. Orzechowski, *A Non-Intent Based Challenge to Exclusionary Zoning: Why RLUIPA Can Help One Religious Community When Constitutional Challenges Fail*, 40 Rutgers L. Rec. 1, 5 (2013).
[41] *Holt v. Hobbs*, 135 S. Ct. 853, 863, 190 L. Ed. 2d 747 (2015) (quotations omitted).

10901750/5