## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| 431 E PALISADE AVENUE REAL ESTATE, LLC and 7 NORTH WOODLAND STREET, LLC, on behalf of themselves and prospective residents, JOHN and JANE DOES 1-10 | Civil Action No. _____ |
| Plaintiffs, | **ORAL ARGUMENT REQUESTED** |
| v. | **Return Date: August 5, 2019** |
| CITY OF ENGLEWOOD and CITY COUNCIL OF ENGLEWOOD, | |
| Defendants. | |

---

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' APPLICATION TO PRELIMINARY ENJOIN THE CITY OF ENGLEWOOD AND THE CITY COUNCIL OF ENGLEWOOD FROM ENFORCING ITS DISCRIMINATORY ZONING CODE AGAINST PLAINTIFFS

---

Of Counsel and On the Brief:
    Warren A. Usatine
    Michael R. Yellin
    A. Kimberly Hoffman (*pro hac vice* application forthcoming)

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT ............................................................................ 1

FACTUAL BACKGROUND................................................................................. 2

LEGAL ARGUMENT.......................................................................................... 3

    I.      DEFENDANTS SHOULD BE PRELIMINARILY ENJOINED FROM
         ENFORCING THE UNCONSTITUTIONAL AND DISCRIMINATORY
         CODE.................................................................................................... 3

         A.    Defendants' Blatant Discrimination Establishes A High Probability
               Of Success On The Merits Of Plaintiffs' Claims........................................ 4

         B.    Plaintiffs Will Suffer Irreparable Harm In The Absence Of
               Preliminary Injunctive Relief................................................................... 23

         C.    The Balance Of Hardships Weighs Decisively In Favor Of
               Approving The Application Despite The City's Exclusionary
               Zoning Code And Inaction........................................................................ 24

         D.    The Public Interest Strongly Favors Granting The Injunctive Relief
               Requested Herein .................................................................................... 25

CONCLUSION.................................................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

901 Ernston Rd., LLC v. Borough of Sayreville Zoning Bd. of Adjustment,
　Case No. 18-2442, 2018 WL 2176175 (D.N.J. May 11, 2018) .........................................15, 26

Arc of N.J., Inc. v. N.J.,
　950 F. Supp. 637 (D.N.J. 1996) .................................................................................................6

Assisted Living Assocs. of Moorestown, L.L.C. v. Moorestown Twp.,
　996 F. Supp. 409 (D.N.J. 1998) ......................................................................................5, 6, 14

Atlantic City Coin & Slot Serv, Co., Inc. v. IGT,
　14 F. Supp. 2d 644 (D.N.J. 1998) ............................................................................................4

Bay Area Addiction Research and Treatment, Inc. v. City of Antioch,
　179 F.3d 725 (9th Cir. 1999) ...................................................................................................17

Beilowitz v. General Motors Corp.,
　233 F. Supp. 2d 631 (D.N.J. 2002) ...........................................................................................3

Byrne v. Calastro,
　205 Fed. Appx. 10 (3d Cir. 2006)..............................................................................................3

Caron Found. of Fla. Inc., v. City of Delray Beach,
　879 F. Supp. 2d. 1353 (S.D. Fla. 2012) ..................................................................................24

City of Cleburne v. Cleburne Living Ctr.,
　473 U.S. 432 (1985)................................................................................................................22

Cmty. Servs., Inc. v. Heidelberg Twp.,
　439 F. Supp. 2d 380 (M.D. Pa. 2006) ...........................................................................6, 12, 14

Cmty. Servs., Inc. v. Wind Gap Mun. Auth,
　421 F.3d 170 (3d Cir. 2005).......................................................................................................8

Congregation Kol Ami v. Abington Twp.,
　Case No. 01-1919, 2004 WL 1837037 (E.D. Pa. Aug. 17, 2004), amended,
　2004 WL 2137819 (E.D. Pa. Sept. 21, 2004) .........................................................................20

In re Eagle-Picher Indus. Inc.,
　963 F.2d 855 (6th Cir. 1992) .....................................................................................................3

Easter Seal Soc. of New Jersey, Inc. v. Twp. of N. Bergen,
　798 F. Supp. 228 (D.N.J. 1992) ...........................................................................................6, 23

Feiler v. Fort Lee Bd. of Adjustment,
    573 A.2d 175 (App. Div. 1990), cert. denied, 604 A.2d 600 (N.J. 1991) ..............................11

Freedom Baptist Church of De. Cty. V. Twp. of Middletown,
    204 F. Supp. 2d 857 (E.D. Pa. 2002) ....................................................................................19

Holt v. Hobbs,
    135 S. Ct. 853 (2015)..............................................................................................................21

Horizon House Dev. Servs., Inc. v. Twp. of Upper Southampton,
    804 F. Supp. 683 (E.D. Pa. 1992), aff'd, 995 F.2d 217 (3d Cir. 1993) ...................................8

Hovsons v. Twp. of Brick,
    89 F.3d 1906 (3d Cir. 1996)................................................................................................9, 10

Hovsons, Inc. v. Twp. of Brick,
    89 F.3d 1096 (3d Cir. 1996).......................................................................................5, 10, 13, 16

Int'l Church of the Foursquare Gospel v. City of San Leandro,
    634 F.3d 1037 (9th Cir. 2011), cert. denied, 132 S. Ct. 251 (2011) .......................................20

Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment of the Twp. of Scotch Plains,
    284 F.3d. 442 (3d Cir. 2002)..............................................................................................8, 11

McKivitz v. Twp. of Stowe,
    769 F. Supp. 2d 803 (W.D. Pa. 2010) (29 U.S.C. § 794a(a)(2)) ............................................17

Midrash Sephardi, Inc. v. Town of Surfside,
    366 F.3d 1214 (11th Cir. 2004), cert. denied, 543 U.S. 1146 (2005) ...............................19, 21

Minard Run Oil Co. v. U.S. Forest Serv.,
    670 F.3d 236 (3d Cir. 2011), as amended (Mar. 7, 2012) .......................................................23

Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly,
    658 F.3d 375 (3d Cir. 2011), cert. dismissed, 571 U.S. 1020 (2013) ......................................11

MX Grp., Inc. v. City of Covington,
    293 F.3d 326 (6th Cir. 2002) ...................................................................................................17

N. Jersey Vineyard Church v. Twp. of S. Hackensack,
    Case No. CV 15-8369, 2016 WL 1365997 (D.N.J. Apr. 6, 2016)...........................................23

New Directions Treatment Servs. v. City of Reading,
    490 F.3d 293 (3d Cir. 2007)...............................................................................................17, 18

NutraSweet Co. v. Vit-Mar Enters., Inc.,
    176 F.3d 151 (3d Cir. 1999)......................................................................................................3

Oxford House, Inc. v. Twp. of Cherry Hill,
   799 F. Supp. 450 (D.N.J. 1992) ..............................................................14, 15

Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin,
   396 F.3d 895 (7th Cir. 2005), reh'g and reh'g en banc denied (Mar. 7, 2005) ......................20

