# EXHIBIT "A"

|  | District | | Residential Uses Allowed |
|---|---|---|---|
| 1 | R-AAA | | Single Family Residence |
| 2 | R-AA | | Single Family Residence |
| 3 | R-A | | Single Family Residence |
| 4 | R-B | | Single Family Residence |
| 5 | R-C | | Single Family Residence |
| 6 | R-D | | Single Family Residence |
| 7 | R-E | | Single Family Residence |
| 8 | R-F | | Single Family Residence |
| 9 | RMA | | Multiple Residence – Single Family Residence, Multi-Family Dwelling, Townhouses |
| 10 | RMB | | Multiple Residence – Single Family Residence, Multi-Family Dwelling, Townhouses |
| 11 | RMC | | Multiple Residence – Multi-Family Dwellings |
| 12 | RIM | | Apartment and condominium communities for senior citizens |
| 13 | RMD | | Multiple Residence – Attached Townhouse Dwellings, Multi-Family Dwellings |
| 14 | RME | | Multiple Residence – Multi-Family Dwellings |
| 15 | RMF | | Multiple Residence – Multi-Family Dwellings |
| 16 | RMH | | Multiple Residence – Multi-Family Dwellings, each containing fewer than three dwellings, for the purpose of providing subsidized rental housing |
| 17 | D-1 | D-1a | Apartments, Condos (permitted only on upper floors of a multi-story building) |
|  |  | D-1b | Apartments, Condos (permitted only on upper floors of a multi-story building) |
| 18 | D-2 | D-2a | Apartments, Condos, Townhouses |
|  |  | D-2b | Apartments, Condos, Townhouses |
|  |  | D-2c | Apartments, Condos (permitted only on upper floors of a multi-story building) |
|  |  | D-2d | Apartments, Condos |
|  |  | D-2e | None |
| 19 | D-3 | | None |
| 20 | N-C | | Apartments, Condos (permitted only on upper floors of a multi-story building) |
| 21 | W-L (Work-Live Overlay) | | Residential use criterial. The residential component of a work/live unit must contain sleeping space, cooking facilities, and complete sanitary facilities. No more than 50% of the total floor area of a work/live unit shall be designed or used for residential purposes. The residential occupancy of a work/live unit must include at least one person who is employed or carries out an occupation in the unit. |
| 22 | SBD (Service District) | | None |
| 23 | L-I | | None |
| 24 | ATH | | Attached Townhouses only |
| 25 | OS | | As a permitted use, living quarters for a watchperson or caretaker and family employed in such capacity |
| 26 | PUD-1 | | Planned Unit Development 1 Overlay – Multi-Family Dwellings, Attached Townhouse Dwellings |
| 27 | DRL | | Downtown Redevelopment Overlay Zone – Multi-Family Dwellings |

# EXHIBIT "B"

E61
8/6/91

## CITY OF ENGLEWOOD

## RESOLUTION

WHEREAS, Moriah School of Englewood had made application to the Board of Adjustment of the City of Englewood for a variance from the provisions of Englewood's Zoning Ordinance, pursuant to N.J.S.A. 40:55D-70(d) to expand its existing school facilities upon premises known as Lots 8 and 9 in Block 3501, and more commonly known as 53 and 81 South Woodland Street, together with site plan and subdivision approval therefor and other related relief; and

WHEREAS, by a memorializing resolution dated June 20, 1991, the Board of Adjustment, following public hearings thereon, granted said application; and

WHEREAS, pursuant to the provisions of N.J.S.A. 40:55D-17 and pursuant to the provisions of the Land Use Ordinance of the City of Englewood, being Ordinance No. 2232, as amended, any interested party may appeal to the City Council any final decision of the Board of Adjustment approving an application for development pursuant to N.J.S.A. 40:55D-70(d); and

WHEREAS, a notice of appeal respecting the approval of the foregoing application on behalf of various parties was submitted to the City on June 28, 1991; and

WHEREAS, for the reasons set forth below, the City Council of the City of Englewood finds and concludes that it is unable to hear such appeal by reason of a conflict of interest,

NOW, THEREFORE, BE IT RESOLVED BY THE CITY COUNCIL OF THE CITY OF ENGLEWOOD, BERGEN COUNTY, NEW JERSEY, as follows:

1. By deed of easement dated April 14, 1978 and recorded on June 15, 1978 in the office of the Bergen County

-1-

Clerk in Book 6391 at page 245, the Moriah School of Englewood had granted to the City of Englewood a conservation easement upon a portion of Lot 9 in Block 3501.

2.  Moriah School of Englewood had encroached upon a portion of said easement through the construction of a playground area.

3.  In an attempt to resolve the dispute regarding the encroachment of the conservation easement, Moriah School proposed to grant the City of Englewood a conservation easement along a portion of Lot 8 in Block 3501 in partial consideration for the release of a portion of the conservation easement upon Lot 9 in Block 3501.

4.  In order to authorize the release of a portion of the existing conservation easement and the acceptance of the proposed conservation easement, the City Council, on May 7, 1991, adopted Ordinance No. 91-14 entitled "An Ordinance Authorizing a Partial Release of a Conservation Easement Located on Lot 9 in Block 3501 and Accepting a Conservation Easement Upon a Portion of Lot 8 in Block 3501 as Shown on the Tax Map of the City of Englewood."

5.  Ordinance 91-14 authorized the execution of an agreement between Moriah School and the City of Englewood to carry out the foregoing purpose, subject to and conditioned upon the approval of the application of Moriah School respecting a proposed school addition which was pending before the Board of Adjustment of the City of Englewood, which application is the subject of the within appeal.

6.  Similarly, the resolution adopted by the Board of Adjustment of the City of Englewood included a condition that Moriah School enter into a mutually acceptable agreement with the City of Englewood regarding the aforesaid exchange of land

-2-

to be released from and encumbered by a conservation easement.

7.   The City Council finds that by reason of the foregoing the City Council has a direct and significant interest in the outcome of the appeal which constitutes either a conflict of interest or the appearance of a conflict of interest sufficient so as to render a hearing and determination by the City Council on the appeal from the granting of such application inappropriate.

8.   The City Clerk is hereby authorized and directed to mail a copy of this resolution to Smith, Don, Alampi, Scalo & D'Argenio, attorneys for the Appellants, and to Lowenstein, Sandler, Kohl, Fisher and Boylan, attorneys for Moriah School, and to publish in the _Press Journal_ and brief notice of the City Council's decision declining to hear the within appeal.

9.   By reason of the City Council's inability to hear the within appeal, and the reasons therefor, the City Council agrees to waive the appeal fee and authorizes the return of any such fee to the attorneys for the Appellants.

I hereby certify that the foregoing is
a true copy of a resolution adopted
by the Council of the City of
Englewood, N.J. on

AUG 0 6 1991

JACK CRAWFORD      City Clerk

JANUARY 17, 2002

1/17/02

## RESOLUTION

## ENGLEWOOD BOARD OF ADJUSTMENT

In the Matter of the application of
Moriah Schools of Englewood
Application No: 1677

WHEREAS, the applicant, Moriah Schools of Englewood submitted an Application to construct a fence around the perimeter of its property and a guard house, in compliance with the site plan/zoning and other development Ordinances of the City of Englewood; and

WHEREAS, the property which is the subject of the application is known and identified as Block 350; Lot 9.01 on the Tax Map of the City of Englewood, which property is located on S. Woodland St. The subject lot is located within the RAAA Zone established by the Zoning Ordinance of the City of Englewood.

NOW THEREFORE, BE IT RESOLVED by the Zoning Board of Adjustment of the City of Englewood, that the following findings of facts, conclusions and determinations are hereby confirmed and memorialized:

FINDINGS OF FACT:

1. The Zoning Board of Adjustment has the jurisdiction to act upon the application, with a majority vote required for approval of all matters with the exception of any "use" variance under the provisions of N.J.S.A. 40:55D-70d for which five affirmative votes are required.

2. This application is before the Zoning Board of Adjustment on the

1

application for a variance from the Englewood Zoning Code maximum fence height requirement to construct an eight (8) foot fence around the perimeter of the school property where a maximum  six (6) foot fence height is permitted and to construct a guard house in the front of the property..

3.     The application was declared complete and a public hearing was held on November 26, 2001, as reflected in the Minutes of the meeting.  Testimony was received and considered in support of the application.  The Board has carefully considered all of the testimony and evidence.

4.     The Board has been called upon to consider testimony presented by the applicant and objectors.  In determining the issues presented, the Board has considered and evaluated the testimony presented by the applicant and objectors, observed the response of the witnesses to questions, and the candidness of their answers.

5.     The applicant presented testimony of Moshel Strauss, the President of Moriah School, who testified in support of the application.  He  testified that the subject school currently enrolls 890 students.  The school has occupied the site approximately 35 years and the site measures approximately 10 acres.

6.     He testified that there exists a fence along the North, East and Souh sides of the property.  No fence exists along the front of the property along S. Woodland Avenue.  He testified that concerns about the safety of the students prompted the school to hire security guards.  The school also seeks to construct the fences to control access to the site from all directions.

2

7.    The applicant also proffered testimony from Marvin Katz, an employee of Controlled Access LLC, having offices aat 122 E. Kings Highway, Maple Shade, NJ, who was accepted by the Board as an expert in Security.

8.    Mr. Katz testified that the eight (8) foot fence height is necessary in order to provide maximum deterrence from intruders.  He further testified that the proposed guard house measures 6 feet by 8 feet  having a height of 9 feet 7 inches.  He testified that the guard house is required for the protection of the on site security guard between the hours of 7am to 10pm.

9.    The Board next heard testimony from several neighboring residents who expressed concern about loss of foliage and the visual affects of the proposed fence along S. Woodland St.

10.    The Board also heard testimony from Kenneth Albert, the City Engineer and Planning Consultant, who testified  that the Board could consider imposing a condition that no existing foliage shall be removed.

11.    The applicant's attorney, Elliot Urdang, Esq.  argued that the proposal promotes the safety and welfare of the school children and the community at large, He further submitted that this application fits within the criteria of N.J.S. 40:55D-70(c)(2) in that the benefits of added safety substantially outweigh any detrimental impact of granting the variances.

12.    The Board finds the testimony of the applicants witnesses to be credible and adopts the aforementioned factual background.

13.    The Board finds that the subject property is entirely occupied by a school, which enrolls 990 students and must adequately provide for the safety of the students

3

on a daily basis.   The Board finds that the size of the proposed fence and guard house provides enhanced safety and  substantially outweighs any detrimental impact. which forms the basis for a grant of a C2 variance.  The Board further finds that the proposed fence and guard house will  have a minimal negative impact on the surrounding area which can be mitigated by planting non deciduous foliage along the front fence line.

CONCLUSIONS AND DETERMINATIONS:

1.    This application is before the Zoning Board of Adjustment on the application for a variance from the Englewood Zoning Code maximum fence height requirement to construct an eight (8) foot fence around the perimeter of the school property where a maximum  six (6) foot fence height is permitted and to construct a guard house in the front of the property.

2.  The applicant  presented testimony concerning the variances which indicated that  the proposed fence and guard house will significantly enhance the safety of the school children by controlling access to the site from all directions.

3.  The Municipal Land Use Law, at N.J.S.A. 40:55D-70(c) provides Boards with the power to grant variances from strict bulk and other non-use related issues when the applicants satisfy certain specific proofs which are enunciated in the Statute. Specifically, the applicants may be entitled to relief under the [C-2] criteria by showing that in a particular instance relating to a specific piece of property, the purposes of the act would be advanced by allowing a deviation from the Zoning Ordinance requirements and the benefits of any deviation would substantially outweigh any detriment.  In those instances, a variance may be granted to allow departure from regulations adopted, pursuant to the Zoning Ordinance.  Those categories specifically enumerated above

4

constitute the affirmative proofs necessary in order to obtain "bulk" or (C) variance relief.

4.   Finally, the applicants must also show that the proposed variance relief sought will not have a substantial detriment to the public good and, further, will not substantially impair the intent and purpose of the zone plan and Zoning Ordinance. It is only in those instances when the applicant has satisfied both these tests, that a Board, acting pursuant to the Statute and case law, can grant relief. The burden of proof is upon the applicant to establish these criteria.

5.   In reviewing the testimony, as well as the plans and exhibits marked before the Board of Adjustment, the Board concludes that the applicant has met the minimum requirements of the Land Use Law and the Case Law to a sufficient degree to enable the Board to grant the relief requested.

6   The Board finds and concludes that the subject property is entirely occupied by a school which enrolls 990 students and must adequately provide for the safety of the students on a daily basis.   The Board finds and concludes that the size of the proposed fence and guard house provides enhanced safety and substantially outweighs any detrimental impact which forms the basis for a grant of a C2 variance. The Board further finds and concludes that the proposed fence and guard house will have a minimal negative impact on the surrounding area which can be mitigated by planting non deciduous foliage along the front fence line.

7.   The application for the variance set forth herein are, accordingly, approved so as to permit construction of the aforesaid fence and guard house subject to the following conditions:

5

(a)    The applicant shall be responsible for the obtaining of any other approvals or permits as may be required by law and shall comply with any requirements or conditions of such approvals or permits.

(b)    The applicant must pay all fees and escrows due to the City of Englewood.

(c)    The applicant shall plant non-deciduous foliage in front of the fence along the front of the property. The foliage shall be limited to four (4) feet in height;

(d)    The applicant shall cause the entrance gates to remain open between the hours of 7:00 a.m. to 9:00 a.m. and 2:30 p. m to 5:00 p.m. to maximize traffic flow onto the property and shall cause the exit gates to be programmed to remain open for a duration of time between vehicles necessary to maximize traffic flow out of the property at all times.

NOW, THEREFORE, BE IT RESOLVED, that the Board of Adjustment hereby memorializes its action of November 26, 2001 and grants the Application for variance relief as contained in the body of this Resolution.

Notice of this decision shall be published in the official newspaper of the City of Englewood.

BE IT FURTHER RESOLVED, that the members of this Board of Adjustment who voted in favor of said variance at its official public meeting held on the 26th day of November, 2001, do hereby MEMORIALIZE AND CONFIRM the foregoing findings of fact, determinations and decisions set forth in this Resolution of Memorialization as the

6

"Official Action" taken by this Board of Adjustment on said date in accordance with the provisions of N.J.S.A. 40:55D-10(g)(2) of the New Jersey Municipal Land Use Law this _____ day of _____, 2002.

Vote for the Motion

| Board Member | Motion | Second | Yes | No | Abstain | Absent |
|---|---|---|---|---|---|---|
| Anhalt | | X | X | | | |
| Backous | X | | X | | | |
| Bernstein | | | | | | |
| Byrne | | | X | | | |
| Citron | | | | | | |
| Kelly | | | | | | |
| Litt | | | | | | |
| Weltzman | | | | | | |
| Feintuch | | | | | | |

Vote for Memorialization

| Board Member | Motion | Second | Yes | No | Abstain | Absent |
|---|---|---|---|---|---|---|
| Anhalt | | X | X | | | |
| Backous | X | | X | | | |
| Bernstein | | | | | | |
| Byrne | | | X | | | |
| Citron | | | | | | |
| Kelly | | | | | | |
| Litt | | | | | | |
| Weltzman | | | | | | |
| Feintuch | | | | | | |

I hereby certify that this resolution of memorialization was duly adopted by a majority vote of the members of the Englewood Board of Adjustment who voted in favor of said decision, a quorum of the membership being present, at the official public meeting of said Board held on the __17__ of __January__ , 2002.

Rosemary Byrne, Chairperson

8

③

$Elliot$ June 18, 2019

**CITY OF ENGLEWOOD**
**BOARD OF ADJUSTMENT**

**RESOLUTION OF MEMORIALIZATION**
**AS TO "OFFICIAL ACTION"**
**GRANTING USE VARIANCE RELIEF AND BULK VARIANCES**

In the Matter of the Application
of MORIAH SCHOOL
53 South Woodland Street
Block 3501, Lots 8 & 9
Application No. 1702

WHEREAS, the Moriah School has applied to City of Englewood Board of Adjustment for conditional use approval and site plan approval with bulk variances, in connection with the construction of a proposed two-story addition to the existing Moriah School, said addition consisting of 13,445.5 square feet, for the construction of a religious educational day school addition, with respect to property known as Block 3501, Lots 8 and 9, on the tax map of the City of Englewood, located at 53 South Woodland Street, in the City of Englewood, County of Bergen, and State of New Jersey, which premises are located in the R-AAA Zone; and

WHEREAS, the Board, after carefully considering the evidence presented by the applicant, the plans and applications on file, and the reports of its consultants, has made the following factual findings and conclusions:

FINDINGS OF FACT:

1.    The subject property, which is owned by the applicant, Moriah School, is on two irregularly shaped 210,330.8 square foot lots on 9.2 acres, located in the R-AAA residential zone. It is presently improved with the existing Moriah School and a house,

-1-

presently used for administrative offices, which will be removed for construction of the school addition.

2.    The applicant, a religious Hebrew Day School, proposes to remove an existing residential structure and erect a two-story addition to the existing school consisting of 13,455.5 square feet. The proposed structure will have a blended stucco and tudor exterior and will be built partly over an existing parking lot. Additional parking spaces will be provided bringing the current non-conforming parking to conformity. Presently there are 104 parking spaces; 153 places will be provided adding 49 parking spaces. In addition, the number of handicap spaces will be brought into conformity.

3.    The applicant's development proposal for the property is more particularly depicted on a Site Plan prepared by Land Associates, Engineering and Planning, dated June 27, 2002, revised last on February 12, 2003, consisting of 8 sheets, T.01 to SP.82, and on architectural drawings or renderings prepared by the Geddis Partnership, architects, dated June 18, 2002, consisting of 4 sheets, A-100 to A-201, depicting the floor plans and elevations of the proposed building.

4.    The application to the Board of Adjustment requires the following variance relief from provisions of the City of Englewood's Zoning Ordinance:

a.    The proposed expansion of an existing Hebrew Day School is an expansion of a non-conforming use and structure.

b.    Preliminary and Final Site Plan approval is also required in accordance with Section 8A of the Municipal Land Use Ordinance of the City of Englewood.

c.    A variance from Englewood's Municipal Land Use Ordinance, Section

-2-

4-1.13(B), regarding impervious coverage is requested. The applicant is requesting 47.9% impervious coverage; 25% is permitted in the R-AAA District.

    d.   The applicant is bringing the number of parking spaces and handicap spaces up to the number required by Ordinance. A variance from Englewood Ordinance Section 5-1.10C parking requirement of having a traffic island for each 10 spaces is requested.

    e.   The applicant seeks preliminary and final Site Plan approval. This relief comes within the ancillary jurisdiction of the Board under N.J.S.A. 40:55D-76(b).

    5.   A prior expansion of the Moriah School was granted by Resolution of the Board of Adjustment, City of Englewood on June 20, 1991. That Resolution had as a condition that no more than 1,000 students shall attend the Moriah School at any time. The applicant is not seeking to expand the number of students of the school but wishes to expand the size of the structure and amount of parking to better serve the existing student population.

    6.   Conservation easements are indicated on page T.01 of the Site Plan and will not be violated.

    7.   In 1991, the City of Englewood and the Moriah School entered into an agreement, which was memorialized in the City of Englewood Ordinance No. 91-14, authorizing a partial release of a conservation easement located on Lot 9, in Block 3501 and accepting a conservation easement upon a portion of Lot 8, in Block 3501.

    8.   The Moriah School presented several witnesses in support of the application.

-3-

Dr. Gerald B. Kirschembaum, the principal of the Moriah School, testified that presently the school has 982 students and is limited to enrollment of 1,000, by virtue of a prior Resolution. He stated that the school does not intend to expand the number of students, but needs space for a larger gym, as well as small group instruction and communal space for the school. Presently, there are offices in the to-be-removed former building that functions as the administration building, which will be relocated to the main building. The applicant needs to increase the size of classrooms and create a new gymnasium. Dr. Kirschembaum stated that the space being provided in this proposed new building is essential to the proper functioning of their educational programs. Presently, there are car pools picking up children that queue up on South Woodland Avenue. The proposal will increase the number of parking spots, as well as provide space on the site for car pools to queue up, and should alleviate the problem of traffic queuing up on South Woodland Avenue.

9.     Barbara Geddis, a licensed architect, testified on behalf of the application. She stated that the existing site is 9.29 acres, including some conservation land on the east. The school has approximately 550 linear feet of frontage on South Woodland Avenue. An accessory building on the site, which was once a residence, is proposed to be demolished. The applicant proposes a two-story building addition at the back of the site. There is no encroachment on any conservation area. The addition will be located primarily on an existing parking lot. Ms. Geddis testified that the proposal maintains a green dense foilage on the back side of the site and an evergreen buffer to shield the school from the view of some of the neighbors.

10.     Ms. Geddis testified that they could not fulfil the school's needs and comply

-4-

with the impervious coverage requirements of the City of Englewood Ordinance.

11.     Kenneth H. Karle, of Lan Associates, a licensed engineer of the State of New Jersey, testified that the site plan proposed will reconfigure the existing parking lot, so that under the new plan, cars will enter and exit at different locations. Under the present plan, the exit and entrance is at the same location, which causes some cross traffic congestion at peak use. The proposal will improve traffic circulation. In addition, the proposal will bring the present non-complying number of parking spaces into compliance with the Ordinance. Mr. Karle stated that one of the variances requested is a waiver from the requirement of having a 50 square foot planting island for every 10 parking spaces. He stated that they do have the equivalent square footage of planting, but in order to increase the efficiency of the lay-out of the lot, they are placing the plantings in one area. He stated that the lot is surrounded by existing mature trees that will act as an adequate buffer. Mr. Karle further testified that the proposed lighting will be back-shielded to prevent any spill-off from the property.

12.     Toomas Tehve testified as the traffic engineer for the applicant. He stated that the present traffic conditions are considered "A Level of Service." The proposal, in his estimation, will improve traffic circulation at the site. The new design provides an additional queuing area, which will alleviate the former problem of queues on South Woodland Avenue. Mr. Tehve was cross-examined by members of the public who later commented on traffic concerns.

13.     Kenneth Albert testified as the City Planner and Engineer for the City of Englewood. He pointed out that in addition to the D Variance, the Board was being asked to approve a variance for impervious coverage. The Board was being asked to approve

47.9% coverage, where 25% is permitted for schools.  In the residential zone, only 10% coverage is permitted.  The impervious coverage variance requested is significant.   Mr. Albert further stated that although the impervious coverage variance is significant, it will amount to only a 2% increase in impervious coverage. Mr. Albert suggested the applicant provide a traffic mitigation plan 'if necessary'.

14.    Parking will be brought into conformity with additional parking spaces being proposed.  Mr. Albert pointed out that the variances proposed will be mitigated by various conditions, such as plantings proposed directly in the line of site between the school and the roadway.  He recommended that the applicant be required to restore the landscaping that will be removed.  He also recommended that during construction, existing vegetation be preserved and protected.  He recommended a requirement that the air-conditioning units be located on the northwest corner of the building where it can be fenced in a closed area by the property, or if it will be on the roof, it be screened and noise amelioration measures be included.   Mr. Albert was cross-examined by members of the public who later spoke on traffic issues.

15.    Hans Howland, an architect on staff with Geddis Partnership, testified that there was at least a 180 foot separation between the south facade of the addition and the existing adjacent neighbors' house.   In addition, the design and materials used in connection with the south facade would have the nature of a residential structure, with detailing in woodwork, so it would have a residential character and less of a negative impact upon the neighbors.

16.    The record in this matter consists of the following:

a.    The application for use, bulk variances and preliminary and Site Plan

approval, together with all the exhibits attached thereto.

b.  All presentations, exhibits, testimony and discussions made or introduced at the meeting, including, but not limited to, reviews by K. Albert Associates, Inc., dated February 20, 2003, August 26, 2002 and November 19, 2002.

c.  City of Englewood Ordinance No. 91-14 regarding the conservation easement.

d.  Lan Associates review dated February 14, 2003, requiring the following:

1.  A sanitary line lateral with an additional manhole;

2.  Landscaping trees within the proposed traffic island of Picea Pungens species (Blue Spruce);

3.  The existing landscaping berm be restored to match the adjacent existing features for the existing curb line elevations, along the western curb line adjacent to the existing landscaping berm be maintained.

4.  Air-conditioning units be adequately screened from view.

17.  After reviewing the evidence submitted, the Board of Adjustment concludes that the applicant has sustained its burden of showing special reasons to warrant the grant of the requested use variance. The Moriah School is a religious educational institution and as such is an inherently beneficial use. It will promote the general welfare and benefit the community. The proposed building will fit in with the surrounding neighborhood and the

existing school. In addition, the Board finds that the purposes of the Municipal Land Use Law will be advanced by the requested deviations from the zoning requirements and the benefits to be derived therefrom will substantially outweigh any detriments associated therewith.

18.     The Board also finds that the applicant has demonstrated that the requested relief can be granted without substantial detriment to the public good and without substantially impairing the intent and purposes of the Zone Plan and Zoning Ordinance.

WHEREAS, the Board took action on this application at its meeting on March 24, 2003, and this Resolution constitutes a Resolution of Memorialization of the action taken in accordance with N.J.S.A. 40:55D-10(G).

NOW, THEREFORE, BE IT RESOLVED by the Zoning Board of Adjustment of the City of Englewood that the application of the Moriah School for a use variance, bulk variance and preliminary and final Site Plan approval, as aforesaid, be granted, subject to the following conditions:

1.     The applicant's obtaining all other necessary governmental approvals, permits, or waivers.

2.     The applicant must obtain a Soil Erosion Sediment Control permit.

3.     The applicant must obtain approval from the Bergen County Planning Board.

4.     The applicant must obtain all appropriate permits from the City of Englewood Engineering Department, for matters within its perview.

5.     The within Site Plan is subject to the execution of a mutually satisfactory Developer's Agreement among the applicant, the City of Englewood and the Board of Adjustment.

6. The proposed addition's exterior will be of blended stucco and tudor style to blend in with the surrounding residential neighborhood.

7. There will be no renting of the facilities, which will be used only by the Moriah School.

8. The applicant will restore landscaping being removed for construction and will provide evergreen trees in the proposed island. The applicant will protect all existing vegetation as much as is practicable.

9. The prior Resolution limit of 1,000 students, in no more than 44 classrooms, will remain in effect.

10. The landscaping trees within the proposed traffic island of the new parking lot in the entrance island will be the species Picea Pungens (Blue Spruce).

