**BEATTIE PADOVANO, LLC**
John J. Lamb, Esq. (024361977)
Martin R. Kafafian, Esq. (025832013)
50 Chestnut Ridge Road, Suite 208
Montvale, New Jersey 07645
Tel: (201) 573-1810
Attorneys for *Amicus Curiae*, Concerned
 Citizens of Englewood, Inc., a Non-Profit
 Corporation of the State of New Jersey

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| 431 E PALISADE AVENUE REAL ESTATE, LLC and 7 NORTH WOODLAND STREET, LLC, on behalf of themselves and prospective residents, JOHN and JANE DOES 1-10, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF ENGLEWOOD and CITY COUNCIL OF ENGLEWOOD, <br><br> Defendants. | Civil Action No. 2:19-cv-14515-BRM-JAD <br><br> ***Document Electronically Filed*** |

---

**BRIEF OF *AMICUS CURIAE*, CONCERNED CITIZENS
OF ENGLEWOOD, INC., IN OPPOSITION TO PLAINTIFFS'
ORDER TO SHOW CAUSE SEEKING A PRELIMINARY INJUNCTION
AND IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR
JUDGMENT ON THE PLEADINGS**

---

**Of Counsel and On the Brief:**
    John J. Lamb, Esq.

**On the Brief:**
    Martin R. Kafafian, Esq.

3546086_1\190533

## CORPORATE DISCLOSURE STATEMENT

*Amicus Curiae* is not a publicly traded corporation. There are no parent corporations or other publicly held corporations that own 10% or more of *Amicus Curiae*.

# TABLE OF CONTENTS

**CORPORATE DISCLOSURE STATEMENT** ............................................ i

**TABLE OF CONTENTS** ............................................................. ii

**TABLE OF AUTHORITIES** ....................................................... iv

**STATEMENT OF INTEREST** ...................................................... 1

**SUMMARY OF ARGUMENT** ...................................................... 1

**ARGUMENT** ..................................................................... 3

    **POINT I: THE ACTION IS NOT YET RIPE WHEN THE DEVELOPER OBTAINED A MUNICIPAL DECISION NOT TO TAKE ACTION ON AN INFORMAL REZONING REQUEST AND HAS NUMEROUS OTHER AVENUES TO PURSUE** ................................................................. 3

    **POINT II: THE CITY HAD NO OBLIGATION TO REZONE; SINCE THE CITY HAS BEEN CRITICIZED FOR ITS FAILURE TO RENDER A DECISION AND/OR ITS DECISION TO TAKE NO ACTION, THE OBLIGATION OF THE CITY MUST BE CAREFULLY REVIEWED** .................... 12

    **POINT III: AN APPLICATION TO THE BOARD OF ADJUSTMENT WOULD NOT BE FUTILE** ................................ 25

    **POINT IV: JUDICIAL REZONING IS ALSO NOT APPROPRIATE HERE WHERE THERE ARE NUMEROUS SITE PLAN ISSUES** ......................................................... 31

    **POINT V: LOCATION OF PART OF THE PROPERTY IN THE BOROUGH OF ENGLEWOOD CLIFFS REQUIRES A USE VARIANCE** ............................................................ 35

    **POINT VI: CARE ONE IS NOT ENTITLED TO A PRELIMINARY INJUNCTION BECAUSE (1) IT HAS NOT**

**DEMONSTRATED A LIKELIHOOD OF SUCCESS; (2) THERE IS NO THREAT OF IRREPARABLE HARM; (3) GRANTING THE INJUNCTION WOULD STRIP THIRD PARTIES OF THEIR CONSTITUTIONAL RIGHTS; AND (4) THE PUBLIC INTEREST WOULD NOT BE SERVED BY THE REQUESTED INJUNCTION**................................................ 36

**CONCLUSION**............................................................................ 37

# TABLE OF AUTHORITIES

## CASES

*Assisted Living Associates of Moorestown, LLC v. Moorestown Twp.,*
    996 F. Supp. 409 (D.N.J. 1998) ............................................................ 9

*Burbridge v. Mine Hill Twp.,*
    117 N.J. 376 (1990) ........................................................................... 32

*Conlon v. Board of Public Works of City of Paterson,*
    11 N.J. 363 (1953) ............................................................................. 18

*Feiler v. Fort Lee Bd. of Adj.,*
    240 N.J. Super. 250 (App. Div. 1990) ................................................ 22

*Hovsons, Inc. v. Twp. of Brick,*
    89 F. 3d 1096 (3d Cir. 1996) ............................................................... 9

*Kinderkamack Road Assoc., LLC v. Mayor and Counsel of the Bo. of Oradell,*
    421 N.J. Super. 8 (App. Div. 2011) .................................................... 36

*Nuckel v. Little Ferry Planning Bd.,*
    208 N.J. 95 (2011) ............................................................................. 36

*Palisades Props., Inc. v. Brunetti,*
    44 N.J. 117 (1965) ............................................................................. 18

*Pennsylvania Care, LLC v. Ashley Borough,*
    2010 WL 4955601 (M.D. Pa. Nov. 30, 2010) ................................. 7, 8

*Price v. Himeji,*
    214 N.J. 263 (2013) ........................................................................... 30

*Puleio v. North Brunswick Bd. of Adj.,*
    375 N.J. Super. 613 (App. Div. 2005) ................................................ 30

*Pullen v. Twp. of South Plainfield,*
    291 N.J. *Super.* 1 (App. Div. 1996) ................................................... 32

*Reilly v. City of Harrisburg,*
    858 F.3d 173, 176 (3d Cir. 2017) ...................................................... 36

*Riggs v. Long Beach Twp.,*
  109 N.J. 601 (1988) ............................................................. 19

*Riya Finnegan LLC v. Twp. Council of Twp. of S. Brunswick,*
  197 N.J. 184 (2008) ....................................................... 19, 20

*Rumson Estates, Inc. v. Fair Haven,*
  177 N.J. 338 (2003) ............................................................. 12

*Speakman v. Mayor and Council of Bo. of North Plainfield,*
  8 N.J. 250 (1951) ................................................................. 19

*Taxpayers Ass'n of Weymouth Twp., Inc. v. Weymouth Twp.,*
  80 N.J. 6 (1976) .................................................................. 18

## STATUTES, REGULATIONS, RULES OF COURT & TREATISES

New Jersey Constitution, art. IV, § VI ¶ 2 ...................................... 8

*N.J.S.A.* 40:55D-12 ................................................................. 8

*N.J.S.A.* 40:55D-26 ................................................................. 4

*N.J.S.A.* 40:55D-62 ............................................................... 12

*N.J.S.A.* 40:55D-64 ................................................................. 4

*N.J.S.A.* 40:55D-70 ............................................................... 31

*N.J.S.A.* 40:55D-73 ................................................................. 5

*N.J.S.A.* 40:55D-89 ................................................................. 4

*New Jersey Zoning & Land Use Administration (2019 Edition)* by Cox and Koenig
  .................................................................................. *passim*

## STATEMENT OF INTEREST

The Concerned Citizens of Englewood, Inc. (the "Concerned Citizens"), is a non-profit corporation organized under the laws of the State of New Jersey. The Concerned Citizens' members include neighboring land owners and residents of the City of Englewood. Concerned Citizens advocates the real-estate and land-use interests of its members. As a representative of neighboring land owners and residents of the City of Englewood, Concerned Citizens is uniquely well-situated to address land use issues, local zoning laws, and the practical impact that Plaintiffs' proposed development will have on the community, its residents, and the local zoning scheme.

