# ANTONELLI KANTOR p.c.
## ATTORNEYS AT LAW

DANIEL ANTONELLI*
*PARTNER*

JARRID H. KANTOR*
*PARTNER*

YULIEIKA TAMAYO*
*PARTNER*

DEBRA M. MCGARVEY*
*ASSOCIATE*

CHARLES R. G. SIMMONS*
*ASSOCIATE*

JAMES J. CRUDELE
*ASSOCIATE*

KYLE A. FISHER
*ASSOCIATE*

DANIEL H. KLINE
*ASSOCIATE*

VIVIAN LEKKAS*
*OF COUNSEL*

*ADMITTED NJ & NY*

1000 STUYVESANT AVE
SUITE #1
UNION, NJ 07083
Main: (908) 623-3676
Fax: (908) 866-0336
www.aknjlaw.com

*WRITER'S CONTACT:*
Direct: 908-623-3673
Email: dantonelli@aknjlaw.com

September 19, 2019

**Via ECF**
Hon. Brian R. Martinotti, U.S.D.J.
United States District Court – District of New Jersey
Martin Luther King, Jr. Courthouse
50 Walnut Street
Newark, NJ 07102

    **RE:**  **431 E Palisades Avenue Real Estate, LLC v. City of Englewood, et al.**
       **Docket No.: 2:19-cv-14515-BRM-JAD**

Dear Judge Martinotti:

  As Your Honor is aware, our firm represents Defendants, City of Englewood and City Council of Englewood (collectively "Defendants"), in the above-referenced matter. As per Your Honor's request, enclosed please find Defendants' written summations following oral argument on September 13, 2019, on Plaintiff's Order to Show Cause and Defendants' Cross-Motion for Judgment on the Pleadings. We thank the Court for its continued attention to this matter.

                Respectfully submitted,

                /s/ Daniel Antonelli
                Daniel Antonelli

DA/vl
Encls.
cc:   All Counsel of Record (*via* ECF)

It bears repeating that Plaintiff comes to this Court seeking extraordinary relief on a self-created emergent application and asks this Court to not only enter permanent restraints absent a full record, but also to grant a judicial use variance effectively creating a new and unprecedented protected class for a commercial, for profit, entity. Plaintiff's application falls woefully short in satisfying any of the prongs necessary to obtain such extraordinary relief. Defendants, City of Englewood and City Council of Englewood (the "City" or "Defendants") rely upon all previous arguments and submissions made and shall focus these summations primarily on Plaintiff's facial challenge. Plaintiff relies upon three claims under the FHA: (1) an "explicit" facial challenge to the ordinance; (2) a disparate impact claim; and (3) a reasonable accommodation claim.

## Plaintiff's Facial Challenge Fails as a Matter of Law

The United States Supreme Court has recognized that facial challenges are disfavored for several reasons. Washington State Grange v. Washington State Republican Party, 552 U.S. 442, 450 (2008). The Supreme Court has stated that claims of facial invalidity "often rest on speculation" and as a consequence, they raise the risk of "premature interpretation of statutes on the basis of factually barebone records; they run contrary to the fundamental principle of judicial restraints that courts should neither 'anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied; and they threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." Id. at 450-51 (internal quotations omitted).

When a plaintiff asserts a facial challenge of "per se" or "explicit" discrimination, neither exhaustion is required nor is malice dispositive; however, a plaintiff still has the burden of establishing the "explicit terms of the discrimination." Community Services, Inc. v. Wind Gap Mun. Authority, 421 F.3d 170, 177 (3d Cir. 2005). The Third Circuit in Wind Gap recognized that in focusing on the explicit language, rather than a showing of animus, an ordinance cannot use a technically neutral classification as a "proxy" to evade the prohibition of intentional discrimination. Id. The Third Circuit used as examples classifications based upon gray hair as a proxy for age or service dogs or wheelchairs as proxies for handicapped status. Id. at 177-78. The Third Circuit further explained that regardless of whether the claim is based upon discriminatory animus or a facially discriminatory classification, "the most fundamental element of the claim is that plaintiff must demonstrate that defendant's alleged discrimination was "**because** of a handicap." Ibid. citing 42 U.S.C. § 3602(h). The Court also noted that this language derived directly from the FHA is often glossed over or perhaps "so obvious as not worthy of discussion." Ibid. This inquiry involves whether a "policy facially discriminates **on the basis** of the protected trait" and "**explicitly** classifies people on **that** basis." Id. (internal citations omitted).