Wagner v. Fair Acres Geriatric Ctr.,
   49 F.3d 1002 (3d Cir. 1995).....................................................................8, 9

Westchester Day Sch. v. Vill. of Mamaroneck,
   504 F.3d 338 (2d Cir. 2007)....................................................................20

**Statutes and Other Authorities**

28 C.F.R. § 35.130(4)(i) ..........................................................................18

29 U.S.C. § 794 ..................................................................................17

42 U.S.C. § 2000cc ..........................................................................19, 20

42 U.S.C. § 2000cc-2 ...........................................................................21

42 U.S.C. § 2000cc-3 ...........................................................................19

42 U.S.C. § 2000cc-5 ...........................................................................19

42 U.S.C.A. § 3604 ...........................................................................5, 13

42 U.S.C § 3613 .................................................................................3

42 U.S.C. § 12132 ...............................................................................18

Local R. Civ. P. 65.1 .............................................................................4

N.J.S.A. 40:550-70(b) ...........................................................................11

Plaintiffs 431 E Palisade Avenue Real Estate, LLC and 7 North Woodland Street, LLC (collectively, "Plaintiffs"), on behalf of themselves and their prospective residents, respectfully submit this Memorandum of Law in support of their application for preliminary injunctive relief against defendants the City of the Englewood (the "City") and the City Council of Englewood (the "Council" and, together with the City, collectively, "Defendants").

## PRELIMINARY STATEMENT

The City's zoning code (the "Code") impermissibly zones assisted living and memory care facilities out of all residential districts in the City.  Instead, the Code segregates such facilities into a "RIM" zone in a distant portion of the City surrounded by industrial zones.  The City's strict enforcement of the Code has had the unacceptable and legally impermissible effect of: (i) depriving elderly and handicapped residents in need of daily care in a congregant setting of the right to live in residential neighborhoods; and (ii) precluding members of the City's Orthodox Jewish community, who have significant restrictions on their ability to travel to the segregated RIM zone, from traveling to or from such facilities on Shabbat and other religious holidays.  Suffice it to say, the Code runs afoul of federal and state anti-discrimination laws and its further enforcement against Plaintiffs cannot be countenanced.

The City's discriminatory practices also expose Plaintiffs to the risk of suffering imminent, irreparable harm, *i.e.*, the loss of their right to acquire certain real property by August 9, 2019.  As elaborated upon below, for the past two years, Plaintiffs have sought to develop a 150-bed assisted living and memory care home (the "Facility") in a residential zone of the City. The Facility will allow elderly and handicapped residents in need of a congregant care setting to live near their family and friends in the City's residential areas.  Moreover, the Facility will be built in an area that will allow members of the Orthodox Jewish community to travel to and from

1

the Facility on Shabbat and other religious holidays—a right that is currently denied by the City's failure to provide a reasonable accommodation for the Facility under established Code procedures.

Plaintiffs intend to build the Facility on four parcels of land, one of which they already own and the three of which they are under contract to acquire.  If Plaintiffs cannot obtain the right to proceed with development of the Facility by August 9, 2019, however, they are at risk that the seller will exercise its right to terminate the sale agreement.   Despite being made aware of the illegality of their discriminatory practices, Defendants have refused to grant Plaintiffs a reasonable accommodation to allow development to proceed.  Instead, Defendants have refused to act on Plaintiffs' request for approval of the Facility.

Defendants' unlawful enforcement of the Code is indefensible and should not be countenanced by this Court.  Pending full adjudication of this matter, Defendants should be precluded from enforcing the discriminatory Code against Plaintiffs.   Thus, for the reasons set forth herein and in Plaintiffs' Verified Complaint, Plaintiffs respectfully request entry of preliminary restraints against Defendants, enjoining their enforcement of the Code against Plaintiffs pending the final resolution of this matter, and approving their present zoning application.

## **FACTUAL BACKGROUND**

The relevant facts are set forth in the accompanying Verified Complaint and Certification of Thomas Herten, Esq. ("Herten Cert.").  For the sake of brevity, those facts will not be repeated below and are incorporated herein by reference.  Capitalized terms used but not defined herein have the meanings ascribed to them in the Verified Complaint.

2

**LEGAL ARGUMENT**

I.  **DEFENDANTS SHOULD BE PRELIMINARILY ENJOINED FROM ENFORCING THE UNCONSTITUTIONAL AND DISCRIMINATORY CODE.**

Courts in the Third Circuit have long recognized the need to grant preliminary restraints to prevent irreparable harm until an opportunity is afforded for a full and deliberate consideration of the merits of an aggrieved party's claims.  See NutraSweet Co. v. Vit-Mar Enters., Inc., 176 F.3d 151, 153 (3d Cir. 1999) (quoting Maldonado v. Houstoun, 157 F.3d 179, 184 (3d Cir. 1998)); Beilowitz v. General Motors Corp., 233 F. Supp. 2d 631, 639 (D.N.J. 2002).  To obtain preliminary injunctive relief, courts consider:

> 1) whether the movant has shown a reasonable probability of success on the merits; 2) whether the movant will be irreparably injured by denial of the relief; 3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and 4) whether granting the preliminary relief will be in the public interest.

Byrne v. Calastro, 205 Fed. Appx. 10, 15 (3d Cir. 2006) (quoting Allegheny Energy, Inc. v. DQE, Inc., 171 F.3d 153, 158 (3d. Cir. 1999)).  Furthermore, this Court is expressly authorized to grant preliminary injunctive relief where, as here, a discriminatory housing practice has occurred or is about to occur.  See 42 U.S.C § 3613(c)(1).

Notably, a movant is not required to rigidly satisfy each of those factors.  In re Eagle-Picher Indus. Inc., 963 F.2d 855, 859 (6th Cir. 1992) (stating "[t]hese factors simply guide the discretion of the court; they are not meant to be rigid unbending requirements").  Rather, "[i]t is important to recognize that the four considerations applicable to preliminary injunctions are factors to be balanced and not prerequisites that must be satisfied."  Id.

Here, Plaintiffs satisfy each of the four factors and are entitled to preliminary injunctive relief.  First, Defendants' enforcement of the Code has resulted in blatant statutory and constitutional violations.  Thus, it is highly probably that Plaintiffs will prevail on the merits of

3

their claims. Next, Defendants' unlawful practices have exposed Plaintiffs to the potential loss of real property rights on August 9, 2019, *i.e.*, irreparable harm.[1] Third, the equities favor Plaintiffs in this case. Indeed, but for the discriminatory use restrictions in the Code, Plaintiffs' plans for the Facility are nearly identical to plans that could be approved "by right" on City lands in an industrial area with the RIM designation. Finally, the public has a strong interest in eliminating blatant discrimination by a municipality and enabling the construction and operation of a facility that will fulfill a community need recognized by the State of New Jersey and the City's own Master Plan. Consequently, Defendants should be preliminarily enjoined from enforcing the Code as against Plaintiffs.