11. The existing landscaping berm will be restored.

12. The existing curb line elevations along the western curb line will be maintained.

13. Adequate screening will be provided around the new air-conditioning units to be provided for the building addition.

14. For a period of 12 months following the issuance of a Certificate of Occupancy, the Board of Adjustment will retain jurisdiction to have the City Engineering Department and/or its Zoning Officer review the pattern of traffic flow at the site, and if in the opinion of either the City Engineer and/or the Zoning Officer, traffic problems continue, the Board may require the applicant to provide a Traffic Mitigation Plan. The applicant agrees that should the Board request it, it will provide a Traffic Mitigation Plan to be

reviewed by the Board.

15.   The application will post funds with the City of Englewood to satisfy any deficiency in the applicant's escrow account.

NOW, THEREFORE, BE IT RESOLVED that the Board of Adjustment of the City of Englewood hereby memorializes its action of March 24, 2003, and grants the application of the Moriah School, for a use variance, impervious coverage variance, variance from the requirement of a parking island for every 10 parking spaces and such waivers as necessary to permit the construction of the Moriah School application.  Notice of this decision shall be published in the official newspaper of the City of Englewood.

BE IT FURTHER RESOLVED that the members of this Board of Adjustment who participated at its official public meeting held on March 24, 2003, do hereby MEMORIALIZE AND CONFIRM the foregoing findings of fact, determinations and decisions set forth in this Resolution of Memorialization, as the "Official Action" taken by this Board of Adjustment on said date, in accordance with the provisions of N.J.S.A. 40:55D-10(g)(2) of the New Jersey Municipal Land Use Law this 19th day of May 2003. June

Vote for Memorialization

| Board Member | Motion | Second | Yes | No | Abstain | Absent |
|---|---|---|---|---|---|---|
| Anhalt | | | | | | |
| Backous | | | ✓ | | | |
| Bernstein | | | ✓ | | | |
| Byrne | | | ✓ | | | |
| Feintuch | | | | | | |
| Kelly | | | ✓ | | | |
| Litt | | | | | | |
| Weitzman | | | | | | |
| Rosenberg | | | ✓ | | | |

I hereby certify that this resolution of memorialization was duly adopted by a majority vote of the members of the Englewood Board of Adjustment who voted in favor of said decision, a quorum of the membership being present, at the official public meeting of said Board held on the _19_ of _June_ 2003.

Rosemary Byrne, Chairperson

L:\Clients\ENGLEWOOD BOARD OF ADJUSTMENT\Board of Adjustment 2003\RESOLUTIONS 2003 APPLICATIONS\Moriah School 6-21-03\tepid

*June 27 2005*

## CITY OF ENGLEWOOD
## BOARD OF ADJUSTMENT

### RESOLUTION OF MEMORIALIZATION AS TO "OFFICIAL ACTION" APPROVING VARIANCES AND SUBDIVISION

In the Matter of the Application of
Moriah School of Englewood
Block 3501, Lots 8 and 9, a/k/a
53 South Woodland Street
Application No. 1767

WHEREAS, Moriah School of Englewood (hereinafter referred to as "the Applicant), has submitted an application for the modification of variances and site plan approval previously granted by the Board; and

WHEREAS, the property which is the subject of the application is known and identified as Block 3501, Lots 8 and 9 on the Tax Map of the City of Englewood, which property is located at 53 South Woodland Street. The subject property is located within the R-AAA zone established by the Zoning Ordinance of the City of Englewood; and

WHEREAS, the Applicant filed an application to amend a variance previously granted to permit a fence in the front yard in excess of the height permitted and to amend variances and site plan approval previously granted in connection with the proposed expansion of the school; and

WHEREAS, this application is within the jurisdiction of the Zoning Board of Adjustment; and

WHEREAS, the application was deemed complete and was considered by the Board at meeting held on April 11, 2005, proper notice having been given in accordance

with law for the public hearing portions of the matter; and

WHEREAS, during the present application the Applicant was represented by Elliot W. Urdang, Esq.; and

WHEREAS, a land/topographical survey, prepared by Willaim T. Manning, P.L.S., dated 8/25/01, revised to 5/12/03 to locate the installed fence, and a plan entitled "Moriah School Parking Lot Expansion," prepared by Kenneth H. Karle, P.E., dated 4/13/04, consisting of five pages, were submitted in support of this application;

NOW, THEREFORE, BE IT RESOLVED by the Zoning Board of Adjustment of the City of Englewood that the following findings of facts, conclusions and determinations are hereby confirmed and memorialized:

FINDINGS OF FACT:

A. Modification of the Fence Location

1. On June 20, 1991, this Board adopted a resolution permitting the use of the subject property as a religious day school, subject to conditions set forth therein.

2. In or about November, 2001, the applicant applied to this Board for permission to construct a security fence and gates around the property. The proposed fence and gates along South Woodland Street exceed the permissible height of the same in a front yard, thus requiring a variance.

3. After a public hearing which occurred on November 26, 2001, the Board approved the variance, subject to conditions, which determination was memorialized in a written resolution adopted on January 17, 2002.

4. The location of the fence and gates which as approved by the Board in that

2

application was as set forth on a plan entitled "Proposed Fence Extension", prepared by The Geddis Partnership, dated 11/8/2001 ( hereinafter "the Geddis Plan").

5. When the applicant went to install the fence, it found that, for a variety of reasons, it could not be installed at the precise location shown on the Geddis Plan. Because of the security issues raised by the 9/11 attacks, the applicant elected to proceed with the installation of the gates even though they were not at the same location shown in the Geddis Plan.

6. Seth Peyser, a member of the applicant's board, testified that the location of the fence as installed by the applicant is a better location than that set forth in the Geddis Plan because it better reflects the existing topography and location of mature plantings than does the Geddis Plan and that it eliminates the potential security problems that might have arisen if the fence had been located as set forth in the Geddis Plan. The Board finds this testimony to be credible.

7. The Board further finds that the difference in location between the installed fence and that shown on the Geddis Plan is not significant, nor will it impair the applicant's ability to install the landscaping required as a condition of the prior resolution.

B  Modification of Prior Site Plan Approval

8. In 2003, the applicant applied for permission to remove an existing residential structure and erect a two-story addition to the existing school consisting of 13,455 square feet of floor area, as well as an expansion of the parking area by 49 parking spaces to make a total of 153 on-site parking spaces, meeting the ordinance requirement.

9. That application required a "d" variance for the expansion of the existing religious school, a variance for impervious coverage, a variance for not having a parking

3

island for each 10 spaces in a parking area and preliminary and final site plan approval.

10.  The said variances and site plan were approved by the Board with conditions, which decision was memorialized in a written resolution adopted on June 19, 2003.

11.  The applicant now finds that it is unable to proceed with its plan for the construction of the new building.  It proposes to retain the residential building, which is used for administrative purposes, and to expand the existing parking lot to provide 28 more parking spaces, for a total of 132 spaces where 153 spaces are required. previously approved plan.

12.  According to the testimony of Jordan Abowitz, the Business Administrator of the applicant, there will be no additional students or faculty and that the enrollment has declined somewhat over the past two years and is below the limit of 1,000 students set in the Board's 1991 resolution.  The Board finds Mr. Abowitz's testimony relevant.

13.  The Board also heard testimony from the applicant's engineer, Richard Wostbrock, that the queuing space remains the same as that in the site plan approved in 2003, which should eliminate or at least significantly reduce any backup onto South Woodland Street, and that the access for fire and emergency vehicles will be substantially improved.  The Board finds Mr. Wostbrock's testimony credible.

14.  The modification of the prior approved site plan requested by applicant in the subject application will provide much needed parking, improve the existing queuing capactiy which will alleviate backup onto South Woodland Street and will improve fire and emergency vehicles.

15.  There are no detriments associated with the present plan as opposed to the site plan previously approved in 2003.

4

NOW, THEREFORE, BE IT RESOLVED that the Board of Adjustment hereby memorializes its action of April 11, 2005, and grants the application for modification of the prior fence approval set forth in its resolution of January 17, 2002 and for modification of the site plan approval granted in its resolution of June 19, 2003, subject to the following conditions:

1.    Compliance by the Applicant with all of the requirements and conditions set forth in the Board's resolutions of January 17, 2002 and June 19, 2003, respectively, which requirements and conditions are incorporated herein as if set forth at length.

2.    As to approval of the relocation of the fence, the applicant shall submit a revised landscaping plan which shall be subject to the approval of Kenneth Albert, the City Engineer and Planner.

3.    The applicant's cleaning out the existing drainage system and the approval by Mr. Albert of a maintenance plan for the same.

4.    As per the prior approval of 2003, the applicant shall develop a traffic mitigation plan and shall report on the same to Mr. Albert and the Board within 12 months from the date use of the parking area and related improvements is permitted.

5.    The landscaping on the south side shall be extended to the beginning of the conservation easement on the easterly side.

6.    The new landscaping shall be integrated into the existing plantings to the end that it will provide an appropriate screen and buffer at the newly located parking lot.  All existing landscaping berms shall be restored.  All of

5

the aforesaid landscaping shall be subject to the approval of Mr. Albert.

7.    The facilities herein approved shall only be used by the Moriah School.

8.    The Applicant shall be responsible for the obtaining of any other approvals or permits required by law and shall comply with any requirements or conditions of such approvals.

9.    The Applicant must pay all fees and escrows due to the City of Englewood.

BE IT FURTHER RESOLVED, notice of this decision shall be published in the official newspaper of the City of Englewood.

BE IT FURTHER RESOLVED, that the members of this Board of Adjustment who voted in favor of said variances and minor subdivision at its official meeting of April 11, 2005, do hereby MEMORIALIZE AND CONFIRM the foregoing findings of fact, determinations and decisions set forth in this Resolution of Memorialization as the "Official Action" taken by this Board of Adjustment on said date in accordance with the provisions of N.J.S.A. 40:55D-10(g)(2) of the New Jersey Municipal Land Use Law this _____ day of June, 2005.

Municipal Land Use Law this _____ day of _____, 2005.

6

Vote for the Motion

| Board Member | Motion | Second | Yes | No | Abstain | Absent |
|---|---|---|---|---|---|---|
| Kelly | x | | x | | | |
| Backous | | | x | | | |
| Rosenberg | | | | | | |
| Feintuch | | | x | | | |
| Byrne | | | x | | | |
| Fuld | | | | | x | |
| Bernstein | | x | x | | | |
| | | | | | | |
| 1st Alternate | | | | | | |
| Sandor 2nd Alternate | | | x | | | |

Vote for Memorialization

| Board Member | Motion | Second | Yes | No | Abstain | Absent |
|---|---|---|---|---|---|---|
| Kelly | | ✓ | X | | | |
| Backous | ✓ | | ✗ | | | |
| Byrne | | | ✗ | | | |
| Feintuch | | | X | | | |
| Rosenberg | | | N'V' | | | |
| Fuld | | | | | | |
| Bernstein | | | | | | |
| | | | | | | |
| 1st Alternate | | | | | | |
| Sandor 2nd Alternate | | | | | | |

I hereby certify that this resolution of memorialization was duly adopted by a majority vote of the members of the Englewood Board of Adjustment who voted in favor of said decision, a quorum of the membership being present, at the official public meeting of said Board held on the __27__ day of __JUNE__, 2005.

Rosemary Byrne, Chairperson

Prepared by Joseph M. Andresini, Esq.

7

ZONING BOARD OF ADJUSTMENTFile No.:2009-12

CITY OF ENGLEWOOD

Resolution with respect to the application of Moriah School
for variances from the Zoning Ordinance of the City of Englewood

      WHEREAS, Moriah School (hereinafter "the applicant") has made application to the
Zoning Board of Adjustment of the City of Englewood (hereinafter "the Board") for variances
from those provisions of the Zoning Ordinance of the City of Englewood (hereinafter "the
Ordinance") relating to conditions imposed upon conditional uses, in order to permit the
expansion of same, and regulating fence height; and for the excision of a condition contained in
a prior resolution of the Board prohibiting the acquisition of additional property, with the
application relating to the property known as Lots 9.01 and 10 in Block 3501 on the tax
assessment map of the City of Englewood, with a street address of 40 and 53 S. Woodland St.,
Englewood, New Jersey 07631 (hereinafter "the property"); and

      WHEREAS, the application was heard by the Board at public hearings held during duly-
constituted meetings of the Board held in compliance with the Open Public Meetings Act on July
16, 2009, November 23, 2009, December 17, 2009, February 18, 2010, February 22, 2010 and
March 22, 2010 at which time testimony was offered on behalf of the applicant by witnesses
including Massimo Piazza, the applicant's professional engineer; Jordan Abowitz, the
applicant's business administrator, Amit Meir, the applicant's security consultant; and oral
argument presented by Elliot W. Urdang, Esq., the applicant's attorney; and

      WHEREAS, the Board also heard testimony from Kenneth Albert, Engineer and Planner
for the City of Englewood; and

      WHEREAS, at the conclusion of the public hearing on March 22, 2010, the Board
approved a motion granting the relief requested by the applicant, subject to certain conditions,
and directing the Board attorney to prepare a memorializing resolution, pursuant to N.J.S.A.
40:55D-10(g)(2); and

      WHEREAS, the Board makes the following findings of fact:

1.    The record in this matter shall consist of:

        a.    the permit denial from the Construction Official/Zoning Officer dated
            November 12, 2008;
        b.    the application filed by the applicant, including a one-page site plan of the
            property dated November 8, 2008 and revised on April 30, 2009; and one-
            page landscape exhibits dated December 16, 2009 and January 8, 2010
            which shows the proposed fencing and landscaping; and the resolution of
            the Board dated June 20, 1991;

1

    c.    all testimony taken on July 16, 2009, November 23, 2009, December 17, 2009, February 18, 2010, February 22, 2010 and March 22, 2010 and exhibits marked into evidence on those occasions, including a letter from the Police Chief of the City of Englewood dated November 5, 2009.

2.    The applicant is the owner Lots 9 and 10, which are located in the R-AAA zone.

3.    The real property taxes, if any, assessed against the property were current at the time of the hearing.

4.    Notice of the application was published in the official newspaper of the City of Englewood as called for in N.J.S.A. 40:55D-12(a), and the other notice requirements found in N.J.S.A. 40:55D-12 were complied with, and an affidavit of service was filed with the Board Secretary.

5.    Lot 10 is located on the East side of S. Woodland St., South of its intersection with E. Palisades Ave. It has an area just in excess of 1 acre, with frontage of 203 ft. along S. Woodland St. It meets the street at an angle, and is irregularly-shaped in the rear. It is improved with a 2 1/2 story, wood-frame, single-family dwelling, a detached garage, and a driveway.

6.    The applicant operates a private school, for students through Grade 12, on adjoining Lot 9, located to the South of Lot 10. That property is improved with a number of buildings, driveways and parking areas.

7.    The applicant has already acquired Lot 10, and seeks to expand an existing playground area on Lot 9 onto the rear portion of Lot 10. The plan also calls for the demolition of the home on Lot 10. Other than the playground, no other use of Lot 10 is proposed at this time. The applicant also wishes to extend a decorative fence, which is 8 ft. in height, located along S. Woodland St. further to the North, across Lot 10, and to construct a chain link fence, also 8 ft. in height, along the North lot line of Lot 10. The plan dated January 8, 2010 also shows a portion of chain link fence extending across the rear of Lot 10, just behind the existing home, and connecting with an existing fence on Lot 9.

8.    The applicant came before the Board in 1991, and on three occasions thereafter, seeking variances so as to permit the expansion of the school, and the construction of other improvements, such as a security fence, a two-story addition and the expansion of a parking area and a modification of a fence. The resolution adopted by the Board with respect to the first such application on June 20, 1991, contained the following condition: "Applicant shall acquire no further adjoining property on S. Woodland Street." There is no factual or legal context for that condition found in the resolution. The Board is left to speculate as to how and why it came to be included in the resolution. The applicant has unquestionably

violated that condition with the acquisition of Lot 10. The applicant explained why that was done, citing a need to move quickly with respect to the property, without sufficient time to come before the Board for approval.

9.   The playground that exists on Lot 9, to be expanded onto Lot 10, will be a grassy area, without equipment of any kind.

10.  Mr. Meir testified to the development of a security plan for the applicant, which has been an on-going process fo 8 years. The work began with a survey in order to assess needs, and continued with the development of a strategy to meet those needs. The first step was fencing, followed by technical features, such as an electric gate, a guardbooth, cameras and security personnel. The fact that the applicant's school building is located close to the street presents special challenges. Over the past few years, there have been regular consultations with the Department of Homeland Security, recognizing that the applicant's school serves persons of the Jewish faith. Mr. Meir considered a fence, less than 8 feet in height, to be meaningless from a security perspective. Even a fence that is 8 feet high can undoubtedly be scaled by an intruder. However, the extra height means that it takes longer, and increases the chances that the person will be seen on the closed-circuit camera system. He considered low plantings to be preferable along the front of the property, as they make it more difficult for an intruder to conceal himself, while planning his next move. Low plantings along the front also increase the visibility of the building from police officers passing by. The primary area of concern was along S. Woodland St. Mr. Meir noted that there already extensive plantings along the North and East property lines. He considered the threat of concealment to be greatest in the front of the building. He also considered the low plantings to improve the visibility of the front of the school from off-campus locations, such as across S. Woodland St. In general terms, he stated that the longer it takes an intruder to scale the fence and get to the buildings, the better.

11.  The Board finds that the landscaping plan dated December 16, 2009 strikes an appropriate balance between aesthetic and security concerns, as it provides for low plantings across the front of both Lots 9 and 10, and some low plantings on Lot 10 along a portion of its border with Lot 12, and no plantings along the border between Lots 10 and 11.

12.  The Board acknowledges receipt of a letter from the Police Chief of the City of Englewood addressing the merits of the application and security concerns. However, the Board cannot make any findings of fact based upon the letter, as the Board heard no testimony from the Chief, and is therefore, unable to evaluate his concerns.

WHEREAS, the Board makes the following conclusions of law:

3

1.  N.J.S.A. 40:55D-70(c)(2) authorizes the Board to grant a variance where "in an application or appeal relating to a specific piece of property, the purposes of this act would be advanced by a deviation from the zoning ordinance requirements and the benefits of the deviation would substantially outweigh any detriment". This section applies to that portion of the application which seeks to vary permitted fence height. One of the purposes of zoning is to promote public health, safety and general welfare. N.J.S.A. 40:55D-3(a). The Board finds that the added fence height has a direct relation to improved security on the property. A combination of fence height, and the distance between the fence the applicant's buildings, will improve the safety of the applicant's staff and students. Because the property is the size it is, the only variable that can be altered is fence height. The Board finds that the enhanced security the fence will provide more than offsets whatever detriment may be associated with its height. The Board also considers the fact that an 8 foot high fence already exists. The impact of the extension of the fence is less than that associated with the construction of the fence in the first place.

2.  N.J.S.A. 40:55D-70(d)(3) permits the Board to grant variances from conditional use requirements. In Englewood, schools, which are considered to be "inherently beneficial" uses for land use purposes, are also "conditional" uses in residential zones, provided they front on one of several enumerated streets. S. Woodland St. is not one of those streets. However, the d(3) variance applicant is held to a lesser standard of proof than the d(1) applicant. Coventry Square v. Westwood Zoning Board of Adjustment, 138 N.J. 285 (1994) instructs the Board to remember that the use is indeed permitted in the zone, provided it meets certain requirements. It is much different than a use which is prohibited altogether in the zone. Therefore, the Board must consider the effect of the deviation from the enumerated condition, in this case, the street upon which it is located, on the continued suitability of the site. The Board notes that the applicant meets all of the other requirements imposed upon schools as conditional uses. The Board cannot find that this modest expansion of the applicant's property, and the very light use to which the property will be put, to render the entire site no longer suitable for its present use.

3.  Regardless of the legal basis for variance relief, variances cannot be granted unless the variance is not substantially detrimental to the purpose and intent of the zone plan and the Ordinance, and the public good. The Board has already found that the benefits associated with the fence outweigh, substantially, any detriment. Furthermore, the use to which Lot 10 is to be put is not substantial, and cannot be characterized as detrimental in any way. It is proposed to be used only as a playground, with a grass surface and no equipment. In this context, the Board notes that pursuant to Section 4-1.2(d) parks and playgrounds are permitted uses in all residential zones in the City of Englewood. The Board is hard-pressed to find any substantial detriment associated with such a use which is otherwise

permitted, simply because it is associated with a conditional use that does not meet all conditional use requirements.

4.  The applicant has also sought relief from the condition found in the resolution of June 20, 1991 prohibiting the acquisition of additional property. As noted above, there is no factual or legal context for this condition. The Board does not know if the applicant requested it, or simply acceded to it, or if it was unilaterally imposed by the Board.  In order to be valid, a condition must:

    a.   not offend any provisions of the Zoning Ordinance;
    b.   not require illegal conduct on behalf of the applicant;
    c.   be in the public interest;
    d.   be reasonably calculated to achieve a legitimate objective of the Ordinance; and
    e.   not be unnecessarily burdensome to the property owner.

DeFelice v. Zoning Board of Adjustment of the Borough of Point Pleasant Beach. 216 N.J. Super. 377, 381 (App. Div. 1987).

In this case, the condition does not run afoul of the Ordinance or require illegal conduct. The more difficult issues are whether it is in the public interest, is reasonably calculated to achieve a legitimate objective of the Ordinance, and is not unnecessarily burdensome.

The Ordinance is designed to regulate the use, not the ownership, of land. Conditions based upon ownership have been routinely struck down by the Courts, as they are based upon matters personal to an applicant, and not matters related to the purposes of zoning.  DeFelice, supra and Berninger v. Board of Adjustment, 254 N.J. Super. 401 (App. Div. 1991).

A condition prohibiting the mere acquisition of additional property does not advance the public interest, nor is it reasonably calculated to achieve a legitimate purpose of the Ordinance, which does not, and indeed cannot, regulate ownership. The Ordinance does regulate an owner can do with property after it is acquired.

Restraints on alienation of land are not favored.  The condition in question is such a restraint, as the applicant would certainly be one of the logical purchasers of adjoining property.

The prohibition against purchase of adjoining property can only be viewed as an attempt to limit or prevent the expansion of the applicant. That cannot be considered as one of the purposes of the Ordinance. Rather, expansions of conditional uses are entitled to be evaluated under the standards relating to such

uses, and dealt with on the merits. If such uses are to be limited in size, the solution is legislative in nature, and should not take the form of conditions tacked on to resolutions of approval.

In Orloski v. Ship Bottom, 226 N.J. Super. 666 (Law Div. 1988), affirmed at 234 N.J. Super. 1 (App. Div. 1989), the Court considered whether a condition prohibiting the further subdivision of a property was legitimate. In that case, the property had a principal building and an accessory building. In the context of an application to destroy the prior principal building, and construct a new principal building, the local board prohibited the further subdivision of the property, which would have had the effect of making the accessory building a principal building in its own right on its own lot. Following the denial of a subsequent application to do just that, the reviewing Court considered two issues: whether the condition was valid, and whether the applicant was bound by it nonetheless, having failed to challenge it within 45 days following its imposition, and by having accepted the benefits of the approval.

On the first issue, the Court found the condition to be valid, as it prevented the conversion of the accessory use into a principal use through the use of the subdivision process. In that case, the accessory building was always subordinate to the principal building. The Court found that when approval was given to destroy the principal building, it was with the assumption by both the Board and the applicant, that the cottage was accessory, and should stay that way. By subdividing the property, the accessory building would have become the principal building, underlying one of the underpinnings of the approval. Therefore, the condition was valid.

The trial Court went on to opine that the failure of the applicant to challenge the condition meant that it was prevented from doing so later on. Since it was clear that the application would not have been approved without the condition, which the court found to be valid, and that therefore the setting aside of the resolution would have been fatal to the approval, the court found that the applicant was bound by having accepted the approval and by not having challenged the condition at the very beginning.

On appeal, the Appellate Division found that if the condition was invalid, but the variance otherwise properly granted, there was nothing to prevent the condition from being set aside, even if the benefits of the variance had been accepted. This is the situation before the Board.

The Board finds that the condition prohibiting future acquisition of additional property was invalid at the outset. Furthermore, the resolution offers no basis for finding that, but for the condition, the variance would not have been granted. Therefore, the Board will not refuse to excise the condition simply because the

6

applicant did not challenge it. The action/inaction of an applicant with respect to challenging a condition has no relation to its legal validity. In addition, there were valid land use reasons to support the Board's granting of relief in 1991. The resolution indicates that the restriction on acquisition of additional land was an incidental consideration, and not integral to the decision-making process.

5.   For the foregoing reasons, the Board finds that the applicants have met the required "positive" and "negative" showing for the granting of a variance, and for the excision of the condition.

NOW, THEREFORE, BE IT RESOLVED that the application of Moriah School for a variance from the provisions of the Ordinance as it relates to conditional use requirements imposed upon schools, fence height, and for the excision of a condition found in the June 20, 1991 resolution of the Board prohibiting the acquisition of additional property, be and the same is hereby granted, on the following terms and conditions:

1.   The applicant shall construct the fencing and landscaping in accordance with the landscape plan dated December 16, 2009;

2.   All other laws and regulations of the City of Englewood and all other governmental authorities having jurisdiction over the project shall be complied with without exception, and the applicant shall obtain all other required permits and approvals;

3.   All necessary permits must be obtained before any work begins;

4.   At the time application is made a building permit, the applicant shall file a certification with the Building Department stating that the plans being submitted are the same as those upon which the Board based this approval;

5.   Nothing contained in this resolution shall supersede the provisions of the Uniform Construction Code of the State of New Jersey or any other law or regulation;

6.   A copy of this Resolution shall be transmitted to the Construction Official/Zoning Officer of the City of Englewood;

7.   A copy of this Resolution shall be mailed to Elliot W. Urdang, Esq., the applicant's attorney, within 10 days of the date hereof; and

8.   Notice of this decision shall be published in the official newspaper of the City of Englewood as required by law.

The foregoing resolution was adopted at a duly constituted meeting of the Board, held in compliance with the provisions of the Open Public Meetings Act on May 24, 2010, by those

7

members who voted in favor of the action taken, and is intended to memorialize and confirm the official action taken by the Board on March 22, 2010.

Rosemary Byrne
Chairperson
Zoning Board of Adjustment

Tina Evans
Secretary
Zoning Board of Adjustment

(for certification, see next page)

I hereby certify that on May 24, 2010, at an official public meeting of the Board, a quorum being present, this Resolution was duly adopted by a majority vote of those members of the Board who voted in favor of the action taken by the Board with respect to this application on March 22, 2010.

Tina Evans
Secretary
Zoning Board of Adjustment

Vote taken on March 22, 2010: In favor: Chairman Byrne, Vice-Chairman Feintuch, Members Fuld, Osorio, Thomas and Schermer (Alt. 1); Opposed: Member Maron; Recused: Member Shafer; Not Participating: Member Mitchell (Alt. 2).

Members authorized to vote on resolution: Chairman Byrne, Vice-Chairman Feintuch, Members Fuld, Osorio, Thomas and Schermer (Alt. 1).