Concerned Citizens files this brief pursuant to a Stipulation and Order entered by this Court on August 22, 2019.

No party's counsel has authored this Brief in whole or in part. No party and no party's counsel has contributed money intended to fund the preparation or submission of this Brief. No person other than the *amicus curiae*, its members, or its counsel, contributed money intended to fund the preparation or submission of this Brief.

## SUMMARY OF ARGUMENT

The Verified Complaint was filed by Plaintiffs on or about June 28, 2019, together with the Order to Show Cause seeking a preliminary injunction.

Thereafter, the Court issued a Scheduling Order which required the Brief of the City of Englewood ("City") to be filed by August 21, 2019.  At the first case management conference, the Court directed the City to render a decision at its next City Council meeting, which took place on July 23, 2019.  The City verbally decided to take no action and did not approve the rezoning request.

By Consent Order submitted to the Court, the parties agreed to allow the Concerned Citizens of Englewood, Inc., a non-profit corporation (the "Concerned Citizens") to participate as *amicus curiae*.  The Court permitted same when it so ordered the Consent Order on August 22, 2019, affording the Concerned Citizens seven days to reply to the preliminary injunction application and opposition brief and other submissions of the Defendant City by August 28, 2019.  This Brief is intended to offer the comments and position of the Concerned Citizens as *amicus curiae*.

The Concerned Citizens' goal is to engage in limited participation if and when it feels appropriate and to the extent it will be helpful to the Court.  The Concerned Citizens is not going to undertake an exhaustive discussion of the case law and repeat what is already briefed by the City, whose position thus far we support, in part for the reasons set forth in the City's Brief.  The Concerned Citizens agrees with the City's position that the action is not yet ripe and that it would not be "futile" for the Plaintiffs to apply to the Englewood Board of

2

Adjustment.  The Concerned Citizens adds, however, that Plaintiff could take certain other actions within the scope of the New Jersey Municipal Land Use Law ("MLUL") applicable to all developers in New Jersey, which was never discussed in the Plaintiffs' moving brief (and not fully addressed in the City's Opposition Brief), as other alternatives available to Plaintiff.

## ARGUMENT

## POINT I

## THE ACTION IS NOT YET RIPE WHEN THE DEVELOPER OBTAINED A MUNICIPAL DECISION NOT TO TAKE ACTION ON AN INFORMAL REZONING REQUEST AND HAS NUMEROUS OTHER AVENUES TO PURSUE

### *A.     THE ALTERNATIVES AVAILABLE TO A DEVELOPER IN GENERAL*

When a developer seeks to develop its property and the use is not permitted in the relevant zoning district in the municipality, the developer can proceed in a number of ways.  It can:

1. Make an "informal" request to the Council for a rezoning of its property. Note:  There is no obligation for the City to rule on such a request unless there is an ordinance requiring a decision.

2. Make a "formal" request and apply to the City for a zoning change, but only when there is an ordinance and procedure by City code that permits same.
Note:  In this case, there is no such procedure and Englewood has not adopted such an Ordinance, so there is no obligation for the City to make a decision on rezoning property.  There is no formal procedure available.

3. Apply to the Planning Board to recommend a rezoning to the City Council.

3

Note:  There is again no obligation of the Planning Board to take such action by City Ordinance.

4. Apply to the Planning Board to review and amend the Master Plan.
Note:  Again, there is no obligation of the Planning Board to do so, other than by Municipal Land Use Law ("MLUL"), which previously required the Planning Board to undertake a Master Plan review by a municipality every six years, pursuant to N.J.S.A. 40:55D-89, but which was later expanded to require such a review every ten years by statutory amendment in 2011.

5. Make application to the Englewood Board of Adjustment ("Board") for a use variance and site plan approval.
Note:  The Board is required to make a decision in 120 days by law.

This Developer has only sought a zone change on an informal basis.  The City's declination is not an appealable decision, though.  And even if the City did allow the rezoning, the prospects of an Ordinance with a zone change would still need to be referred to the City Planning Board to determine whether the rezoning is consistent with the Master Plan and to provide comments on same.  *See N.J.S.A. 40:55D-26—64.*  Simply put, the informal request does not count as an "application" for purposes of determining "ripeness," despite Plaintiffs' exaggerated allegations in its Complaint that it made an "application."

As soon as the Plaintiffs, 431 E Palisade Avenue Real Estate, LLC and 7 North Woodland Street, LLC (hereinafter collectively the "Plaintiff," the "Developer," or "Care One"),[1] acquired the subject property or determined its

---

[1] We note Plaintiffs acknowledge their affiliation with Care One, so that entity is sometimes referred to in this Brief.

development plans, it knew that it needed a use variance.  As the Plaintiff is an

affiliate of Care One, Care One is no stranger to the Board of Adjustment process

for its assisted living facilities.  For example, it previously filed an application to

the Oradell Board of Adjustment, and when that was denied, challenged same in

Federal Court.  *See, Care One, LLC v. Zoning Board of Adjustment of the Borough

of Oradell, et al*., Case No. 2:08-cv-06217-POS-ES.  Plaintiff, with its team of

experienced land use counsel and experts, submitted 764 pages of filings in

connection with its Verified Complaint and Order to Show Cause in this case.

Plaintiff has assembled every site plan and use variance expert that it would

normally need.  It has a planner, an engineer, and a traffic expert.  It has

experienced land use counsel.  Plaintiff knew quite well what it needed—at the

beginning of the process.  The circumstances and conditions show it just attempted

to avoid the normal procedures.

      This process is no surprise to any experienced developer with a substantial

project.  But the Developer did not choose the only option that would have

guaranteed it a decision—a use variance application.  It chose an option which did

not guarantee a decision and now tries to use that "failure to rezone" to seek a

judicial rezoning of the property and make this Court a "super land use board."

      We note that the MLUL requires that decision by the Board of Adjustment is

required to be made in 120 days under *N.J.S.A.* 40:50D-73 (although that time limit

is frequently extended in the case of large and complex applications).  Indeed, although its initial request to the City of Englewood was in January of 2019, the Developer did not file the application to the Englewood Board of Adjustment. With all the professionals already lined up, and with the work that could have been done, and a site plan already prepared, if Plaintiff filed an application with the Englewood Board of Adjustment, it would have already been decided by now. Instead, this Plaintiff decided to seek a "judicial rezoning" of the property and have the Court act as a replacement to the land use board.