In rejecting the district court's conclusion that because "personal care home" coincided with the FHA definition of "handicap," the use of the term constituted facial discrimination **because** of a handicap, the Third Circuit reasoned that "on its face," the term "personal care home" has nothing to do with handicapped or disabled status and that without context to inform interpretation of the term, "personal care" home could fairly be used to describe any number of facilities providing services to residents. Id. at 179. The Third Circuit also recognized that even if "personal care home" was equated with "homes for the disabled or handicapped," this classification was not necessarily **because of** the disabled status rather than the **"commercial"**

1

nature of the entity. Ibid. **As such, the Third Circuit could not agree that the case lent itself to a facially discriminatory classification theory because the regulation did not "facially" discriminate "because of" the handicapped status of the residents.** Id. (emphasis added).

The Third Circuit looked to other "proxy cases" where facial challenges were upheld and distinguished those cases and in reviewing them noted a combination of four common elements that were lacking in the case before it: (1) the alleged discriminatory classification was actually defined by the challenged regulation in terms that largely coincide with the FHA's definition of "handicap"; (2) the classification was used specifically to "single out" facilities for handicapped individuals for different treatment "because of" their disability; (3) there was often direct or circumstantial evidence of discriminatory animus indicating an intent to discriminate; and (4) the defendants' purported reason for treating plaintiff's facility differently was predicated on a justification that was of questionable legitimacy. For example, in both Larkin v. Mich. Dep't of Social Servs., 89 F.3d 285 (6th Cir. 1996) and Horizon House v. Township of Upper Southampton, 804 F.Supp. 683 (E.D. Pa. 1992), the courts struck down laws that imposed distance requirements between residential care facilities for persons who were "handicapped" under the FHA. Id. at 180.

The explicit discriminatory language in Horizon House was that the ordinance imposed a distance requirement of 1,000 feet for group homes within the Township. Id. In Larkin, the Sixth Circuit found that the spacing requirement prohibiting the Michigan Department of Social Services from licensing any new adult foster care ("AFC") facilities within 1,500 feet of an existing facility and requiring Social Services to notify the municipality and the local authorities to then notify all residents within 1,500 feet of the proposed facility were both facially discriminatory because by their very terms the statutes apply only to AFC facilities which will house the disabled and **"not to other living arrangements."** Larkin, 89 F.3d 285, 291 (6th Cir. 1996). The explicit language in New Directions Treatment Services v. City of Reading, 490 F.3d 293 (3d Cir. 2007) and Bay Area Addiction Research and Treatment, Inc. v. City of Antioch, 179 F.3d 725 (9th Cir. 1999), involved a ban on methadone clinics within 500 feet of a residential area.

Similar to the Third Circuit in Wind Gap where it distinguished the four common elements found in facial challenge cases from the case before it, the ordinance in question in this case is clearly distinguishable. The Court must focus on the language of the R-AAA Zone, and not be misguided by Plaintiff's attempt to have the Court focus on the RIM Zone. In reviewing the language in the R-AAA Zone, it cannot be disputed that there is no alleged discriminatory classification which is actually defined by the regulation in terms that largely coincide with the FHA's definition of "handicap." Because there is no suspect classification even mentioned in the R-AAA Zone, it cannot be disputed that the classification was used to "single out" the handicapped or to treat them differently because of their handicap. It is undisputed that there is no direct or circumstantial evidence of discriminatory animus and in fact, the record reflects quite the opposite based upon the facilities that already exist in the City, the Wayne Scott Declaration, the former Mayors' Declaration, and the facts set forth in the Antonelli Certification. Lastly, there is not even a scintilla of evidence to suggest that the purported reason for treating the facility in a certain manner was of questionable legitimacy. While a full record has yet to be developed, the Declarations submitted as well as the purpose of the RIM zone, which in part notes, the residential complexes within the RIM and the attention given to "foster internal connectivity, mobility, and **safety** for all modes of transportation within and between properties," evidences legitimate reasons

2

even if somehow this Court could find that on its face the ordinance was facially discriminatory, which we submit it is not. (Defendants' Br., p. 17). Therefore, based upon the criteria our Third Circuit has announced, there can be no viable facial challenge even on a "proxy" theory.

In a final attempt to save its meritless claim, Plaintiff's reply brief cites to the distinguishable and non-precedential decision in Montana Fair Housing, Inc. v. City of Bozeman, 854 F.Supp.2d 832 (D. Montana 2012). However, even that case supports Defendants' argument that the R-AAA Zone in question is not facially discriminatory. In Bozeman, the "Authorized Uses Section of the Ordinance," included a table listing various residential districts and noted either a "P" (principal use), a "C" (conditional use), an "A" (accessory use), or a "-" for uses not permitted. The express language of the table utilized the words "Assisted Living / Elderly Care Facilities" and expressly prohibited that use within four residential districts. Id. at 837. At the same time, "community residential facilities" and "cooperative housing" were permitted as conditional or principal uses in all residential districts. Id. Therefore, the court found that "on its face" it applied less favorably to a protected group. Id. In the case before us, the R-AAA Zone is completely devoid of any language explicitly referring to the protected class whatsoever and as such, the inquiry ends there. Equally absent is any evidence that this group was treated less favorably. Plaintiff's attempts to point to the RIM Zone to support is facial claim misses the mark by a mile.