A.    **Defendants' Blatant Discrimination Establishes A High Probability Of Success On The Merits Of Plaintiffs' Claims.**

To obtain interim relief pending a final adjudication of the claims at issue, Plaintiffs need only "make a showing of reasonable probability, not the certainty, of success on the merits." Atlantic City Coin & Slot Serv., Co., Inc. v. IGT, 14 F. Supp. 2d 644, 657 (D.N.J. 1998) (quoting SK & F Co. v. Premo Pharm. Lab., Inc., 625 F.2d 1055, 1066 (3d Cir. 1980)). The Verified Complaint and other supporting documentation unquestionably establish a likelihood of success on the merits of Plaintiffs' federal housing, disability, religious discrimination and constitutional claims. In fact, Defendants' misconduct makes it highly probable that Plaintiffs will prevail on the merits, more than satisfying the first element necessary to obtain preliminary injunctive relief.

---

[1] In accordance with Local R. Civ. P. 65.1, Defendants note that this application has been brought by way of Order to Show Cause instead of by motion to ensure a hearing on the merits in advance of August 9, 2019.

47967/0023-17496280v2

**1.      Defendants' Enforcement Of The Code Violates The Fair Housing Act.**

The Fair Housing Act, 42 U.S.C. § 3601 et seq. (as amended, the "<u>FHA</u>") provides

protection against government conduct that makes "unavailable or den[ies] a dwelling" due to an

individual due to his or her status, including physical handicap. 42 U.S.C. § 3604(a), and (f)(1),

(2) and (3)(B).  Specifically, the FHA makes it unlawful to:

> To discriminate in the sale or rental, or to otherwise make
> unavailable or deny, a dwelling to any buyer or renter because of a
> handicap of--
> (A) that buyer or renter,
> (B) a person residing in or intending to reside in that dwelling after
> it is so sold, rented, or made available; or
> (C) any person associated with that buyer or renter.

42 U.S.C. § 3604(f).  Such discrimination includes a municipality's "refusal to make reasonable

accommodations in rules, policies, practices, or services, when such accommodations may be

necessary to afford such person equal opportunity to use and enjoy a dwelling . . . ."

42 U.S.C.A. § 3604.

Stated differently, the FHA is intended to "prohibit the application of special

requirements through land-use regulations . . .  that have the effect of limiting the ability of such

individuals to live in the residence of their choice in the community."  <u>Hovsons, Inc. v. Twp. of</u>

<u>Brick</u>, 89 F.3d 1096, 1105 (3d Cir. 1996) (citing H.R. Rep. No. 711, 100th Cong., 2d Sess.

24, <u>reprinted in</u> 1988 U.S.C.C.A.N. 2173, 2185)).  Indeed, the Third Circuit has expressly cited

the House Report to the FHA, which provides that the Act "is intended to prohibit . . . [the

imposition of] terms or conditions . . . which have the effect of excluding . . . congregate living

arrangements for persons with handicaps."  <u>Id.</u>  In that regard, Plaintiffs, as the proposed

developers of an assisted living facility, have standing under the FHA on their own behalf and on

behalf of prospective residents to bring an action challenging the City's Code.  <u>Assisted Living</u>

<u>Assocs. of Moorestown, L.L.C. v. Moorestown Twp.</u>, 996 F. Supp. 409 (D.N.J. 1998).

Moreover, the FHA expressly authorizes this Court to grant a preliminary injunction under the circumstances. Easter Seal Soc. of New Jersey, Inc. v. Twp. of N. Bergen, 798 F. Supp. 228, 233 (D.N.J. 1992) (citing 42 U.S.C. § 3613(c)(1)).

The factual record establishes that: (i) the Code intentionally discriminates against handicapped individuals; (ii) the Code has a disparate impact against handicapped individuals; and (iii) that the City would not make a reasonable accommodation for Plaintiffs.   Establishing any one of these three bases for liability is sufficient to establish Plaintiffs' likelihood of success; the presence of all three alternatives virtually assures Defendants' liability.  See Cmty. Servs., Inc. v. Heidelberg Twp., 439 F. Supp. 2d 380, 396 (M.D. Pa. 2006), citing (Cmty. Servs., Inc. v. Wind Gap Mun. Auth, 421 F.3d 170, 176 (3d Cir. 2005) (plaintiffs may bring a claim under the FHA for "[i] disparate impact, [ii] intentional discrimination [also known as disparate treatment], or [iii] refusal to make a 'reasonable accommodation'").  Accordingly, preliminary injunctive relief is appropriate and warranted.  See e.g. Moorestown, supra, 996 F. Supp. at 441.

     a.  On Its Face, The Code Discriminates Against The City's Elderly And Handicapped Citizens.

"A case of disparate treatment may be established against a public entity by demonstrating that a given legislative provision discriminates against the handicapped on its face, i.e., applies different rules to the disabled than are applied to others."  Arc of N.J., Inc. v. N.J., 950 F. Supp. 637, 643 (D.N.J. 1996).  If a statute or ordinance is facially discriminatory, plaintiffs "need not prove malice or prejudice on the part of the drafters of the statute or ordinance" to prevail "because the proper focus is on the explicit terms of the legislation." Id.; see also Cmty. Servs. Inc. v. Heidelberg Twp., 439 F. Supp. 2d 380 (M.D. Pa. 2006) (quotation omitted).

6

On its face, the Code discriminates against disabled individuals requiring care in congregant settings because it expressly limits construction of such homes to the RIM district, where institutional and industrial uses predominate.  In fact, the City's zoning officer confirmed to the Council that creation of the RIM district as the exclusive zone where the handicapped elderly could receive assistance in a congregant setting was intentional.  See Herten Cert. ¶ 2 at Exhibit J; Tr. at 80-81.  After creation of the RIM district in accordance with the 2014 Master Plan, the Council acted deliberately to only rezone lands in industrial areas to the new designation, creating the segregated purple area on the Master Plan.  See Herten Cert. ¶ 2 at Exhibit D, Zoning Map.  Thus, although the Master Plan sets a goal for the City to provide more housing opportunities for the growing elderly population, the City adopted the Code which expressly segregates the elderly handicapped into an industrial area.

Critically, non-handicapped citizens are not treated the same way; a variety of residential zones—comprising 75% of the land in the City—support diverse housing choices for non-handicapped citizens.  See Herten Cert. ¶ 2, Exhibit B, Master Plan, Introduction p. 1 – "the City at a Glance."

The disparate treatment of Plaintiffs and their future residents is also made clear by the City's recent approval of a similar facility within the RIM District—The Bristal Assisted Living (the "Bristal").  The City approved the Bristal in 2016 for 309 units and 6 stories on an "arterial" road in the RIM District.  See Stephanie Noda, "Developer Scales Back Building Size in the City to Reduce Cost," Northern Valley Suburbanite, NorthJersey.com, 12:00 am EST, March 3, 2016; Herten Cert. ¶ 2 at Exhibit D, Master Plan p. 80.[2]  In fact, the only meaningful distinction between the Facility and the Bristal is that the Facility would be in a residential area.