Vote taken on Resolution:

| Member: | In Favor | Opposed | Absent | Abstain |
|---|---|---|---|---|
| Chairman Byrne | ✓ | | | |
| Vice-Chairman Feintuch | ✓ | | | |
| Member Fuld | ✓ | | | |
| Member Osorio | ✓ | | | |
| Member Thomas | | | ✓ | |
| Member Schermer (Alt. 2) | ✓ | | | |

englewoo\zba\forms\resol.frm
dd May 24, 2010

9

DEC/22/2015/TUE 05:31 PM          FAX No.                    P. 001

*file copy do not remove.*

## ZONING BOARD OF ADJUSTMENT                 File No.: 2013-13

### CITY OF ENGLEWOOD

Resolution with respect to the application of Moriah School of Englewood
for a variance from the Zoning Ordinance of the City of Englewood,
and related modifications to prior approvals

WHEREAS, Moriah School of Englewood (hereinafter "the applicant") has made application to the Zoning Board of Adjustment of the City of Englewood (hereinafter "the Board") for a variance from those provisions of the Zoning Ordinance of the City of Englewood (hereinafter "the Ordinance") relating to side yard setback, and other existing non-conformities, and for related modifications to prior approvals, for the property known as Lot 9.01 in Block 3501 on the tax assessment map of the City of Englewood, with a street address of 53 S. Woodland St., Englewood, New Jersey 07631 (hereinafter "the property"); and

WHEREAS, the application was heard by the Board at a public hearing held during a duly-constituted meeting of the Board held in compliance with the Open Public Meetings Act on September 30, 2013 at which time testimony was offered by the applicant's Director of Buildings and Grounds and the applicant's Professional Engineer, and oral argument presented by Brian M. Chewcaskie, Esq., the applicant's attorney; and

WHEREAS, the Board also heard testimony from interested parties; and

WHEREAS, the Board also heard oral argument from Michael Profita, Esq., representing Jesse Pichel, an interested party who resides at 95 S. Woodland St., and

WHEREAS, the Board also heard testimony from Kenneth Albert, Engineer and Planner for the City of Englewood; and

WHEREAS, at the conclusion of the public hearing, the Board approved a motion granting the relief requested by the applicants, subject to certain conditions, and directing the Board attorney to prepare a memorializing resolution, pursuant to N.J.S.A. 40:55D-10(g)(2); and

WHEREAS, the Board makes the following findings of fact:

1.    The record in this matter shall consist of:

    a.    the permit denial from the Construction Official/Zoning Officer dated July 19, 2013;

    b.    the application filed by the applicant, including a one-page plan prepared by Piazza Engineering entitled "Site Demolition Plan, Business Office Building" dated July 8, 2013, consisting of a site plan, zoning schedule, parking

1

               calculations and 200 foot list of property owners; and

c.       all testimony taken on September 30, 2013 and exhibits marked into evidence at that time.

2.       The applicant is the owner of the property, which is located in the R-AAA zone.

3.       The real property taxes assessed against the property were current at the time of the hearing.

4.       Notice of the application was published in the official newspaper of the City of Englewood as called for in N.J.S.A. 40:55D-12(a), and the other notice requirements found in N.J.S.A. 40:55D-12 were complied with, and an affidavit of service was filed with the Board Secretary.

5.       The property has an area of over 10 acres, and is improved with a school building, a 2 ½ story building in the Southwest corner of the property, presently used as the applicant's business office, a second 2 1/2 story building in the Northwest corner of the property, which is not used at the present time, and a child care center (the "Frisch Building").

6.       The applicant proposes to demolish the building, and attached deck, in the Southwest corner of the property. The plan shows that the 5 existing trees in the front of the building will remain, that two trees on the South side of the building will be removed, that the sidewalks abutting the building will be removed, that the basement area will be filled with approved backfill, and that all disturbed areas will be graded and seeded.

7.       The business office will be relocated to the building on the Northwest corner of the property. That building is served by a macadam driveway leading from S. Woodland St. The building is located 24.1 ft. from the side lot line, where 60 ft. is required. This is an existing condition, which the applicant does not propose to change. The interior of the building will be renovated. 4 employees will work in the building, and they will use the existing driveway for parking. The area of this building is much smaller than the building to be removed.

8.       The removal of the building will reduce building coverage and lot coverage, which is desirable. There will be no impact on parking. 151 spaces are required, and 160 spaces are provided.

9.       No new variances are created. All "variances" are existing non-conformities, which will remain. Those nonconformities relate to the side yard setback referenced above, required width of planting area, building coverage, impervious coverage, garage setback, garage height and basketball court setback.

10. In 2009 and 2010, the applicants came before the Board for the relief needed to acquire Lot 10 (now part of the "campus", and representing that portion of the property where the building is located where the business office is intended to be relocated), expand an existing playground area, and extend an existing fence. That application was approved. The related plan called for the demolition of the building now located on Lot 10.

11. The present plan calls for the preservation of that building, and the demolition of the building on the Southwest corner of the property.

12. The applicant also seeks ratification of the various existing conditions listed on Exhibit "A" as "non-conformities" as that term is used in the MLUL.

WHEREAS, the Board makes the following conclusions of law:

1. N.J.S.A. 40:55D-70(d)(3) permits the Board to grant variances from conditional use requirements. In Englewood, schools, which are considered to be "inherently beneficial" uses for land use purposes, are also "conditional" uses in residential zones, provided they front on one of several enumerated streets. S. Woodland St. is not one of those streets. However, the d(3) variance applicant is held to a lesser standard of proof than the d(1) applicant, Coventry Square v. Westwood Zoning Board of Adjustment, 138 N.J. 285 (1994) instructs the Board to remember that the use is indeed permitted in the zone, provided it meets certain requirements. It is much different than a use which is prohibited altogether in the zone. Therefore, the Board must consider the effect of the deviation from the enumerated condition, in this case, an existing side yard setback non-conformity, on the continued suitability of the site. The Board notes that the applicant meets all of the other requirements imposed upon schools as conditional uses. The Board cannot find that this modest change in the use of the applicant's property, namely the relocation of the business from one existing structure (to be demolished) to another existing structure will render the site no longer suitable for its present use.

2. N.J.S.A. 40:55D-70(c)(1)© authorizes the Board to grant a variance where "by reason of an extraordinary and exceptional situation uniquely affecting a specific piece of property or the structures lawfully existing thereon" the strict application of the Ordinance would result in "peculiar and exceptional practical difficulties to, or exceptional and undue hardship upon" the developer of such property. The side-yard encroachment in issue is such an existing condition.

3. Regardless of the legal basis for variance relief, variances cannot be granted unless the variance is not substantially detrimental to the purpose and intent of the zone plan and the Ordinance, and the public good. The side-yard encroachment already exists, and will not be changed or exacerbated in any way if the relief sought by the

3

applicant is granted. The Board finds that there are elements of the plan that are beneficial, specifically the reduction in lot and building coverage, and the fact that a building, presently not in use, will be put to productive use, and the building housing the former business office demolished.

4.   For the foregoing reasons, the Board finds that the applicant has met the required "positive" and "negative" showing for the granting of variance relief.

NOW, THEREFORE, BE IT RESOLVED that the application of Moriah School of Englewood for a variance from the provisions of the Ordinance so as to permit the relocation of the business office as described above, and to ratify the existing side yard setback of 24.1 ft., as well as the other nonconformities on Exhibit "A", and to modify the terms of the 2010 approval to permit the relocation of the business office, be and the same is hereby granted, on the following terms and conditions:

1.   The applicants shall maintain landscaping and plantings around the new business office in perpetuity;

2.   There shall be a maximum of 4 cars parked in the driveway of the new business office;

3.   The applicant shall comply with the terms and conditions of all prior approvals, which are incorporated herein by reference in their entirety to the extent not previously modified or modified by this resolution;

4.   The applicant shall submit a final landscaping plan, which shall be subject to review and approval by Mr. Albert, and shall comply with Condition No. 1. of the resolution adopted by the Board on May 22, 2010. The landscape plan shall be deemed to be the approved landscape plan and shall supercede all prior landscape plans for the property. In addition, the landscape plans shall include the items set fort on Exhibit "B";

5.   To the extent practical, the applicant shall maintain the "residential" character and look of the new business office;

6.   The applicant shall comply with any engineering/planning conditions imposed by Mr. Albert;

7.   All other laws and regulations of the City of Englewood and all other governmental authorities having jurisdiction over the project shall be complied with without exception, and the applicant shall obtain all other required permits and approvals;

8.   A building permit must be obtained before any work begins;

4

9.   At the time application is made a building permit, the applicant shall file a
     certification with the Building Department stating that the plans being submitted are
     the same as those upon which the Board based this approval;

10.  Nothing contained in this resolution shall supersede the provisions of the Uniform
     Construction Code of the State of New Jersey or any other law or regulation;

11.  A copy of this Resolution shall be transmitted to the Construction Official/Zoning
     Officer of the City of Englewood;

12.  A copy of this Resolution shall be mailed to the applicant's attorney within 10 days
     of the date hereof; and

13.  Notice of this decision shall be published in the official newspaper of the City of
     Englewood as required by law.

The foregoing resolution was adopted at a duly constituted meeting of the Board, held in
compliance with the provisions of the Open Public Meetings Act on December 19, 2013 by those
members who voted in favor of the action taken, and is intended to memorialize and confirm the
official action taken by the Board on September 30, 2013.


Rosemary Byrne                          Tina Evans
Chairperson                             Secretary
Zoning Board of Adjustment              Zoning Board of Adjustment

(for certification, see next page)

5

I hereby certify that on December 19, 2013, at an official public meeting of the Board, a quorum being present, this Resolution was duly adopted by a majority vote of those members of the Board who voted in favor of the action taken by the Board with respect to this application on September 30, 2013.

Tina Evans
Secretary
Zoning Board of Adjustment

Vote taken on September 30, 2013: In favor: Chairman Byrne, Vice-Chairman Feintuch, Members Fuld, Thomas, Reidler, Baker (Alt. 1) and Weitzman (Alt. 2); Opposed: None.

Members authorized to vote on resolution: Chairman Byrne, Vice-Chairman Feintuch, Members Fuld, Thomas, Reidler, Baker (Alt. 1) and Weitzman (Alt. 2).

Vote taken on Resolution:

| Member: | In Favor | Opposed | Absent | Abstain |
|---|---|---|---|---|
| Chairman Byrne | ✓ | | | |
| Vice-Chairman Feintuch | ✓ | | | |
| Member Fuld | ✓ | | | |
| Member Thomas | ✓ | | | |
| Member Reidler | ✓ | | | |
| Member Baker (Alt. 1) | ✓ | | | |
| Member Weitzman (Alt. 2) | ✓ | | | |

6

Exhibit "A" to Resolution dated December 19, 2013, relating to the appliation of Moriah School of Englewood:

Minimum side yard setback - 60 feet required; 24.1 feet existing and provided
Minimum planting area (side) - 15 feet required; 2.14 feet existing and provided
Maximum Building Coverage (All Structures) - 15% required; 23% existing and 21% proposed
Maximum Impervious Material Coverage (Entire Site) - 25% required; 48% existing and 47% proposed
Accessory Structures
      Garage - 35 feet required; 2.14 feet existing and provided
      Garage Height - 12 feet required; 13 feet existing and provided
      Basketball Court - 35 feet required; 10.6 feet existing and provided

Exhibit "B"

Resolution dated December 19, 2013 relating to application of Moriah School:

A planting berm will be installed and maintained at the Northerly boundary of the 60 foot setback area from 95 S. Woodland St.;

The berm will be planted with a mixture of evergreen trees spaced on no less than 5 foot centers, and the trees will be no less than to 7 to 8 feet in height when planted. The berm and the tree plantings will be installed starting a point aproximately 50 feet East of the S. Woodland St. curb, and continue in an Easterly direction along the Northerly boundary of the 60 foot setback area to a point at the Easterly end of the existing paved parking area.   The planting plan will be submitted to Kenneth Albert, PE for approval. The trees will be planted prior to demolition of the house located between the school and 95 S. Woodland St., however if the Fall planting season has passed, then the installation will place in the Spring of 2014.

The 60 foot setback area will be maintained free of debris and dead trees.  The plantings will be properly watered and maintained and any dead trees will be replaced by the next planting season.

Any dead trees in the existing planting islands in the parking area will be replaced by the next planting season.

# EXHIBIT "C"

ZONING BOARD OF ADJUSTMENT                    File No.:2015-10
CITY OF ENGLEWOOD

Resolution with respect to the application of Dwight Englewood School
for variance relief from the Zoning Ordinance of the City of Englewood
and for preliminary and final site plan approval
(Expanded Parking Area)

WHEREAS, Dwight Englewood School (hereinafter "the applicant") has made application
to the Zoning Board of Adjustment of the City of Englewood (hereinafter "the Board") for variances
from provisions of the Zoning Ordinance of the City of Englewood (hereinafter "the Ordinance") and
for preliminary and final site plan approval for the property commonly known as 315 E. Palisade
Ave, Englewood, New Jersey 07631 (being the applicant's street address), but more specifically
known as Lot 8.03 in Block 1901 on the tax assessment map of the City of Englewood (hereinafter
"the property"); and

WHEREAS, the application was filed to obtain, in general terms, the approvals needed to
permit the construction of a new parking area with a net gain of 63 parking spaces, including a d(3)
variance (the school is not located on one of the enumerated streets) and variances from bulk
requirements regulating impervious coverage, development of steep slopes and the number of
placement of landscaped islands in parking areas; and

WHEREAS, the application was heard by the Board at a public hearing held during a duly-
constituted meeting of the Board held in compliance with the Open Public Meetings Act on July 27,
2015 at which time the Board heard testimony from Dr. Rodney DeJarnet, the applicant's Head of
School, and Jeremy Secaras, P.E., the applicant's professional engineer, and entertained oral
argument by Elliot W. Urdang, Esq., the applicant's attorney; and

WHEREAS, the Board also heard testimony from Franz Volcy, P.E., the Board's Professional
Engineer, and Stan Slachetka, P.P., the Board's professional planner; and considered their reports
dated June 8, 2015 (Mr. Volcy) and July 24, 2015 as revised on July 27, 2015 (Mr. Slachetka); and

WHEREAS, at the conclusion of the public hearing, the Board approved a motion granting
the variance relief requested by the applicant, subject to certain conditions, one of which is the need
to obtain preliminary and final site plan approval, and directing the Board attorney to prepare a
memorializing resolution, pursuant to N.J.S.A. 40:55D-10(g)(2); and

WHEREAS, the Board intends for this resolution to be that memorializing resolution.

OVERVIEW AND CONCLUSIONS

The applicant is an inherently-beneficial use, conditionally-permitted in the Zone. Parking
has long been an issue for the applicant, one of the reasons being students, primarily Seniors, who
drive to school and need parking. The applicant is located in a residential neighborhood of narrow

1

streets, and on-street parking is a problem for everyone: the applicant, its students, neighbors and passersby.

Focusing on the only deviation from the conditions imposed upon the use, namely the fact that the property is not located on one of the enumerated streets, the Board finds that the proposed improvements do not render the property unsuitable for the use, notwithstanding its location.

The Board considers the application to be part of a concerted effort on the part of the applicant to improve its parking facilities, and on-site traffic circulation, which as noted above, enures to the benefit of all.

In addition to the variance from conditional use standards pursuant to N.J.S.A. 40:55D-70(d)(3), the applicant  also seeks a variance for impervious coverage, a variance to permit the disturbance of steep slopes (both in excess of 15% and 25%), and a variance/waiver from those provisions of the Ordinance relating to landscaped islands, and their placement in parking areas.

### FINDINGS OF FACT

WHEREAS, the Board makes the following findings of fact:

1.    The Record.  The record in this matter shall consist of:

     a.    the permit denial from the Construction Official/Zoning Officer dated May 5, 2015;

     b.    the application filed by the applicant, specifically including, but not limited to, the plan identified on Exhibit "A" to this resolution;

     c.    all testimony taken at the public hearing and the exhibits marked into evidence at that time.

2.    Standing. 'The applicant owns the property which is located in the R-AAA Zone.

3.    Real Property Taxation.  The property is tax-exempt.

4.    Notice.  Notice of the application was published in the official newspaper of the City of Englewood  as called for in N.J.S.A. 40:55D-12(a), and the other notice requirements found in N.J.S.A. 40:55D-12 were complied with, and an affidavit of service was filed with the Board Secretary.

5.    The Property.  The property comprising the campus of the applicant consists of Lot 8.03 on the tax assessment map of the City of Englewood, comprising a parcel with an area of approximately 24 acres.  Since the applicant was last before the Board in 2014 for the approvals needed to construct a STeM building, the applicant has acquired additional properties located between E. Palisade Ave., Lincoln St., Walnut St. and N. Woodland St., and has incorporated those properties into its campus, now

known as Lot 8.03. According to the boundary survey, there is only one other parcel within the boundaries of the streets listed above which is owned by someone other than the applicant, namely Block 1901 Lot 4 located at the corner of Walnut St. and N. Woodland St.

6.      The property is located on the North side of E. Palisade Ave., running between Lincoln St. and N. Woodland St. The Northeast side of the property runs all the way to Walnut St. The property features a variety of buildings (including approximately 12 principal academic buildings, and several accessory buildings), parking areas, walkways, tennis courts, athletics field and other improvements, including the home of the Head of School and the STeM building, presently under construction.

7.      At the time the applicant received the approvals to construct the STeM building in 2014, it also received approvals to construct a new parking area on the East of the property, adjacent to N. Woodland Ave. The Board is very familiar with that part of the property as a result of that proceeding.

8.      The applicant now comes before the Board to expand two existing parking areas, located essentially parallel to and to the West of, the parking area approved as part of the STeM project. A total of 66 spaces are proposed, but three existing spaces will be lost, for a "net" gain of 63 spaces. Total parking will increase from 263 spaces to 326 spaces. The expanded parking area will be served by the same driveway leading in from N. Woodland St., and will feature an interior connector road that will permit motorists to travel past the gym and sports complex and across the campus to the area of the STeM building, and the exit onto Lincoln St. All changes are interior to the site. There is no change proposed to existing entrances and exits from the site.

9.      The need for additional parking is a result of a number of factors, including the fact, as previously noted, that students who are seniors wish to drive to school and need parking, and to accommodate events known as "teas" which are held annually for each grade level (of which there are 15) which involve a heavy demand for parking. The additional parking is not part of a plan to increase enrollment or the number of faculty or staff. Those numbers will not change, but for the usual annual fluctuations. The additional parking will enable the applicant to meet all of its regular needs. The only event it will likely not serve is Commencement Exercises.

10.     The drive aisles in the parking areas are 24 ft. wide, and the connector road is 22 ft. wide. The spaces are 9 ft. by 19 ft. These dimensions comply with the Ordinance. Just like the parking area approved as part of the STeM project, the proposed parking area is located in an area of steep slopes. Notwithstanding that, the applicant has come up with a grading plan where the slopes on the parking areas will not exceed 6%, and the drive aisles will not exceed 10%, both of which comply with the Ordinance and generally accepted engineering standards. Other than parking areas and drive aisles, there will be other sloped areas featuring a 3:1 grade. All parties,

3

including Mr. Volcy, agreed that while the slopes are not insignificant, and a major problem to be dealt with, they will not present any safety issue to motorists or pedestrians, and that slopes in all non-driveway and non-parking areas can be property stabilized.

11.   The Board recognizes that grading is often a matter of compromise, in that more level drive aisles and parking areas increase surrounding grades and will require more extensive retaining walls, and vice versa. In this instance, more level parking areas would result in a drive aisle at the Northerly end of the expanded parking areas of a greater slope. Grading is a "trade-off", as Mr. Secaras testified.

12.   The parking lot will feature an underground detention system, with water quality controls, all in compliance with the Ordinance and the stormwater regulations established by the NJDEP.

13.   The project will result in more impervious coverage (an increase from 41% , previously approved, to 42%), but due to the addition of property to the campus, the increase is much less than it would otherwise be.

14.   The plan complies with the general intent of the Ordinance provisions relating to landscaped islands in parking areas, but not the specific provisions. The Board finds that while the number of landscaped islands in the parking area may meet the Ordinance, their placement does not. Given the size of the parking areas, and nature of the surrounding property, the Board finds that a pattern of landscaped islands every 10 spaces is not necessary or appropriate. The island provided sufficiently break up the appearance of the parking area.

15.   Unresolved site plan issues relate to tree removal and landscaping, and pedestrian use of the connector road

As regards tree removal and landscaping, the testimony and plan indicated that 81 trees will be removed in order to construct the expanded parking areas. According to the tree removal ordinance, this necessitates (based upon the sizes of the various trees being removed) a total of 157 replacement trees, and the plan presented by the applicant proposed only 51. Messrs. Volcy and Slachetka each testified that the number of replacement trees was insufficient, and that the property could accommodate the required number of replacement trees. While the Board recognizes that the tree removal is limited to an area which is interior to the campus, and not readily visible from adjoining properties, the tree removal Ordinance is designed to protect and preserve trees regardless of where they are located on a property, and is not limited to protecting the rights of adjoining property owners. In other words, simply because neighbors may not easily see the area where trees are to be removed, does not mean that the tree removal provisions are not important. The testimony also disclosed the need to install additional landscaping along N. Woodland St., in the

4

area adjacent to the Northeast corner of the most Easterly expanded parking area. A single-family home, since removed, was located there. The Board finds that the landscaping plan and tree replacement plan are deficient as presented to the Board.

As regards the connector road, Mr. Slachetka expressed concern for pedestrian safety, given the configuration and slope of the road. The applicant should give consideration to steps that could be taken to address that issue, such as widening the road, or constructing an adjacent path.

The Board finds that site plan approval should be not be granted until these issues are addressed..

16.    As previously found by the Board in the course of the STeM application, the number of spaces presently on campus complies with the Ordinance. No variance is required for the number of parking spaces. In fact, the number of spaces will greatly exceed what is required by the Ordinance.

## CONCLUSIONS OF LAW

WHEREAS, the Board makes the following conclusions of law:

1.    Section 4-1.2 (f) of the Ordinance provides that "public schools and private non-profit day schools accredited by the New Jersey State Department of Education, for grades not above high school, and day care centers licensed by the State of New Jersey" are conditional uses, subject to the conditions and limitations set forth in Section 4-1.6.

Section 4-1.6 contains four subsections, dealing with bulk requirements, the need for site plan approval (subsection c) and the procedure to be followed for conditional use approval (subsection d). Subsection a of the Ordinance provides that the conditional uses enumerated in Section 4-1.2(f) are permitted only on premises which front on one of 7 listed streets.

The Board has historically considered schools in residential zones to be conditional uses within the meaning of the Ordinance, even if not located on one of the enumerated streets. That consistency of interpretation is relevant, especially because in the past few years, other private schools have been declared to be conditional uses, notwithstanding the fact that they were not located on one of the seven streets.

The Board finds that, to the extent d(3) variance relief is required to permit the applicant to expand its parking facilities, it is warranted. As noted elsewhere in this resolution, the property undoubtedly remains suitable for its present use,

2.    The applicant requires the following variance relief:

5

a.    a variance from conditional use requirements found in Section 4-1.6(a) as the property is not located on one of the seven enumerated streets for conditional uses;

b.    a variance to permit impervious coverage of 42% of lot area, where 41% exists (43% was previously approved), and only 25% is permitted;

c.    a variance to permit disturbance into steep slopes in excess of 15% and 25%; and

d     a variance/waiver from those provisions of the Ordinance dealing with landscaped islands in parking areas.

Addressing the issues raised by these requests:

An analysis of the continued suitability of the site for the use, notwithstanding the fact that it does not front on an enumerated street is set forth elsewhere in this resolution. The increase in impervious coverage and the relief related to landscaped islands are justified as the applicant seeks to provide sufficient parking, more spaces than are required. Steep slope disturbance is necessary if the desired, and beneficial, improvements are to be constructed. These variances can be granted based upon N.J.S.A. 40:55D-70(c)(1)(b) and c(2). The topography is the primary reason why the steep slope disturbance variance is needed. The additional parking is very beneficial, and the benefits to be derived from its construction are substantial.

3.    The Board finds that any detriment related to the variances is not substantial. The construction of the parking area does not involve an increase in faculty or students, and will have no impact upon the nature or intensity of the use.   The change in impervious coverage is minimal given the size of the property, and notwithstanding a failure to literally comply, the purpose and intent of the provisions relating to landscaped islands are being respected. The conditions imposed with respect to tree replacement and landscaping will address any related detriments.  The Board is satisfied that the proposed slopes in the parking areas and drive aisles comply with the Ordinance and generally accepted engineering standards.  There is no question but that disturbed areas can be stabilized and that there will be no erosion as a result of the disturbance.

As far as the conditional use variance is concerned, the Board finds that the deviation from the standard relating to permitted streets will not result in substantial detriment to the surrounding neighborhood, again recognizing that the campus already exists, and that proposed improvements will not significantly change or expand the use to which it is put.

4.    For the foregoing reasons, the Board finds that the applicant has met the required

6

"positive" and "negative" showing for the granting of the variance relief outlined above.

## APPROVAL OF APPLICATION AND IMPOSITION OF CONDITIONS

NOW, THEREFORE, BE IT RESOLVED that the application of Dwight Englewood School for variances from the provisions of the Ordinance for variance relief, but not for preliminary or final site plan approval, be and the same is hereby granted, on the following terms and conditions:

1.    The applicants shall construct all improvements, and install landscaping in strict accordance with the plan referred to in Paragraph 1(b) of the Findings of Fact section of this resolution, and as described on Exhibit "A". The Board finds that all aspects of the plan are important, and that plan compliance is a specific condition of approval, even if a particular aspect of the plan is not enumerated as such or specifically mentioned in this resolution;

2.    The Board finds that the site plan presented is satisfactory in all respects, but for:

    a.    Additional landscaping along N. Woodland St. in the area of the Northeast corner of the most Easterly expanded parking area is needed. The applicant shall revise its plan in that regard, and may, as part of that process, consult with Messrs. Slachetka and Volcy;

    b.    The tree replacement plan is deficient. The applicant shall revise its plan to call for the planting of additional replacement trees, in order to comply to a greater extent with the provisions of the Tree Replacement Ordinance. The revised plan may or may not provide the full complement of replacement trees, and may provide for a fewer number, but perhaps of larger sizes, and need not provide for the installation of all required replacement trees in the area of the expanded parking area, but may provide for the planting of trees throughout the campus.

    c.    The issue of safety of pedestrians walking on the connector road needs to be addressed. Just as with landscaping, the applicant shall revise its plan in that regard, and may, as part of that process, consult with Messrs. Slachetka and Volcy.