The Plaintiff has not cited one case where the board of adjustment or land use board was by-passed before the filing of the Federal action.  This Developer wanted to avoid the notice requirement.  It wanted to avoid a careful review of the project by the City's professionals.  It wanted to avoid a hearing with interested parties involved.  Instead it threatened the City if it did not rezone.

We should also note that the absence of any case law allowing resort to the Federal Courts so early in the development process is ample proof that Plaintiff's attempt to nullify the zoning ordinances is unprecedented.  Indeed, the Court ruling in favor of such an injunction would open the proverbial flood gates for additional litigation by many developers.  If all that was required is that a developer could send a letter requesting a rezoning that was denied or on which no action was taken, so as to avoid the limitations and provisions of the zoning ordinances, then

6

the Governing Body of any municipality would be flooded with such letters—and

the courts would then be flooded with complaints alleging "ripeness" based solely

upon a municipal discretionary decision not to rezone.

The case decided by the Defendant City in *Pennsylvania Care, LLC v.*

*Ashley Borough, et al.,* 2010 WL 4955601 (M.D. Pa. Nov. 30, 2010), is directly on

point.  The Court there noted that:

> Requiring a plaintiff to obtain a final decision from a
> local land use authority serves four purposes.  First, this
> requirement helps to develop a full record.  Second, a
> final decision informs the court how regulations will be
> applied to the property at issue.  Third, the local authority
> may give the claimant the relief he seeks, obviating the
> need for the court to decide the dispute on constitutional
> grounds.  Finally, "[r]equiring a property owner to obtain
> a final, definitive position from zoning authorities
> evinces the judiciary's appreciation that land use disputes
> are uniquely matters of local concern more aptly suited
> for local resolution."
>
> Indeed, the court of appeals has stressed the importance
> "of the finality requirement and [its] reluctance to allow
> the courts to become super land-use boards of appeals.
> Land-use decisions concern a variety of interests and
> persons, and local authorities are in a better position than
> the courts to assess the burdens and benefits of those
> varying interests."
>
> [*Id.* at *2; emphasis supplied; citations omitted]

The court went on to hold as follows:

> In line with the foregoing principles, the Court raises the
> issue of ripeness *sua* sponte.[1] The parties are directed to
> submit evidence and supporting briefs as to the ripeness

3546044_4\190533

of this dispute within fourteen days from the date of the
Court's order. The parties are advised to explain whether
entertaining this action would comport with the
prudential principles laid down by the Supreme Court in
*Williamson County*. An appropriate order follows.
  [*Id.*]

It is our understanding that the Court made a similar request by requesting a

decision from the City Council.  That decision could have mooted the case if the

City Council decided to rezone.  But now the Court must decide how to proceed in

light of the City's "no action vote."  The case law clearly indicates it is the

variance and land use process that must be utilized first.

**B.      *THE ATTEMPT TO AVOID THE NOTICE REQUIREMENTS***

While the Concerned Citizens is comprised of some of the concerned

citizens, taxpayers and residents in the neighborhood and/or City and/or zone, it

does not include or represent all that may be impacted by Care One's proposed

development.  However, the MLUL requires public notice to all interested parties

for an application for development by way of publication in a newspaper.  *See*

*N.J.S.A.* 40:55D-12(a).  All property owners within 200 feet are required to receive

written notice too.  *See N.J.S.A.* 40:55D-12(b).  Moreover, adjacent municipalities

within 200 feet, such as Englewood Cliffs in this instance, are also entitled to

notice.  *See N.J.S.A.* 40:55D-12(d).  Moreover, because Palisades Avenue is a

County road, the County of Bergen would also be required to receive notice.  *See*

*N.J.S.A.* 40:55D-12(e).  Due process, as noted in the City's Brief, requires notice to

8

the public so that everyone has a fair opportunity to be heard and comment on the application.  None of this has occurred thus far in this case.

## C.  THE PRIMARY CASES RELIED ON BY PLAINTIFF DO NOT SUPPORT AN INJUNCTION OR ITS POSITION

The primary cases relied upon by Plaintiff are *Assisted Living Associates of Moorestown, LLC v. Moorestown Twp.,* 996 F. Supp. 409 (D.N.J. 1998) ("*Moorestown*") and *Hovsons, Inc. v. Twp. of Brick,* 89 F. 3d 1096 (3d Cir. 1996) *("Hovsons").*  However, in the *Moorestown* case, the use was permitted, but there was an issue with the calculation of the land area because of the existence of certain conservation restrictions comprising part of the property.  The developer there did apply to the Planning Board (because the use was initially permitted), but then sought an interpretation from the Board of Adjustment on the land area calculation.  During this process of seeking to develop the property, the municipality changed the Zoning Ordinance to make an assisted living use a prohibited use in the zone—while the application was pending.  That developer even bought adjacent properties so that it would have additional land area to address the conservation-restricted land area position of the City.  The developer applied to the Board of Adjustment, after the rezoning, but without success.  The developer looked at other lands for its project and pursued numerous other sites, all without success (there is no showing here that this Plaintiff pursued any other site).  So after several land use applications before local land use boards, and even

several land use appeals in State Court, that developer finally resorted to the Federal Courts.  Similarly, in the *Hovsons* case, before the Federal action was filed, the developer there applied to the Board of Adjustment, and the application was denied.  The developer then appealed that decision as a prerogative writ action, and the denial was upheld in the Superior Court.  No similar action occurred here.

## D.   *THE LACK OF AN ADMINISTRATIVE RECORD*

Plaintiff started the approval process by filing an action to achieve a "judicial rezoning" by having the Court act as a "super land use board."  These efforts are simply premature.  There is no administrative record presented to the Court.  While Plaintiff submitted detailed reports and information from its experts, and a detailed (not legible) site plan, we note the following:

1. The Developer's experts have not testified;

2. Those experts have not been cross-examined;

3. There are no reports by the City's professionals (*i.e.*, planner, engineer and traffic expert);

4. There has been no testimony or cross-examination of the City's professionals by interested parties;

5. The public or objectors have not commented;

6. The objectors' professional witnesses (if any) have not submitted any reports;

7. The objectors' witnesses (if any) have not been subject to cross-examination.

Moreover, it is often our experience in these types of contested cases, that there is also room for discussion.  In virtually every case where we represented an objector or interested party, we always seek to see if the matter can be resolved.  Will a developer change the design or configuration?  Will a developer provide larger landscape buffers?  Will a developer address some of the problems that arise when its proposed project is being scrutinized?  These are all issues that come up as part of the evaluation in the zoning process.

*   *   *

Plaintiff's lawsuit is premature.  The Plaintiff certainly would have a right to challenge an adverse decision reached after going through the land use and zoning process if it feels it has been wronged.  The Board of Adjustment could approve the entire application, deny the application, approve part and deny part, or approve with changes or modifications.  How that important preliminary process would unfold is unknown.  Without it, there is no decision to review.

Respectfully, it is the position of the Concerned Citizens that the Complaint should be dismissed without prejudice, and Plaintiff should be afforded an opportunity to make an application to the Englewood Board of Adjustment, which is the forum where this process should have started a long time ago.  The Concerned Citizens, and the public, have constitutional rights as well, so the Developer should not be able to accomplish an "end run" around the land use

11

process, and avoid "due process," a process which every developer must go through, after notice to the public and interested parties.