In Curto v. A Country Place Condominium Association, Inc., 921 F.3d 405, 407 (3d Cir. 2019), cited by Plaintiff in its reply and which was initially decided by this very district court, the Third Circuit held that the pool schedule discriminated against women in violation of the FHA. In reversing the district court, the Third Circuit looked to the "express" terms of the pool policy which discriminated not only in its allotment of different times to men and women but also employed "sex" as its criterion. Id. at 410. In other words, the explicit terms utilized a protected trait, namely sex, to differentiate and treat that protected trait differently, which is not the case here.

In Marriott Senior Living Services, Inc. v. Springfield Twp., 78 F.Supp.2d 376 (E.D. Pa. 1999), the plaintiff sought to build a large, multi-unit senior assisted living facility in a single-family zone and only had made informal inquiries to the Township officials without formally submitting a proposed plan or applying for variances. On similar claims to the ones before this Court, the court held that the reasonable accommodation claim was not ripe, the zoning scheme does not "on its face" discriminate; and genuine issues of material fact existed as to the disparate impact claim, in part because the Township was not afforded opportunity to previously rule on an assisted living center in a residential area. Id. at 380. In reaching its conclusion on the facial challenge, the district court cited and distinguished other cases where a facial challenge was found such as Larkin and Horizon House, *supra.*, and Bangerter v. Orem City Corp., 46 F.3d 1491, 1494 (10th Cir. 1995) (statute expressly outlined special conditions for group homes for the handicapped). Significantly, the court recognized that plaintiff's facial challenge failed because it had not identified the specific provision treating the protected class differently and **rejected plaintiff's argument that the absence of language permitting "assisted living homes"** in areas zoned residential, combined with the Township's interpretation of its current regulations, is sufficient to establish a facial challenge. Id. at n. 21 (emphasis added).

Fatal to Plaintiff's facial challenge is that Plaintiff cannot point to any explicit language in the R-AAA Zone which discriminates, prohibits, restricts, or otherwise treats disabled individuals differently than non-disabled individuals. The focus of the Court's determination must be on the actual text within the R-AAA zone where Plaintiff seeks to build an assisted living facility. In fact,

3

the words "assisted living facility" or "handicap" or "disabled" or any other "proxy" for this protected class cannot be found anywhere within the R-AAA Zone. (Herten Certification, Exhibit C, § 250-59). As such, the facial challenge inquiry is easily defeated. Notwithstanding this, the only time assisted living facility is mentioned is within the RIM ordinance where preferential treatment is given to assisted living facilities over other uses as assisted living facilities are expressly permitted uses within the zone. (Herten Certification, Exhibit C, § 250-72). Although not required to have an assisted living facility as a permitted use at all, the City of Englewood specifically amended its code and memorialized assisted living facilities as a permitted use in 2014. When Plaintiff was challenged during oral argument to set forth the explicit discriminatory language, Plaintiff pointed to the words "no land or building shall be used…for any purposes other than the following…" § 250-59(B). As a matter of law, this language is not facially discriminatory against handicap individuals and applies to all non-permitted as of right uses equally.

The fact that the FHA protects disabled individuals does not mean that they are entitled to "preferential" treatment but rather the FHA prohibits "discriminatory" treatment. To the extent that disabled individuals are afforded an opportunity to establish that rules should be applied to them differently in the form of a reasonable accommodation because it is necessary to afford the disabled equal opportunity to use and enjoy a dwelling, such a claim is not ripe and Plaintiff has failed to establish its burden on the merits. Plaintiff's ill-interpretation of the law would have this Court believe that the absence of language is somehow indicative of a facial challenge; however, as articulated in Marriott, supra., **the absence of language does not establish a facial challenge**. As previously argued extensively, disabled individuals are not prohibited from living within the R-AAA Zone. Similarly, non-disabled individuals seeking to live in multi-family homes, for example, are treated the same as the disabled. In fact, by the City Ordinance's own definition, a "one-family dwelling" permits a group home or congregate living facility as long as it is not dependent upon the "payment of a fixed rent or room charge." (Herten Certification, Exhibit C, § 250-57). Similarly, the Ordinance defines "family" as "one or more persons living together in a dwelling on a permanent basis as a bona fide single housekeeping unit sharing living, sleeping, cooking, …on a nonprofit or a nonremunerative basis, and which is noncommercial in character and does not require, as a condition of continued occupancy, the payment of a fixed room rent or a service charge." Id. Therefore, by definition and on its face, disabled individuals are permitted to live in the R-AAA zone even in a congregate living facility. The only arguably differential treatment is that of a commercial, for profit entity, such as the assisted living facility Plaintiff seeks to build here. This is not a protected class and granting Plaintiff's request for this extraordinary relief would effectively create a new protected class for "for-profit" commercial entities.