---

[2] The Bristal's legal frontage appears to be on Van Brunt Street, which is an "Urban Collector" road.  Id. at 80.

Nevertheless, despite promptly adjudicating and approving the Bristal's application, the City has not heard Plaintiffs' Application for over six (6) months.  See Herten Cert., ¶¶ 3, 4, and 10.

Stated simply, the Code discriminates against disabled individuals requiring care in a congregant setting, an indisputable fact apparent on the face of the Code and by its application and enforcement (which are consistent with the Code's discriminatory drafting).

b.  The City's Enforcement Of The Code Results Has A Disparate Impact On Elderly And Handicapped Citizens.

Not surprisingly, the discriminatory Code also has a disparate impact on elderly and handicapped citizens.  Indeed, the Code's impact on handicapped individuals' ability to choose housing in a residential City neighborhood has been severe.  Plaintiffs are likely to prevail on their claim that the City's actions have had a disparate impact on the handicapped elderly, more so than on other persons.  See e.g., Horizon House Dev. Servs., Inc. v. Twp. of Upper Southampton, 804 F. Supp. 683, 694 (E.D. Pa. 1992) (zoning codes may not single out individuals unable to live independently), aff'd, 995 F.2d 217 (3d Cir. 1993).

The FHA particularly prohibits zoning ordinances that have a disparate impact on the disabled.  Cmty. Servs., Inc. v. Wind Gap Mun. Auth., 421 F.3d 170, 177 (3d Cir. 2005).  As noted in the House Report for the FHA, "[t]he [FHA] is intended to prohibit the application of special requirements through land-use regulations, restrictive covenants, and conditional or special use permits that have the effect of limiting the ability of such individuals to live in the residence of their choice in the community."  In that regard, as the Third Circuit has recognized, the FHA allows Plaintiffs to protect future residents of the Facility from disparate zoning impacts, because those residents are presumptively disabled.  Wagner v. Fair Acres Geriatric Ctr., 49 F.3d 1002, 1010 (3d Cir. 1995); Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment of the Twp. of Scotch Plains, 284 F.3d 442, 466-67 (3d Cir. 2002).  As noted in Wagner,

8

"[o]bviously, everyone that applies for admission to a nursing home does so because of his or her disabilities. Indeed, no one would be able to meet a nursing home's admissions requirements in the absence of some handicapping condition necessitating nursing home care." Id. at 1010. See also Olmstead, 527 U.S. 581, 606-607 (holding, under the ADA, that unjustified isolation of the disabled who prefer community-based housing is discriminatory).

The City must afford the elderly and disabled with an equal opportunity to use and enjoy housing in residential districts—including housing such as the Facility.[3]  The City's land use regulations hinder the residential choices of elderly and handicapped citizens, including such individuals' choice to live in communal or congregate residential settings, such as assisted living and memory care facilities.  Both the City's use variance procedure and the rezoning process cause the Code to have a disparate impact on the handicapped. There is no dispute that, to date, there are no assisted living facilities in any of the City's residential districts,[4] or that all the land the City has actually zoned RIM is surrounded primarily by industrial and commercial uses. See Herten Cert. ¶ 2 at Exhibit D, Zoning Map.  Under the circumstances, the City's liability under the FHA is clearly established. See, e.g., Hovsons v. Twp. of Brick, 89 F.3d 1906, 1106 (3d Cir. 1996) (ruling in favor of a nursing home developer and finding that the municipality had violated the FHA by its refusal to grant a developer a variance to build a nursing home in a predominantly residential area).

---

[3] The FHA draws no distinction between nursing homes, assisted living facilities, and skilled nursing centers for purposes of this analysis so long as they house the disabled.  Case law discussing nursing homes applies equally to the Facility.   See A.K. Hoffman and J. Landon, "Zoning and the Aging Population:  Are Residential Communities Zoning Elder Care Out," At the Cutting Edge 2012:  Land Use Law From Urban Lawyer at 634-35 & fn. 29 (2012 ABA).

[4] Excepting the Actor's Home, discussed in the Verified Complaint.

9

In <u>Hovsons</u>, the Brick Township zoning code did not allow nursing homes to be built in residential areas, instead restricting such facilities to a "hospital support zone." <u>Id.</u> Much of the remaining land in the hospital support zone was unsuitable for development, so the developer applied for a variance. After seventeen public hearings over two years, the township's zoning board denied the variance. On appeal, the Third Circuit flatly rejected the township's arguments that nursing homes were incompatible with its zoning code or general residential use because such a conclusion was "precisely the type of land use planning that the [FHA] was enacted to prevent and, if necessary, overrule." 89 F.3d at 1105.[5]

The facts in <u>Hovsons</u> mirror Plaintiffs' present predicament: no City residential zone allows the Application to proceed. The only means available for actually seeking relief from the exclusionary Code—rezonings and variances—prove illusory chimeras upon close examination, consuming Plaintiffs' time and resources while achieving no result.

Just like the obstacles facing the plaintiffs in Hovsons, the City has erected an impermissibly high barrier for handicapped persons seeking relief from its exclusionary Code through variances. Moreover, Plaintiffs must follow procedures and incur expenses others do not under the Code. For example, to locate the Facility in any City residential district requires Plaintiffs to pursue a use variance or rezoning because the City zoned no land to the RIM zoning designation in or near the City's residential neighborhoods. <u>See</u> Code §§ 250-3 - 250-7 (rezoning maps); 250-17(6) (Planning Board powers); 250-26 – 250-27 (Board of Adjustment powers). Thus, Plaintiffs would need a variance from every significant bulk standard in R-AAA including height, setback, lot coverage ratio and others. <u>Id.</u> The Board of Adjustment in

---

[5] While the City may attempt to argue its zoning scheme precludes the Facility in an R-AAA district, and its segregation practices should be upheld, the Supreme Court in <u>Olmstead</u> and the Third Circuit in <u>Hovsons</u> reject that reasoning. 527 U.S. 581; <u>Hovsons</u>, 89 F. 3d at 1106.

granting such aggressive relief would veer into exercising zoning powers committed by statute to Council.  See Feiler v. Fort Lee Bd. of Adjustment, 573 A.2d 175 (App. Div. 1990), cert. denied, 604 A.2d 600 (N.J. 1991).  After considerable time and expense, therefore, Plaintiffs' approvals obtained from the Board of Adjustment could well be rendered invalid.  Plaintiffs also would need to achieve a super-majority vote from the Council.  N.J.S.A. 40:550-70(b).  Plaintiffs, therefore, pursued a rezoning because the Code not only does not allow for the use, it articulates no bulk standards appropriate to the Facility in a residential district.  Herten Cert. ¶ 2, Exhibit K, Tr. at 23-27.