    The applicant shall then return to the Board, on notice as required by the Municipal Land Use Law, for review of its revised plan. Consistent with this paragraph, the only issues to be considered at that time are the N. Woodland St. landscaping, and the revised tree replacement plan. If those issues are adequately addressed, the Board will proceed to grant preliminary and final site plan approval;

7

3.   The applicant shall comply with all of the terms, conditions and requirements of Mr. Volcy's report dated July 8, 2015;

4.   All other laws and regulations of the City of Englewood and all other governmental authorities having jurisdiction over the project shall be complied with without exception, and the applicant shall obtain all other required permits and approvals;

5.   The applicant shall enter into a Developers Agreement with the City of Englewood prior to the commencement of construction;

6.   All required permits must be obtained before any work begins;

7.   Nothing contained in this resolution shall supersede the provisions of the Uniform Construction Code of the State of New Jersey or any other law or regulation;

8.   A copy of this Resolution shall be transmitted to the Construction Official/Zoning Officer of the City of Englewood;

8.   A copy of this Resolution shall be mailed to the applicant's attorney within 10 days of the date hereof; and

10.  Notice of this decision shall be published in the official newspaper of the City of Englewood as required by law.

The foregoing resolution was adopted at a duly constituted meeting of the Board, held in compliance with the provisions of the Open Public Meetings Act on August 17, 2015 by those members who voted in favor of the action taken, and is intended to memorialize and confirm the official action taken by the Board on July 27, 2015.

Rosemary Byrne
Chairperson
Zoning Board of Adjustment

Tina Evans
Secretary
Zoning Board of Adjustment

(for certification, see next page)

8

I hereby certify that on August 17, 2015, at an official public meeting of the Board, a quorum being present, this Resolution was duly adopted by a majority vote of those members of the Board who voted in favor of the action taken by the Board with respect to this application on July 27, 2015.

Tina Evans
Secretary
Zoning Board of Adjustment

Vote taken on July 27, 2015: In favor: Chairman Byrne, Vice-Chairman Feintuch, Members Fuld, Thomas, Reidler and Wilson (Alt. 2); Recused: Members Schwalbe and Baker-Jackson.

Members authorized to vote on resolution: Chairman Byrne, Vice-Chairman Feintuch, Members Fuld, Thomas, Reidler and Wilson (Alt. 2).

Vote taken on Resolution:

| Member: | In Favor | Opposed | Absent | Abstain |
|---------|----------|---------|--------|---------|
| Chairman Byrne | √ | | | |
| Vice-Chairman Feintuch | | | √ | |
| Member Fuld | √ | | | |
| Member Thomas | √ | | | |
| Member Reidler | √ | | | |
| Member Wilson | √ | | | |

9

EXHIBIT "A"

Plan prepared by Langan Engineering:

Sheet C-00.00 (cover sheet) last revised on July 8, 2015;
Sheet VB-101 (boundary survey) last revised on June 24, 2015
Sheet VT-101 (topographic survey) last revised on June 24, 2015
Sheet C-20.00 (parking lot expansion and connector road on overall site) last revised on July 8, 2015
Sheet C-20.01 (parking expansion and connector road detail) last revised on July 8, 2015
Sheet C-21.01 (grading and drainage plan) last revised on July 8, 2015
Sheet C-22.01 (utility notes) last revised on July 8, 2015
Sheet C-23.01 (soil erosion and sediment control) last revised on July 8, 2015
Sheet C-28.01 (notes and details) last revised on July 8, 2015
Sheet C-28.02 (stormwater facility details) last revised on July 8, 2015
Sheet C-28.03 (additional stormwater facility details) last revised on July 8, 2015
Sheet C-28.04 (silt fence and tree protection notes) last revised on July 8, 2015
Sheet L-24.01 (tree removal replacement plan) last revised on July 8, 2015
Sheet L-24.02 (landscape plan) last revised on July 8, 2015
Sheet L-24.03 (landscaping planting notes) last revised on July 8, 2015
Sheet L-25.01 (lighting plan) last revised on July 8, 2015
Sheet L-25.02 (general lighting notes) last revised on July 8, 2015

<u>ZONING BOARD OF ADJUSTMENT</u>                    File No.:2017-11
<u>CITY OF ENGLEWOOD</u>

Resolution with respect to the application of Dwight Englewood School
for variance relief from the Zoning Ordinance of the City of Englewood
and for preliminary and final site plan approval
(Replacement of Maintenance Building)

WHEREAS, Dwight Englewood School (hereinafter "the applicant") has made application
to the Zoning Board of Adjustment of the City of Englewood (hereinafter "the Board") for variances
from the provisions of the Zoning Ordinance of the City of Englewood (hereinafter "the Ordinance")
and for preliminary and final site plan approval for the property commonly known as 315 E. Palisade
Ave, Englewood, New Jersey 07631 (being the applicant's street address), but more specifically
known as Lot 8.03 in Block 1901 on the tax assessment map of the City of Englewood (hereinafter
"the property"); and

WHEREAS, the application was filed to obtain, in general terms, the approvals needed to
permit the removal of an existing maintenance building, and the construction of a new maintenance
building, specifically a d(3) variance (the school is not located on one of the enumerated streets) and
variances relating to impervious coverage and disturbance of steep slopes, with the applicant fully
complying with all other applicable bulk requirements; and

WHEREAS, the application was heard by the Board at public hearings held during duly-
constituted meetings of the Board held in compliance with the Open Public Meetings Act on January
18, February 15 and March 15, 2018 at which time the Board heard testimony from Jeremy Secaris,
the applicant's professional engineer;  Charles Koch, the applicant's architect; Michael Burns, the
applicant's Director of Operations; Richard M. Preiss, the applicant's professional planner; and
entertained oral argument by Elliot W. Urdang, Esq., the applicant's attorney; and

WHEREAS, the Board also heard testimony from Frantz Volcy, P.E., the Board's
Professional Engineer, and John Szabo, the Board's professional planner; and considered their
reports dated November 22, 2017 (Mr. Volcy) and January 17, 2018 (Mr. Szabo); and

WHEREAS, at the conclusion of the public hearing, the Board approved a motion granting
the variance relief requested by the applicant, subject to certain conditions and directing the Board
attorney to prepare a memorializing resolution, pursuant to <u>N.J.S.A.</u> 40:55D-10(g)(2); and

WHEREAS, the Board intends for this resolution to be that memorializing resolution.

<u>OVERVIEW AND CONCLUSIONS</u>

The applicant is an inherently-beneficial use, conditionally-permitted in the R-AAA Zone.

Focusing on the only deviation from the conditions imposed upon the use, namely the fact

that the property is not located on one of the enumerated streets, the Board finds that the proposed improvements do not render the property unsuitable for the use, notwithstanding its location.

The applicant proposes to remove an existing maintenance building, and replace it with a larger building, but one that will comply with all bulk requirements but for a slight increase in impervious coverage (an increase from 41.79% of lot area to 42.2%, where only 25% is permitted) and disturbance of steep slopes in excess of 15%.

The Board finds that the applicant has met the burden of proof for a variance pursuant to N.J.S.A. 40:55D-70(d)(3), the Board analyzing the bulk deviations as d(3) variances, because compliance with bulk regulations is one of the "conditions" of the use, and for related preliminary and final site plan approval.

The Board acknowledges that the applicant has filed an application seeking the approvals needed to construct other improvements on its property, and that the plan referred to Exhibit "A" shows those other improvements. The approval granted in this resolution is strictly limited to the maintenance building.

## FINDINGS OF FACT

WHEREAS, the Board makes the following findings of fact:

1.   The Record.  The record in this matter shall consist of:

   a.   the permit denial from the Zoning Officer dated June 12, 2017, as supplemented by an E-Mail dated February 13, 2018 confirming that the proposed new building complies with the height requirements of the Ordinance;

   b.   the application filed by the applicant, specifically including, but not limited to, the plans identified on Exhibit "A" to this resolution;

   c.   all testimony taken at the public hearings and the exhibits marked into evidence at those times.

2.   Standing.  The applicant owns the property which is located in the R-AAA Zone.

3.   Real Property Taxation.  The property is tax-exempt.

4.   Notice.  Notice of the application was published in the official newspaper of the City of Englewood  as called for in N.J.S.A. 40:55D-12(a), and the other notice requirements found in N.J.S.A. 40:55D-12 were complied with, and an affidavit of service was filed with the Board Secretary.

5.   The Property.  The property comprising the campus of the applicant consists of Lot 8.03 on the tax assessment map of the City of Englewood, comprising a parcel with

2

an area of approximately 24 acres.

6.   <u>The Improvements on the Property.</u>  The property is located on the North side of E. Palisade Ave., running between Lincoln St. and N. Woodland St. The Northeast side of the property runs all the way to Walnut St. The property features a variety of buildings (including approximately 12 principal academic buildings, and several accessory buildings), parking areas, walkways, tennis courts, athletics field and other improvements, including the home of the Head of School and a recently-constructed STEM building.

7.   <u>Recent Approvals.</u>   In the past several years, the applicants received the approvals to construct the STEM building in 2014 and to expand two parking areas. The Board is very familiar with the property as a result of those applications.

8.   <u>Present Request.</u>  The applicant comes before the Board for the approvals needed to demolish an existing maintenance building, with an area of approximately 1,220 sq. ft., and to construct a new maintenance building. The existing building is not large enough to meet the applicant's needs, and is older and in need of improvement. The new building will be located in close proximity to the existing building. It will be "L-shaped" with a "footprint" of 6,800 sq. ft.  It will be located in the Northeast portion of the property, at the Northwest corner of an existing parking area. The existing building and the driveway serving it, will be removed, and the property restored with vegetation. The proposed building complies with all bulk requirements, and does not create any variances other than a slight increase in impervious coverage, and disturbance of slopes required for its construction. One variance needed is that the property is not located on one of the enumerated streets where schools are permitted as "conditional" uses. Few site improvements are proposed, other then the construction of the building and some minor changes to the Northwest corner of the parking area abutting the building. The building will be hidden in the central part of the campus, 234 ft. from N. Woodland St. and 308 ft. from the North property line. It is also quite a bit lower (some 30 ft. according to Mr. Preiss) from the level of the adjoining roadways which will further serve to decrease its visibility from surrounding properties.

The building will be two stories in height, featuring primarily open space on both floors, with a stairwell, mechanical rooms and restrooms. There will be a material lift to facilitate getting materials to the second floor. There will be a standing seam metal roof, double hung aluminum windows and corrugated metal siding.  The building will be 28 ft. 6 in. high, measured to the ridge from the finished first floor elevation.  In his supplemented zoning denial, the Zoning Officer found that the building complies with the height limitations of the Ordinance.  Lighting is limited to building-mounted fixtures next to the entry door and garage bays. The site plan does not show any floodlights or additional parking lot lighting. There is no change to existing circulation or parking patterns.  It is a project separate and apart from the

3

pending application, and even if it were part of same, would have been appropriate for a "phasing" process, as noted by Mr. Szabo.

The building will be used for storage of vehicles and equipment only. Mr. Burns testified that all repair and maintenance is done off-site. The construction of the building is not associated with an increase in the number of vehicles or pieces of equipment. Finally, the new building will enable an existing portable toilet to be removed, a desirable aesthetic improvement.

## CONCLUSIONS OF LAW

WHEREAS, the Board makes the following conclusions of law:

1.    Section 4-1.2 (f) of the Ordinance provides that "public schools and private non-profit day schools accredited by the New Jersey State Department of Education, for grades not above high school, and day care centers licensed by the State of New Jersey" are conditional uses, subject to the conditions and limitations set forth in Section 4-1.6.

Section 4-1.6 contains four subsections, dealing with bulk requirements, the need for site plan approval (subsection c) and the procedure to be followed for conditional use approval (subsection d). Subsection a of the Ordinance provides that the conditional uses enumerated in Section 4-1.2(f) are permitted only on premises which front on one of 7 listed streets.

The Board has historically considered schools in residential zones to be conditional uses within the meaning of the Ordinance, even if not located on one of the enumerated streets. That consistency of interpretation is relevant, especially because in the past few years, other private schools have been declared to be conditional uses, notwithstanding the fact that they were not located on one of the seven streets.

The Board finds that, to the extent d(3) variance relief is required to permit the applicant to expand its parking facilities, it is warranted. The property undoubtedly remains suitable for its present use. The removal of the existing maintenance building, and the construction of the new building has no effect on that suitability.

2.    As far as the conditional use variance is concerned, the Board finds that the deviation from the standard relating to permitted streets will not result in substantial detriment to the surrounding neighborhood, again recognizing that the campus already exists, and that proposed improvements will not significantly change or expand the use to which it is put.

3.    The Board finds that the increase in impervious coverage is not significant, given the size of the property and the location of the proposed improvements, and that

4

compliance with stormwater management regulations is a specific condition of approval. Such management will address any detriment resulting from the increase in coverage.

4.     The Board acknowledges that there are steep slopes, as that term is defined in the Ordinance, throughout the property. The location chosen for the maintenance building is a logical one, just off an existing parking area, and the applicant really has no choice but to build it at that spot, which is in a steeply-sloped area. The Board finds that the related disturbance can be addressed through proper engineering and soil stabilization. Construction in other locations would actually result in a greater degree of disturbance.

5.     The new building represents a significant aesthetic improvement, along with a significant improvement in utility and functionality. Any detriments do not approach being substantial in nature.

6.     For the foregoing reasons, the Board finds that the applicant has met the required "positive" and "negative" showing for the granting of the variance relief outlined above, and for preliminary and final site plan approval.

## APPROVAL OF APPLICATION AND IMPOSITION OF CONDITIONS

NOW, THEREFORE, BE IT RESOLVED that the application of Dwight Englewood School for variances from the provisions of the Ordinance, and for preliminary and final site plan approval, be and the same is hereby granted, on the following terms and conditions:

1.     The applicants shall construct all improvements in strict accordance with the plans referred to in this resolution and as described on Exhibit "A", and shall comply with Items S-1 through S-7 of Mr. Volcy's report dated November 22, 2017, with the understanding that the landscaping plan is approved as presented;

2.     The scope of the approval contained in this resolution is strictly limited to the proposed maintenance building, and does not constitute any sort of approval, express or implied, of any other improvements;

3.     Consistent with the testimony, the maintenance building shall be used for storage of vehicles and equipment, and not for the repair of same, and shall not result in any increase in the number of vehicles or pieces of equipment;

4.     All other laws and regulations of the City of Englewood and all other governmental authorities having jurisdiction over the project shall be complied with without exception, and the applicant shall obtain all other required permits and approvals;

5.     All required permits must be obtained before any work begins;

5

6.  Nothing contained in this resolution shall supersede the provisions of the Uniform Construction Code of the State of New Jersey or any other law or regulation;

7.  A copy of this Resolution shall be transmitted to the Construction Official/Zoning Officer of the City of Englewood;

8.  A copy of this Resolution shall be mailed to the applicant's attorney within 10 days of the date hereof; and

9.  Notice of this decision shall be published in the official newspaper of the City of Englewood as required by law.

The foregoing resolution was adopted at a duly constituted meeting of the Board, held in compliance with the provisions of the Open Public Meetings Act on April 23, 2018 by those members who voted in favor of the action taken, and is intended to memorialize and confirm the official action taken by the Board on March 15, 2018.

Rosemary Byrne
Chairperson
Zoning Board of Adjustment

Tina Evans
Secretary
Zoning Board of Adjustment

(for certification, see next page)

6

I hereby certify that on April 23, 2018, at an official public meeting of the Board, a quorum being present, this Resolution was duly adopted by a majority vote of those members of the Board who voted in favor of the action taken by the Board with respect to this application on March 15, 2018.

_Tina Evans_

Tina Evans
Secretary
Zoning Board of Adjustment

Vote taken on March 15, 2018: In favor: Chairman Byrne, Vice-Chairman Feintuch, Members Fuld, Thomas, Cureton, Dawson (Alt. 1) and Gleis (Alt. 2):  Absent: Members Reidler and Schwalbe.

Members authorized to vote on resolution: Chairman Byrne, Vice-Chairman Feintuch, Members Fuld, Thomas, Dawson (Alt. 1) and Gleis (Alt. 2).

Vote taken on Resolution:

| Member: | In Favor | Opposed | Absent | Abstain |
|---|---|---|---|---|
| Chairman Byrne | ✓ | | | |
| Vice-Chairman Feintuch | | | ✓ | |
| Member Fuld | ✓ | | | |
| Member Thomas | ✓ | | | |
| Member Dawson (Alt. 1) | | | | |
| Member Gleis (Alt. 2) | ✓ | | | |

Note: Between the March 15 and April 23 meetings, Member Cureton resigned from the Board.

7

EXHIBIT "A"

One-page Maintenance Building Site Plan prepared by Langan Engineering titled as Sheet C-110 dated April 26, 2017, last revised on January 19, 2018 showing that portion of the property where the maintenance building is to be placed, a portion of the immediately adjacent parking area, and depicting the removal of the existing maintenance building

Two-page 1st and 2nd Floor Construction Plan prepared by Environetics Group Architect, P.C. titled as Sheets A-100 and A-200 dated August 2, 2017

Twelve-page Plan prepared by Langan Engineering titled as Sheets C-110, VB-102, VT-101, C-080, C-110, C-310, C-410, C-411, C-412, C-510, C-511 dated April 26, 2017, last revised on August 7, 2017, which shows the proposed maintenance building, but also the other improvements (proposed middle school and auditorium) which are the subject of a pending application before the Board, and which are not a part of this approval

8

# EXHIBIT "D"

<u>ZONING BOARD OF ADJUSTMENT</u>                    <u>File No.: 2014-8</u>

<u>CITY OF ENGLEWOOD</u>

Resolution with respect to the application of The Actor's Fund Homes
for variances from the Zoning Ordinance of the City of Englewood, and
for preliminary and final site plan approval

WHEREAS, The Actor's Fund Homes (hereinafter "the applicants") have made application to the Zoning Board of Adjustment of the City of Englewood (hereinafter "the Board") for variances from those provisions of the Zoning Ordinance of the City of Englewood (hereinafter "the Ordinance") relating to permitted uses and building height (variances cognizable under <u>N.J.S.A.</u> 40:55D070(d), related bulk variances (variances cognizable under <u>N.J.S.A.</u> 40:55D-70(c), and for preliminary and final site plan approval, for the property known as Lot 4 in Block 407 on the tax assessment map of the City of Englewood, with a street address of 155-175 West Hudson Ave., Englewood, New Jersey 07631 (hereinafter "the property"); and

WHEREAS, the application was heard by the Board at public hearings held during duly-constituted meetings of the Board held in compliance with the Open Public Meetings Act on September 18, October 27, November 20, November 24, December 11 and December 15, 2014, at which time testimony was offered by Jordan Strohl, the applicant's Administrator; Steve Leone, the applicant's architect, Nicholas C. Rotonda and Michael R. Thomas, the applicant's professional engineers; Jack Zybura, the applicant's acoustical engineer; Bruce Klein, the applicant's traffic and parking expert; John Maczuga, the applicant's professional planner; and oral argument presented by Michael Prigoff, Esq., the applicant's Attorney; and

WHEREAS, the Board also heard testimony from a number of neighborhood residents, primarily located on W. Pleasant Ave.; and

WHEREAS, the Board also heard testimony from representatives of Boswell Engineering. the Board's professional engineering consultant (Peter C. Ten Kate. P.E. and Jeffrey Morris, P.E. appearing), and considered the written reports of Boswell dated October 15, October 24 and November 17, 2014, and also heard testimony from Brigette Bogart, PP, AICP, CGW, the Board's professional planning consultant, and considered her written reports dated November 7, November 24, December 11 and December 15, 2014; and

WHEREAS, at the conclusion of the public hearing, the Board approved a motion granting the relief requested by the applicant, subject to certain conditions, and directing the Board attorney to prepare a memorializing resolution, pursuant to <u>N.J.S.A.</u> 40:55D-10(g)(2); and

WHEREAS, the Board makes the following findings of fact:

1.      The record in this matter shall consist of:

i

a. the permit denial from the Construction Official/Zoning Officer dated August 8, 2014;

b. the application filed by the applicant, including a 22-page plan prepared by T & M Associates dated August 11, 2014 and revised on November 10, 2014; a four-page plan prepared by Spiezle Architectural Group dated August 11, 2014; a Traffic Impact and Parking Capacity Study prepared by T & M Associates dated August 11, 2014 and revised on November 10, 2014; a Soils and Foundation Investigation Report prepared by Melick-Tully and Associates, P.C. dated October 21, 2013; a Stormwater Management Report prepared by T & M Associates dated August 2014; a Property Survey prepared by T & M Associates dated August 11, 2014; and a Planning and Variance Report prepared by T & M Associates dated August 11, 2014; and

c. all testimony taken at the various public hearings, and exhibits marked into evidence at that time as set forth on Exhibit "A" attached to this resolution.

2. The Actors' Fund of America is the owner of the property, which is located in the R-D Zone, and consented to the filing of the application.

3. The real property taxes assessed against the property were current at the time of the hearing.

4. Notice of the application was published in the official newspaper of the City of Englewood as called for in N.J.S.A. 40:55D-12(a), and the other notice requirements found in N.J.S.A. 40:55D-12 were complied with, and an affidavit of service was filed with the Board Secretary.

5. The applicant is a tax-exempt 501(c)(3) organization providing skilled nursing and assisted living services to persons not only from Englewood and environs, but also from around the United States. It has operated in Englewood since 1959, and received approval from the Board on three prior occasions for expansion projects, in 1994, 2005 and 2007.  It is a "non-conforming" use as that term is defined in the Municipal Land Use Law.  Presently, there are 82 skilled nursing beds located in a building dating to 1985, and 42 assisted living beds in a building dating to 1959. The buildings were described by Mr. Strohl as "aging in place", and present a number of issues, including disabled access, width of hallways, and the size of bathrooms. The facility was originally a retirement home, but has now expanded into the assisted living realm.  Part of the existing building is of wood-frame construction.  The applicant has operated at 100% capacity for the past two years, and expects that to continue.  The applicant seeks to add 25 sub-acute rehabilitation beds, and 20 memory care beds in the assisted-living area, for a total of 45 additional beds. There are 124 beds at the present time, so the total will rise to 169 beds.  The applicant presently employs 129 persons, 98 on a full-time basis and 29 on a part-time basis. After the renovation and expansion is completed, the numbers will be 98 full-time and 42 part-time, for a total of 140.  Shifts run from 7 AM to 3 PM, 3 PM to 11 PM

2

and 11 PM to 7 AM.  The shift change at 3 PM is sometimes an issue, as one shift arrives and another departs.  The applicant attempts to stagger the shifts somewhat in order to alleviate a rush of traffic.

6.      During the 7 AM to 3 PM shift, there are at most 68 employees on the property, 48 shift workers and 20 management and supervisory personnel.  The management and supervisory personnel work hours other than 7 AM to 3 PM, and are on the property until 5 PM or 6 PM in the evening.  When the project is completed, there will be 81 employees on the day shift, 60 shift workers and 21 management and supervisory personnel.  Mr. Strohl stated that during the shift change period (the period between 3 PM and 4 PM) there are approximately 93 persons entering and leaving the site, 60 day shift workers departing, and 33 evening shift workers arriving.  Mr. Strohl noted, without providing an exact number, that many workers use public transportation, are in car pools, and that some even walk or ride bicycles.  There are relatively few visitors, averaging approximately 3 per day now, and perhaps 5 per day after the expansion.  Those visitors are most likely on site in the morning, and the evening, and not at shift change times.

7.      In broad outline, the plan calls for the demolition of a portion of the building designed as the "existing multi-level building" and the construction of a larger building in its place, which will still be part of the multi-level building; the reconstruction of the Central Services Building including the four corridors, and a major reconstruction of the Percy Williams section of the building.  The renovations and additions can be summarized as follows:

   a.      An addition of 7,715 sq. ft. on the lower level consisting of a rehab gym, storage areas, a beauty room, conference room, lounge and office.
   b.      An addition of 4,396 sq. ft. on the lower level consisting of resident rooms, a lounge, storage area and conference room.
   c.      An addition of 10,565 sq. ft. on the first floor consisting of resident rooms, a living/dining area, a courtyard and conference room.
   d.      An addition of 10,565 sq. ft. to the upper level, very similar to the first floor addition.

The expansion of the Percy Williams section is the work described in subsections c and d, and involves the reconstruction and expansion of four wings that now protrude from that portion of the building.

8.      The property features a circular driveway on the West Hudson Ave. side of the site.  The circular driveway operates in a counter-clockwise direction in front of the building, but will have two-way portions on the East and West.  The plan includes a new parking field in a two-way portion of the entrance driveway on the East side from West Hudson Ave.  That parking field will have 38 spaces.  There will be 21 spaces in the front of the building, 17 spaces in a parking lot on the West side of the

property, and 20 spaces in a parking area on the left side of the driveway as it returns to West Hudson Ave., for a total of 96 spaces. As originally presented to the Board, 36 "head-in" parking spaces were proposed for the property along Pleasant Ave., which would have involved the loss of present street parking in that area. Significant concerns were raised by the Board and interested parties with respect to that portion of the plan, and in response, the applicant revised the plan to eliminate those spaces. At the present time, there are 62 parking spaces including 2 disabled spaces. The existing entrance to the West of the property along Pleasant Ave. will be eliminated, and a new driveway in the center of the property constructed that will provide access to the service elements of the building, for deliveries and for the removal of trash and recycling materials. That driveway will be located opposite where Barling St. meets Pleasant Ave. It will be designed such that trucks can proceed West on Pleasant Ave., back into the site for purpose of making deliveries and removing the trash compactor, and then exiting the site facing forward making a 80 degree turn to proceed on Pleasant Ave. The Board finds this to be an especially desirable feature of the plan, as trucks will no longer need to back out of the site.

9.     The Ordinance requires 0.5 spaces per bed, which based upon an expanded facility of 170 beds (actually 169 beds), yields a requirement of 85 spaces, with 96 being provided (62 existing at the present time). Using an analysis similar to that followed in the trip generation study, ITE parking standards calculate the additional peak parking demand as between 24 and 37 spaces, with the lower number being based upon number of beds, and the higher number being based upon the number of employees. This yields a peak parking demand ranging between 96 and 109 spaces, which takes into account utilization rates throughout the day, with the peak being between 2 PM and 3 PM in the afternoon. The Board recognizes that there are a lot of variables at play here, including vacation schedules, weather, and other items. The reasonable conclusion to be drawn is that the peak parking period may require at most 13 cars (the difference between the absolute peak parking demand of 109 spaces, and the 96 spaces provided) to be parked on nearby streets (but not Pleasant Ave., which is one of the conditions for approval). The Board also finds that, based upon the testimony of Mr. Strohl, many employees walk or bike to work, take public transportation or arrange for car pools.   The Board also notes that the plan still proposes a compliant number of parking spaces as per the Ordinance.