**POINT II**

**THE CITY HAD NO OBLIGATION TO REZONE;
SINCE THE CITY HAS BEEN CRITICIZED FOR ITS FAILURE TO
RENDER A DECISION AND/OR ITS DECISION TO TAKE NO ACTION,
THE OBLIGATION OF THE CITY MUST BE CAREFULLY REVIEWED**

*A.  CITY HAS THE DISCRETION TO ZONE*

The municipal power to zone emanates from Paragraph 2 of Section VI of Article IV of the New Jersey Constitution.  The Constitution provides that municipalities "*may* adopt zoning ordinances limiting and restricting to specified districts and regulating therein, buildings and structures, according to their construction, and the nature and extent of their use, and the nature and extent of the uses of land, and the exercise of such authority shall be deemed to be within the police power of the State" [emphasis supplied].  New Jersey's Constitution does not require compulsory zoning and the provision that "the exercise of [the zoning power] is within the police power of the State" is understood to confer wide discretion on municipalities to zone for the general welfare.  *See, e.g., Rumson Estates, Inc. v. Fair Haven*, 177 N.J. 338, 348-349 (2003).  To this end, the MLUL provides that there is no obligation to adopt zoning, but instead also confers the right to exercise the zoning power in any fashion that the municipal governing body sees fit.  *See N.J.S.A.* 40:55D-62(a).  This power is only constrained by

12

certain limitations, among them the Constitution and the procedural and substantive requirements in the Municipal Land Use Law. *See, e.g., Riggs v. Long Beach Twp.*, 109 N.J. 601, 611-612 (1988). The City has wide discretion to zone, and rightfully chose not to exercise it when presented by Plaintiff's request.

## B.   *THERE WAS NO REQUIREMENT THAT THE CITY EVEN HEAR THE REZONING REQUEST*

There is no legal requirement that a municipality is obligated to rezone a property in the absence of a local ordinance, as generally discussed in the last section. But this is especially so when the municipal ordinances do not have a procedure which allows for an application to be made. Englewood does not have a rezoning procedure—and is not required to have one.

As noted by the well-respected land use and zoning treatise, *New Jersey Zoning & Land Use Administration (2019 Edition)* by Cox and Koenig (sometimes the "Treatise"):

> The MLUL is silent with respect to any specific procedure to be followed by a landowner desiring to have the zoning designation of his land changed. See TWC Realty v. Zoning Bd. Of Adjust., 315 N.J. Super. 205, 215 (Law Div. 1998), aff'd o.b. 321 N.J. Super. 216 (App. Div. 1999), pointing this out. Thus the landowner will often begin his quest with the municipal body which seems to have the most influence, either the governing body or the planning board. <u>From a planning standpoint, however, **it would be best to go to the planning board**, since it is most knowledgeable about the master plan and the reasoning which went into the current zoning.</u> As pointed out in 15-3.1, all zoning ordinance amendments

13

must be referred to the planning board in any event.
[*Id.* at p. 214; emphasis supplied]

As also noted in that Treatise, the municipal master plan is a key document

in not only the Planning Board review, but in connection with the zoning request.

The aforesaid Treatise states as follows:

> In the event that a change is made, the master plan should
> also be amended so that there is consistency between the
> plan and the zoning ordinance.  Wherever the master plan
> is not so amended the governing body would have to
> state its reasons in a resolution for adopting a zoning
> amendment inconsistent with the plan.
> [*Id.*; emphasis supplied]

It is certainly true that many municipalities adopt a procedure by ordinance

to avoid any uncertainty and essentially provide a procedure which would require

municipal action.  Again, it is not required.  The Treatise notes as follows:

> As it happens, a growing number of municipalities are
> filling the gap in the statute by adopting ordinances
> which establish a procedure for this type of request.
> Generally, these do require the application to be made to
> the planning board.  They usually provide an application
> form which must be used, and filed, together with a fee,
> and further provide for the posting of escrow money to
> cover the cost of review by the municipal planner and
> other professionals.  Almost every request will require
> such review, some by the municipal engineer and
> attorney as well as the planner, and without a fee and
> escrow the municipalities will be put to uncompensated
> expense.    [*Id.*; emphasis supplied]

The Treatise also notes as follows:

14

> Most often, the ordinances provide that the planning
> board shall, upon receipt of reports from its
> professionals, <u>make a recommendation to the governing
> body either to adopt or not to adopt the proposed change</u>.
> Those municipalities not having this kind of ordinance
> would do well to investigate ordinances enacted by
> others around the state and adapt one of these to their
> own needs.  An ordinance provision requiring
> applications to the planning board as part of a request for
> a zoning ordinance amendment was upheld in Messer v.
> Burlington Tp., 172 N.J. Super. 479, 484-485 (Law Div.
> 1980).  Messer was cited with approval by the Supreme
> Court in Great Atlantic v. Point Pleasant, 137 N.J. 136,
> 148-149 (1994).
>      [*Id.* at 214-215; emphasis supplied]

In the present case, the Developer seeks to elevate its informal, non-binding letter

request to an "application" which was denied and which denial or "no action" is

now challenged by Plaintiff.  It sent a letter to the City requesting an immediate

presentation.  It chose not to apply to the Planning Board, as the Treatise

recommends, for a zone change.  It chose not to seek a Master Plan amendment.  It

chose not to seek a use variance from the Board of Adjustment.

While the City did not have to grant such a presentation, especially in the

absence of a City Ordinance, it did schedule same in any case.  It listened to the

presentation on May 7, 2019.  But it appears that the Plaintiff thought that this

presentation was going to be in lieu of a land use application or a more detailed

presentation before the Board of Adjustment.  The Developer brought its

professionals—engineer, planner, etc.—to testify at the City Council hearing

(erroneously assuming the City Council wanted to hear a "full application" with witnesses).  However, the City Council did not have all of its professionals present (only its engineer).  That presentation was not on notice to the adjacent property owners or to the public to enable them to provide input.

While the City Council did not have any obligation to make a decision, it simply did not grant the request.  Apparently, the City Council discussed that the Developer could file a Board of Adjustment application—back in May.  As the proposed use is not permitted, this project requires a use variance.  But it also involved a proposal for a site plan.  A use variance and site plan approval would be the normal procedure.  But this Plaintiff did not like that answer, even though the City Council did nothing wrong.

We recognize the Court thought it appropriate to have the City affirmatively rule and we support that decision.  The City now did decide by more formal vote to take "no action."  So in summary, the most appropriate procedure now would be to apply to the Board of Adjustment and develop an administrative record.  The sophisticated Plaintiff has thus far chosen not to do that.

The Developer claims that there was "undisputed expert witness testimony." That simply did not address the fact that the City did not have all of its experts there, and adjacent property owners and other interested parties also had the right to have their experts there.  They never got the chance to "dispute" anything.  Even

16

the City Zoning Officer, Wayne Scott, indicated that the request did not come through him for a referral to the Board.