As further evidence that the ordinance is not on its face invalid, this Court can look to the relief typically granted when facial challenges are successful. "The only way to modify a facially discriminatory statute is to remove the discriminatory language." New Directions Treatment Services v. City of Reading, 490 F.3d 293 (3d Cir. 2007). In this case, since there are no explicit terms that are facially invalid, there is simply no language that can be removed. It therefore follows that the language in the R-AAA Zone is by definition not invalid on its face. If this Court was to find this ordinance facially invalid, it essentially would be granting a "judicial" use variance and would be amending the R-AAA Zone, rather than striking language, to include assisted living facilities presumably in the R-AAA zone, without any expertise or localized knowledge to apply to such a determination. This is exactly the type of judicial interference that is not permitted under the law and is the precise reason that Planning Boards undergo studies before making amendments

to zoning ordinances. In <u>Finn v. Wayne Twp.</u>, 45 N.J. Super. 375, 379 (App. Div. 1957), the Appellate Division held that "although the authority exists to adopt a zoning ordinance, the determination to do so or to refrain therefrom rests in the discretion of the governing body. Courts have no general supervisory over the exercise of that discretion." This court would be usurping the local government's authority.

### Plaintiff's Disparate Impact and Reasonable Accommodation Claims Fail

This Court needs to look no further than the Third Circuit's decision in <u>Lapid-Laurel, LLC v. Zoning Bd. of Adjustment of Twp. of Scotch Plains</u>, 284 F.3d 442 (3d Cir. 2002) to conclude that Plaintiff's disparate impact and reasonable accommodation claims fail. The Third Circuit addressed an almost identical ordinance related to an applicant who sought to build a 95-bed care facility for the elderly. Plaintiff pointed to the fact that Scotch Plains' zoning plan designated only one location in the Township for "senior housing," and in an undesirable location, a light industrial area rather than a residential area. <u>Id.</u> at 467. Plaintiff also pointed out that the town permitted no development of senior residences as of right (meaning without a use variance) in any other part of the Township. <u>Id.</u> The Third Circuit rejected plaintiff's argument and in part, noted the "inherently beneficial" use status afforded to assisted living facilities in New Jersey. <u>Ibid.</u> The Third Circuit further found that nonetheless, the Township had legitimate reasons that it had a bona fide interest in denying the site plan application, namely traffic safety concerns and emergency vehicle access. <u>Id.</u> at 467. The Third Circuit also recognized that reasonable accommodation claims should be brought before the land use board and held that not only did plaintiff fail to establish that his site plan, including the size, was necessary to afford the disabled equal opportunity, the town had nonetheless established an undue burden citing to traffic safety concerns and emergency vehicle access. <u>Id.</u> at n. 5, 461-63. The facts of this case, where safety is even listed within the RIM's purpose, clearly demonstrate that Plaintiff cannot establish a reasonable likelihood of success on a disparate impact claim or a reasonable accommodation claim <u>and</u> that Plaintiff failed to exhaust its administrative remedies or establish futility, thereby making its claims premature.

The critical question this Court must ask itself arising from the Third Circuit's decision in <u>Lapid-Laurel</u> is, "Would the Third Circuit have denied plaintiff's disparate impact claim based upon an ordinance which was on its face invalid and not have at least raised this important issue *sua sponte*?" The obvious answer is "no." This is well supported by the numerous footnotes within the opinion itself. For example, at footnote 5, although not an issue before the court, the Third Circuit discussed ripeness at length. <u>Id.</u> at n. 5. It would defy common sense and justice that the Third Circuit would ignore and uphold an ordinance that was on its face discriminatory.

In short, Plaintiff's Order to Show Cause seeking extraordinary relief in the form of a judicial use variance and asking this Court to rubber stamp a site plan essentially "as is" and consisting of a 150-bed facility based upon an informal presentation to the Council defies the case law, the Municipal Land Use Law, federal statutes, and must outright be denied in its entirety, and Defendants' cross-motion for judgment on the pleadings should be granted.

**ANTONELLI KANTOR, P.C.**
*Attorneys for Defendants*
By:___/s/ Daniel Antonelli___
Daniel Antonelli

5