Consistent with their other discriminatory practices, the City's rezoning practices also have a disparate impact on Plaintiffs.  Six months have passed since the Plaintiffs filed their Application, yet the Council still refuses to hold a hearing on it.  Meanwhile, the City Solicitor asked that Plaintiffs prove that a rezoning would not constitute illegal spot zoning (which it does not), an issue brought to the fore no doubt by the reality that the City failed to (i) zone any land in residential areas RIM and (ii) otherwise provide for assisted living and memory care uses, perhaps through an overlay zone or by making the use a conditional one in some residential zoning districts.  Herten Cert. ¶ 2, Exhibit I; see also, Exhibit K, Transcript at 27.  In other words, the City zoned the use out and then claimed allowing it in a residential area would constitute spot zoning.

Having established a *prima facia* case of disparate impact, the burden the shifts to the City to "show that it had a legitimate, non-discriminatory reason for [its] action and that no less discriminatory alternatives were available."  Lapid-Laurel LLC, 284 F.3d at 467.  A desire to keep congregate care settings for handicapped residents out of City residential zoning districts does not constitute a legitimate interest.  See Mt. Holly Gardens Citizens in Action, Inc. v. Twp.

11

of Mount Holly, 658 F.3d 375, 385-86 (3d Cir. 2011), cert. dismissed, 571 U.S. 1020 (2013). To protect residential character, the City could have resorted to any number of less discriminatory alternatives, such as providing for conditional use standards in residential districts whereby the Facility would have to meet certain minimal lot size and setback requirements, with frontage on a major road.  This would not require any undue financial or administrative burdens, hardship, or require "a fundamental alteration in the nature of the zoning program."  Cmty. Servs., Inc. v. Heidelberg Twp., 439 F. Supp. 2d 380, 398 (M.D. Pa. 2006).

In fact, the City's exclusion of the Facility from the R-AAA district is grossly inconsistent with the substantial relief from the Code granted to the Dwight-Englewood School, which is next door to the Property.  The school obviously lacks residential character.  It has parking lots, signage, lighting, and buildings massed on a greater scale than any nearby single-family home, and substantial traffic associated with the use.  Unlike the Property and proposed Facility, the school sits down-grade, has a limited landscaping buffer, and is highly visible to passersby.  The school has the same zoning as the Property, R-AAA, yet it has been allowed to develop and even expand by a series of waivers from Code requirements over the years.  See Herten Cert. ¶ 2 at Exhibit D, Zoning Map, Exhibit B. Master Plan p. 45 (fig. 21).[6]  Although the school and Plaintiffs are similarly situated with road frontage on East Palisade Avenue and acreage adequate to their uses, the City has allowed the school to develop and operate but not the Facility.  The City cannot allow a more intense use serving 900 students each weekday next door

---

[6] The Land Use Map shows the large "institutional" block containing the Dwight-Englewood School colored brown, adjacent to the Property on East Palisade Avenue.  Herten Cert. ¶ 2, Exhibit B p. 45.  A small, grey adjacent parcel across North Woodland Street is designated as "vacant".  That grey lot comprises part of the Property.  See also the Dwight-Englewood website: www.d-e.org for pictures of the sprawling campus serving "approximately 900 students."

47967/0023-17496280v2

to the Property while denying Plaintiffs the right to locate a 150 bed Facility for the elderly and handicapped in the same area.

At minimum, the City should have promptly approved the Application after duly reviewing submissions made by professional planner, Phillips Preiss, and others, as well considering their testimony.  The City already has allowed nearby institutional uses, traffic will not appreciably increase, the design fits in with the community, and all health, safety, and welfare obligations have been met by the Application.  See Herten Cert. ¶ 2, Exhibit J, May 2, 2019, beginning at Bates page 0090.  Instead, the City allowed the disparate, adverse impacts it caused to stand unabated.  Plaintiffs are likely to prevail on the merits of their disparate impact claim.

### c.  The City Failed To Make Reasonable Accommodations For Plaintiffs.

Plaintiffs also will prevail on their claim that the City has not provided a reasonable accommodation under the FHA.  The FHA makes it unlawful to "refuse to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford persons with disabilities an equal opportunity to use and enjoy a dwelling . . . ."  42 U.S.C.A. § 3604(f)(3)(B); see also Hovsons, 89 F.3d at 1106 (municipal zoning authorities have an affirmative duty "to accommodate the elderly disabled who are in need of nursing home care and desire to live in one of the [municipality's] residential zones").  The City made no reasonable accommodation to Plaintiffs that would have afforded handicapped individuals needing care in a congregant setting the right to live in a residential area.

Plaintiffs requested reasonable accommodations by submitting the Application, which the City effectively denied by refusing to consider it.  See Herten Cert. ¶ 2, Exhibit L (June 20, 2019 Letter to City Solicitor).  The City's refusal to grant such an accommodation has resulted in the

47967/0023-17496280v2

continued absence of facilities to help the handicapped in a residential area—a clear violation of the FHA.  For example, in Community Services, Inc. v. Heidelberg Township, the court ruled in favor of a regional healthcare provider that sought an injunction against a township which refused a reasonable accommodation request.  As the court noted, a municipality that refuses to permit disabled housing or a convalescent home as a matter of right in any zoning classification is committing "intentional discrimination through . . .  application of facially discriminatory zoning ordinances."  439 F. Supp. 2d 380, 397 (M.D. Pa. 2006),.  The Code falls into this same category by zoning the Facility out of all residential districts.  The Council should have addressed the discriminatory Code by providing a reasonable accommodation in response to Plaintiffs' Application.

Similarly, in Assisted Living Associates of Moorestown, L.L.C. v. Moorestown Township, the court rejected a municipality's deliberate attempt to rezone an area to prevent construction of a nursing home.  996 F. Supp. 409 (D.N.J. 1998).  Even though there were other available nursing homes in the area, the court granted an injunction against the township's enforcement of the new ordinance because the court found that the developer and the potential residents were likely to prevail on claims of intentional discrimination or disparate impact.  Id. Similarly here, the only other assisted living facility being developed in the City is in the non-residential RIM district.  That facility does not relieve the City of the obligation to provide Plaintiffs a reasonable accommodation in a residentially zoned district.

The City's attempt to force Plaintiffs to apply to the Board of Adjustment is also not a "reasonable accommodation."  "'Reasonable accommodation' means changing some rule that is generally applicable to everyone so as to make its burden less onerous on the handicapped individual."  Oxford House, Inc. v. Twp. of Cherry Hill, 799 F. Supp. 450, 462 n.25 (D.N.J.

1992).   Imposing a more onerous process on those seeking an accommodation "stands the concept [of reasonable accommodation] on its head" because it is analogous to arguing that "a rule requiring only handicapped people to pay a special fee before entering a building constitutes a reasonable accommodation."   Id.   Courts repeatedly have rejected municipalities' claims that providing an alternate, more onerous pathway like obtaining multiple variances is a reasonable accommodation.   For instance, in Oxford House, the court found that the town had failed to provide a reasonable accommodation when rather than simply waive a minor requirement and grant a certificate of occupancy, the town instead suggested that the developer undertake a variance process.   Likewise, in Sunrise Dev., Inc. v. Town of Huntington, N.Y., the court rejected a town's position that it had provided a reasonable accommodation because the developer of a nursing home could apply for a full zoning change even though other applicants would have been entitled to apply for a special use.   62 F. Supp. 2d 762, 777 (E.D.N.Y. 1999).