10.   As originally filed, the application called for the maintaining of eight waste dumpsters, emptied twice per week by the City of Englewood, and two recycling dumpsters emptied on a weekly basis. The applicant now proposes to use a sealed trash compactor system, in place of the eight dumpsters. This system involves a roll-off, enclosed container, with a capacity of 30 cubic yards and measuring 22 ft. by 8 ft., that will require emptying only about once every three weeks. When that occurs, a truck will visit the property, remove the container, empty it at an off-site location, and return it in about 45 minutes. The compactor will be operated only during daylight hours. The compactor system will comply with State noise standards.

4

11.     The drainage system has been designed to comply with the requirements of the City and the New Jersey Department of Environmental Protection.  There will be an expanded underground detention basin in the front of the property, and a similar basin in the rear.

12.     Extensive landscaping is proposed on virtually all portions of the property, specifically including the following: both sides of the new parking field along the two-way portion of the driveway on the West; on the South side of the existing 17 space parking field to the West of the circular driveway in order to further shield the parking area from the view of W. Hudson Ave.; along the entire length of Pleasant Ave., with special attention being paid to the expanded building and the areas where mechanical equipment and generators are located, including the retaining wall; along the entire East property line, and some additional plantings on the W. Hudson Ave. of the driveway passing in front of the building.  The Board finds that landscaping is an important part of the plan, and based upon the concerns raised by Ms. Bogart, will make landscaping a specific condition of the approval.

13.     Noise was a major concern during the course of the public hearings, because the facility involves significant mechanical equipment.  Mr. Zybura testified based upon the report of Lewis S. Goodfriend & Associated, dated November 7, 2014, which analyzed the noise to be created by the two emergency generators and four chillers located on the North side of the building.  His analysis also included the 30 yd. trash compactor.  He stated that with the combination of the Level 2 generator enclosures and the installation of the proposed sound barriers around the proposed equipment, sound emissions will meet the limits of state and local noise regulations at the property line along Pleasant Ave. to the North.  Noise regulations include standards established by the New Jersey Department of Environmental Protection, and the City of Englewood, which in this case are substantially the same.  Noise generated by generators during periods of emergency use are exempt from those standards, but the noise generated during periodic testing is not.  Standards are lower at night (50 dB(A) than during the day (65dB(A).  The night sound analysis was limited to the chillers, as the generators are not tested at night.  The daytime sound analysis included the chillers, the trash compactor, the generator testing as well as the sound created by the existing HVAC equipment.  Mr. Zybura concluded that there will be compliance with all applicable noise regulations, provided that the chillers are purchased and installed with factory-installed noise control measures as outlined in this report, that a noise barrier is erected on the North side of the equipment, and that emergency generators feature the Level 2 enclosures referenced above.  The Board finds compliance with these standards, and conditions set forth in the Goodfriend report, to be critical, and will specifically condition its approval upon such compliance.

14.     Traffic and parking were also significant issues, especially with the elimination of the spaces proposed for Pleasant Ave.  These issues are a function of the location of an institutional facility in a residential neighborhood.  Mr. Klein testified based upon the

report of T&M Associates, Inc. dated August 11, 2014 and revised on November 10, 2014 to reflect the revision to the plan eliminating the Pleasant Ave. parking spaces. The report focused on the signalized intersections at Tenafly Rd. and W. Hudson Ave. and Knickerbocker Rd. and W. Hudson Ave., as well as the parking needs of the expanded facility. The report was quite extensive, and included traffic volume counts at both intersections, for the AM and PM peak hours, at the present time and in a "no-build" situation two years in the future, representing the estimated time of construction. The projected increase is 1% per year. Using ITE trip generation rates, which the Board finds to be an accepted basis for traffic analysis, additional site generated trips for the expanded facility based upon the increase in employees, increase in beds, and increase in the size of the building, were calculated. The most conservative analysis is based upon square footage, and yielded a total of 16 additional trips during the AM peak hour, and 28 additional trips during the PM peak hour. Additional trips calculated based upon the increase in employees and beds yield lower numbers. Following this conservative path, an analysis was made as if each intersection would bear the entire increase in the number of trips. The conclusion was that the number of trips added to each intersection will be less than 3% of the existing trips, at intersections which presently operate far below capacity. The report also notes that the increase in trips will not all occur during the peak hours, as the facility operates on a shift basis, with changes at approximately 7 AM, 3 PM and 11 PM. This serves to spread out the additional trips significantly, further mitigating the impact upon the intersections.

11.   Lighting is proposed, and was not a major issue during the course of the hearings. The Board finds the lighting plan to be acceptable, provided it is implemented in strict accordance with the approved plan, and does in fact comply with all provisions of the Ordinance.

WHEREAS, the Board makes the following conclusions of law:

1.   The applicant's use is both non-conforming, as that term is defined in N.J.S.A. 40:55D-68 and inherently beneficial. Therefore, the applicant needs a variance pursuant to N.J.S.A. 40:55D-70(d)(2) for the expansion of a non-conforming use. The burden of proof for such an expansion is less than that needed to establish the use in the first instance. Furthermore, inherently-beneficial uses are deemed to have satisfied the "positive" criteria for the granting of a "d" variance as a matter of law. Sica v. Board of Adjustment of Township of Wall, 127 N.J. 152 (1992)  Therefore, the applicant need not establish particular suitability, nor is the applicant required to reconcile the granting of the variance with the prohibition of the use in the zone, otherwise required by Medici v. BPR. Co., 107 N.J. 1 (1987). The Board will perform its legal analysis through the prism of the familiar four-part Sica test, which requires the Board to consider the nature of the use, identify any detriments associated with the proposal, affirmatively consider conditions that can be imposed to mitigate those detriments, and then determine whether, on balance, the benefits to

6

be derived outweigh the associated detriments.

In House of Fire Christian Church v. Zoning Board of Adjustment of the City of Clifton, 379 N.J.Super. 526 (App. Div. 2005), the proposed religious use was permitted in the zone. The Court cited the standard for the granting of a conditional use variance as set forth in Coventry Square, Inc. v. Westwood Zoning Bd. of Adj., 138 N.J.Super. 285 (1994), where the Court found that the conditional use variance applicant is held to a lesser burden of proof than the applicant for a straight use variance, recognizing the different between prohibited and conditional uses. However, the Court went on to find, based upon Sica v. Board of Adjustment of Township of Wall, 127 N.J. 152 (1992), that the inherently-beneficial applicant for a "d" variance satisfies the required showing of "special reasons" (the so-called "positive") criteria as a matter of law, with the Board to next consider the balance of the benefits with the detriments.

2.    While the cases seem to recognize that there is a hierarchy of inherently-beneficial uses, implying that some are more beneficial than others, the Board is not aware of any cases that set forth criteria to be considered when evaluating where the use falls on the scale. The Board notes that the applicant's use fulfills an important public need. An aging population increasingly needs safe and secure housing and medical care, and the applicant has provided those services for many years in the City of Englewood. The applicant's facility serves not only citizens of Englewood, but residents of nearby towns and states. It occupies a high position on the scale of inherently-beneficial uses.

3.    The existence of an institutional use in a single-family area undoubtedly involves detriments. Such uses are, in many respects, incompatible, as the institutional use involves a greater level of noise and activity than single-family residential use, involves deliveries of supplies, the removal of trash and debris and a constant flow of the staff and employees needed to support a use which operates on a 24 hour per day, 7 day per week basis, and the construction of buildings that require mechanical equipment (chillers, generators and the trash compactor) of far greater capacity than a residential use. Recognizing that the use already exists, and that the applicant is not proposing to create those conditions for the first time, the Board finds that the detriments will not be significantly intensified if the project is approved. In certain respects, such as the use of the proposed trash compactor instead of regular trash collections, the impact of the use will be mitigated. The Board also finds that the relocation of the entrance driveway on Pleasant Ave. to a more central location, and the ability of trucks to back in and exit in a forward direction, is a significant improvement which will to serve to ease vehicular traffic, reduce the number of truck trips and make deliveries and pick-ups more efficient.

4.    The Board is satisfied that the conditions it has imposed will serve to mitigate what increased detriments may result from the expanded facility. Additional landscaping

7

will serve to screen the buildings from view. While the buildings will be aesthetically pleasing, they remain institutional buildings in a residential zone, and the addition of landscaping will "soften" their appearance further.  The applicant is required to comply with State noise standards whether imposed as a condition or not, but the Board includes the condition to highlight its importance.  Based upon the expert testimony of the applicant's acoustical engineer, which was not rebutted with competent expert testimony, the Board is satisfied that noise limits will not be exceeded.  The prohibition of parking on Pleasant Ave. will work to preserve the integrity of the residential neighborhood.  Requiring the applicant to prepare a summary of anticipated regularly-scheduled truck traffic, with no deliveries taking place before 8 AM, will help to facilitate communication between neighbors and the applicants, and give the neighbors an idea of what they can expect.

5.   The Board finds that the identified features of the plan, coupled with the conditions imposed by the Board, will outweigh the detriments associated with the expansion of the facility, and related intensification of the use.  This analysis recognizes the inherently-beneficial of the use, and the fact that it already exists on the site.

6.   The applicant also requires a variance from the provisions of N.J.S.A. 40:55D-7-(d)(6) to permit the height of the principal building to exceed permitted height by more than 10 ft. or 10%. The applicant proposes a building height of 39.16 ft. where 30 ft. is permitted.  Again, the burden of proof is not the same as that for a d(1) variance.  Grasso v. Borough of Spring Lake Heights, 375 N.J.Super. 41 (App. Div. 2004).  Even considering the fact that the proposed use is not permitted, the d(6) applicant need not establish particular suitability, but need only show that the site can accommodate any problems associated with the increased height.  In this case, where the proposed new height equals the highest point of the existing building, the Board finds that the expansion concept of going up instead of going out, is sound, and serves to mitigate the impact of the expansion.  Valuable open space will be preserved at the "cost" of a height variance.

7.   The applicant also requires the bulk variances set forth on attached Exhibit "B".  All of those variances relate to features of the plan that are intended to further mitigate the detrimental impacts associated with the institutional use by providing barriers for sound, stabilizing slopes and providing for proper access, permitting the installation of additional parking spaces and placing the generators in their logical location given the design of the building. They are all either functions of the property and the manner in which it has been improved or the design and location of the improvements constructed upon it.  They are properly granted under N.J.S.A. 40:55D-70(c)(1) (b and c) and c(2).

8.   For the foregoing reasons, the Board finds that the applicants have met the required "positive" and "negative" showing for the granting of preliminary and final site plan approval and for the variances set forth on Exhibit "B".

8

NOW, THEREFORE, BE IT RESOLVED that the application of The Actor's Fund Homes for variances from the provisions of the Ordinance be and the same is hereby granted as it relates to use and building height, and for the bulk variances described on Exhibit "B", and for preliminary and final site plan approval, on the following terms and conditions:

1.      The applicant shall construct the improvements in strict accordance with the plans filed with the application and referenced above;

2.      The generators, chillers, trash compactor and all other mechanical equipment shall be operated in such a way so as to comply with all applicable noise standards, and there shall be strict compliance with the conditions found in Section 5.0 of the Goodfriend Report dated November 7, 2014, even if not specifically shown on the approved plan;

3.      The applicant shall consult with Brigette Bogart, PP, AICP, CGW with respect to the final landscape plan, shall incorporate the comments contained in her various review memoranda, including that of December 10, 2014, and shall obtain her approval of the final plan, returning to the Board for further review in the event of a dispute;

4.      The applicant shall prepare, and file with the Board within 30 days of the date of this resolution, a summary of regularly-scheduled truck traffic, which shall be as specific as possible, and which shall be made available to interested parties.  No deliveries shall take place before 8 AM.  The applicant shall update the summary from time to time as circumstances change. The purpose of this condition is to give neighbors some advance notice of what they can expect as far as deliveries and truck traffic are concerned;

5.      The applicant's employees shall not park on Pleasant Ave. once construction is completed;

6.      The applicant shall enter into a Developer's Agreement with the City of Englewood prior to the start of construction, which shall include provisions for the bonding required by Municipal Land Use Law, including bonds for the installation of improvements and maintenance of same;

7.      The applicant shall comply with all of the conditions set forth in the reports of Boswell Engineering and Ms. Bogart, which reports are itemized in the introductory clauses of this resolution; and

8.      All other laws and regulations of the City of Englewood and all other governmental authorities having jurisdiction over the project shall be complied with without exception, and the applicant shall obtain all other required permits and approvals, and shall return to the Board for further review if, in the event of any reviewing official, the changes requested by any other authority requires significant changes to the

9

approved plan;

9.  A building permit must be obtained before any work begins;

10. At the time application is made a building permit, the applicant shall file a certification with the Building Department stating that the plans being submitted are the same as those upon which the Board based this approval, and if not, shall note any changes so that City Officials may determine if application to the Board for further review is needed;

11. Nothing contained in this resolution shall supersede the provisions of the Uniform Construction Code of the State of New Jersey or any other law or regulation;

12. A copy of this Resolution shall be transmitted to the Construction Official/Zoning Officer of the City of Englewood;

13. A copy of this Resolution shall be mailed to the applicant's attorney within 10 days of the date hereof; and

14. Notice of this decision shall be published in the official newspaper of the City of Englewood as required by law.

The foregoing resolution was adopted at a duly constituted meeting of the Board, held in compliance with the provisions of the Open Public Meetings Act on January 26, 2015, by those members who voted in favor of the action taken, and is intended to memorialize and confirm the official action taken by the Board on December 17, 2014.


Rosemary Byrne
Chairperson
Zoning Board of Adjustment

Tina Evans
Secretary
Zoning Board of Adjustment

(for certification, see next page)

10

I hereby certify that on January 26, 2015, at an official public meeting of the Board, a quorum being present, this Resolution was duly adopted by a majority vote of those members of the Board who voted in favor of the action taken by the Board with respect to this application on December 15, 2014.


_____

Tina Evans
Secretary
Zoning Board of Adjustment

Vote taken on December 15, 2014: In favor: Chairman Byrne, Vice-Chairman Feintuch, Members Thomas, Reidler and Schwalbe; Absent: Members Fuld and Baker (Alt. 1); Not Eligible" Member Weitzman.

Members authorized to vote on resolution: Chairman Byrne, Vice-Chairman Feintuch, Members Thomas, Reidler and Schwalbe.

Vote taken on Resolution:

| Member: | In Favor | Opposed | Absent | Abstain |
|---|---|---|---|---|
| Chairman Byrne | | | | |
| Vice-Chairman Feintuch | | | | |
| Member Thomas | | | | |
| Member Reidler | | | | |
| Member Schwalbe | | | | |

11

**Variances required:**

1.  Use variance (expansion of nonconforming use - d(2))    5 votes

2.  Exceeding height by more than 10% (d(6))
    250-59 (K)(1)    5 votes

3.  Retaining wall in front yard (c)2   250-59(J)(1)    majority

4.  Sound Wall in front yard  (c)2  250-59(J)(1)    majority

5.  Retaining wall > 6.5 feet   (c)2  250-59(J)(7)    majority

6.  Sound Wall > 6.5 feet    (c)2  250-59(J)(7)    majority

7.  Parking in front yard (7 spaces 23 feet from    majority
    property line        (c)(2)      250-86

8.  Generator in front yard (Pleasant Avenue)    majority
    (c)(1)      350-59(J)(9)

EXHIBIT "A"

**ACTOR'S FUND HOMES**
**EXHIBIT LIST**

**9/18/14**

A-1    Photographs (4 pages)

A-2, A-D    Spiezle Group architectural plans dated 8/11/14 (4 sheets)

A-3    T&M Planning Report dated 8/11/14 (6 pages)

~~A-4    T&M Traffic/Parking study dated 8/11/14 (9 pages + appendices)~~

A-5    T&M civil engineering plans dated 8/11/14 (21 sheets)

A-6    Colorized landscape rendering

A-7    Building Exhibit 8/25/14

A-8    Composite Photo

A-9    3-D View of Buildings

**10/27/14**

A-10   Loading, Recycling, Trash Plans (3 pages)

A-11   Remediation Exhibit 10/27/14 (1 page)

**11/20/14**

A-12   Revised T&M civil engineering plans dated 11/10/14 (22 sheets)

A-13   Revised colorized plan showing changes from 1st set of plans

A-14   Revised colorized landscape rendering

A-15   Street View Simulation from Pleasant Avenue #1 (1 page)

A-16   Street View Simulation from Pleasant Avenue #2 (1 page)

A-17   Street View Simulation from Barling Street (1 page)

*Exhibit "8"*

A-18   Video of Compactor (on thumb drive)

**11/24/14**

A-19   Lewis S. Goodfriend Report dated 11/7/14 (10 pages)

A-20   Revised T&M Traffic/Parking study dated 11/10/14 (12 pages + appendices)

A-21   Revised Landscaping Simulation from Pleasant Avenue (1 Page)

**12/11/14**

None

# EXHIBIT "E"

PLANNING BOARD
CITY OF ENGLEWOOD

---

IN THE MATTER OF THE APPLICATION OF
ENGEL BURMAN AT ENGLEWOOD, LLC, FOR
SITE PLAN APPROVAL AND VARIANCE RELIEF
RELATING TO LOT 10.01 IN BLOCK 2516,
412 SOUTH VAN BRUNT STREET

MEMORIALIZATION RESOLUTION

Case No. 2015-5

---

WHEREAS, ENGEL BURMAN AT ENGLEWOOD, LLC applied to the Planning Board of the City of Englewood, for preliminary and final site plan approval and variance relief to erect an assisted living facility consisting of 309 units in the "RIM" Research, Industrial and Medical District; and

WHEREAS, public hearings were conducted on July 23, 2015, August 6, 2015, August 20, 2015, September 10, 2015 and October 22, 2015, upon proper notice, certified by the applicant's proof of service to property owners within a 200/foot radius of the subject property and proof of publication in an official newspaper of the City; and

WHEREAS, applicant was represented by Glenn C. Kienz, Esq., Weiner Lesniak LLP, 629 Parsippany Road, Parsippany, NJ 07054; and

WHEREAS, interdepartmental communications and advisory reports of municipal departments and agencies were received as follows:

- Letter of Wayne Scott, Zoning Official, dated April 7, 2015, directing the applicant to the jurisdiction of the Planning Board for the reasons stated therein; and
- Memorandums of Frantz Volcy, P.E., City Engineer, T & M Associates, Inc., 9 East Street, Englewood, NJ 07631, dated May 7, 2015, July 6, 2015 and August 24, 2015; and

ATES NUSSMAN RAPONE
ELLIS & FARHI, LLP
ATTORNEYS-AT-LAW
190 MOORE STREET
SUITE 306
HACKENSACK, N.J.
07601-7407

**WHEREAS,** the following exhibits were admitted into evidence:

A-1 – Rendering of The Bristal Assisted Living facility;

A-2 – Red brick sample – Belden Material Board;

A-3 – Sample of limestone finish (synthetic);

A-4 – Mansard roof shingle sample that mimic slate;

A-5 – Aerial photo of the subject property dated June 17, 2015;

A-6 – Colorized Proposed Site Plan with Landscaping Overlay prepared by Robert L. Streker, P.E., Bohler Engineering, 35 Technology Drive, Warren, NJ 07059, dated February 20, 2015 with latest revision June 17, 2015;

A-7 – Rendering of two freestanding signs prepared by H2M Architects and Engineers, dated August 2015;

A-8 – Sheet A-3.0 entitled "South and North Elevations" of Architectural Plans prepared by David L. Mammina, RA, H2M Architects and Engineers, 538 Broad Hollow Road, Melville, NY 11747, dated January 2015 with latest revision June 23, 2015;

A-9 - Sheet A-3.1 entitled "East and West Elevations" of Architectural Plans prepared by David L. Mammina, H2M Architects and Engineers, dated January 2015 with latest revision June 23, 2015;

A-10 – Computer generated rendering of the Bristal Assisted Living;

A-11 – Computer generated rendering of the Bristal Assisted Living;

A-12 – Colorized Proposed Site Plan with Landscaping Overlay prepared by Robert L. Streker, P.E., Bohler Engineering, 35 Technology Drive, Warren, NJ 07059, dated February 20, 2015, with revision 3 erroneously not shown with date of September 10, 2015;

BD-1 – Computer generated rendering; and

BD-2 – Memorandum to Planning Board of Mark Keener, PP AICP AIA – The RBA Group, Inc., 32 Old Slip, New York, NY 10004, dated August 19, 2015; and

**WHEREAS,** the following documents were made part of the record without exhibit references:

:ATES NUSSMAN RAPONE
ELLIS & FARHI. LLP
ATTORNEYS-AT-LAW
190 MOORE STREET
SUITE 306
HACKENSACK, N.J.
07601-7407

2

▪ Memoranda of Mark Keener, PP AICP AIA, dated June 1, 2015 and July 15, 2015;

▪ Traffic Impact Assessment for Proposed Assisted Living Facility, prepared by Elizabeth Dolan, P.E. and Gary W. Dean, P.E., P.P., Dolan and Dean Consulting Engineers, LLC, 792 Chimney Rock Road, Martinsville, NJ 08836, dated May 19, 2015;

▪ Stormwater Management Report prepared by Robert L. Streker, P.E., dated February 18, 2015;

▪ Environmental Impact Statement prepared by Robert L. Streker, P.E., dated February 28, 2015;

▪ Memorandum of Robert L. Streker, P.E. to City of Englewood, dated May 22, 2015;

▪ Survey of the subject property prepared by James C. Weed, PLS, Control Point Associates, Inc., 35 Technology Drive, Warren, NJ 07059, dated February 20, 2015;

▪ Architectural Plans prepared by David L. Mammina, R.A., dated January 2015 with latest revision dated September 10, 2015, consisting of nine sheets, as follows:
- **Drawing No. A-2.0** – First Floor/Parking Plan;
- **Drawing No. A-2.1** – Second Floor Plan;
- **Drawing No. A-2.2** – Third Floor Plan;
- **Drawing No. A-2.3** – Typical Floor Plan (4th thru 6th Floors);
- **Drawing No. A-2.4** – Seventh Floor Plan;
- **Drawing No. A-2.5** – Eighth Floor Plan;
- **Drawing No. A-3.0** – South and North Elevation;
- **Drawing No. A-3.1** – East and West Elevation; and
- **Drawing No. A-3.2** – Courtyard Elevation; and

▪ Engineering Plans prepared by Robert L. Streker, P.E., dated February 20, 2015 with latest revision dated June 17, 2015, consisting of twelve sheets, as follows:
- **Sheet 1 of 12** – Cover Sheet;
- **Sheet 2 of 12** – Demolition Plan;
- **Sheet 3 of 12** – Site Plan;
- **Sheet 4 of 12** – Grading Plan;
- **Sheet 5 of 12** – Drainage and Utilities Plan;
- **Sheet 6 of 12** – Lighting Plan;
- **Sheet 7 of 12** – Landscape Plan;
- **Sheet 8 of 12** – Soil Erosion and Sediment Control Plan;

ATES NUSSMAN RAPONE
ELLIS & FARHI, LLP
ATTORNEYS-AT-LAW
190 MOORE STREET
SUITE 306
HACKENSACK, N.J.
07601-7407

3

- **Sheet 9 of 12** – Detail Sheet;
- **Sheet 10 of 12** – Detail Sheet;
- **Sheet 11 of 12** – Detail Sheet; and
- **Sheet 12 of 12** – Detail Sheet; and

**WHEREAS,** testimony in support of the application was given under oath by Steven Krieger, principal and founding member of Engel Burman Group, 67 Garden Road, Garden City, NY 11530; David L. Mammina, R.A.; Robert Streker, P.E., Elizabeth Dolan, P.E.; Sean Moronski, P.P., of Burgis Associates, 25 Westwood Avenue, Westwood, NJ 07675; Mark Keener, PP AICP AIA; Frantz Volcy, P.E., City Engineer and Planner, 9 West Street, Englewood; and the following persons questioned the witnesses and gave testimony: Sandy Greenberg, 449 Liberty Road, Englewood, NJ; Curtis Caviness, 98 Grand Avenue, Englewood, NJ; and Ann Dermansky, 300 Catherine Street, Englewood, NJ; and

**WHEREAS,** the Planning Board did consider the testimony and evidence presented, the following are the findings of fact and conclusions of the Board:

1. Applicant seeks site plan approval and variance relief for the development of a 307,100 sf, 8-story assisted-living facility comprised of 309 units on an approximately 2.5-acre parcel along South Van Brunt Street within the "RIM" Research, Industry and Medical Zoning District. The proposed use is permitted in the RIM District.

2. As revised, the following variances and design waivers are implicated:

- **Dimensional Standards – Maximum Building Height (Variance): Code §250-72D.** The maximum permitted building within the RIM District is 75 feet. Applicant is proposing a building height of 80.5 feet, which is within 10 feet or 10% of the maximum permitted height and, therefore, not the subject of a "use" variance under N.J.S.A. 40:55D-70d(6). The extra height accommodates higher ceilings on certain floors within the building to allow for the amenities included in the building. To calculate building height for its revised submission, applicant has utilized Code §250-98, "Exempt Stories" to reduce the calculated height of the building. However, a variance will still be required as applying the calculation from

:ATES NUSSMAN RAPONE
ELLIS & FARHI, LLP
ATTORNEYS-AT-LAW
190 MOORE STREET
SUITE 306
HACKENSACK, N.J.
07601-7407

4

this Section of the Code still does not reduce the building height below the maximum 75 feet.

- **Paving and Landscaping Requirements (Design Waiver): Code §250-84E** requires that an off-street surface parking facility shall not have more than ten (10) parking spaces in any one row without a planting island or planting peninsula containing a minimum of 50 square feet of permeable space and with a minimum planting width of four feet. The Planning Board may waive all or any part of such requirements if such plantings shall be impractical.

- **Parking in Front of Principal Structure (Design Waiver):** While parking is no longer infringing into the required front yard setback, **Code §250-81(B)(1)** nevertheless requires parking to be on the side or rear of the principal structure on the lot and not in front of the principal structure.

### Variances and Waivers

3. **Height variance.** Expert witnesses have concluded that the proposed building is 77 feet, 6 inches. Applicant had calculated the regulated building height as 80 feet, 6 inches. The maximum permitted height within the RIM District is 75 feet, which means the variance amounts to **2 feet, 6 inches** in height beyond the maximum permitted height (and not 5 feet, 6 inches). The following is a more detailed explanation of the calculation:

- The height of the proposed building is shown at 88 feet above ground floor elevation. However, **Code §250-58 "Definitions"** defines **"height"** as **"the vertical dimension of a building or structure, measured in feet, from the grade to the highest point of the building or structure."** In other words, height should not be measured from the ground floor, but rather from the grade. Typically "the grade" is at least 6 inches below the level ground floor. This would mean that the regulated height would be 88 feet, 6 inches.