The City Council, without obligation, discussed with the Developer its right to make an application to the Englewood Board of Adjustment.  And of course, this Developer knows that Care One has made numerous applications to other land use boards throughout the County and State.  It has sophisticated counsel and a team of experts.  The City therefore made a decision—the correct one.

Finally, while the Developer had the opportunity throughout these proceedings and time period to make that application, it failed to make the application and instead tried to "judicially" get a use variance and site plan approval—in the absence of a formal rezoning by the City Council.

## C.  SPOT ZONING

Another important point is necessary.  There is no discussion in connection with this particular rezoning request by Plaintiff, for a comprehensive review of the City Zoning Ordinances and/or zoning districts.  This Developer sought to rezone a specific piece of property, about five acres in size (the equivalency of two residential lots in this minimum 2 acre per lot zone).  This raises the issue of whether this would have been "spot zoning," even if the City Council had acceded to the request of the Developer.

We understand that the Care One Plaintiff previously argued to the City that a rezoning of its property would not constitute spot zoning, including its position set forth in a memorandum from Thomas Herten, Esq. to the City Attorney dated March 16, 2018.  For the reasons set forth below, we disagree and believe that the rezoning of Care One's property would have constituted illegal and unlawful spot zoning.  In short, what the Developer was requesting to avoid the Board of Adjustment application was not appropriate and likely illegal.

Spot zoning is "the use of the zoning power to benefit particular private interests rather than the collective interests of the community." *Taxpayers Ass'n of Weymouth Twp., Inc. v. Weymouth Twp.,* 80 N.J. 6, 18 (1976), *cert. denied,* 430 U.S. 977 (1977).  Because it gives an improper benefit to private interests, "[s]pot zoning is the antithesis of . . . planned zoning. . . . [T]he test is whether the particular provision of the zoning ordinance is made with the purpose or effect of *furthering a comprehensive scheme* or whether it is designed merely to relieve a lot or lots from the burden of a general regulation." *Palisades Props., Inc. v. Brunetti,* 44 N.J. 117, 134, (1965) (emphasis supplied).  An ordinance "designed merely to relieve the lot of the burden of the restriction of the general regulation by reason of conditions alleged to cause such regulation to bear with particular harshness upon it" is spot zoning.  *Conlon v. Board of Public Works of City of Paterson,* 11 N.J. 363, 366 (1953).  Other indicia of spot zoning appear when the ordinance treats the

18

owner of the rezoned property more favorably than the comprehensive plan allows

"to the detriment of the larger community or the immediate neighbors." *Riya*

*Finnegan LLC v. Twp. Council of Twp. of S. Brunswick*, 197 N.J. 184, 199

(2008).  When an ordinance's effect is to relieve the burden of the restriction rather

than furthering the comprehensive plan and results in the circumvention of the

functions of the board of adjustment, it is invalid spot zoning.  *Speakman v. Mayor*

*and Council of Bo. of North Plainfield,* 8 N.J. 250, 257-258 (1951).

The Treatise by Cox and Koenig noted as follows:

> One issue which will have to be determined by
> whichever body hears the matter is whether or not the
> change will amount to spot zoning.  ***  The issue will
> most frequently arise where only one landowner applies
> for the change and his holdings are not very large.
> [Treatise at p. 214]

Here, the subject project is sought to be rezoned by one property owner (contract

purchaser for part of the property), for a parcel that is about five acres (but where

the minimum lot size is two acres).  The project essentially consists of two 2+ acre

residential lots (with an existing house on each 2-acre parcel).  Any two 2+ acre

sites in the R-AAA Zone could therefore house this facility if Plaintiff had its way.

Why should this Developer get a 150-room facility and not the other property

owners?  Is this the proper location for the facility?  So the issue is whether this is

appropriate.

## D.  *THE IMPORTANCE OF THE MASTER PLAN*

*Riya Finnegan* makes clear that the "comprehensive scheme" described in *Speakman* and *Palisades Props.* is the City's Master Plan.  197 N.J. at 198. The City's Master Plan does not recommend that any parcels in the R-AAA Zone be rezoned to permit assisted living or age-restricted housing.  It may be, as Care One's counsel noted in his March 16, 2018 memorandum, that an assisted living use furthers the general welfare.  But that is not a basis to authorize anything and everything that Care One wants on its property.  Indeed, the City must be concerned with the land use impacts on adjacent properties and the underlying zoning scheme when deciding whether or not to exercise its zoning power.  To this end, the Planning Board adopted the City's Master Plan in 2014 and adopted amendments in 2015.  There was no determination to recommend the rezoning of any portion of the R-AAA Zone, certainly not for this particular parcel.

This is not a case where the Master Plan has not been reviewed for a long time and is "outdated."  It has been reviewed recently.  Indeed, we understand that at least one principal of the Developer has resided in the City for decades.  Where was the concern for a zone change or Master Plan study during the last few Master Plan reviews by Plaintiff through its principal?  The Developer is not some stranger starting the process from scratch.

A rezoning of Care One's property is therefore not in accord with the City's comprehensive zoning scheme embodied in the Master Plan.  Care One's memorandum and its presentation ignores this requirement in total.  Instead, a rezoning would simply be to give Care One a pass from pursuing its administrative remedies, and a pass from seeking and obtaining a use variance that demonstrates (i) that its proper use advances the general welfare, and (ii) it does not cause substantial detriments to adjacent properties, or (iii) it does not substantially impair the intent and purposes of the zone plan and zoning ordinances.  Absent same, and given the protections to be afforded to the existing uses that are embodied in the City's Master Plan, the wholesale departure from the zoning requirements, solely so that Care One can develop its several tax lots, is "spot zoning."

We note that the review and analysis of the Master Plan, usually done in the context of an application before the Board of Adjustment, is not a simple one. Englewood has the following relevant planning documents: 1. 1988 Master Plan; 2. Ordinance No. 90-11; 3. Ordinance No. 93-16; 4. September 18, 1995 Re-Examination Report; 5. 2001 Housing Plan Element and Fair Share Plan; 6. 2002 Master Plan; 7. 2014 Master Plan (without Appendix); 8. 2014 Municipal Master Plan Appendix A – E; 9. 2015 Master Plan Amendment.  A review of these planning documents will reveal that the R-AAA Zone, where the subject property is located, has been sought to be preserved for the last 30+ years.  The minimum

21

lot size was increased to two acres.  *See* Joint Declaration of Mayors, [ECF No. 20-4] at pp. 2-3.  The goal of the City was to preserve and protect open space.  A 150-room assisted living facility simply does not achieve that objective.  While Plaintiff included in the submission to the Council the City Zoning Code (*see* Herten Declaration), it failed to include any of the relevant Master Plan documents.  It included not one.  But it is the Master Plan that is the major factor in whether a use not permitted in the zone should be allowed.