Here, Plaintiffs offered to collaborate with the City to create a new, appropriate zoning category to accommodate the Facility, while generally respecting the same health, safety, and welfare requirements the RIM district uses for similar facilities.   In response, and as elaborated upon above, City officials admonished Plaintiffs to seek a use variance.   Thus, instead of considering the rezoning the City impermissibly imposed more onerous requirements rather than relieve the Code's burdens.   See Herten Cert. ¶ 6.

Plaintiffs have established that they require a reasonable accommodation from the City to allow the handicapped and elderly to seek congregate housing outside an industrial area.   That shifts the burden to the City to show why Plaintiffs' accommodation request is unreasonable. 901 Ernston Rd., LLC v. Borough of Sayreville Zoning Bd. of Adjustment, Case No. 18-2442, 2018 WL 2176175, at *8 (D.N.J. May 11, 2018).   The City has created no record to support the

15

required showing.   The City raised one substantive concern with the Application, which Plaintiffs addressed in the Spot Zoning Memo.  The City did not respond to the Spot Zoning Memo.  Herten Cert. ¶ 4.  The City has otherwise created no official record with regard to the Application, because it has not taken it up officially.   Id.  On these facts, any argument the City may make about its zoning scheme, residential character preservation, or any additional burden the Facility would place upon the City flowing from approving the Application will contradict well-established precedent, which does not countenance speculative concerns as a legitimate reason to exclude the handicapped.  Id.

Moreover, the City cannot argue that Plaintiffs' request is not reasonable due to the availability of an alternate location.  Another site will not present a sufficient opportunity to develop the Facility on a Regional Arterial road in a residential area without presenting the same issues as the Property given the committed development pattern of the City today.

In sum, Plaintiffs are likely to succeed on the merits of its FHA claims.  As the Third Circuit has recognized, the FHA "is intended to prohibit the imposition of terms or conditions which have the effect of excluding congregate living arrangements for persons with handicaps," and "strict adherence to a rule which has the effect of precluding handicapped individuals from residing in the residence of their choice was precisely the type of conduct which the [FHA] sought to overcome."   Hovsons, 89 F.3d at 1106 (citations and internal marks omitted).  Approving the Application would have obviated those infirmities in the Code, but the City unlawfully failed to provide such a reasonable accommodation.

### 2.  Defendants Have Also Violated The Rehabilitation Act.

The Rehabilitation Act (the "RA") provides, in pertinent part, that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or

his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). The term "program or activity" includes all operations of "a department, agency, special purpose district, or other instrumentality of a State or of a local government . . . ." 29 U.S.C. § 794(b)(1)(A). The RA provides a remedy "to any person aggrieved by any act or failure to act" by a recipient of federal financial assistance. McKivitz v. Twp. of Stowe, 769 F. Supp. 2d 803, 818 (W.D. Pa. 2010) (29 U.S.C. § 794a(a)(2)); see also MX Grp., Inc. v. City of Covington, 293 F.3d 326, 342 (6th Cir. 2002) and Bay Area Addiction Research and Treatment, Inc. v. City of Antioch, 179 F.3d 725, 730-31 (9th Cir. 1999) (both finding discriminatory municipal ordinances to violate the proscriptions contained in the RA). In that regard, Plaintiffs have standing to assert claims under the RA on behalf of themselves and their future residents. Id.

Here, ten percent of the beds in the Facility will be designated for Medicaid patients, and the Application furthers disabled individuals' access to those benefits. Herten Cert. ¶ 2 at Exhibit J, Preiss Report Bates p. 0086. Nevertheless, in violation of Section 504 of the RA, Defendants have enforced the Code and denied Plaintiffs and their future residents the benefits of the City's residential zoning. See New Directions Treatment Servs. v. City of Reading, 490 F.3d 293, 304-05 (3d Cir. 2007) (the application of a law that discriminates with respect to "zoning procedures is facially discriminatory under the ADA and the Rehabilitation Act").

### 3. Defendants' Enforcement Of The Code Violates The Americans With Disabilities Act.

Likewise, Plaintiffs are likely to succeed on the merits of their ADA claims because the City has impermissibly zoned the handicapped out of residential districts. The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded

17

from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. ADA regulations prohibit public entities from discriminating against qualified individuals with disabilities (1) in administering a license program in a manner that subjects them to discrimination on the basis of the disability and (2) in establishing requirements for programs or activities of licensees that subject qualified individuals with disabilities to discrimination on the basis of disability. 28 C.F.C. § 35.130(b)(6). The regulations prohibit public entities from determining the location of a facility in a way that has the purpose or "effect of excluding individuals with disabilities from, denying them the benefits of [the facility], or otherwise subjecting them to discrimination." 28 C.F.R. § 35.130(4)(i). Notably, The Third Circuit has held that "'[a]s the ADA simply expands the Rehabilitation Act's prohibitions against discrimination into the private sector, Congress has directed that the two acts' judicial and agency standards be harmonized' and [it] accordingly analyze[s] the two provisions together." New Directions Treatment Servs. v. City of Reading, 490 F.3d 293, 302 (3d Cir. 2007) (quoting Newman v. GHS Osteopathic, Inc., 60 F.3d 153, 157-58 (3d Cir. 1995)).

The City has run afoul of the ADA by creating an industrial park for the elderly handicapped, delineated in purple on its zoning map. Herten Cert. ¶ 2, Exhibit D. Congregate living with help for activities of daily living can only take place in this segregated area. Meanwhile, the non-handicapped population can choose from a variety of residentially zoned areas for housing throughout the City. Id. This discrimination is exactly what the ADA (and the RA) prohibit and, therefore, Plaintiffs are likely to prevail on their ADA claim.

18

### 4. Defendants' Discriminatory Enforcement Of The Code Violates The RLUIPA.

The City violated the Religious Land Use and Institutionalized Persons Act ("RLUIPA") when it failed to lift its Code's impermissible burdens on the free exercise of religion by Orthodox Jews or use the least restrictive means available to accomplish legitimate health, safety, and welfare objectives.  See Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1222 (11th Cir. 2004), cert. denied, 543 U.S. 1146 (2005) (noting issuance of injunction pending appeal in case where Jewish Orthodox synagogues zoned out of "tourist district").   Thus, Plaintiffs will likely prevail on their claim that the City's failure to approve the Application, or even act on it at all, violates RLUIPA.

RLUIPA prohibits zoning ordinances which, even if facially neutral, nonetheless impose a substantial burden on religious exercise.  The City's land use regulations confine uses like the Facility to the RIM district, substantially burdening the exercise of Orthodox Judaism in the City in violation of the law. 42 U.S.C. § 2000cc(2)(C).  RLUIPA covers the City's zoning functions because zoning ordinances, by nature, impose individualized assessments and case-by-case evaluations of a proposed activity against land use regulations.  Freedom Baptist Church of De. Cty. V. Twp. of Middletown, 204 F. Supp. 2d 857, 868-69 (E.D. Pa. 2002).  Further, RLUIPA defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief," with the understanding that the definition is to be construed broadly "to the maximum extent permitted by the [RLUIPA] and the Constitution." 42 U.S.C. § 2000cc-5(7)(A); 42 U.S.C. § 2000cc-3(g).  Certainly the RLUIPA covers common Orthodox Jewish religious practices.