- However, this application also invokes **Code §250-98 "Exempt Stories"**, which provides criteria for a story to be considered an "exempt story," which means it is not counted in the regulated height of the building.[1] A "story" is

ATES NUSSMAN RAPONE
ELLIS & FARHI, LLP
ATTORNEYS-AT-LAW
190 MOORE STREET
SUITE 306
HACKENSACK, N.J.
07601-7407

---

[1] In order to qualify as an exempt story, a story in a building must meet the following requirements: (1) At least 90% of the floor area of the story shall be used for parking spaces, access aisles, lobbies, stairs and elevators; (2) Not more than 50% of the parking spaces provided on such floor shall be devoted to commercial garage use, including the parking or storage of vehicles for sale, hire, servicing or repair and the garaging of fleets of commercial vehicles; (3) The story shall have a minimum height, from finished floor to the bottom of overhead girders, beams or flat ceilings, of seven feet six inches; (4) No columns or posts shall be located so as to interfere with the free flow of

defined in **Code §250-58** as "floor-to-floor"—in this case 11 feet. Therefore, the regulated height is 77 feet, 6 inches, which is **2 feet, 6 inches** beyond the maximum height limit established by RIM District regulations.

4. The Board concludes that the height variance is justified, under the rationale offered by applicant's planner, Mr. Moronsky and N.J.S.A. 40:55D-70c(2). In Kaufmann v. Planning Bd. For Warren Tp., 110 N.J. 551 (1988), the Supreme Court explained the standard for a c(2) variance as falling somewhere between the traditional standards of "hardship" on the one hand and "special reasons" on the other. The Court pointed out that the grant of a c(2) variance must be rooted in the purposes of zoning and planning itself, as enumerated in N.J.S.A. 40:55D-2.

5. Mr. Moronsky opined that the creation of an assisted living facility was an "appropriate use or development of the land" in a manner that "promotes the public health safety and welfare", a planning purpose referenced in subsection "a" of N.J.S.A. 40:55D-2. Applicant is required to obtain a "Certificate of Need" from the State of New Jersey, Department of Health, predicated on a deficiency of such housing in the area. According to applicant's principal, Steven Krieger, the Certificate of Need will require ten (10%) of the beds to be set aside for Medicaid recipients; and 64 of the 309 living units in applicant's project will be for persons with an early stage Alzheimer. Accordingly, the Board concludes that the provision of this type of housing meets the c(2) standard, whether operated for profit or not. The Appellate Division in Jayber, Inc. v. Municipal Council, 238 N.J.Super. 165 (App.Div.) certif. den. 122 N.J. 142 (1990), in reversing the denial of a variance for construction of a congregate care housing facility as an adjunct to an existing nursing home, pointed out that the aging of the population and the special housing needs of the elderly, irrespective of their individual financial resources, creates significant social problems which government, as a matter of the general welfare, is obliged to address. We would add that the construction of senior citizen housing is expressly set forth as a planning objective in subsection "l" of N.J.S.A.

ATES NUSSMAN RAPONE
ELLIS & FARHI, LLP
ATTORNEYS-AT-LAW
190 MOORE STREET
SUITE 306
HACKENSACK, N.J.
07 601-7407

---

traffic; and (5) Such story shall either be enclosed by a solid wall at least four feet high or be enclosed from the bottom of the story to the top of the story with walls or paneling, of which at least 50% shall be composed of solid material. The application meets all of these criteria to qualify for an exempt story.

6

40:55D-2, also approved in Jayber, Inc. v. Municipal Council, at 174-175. See also Holmdel Builders Ass'n v. Township of Holmdel, 121 N.J. 550, 557 (1990), where the Court, in another context, found that provision of lower income housing is one of the "general welfare" purposes of zoning.

6. Note 6.1 on page 72 of the 2014 Master Plan speaks to the appropriateness of this use and its placement in that section of Englewood referred to in the Master Plan as "Englewood South":

> Age-restricted, senior independent living, and assisted care facility developments can benefit both the tax base and employment opportunities in Englewood. These facilities could reasonably be located in Englewood in part because of the presence of Englewood Hospital. Age-restricted developments generally provide positive fiscal returns with tax revenues greatly exceeding public cost of services. Senior independent living and assisted-living facilities also provide positive fiscal benefits. In addition, these independent living and assisted living facilities employ many moderate income workers who often utilize public transportation. These facilities should be easily accessible by public transportation.

7. As to the negative criteria of N.J.S.A. 40:55D-70, there are no detrimental adverse effects on surrounding properties, all of which are commercial in the immediate area. The statute requires "substantial" detriments and the Board can find none. The dominant element is the proximity of State Highway Route 4 and its South Van Brunt Street off-ramp. Surrounding uses are highway oriented, including a hotel. The existing use of the site is the 4 West Diner, which will be demolished. The "Vision Statement" set forth on page 34 of the 2014 Master Plan, explains the transformative goal of redeveloping Englewood South rather than preserving the counterproductive or unattractive aspects of it.

> Vision Statement. These blocks, traditionally devoted to manufacturing and commerce, will evolve into a vibrant, attractive, entrepreneurial district and employment center. Streetscape improvements, investments in branding and wayfinding, and improved business facades and signs, will create an attractive environment that celebrates Englewood industry and attracts investment. Businesses will begin to work together to cooperatively strengthen the district.As such, whatever values the negative criteria place on existing uses and the existing land use scheme are diminished by the new Master Plan and a new zoning ordinance (Ordinance No. 14-36), both calling for

ATES NUSSMAN RAPONE
ELLIS & FARHI, LLP
ATTORNEYS-AT-LAW
180 MOORE STREET
SUITE 306
HACKENSACK, N.J.
07601-7407

7

change and recognizing "Medical and Health Care" facilities generally, and "Wellness Centers" specifically, as part of that change.[2]

8.   As to a waiver in design criteria relating to the absence of planting islands or peninsulas in the parking areas, the parking is underneath the building – essentially garage parking for 145 vehicles - where such plantings would not be feasible. See Site Plan, revised June 17, 2015, **Exhibit A-6.** Further, there will be valet service for the residents.

9.   As to a waiver for parking in front of the principal structure, the Board accepts the explanation of applicant's site engineer, Robert L. Streker, P.E. of Bohler Engineering, as justification for the waiver:

> We have 13 spaces at the front, none of which are in the front yard setback.
> This is all short term, quick drop-offs, going in and out of the building. This is a
> common feature with other facilities of assisted living. There is always a need
> for short term visitors as opposed to coming in to the building. There are no
> assigned spaces here in terms of residents, it serves functionally to get people
> in and out when they have to. And we also take into account aesthetics, in
> terms of limiting it to one curb cut, improving the streetscape and the
> aesthetics with the fountain.

10.   The revised design of the "auto court" represents an improvement with respect to conformance with the intent of the Master Plan and with the Design Standards in Code §250-72L. The redesigned "auto court" enhances accessibility and safety of pedestrians and improves the relationship of the auto court to South Van Brunt Street in terms of "giving deliberate form to the streets and sidewalk area" (from **Code §250-72F).**

## Site Plan Considerations

11.   **Usable Open Space.** A major consideration of the Board, from the standpoint of access by emergency vehicles and resident use of the proposed walking track along the circumference of the building perimeter, has been addressed. With respect to **Code §250-72(E)(6),** the building perimeter roadway is proposed to be utilized as a walking path except when emergency vehicles need to use this route. The exact design and materials of the roadway and walking path are shown on the plans submitted as part of this Application. This

ATES NUSSMAN RAPONE
ELLIS & FARHI, LLP
ATTORNEYS-AT-LAW
190 MOORE STREET
SUITE 306
HACKENSACK, N.J.
07601-7407

---

[2] "Wellness Centers" are defined in companion Ordinance No. 14-34 (**Code §250-58**) to include the proposed use.

fulfills the minimum "usable open space" requirement within the RIM District of 10% of the lot area.

12. **Improved Conformance with Design Standards.** The Board's consulting planner, Mark Keener, P.P. of The RBA Group, recommends that the development plan include the following:

- **Bicycle parking.** Some on-site bicycle parking (preferably sheltered from the elements). Building, Site and Circulation Standards (from **Code §250-72L subsection 1h**) include: "special treatments for bicycle circulation on site should be considered, including the provision of sheltered or unsheltered bicycle parking."

- **Public Realm/Streetscape treatment.** Streetscape features along South Van Brunt Street. These may the "Public Realm Design Standards" from **Code §250-70L subsection 2a**, as follows: "Internal streetscapes and streetscapes along public streets should consist of street trees or and other appropriate landscape features, street furniture, and street lights. The types/designs should complement existing streetscape features located throughout the City."

13. **Building aesthetics.** Applicant's architect, David Mammina. R.A., of H2M Architects and Engineers, has addressed the Board's concern with minimizing or camouflaging the elongated southern and northern exposures of the building by architectural design. See **Exhibits A-8** and **A-12.**

14. As to stormwater management, tree and landscape plantings and replacements, site lighting, sanitary sewer flow and all other engineering considerations, applicant has agreed to the conditions set forth in City Engineer Frantz Volcy's review reports of May 7, 2015, July 6, 2015 and August 24, 2015, and they are made conditions of this approval. As stated above, signage review and approval has been reserved for a separate hearing, pending review by the Board Sign & Façade Committee.

**NOW, THEREFORE, BE IT RESOLVED** by the Planning Board of the City of Englewood, that the within application be, and the same is hereby approved, subject to the following conditions:

ATES NUSSMAN RAPONE
ELLIS & FARHI, LLP
ATTORNEYS-AT-LAW
190 MOORE STREET
SUITE 306
HACKENSACK, N.J.
07601-7407

## CONDITIONS SPECIFIC TO THE APPLICATION

A.  The conditions set forth in City Engineer Frantz Voicy's review reports of May 7, 2015, July 6, 2015 and August 24, 2015, including the requirement of a Developers' Agreement.

B.  Applicant will obtain and furnish proof of a Certificate of Need for the project.

C.  The plans will be revised to note the absence of structures on the roof, as well as other representations made by applicant during the course of the hearings.   No building permit shall be issued until revised plans have been filed and approved by the City Engineer.  The revised landscape plan shall be reviewed and approved by the RBA Group.

D.  Applicant will consider the installation of solar panels or photovoltaic cells on the roof. This is a non-binding recommendation.

## GENERAL CONDITIONS

E.  This approval is subject to applicant obtaining a building permit and any other State, County or City approvals (including City Board of Health), if required.

F.  All fees, costs, bonds and escrows shall be paid when due or becoming due. Any monies are to be paid within twenty (20) days of said request by the Board's Secretary.

G.  All representations made by applicant or its agents shall be deemed conditions of this approval and any misrepresentations by applicants contrary to the representations made before the Board shall be deemed a violation of this approval.

H.  The action of the Planning Board in approving this application shall not relieve the applicant of responsibility for any damages caused by this project, nor does the Planning Board of the City of Englewood, or its reviewing professionals and agencies, accept any responsibility for design of the proposed improvement or for any damages that may be caused by this development.

I.  Applicant shall comply with all applicable federal, state, regional, county and local rules, regulations and requirements. In the event compliance with the requirements of any such governmental entity necessitates modifications to the Site Plan, applicant shall submit revised plans to the Zoning Officer and Construction Official for their review and approval. If deemed by either of them to be so substantial or different as to warrant further review by the Planning Board, such modification(s) shall be referred to the Planning Board for its formal

ATES NUSSMAN RAPONE
ELLIS & FARHI, LLP
ATTORNEYS-AT-LAW
190 MOORE STREET
SUITE 306
HACKENSACK, N.J.
07601-7407

10

review, and applicant shall be required to present same in compliance with the notice provisions of the Municipal Land Use Law.

J.    This approval is conditioned upon the truthfulness of the testimony of the applicant and applicant's witnesses. In the event that said testimony is found to be willfully false, this approval may be voidable and may be nullified by the Planning Board.

| | |
|---|---|
| **MOTION BY:** | **MR. DAVID** |
| **SECONDED BY:** | **MR. DACEY** |
| **IN FAVOR:** | **MR. DAVID, MR. DACEY, MR. BROWN, MS. MANN, MR. MARON, MS. FAY, MAYOR HUTTLE, COUNCILMAN FORMAN and MR. DEMETRAKIS** |
| **OPPOSED:** | **NONE** |

**DATE APPLICATION APPROVED:**    SEPTEMBER 10, 2015

**DATE RESOLUTION APPROVED:**    NOVEMBER 5, 2015

JAMES DEMETRAKIS, CHAIRMAN
PLANNING BOARD

ATES NUSSMAN RAPONE
ELLIS & FARHI, LLP
ATTORNEYS-AT-LAW
190 MOORE STREET
SUITE 306
HACKENSACK, N.J.
07601-7407

PLANNING BOARD
CITY OF ENGLEWOOD

IN THE MATTER OF THE APPLICATION OF     :

ENGEL BURMAN AT ENGLEWOOD, LLC, FOR     :   MEMORIALIZATION RESOLUTION

SITE PLAN APPROVAL AND VARIANCE RELIEF     :

RELATING TO LOT 10.01 IN BLOCK 2516,     :    Case No. 2015-5

412 SOUTH VAN BRUNT STREET     :

WHEREAS, ENGEL BURMAN AT ENGLEWOOD, LLC applied to the Planning Board of the City of Englewood, for preliminary and final site plan approval and variance relief to erect an assisted living facility consisting of 309 units in the "RIM" Research, Industrial and Medical District; and

WHEREAS, the development application was granted on September 10, 2015 and memorialized on November 5, 2015; however, at the request of the Board and with applicant's consent, the consideration of all signage in the development plan was postponed to await a review and report by the Planning Board's Sign & Façade Committee; and

WHEREAS, the hearing recommenced on November 5, 2015, with the applicant again represented by Glenn C. Kienz, Esq., Weiner Lesniak LLP, 629 Parsippany Road, Parsippany, NJ 07054, and without the renewal of public notice as the November 5 date had been announced and posted as a continuation date on prior hearing dates; and

WHEREAS, at the hearing on November 5, 2015,.the Board received into its record without exhibit reference the report of the Sign & Façade Committee; and

WHEREAS, testimony in support of the application was given under oath by Steven Krieger, principal and founding member of Engel Burman Group, 67 Garden Road, Garden City, NY 11530; and testimony was also given by Frantz Volcy, P.E., City Engineer and Planner,

KATES NUSSMAN RAPONE
ELLIS & FARHI LLP
ATTORNEYS-AT-LAW
190 MOORE STREET
SUITE 306
HACKENSACK, N.J.
07601-7407

9 West Street, Englewood; and no other persons gave testimony or appeared in opposition to the application; and

**WHEREAS,** the Planning Board did consider the testimony and evidence presented, the following are the findings of fact and conclusions of the Board:

1. The findings of fact and conclusions of law set forth in the Board's Resolution of November 5, 2015, as well as the referenced exhibits, are incorporated herein, as if fully set forth.

2. At the Board's request and with applicant's consent, the proposed signage for the project was deferred. This resolution memorializes that deferred discussion on November 5, 2015.

3. The Board has now had the benefit of the Report of the Sign & Façade Committee, dated September 22, 2015, a copy of which is appended hereto.

4. As set forth on the Site Plan, Sheet 3 of 12, revised June 17, 2015, the following variances and / or design waivers are required for signage:

## GROUND / POLE SIGNS

| ITEM | PERMITTED | EXISTING | PROPOSED |
|------|-----------|----------|----------|
| Max. Number of Signs | 1 per Frontage | 1 | 2 |
| Max. Sign Area | 20 SF | 24 SF (EN) | 84 SF (V) [Route 4 Sign] |
| | | | 40 SF (V) [S. Van Brunt Sign] |
| Max. Sign Height | 10 FT | 20 FT (EN) | 20 FT (V) [Route 4 Sign] |
| | | | 8 FT [S. Van Brunt Sign] |
| Min. Sign Setback | 5 FT | 3.4 FT | 5 FT |

## WALL SIGNS

| ITEM | PERMITTED | EXISTING | PROPOSED |
|------|-----------|----------|----------|
| Max. Number of Signs | 1 per Frontage | 1 | 3 (V) |
| Max. Sign Area | 15 SF | 15 SF | 120 SF EACH (V) |

5. The Board supports the conclusions of its Committee that in number and dimensions the foregoing variances and/or design waivers are justified by the proximity of the site to N.J. State Highway No. 4 and the size of the principal building and parking structure.

KATES NUSSMAN RAPONE
ELLIS & FARHI, LLP
ATTORNEYS-AT-LAW
190 MOORE STREET
SUITE 306
HACKENSACK, N.J.
07601-7407

2

6. With respect to the Monument sign at the entry, applicant has requested both a phone number and a web address to be displayed. As per Code Section 250-104, Subsection U, telephone numbers are prohibited on all signs other than a window sign and with limiting dimensions. As related by its Chairwoman, Ms. Mann, the Sign & Façade Committee is of the opinion that a web address is the equivalent of a telephone number and should be excluded; notwithstanding the absence of a reference to "web addresses" in the Zoning Ordinance. The Ordinance probably preceded the web as an advertising media.

7. According to Ms. Mann, the Committee's opposition is primarily based upon speed of traffic on State Highway Route No. 4 and the westbound exist ramp onto South Van Brunt Street, in the immediate vicinity of the monument sign. The Committee considers telephone numbers and web addresses as a distraction to motorists that would interfere with public safety, and the Board concurs. Applicant offered to remove the telephone number but insisted on keeping the web address.

8. Further, the Board concludes that its determination is not a content-based violation of applicant's constitutionally protected free speech. This is simply predicated upon public safety and not on the message or content of the proposed signs.

9. It was noted that the regulations concerning signage are under review by the City and to the extent they are modified, nothing herein contained shall be deemed to preclude applicant from seeking approval under any new or revised signage regulations.

**NOW, THEREFORE, BE IT RESOLVED** by the Planning Board of the City of Englewood, that the within signage application be, and the same is hereby approved, subject to the conditions set forth in the Board's Resolution of November 5, 2015, as if repeated herein verbatim.

|  |  |
|---|---|
| MOTION BY: | MS. MANN |
| SECONDED BY: | MR. BAER |
| IN FAVOR: | MR. DAVID, MR. DACEY, MR. BROWN, MS. MANN, MR. MARON, MS. FAY, MAYOR HUTTLE, COUNCILMAN FORMAN and MR. DEMETRAKIS |
| OPPOSED: | NONE |

KATES NUSSMAN RAPONE
ELLIS & FARHI, LLP
ATTORNEYS-AT-LAW
190 MOORE STREET
SUITE 306
HACKENSACK, N.J.
07601-7407

3

**DATE APPLICATION APPROVED:**     NOVEMBER 5, 2015

**DATE RESOLUTION APPROVED:**     NOVEMBER 16, 2015

---

JAMES DEMETRAKIS, CHAIRMAN
PLANNING BOARD

(M) Mr Brows ..          (2) Mayor Huttle

4yes - Huttle, Forman, David, Baer, Maron, Fry, Mann

O No.

KATES NUSSMAN RAPONE
ELLIS & FARHI, LLP
ATTORNEYS-AT-LAW
190 MOORE STREET
SUITE 305
HACKENSACK, N.J.
07601-7407

4

PLANNING BOARD
CITY OF ENGLEWOOD

| | | |
|---|---|---|
| IN THE MATTER OF THE APPLICATION OF ENGEL | : | |
| BURMAN AT ENGLEWOOD, LLC FOR AMENDED | : | MEMORIALIZATION RESOLUTION |
| SITE PLAN APPROVAL RELATING TO LOT 10.01 | : | |
| IN BLOCK 2516, 412 SOUTH VAN BRUNT STREET | : | Case No. 2015-5 |

WHEREAS, ENGEL BURMAN AT ENGLEWOOD, LLC (hereinafter "applicant") seeks to amend its previously approved site plan on September 10, 2015, memorialized November 5, 2015; and

WHEREAS, all of the proposed changes lessen or diminish the size and scope of the project in the following particulars:

- The building is reduced from eight stories to six stories;
- The height of the building is reduced from 88 feet without a parapet to 81 feet including the parapet;
- The resident population is reduced from 309 rooms or beds to 273; reflecting an elimination of independent living accommodations on what were the 7th and 8th floors of the approved plan;
- The addition of a walk-up stairwell to the roof as recommended by the Fire Chief and Fire Subcode Official;
- The elimination of nine (9) parking spaces; and
- The consolidation three front entrances to the building into one, with consequent of the front entry; and

WHEREAS, applicant presented its plan revisions at a public meeting of the Planning Board on February 25, 2016, opting to do so without public notice, citing exceptions to public notice in N.J.S.A. 40:55D-12.a(1) and (3); and allowed by the Board attorney on the understanding that applicant assumed the responsibility for presenting without notice; and

WHEREAS, applicant was represented by Louis I. Karp, Esq., of Weiner Lesniak LLP, 629 Parsippany Road, Parsippany, NJ 07054; and

ATES NUSSMAN RAPONE
ELLIS & FARHI, LLP
ATTORNEYS-AT-LAW
190 MOORE STREET
SUITE 306
HACKENSACK, N.J.
07601-7407

WHEREAS, the following exhibits were presented:

A-1 – Rendering of front façade of approved building;

A-2 – Rendering of front façade building as revised;

A-3 – Previously approved architectural plan, Sheet A-3.0, entitled "South and North Elevations", drawn by David L. Mammina, RA, H2M Architects and Engineers, 538 Broad Hollow Road, Melville, NY 11747, dated September 10, 2015;

A-4 – Comparison drawings of East Elevation as previously approved and proposed, Sheet A-3.1, entitled "East Elevation", dated February 9, 2016;

A-5 – Comparison drawings of South and West Elevations as previously approved and proposed, Sheet A-3.2, entitled "South and West Elevation", dated February 9, 2016; and

WHEREAS, the following documents were made part of the record without exhibit references:

Architectural plans prepared by David L. Mammina, R.A., dated February 9, 2016, consisting of four sheets, as follows:

- Drawing No. A-2.0 – First Floor Overall Plan;
- Drawing No. A-2.1 – Second Floor Overall Plan;
- Drawing No. A-2.2 – Third Floor Overall Plan; and
- Drawing No. A-2.3 – Typical Floor Plan (4th thru 6th Floors);

Sheet 3 of 12 entitled "Site Plan" of Engineering Plans prepared by Robert L. Streker, P.E., Bohler Engineering, 35 Technology Drive, Warren, NJ 07059dated February 20, 2015 with latest revision dated February 8, 2016;

Colored rendering of the subject property; and

Prior Resolution of the Planning Board dated November 5, 2015; and

WHEREAS, testimony in support of the application was given under oath by David L. Mammina, R.A.; and Frantz Volcy, P.E., City Engineer and Planner, 9 West Street, Englewood confirmed that the revisions were both minor and acceptable to his office; and

WHEREAS, the Planning Board did consider the testimony and evidence presented, the following are the findings of fact and conclusions of the Board:

ATES NUSSMAN RAPONE
ELLIS & FARHI, LLP
ATTORNEYS-AT-LAW
190 MOORE STREET
SUITE 306
HACKENSACK, N.J.
07601-7407

2

1. The revisions are minor and insubstantial but with positive consequences in reducing the height bulk of the building and the consequent intensity of use at that location. The revisions offer better site utilization beneficial to the zone plan and zoning ordinance and with no adverse effect to surrounding properties. To the contrary, any negative consequences of the previous plan are minimized.

2. Applicant has agreed to the continuing oversight of the City Engineer, compliance with his memorandum of February 12, 2016, and to comply with all of the conditions imposed in the memorializing resolution of November 5, 2015, which are incorporated herein by reference.

3. Except as may be contradicted by the amended architectural and site plans, the findings of fact and conclusions of law memorialized November 5, 2015 are also incorporated herein by reference.

4. Applicant shall formally file its revised plans with the City Building Department.

NOW, THEREFORE, BE IT RESOLVED by the Planning Board of the City of Englewood, that proposed revisions to the approved site plan are hereby approved, subject to the aforesaid conditions.

MOTION BY:      MR. BAER

SECONDED BY:      MR. DACEY

IN FAVOR:      MR. BAER, MR. DACEY, MR. DAVID, MR. DEMETRAKIS, MS. FAY, MR. BROWN, MR. LASHER and COUNCILMAN FORMAN

OPPOSED:      NONE

*Motion : Mr David*
*Second : Councilman Forman*

ATES NUSSMAN RAPONE
ELLIS & FARHI, LLP
ATTORNEYS-AT-LAW
190 MOORE STREET
SUITE 306
HACKENSACK, N.J.
07601-7402

3

DATE APPLICATION APPROVED:   FEBRUARY 25, 2016

DATE RESOLUTION APPROVED:   MARCH 24, 2016

JAMES D. DEMETRAKIS, CHAIRMAN
PLANNING BOARD

ATEB NUSSMAN RAPONE
ELLIS & FARHI, LLP
ATTORNEYS-AT-LAW
190 MOORE STREET
SUITE 306
HACKENSACK, N.J.
07601-7407

4

# EXHIBIT "F"

# THIRD ROUND HOUSING ELEMENT

# AND FAIR SHARE PLAN

# CITY OF ENGLEWOOD: 2014 REVISION

**City of Englewood Planning Board
Bergen County, New Jersey**

In consultation with

Phillips Preiss Grygiel LLC
Planning and Real Estate Consultants
33-41 Newark Street
Hoboken, New Jersey 07030

The original copy of this document was signed and sealed
in accordance with N.J.S.A. 45:14 A-1 et seq.