It makes no sense if every property owner of four or more acres (*i.e.*, two lots) has the right to have rezoning.  While the Developer cites the case of *Feiler v. Fort Lee Bd. of Adj.,* 240 N.J. Super. 250 (App. Div. 1990), to argue that the property is too large for a use variance, that is inapposite.  In *Feiler*, the subject property was a substantial part of the zone by the George Washington Bridge.  It consisted of 15.69 acres.  It was so large that the court held the board of adjustment should not address new uses by way of variance because it constituted a *de facto* rezoning.  In the case *sub judice*, one only need review the Zoning Map and the boundaries of the R-AAA Zone to recognize that argument by Plaintiff that a use variance could not be granted by the Board of Adjustment is a stretch.  The subject property, two residential lots, is but a small fraction of the R-AAA Zone in Englewood.

The R-AAA Residential District, in which the property is located, is one of the most important zones in the City.  It is a substantial zone.  It is a historic zone. *See* Joint Declaration of Mayors, [ECF No. 20-4] at pp. 2-3.  The Master Plan and amendments carefully discuss its importance and development over the years. This Developer however wants its property "spot zoned."  Thus, even if the City attempted the rezoning, its action would be illegal as improper and unlawful spot zoning.  This is another reason why the Board of Adjustment should hear this case.

**E.  THE CITY'S ZONING DISTRICT CONTAINS 24 ZONES WHICH ALLOW RESIDENTIAL USES; THERE IS NO PROOF THE R-AAA ZONE IS APPROPRIATE FOR A REZONING**

The allegation of Plaintiff omits the simple fact that out of 27 zoning districts in the City, 24 of them allow residential uses.  *See* Certification of Thomas C. Herten, Esq. ("Herten Cert."), Exhibit C, Zoning Ordinance.  Plaintiff complains that the assisted living use was allowed in the RIM Zone for the Bristal. Plaintiff calls the RIM an "industrial zone."  Plaintiff alleges that "the City's segregation of assisted living and memory care facilities to <u>industrial zones</u> unduly limits creation of access to assisted living and similar facilities and has a <u>disparate impact</u> upon those who cannot travel to the segregated area."  [Emphasis supplied]. But Plaintiff does not mention the RIM Zone is not all industrial.  It has a large residential component.   Moreover, Plaintiff also alleges as follows:

> For example, under the Code, assisted living and memory care homes can only be located on lands assigned the Research, Industrial and

Medical ("RIM") designation; such homes are not allowed in the R-AAA district or any other residential category.

The Plaintiff implies such a use is not allowed in any residential zone.  The RIM Zone does allow residential uses.  The Complaint further alleges that "the RIM zone lands are surrounded by 'Light Industrial' zone lands ***."  It again fails to recognize that the RIM Zone is one of the 24 zones that allow residential uses.

The Developer fails to argue why its property, in the R-AAA Zone, should be chosen to receive the next assisted living facility.  Why not one of the other zones?  Plaintiff gives lip service to The Actor's Fund and neglects to point out that The Actor's Fund is located in the Residential-D (R-D) Zone, and was recently allowed to expand.  *See* Declaration of Wayne Scott ("Scott Decl.") dated August 21, 2019 [ECF No. 20-5], at p. 5 and Exhibit D.

Therefore, the task of allowing this use in this one zone—the R-AAA Zone—on this one property, but not any others, is simply not supported.

## F.  AS A PRACTICAL MATTER, A MUNICIPALITY OF A BIG CITY CANNOT RECOMMEND IT DO WHAT THIS DEVELOPER REQUESTS

The City Council is the governmental agency that operates the City.  It has its constituent land use boards to help with development—a Planning Board for permitted uses and a Board of Adjustment when a use variance is needed.  The City Council is simply not the forum to bring in witnesses, including experts like an engineer and planner, to "testify" about a proposed rezoning (as the Developer

24

did in May).  This is especially the case in one of the largest municipalities in

Bergen County.  If more developers did this, all the City would be doing would be

listening to rezoning requests and its business would grind to a halt.  The City

Council is simply not the place.

## POINT III

## AN APPLICATION TO THE BOARD OF ADJUSTMENT WOULD NOT BE FUTILE

The Plaintiff makes an argument that its application would be "futile," but

gives no real support as to the facts underlying the claims of "futility."  Indeed, the

Declaration of Wayne Scott, the City Zoning Officer, clearly indicates that a use

variance application in the R-AAA Zone, or in connection with assisted living

facilities, has been anything but futile in the City of Englewood.  *See* Scott Decl.

While the subject property is located on North Woodland Avenue, an Orthodox

Jewish day school on South Woodland Avenue has been given approval after

approval after approval—over the last 30 years.  *See* Scott Decl. at pp. 4-5 and

Exhibit B.  That property is in close proximity to the subject Property, only about

500 feet away.  Moreover, even across the street from the subject property, the

Dwight Englewood School (hereinafter the "School") has also been granted use

variances for expansions.  *See* Scott Decl. at pp. 4-5 and Exhibit C.  The City also

recently granted a use variance for The Actor's Fund to expand its facility, and The

Actor's Fund is located in the Residential-D Zone.  *See* Scott Decl. at p. 5 and

Exhibit D.  That use variance was granted in 2015 and the expansion already took place.  Even in the case of the Bristal, while not in the R-AAA Zone, a 288-bed project recently received approval.  *See* Certification of Daniel Antonelli, Esq. ("Antonelli Cert.") dated August 21, 2019 [ECF No. 20-3] at Exhibit B.

Plaintiff did not disclose in its Complaint that an assisted living facility was allowed to be expanded in several of the residential zones, and failed to mention that the RIM Zone, where the Bristal is located, allows mixed uses including residential uses.  The City has been more than accommodating through its land use boards to these types of uses.[2]  There is simply no problem here of a municipality changing ordinances in the middle of an application (like the *Moorestown* case).

Moreover, in connection with the 2015 City Master Plan Amendment, assisted living uses were added in the RIM Zone.  After the Master Plan recommended same, the City immediately enacted an Ordinance codifying the recommendation, and a developer constructed the Bristal, which consists of 288 beds.  Respectfully, the facts do not reveal a City that is turning a blind eye on assisted living for seniors and disabled persons and those needing assistance.  If

---

[2] We also note that the ultimate in "senior and assisted housing" is the Englewood Hospital.  There are only three Hospitals in the Northern New Jersey area in Bergen County, Hackensack University Medical Center, the Pascack Valley Hospital (previously referred to as Hackensack University Medical Center at Pascack Valley), and the Englewood Hospital.  The Englewood Hospital is a large facility located in the City that obviously treats seniors and those who are disabled.

anything, the proofs in the Certifications submitted by the City shows exactly the opposite.  Certainly, at a minimum, a substantial question of fact is raised and there is no probability of success on the merits proven.

Significantly, despite the larger assisted living facilities, a careful review of the smaller assisted living facilities also bears out that the City of Englewood has more than its "fair share" of assisted living and senior housing throughout the City. *See* Scott Decl., Exhibit F (2015 Housing Element Plan).  These assisted living and special needs housing are scattered throughout the City and its residential zones and include the following, as noted in the aforesaid 2014 Housing Plan:

1.   <u>Shepheard House (Block 605, Lot 2) – 12 Single-Room Occupancy Rental Units</u>

The Bergen County Community Action Partnership (BCCAP) operates a single-room occupancy supportive and special needs housing development on Demarest Avenue known as Shepherd House.  BCCAP reconstructed the 12-unit building for occupancy in 1998.  This project is eligible for credit in the second round, as well as bonus rental credits.  Thus, 24 total units of credit are generated by Shepheard House.