A violation of RLUIPA occurs when the land use regulation at issue as implemented:  (1) imposes a substantial burden (2) on the "religious exercise" (3) of a person, institution, or

assembly.  42 U.S.C. § 2000cc(a)(1).  Where protected persons identifiy a substantial burden, defendants bear the burden of proving the ordinance "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000cc(a)(1)(A)-(B).  Because the definition of what constitutes "religious exercise" is broad, the range of restrictions that constitute a substantial burden is similarly broad.  See Congregation Kol Ami v. Abington Twp., Case No. 01-1919, 2004 WL 1837037, at *8 (E.D. Pa. Aug. 17, 2004), amended, 2004 WL 2137819 (E.D. Pa. Sept. 21, 2004).  And numerous courts have recognized that "a burden need not be found insuperable to be held substantial." See, e.g., Int'l Church of the Foursquare Gospel v. City of San Leandro, 634 F.3d 1037, 1046 (9th Cir. 2011), cert. denied, 132 S. Ct. 251 (2011); Westchester Day Sch. v. Vill. of Mamaroneck, 504 F.3d 338, 349 (2d Cir. 2007); Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin, 396 F.3d 895, 901 (7th Cir. 2005), reh'g and reh'g en banc denied, (Mar. 7, 2005).

Here, the Code imposes a substantial burden on religious practice by Orthodox Jews, such as John and Jane Does 1-10.  Under their religious tenets, Orthodox Jews are forbidden from riding or driving in cars from sundown on Friday until sundown on Saturday, but Orthodox Jews also have a duty to visit the sick on the Shabbat, in addition to attending services.  In light of this obligation, the Code's burden has a significant and widespread impact.  Specifically, Bergen County has 44 Orthodox Jewish congregations with 18,500 adherents constituting 20% of the County's population.[7]  Orthodox congregations in the City include, among a number of others, Congregation Ahavath Torah, which is 1.1 miles from the proposed Facility.  Members of the temple, including the rabbi, cannot feasibly walk to an assisted living or memory care facility

---

[7] See usreligiouscensus.org/Orthodox Judaism (based on the most recent 2010 census), and the Association of Religious Data Archives (http;//www.thearda.com).

located in the RIM district, impairing the exercise of religion for congregants both living at an assisted living facility and the rabbis and families with whom they may wish to worship.  See Herten Cert. ¶ 2, Exhibit K, Tr. at 51-52, 57, and 72-74 (testimony of various rabbis from the City).

 By segregating care facilities to the RIM district, the City's ordinance forces exactly the choice that RLUIPA prohibits; it requires individuals to decide between accessing handicapped services and complying with religious tenets. In Midrash Sephardi, Inc. v. Town of Surfside, for example, a Florida federal court accepted that zoning which forced Jewish residents to walk distances of more than "a few extra blocks" out of their way might pose a substantial burden. 366 F.3d at 1228.  Such a burden is even more substantial where, as here, the affected individuals, John and Jane Does 1-10, are elderly and presumptively disabled.  See id.  RLUIPA is implicated any time a zoning code prevents an Orthodox Jewish community from having access to all essential services, including congregants' dwellings, within a 1.2-mile radius.[8] The City's Code does exactly that.

The existence of a substantial burden on religious practice shifts the legal burden to the City to show that its Code furthers a compelling government interest by the least restrictive means possible.  See 42 U.S.C. § 2000cc-2(b).  The City cannot meet that burden.  The United States Supreme Court requires courts to "scrutinize the asserted harm of granting specific exemptions to particular religious claimants and to look to the marginal interest in enforcing the challenged government action in that particular context."  Holt v. Hobbs, 135 S. Ct. 853, 863 (2015) (quotations omitted).  As the Master Plan found, the City's elderly increasingly live alone

---

[8] See Charis G. Orzechowski, A Non-Intent Based Challenge to Exclusionary Zoning: Why RLUIPA Can Help One Religious Community When Constitutional Challenges Fail, 40 Rutgers L. Rec. 1, 5 (2013).

with escalating needs for more supportive housing choices.[9]   See Herten Cert. ¶ 2, Exhibit B, Master Plan pp. 27-28.  Such persons also face barriers to participating in religious life in the City.  To date, the City has alleged no compelling interest to justify exclusion of the Facility from an R-AAA zoned district and its effective denial of Plaintiffs' Application should be invalidated under RLUIPA.[10]  Therefore, Plaintiffs will likely succeed on the merits of their RLUIPA claims.

<strong>5.     Enforcement Of The Code Violates The Fourteenth Amendment To The U.S. Constitution.</strong>

Plaintiffs are also likely to succeed on their claims under the 14th Amendment to the U.S. Constitution because the City treats disabled persons differently than those without disabilities. This disparate treatment, however, bears no rational relationship to a legitimate state interest, in violation of the equal protection clause of the Fourteenth Amendment.  See City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432 (1985).  The City has articulated no legitimate interest in

---

[9] The City itself in fact recognizes the benefits of senior housing.  The Master Plan states,

> Consider senior-oriented development.   Age-restricted, senior independent living, and assisted care facility developments can benefit both the tax base and employment opportunities in the City.   These facilities could reasonably be located in the City in part because of the presence of the City Hospital.  Age-restricted developments generally provide positive fiscal returns with tax revenues greatly exceeding public cost of services.  Senior independent living and assisted-living facilities also provide positive fiscal benefits.  In addition, these independent living and assisted living facilities employ many moderate income workers who often utilize public transportation.  These facilities should be easily accessible by public transportation.

Herten Cert. ¶ 2, Exhibit B, Master Plan at p. 81.

[10] Generalities such as 'preserving community character' will not hold water even if the City eventually offers them:  the Facility will replace an eyesore, a vacant structure, sit on a Regional Arterial Road, and abut an expanding school.  The only competing interest the City can offer is "not in my backyard" platitudes.

22

blocking the handicapped from establishing a congregate living facility on a major arterial road next to a school.  Thus, Plaintiffs are likely to prevail on their disparate treatment claims.

**B.**    **Plaintiffs Will Suffer Irreparable Harm In The Absence Of Preliminary Injunctive Relief.**

"Irreparable harm is harm that cannot be redressed by a legal or an equitable remedy following a trial." N. Jersey Vineyard Church v. Twp. of S. Hackensack, Case No. CV 15-8369, 2016 WL 1365997, at *2 (D.N.J. Apr. 6, 2016) (citations omitted).   Stated differently, "[i]rreparable harm must be of a peculiar nature, so that compensation in money alone cannot atone for it." Id.  Where, as here, "interests involving real property are at stake, preliminary injunctive relief can be particularly appropriate because of the unique nature of the property interest." Minard Run Oil Co. v. U.S. Forest Serv., 670 F.3d 236, 256 (3d Cir. 2011), as amended (Mar. 7, 2012) (citations omitted).