*Reed M Preiss*

Richard M. Preiss
New Jersey Professional Planner License #3461

April 2014

5/9/14

**Acknowledgments**

<u>Mayor</u>

Frank Huttle III

<u>City Council</u>

Lynne Algrant, President (At-Large Member)
Marc Forman (Ward 1)
Michael D. Cohen (Ward 2)
Eugene Skurnick (Ward 3)
Wayne Hamer (Ward 4)

William J. Bailey, Esq., City Council Attorney

<u>Planning Board</u>

Frank Huttle III
Timothy Dacey
Marc Forman
Marvin Anhalt
Curtis Caviness
Lewis J. Baer
David Maron
James Demetrakis
Toni Fay
Emily Mann (Alternate #1)
Adam Brown (Alternate #2)

Michael B. Kates, Esq. Board Attorney
Kenneth Albert PE, PP, Board Engineer/Board Planner
Deborah Gallagher, Planning Board Secretary

<u>City Liaison</u>
Tina Evans

5/9/14

## Table of Contents

EXECUTIVE SUMMARY: ENGLEWOOD REVISED THIRD ROUND HOUSING ELEMENT AND FAIR
SHARE PLAN ............................................................................................................................................ 1

1.  INTRODUCTION ......................................................................................................................... 2

2.  HOUSING ELEMENT/FAIR SHARE PLAN REQUIREMENTS ............................................... 4

3.  HOUSING STOCK AND DEMOGRAPHIC ANALYSIS ............................................................. 5

    A.  HOUSING STOCK INVENTORY ................................................................................. 5
    B.  GENERAL POPULATION CHARACTERISTICS ........................................................ 9
    C.  HOUSEHOLD CHARACTERISTICS .......................................................................... 10
    D.  INCOME CHARACTERISTICS ................................................................................... 11
    E.  EMPLOYMENT CHARACTERISTICS ....................................................................... 12

4.  THIRD ROUND FAIR SHARE PLAN ...................................................................................... 14

    A.  OVERVIEW .................................................................................................................. 14
        1.  Rehabilitation Share ............................................................................................. 14
        2.  Prior Round Obligation ......................................................................................... 16
        3.  Prospective Obligation .......................................................................................... 16

5.  SUMMARY ................................................................................................................................ 22

## List of Tables

Table 1.  Housing Tenure by Number of Units in Structure ............................................................. 5
Table 2.  Occupied Housing Units by Age of Structure .................................................................... 5
Table 3.  Housing by Units in Structure ............................................................................................ 6
Table 4.  Housing Value, Owner-Occupied Units, 2012 .................................................................. 7
Table 5.  City of Englewood Monthly Rental Cost, 2012 .................................................................. 8
Table 6.  Number of Housing Units by Condition of Unit, 2012 ....................................................... 9
Table 7.  Population Growth, 1960 to 2010 ...................................................................................... 9
Table 8.  Englewood Age Distribution, 2000 to 2010 ...................................................................... 10
Table 9.  Household Income - City of Englewood, 2012 ................................................................... 12
Table 10.  Employment Status for Population 16 Years and Over .................................................... 12
Table 11.  Distribution of Employment by Industry, Employed Englewood Residents, 2012 .......... 13
Table 12.  Rehabilitation Share, Prior Round and Prospective Housing Obligation ........................ 14
Table 13.  City of Englewood - Rehabilitated Units since April 1, 2000 ......................................... 15
Table 14.  City of Englewood – Prior Round Affordable Obligation ................................................ 16
Table 15.  City of Englewood – Third Round Prospective Plan ....................................................... 19

## Executive Summary: Englewood Third Round Housing Element and Fair Share Plan: 2014 Revision

Englewood's Third Round Housing Element and Fair Share Plan: 2014 Revision addresses the obligations required by New Jersey's Fair Housing Act and the New Jersey Constitution. Specifically, this revised version addresses all three parts of the obligation: the rehabilitation share and prior round obligation of 194 units and 152 units respectively that stem from the validated portions of COAH's third round rules, and a prospective obligation of 95 units of affordable housing pursuant to an amendment to the Settlement Agreement reached between the City of Englewood, ERA South LLC, and Fair Share Housing Center.

### A.   Rehabilitation Share

To date, Englewood's 194-unit rehabilitation share has been partially fulfilled. Since April 1, 2000, 48 units have been rehabilitated via the Bergen County Home Improvement Program. In addition, the City Housing Authority has completed interior improvements of the 152-unit Tibbs Senior Housing Development and has nearly completed an exterior renovation of the building. Utilizing COAH's recognized standard of crediting one unit per $10,000 spent on the rehabilitation of existing substandard units occupied by low- and moderate-income households, the City is currently eligible for 129 rehabilitation credits toward its Third-Round rehabilitation share. The City anticipates continued rehabilitation of the remaining 65-unit rehabilitation share obligation through County Home Improvement Program funds and the City Housing Authority. The City anticipates that the rehabilitation obligation will be met by 2018.

### B.   Prior-Round Obligation

COAH has determined that Englewood is responsible for a 152-unit prior-round obligation (from rounds 1 and 2). The City has provided sufficient affordable units to satisfy its 152-unit prior-round obligation through prior-cycle credits, group homes and family affordable housing construction, including: Westmoor Gardens (64 units); Shepherd House (12 units plus 12 bonus credits); Independence Hall (8 units plus 1 bonus credit); J-ADD (formerly UJC) group home (4 credits); PSCH Phelps Avenue group home (4 credits); PSCH Knickerbocker Avenue group home (4 credits); 167-169 Morse Place (4 units); Garrett Apartments (34 units); and First Baptist Church group home (5 units).

### C.   Prospective Obligation

Pursuant to the aforementioned amendment to the Settlement Agreement, Englewood proposes to fulfill a Third Round Prospective obligation of 95-unit through: the extension of the affordability controls of the 64-unit Westmoor Gardens affordable development; four units constructed by Habitat for Humanity; a three-unit expansion of the existing Foti housing development; a three-unit supportive and special needs housing project by Vantage Health Systems; six senior units to be built at 109 West Englewood Avenue; and by including 15 low- and moderate-income units in the 195-unit Flatrock Square project to be developed by ERA South LLC. The 95-unit obligation would be met within 5 years (that is, by 2019).

## 1.   INTRODUCTION

### A.   *Required Third Round Housing Element and Fair Share Plan: 2014 Revision*

The City of Englewood's Third Round Housing Element and Fair Share Plan: 2014 Revision amends and supersedes all prior Housing Elements and Fair Share Plans of the City of Englewood.  This Housing Element and Fair Share Plan has been prepared in accordance with the Municipal Land Use Law ("MLUL") per *NJSA* 40:55D-28b.(3) as well as those portions of the Third Round Substantive Rules (*NJAC* 5:97) and Procedural Rules (*NJAC* 5:96) of the New Jersey Council on Affordable Housing (COAH) which were not invalidated by the Supreme Court decision of September 26, 2013.  COAH adopted its initial *("previous rules")* Third Round methodology and regulations on November 22, 2004, which became effective on December 20, 2004.  However, in January 2007 the New Jersey Appellate Court invalidated portions of COAH's Third Round rules. As a result, COAH adopted significant revisions to its rules effective June 2, 2008, with amendments effective October 20, 2008 and April 6, 2009 *("revised rules")*.  However, certain portions of these rules were invalidated by the Appellate Court on October 8, 2010, a decision which was appealed to the Supreme Court.  On September 26, 2013 the Supreme Court affirmed the decision of the Appellate Division and invalidated the growth share portion of the third round rules adopted by COAH. The Supreme Court directed COAH to adopt new affordable housing rules consistent with the requirements of the Fair Housing Act. These new rules are expected to be released on May 1, 2014.

This Third Round Housing Element and Fair Share Plan: 2014 Revision has therefore been prepared in accordance with the Fair Housing Act and those portions of COAH's third round rules which remain intact, as well as the terms of an Amendment to a Settlement Agreement between ERA South LLC, the City of Englewood and the Fair Share Housing Center, dated 4/8/14, which is further detailed below.

### B.   *Affordable Housing and COAH History in the City of Englewood*

At the time the New Jersey State Legislature enacted the Fair Housing Act in 1985, the City of Englewood already had a long history of providing affordable housing for its residents through local and Federal government programs.  Essentially fully developed and built out since the early 1970s, the City has utilized a range of techniques to provide affordable housing and supportive social programs, including: forming a Housing Authority and utilizing HUD funds and other available funding to build affordable housing; incorporating affordable housing in redevelopment projects; construction of new affordable housing and group homes; the adoption of rehabilitation programs; and providing social services and financial assistance programs to assure the creation and support of affordable housing in the City.

As far as Englewood's history specific to COAH is concerned, a Housing Element and Fair Share Plan was filed with COAH on March 26, 2001 in response to its required Second Round obligation.

Following release of COAH's first set of Third Round Substantive Rules, the Planning Board adopted a Third Round Housing Element and Fair Share Plan on February 2, 2006. As indicated above, portions of COAH's *previous* Third Round Rules were invalidated by the court, requiring an amendment to COAH's Third Round Rules. This necessitated Englewood preparing a second, amended Third Round Housing Element and Fair Share Plan. Such a document was prepared by Peter G. Steck, P.P., and adopted by the Englewood Planning Board on January 27, 2009. A third Housing Element and Fair Share Plan report was prepared by Phillips Preiss Shapiro Associates, Inc. and adopted by the Englewood Planning Board on August 25, 2009, in an initial response to the lawsuit filed by ERA South LLC et al. (ERA South) on January 2, 2009. In response to the Appellate Court's decision on October 8, 2010, the Planning Board adopted a Revised Third Round Housing Element and Fair Share Plan on September 19, 2011 in accordance with the Fair Housing Act and those portions of COAH's third round rules which remained intact. On September 26, 2013 the Supreme Court affirmed the decision of the Appellate Division and invalidated the third round rules adopted by COAH. The Supreme Court directed COAH to adopt affordable housing new rules consistent with the requirements of the Fair Housing Act. These new rules are expected to be released on May 1, 2014.

In March 2012, the City entered into a Settlement Agreement with litigant ERA South LLC, who had challenged Englewood's provision of low- and moderate-income housing on January 2, 2009. Fair Share Housing Center (FSHC) objected to the terms of the Settlement Agreement. At the fairness hearing in the Superior Court of Bergen County, Judge Martinotti validated the agreement. FSHC appealed that decision to the Appellate Division. In February 2014, the City, FSHC and ERA South entered into a supplement agreement amending the Settlement Agreement. Amongst the terms of the supplemental agreement was a prospective 95-unit affordable housing obligation be addressed in a revised Fair Share Plan, and that a period of repose against any further Mt. Laurel suits be granted for 5 years. The Amended Settlement Agreement also provides that the 95 units will count toward any future obligation of the City for affordable housing units after a five-year period of repose expires. As part of the agreement, ERA South agreed to provide a 15-unit affordable housing set-aside out of the 195 multi-family units approved at ERA South's Flatrock Square multi-family residential project. Of these 15 units, 50 percent will be moderate income housing and 50 percent will be low-income housing. If the low- and moderate-income units are rental units, 20 percent of the low-income units will be very low-income housing.

This document therefore supersedes and replaces the adopted September 2011 Housing Element and Fair Share Plan report.

## 2.   HOUSING ELEMENT/FAIR SHARE PLAN REQUIREMENTS

The Fair Housing Act requires that a "municipality's Housing Element be designed to achieve the goal of access to affordable housing to meet present and prospective housing needs, with particular attention to low- and moderate-income housing." The following items must be provided in order to fulfill the tenets of the Fair Housing Act and the purposes of the MLUL:

- An inventory of the municipality's housing stock by age, condition, purchase or rental value, occupancy characteristics, and type, including the number of units affordable to low- and moderate-income households and substandard housing capable of being rehabilitated.

- A projection of the municipality's housing stock, including the probable future construction of low- and moderate-income housing, for the next ten (10) years, taking into account, but not necessarily limited to, construction permits issued, approvals of applications for development, and probable residential development trends.

- An analysis of the municipality's demographic characteristics, including, but not necessarily limited to, household size, income level, and age.

- An analysis of the existing and probable future employment characteristics of the municipality.

- A determination of the municipality's present and prospective fair share of low- and moderate-income housing and its capacity to accommodate its present and prospective housing needs, including its fair share of low- and moderate-income housing.

- A consideration of the lands most appropriate for construction of low- and moderate-income housing and of the existing structures most appropriate for conversion to, or rehabilitation for, low- and moderate-income housing, including a consideration of lands of developers who have expressed a commitment to provide low- and moderate-income housing.

In addition, per the validated portions of COAH's Third Round Substantive Rules (*NJAC* 5:97), a Housing Element and Fair Share Plan is required to address a rehabilitation share and the municipal prior round obligation. The Supreme Court has invalidated COAH's rules regarding the "growth share approach" towards satisfying the community's prospective obligation, the third component of the fair share obligation. Nevertheless, a prospective obligation is still required per the New Jersey Fair Housing Act, and in accordance with the aforementioned Amendment to the Settlement Agreement between ERA South LLC, the City of Englewood and the Fair Share Housing Center. As such, this Fair Share Plan addresses a prospective obligation as well.

## 3.   HOUSING STOCK AND DEMOGRAPHIC ANALYSIS

### A.   *Housing Stock Inventory*

According to the 2012 American Community Survey, there were 11,315 housing units in the City of Englewood, of which 838 or 7% were vacant. Of the 10,477 occupied units, 55.5% were owner occupied and 44.5% were renter occupied. See Table 1, <u>Housing Tenure by Number of Units in Structure</u> for a detailed explanation of the City's housing units in 2012.

**Table 1.  Housing Tenure by Number of Units in Structure**

| Tenure and Occupancy Status | 2000 | 2010 | 2012 |
|---|---|---|---|
| Owner Occupied Units | 5,508 | 5,897 | 5,819 |
| Renter Occupied Units | 3,765 | 4,477 | 4,658 |
| **Total Occupied Units** | **9,273** | **10,374** | **10,477** |
| Vacant for Rent | 96 | 230 | 289 |
| Vacant for Sale | 57 | 120 | 135 |
| Rented or Sold, Not Occupied | 35 | 198 | 181 |
| For Seasonal, Recreational or Occasional Use | 38 | 16 | 0 |
| For Migrant Workers | - | 24 | 20 |
| Other Vacant | 115 | 160 | 213 |
| **Total Vacant Units** | **341** | **748** | **838** |
| **Total Housing Units** | **9,614** | **11,122** | **11,315** |

*Source: 2000 United States Census, 2006-2010 American Community Survey,
2008-2012 American Community Survey*

Table 2, <u>Occupied Housing Units by Age of Structure</u>, indicates the age of the City's housing stock. Englewood experienced the majority of its growth prior to 1960, in which nearly 60% of the housing stock was constructed. In comparison, just 22% of the City's overall housing stock was constructed after 1980. Overall, 41% of the existing dwellings in the City were completed between 1960 and 2010 or later.

**Table 2.  Occupied Housing Units by Age of Structure**

| | 2012 | | |
|---|---|---|---|
| Year Built | Owner Occupied | Renter Occupied | Units |
| 2010 or later | 0 | 12 | 12 |
| 2000 – 2009 | 196 | 659 | 855 |
| 1990 – 1999 | 155 | 176 | 331 |
| 1980 – 1989 | 731 | 368 | 1,099 |
| 1970 – 1979 | 128 | 513 | 641 |
| 1960 – 1969 | 745 | 645 | 1,390 |
| 1950 – 1959 | 893 | 606 | 1,499 |
| 1940 – 1949 | 930 | 786 | 1,716 |
| 1939 or earlier | 2,041 | 893 | 2,934 |
| **Total** | **5,819** | **4,658** | **10,477** |

*Source: 2008-2012 American Community Survey*

As seen in Table 3, <u>Housing by Units in Structure</u>, the City of Englewood is a community with a mixed housing stock that contains a majority of one- and two-family dwellings. In 2012, nearly 60% of the existing housing stock consisted of one- and two-family units. In fact, 44% of housing units within the City consist of detached one-family units. On the other end of the spectrum, 33% of the housing stock contains five or more dwelling units. According to the Census Bureau, structures with 20 to 50 or more units comprised 20% of housing within the City in 2012, an increase of 59% from 2000.

**Table 3. Housing by Units in Structure**

| Type of Structure | 2000 | 2010 | 2012 |
|---|---|---|---|
| 1, detached | 4,502 | 4,978 | 4,972 |
| 1, attached | 745 | 780 | 716 |
| 2 | 1,074 | 953 | 1,024 |
| 3 or 4 | 586 | 754 | 809 |
| 5 to 9 | 746 | 1,077 | 931 |
| 10 to 19 | 523 | 611 | 627 |
| 20 to 49 | 636 | 948 | 965 |
| 50 or More | 759 | 1,021 | 1,257 |
| Mobile Home or Trailer | 43 | 0 | 14 |
| Other (Boat, RV, Van, etc.) | 0 | 0 | 0 |
| **Total** | **9,614** | **11,122** | **11,315** |

*Source: 2000 United States Census, 2006-2010 American Community Survey,*
*2008-2012 American Community Survey*

Table 4, <u>Housing Value, Owner-Occupied Units, 2012</u>, provides a detailed description of housing values within the City of Englewood. Based on review of the data, the diversity of Englewood's housing stock is reflected in the wide range of housing values. Approximately 18% of all owner-occupied buildings are valued below $300,000, while 32% are valued in excess of $500,000. Approximately 50% of the City's owner-occupied units are valued between $300,000 and $499,999. It should be noted that median home value in 2012 measured $410,100 in Englewood. While Englewood's median home value exceeds that of the State of New Jersey ($337,900), it falls below Bergen County ($461,400) as a whole.

**Table 4.  Housing Value, Owner-Occupied Units, 2012**

| Owner-Estimated Value | Number of Units |
|---|---|
| Less than $50,000 | 36 |
| $50,000 - $59,999 | 22 |
| $60,000 - $69,999 | 8 |
| $70,000 - $79,999 | 16 |
| $80,000 - $89,999 | 20 |
| $90,000 - $99,999 | 0 |
| $100,000 - $124,999 | 10 |
| $125,000 - $149,999 | 42 |
| $150,000 - $174,999 | 26 |
| $175,000 - $199,999 | 211 |
| $200,000 - $249,999 | 200 |
| $250,000 - $299,999 | 469 |
| $300,000 - $399,999 | 1,731 |
| $400,000 - $499,999 | 1,171 |
| $500,000 - $749,999 | 743 |
| $750,000 - $999,000 | 408 |
| $1,000,000 or more | 706 |
| **Total** | **5,819** |
| **Median Value** | **410,100** |

Source: 2008-2012 American Community Survey

In 2012, average monthly contract rent (not including utilities) in the City of Englewood was just about the same as that of Bergen County ($1,196 per month v. $1,191 per month). In the City, 15% of renters paid between $500 and $1,000 in rent. Approximately 69% of renters paid more than $1,000 per month in rent, 38% of which paid between $1,000 and $1,500 per month in rent. Similarly, 69% of Bergen County renters paid more than $1,000 per month in rent, and 43% paid between $1,000 and $1,500 per month in rent. For detailed figures, see Table 5, City of Englewood Monthly Rental Cost, 2012.

**Table 5. City of Englewood Monthly Rental Cost, 2012**

| Monthly Rental | Number of Units |
|---|---|
| Less than $100 | 98 |
| $100 - $149 | 0 |
| $150 - $199 | 125 |
| $200 - $249 | 22 |
| $250 - $299 | 70 |
| $300 - $349 | 87 |
| $350 – $399 | 116 |
| $400 - $449 | 43 |
| $450 - $499 | 0 |
| $500 - $549 | 58 |
| $550 - $599 | 52 |
| $600 - $649 | 25 |
| $650 - $699 | 16 |
| $700 - $749 | 22 |
| $750 - $799 | 42 |
| $800 - $899 | 305 |
| $900 - $999 | 187 |
| $1,000 - $1,249 | 1,229 |
| $1,250 – $1,499 | 529 |
| $1,500 – $1,999 | 648 |
| $2,000 or more | 789 |
| No cash rent | 195 |
| **Total** | **4,658** |
| **Median Contract Rent** | **$1,196** |

*Source: 2008-2012 American Community Survey*

Despite the number of pre-1960 dwelling units within the City, Census statistics indicate a well-maintained housing stock. Approximately 2% of all occupied housing units within Englewood lack complete plumbing and/or kitchen facilities. Concurrently, while the Census Bureau has no actual definition for overcrowding (i.e., occupants per room), it is generally accepted that housing units with more than one occupant per room constitute an overcrowded dwelling unit. It appears that 3% of occupied housing units in Englewood contain more than one occupant per room. This statistic seems attributable to the mix of dwelling types within the City. See Table 6, Number of Housing Units by Condition of Unit, 2012.

**Table 6.  Number of Housing Units by Condition of Unit, 2012**

| Household Condition | 2012 |
|---|---|
| Units with more than one person per room | 357 |
| Units lacking complete plumbing | 85<br>60 Owner Occupied<br>25 Renter Occupied |
| Units lacking complete kitchen | 129<br>82 Owner Occupied<br>47 Renter Occupied |
| No telephone service available | 94<br>60 Owner Occupied<br>34 Renter Occupied |
| Total Occupied Units | 10,477 |

*Source: 2008-2012 American Community Survey*


**B.    General Population Characteristics**

According to Census figures, population in the City of Englewood has generally grown steadily, ex-cept for a respective 4% and 9% population decline throughout the 1960s and 1970s. A subse-quent population increase occurred throughout the 1980s and 1990s, leading to a reported year 2000 population total in excess of the previous 1960 peak. Bergen County's population has experi-enced similar peaks and valleys. While population in Bergen County increased between 1960 and 1970, population decreased in both the 1970s and 1980s.  Similar to Englewood, Bergen County gained population during the 1990s and 2000s, but an overall population loss occurred in the County between 1970 and 1990.  See Table 7, Population Growth, 1960 to 2010.

**Table 7.  Population Growth, 1960 to 2010**

| Year | Total Population |
|---|---|
| 1960 | 26,057 |
| 1970 | 24,985 |
| 1980 | 23,701 |
| 1990 | 24,850 |
| 2000 | 26,203 |
| 2010 | 27,147 |

*Source:  1960, 1970, 1980, 1990, 2000, 2010 US Census*

Englewood's age distribution, as seen in Table 8, Englewood Age Distribution, 2000 to 2010, is spread somewhat evenly. Considering that the combined population of residents under age 24, and from age 35 to 54 comprises nearly 60% of the total City population, much of the City's popu-lation includes children in families. Between 2000 and 2010, a decrease in population occurred for all age cohorts under 14 years. Conversely, population within all age cohorts from 45 to 69 in-creased during the same time period. Greater gains in population were observed in the older age cohorts, particularly in the 62 to 64 age group, which saw a 35% increase between 2000 and 2010.

Due to these fluctuations in the age of the overall population, median age in the City increased slightly between 2000 and 2010, from 37.2 to 38.9.

**Table 8. Englewood Age Distribution, 2000 to 2010**

| Age Cohort | 2000 | | | 2010 | | |
|---|---|---|---|---|---|---|
| | **Male** | **Female** | **Total** | **Male** | **Female** | **Total** |
| Under 5 years | 905 | 909 | 1,814 | 905 | 878 | 1,783 |
| 5 to 9 years | 929 | 849 | 1,778 | 860 | 831 | 1,691 |
| 10 to 14 years | 898 | 809 | 1,707 | 791 | 755 | 1,546 |
| 15 to 17 years | 470 | 487 | 957 | 518 | 485 | 1,003 |
| 18 and 19 years | 287 | 257 | 544 | 316 | 276 | 592 |
| 20 years | 150 | 141 | 291 | 172 | 131 | 303 |
| 21 years | 121 | 130 | 251 | 153 | 147 | 300 |
| 22 to 24 years | 420 | 443 | 863 | 439 | 463 | 902 |
| 25 to 29 years | 823 | 868 | 1,691 | 909 | 960 | 1,869 |
| 30 to 34 years | 1,047 | 1,092 | 2,139 | 1,009 | 1,024 | 2,033 |
| 35 to 39 years | 1,032 | 1,140 | 2,172 | 983 | 1,003 | 1,986 |
| 40 to 44 years | 939 | 1,052 | 1,991 | 918 | 1,035 | 1,953 |
| 45 to 49 years | 877 | 1,005 | 1,882 | 913 | 1,030 | 1,943 |
| 50 to 54 years | 787 | 1,087 | 1,874 | 894 | 1,094 | 1,988 |
| 55 to 59 years | 671 | 851 | 1,522 | 826 | 955 | 1,718 |
| 60 and 61 years | 239 | 288 | 527 | 302 | 357 | 659 |
| 62 to 64 years | 317 | 392 | 709 | 392 | 566 | 958 |
| 65 and 66 years | 189 | 250 | 439 | 221 | 311 | 532 |
| 67 to 69 years | 262 | 310 | 572 | 307 | 397 | 704 |
| 70 to 74 years | 389 | 514 | 903 | 366 | 521 | 887 |
| 75 to 79 years | 275 | 406 | 681 | 273 | 416 | 689 |
| 80 to 84 years | 168 | 291 | 459 | 207 | 311 | 518 |
| 85 years and over | 125 | 314 | 439 | 186 | 341 | 527 |
| **Total** | **12,318** | **13,885** | **26,206** | **12,860** | **14,287** | **27,147** |
| Median Age | 35.5 | 39.2 | 37.2 | 38.9 | 40.9 | 38.9 |

*Source: 2000, 2010 US Census*

## C.   Household Characteristics

As defined by the Census Bureau, a household includes all persons who occupy a single housing unit, regardless of blood relation. Thus, a household may also include a group of unrelated individuals sharing group quarters. The Census further identifies a family as a group of persons including a householder and one or more persons related by blood, marriage or adoption, all living in the same household. In 2010 there were 10,057 households in the City, with an average of 2.68 persons per household and an average of 3.24 persons per family.  Approximately 81% of the City's total population resides within families; of these family households, approximately 67% were comprised of married couples with or without children. Additionally, 33% of all households in Englewood were comprised of non-family households.

### D.  Income Characteristics

The City of Englewood generally mirrors Bergen County in terms of the percentage breakdown of wage earners highlighted within Table 9, Household Income – City of Englewood, 2012.  Approximately 37% of households in Englewood earned incomes over $100,000 in 2012 compared to 42% in Bergen County. Where 13% of households in the County earned incomes greater than $200,000 annually, approximately 12% did so in the City of Englewood. On the other side of the income scale, 30% of households in Bergen County earned under $50,000 per year, as opposed to 38% of households in the City of Englewood. As such, County wage earners have greater median household incomes and median family incomes than those in the City of Englewood.  According to the 2012 American Community Survey, median household income in Englewood was $69,557, as opposed to $84,255 in Bergen County. Similarly, the 2012 American Community Survey indicated that median family income in Englewood was $86,741 as compared to $102,653 in Bergen County.

The poverty threshold in 2012, as defined by the U.S. Census Bureau, was $11,945 for a one-person household under age 65 and $23,492 for a household that includes a family of four.  Census data does not provide a breakdown of household income by household size. However, it does provide information concerning individuals and families under the poverty threshold.  According to the 2012 American Community Survey, of the total population in which poverty status is determined, approximately 12% live below the poverty level in the City. This percentage is greater than Bergen County as a whole, in which approximately 7% of County residents fall below the Census poverty level. The 2012 American Community Survey data also indicates that approximately 9% of families live below the poverty level in Englewood.