2.   <u>Independence Hall (Block 605, Lot 15) – 8 Single-Room Occupancy Rental Units</u>

The Bergen County Community Action Partnership (BCCAP) operates a single-room occupancy rental development known as Independence Hall.  BCCAP reconstructed the building into an 8-unit transitional development reserved for mentally ill and chemically dependent persons in 1998.  Since the building was entirely reconstructed (not merely rehabilitated), it is eligible for prior round credits.  As a rental project, it is also eligible for rental bonuses.

27

However, since Englewood is eligible for only 13 units of rental bonuses, only 1 unit is counted as a rental bonus.

3.  J-ADD (formerly UJC) Group Home (Block 111, Lot 12) – 4-Unit Supportive Housing

The Jewish Association for Developmental Disabilities (J-ADD) operates a four-bedroom group home occupied by eligible developmentally disabled persons.  The home began operating in 1988 through a program funded by the New Jersey Department of Human Services.    [In previous COAH documentation, the group home was referenced as the United Jewish Community of Bergen County (UJC) group home.]

4.  PSCH-Phelps Avenue (Block 3006, Lot 36) – 4-Unit Supportive Housing

Promotions Specialized Care and Health (PSCH) manages a four-bedroom supportive and special needs housing development for disabled persons on Phelps Avenue.  The group home has operated since 1999.

5.  PSCH-Knickerbocker Rd. (Block 401, Lot 21) – 4-Unit Supportive Housing

PSCH operates an additional four-bedroom supportive and special needs housing development for disabled persons on Knickerbocker Road.  The group home has operated since 2002.

6.  First Baptist Church (Block 2011, Lot 28) – 5-Unit Supportive Housing

The First Baptist Church of Englewood completed a reconstruction project resulting in a five-unit supportive and special needs housing development for homeless women and their families.  The dwelling began operation in mid-2009 and is located adjacent to the Church.

However, when reviewing the allegations in the Verified Complaint, even

the assisted living facility, The Actor's Fund (located in a Residential Zone), is

28

downplayed and relegated to a footnote. *See* Verified Complaint, [ECF No. 1] at p. 8, fn. 4. The fact that it is located in an entirely residential zone (the R-D Zone), is omitted. While of course the Plaintiff had to refer to same because it is one of the major assisted living facilities in the City, when you count that facility, the new Bristal, the other major facilities such as the Inglemoor Center at 333 Grand Avenue (in the RM-B Zone) and the 151-unit Vincent Tibbs senior housing development at 111 West Street (in the RM-H Zone), and you count the smaller facilities, the City has been more than fair to its seniors and those requiring assistance. Indeed, as noted by the Antonelli Declaration, the City has approximately 32% of all the assisted living beds amongst the six surrounding municipalities (including the City). Some towns do not have any, but the City of Englewood has a substantial portion of same, and more than almost all the other cities in Bergen County.

Simply put, the history of development of assisted living, senior housing and disabled housing in the City does not give any factual support for the claims of Plaintiff that there is somehow discrimination or that the City is turning its back on the disadvantaged and those needing assistance. The facts respectfully do not show a probability of success on the merits, one of the key elements for the issuance of a preliminary injunction.

Although there are no specific bulk standards for an assisted living facility in

the R-AAA Zone, that does not mean that Care One cannot seek relief from the

Board of Adjustment.  The bulk requirements for the R-AAA Zone are designed

for the uses that are permitted in the zone.  When an applicant seeks a use variance,

as Care One would be required to do here, the traditional rule is that the bulk

requirement such as setbacks, building height, and coverage applicable to the

permitted uses should not be considered, but instead that the board of adjustment

reviewing the application should consider both the use proposed and the intensity

thereof in deciding whether to grant a use variance and how the bulk requirements

should be addressed.  In the case of *Puleio v. North Brunswick Bd. of Adj.,* 375 N.J.

Super. 613 (App. Div. 2005), the New Jersey Appellate Division held as follows:

> If the application is for a use not permitted in the zone, the bulk regulations designed for that zone cannot be applicable to the intended use. For example, an application for a gasoline service station in a residential zone should not be held to the bulk requirements of the residential zone. Lot area requirements and front and side yard setbacks for a residence were not contemplated to be made applicable to a service station. <u>A Zoning Board, in considering a "use" variance, must then consider the overall site design. In essence, the "c" variances are subsumed in the "d" variance.</u>
> [*Id.* at 621; emphasis supplied]

The New Jersey Supreme Court cited this principal in its decision in *Price v.*

*Himeji*, 214 N.J. 263 (2013), when it found that the board in that case correctly

analyzed the overall design of the project.  *Id.* at 301.

Here, if Care One were to apply to the Englewood Board of Adjustment seeking a use variance, the same logic would apply.  The Board of Adjustment would need to review and analyze the overall design of the project to determine if there were special reasons to authorize the use, decide whether there was any substantial detriment to nearby properties and any substantial impairment to the intent and purposes of the zone plan and zoning ordinance.  *See N.J.S.A.* 40:55D-70(d).  For example, a board might conclude that a proposed development if smaller is reasonable because of the project fits on the lot and within its surroundings, but could conclude that the same proposed use, if too big, was not appropriate for the location proposed because it did not fit on the lot and its surroundings.  That is exactly what happened in the case Care One brought against Oradell – and lost.

## POINT IV

### JUDICIAL REZONING IS ALSO NOT APPROPRIATE HERE WHERE THERE ARE NUMEROUS SITE PLAN ISSUES

There are particular site plan issues with respect to this property.  For example, in general, the property is on a fairly steep incline and is located on one of the busiest roads in the City, Palisade Avenue.  The traffic back-up on Palisade Avenue is legendary.

Moreover, the property is across from the Dwight Englewood School, a private non-profit institution (the "School").  A 150-bed assisted living facility, no

31

matter how laudable the purpose of such a use, across from the School, has special issues, including the traffic, the peak hours on the subject property, and the peak hours of the School.  Moreover, the School's recreational fields are located on the same street, and those fields are used after normal school hours.

There are also issues with the preservation of the historic "East Hill" in which the property is located, and in particular, the R-AAA Zone.  *See* Joint Declaration of Mayors, [ECF No. 20-4].  The Master Plan, the zoning history of the City, and the existing conditions are all factors that play into a review of the use variance and, in particular, the review of the site plan.  Simply put, it is something that is best left to a Board of Adjustment, comprised of local residents familiar with local conditions.  In the land use realm, the Courts of the State of New Jersey have routinely noted that local officials are granted "wide latitude in the exercise of the delegated discretion" due to their "peculiar knowledge of local conditions." *Burbridge v. Mine Hill Twp.,* 117 N.J. 376, 385 (1990).  The reason for this latitude is that local officials are "thoroughly familiar with their communities' characteristics and interests" and are best suited to make judgments concerning local zoning regulations. *Pullen v. Twp. of South Plainfield,* 291 N.J. *Super.* 1, 6 (App. Div. 1996).