Moreover, enforcement of the Code's discriminatory enforcement provisions "is presumed to be irreparable harm." Easter Seal Soc. of N.J., Inc. v. Twp. of N. Bergen, 798 F. Supp. 228, 235-36 (D.N.J. 1992) (citing Gresham v. Windrush Partners, Ltd., 730 F.2d 1417, 1423–24 (11th Cir. 1984), cert. denied, 469 U.S. 882 (1984)).

The preliminary injunctive relief sought herein is necessary and appropriate under the circumstances.  On August 9, 2019, Plaintiffs will lose contractual control over a portion of the Property essential to carry out development of the Facility.  Herten Cert. ¶ 2, Exhibit F (Contract of Sale).  Loss of control over the Property will delay, perhaps indefinitely, or destroy entirely, residential housing opportunities for handicapped residents in the City.  This Court may grant an injunction to prevent such a result from occurring.  See Easter Seal Soc. of N.J., 798 F. Supp. 228 (issuing construction permit to allow facility renovations).  Further delay in approving the Application will cause irreparable harm to Plaintiffs, the Facility's potential residents (including

Orthodox Jewish residents seeking to reside near a synagogue), and adherents of Orthodox Judaism in the City hindered from visiting family.

Furthermore, frustration of Plaintiffs' mission to provide housing for the elderly and handicapped in a residential area within the City constitutes irreparable harm.  See e.g., Caron Found. of Fla. Inc., v. City of Delray Beach, 879 F. Supp. 2d. 1353, 1373 (S.D. Fla. 2012). Bringing a project like the Facility to fruition requires a substantial investment of time and capital.  In addition to local zoning approvals, the state of New Jersey issues a certificate of need, which it has done for this Facility, a suitable parcel must be identified and acquired or at least placed under contract, development professionals must draw up plans, construction must occur, staff must be hired and trained, and a critical mass of new residents must be sought and then moved into the Facility.  As time goes on, the state-identified need for memory care and assisted living grows, but beds do not become available unless the Application and others like it are moving forward.  The City's own Master Plan identifies housing for elderly persons as a compelling problem, yet the Code establishes barriers rather than opportunities for senior housing in the City.  Herten Cert. ¶ 2, Exhibit B at 30; Exhibit C, Code §§ 250-3 – 250-7.  This Court must remove those barriers or Plaintiffs will not recover from the harm caused by Defendant's discriminatory practices.

### C.  The Balance Of Hardships Weighs Decisively In Favor Of Approving The Application Despite The City's Exclusionary Zoning Code And Inaction.

The balance of hardships weighs overwhelmingly in favor of issuing a preliminary injunction.  As set forth above, handicapped seniors lack congregate housing opportunities in a residentially zoned district in the City and will continue to do so without relief.  Without relief from the City's exclusionary zoning Code, the City's Orthodox Jews will continue to be deprived of the ability to live near Orthodox synagogues while exercising their religious duty to visit the

24

sick on Shabbat.  If an injunction is not granted, on August 9, 2019, Plaintiffs will lose their equitable interest in a portion of the Property, thwarting development of the Facility completely. As the process drags on, Plaintiffs' certificate of need will expire and the months-long process to obtain a new one must begin.

The City will suffer no corresponding harm if this Court grants a preliminary injunction.  No City official has articulated any health, safety, or welfare reason for never hearing and deciding the Application.  It would be a reasonable accommodation under the FHA to disregard the City's exclusion of assisted living and memory care from the residentially zoned Property.  The Property is on a Major Arterial Road designated by the City's Master Plan, next to an existing institutional use, the Dwight-Englewood School, which has been allowed to expand by means of multiple waivers of the Code's R-AAA use restrictions—the same use restrictions from which Plaintiffs now seek relief.  As such, establishing an assisted living and memory care facility on the Property will not undermine the City's zoning scheme or the public health, safety, and welfare.  The City will bear no expenses related to the Facility and in fact will collect substantial fees and taxes from it.  Herten Cert. ¶ 2, Exhibit B, Master Plan, p. 72; Exhibit K, Transcript at 24.  The balance of hardships weighs in favor of granting Plaintiffs their requested relief.

### D. The Public Interest Strongly Favors Granting The Injunctive Relief Requested Herein.

There is a strong public interest in providing the elderly and handicapped with housing opportunities, as well as lifting a burden on religious exercise that serves no compelling government interest.  An injunction will allow the City's Orthodox Jews like Rabbi Poupko, who testified at the May 7, 2019 Hearing, to have a place to look forward to calling home should he suffer from memory loss or need help with activities of daily living as he ages.  Herten Cert. ¶ 2,

47967/0023-17496280v2

Exhibit K at 51-52.  Orthodox Jews should not have to seek housing outside of the City or within a commercial zone; this is especially true when housing in a commercial zone in the City will likely cut that person off from his family and faith community during Shabbat and other religious holidays, due to the geographic distance between RIM zoned lands and many Orthodox Jews' homes in the City.   See Herten Cert. ¶ 2, Exhibit K, Transcript at 72-73 (Rabbi Bousbib testifying he could never visit his elderly father on Shabbat while he was still alive, because there was not an appropriate congregate living home available in the City to house him).  Furthermore, the City has a substantial "fair share" housing obligation the Facility will help the City meet.  Id. at 27-28.

Lastly, after two years of meetings and filing an official zoning Application in January of 2019, the City has not acted on Plaintiff's Application at all.  When a municipality will not even formally consider a request for a reasonable accommodation for the handicapped elderly, the public interest demands judicial intervention.

[remainder of page left intentionally blank]

## **CONCLUSION**

For the reasons stated above, Plaintiffs request that the Court issue a preliminary injunction against Defendants, enjoining their enforcement of the Code's discriminatory restrictions on the development of the Facility in a residential area, pending a full adjudication on the City's unlawful enforcement of the Code.   Because such an injunction creates no financial risk to the City, Plaintiffs respectfully request the issuance of the injunction without requiring a bond is the simplest and fairest way to allow Plaintiffs to proceed.   *See, e.g.,* 901 Ernston Road, 2018 WL 2176175, at *9.

Dated: June 28, 2019
Hackensack, New Jersey

Respectfully submitted,

COLE SCHOTZ P.C.

*/s/ Warren Usatine*
Warren Usatine, Esq.
Michael R. Yellin, Esq.
25 Main Street
Hackensack, New Jersey  07601
201-489-3000
201-489-1536  Facsimile

MORRIS JAMES, LLP
Kimberly Hoffman, Esq.
     (*pro hac vice* application forthcoming)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Tel.: (302) 888-5209
Fax: (302) 571-1750
*Attorneys for Plaintiffs,*
*431 E Palisade Avenue Real Estate, LLC and 7 North*
*Woodland Street,*

27