**Table 9.  Household Income - City of Englewood, 2012**

| Income Range | 2012 No. of Households |
|---|---|
| Less than $10,000 | 707 |
| $10,000 - $14,999 | 624 |
| $15,000 - $19,999 | 339 |
| $20,000 - $24,999 | 484 |
| $25,000 - $29,999 | 330 |
| $30,000 - $34,999 | 445 |
| $35,000 - $39,999 | 291 |
| $40,000 - $44,999 | 469 |
| $45,000 - $49,999 | 336 |
| $50,000 - $59,999 | 622 |
| $60,000 - $74,999 | 1,010 |
| $75,000 - $99,999 | 965 |
| $100,000 - $124,999 | 1,100 |
| $125,000 - $149,999 | 588 |
| $150,000 - $199,999 | 918 |
| $200,000 or more | 1,249 |
| **Total** | **10,477** |
| Median Household Income | $69,557 |
| Median Family Income | $86,741 |

*Source:  2008-2012 American Community Survey*

## E.    *Employment Characteristics*

Table 10, <u>Employment Status for Population 16 Years and Over</u>, provides insight into the number of employed and unemployed persons in the City of Englewood. Of the total persons 16 years and over, 64% are employed, 5% are unemployed, and 31% do not participate in the labor force.

**Table 10.  Employment Status for Population 16 Years and Over**

| Employment Status | Persons |
|---|---|
| Total population 16 years and over | 21,633 |
| Employed persons in the civilian labor force | 13,872 |
| Unemployed persons in the civilian labor force | 1,111 |
| Persons not in the labor force | 6,650 |

*Source:  2008-2012 American Community Survey*

Table 11, <u>Distribution of Employment by Industry, Employed Englewood Residents, 2012</u> indicates the distribution of employment by industry for employed City residents. The four industries that captured the largest portion of the employed population in Englewood were educational services, and health care and social assistance at 28%; professional, scientific, and management, and administrative and waste management services at 11%; finance and insurance, and real estate and rental and leasing at 11%; and retail trade at 10%.

**Table 11.  Distribution of Employment by Industry, Employed Englewood Residents, 2012**

| Industry | Units (Jobs) |
|---|---|
| Agriculture, forestry, fishing and hunting, mining | 13 |
| Construction | 399 |
| Manufacturing | 1,267 |
| Wholesale trade | 758 |
| Retail trade | 1,366 |
| Transportation, warehousing and utilities | 706 |
| Information | 642 |
| Finance and insurance, and real estate and rental and leasing | 1,483 |
| Professional, scientific, and management, and administrative and waste management services | 1,576 |
| Educational services, and health care and social assistance | 3,867 |
| Arts, entertainment, and recreation, and accommodation and food services | 679 |
| Other services, except public administration | 811 |
| Public administration | 305 |
| **Total Employed Civilians** | **13,872** |

Source:  2008-2012 American Community Survey

## 4.   THIRD ROUND FAIR SHARE PLAN: 2014 REVISION

### A.   *Overview*

The City of Englewood's Third Round affordable housing obligation consists of three parts: (1) rehabilitation share; (2) fulfillment of a prior round affordable housing obligation; and (3) a prospective obligation.  Per the validated portions of COAH's Substantive Rules, COAH has calculated Englewood's required Third Round rehabilitation share as 194 units (as provided for in Appendix B of COAH's Substantive Rules), and a prior round obligation of 152 units (per Appendix C in COAH's Substantive Rules).  The prospective obligation of 95 units has been determined pursuant to the aforementioned Amendment to the Settlement Agreement between ERA South, the City of Englewood and FSHC.

**Table 12.  Rehabilitation Share, Prior Round and Prospective Housing Obligation**

| Component | Obligation (dwelling units) |
|---|---|
| 1. Rehabilitation | 194 |
| 2. Prior Round Obligation | 152 |
| 3. Prospective Obligation | 95 |

### 1.   Rehabilitation Share

COAH's Third Round rehabilitation share for the City of Englewood is 194 units.  COAH has utilized the number of substandard housing units identified in the 2000 US Census to determine this figure.  COAH rules indicate that any units rehabilitated in Englewood after April 1, 2000 can be credited against its Third Round rehabilitation share obligation.  Since April 1, 2000, the City Housing Authority has completed interior improvements to the 152-unit Tibbs Senior Housing development, and has nearly completed an exterior renovation of the building façade.  In addition, 48 City homeowners have utilized low-interest loans from the Bergen County Home Improvement Program to rehabilitate dwellings since April 1, 2000 (See Table 14, City of Englewood - Rehabilitated Units Since April 1, 2000).  COAH rules indicate that in order to receive credit for units rehabilitated in the Third Round, a minimum of $10,000 per unit must be spent for rehabilitation.  Upon application of a $10,000 per-unit monetary average to the overall value of the above-rehabilitated units, the City is eligible to receive credit for 129 units.  This represents the total monetary value of rehabilitation improvements divided by $10,000.  In order to fulfill the remaining 65-unit rehabilitation share, the City proposes to provide ongoing rehabilitation of units through the Englewood Housing Authority and continued use of the Bergen County Home Improvement Program.

**Table 13.  City of Englewood - Rehabilitated Units since April 1, 2000**

| ADDRESS | BLOCK | LOT | LOAN/FUNDS EXPENDED ($) | # OF UNITS | YEAR |
|---|---|---|---|---|---|
| *City of Englewood Eligible Rehabilitation Units - Tibbs Senior Housing* | | | | | |
| Tibbs Senior (111 West Street) | 910 | 10.01 | | 152 | |
| Kitchen Remodeling (All units) | | | $207,000 | | 2002 |
| Elevator Repair | | | $89,440 | | 2008 |
| Exterior Masonry Repair/Protection | | | $240,000 | | 2009 |
| *Bergen County Home Improvement Program Loans* | | | | | |
| 253 W. Englewood Avenue | 2012 | 14 | $25,000 | 2 | 2008 |
| 46 Belmont Street | 301 | 5 | $10,500 | 1 | 2005 |
| | | | $14,300 | | 2013 |
| 50 Lafayette Avenue | 2301 | 21 | $21,400 | 1 | 2001 |
| 184 Third Street | 2113 | 11 | $17,500 | 1 | 2004 |
| 298 W. Forest Avenue | 2212 | 4 | $10,000 | 2 | 4/1/2000-2009 |
| 186 Third Street | 2113 | 10 | $15,980 | 1 | 2003 |
| 368 Washington Place | 2003 | 2 | $14,500 | 1 | 2003 |
| 11 Cottage Place | 2301 | 14 | $16,930 | 1 | 2002 |
| 161 Crescent Court | 202 | 6 | $17,500 | 1 | 4/1/2000-2009 |
| 377 Tryon Avenue | 207 | 17 | $14,300 | 1 | 2001 |
| 301 Mary Street | 2905 | 25 | $5,400 | 1 | 2005 |
| 124 First Street | 2209 | 5 | $18,000 | 1 | 2000 |
| 67 Knapp Place | 3010 | 16 | $25,000 | 2 | 2004 |
| 91 Reis Avenue | 308 | 3 | $17,500 | 1 | 2006 |
| 163 Third Street | 2112 | 2 | $17,481 | 1 | 2001 |
| 280 Garden Street | 2106 | 9 | $17,500 | 1 | 2003 |
| 44 Brookway Street | 2008 | 12 | $25,000 | 2 | 2005 |
| 250 Franklin Road | 2109 | 12 | $17,500 | 1 | 2000 |
| 127 Oak Street | 2014 | 12 | $8,050 | 1 | 2001 |
| 170 W. Demarest Avenue | 606 | 5 | $25,000 | 2 | 2006 |
| 23 E. Forest Avenue | 2802 | 21 | $17,500 | 1 | 2003 |
| 63 Brook Avenue | 806 | 9 | $13,450 | 1 | 2001 |
| 103 Glenbrook Parkway | 306 | 9 | $17,500 | 1 | 2003 |
| 20 Cleveland Street | 314 | 13 | $13,800 | 1 | 2003 |
| 305 Levinsohn Place | 311 | 9 | $13,050 | 1 | 2003 |
| 11 Belmont Street | 302 | 22 | $12,400 | 1 | 2004 |
| 258 Thomson Avenue | 2219 | 5 | $15,698 | 1 | 2001 |
| 15 Belmont Street | 302 | 23 | $30,165 | 1 | 2007 |
| 120 Wood Street | 2014 | 7 | $24,125 | 1 | 2006 |
| 201 Warren Street | 2201 | 20 | $20,300 | 1 | 2006 |
| 381 Greenleaf Street | 202 | 14 | $17,490 | 1 | 2005 |
| 110 Otsego Place | 601 | 40 | $17,500 | 1 | 2003 |
| 66 Spring Lane | 1209 | 2 | $23,900 | 2 | 2001 |
| 64 Herzog Place | 308 | 10 | $20,225 | 1 | 2001 |
| 146 Morse Place | 602 | 6 | $2,850 | 1 | 2001 |
| 154 Warren Street | 2207 | 6 | $17,425 | 1 | 2003 |
| 354 Howell Road | 304 | 3 | $17,450 | 1 | 2010 |
| 149 Slocum Avenue | 508 | 23 | $21,800 | 1 | 2009 |
| 17 Cleveland Street | 612 | 14 | $22,200 | 1 | 2010 |
| 123 E. Sheffield Avenue | 3008 | 32 | $12,900 | 1 | 2010 |
| 414 Tyron Avenue | 302 | 1 | $26,500 | 1 | 2012 |
| 243 Epps Avenue | 2210 | 3 | $16,250 | 1 | 2012 |
| *Total Rehabilitation Funds Utilized: Englewood Housing Authority & Bergen County Home Program* | | | $1,285,259 | 200 | |
| *Eligible Rehabilitation Credits (Total Rehab Funds/$10,000)* | | | 129 | | |

## 2.    Prior Round Obligation

COAH regulations permit municipalities to receive credit for affordable housing activity completed during and also preceding the prior round as long as these units meet certain affordability criteria. COAH has recalculated Englewood's prior round obligation as 152 total units.  The City is sufficiently able to meet its prior round affordable obligation through credit for 134 previously constructed affordable units, a five-unit group home constructed in the Third Round, and 13 eligible rental bonus credits.  Table 15 provides a summary of the affordable units that are eligible for credit toward the City's prior round obligation for the period between 1987 and 1999.  This is followed by a detailed explanation of each of the projects.

### Table 14.  City of Englewood – Prior Round Affordable Obligation

| Development | Type | Total Credit |
|---|---|---|
| i. Westmoor Gardens (1984) | 64-unit family rental; No bonus (prior cycle credit-1980 to 1986) | 64 |
| ii. Shepherd House (1998) | 12-unit group home; family rental; *Bonus eligible (12)* | *24 (12 + 12)* |
| iii. Independence Hall (1998) | 8-unit group home; family rental; *Bonus eligible (1.5)* | *9.5 (8 +1.5)* |
| iv. J-ADD (UJC) Group Home (1988) | 4-unit group home; family rental; Bonus eligible but exceeds maximum bonus | 4 |
| v. PSCH-Phelps Avenue (1999) | 4-unit group home; family rental; Bonus eligible but exceeds maximum bonus | 4 |
| vi. PSCH-Knickerbocker Rd. (2002) | 4-unit group home; family rental; Bonus eligible but exceeds maximum bonus | 4 |
| vii. 167-169 Morse (1993-1994) | 4-unit family; reconstruction (fire) | 4 |
| viii. Garrett Apartments (1982) | 34-unit family rental; No bonus (prior cycle credit-1980 to 1986) | 34 |
| SUB-TOTAL FOR PRIOR ROUND (WITH ELIGIBLE RENTAL BONUS) | | 147.5 |
| | | |
| ix. First Baptist Church (2009) | 5-unit group home; family rental; bonus–eligible but exceeds maximum bonus | 5 |
| TOTAL WITH ADDITION OF THIRD ROUND PROJECT | | 152.5 |
| *Bonus* = 0.25 x (total obligation – prior cycle credits) | | |
| = 0.25 x (152 – 64 (Westmoor Gardens) - 34 (Garrett Apartments) = *13.5* | | |

### a.    Affordable Housing Units Eligible for Prior Round Credits

#### i.    Westmoor Gardens (Block 910, Lot 8.01) – 64 Project-Based Section 8 Units

The City of Englewood Housing Authority manages Westmoor Gardens, a 64-unit Project-Based Section 8 development on West Street constructed in 1984.  Per COAH rules, all 64 units are eligible for credit in the prior round as "prior cycle" credits (i.e., built between 1980 and 1986).  While these units are family rentals, because they are prior cycle units, they are not eligible for rental bonus credits.

*ii. Shepherd House (Block 605, Lot 2) – 12 Single-Room Occupancy Rental Units*

The Bergen County Community Action Partnership (BCCAP) operates a single-room occu-
pancy supportive and special needs housing development on Demarest Avenue known as
Shepherd House. BCCAP reconstructed the 12-unit building for occupancy in 1998. This
project is eligible for credit in the second round, as well as bonus rental credits. Thus, 24 to-
tal units of credit are generated by Shepherd House.

*iii. Independence Hall (Block 605, Lot 15) – 8 Single-Room Occupancy Rental Units*

The Bergen County Community Action Partnership (BCCAP) operates a single-room occu-
pancy rental development known as Independence Hall. BCCAP reconstructed the building
into an 8-unit transitional development reserved for mentally ill and chemically dependent
persons in 1998. Since the building was entirely reconstructed (not merely rehabilitated), it is
eligible for prior round credits. As a rental project, it is also eligible for rental bonuses. How-
ever, since Englewood is eligible for only 13 units of rental bonuses, only 1 unit is counted as
a rental bonus.

*iv. J-ADD (formerly UJC) Group Home (Block 111, Lot 12) – 4-Unit Supportive Housing*

The Jewish Association for Developmental Disabilities (J-ADD) operates a four-bedroom
group home occupied by eligible developmentally disabled persons. The home began oper-
ating in 1988 through a program funded by the New Jersey Department of Human Services.[1]

*v. PSCH-Phelps Avenue (Block 3006, Lot 36) – 4-Unit Supportive Housing*

Promotions Specialized Care and Health (PSCH) manages a four-bedroom supportive and
special needs housing development for disabled persons on Phelps Avenue. The group
home has operated since 1999.

*vi. PSCH-Knickerbocker Rd. (Block 401, Lot 21) – 4-Unit Supportive Housing*

PSCH operates an additional four-bedroom supportive and special needs housing develop-
ment for disabled persons on Knickerbocker Road. The group home has operated since
2002.

*vii. 167-169 Morse Place (Block 601, Lot 32) – 4-Unit Affordable Rental*

The Englewood Housing Authority reconstructed the building at 167-169 Morse, which had
been damaged by fire, into four two-bedroom affordable family rental units in 1993-1994.

---

[1] In previous COAH documentation, the group home was referenced as the United Jewish Community of
Bergen County (UJC) group home.

The Housing Authority currently utilizes Section 8 vouchers to fill these units.  As a project-based Section 8 Housing project, it is eligible for 4 credits in the prior round.

### viii.  Garrett Apartments (Block 2408, Lot 21) – 34 Project Based Section 8 Units

Thirty-four (34) apartments within the Garrett Apartments were created through a reconstruction project within an existing building in 1982 as a Project-Based Section 8 affordable development.  Within the past few years the affordability controls for the Garrett Apartments expired, and the owner of the building decided against extending the controls.  However, the City is eligible to count this project toward its prior round obligation as "prior cycle" credits.

### ix.   First Baptist Church (Block 2011, Lot 28) – 5-Unit Supportive Housing

The First Baptist Church of Englewood completed a reconstruction project resulting in a five-unit supportive and special needs housing development for homeless women and their families.  The dwelling began operation in mid-2009 and is located adjacent to the Church.

**b.   Prior Round Rental Obligation and Rental Bonus**

Per COAH's prior round Substantive Rules, certain minimum and maximum parameters are applicable to Fair Share Plans.  For example, no community may have more than 50% of its obligation satisfied by Regional Contribution Agreements (Englewood has zero (0)), and no more than 25% of the units can be age-restricted (again Englewood has none).  The only parameters applicable to Englewood's prior round obligation are the rental obligation—which is a minimum of 25% of the total obligation (minus prior cycle credits[2]), and the maximum rental bonus, which is equal to the minimum rental obligation.  As applied to Englewood, there are two projects built between 1980 and 1986 which are considered prior cycle credits, and thus which must be deducted from the minimum rental obligation.  The two projects are Westmoor Gardens and the Garrett Apartments.  Thus, Englewood's rental obligation is calculated as follows:

> 25% x Prior Round Obligation - Prior Cycle Credits
> = 0.25 x (152 – 64 (Westmoor Gardens) – 34 (Garrett Apartments) = 13.5, or rounded, 13.0 units

Englewood has exceeded its rental obligation of 13 units; in fact, all of the projects that Englewood is utilizing to satisfy its prior round obligation are rental projects.

In terms of the maximum bonus that may be received, a municipality may receive rental bonuses equal to, but no more than, the required rental obligation, which in this case is 13.0 units.  The City of Englewood is eligible for 13.0 rental bonus credits based upon 12 bonus credits from Shepherd House and 1 bonus unit from Independence Hall.

---

[2] Prior cycle credits are units created and occupied between April 1, 1980 and December 15, 1986.

3.    **Prospective Obligation**

Pursuant to the Settlement Agreement between Englewood, ERA South, and FSHC, the City of Englewood has a 95-unit Third Round affordable housing obligation. Table 15, City of Englewood – Third Round Growth Share Plan provides a summary of the City's proposed Third Round affordable plan, which consists of a mix of already-constructed and proposed affordable housing projects to be developed during the Third Round period.  More detailed explanations of each project follow Table 18.

**Table 15.  City of Englewood – Third Round Prospective Plan**

| Development | Type | Total Credit |
|---|---|---|
| i. Westmoor Gardens (1984) | 64 units; Extension of expiring controls | 64 |
| II. Habitat for Humanity (2006-2008) | 4-unit for sale family | 4 |
| iii. Foti | 3-unit addition to existing development | 3 |
| iv. Vantage Health (2009/2011) | 3-unit group home | 3 |
| vii. Englewood Avenue Senior (Future) | 6-unit senior rental | 6 |
| viii. Flatrock Square (Future) | 15 units, low and moderate income units | 15 |
| | SUBTOTAL FOR THIRD ROUND | 95 |
| | *TOTAL | 95 |

*i.*    *Westmoor Gardens (Block 910, Lot 8.01) – 64 Unit Extension of Controls*

In the next five years, the City is proposing to enter into an agreement with the City of Englewood Housing Authority to impose or extend the affordability controls for another 30 years on the existing 64-unit Project-Based Section 8 rental development known as Westmoor Gardens, which is eligible for credit under COAH's Third Round rules. To the extent that this requires that some or all of these units must be physically rehabilitated in order to be eligible for credit, the City will provide funds (which it may seek from other sources) to fund the rehabilitation.

*ii.*    *Habitat for Humanity (Block 2112, Lots 4.01, 4.02; Block 2114, Lots 6.01, 6.02, 7.01, 7.02) – 4 For-Sale Affordable Family Units*

Habitat for Humanity of Bergen County completed two two-family dwellings on Third Street (a total of four dwelling units).  Each of the units is currently occupied by eligible families and can be included for Third Round COAH credit.

*iii.  Foti (Block 2409, Lot 30) – 3 Affordable Rental Units*

The Englewood Housing Authority utilized funding from its HOME grant to construct an addition to the existing 8-unit Foti development at 115 Humphrey Street in the form of three affordable rental units, which are eligible for credit under COAH's Third Round rules.

*iv.  Vantage Health System Group Home (Block 2006, Lot 2) – 3 Unit Supportive Housing*

Vantage Health System has developed a three-unit supportive and special needs housing development within an existing dwelling on Shepard Avenue, utilizing Neighborhood Stabilization Funding from Bergen County.  This supportive and special needs housing development is consistent with 5:97-6.10 of the COAH rules, which limit eligible credits to "residential health care facilities as licensed and/or regulated by DCA or the New Jersey Department of Health and Senior Services if the facility is located with, and operated by, a licensed health care facility; group homes for people with developmental disabilities and mental illness as licensed and/or regulated by the New Jersey Department of Human Services; permanent supportive housing; and supportive shared living housing.  Long-term health care facilities including nursing homes, and Class A, B, C, D, and E boarding homes do not qualify as supportive and special needs housing."

*v.  Englewood Avenue Senior – 6 Senior Affordable Rental Units*

109 West Englewood LLC is the owner of a 0.18-acre parcel on Englewood Avenue between Armory Street and Bennett Road that contains an existing vacant structure damaged by fire The property owner proposes to complete a reconstruction project on the site which will yield six senior affordable rental units.

*vi.  Flatrock Square – 15 Low- and Moderate-Income Units*

Pursuant to the amended Settlement Agreement involving the City of Englewood, ERA South LLC, and Fair Share Housing Center, a 195-unit multi-family housing project approved at the site will be amended to include 15 units of low- and moderate-income housing (a 7.5% affordable set-aside).  The project, known as Flatrock Square, is located to the north of Route 4.  Of the 15 affordable units, 50 percent will be moderate-income housing and 50 percent will be low-income housing. If the low- and moderate-income units are rental units, 20 percent of the low-income units will be very low-income housing as those terms are defined by N.J.S.A. 52-27D-304.  Also, 20 percent of the units set aside for low- and moderate-income households will be three-bedroom units.

*vi. "Hotel Pad"*

In addition to the 95 units of low- and moderate-income housing credits that will be provided by this plan as set forth above, if pursuant to paragraph 11(B) of the aforementioned settlement agreement, the plaintiffs (ERA South LLC) transfer the so-called "Hotel Pad" (located south of Route 4) to the City of Englewood or its designee, and the City or its designee chooses to develop the "Hotel Pad" for residential uses, 12.5 percent of the housing units constructed on the "Hotel Pad" will be for low- and moderate-income housing.  Fifty percent will be low-income units and 50 percent moderate-income households.  If the low- and moderate-income units are rental units, 20 percent of the low-income units will be units available to very low-income families as defined by NJSA 52:27D-304, and otherwise conform to the standards established in the Uniform Housing Affordability Controls, N.J.A.C. 5:80-26.1 et seq.

## 5.   SUMMARY

The City of Englewood's cumulative fair share obligation (1987 through 2018) consists of a 194-unit rehabilitation share, a 152-unit prior round affordable housing obligation, and a 95-unit Third Round prospective obligation. A summary of the affordable housing mechanisms by which the City of Englewood proposes to meet its rehabilitation share, prior round, and Third Round prospective affordable obligation are as follows:

- *Rehabilitation Share* – Overall, the City is currently eligible to receive 129 rehabilitation credits in pursuit of its 194-unit required rehabilitation share. Englewood's rehabilitation credits have been achieved by way of funds from the Englewood Housing Authority and through the Bergen County Home Improvement Program. Englewood anticipates that the remaining 65 units within its rehabilitation share will be fulfilled through the ongoing rehabilitation of units through the Bergen County Home Improvement Program, and through the continued work of the City Housing Authority.

- *Prior Round obligation* – Englewood's prior round affordable obligation of 152 units and rental obligation has been fulfilled by way of credits for a variety of already-completed affordable housing developments, one supportive and special needs housing development constructed in the Third Round, and eligible rental bonuses. A project-by-project summary of the City's entire prior round obligation is included in Table 14, <u>City of Englewood – Prior Round Affordable Obligation</u>.

- *Third Round Prospective Obligation Share* – Englewood proposes to fulfill its 95-unit Third Round obligation through the extension of the affordability controls within the 64-unit Westmoor Gardens affordable development, through four constructed Habitat for Humanity units, a three-unit expansion of the existing Foti housing development, a three-unit supportive and special needs housing project, a 6-unit senior project on Englewood Avenue, and 15 units at Flatrock Square. A project-by-project summary of the City plan to meet its Third Round Prospective obligation is included in Table 15, <u>City of Englewood–Third Round Prospective Plan</u>.

**CITY OF ENGLEWOOD**

**RESOLUTION #119-05-13-14**

### ENDORSEMENT OF THE HOUSING ELEMENT AND FAIR SHARE PLAN

**WHEREAS,** the Planning Board of the City of Englewood ("Planning Board"), County of Bergen, State of New Jersey, adopted the Housing Element of the Master Plan on May 1, 2014; and

**WHEREAS,** a true copy of the resolution of the Planning Board adopting the Housing Element is attached hereto; and

**WHEREAS,** the Planning Board adopted the Fair Share Plan on May 1, 2014; and

**WHEREAS,** a true copy of the resolution of the Planning Board adopting the Fair Share Plan is attached hereto; and

**WHEREAS,** pursuant to N.J.S.A. 52:27D-313, the Superior Court has the authority to enter an Order granting protection and repose against exclusionary zoning litigation to a municipality that is in compliance with its affordable housing obligations under the Fair Housing Act, N.J.S.A. 52:27D-301, et seq.; and

**WHEREAS,** in connection with the lawsuit captioned ERA South, LLC, et al. v. City of Englewood, et al., Superior Court of New Jersey, Bergen County, Law Division, Docket No. L-233-09 (the "ERA South" matter), the Superior Court has been asked to review the Housing and Element and Fair Share Plan and the zoning ordinances of the City of Englewood ("City") to determine whether the City is in compliance with its affordable housing obligations under the Fair Housing Act, N.J.S.A. 52:27D-301, et seq.; and

**WHEREAS,** the Governing Body desires to endorse the Housing Element and Fair Share Plan adopted by the Planning Board and to submit the same to the Superior Court as abovementioned.

**NOW, THEREFORE, BE IT RESOLVED** that the Governing Body of the City of Englewood, County of Bergen, State of New Jersey hereby endorses the Housing Element and Fair Share Plan as adopted by the Planning Board; and

**BE IT FURTHER RESOLVED** that the Governing Body of the City of Englewood, pursuant to the provisions of N.J.S.A. 52:27D-313, hereby submits the Housing Element and Fair Share Plan and this petition to the Superior Court for review and requests that the Superior Court enter an Order granting the City of Englewood protection and repose against exclusionary zoning litigation for a five year period commencing on the date of the Judgment or until May 31, 2019 whichever occurs first; and

**BE IT FURTHER RESOLVED** that a list of names and addresses for all owners of sites in the Housing Element and Fair Share Plan shall be included with the submission to the Superior Court; and

**BE IT FURTHER RESOLVED** that notice of the hearing on this matter requesting an Order granting the City of Englewood protection and repose against exclusionary zoning litigation shall be provided in the form and manner as directed by the Superior Court.

| COUNCIL | MOTION | AYES | NAYS | ABSTAIN | ABSENT |
|---------|--------|------|------|---------|--------|
| Algrant |  | X |  |  |  |
| Forman |  | X |  |  |  |
| Skurnick |  | X |  |  |  |
| Cohen | X | X |  |  |  |
| Hamer |  | X |  |  |  |

Resolution #119-05-13-14 Page 2 of 2

I do hereby certify that the foregoing is a true and exact
copy of a Resolution adopted by the Council of the City
of Englewood.

Lauren P. Vande Vaarst, RMC
City Clerk
City of Englewood