Much has been discussed on the rezoning request.  But this Developer also thinks that it should somehow be entitled to site plan approval as well.  It does not only want a "judicial rezoning."  It wants a "judicial site plan" too.

The following are just some of the site plan issues:

1.    <u>Master Plan</u>:  As stated, a careful review of the Master Plan is required and not complete.

2.    <u>R-AAA Zone</u>:   The preservation of open space is the objective.  The request is contrary to same.  *See* Joint Declaration of Former Englewood Mayors.

3.    <u>Planning</u>:  The effect on adjacent properties and diminution in value is critical.

4.    <u>Traffic</u>:  The traffic has always been an issue on Palisades Avenue.  The proposed location across from the School and down the street from the School's recreational fields, further intensifies the issue.  There is assumed to be emergency vehicles at all hours that are needed, including ambulances and/or police and/or EMT vehicles.

5.    <u>School safety</u>:  The effect on Dwight Englewood School as stated is critical.  It is across the street, and the School's recreational fields are down the street.  An assisted living facility and/or facility with approximately 150 rooms, with numerous employees and various shifts in a 24-7 facility, would create safety issues concerning the activities at the School.  The traffic generated by a 150-room

33

assisted living facility on a very busy street, next to the School, and down the street

from the School's recreational fields, is a potential recipe for disaster.

6.     <u>Effect on property values</u>:  The proposed facility would adversely

affect adjacent properties and those in the neighborhood.  That would need to be

reviewed.

7.     <u>Public need not sufficient</u>:  There are at least two other facilities in

Englewood, including a new one and one older facility that recently expanded.

There are other larger facilities.  There are numerous other smaller facilities.  The

Zoning Officer noted a number of them in his Declaration.  And there are more.

There is a question of whether the "public need" for such a use is present.  The

issue of whether the proposed use is needed in Englewood must be considered as

part of a use variance application.  The proposed assisted living use will no doubt

be argued as inherently beneficial,[3] so the Developer will argue it already satisfies

the "positive criteria" so there does not need to be a showing of special reasons to

depart from the zoning.  To determine the public interest at stake so that the

positives can be balanced against the negatives, a determination must be made

about whether there is a need in the community for the use variance.  We

understand that there are numerous other facilities, including some that are not

---

[3] That is a separate legal issue which is not discussed herein.

even full.  There is a factual question of whether there is even a need for assisted living uses for which a reasonable accommodation is required.

## POINT V

## LOCATION OF PART OF THE PROPERTY IN THE BOROUGH OF ENGLEWOOD CLIFFS REQUIRES A USE VARIANCE

The subject Property is comprised of some of the old estates located on larger parcels in the City and a part of the historical East Hill.  Lot 8, already owned by Plaintiff Developer, is located in the City of Englewood and consists of 2.677 acres in total.  However, a portion of that parcel is also located in the Borough of Englewood Cliffs.

The portion of the property, consisting of 12,937 square feet located in the Borough of Englewood Cliffs, is formally known as Block 601, Lot 13.  Said Lot 13 has a dimension of approximately 35 feet by 350 feet.  This parcel is in the R-B Zone.  Upon information and belief, said Lot 13 is part and parcel of the entire lot previously treated as one parcel, and part of adjacent Lot 8 (even though the adjacent municipality, Englewood Cliffs, has placed a separate lot designation on same).  It is, as a matter of law, part and parcel of the entire subject property.  The Developer neglects to mention that.

Upon information and belief, no attempt has been made to seek development of the portion of the subject Property located in Englewood Cliffs, despite the fact that any use sought of the main parcel would be applicable to any other portion of

35

the property, whether or not located in an adjacent municipality.  *Cf., Nuckel v.*

*Little Ferry Planning Bd.,* 208 N.J. 95 (2011) (adjacent lot takes on character of

the use on main lot); *Kinderkamack Road Assoc., LLC v. Mayor and Counsel of the*

*Bo. of Oradell,* 421 N.J. Super. 8 (App. Div. 2011) (vacant lot that is part of a

property takes on character of overall development).  In short, irrespective of any

zoning or land use application in Englewood, the proposed development would

also likely cause the need for a use variance in Englewood Cliffs and/or the

consideration of the part of the property located in the adjacent municipality.

### POINT VI

**CARE ONE IS NOT ENTITLED TO A PRELIMINARY INJUNCTION
BECAUSE (1) IT HAS NOT DEMONSTRATED A LIKELIHOOD OF
SUCCESS; (2) THERE IS NO THREAT OF IRREPARABLE HARM;
(3) GRANTING THE INJUNCTION WOULD STRIP THIRD PARTIES OF
THEIR CONSTITUTIONAL RIGHTS; AND (4) THE PUBLIC INTEREST
WOULD NOT BE SERVED BY THE REQUESTED INJUNCTION.**

Care One has not shown the necessary prerequisites for the issuance of a

preliminary injunction.  The Third Circuit has held that to obtain a preliminary

injunction, the proponent must show:

> (1) a reasonable probability of eventual success in the litigation,
> and (2) that it will be irreparably injured . . . if relief is not granted
> . . . . [In addition,] the district court, in considering whether to
> grant a preliminary injunction, should take into account, when
> they are relevant, (3) the possibility of harm to other interested
> persons from the grant or denial of the injunction, and (4) the
> public interest.

*Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017), citing *Del. River Port Auth. v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 919-20 (3d Cir. 1974).  The District Court may balance these four factors *so long as the first two have been satisfied*.  *Id.* (citations omitted).  As discussed above and in the Briefs submitted by Care One and the City, it is clear that Care One is not entitled to preliminary relief because it has made out the two necessary elements under *Reilly*—that it is likely to succeed on the merits and that it will suffer irreparable injury.  For this reason alone, Care One's application for a preliminary injunction should be denied.

Also, the balancing of equities under the third and fourth factors militate against Care One.  As outlined above, the MLUL and New Jersey constitution vest in Care One's neighbors, the Borough of Englewood Cliffs, and Englewood residents generally the right to notice of and participation in the process under which Care One seeks a variance from local laws.

## CONCLUSION

For the foregoing reasons, the Concerned Citizens, as *Amicus Curiae*, ask the Court to consider this additional information provided and deny the issuance of a preliminary injunction, dismiss the Complaint without prejudice, and require the Plaintiff to pursue the application before the Englewood Board of Adjustment, or the other avenues available as set forth herein.

37

Respectfully submitted,

BEATTIE PADOVANO, LLC
Attorneys for *Amicus Curiae*,
Concerned Citizens of Englewood, Inc.


By: */s/ Martin R. Kafafian*
Dated:  August 28, 2019          Martin R. Kafafian
                                 John J. Lamb
                                      A Member of the Firm

3546044_4\190533