**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

---

| | |
|---|---|
| 431 E PALISADE AVENUE REAL ESTATE, LLC, et al., | : <br> : <br> : <br> : |
| Plaintiffs, | : |
| v. | :    Case No. 2:19-cv-14515-BRM-JAD |
| | : <br> : |
| CITY OF ENGLEWOOD, et al., | : |
| | :        **OPINION** |
| Defendants. | : |

---

**MARTINOTTI, DISTRICT JUDGE**

Before this Court is Plaintiffs' Application for an Order to Show Cause (ECF No. 2) seeking a Preliminary Injunction to enjoin the City of Englewood (the "City") and City Council of Englewood (the "Council," and together with the City, the "Defendants") from enforcing any provisions in the Code of the City of Englewood, ch. 250 (Land Use) (the "Code," "Englewood Code," or "Zoning Ordinance"), related to allowed land uses or dimensions, in any review of Plaintiffs' request for approvals to develop, construct, and operate an assisted-living and memory-care facility on land located at 405 East Palisade Avenue, 431 East Palisade Avenue and 7 North Woodland Street (the "Property"). (*Id.* at 1-2.) Plaintiffs are two limited liability companies—431 E Palisade Avenue Real Estate, LLC and 7 North Woodland Street, LLC,[1] along with unnamed John and Jane Does 1-10 (collectively "Plaintiffs")—seeking to develop the Property. Plaintiffs claim the City's Zoning Ordinance is facially discriminatory because it does not allow assisted-living and memory-care facilities as permitted uses in any purely residential district in the City,

---

[1] Plaintiffs' offices are located at 173 Bridge Plaza North, Fort Lee, New Jersey 07024.

instead permitting such uses only in what the City calls its Research, Industrial, Medical, or RIM, zone. Plaintiffs further contend this zoning violates, *inter alia*, the federal Fair Housing Act, which "prohibit[s] the application of special requirements through land-use regulations . . . that have the effect of limiting the ability of such individuals to live in the residence of their choice in the community." (*See* Pls.' Br. in Support of App. (ECF No. 2-16) at 4 (citing *Hovsons, Inc. v. Twp. of Brick*, 89 F.3d 1096, 1105 (3d Cir. 1996) (citing H.R. Rep. No. 711, 100th Cong., 2d Sess. 24, reprinted in 1988 U.S.C.C.A.N. 2173, 2185)).) Defendants oppose Plaintiffs' Application, contending Plaintiffs are unjustifiably attempting to short-circuit the zoning process and that, as Plaintiffs never submitted a request either to rezone the subject properties or for a variance to existing zoning regulations, the Application should be dismissed because the issue is not ripe for judicial resolution of the dispute between the parties. (*See* Defs.' Br. in Opp. to Pls.' App. for Order to Show Cause (ECF No. 20-2) at 1-3.)[2] Concerned Citizens of Englewood, Inc. (the "Concerned Citizens," or "amici"), a nonprofit corporation granted leave by this Court to appear as Amicus Curiae, also oppose the Application. (*See* Amicus Curiae Br. in Opp. to Pls.' Application (ECF No. 22).) Pursuant to Federal Rule of Civil Procedure 78(a), the Court heard oral argument on September 13, 2019. (ECF No. 24.) The Parties and amici each submitted post-argument summations of their positions on September 19, 2019. (*See* ECF Nos. 28, 29, 30.) Having reviewed the submissions filed in connection with the Motion and having heard the arguments of the parties, for the reasons set forth below and for good cause appearing, Plaintiffs' Application for a Preliminary Injunction is **GRANTED**.

---

[2] Defendants also filed a Cross-Motion Seeking a Judgment on the Pleadings pursuant to Fed. R. Civ. P. 12(c). The Court does not address the merits of that Motion here.

## I.    BACKGROUND[3]

Plaintiffs acquired the property at 431 East Palisade Avenue in May 2017. (*See* Compl. (ECF No. 1) ¶ 72 (citing Cert. of Thomas Herten (ECF No. 2-1) ¶ 2, Ex. E).) In April 2017, a predecessor-in-interest contingently agreed to buy two adjacent lots. (*Id.* ¶ 78 (citing ECF No. 2-1 ¶ 2, Ex. F).) Plaintiffs were assigned those rights eight days later. (*Id.* ¶ 79.) The sale of the adjacent lots was contingent on the purchaser obtaining, by August 9, 2019, the approvals necessary to develop the Property, otherwise the seller could terminate the sale.[4] (*Id.* (citing ECF No. 2-1 ¶ 2, Ex. F at §§ 4.1, 4.2 and 8.1).) With the adjacent lots, Plaintiffs would control a roughly five-acre site, with a school located across the street of its western border, the City of Englewood Cliffs on its eastern border, the main thoroughfare of East Palisade Avenue on its southern border and a single-family residence to the north, as shown herein. (*Id.* (citing ECF No. 2-1 ¶ 2, Ex. H).)



---

[3] Unless otherwise noted, the following facts are taken from Plaintiffs' Complaint and assumed true for purposes of this Opinion.

[4] Plaintiffs have represented to the Court that they were able to secure an extension of this contingency.

Plaintiffs plan to demolish existing "dilapidated" structures on the properties and build a 150-bed facility for assisted living and memory care (the "Facility").[5] (*Id.* ¶ 84-85.) The Property, however, is in an R-AA[6] (residential) zoning district, though it is located within an *eruv*[7] erected around the City. (*Id.* ¶ 85-6.) In addition to 150 residents, the Property would feature "supportive care twenty-four hours a day, seven days a week for its memory care patients, as well as social workers, clinical and family therapists, counselors and patient support staff." (*Id.* ¶ 90.) Plaintiffs are silent on how many staff would work at the site. Plaintiffs propose the new Facility would appear as follows:



---

[5] Plaintiffs are affiliated with CareOne, LLC, as well as the entity that will manage the Facility, 431 E. Palisade Avenue OpCo, LLC (collectively, "CareOne"), which also has offices at 173 Bridge Plaza North, Fort Lee, New Jersey.

[6] While the Complaint refers to the Property as being in an R-AA (residential) zoning district, Plaintiffs and amici in their briefing for this Motion refer to the property as being in an R-AAA zoning district that also is primarily for residential use. (*Compare* Compl. at ¶ 85, *with Amicus* Br. at 19, Pls. Br. at 10, 12, 22, 25, Pls. Reply at 3, 4, 26.) Because R-AA and R-AAA are essentially the same for the purposes of Plaintiffs' Application, any discrepancy has no impact on the outcome of the Court's decision.

[7] An *eruv* is a religiously designated geographic area that allows religiously observant Jews the ability to travel do other those otherwise prohibited on the Shabbat. (*Id.* at ¶ 85.)

Plaintiffs contend "plans for the Facility are nearly identical to plans that could be approved 'by right' on City lands zoned RIM in terms of use and all bulk requirements." (*Id.* ¶ 95 (citing ECF No. 2-1 ¶ 2, Ex. K, at 24).) However, the City's Zoning Ordinances provide for assisted-living facilities only in the RIM—Research, Industry, Medical—district; assisted-living centers are not a permitted use in any other zone. (*Id.* ¶ 22 (citing ECF No. 2-1 ¶ 2, Ex. C; Englewood Code § 250-72).) The RIM district is not included in the *eruv,* meaning Orthodox Jews on certain days would not be able to travel to or from an assisted-living center compliant with the City's Zoning Ordinances. (*Id.* at ¶¶ 53-54.) A Zoning Map is pictured below:



Plaintiffs contend they have discussed with City officials the approvals required for their project numerous times since 2017. (*Id.* ¶ 97.) Plaintiffs state they were asked by City officials to present the project to the Council in January 2018, only to be taken off the agenda at the last minute. (*Id.* at ¶ 98.) Plaintiffs say that by letter dated January 14, 2018, they submitted a written request that the Council rezone the Property for the Facility. (*Id.* at ¶ 98 (citing ECF No. 2-1 at ¶ 2, Ex. H).) That letter states:

> Now that the Council has reorganized for 2019, our client *formally requests* that the [p]arcels be rezoned either to allow assisted living/memory care as a permitted use in the R-AAA zone or to allow the parcels to be developed as a conditional use in the R-AAA zone with appropriate standards adopted to allow building coverage and lot coverage for its development.

(ECF No. 2-1 at ¶ 2, Ex. H at 2 (emphasis added).) Plaintiffs attached "suggested standards" to the letter. (*Id.*) Plaintiffs further stated in the letter that the "oversight" of limiting assisted-care facilities to the RIM district through a City Master Plan that acknowledges the looming issue of "the 'graying' residents of Englewood needed to be addressed" provided, in concert with the Fair Housing Amendments Act, "an affirmative basis to support [Plaintiffs'] rezoning request." (*Id.* at 2-3.) Plaintiffs contend they were prepared to "make a more formal presentation at a Council meeting to provide whatever additional information" the Council required. (*Id.* at 3.) In the Complaint, Plaintiffs label this letter as "The Application." (ECF No. 1 ¶ 99.) Plaintiffs claim Defendants "refused to act on the Application." (*Id.* ¶¶ 102-03.) Instead, Plaintiffs say, Defendants raised "spurious concerns about hot zoning" and told Plaintiffs "on numerous occasions" that Plaintiffs should instead apply to the Board of Adjustment for variances that would permit the Property to be developed for Plaintiffs' intended use. (*Id.* ¶¶ 102, 104.) Plaintiffs have not applied for a variance, contending this course of action would be futile because, among other reasons, the variance process—including a four-part balancing test the Board must conduct to approve a

variance as a "beneficial use" of the Property and the super-majority required to approve a variance—is itself discriminatory because it "places a burden on handicapped persons in the City not faced by non-handicapped persons who want to reside in residential districts." (*Id.* ¶ 110.)[8]

Plaintiffs responded to the "hot zoning" issue raised by Defendants by letter dated March 15, 2018, stating that "rezoning to accommodate a fair share housing requirement is not illegal spot zoning under well-settled New Jersey law." (*Id.* ¶ 116.) Plaintiffs say the City did not respond to that letter. (*Id.* ¶ 117.) Plaintiffs publicly presented their development and zoning plans to the Council at a May 7, 2019 meeting, though Plaintiffs concede that, as "no rezoning ordinance had been introduced, the May 2019 hearing was not an official consideration of the Application by Council." (*Id.* ¶ 118.) Plaintiffs' experts spoke at this hearing in support of Plaintiffs' rezoning and development proposals. (*Id.* ¶¶ 121-25.) Plaintiffs contend Wayne Scott, the City's Zoning Officer, "stated several times he did not believe the Council had sufficient knowledge of land use to act in zoning matters, including regarding the Application, and that '[applications] normally come [] before the zoning official, he reviews it and sends it to the appropriate board.'" (*Id.* ¶ 129 (citing ECF No. 2-1 ¶ 2, Ex. K at 82).) Plaintiffs further contend Mr. Scott "complained the Application

---

[8] Plaintiffs are holders of a Certificate of Need issued by the State of New Jersey, which cited in part "the [lack of] availability of facilities or services which may serve as alternatives or substitutes." (ECF No. 1 at ¶ 21 (citing ECF No. 2-1 ¶ 2, Ex. A, at 1).) The state of New Jersey issues certificates of need pursuant to N.J. Stat. Ann § 26:2H-8. (*See* ECF No. 2-1, Ex. A). "Under New Jersey law, developers of group homes for the handicapped (including the elderly) may apply for use variances as an "inherently beneficial use" in any zone. *Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment of Twp. of Scotch Plains*, 284 F.3d 442, 467 (3d Cir. 2002) (citing *Smart SMR of N.Y., Inc. v. Borough of Fair Lawn Bd. of Adjustment,* 152 N.J. 309, 704 A.2d 1271, 1281 (1998) (noting that the New Jersey Supreme Court has recognized nursing homes as "inherently beneficial uses"). Because the Court was able to reach a decision on the FHA disparate-treatment claim, the Court does not address Plaintiffs' futility argument related to its reasonable-accommodation claim. But, the Court is persuaded that the expiration of the Certificate of Need in the event Plaintiffs' application failed would have required Plaintiffs to undergo the months-long process of obtaining a new one (ECF No. 2-16 at 25), a prospect that did inform the Court's irreparable-harm analysis.

had not come to him for a referral to a board, which would allow him to derail Plaintiffs' proposed rezoning." (*Id.* ¶ 130 (citing ECF No. 2-1 ¶ 2, Ex. K at 81-82).) Plaintiffs claim Defendants refused to act on Plaintiffs' application, a course of nonaction that "den[ies] Plaintiffs a reasonable accommodation in any residential district in the City, not just at the location of the Property, as all the same objections regarding residential character will arise in any location with residential zoning." (*Id.* ¶ 138.) The failure to rezone the Property, Plaintiffs contend, "resulted in significant harm to Plaintiffs and Plaintiffs' prospective residents, and exposed Plaintiffs to potentially losing necessary parcels of land on August 9, 2019." (*Id.* ¶ 142.)

## II.  PROCEDURAL HISTORY

Plaintiffs filed the Complaint on June 28, 2019, alleging violations of the federal Americans With Disabilities Act (Count I), federal Fair Housing Act (Count 2), federal Rehabilitation Act (Count 3), violations of their constitutional rights under 42 U.S.C. § 1983 (Counts 4-6, 11), the federal Religious Land Use and Institutionalized Persons Act, (Count 10), and various state laws (Counts 7-9). (ECF No. 1). Concomitantly, Plaintiffs filed an Application/Petition for an Order to Show Cause seeking a preliminary injunction "enjoining their enforcement of the Code against Plaintiffs pending the final resolution of this matter, and approving their present zoning application." (ECF No. 2, *see also* Pl. Mem. in Support of App. (ECF No. 2-16) at 2).) On August 21, 2019, Defendants filed a Cross Motion for Judgment on the Pleadings and Opposition to Plaintiffs' Order to Show Cause. (ECF No. 20.) On August 28, 2019, pursuant to the Stipulation of the Parties and this Court's Order of August 22, 2019, the nonprofit corporation Concerned Citizens filed an *Amicus Curiae* brief opposing Plaintiffs' Order to Show Cause. (ECF No. 22.) Plaintiffs filed their Reply Brief on September 6, 2019. (ECF No. 23.) This Court conducted oral argument on the Application on September 13, 2019. (ECF No. 32.) The

Parties and amici each filed post-argument summations of their positions at this Court's request on September 19, 2019. (ECF Nos. 28-30.)

### III. LEGAL STANDARD

"Preliminary injunctive relief is an 'extraordinary remedy, which should be granted only in limited circumstances.'" *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) (quoting *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 586 (3d Cir. 2002)). To obtain preliminary relief, a movant must show

> (1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured . . . if relief is not granted. . . . [In addition,] the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.

*Reilly*, 858 F.3d at 176 (citing *Del. River Port Auth. v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 919–20 (3d Cir. 1974) (citations omitted)). The first two factors are the "most critical." *Reilly,* 858 F.3d at 179. To satisfy the first prong, a movant must "demonstrate that it can win on the merits[,] which requires a showing significantly better than negligible but not necessarily more likely than not." (*Id.* (internal punctuation omitted).) The Third Circuit does not require "a more-likely-than-not showing of success on the merits because a 'likelihood' [of success on the merits] does not mean more likely than not." *Reilly,* 858 F.3d at 179 n.3 (quoting *Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011) (en banc) (internal punctuation omitted); *cf. Nken v. Holder*, 556 U.S. 418, 434 (2009) ("It is not enough that the chance of success on the merits be better than negligible[,]" and "more than a mere 'possibility' of relief is required.") (quotations omitted)).

## IV.    DECISION

Plaintiffs seek a preliminary injunction to enjoin Defendants from enforcing the City's Zoning Ordinances against the Property. The practical effect of a preliminary injunction is that Plaintiffs' plans for developing the Property as a 150-bed assisted-living center would be considered a permitted use in the residential zone in which the site is located. Currently, assisted-living centers are permitted uses only in the RIM district,[9] while the Property is located in District R-AAA, which is zoned primarily for one-family dwellings. To obtain such relief Plaintiffs first must show they are likely to succeed on the merits at trial. Thus, the threshold issue facing this

---

[9] At oral argument, the parties agreed that in the event this Court granted Plaintiffs' application for a preliminary injunction and deemed Plaintiffs' plans for an assisted-living center to be a permitted use at the Property, that Plaintiffs still would be subject to the remaining procedures of the City of Englewood's land-use process:

> PLAINTIFFS/WARREN A. USATINE: . . . What we're not here to do is what the citizens say we're doing, which is turning Your Honor into some kind of a super Planning Board. We are not seeking that. We're seeking to have our use deemed allowed. We're seeking to have Your Honor order that the facility we contemplate consistently with the certificate of need allowed. We're not seeking Your Honor to say "and just go build whatever you want." We fully expect to—and are ready to—go to the Planning Board.
> . . .
> THE COURT: What would you say the relief should be if the ordinance is deemed facially unconstitutional?
> DEFENDANTS/DANIEL ANTONELLI: If Your Honor deems the ordinance facially unconstitutional?
> THE COURT: Yes.
> MR. ANTONELLI: Then I would take that to mean that the prohibition—that the assisted living facility is prohibited, then the R triple-A zone would not apply.
> THE COURT: Okay. And then what does that mean?
> MR. ANTONELLI: I would think at that point because it's no longer a use issue, plaintiff would be obligated to proceed before the Planning Board.

(Trans. of Oral Arg. (ECF No. 32) at 31:2-11, 41:16-42:2.)

Court is whether the City's Zoning Ordinances are facially discriminatory against the elderly and handicapped, as Plaintiffs allege, because they provide only one zone in which assisted-living centers are a permitted use.

Plaintiffs bring their action under, among other grounds, the Fair Housing Act ("FHA"),[10] the Americans With Disabilities Act ("ADA"),[11] and the Rehabilitation Act.[12] (*See* ECF No. 1 ¶ 10.) This Court has subject-matter jurisdiction over the federal claims pursuant to 28 U.S.C. § 1331, while it has supplemental jurisdiction over the state claims pursuant to 28 U.S.C. § 1367, as the state law claims are related to the federal claims.

The FHA, the ADA, and the Rehabilitation Act all are applicable to zoning decisions. *McKivitz v. Twp. of Stowe*, 769 F. Supp. 2d 803, 823-24 (W.D. Pa. 2010) (citing *Forest City Daly Housing, Inc. v. Town of North Hempstead,* 175 F.3d 144, 150–51 (2d Cir. 1999)). As these three statutes apply the same governing standards, the Court addresses Plaintiffs' federal law claims in accordance with the requirements of the FHA. *McKivitz*, 769 F. Supp. 2d at 823-24 (citing *Dr. Gertrude A. Barber Center, Inc. v. Peters Tp.,* 273 F. Supp. 2d 643, 652 (W.D. Pa. 2003)).

Pursuant to the FHA, it is illegal to discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter from a protected class of individuals. *See*

---

[10] 42 U.S.C. § 3601 *et seq.*, as amended by the Federal Fair Housing Amendments Act of 1988. *Horizon House Developmental Servs., Inc. v. Twp. of Upper Southampton*, 804 F. Supp. 683, 685 (E.D. Pa. 1992), *aff'd*, 995 F.2d 217 (3d Cir. 1993)

[11] 42 U.S.C. § 12101, *et seq.*

[12] 29 U.S.C. § 791. Plaintiffs also alleged violations of the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc (the "RLUIPA"), the Constitution of the State of New Jersey, "the New Jersey Municipal Land Use Law, N.J. Stan. Ann. § 40:55D-62 et seq. (the "MLUL"), and N.J. Stat. Ann. § 10:5-1 (the "New Jersey Law Against Discrimination" or "NJLAD"). Because the Court reached a decision on the FHA disparate-treatment claim, the Court does not address Plaintiffs' additional federal and state law claims.

42 U.S.C.A. § 3604(f)(1) (West). "The FHA makes discriminatory 'a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling.'" *901 Ernston Rd., LLC v. Borough of Sayreville Zoning Bd. of Adjustment*, No. CV 18-2442, 2018 WL 2176175, at *5–6 (D.N.J. May 11, 2018) (quoting 42 U.S.C. § 3604(f)(3)). A subsequent amendment to the FHA, the Fair Housing Amendments Act ("FHAA"), "was expressly intended to prevent municipalities from using their zoning authority to treat congregate living arrangements of unrelated people with disabilities differently from living arrangements of nondisabled people." *901 Ernston Rd.*, 2018 WL 2176175, at *5–6 (citing *Twp. of W. Orange v. Whitman*, 8 F. Supp. 2d 408, 425 (D.N.J. 1998)). Specifically relevant to this matter, the FHAA defines a handicap as "a physical or mental impairment which substantially limits one or more of such person's major life activities." *Arc of New Jersey, Inc. v. State of N.J.*, 950 F. Supp. 637, 644 (D.N.J. 1996) (citing 42 U.S.C. § 3602(h) (1994)).

The Rehabilitation Act provides that no disabled individual "shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Lastly, the ADA expands the scope of the Rehabilitation Act to private entities receiving federal funds. *901 Ernston Rd.*, 2018 WL 2176175, at *5–6 (citing *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 302 (3d Cir. 2007).) Beyond the Court's inherent judicial authority to issue a preliminary injunction pursuant to Fed. R. Civ. P. 65, these statutes authorize courts to grant injunctive relief, either temporary or permanent, where "a discriminatory housing practice has occurred or is about to occur." *901 Ernston Rd.*, 2018 WL 2176175, at *5–6 (citing 42 U.S.C. § 3613(c)(1) (FHA)); *see also* 29 U.S.C. § 794a (noting ADA remedies are same as

those available under the Civil Rights Act enforcement provision, 42 U.S.C. § 2000e–5, which authorizes injunctive relief); 42 U.S.C. § 12133 (same, incorporating ADA remedies and enforcement procedures).

As a predicate to success on any of these claims, a plaintiff must present a class of protected individuals, here handicapped individuals. *901 Ernston Rd.*, 2018 WL 2176175, at *5–6. In the Third Circuit,

> Plaintiffs alleging violations of the FHAA . . . may bring three general types of claims: (1) intentional discrimination claims (also called disparate treatment claims) and (2) disparate impact claims, both of which arise under § 3604(f)(2), and (3) claims that a defendant refused to make 'reasonable accommodations,' which arise under § 3604(f)(3)(B).

*Community Services, Inc. v. Wind Gap Mun. Authority*, 421 F.3d 170, 172 (3d Cir. 2008).

Because the parties disagree on how the City's Zoning Ordinances are to be interpreted, the Court first must determine how to read the relevant provisions in order to decide whether the City's Zoning Ordinances violate the FHA, ADA, or Rehabilitation Act on their face.

The City's Zoning Ordinances provide for residential living in 24 districts. Eight of those districts are defined as one-family residence districts. Englewood Code § 250-59(A). In those eight districts, the ordinances state that "no land or building shall be used, nor shall any building be constructed, altered or designed to be used, for any purposes other than" eight delineated uses, including one-family dwellings, municipal uses, public schools and places of worship. *Id.* Another seven districts are zoned for either multifamily or multiresidence use, with one expressly allowing "subsidized nonprofit housing for families and senior citizens." *Id.* §§ 250-60 through -62, -71 through -74, -77. Apartments and condominiums are permitted or conditional uses, other than in the multifamily or multiresidence districts, in three other districts, while townhouses are permitted

or conditional uses in three districts outside the multifamily or multiresidence areas. *Id.* §§ 250-63, -65, -72, -69, -76.

There is no express language in any of these ordinances prohibiting or discriminating against either the elderly or the handicapped in any of these districts. Indeed, two districts explicitly provide for multifamily or multiresidence senior housing. *Id.* §§ 250-62, -72. Defendants cite *Marriott Senior Living Services, Inc. v. Springfield Twp.* for the proposition that the absence of language permitting assisted-living centers in areas zoned residential cannot be the basis for a disparate-treatment claim. (*See* Defs.' Letter (ECF No. 28) at 3 (citing *Marriott*, 78 F. Supp. 2d 376 (E.D. Pa. 1999).) *Marriott* is distinguishable on the facts. The *Marriott* Court stated that plaintiff had not identified "any specific provision of the zoning code or land use ordinance it challenges whereby elderly persons with disabilities are expressly treated differently than others." *Marriott*, 78 F. Supp. 2d at 388. As the Court explained in a footnote, this conclusion was grounded in the fact that plaintiff "candidly acknowledges that the terms 'personal care homes' and 'senior assisted living homes' are not specifically mentioned anywhere in the Township's zoning code." *Id.* at 388 n.10. This stands in contrast to the City's Zoning Ordinances, where assisted-living facilities are expressly provided for as a permitted use in the RIM district. Englewood Code § 250-72(A).

Where Plaintiff does allege discrimination is in "the segregation" of assisted-living and memory-care facilities from "all residential districts in the City." (*See* Pls.' Br. in Support of Appl. (ECF No. 2-16) at 1.) At issue is the RIM district, the only area in the City in which assisted-living facilities are an expressly permitted use. Englewood Code § 250-72(B). Plaintiff claims this zoning scheme "depriv[es] elderly and handicapped residents in need of daily care in a congregant setting of the right to live in residential neighborhoods." (ECF No. 2-16 at 1.)

Plaintiffs cite *Hovsons, Inc. v. Twp. of Brick* for the proposition that the FHA is intended to "prohibit the application of special requirements through land-use regulations . . . that have the effect of limiting the ability of such individuals to live in the residence of their choice in the community." (*Id.* (citing *Hovsons*, 89 F.3d 1096, 1105 (3d Cir. 1996) (citing H.R. Rep. No. 711, 100th Cong., 2d Sess. 24, reprinted in 1988 U.S.C.C.A.N. 2173, 2185)).) Indeed, Plaintiffs argue, "the Third Circuit has expressly cited the House Report to the FHA, which provides that the Act 'is intended to prohibit . . . [the imposition of] terms or conditions . . . which have the effect of excluding . . . congregate living arrangements for persons with handicaps.'" (*Id.* (citing *Hovsons*, 89 F.3d at 1105).)

Plaintiffs contend the City's zoning "*discriminates against disabled individuals requiring care in congregant settings* because it expressly limits construction of such homes to the RIM district, where institutional and industrial uses predominate." (*Id.* at 7) (emphasis added). This zoning also is discriminatory, Plaintiffs argue, because limiting assisted-living centers to the RIM district "has a disparate impact on elderly and handicapped citizens," whose "ability to choose housing in a residential City neighborhood has been" severely constrained. (*Id.* at 8.) Plaintiffs contend "[t]he City's land use regulations hinder the residential choices of elderly and handicapped citizens, including such individuals' choice to live in communal or congregate residential settings, such as assisted living and memory care facilities." (*Id.* at 9.)

In their opposition, Defendants rest primarily on the argument that the matter is not ripe for adjudication, and thus that it would be premature for this Court to issue a preliminary injunction enjoining the City from enforcing its Zoning Ordinances and approving Plaintiffs' zoning request. They allege it is not ripe for adjudication because, contra Plaintiffs' Complaint, Plaintiffs have not filed any application with the City's Zoning Board of Adjustment ("Zoning Board") to have the

Property rezoned. Defendants contend *Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnston City* stands for the proposition that the "question of ripeness is a determination of whether 'the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue.'" (Defs.' Br. in Opp. to App. (ECF No. 20-16) at 4 (quoting *Williamson*, 473 U.S. 172, 186 (1985)).)[13] Defendants contend Plaintiffs come before this Court having disregarded New Jersey's Municipal Land Use Law requiring, among other things, Plaintiffs to submit a formal application to the City to rezone the Property. (*Id.* at 7.) This step is critical, Defendants argue, because "the Third Circuit held [in *Lapid-Laurel, LLC v. Zoning Bd. of Adj. of Twp. of Scotch Plains*] that 'federal courts should limited [sic] their review to the materials that were presented to the local

---

[13] At oral argument, the parties agreed that ripeness is not an issue as to Plaintiffs' claim that the City's Zoning Ordinances facially discriminate against the elderly and handicapped:

> THE COURT: You're talking about, I guess, an as-applied analysis to your ordinance, correct?
> DEFENDANTS/DANIEL ANTONELLI: That's an as-applied analysis, correct.
> THE COURT: But we—plaintiff is saying—and correct me if I'm wrong—we don't even need to get to that. We don't need to get to ripeness. We don't need to get to exhaustion of administrative remedies. We don't need to get to the five different ways this case could have been brought to the municipality because the ordinance on its face is unconstitutional, so the rest of the analysis is unneeded. Is that what you're saying?
> PLAINTIFFS/WARREN A. USATINE: Your Honor, that's exactly what we're saying, and facially discriminatory statutes are ripe the second they are enacted. That is exactly what we're saying.
> THE COURT: Okay. On that point—
> MR. ANTONELLI: And I don't disagree with that point. But this isn't—
> THE COURT: You're saying this isn't facially unconstitutional.
> MR. ANTONELLI: The City's position and argument is that the ordinance as drafted is not facially unconstitutional. . . .

(ECF No. 32 at 10:16-11:9.)

use board, except in circumstances where the board prevents applicants from presenting sufficient information." (*Id.* at 7 (quoting *Lapid-Laurel*, 284 F.3d 442 (3d Cir. 2002).) Also, this step enables land-use boards "to have the initial opportunity to provide reasonable accommodations" to applicants. (*Id.* at 8 (quoting *Lapid-Laurel*, 284 F.3d at 450).)

Defendants contend that "in all of the land use cases cited by Plaintiffs to support their position, all plaintiffs made an application before a land-use board." (*Id.* at 6.) Here, Defendants argue, the City's Zoning Ordinances require all applications for development to be "initially presented to the Zoning Officer," who is to "refer the application to the appropriate municipal agency and [] assist the applicant in process the application for development." (*Id* at 10 (citing Englewood Code § 250-3; *see also* ECF No. 2-1, Ex. C at 3).) As stated in Plaintiffs' Complaint, the City's Zoning Officer, Mr. Scott, "complained the Application had not come to him for a referral to a board." (ECF No. 1 ¶ 130 (citing ECF No. 2-1, Ex. K at 81-82).) Because Plaintiffs did not submit a formal application for rezoning or submit an application for a variance to the City's Zoning Board, Defendants assert Plaintiffs come to this Court with "unclean hands," seeking to "circumvent[] all procedural requirements applicable to all other applicants and in total contravention of the Municipal Land Use Law and the City's own ordinance requirements." (ECF No. 2-16 at 1.)

Defendants contend the City's zoning does not discriminate and that Plaintiffs have not shown any facts to support the discrimination claims. That is because, Defendants argue, a "plaintiff makes out a prima facie case under Title VIII, as amended by the FHA, by showing either: (1) intentional disparate treatment of the handicapped with regard to housing; or (2) disparate impact along, without proof of discriminatory intent." (ECF No. 20-2 at 15 (citing *Doe v. City of Butler*, 892 F.2d 315, 323 (3d Cir. 1989)).) To evidence discrimination, Defendants

contend, Plaintiffs must demonstrate "that a given legislative provision discriminates against the handicapped on its face, i.e., applies different rules to the disabled than are applied to others." (*Id.* at 16 (citing *Arc of New Jersey, Inc. v. State of N.J.*, 950 F. Supp. 637, 643 (D.N.J. 1996)).)

Plaintiffs contend the City's Zoning Ordinances discriminate because they prohibit assisted-living facilities from all districts in the City except the RIM district, where among other permitted uses are light industrial, warehousing, auto sales and repair, hotels, accessory retail, and a host of health-care uses such as medical offices, rehabilitation centers, skilled nursing facilities, ambulatory surgery centers, among others. Englewood Code § 250-72(B).

Defendants counter that the Zoning Ordinances permit assisted-living facilities in the RIM district and do not expressly or explicitly prohibit, ban, limit or otherwise forbid assisted-living centers in any other district.[14] Defendants say that because such negative or prohibitive language

_____

[14] At oral argument, Defendants stated:

> THE COURT: Would you agree that handicapped individuals do not have the same opportunity to live in a congregate care facility in any district in Englewood but the RIM district? Save your argument for—other than getting a use variance, you would agree to that.
> DEFENDANTS/VIVIAN LEKKAS: Other than getting a use variance?
> THE COURT: Yes.
> MS. LEKKAS: Well, no, I wouldn't agree to that because it's very important that they can get a use variance.
> THE COURT: I'm just saying, the only way they can is through a use variance.
> MS. LEKKAS: Correct. The only way they can is –
> THE COURT: The ordinance as written does not permit that.
> MS. LEKKAS: It does not prohibit it either. There's no language in the ordinance that prohibits it. That's essential to this case. It's germane.
> THE COURT: So a handicapped person can live in a single-family home in any district in Englewood.
> MS. LEKKAS: Right.

is not used, Plaintiffs cannot show the discriminatory intent required by *Arc of N.J.*[15] The Court is

not persuaded.

---

> THE COURT: But once it starts to get to a deemed congregate care facility, they would need a use variance to obtain residential housing.
>
> MS. LEKKAS: And so would a nondisabled person, which is also germane. They're treated equally.
>
> THE COURT: Well, is a nondisabled person defined under the Fair Housing Act?
>
> MS. LEKKAS: No. There are protections given under the Fair Housing Act to handicapped people, but you need to establish differential treatment. And on a facial challenge, you have the burden of showing the words in the ordinance on a facial challenge claim. So I challenge plaintiffs, look up the ordinance. Tell us the words that say "prohibit," "forbid." They're not there, but they are there in the cases cited. There's the New Directions case, which restricted methadone clinics. Uses the word "restrict," "forbid." The *Bay Area* case again, and the one cited by plaintiffs, the Montana case, a graph literally X-ing out with a dash that those—the assisted living facility is restricted, and that's the key difference with those cases.

(ECF No. 32 at 62:4-63:19.)

[15] Amici further state that the City "has been more than accommodating through its land use boards" to assisted-living facilities and point to six smaller special-needs and assisted-living housing scattered throughout the City, including in residential districts. (ECF No. 22 at 26). The Court observes that the Master Plan Amendment through which the City added the assisted-living provisions to its Zoning Ordinances occurred in 2014-2015, while the six properties cited by amici all began operations well before that Amendment. (*Id.* at 26-28.) Amici and Defendants also contend there is no discrimination because the Lillian Booth Actor's Home, an assisted-living facility, is located in the Residential-D district. (*Id.* at 24; *see also* ECF No. 20-2 at 2 (citing Decl. of Wayne Scott (ECF No. 20-5) ¶¶ 17-19).) The Court observes that this home was built in 1960 and expanded in 1988. (ECF No. 20-5 at ¶ 18.) In short, the existence of any of these facilities is irrelevant to the question of whether the City's Zoning Ordinances in 2019 are facially discriminatory. Also, the use variances that Defendants and amici say have been granted to some of these facilities may be relevant and perhaps even persuasive to Plaintiffs' reasonable-accommodation challenge, but they are immaterial to Plaintiffs' facial challenge to the City's zoning. Regardless, as stated at oral argument, the Court recognizes that the City's zoning generally demonstrates that Englewood is "an inclusive community. It's a progressive community, and certainly one that should be admired throughout our state if not the country." (ECF No. 32 at 91:20-23.)

As a threshold matter, it is well settled that facial challenges are ripe for adjudication upon the enactment of the ordinance or legislation being challenged. *See Marriott Senior Living Servs., Inc. v. Springfield Twp.*, 78 F. Supp. 2d 376, 388 (E.D. Pa. 1999) (citing *Suitum v. Tahoe Regional Planning Agency,* 520 U.S. 725, 117 S. Ct. 1659, 1667 n.10, 137 L.Ed.2d 980 (1997) (noting that facial challenges to regulations are generally ripe the moment the challenged regulation or ordinance is passed in "takings" cases). Defendants' ripeness argument, thus, is inapplicable to Plaintiffs' facial challenge to the City's Zoning Ordinances.

The Court is persuaded that the failure of the Code to employ such negative words as assisted-living centers are "prohibited," or "banned," or "forbidden" from any other district other than the RIM district, as argued by Defendants, does not disguise the fact that assisted-living centers are not permitted uses in any district defined residential as its primary character.

Moreover, the Court is persuaded that, as Plaintiffs argue, "creation of the RIM district as the exclusive zone where the handicapped elderly could receive assistance in a congregant setting was intentional." (*See* ECF No. 2-16 at 7 (citing ECF No. 2-1 ¶ 2, Ex. K, at 80:16-81:5).) Indeed, the Zoning Ordinances permit nonhandicapped elderly in multiresidence dwellings in the RMH district,[16] but the handicapped elderly requiring congregant care are not similarly treated. Rather, the handicapped elderly are limited to the RIM district if they require congregant care.

The Court agrees with Plaintiff that the City's Zoning Ordinances actually do use prohibitive language. For instance, § 250-59 of the Code, which defines the permitted uses in the City's eight solely one-family residential districts, states that "no land or building shall be used,

---

[16] The RMH district "provide[s] for subsidized nonprofit housing for families and senior citizens," and "no land or building shall be used, nor shall any building be constructed, altered or designed to be used, for any purpose other than" multifamily dwellings, accessory buildings, municipal purposes and parks and playgrounds. Englewood Code § 250-62(A), (B).

nor shall any building be constructed, altered or designed to be use, for any purposes" other than the eight listed exceptions, none of which can be construed as including an assisted-living facility as among the permitted uses in these districts. Englewood Code § 250-59(B). Consider also the definition of a one-family dwelling: "A building designed for, or occupied exclusively by, one family and *not designed or used as . . . a congregant living facility* in which a person's continued occupancy is dependent upon the payment of a fixed rent or room charge." *Id.* § 250-58. Defendants contend this definition should be construed to mean disabled individuals are permitted to live in the R-AAA zone, even in a congregate-living facility, provided the facility is not a commercial, for-profit entity. (*See* Defs.' Letter (ECF No. 28) at 4.) If this definition is discriminatory, Defendants suggest it discriminates not against the handicapped but against commercial entities, which are not a protected class. (*Id.*) The Court does not agree.

The Court recognizes the City's Zoning Ordinances do not expressly state that assisted-living centers are prohibited from districts primarily designed as residential. There also is no language explicitly stating that assisted-living centers are limited to the RIM district, or providing that assisted-living centers are barred from being a permitted, or even conditional, use in any other district.[17] Instead, assisted-living centers are simply listed as a permitted use in only one zone— the RIM district. But, in one-family residential districts, any uses other than the eight examples discussed above that are listed in the Zoning Ordinances are, in fact, prohibited. The Zoning Ordinances expressly state that "no land or building shall be used, nor shall any building be

---

[17] The City's Zoning Ordinances do not define conditional or permitted use. Black's Law Dictionary defines conditional use as, "A use of property subject to special controls and conditions. A conditional use is one that is suitable to a zoning district, but not necessarily in every location within that district." *See* Black's Law Dictionary, 10th Ed. at 1775.

constructed, altered or designed to be used, for any purposes other than" listed exceptions that do not include assisted-living or congregant-care facilities. Englewood Code § 250-59(B).

The Court concludes from this that the City's Zoning Ordinances expressly prohibit congregate-living facilities from those districts in which single-family homes are permitted uses and from those multifamily and multiresidence districts in which larger residences such as apartment buildings, condominiums and townhouse communities are permitted uses.

Having determined that the City's Zoning Ordinances prohibit assisted-living centers from any district zoned primarily for residential use, the Court now must consider whether the City's prohibition constitutes disparate treatment of these facilities, meaning does Plaintiff "demonstrate that some discriminatory purpose was a 'motivating factor' behind the challenged" ordinances. *Community Services*, 421 F.3d at 177 (citing *Cmty. Hous. Trust v. Dep't of Consumer & Regulatory Affairs*, 257 F. Supp. 2d 208, 225 (D.D.C. 2003)).

The Third Circuit has stated a "discriminatory purpose need not be malicious or invidious, nor need it figure in 'solely, primarily, or even predominantly' in the motivation behind the challenged action." *Community Services*, 421 F.3d at 177. The Court begins this inquiry with the determination that the "creation of the RIM district as the exclusive zone where the handicapped elderly could receive assistance in a congregant setting was intentional." (*See* ECF No. 2-16 at 7 (citing ECF No. 2-1 ¶ 2, Ex. K, at 80:16-81:5).)

The City's Zoning Ordinances justify the RIM's permitted uses including assisted-living centers by stating that this will

> foster the development of medical and health-care facilities that complement the existing medical and health care services located throughout the City. Senior housing is permitted to complement future medical and health care services and to contribute to a sense of a health care village that offers care and living opportunities for older persons.

Englewood Code § 250-72(A). The Court does not doubt that the creation of a health-care village for seniors may be a rational, even a desirable or laudable, goal for the City. However, the Court is persuaded that creating a Master Plan in which assisted-living centers are a permitted use in only one district, and not a primarily residential district at that, in order to create a "sense of a health care village" for seniors the City's Zoning Ordinances does have "the effect of limiting the ability of [handicapped and elderly individuals requiring congregant care] to live in the residence of their choice in the community." *Hovsons*, 89 F.3d at 1105.[18]

Accordingly, the Court concludes Plaintiffs are likely to succeed on the merits of their claim that the City's Zoning Ordinances are discriminatory on their face, meaning they treat the handicapped needing congregant care differently from other individuals because of their handicap.

Having reached this conclusion, the burden shifts to Defendants to justify this disparate treatment. *Mt Holly Citizens in Action, Inc. v. Twp. of Mount Holly*, 2009 WL 3584894, at *3 (D.N.J. 2009) ("If a plaintiff establishes his prima facie case, the burden shifts to the defendant to

---

[18] Amici point to Plaintiffs' argument that putting assisted-living facilities only in the RIM district segregates the handicapped and elderly to the outskirts of the City and say that allowing the proposed facility on this Property will not solve the issue identified by Plaintiffs as the property is on the outskirts of the City. (ECF No. 29 at 5.) Specifically, at oral argument, amici stated:

> AMICI/JOHN J. LAMB: And we know that's the case because we've all acknowledged the City of Englewood Cliffs has—the borough of Englewood Cliffs has—is part of the property here. So we know it's on the border. So it's almost like the plaintiff saying, well, we can't put it on the outskirts. You can't put in the RIM zone, but put it on our property in the R triple-A zone. Well, that's on the outskirts on the other side.

(ECF No. 32 at 68:1-8.) While this argument may be relevant and perhaps even persuasive as to Plaintiffs' reasonable-accommodation challenge, it is immaterial to Plaintiffs' facial challenge to the City's Zoning Ordinances.

demonstrate justification.") In the Third Circuit, the determination of whether a defendant has met its burden falls under the discretion of the Court, but the following rough criteria provide guidance:

> [A] justification must serve, in theory and practice, a legitimate, bona fide interest of the Title VIII defendant, and the defendant must show that no alternative course of action could be adopted that would enable that interest to be served with less discriminatory impact.

*Resident Advisory Bd. v. Rizzo,* 564 F.2d 126, 149 (3d Cir. 1977), *cert. denied,* 435 U.S. 908, 98 S. Ct. 1457, 1458, 55 L.Ed.2d 499 (1978)). "If the defendant produces no evidence to justify the disparate treatment, a violation is proved." (*Id.* at 149.)

In their submissions and at oral argument, Defendants did not provide a nondiscriminatory reason for this disparate treatment. Defendants being silent on this point, the Court looks to the City's Zoning Ordinances. A review of these ordinances reveals two potential justifications. As discussed, the City's Code contemplates that locating assisted-living centers in the RIM district would "foster the development of medical and health-care facilities that complement the existing medical and health care services located throughout the City," while siting senior housing in close proximity to future medical and health care services would "contribute to a sense of a health care village that offers care and living opportunities for older persons." Englewood Code § 250-72(A). Separately, the Zoning Ordinances state that the City defined the single-family districts in order "to preserve and protect the integrity of such districts for one-family residential purposes, to establish one-family residence districts that provide for a range of lot sizes, and to permit in such districts only such other uses as will be compatible with one-family residential use." *Id.* § 250-59(A).

The only "justification" argument made in connection with this Motion is by Concerned Citizens. In their summation papers, amici argue that limiting assisted-living centers to the RIM

district has the advantage of placing these facilities "close to services and businesses useful to senior and/or those needing assistance." (*See* Response by Concerned Citizens (ECF No. 29) at 1-2.) Amici further point out that among the RIM district's uses are medical services, "so Defendant City thought that was an appropriate place to locate a large assisted living facility." (*Id.* at 2.)

As discussed, the creation of a health-care village may constitute a reasonable goal for the City, but that zoning aspiration does not justify "limiting the ability" of handicapped and elderly individuals requiring congregant care "to live in the residence of their choice in the community." *Hovsons*, 89 F.3d at 1105. Also, neither Defendants nor Concerned Citizens demonstrate that the creation of a health-care village is a "legitimate, bona fide interest" of the City. Similarly, the preservation of and protection of the integrity of one-family residential districts also does not justify "limiting the ability" of handicapped and elderly individuals requiring congregant care "to live in the residence of their choice in the community." *Hovsons*, 89 F.3d at 1105; *see also Montana Fair Hous., Inc. v. City of Bozeman*, 854 F. Supp. 2d 832, 839 (D. Mont. 2012) (citing H.R.Rep. No. 100–711, 100th Cong., 2d Sess. 13, reprinted in 1988 U.S.Code Cong. & Admin. News 2173, 2179.) As the *Bozeman* Court stated, "[T]he preservation of a neighborhood's residential character neither benefits the disabled nor responds to a legitimate, non-stereotypical safety concern." (*Id.*)

Finally, amici's argument concerning the nearby location of medical services is devoid of details that might explain precisely why an assisted-living center ought to be limited to this one district in a City constituting five square miles other than the aspirational goal of creating a health-care village atmosphere. In short, the Court concludes Defendants have not carried their burden of

providing a legitimate justification for allowing congregant-care facilities as a permitted or conditional use in only one district in the entire City and not in any primarily residential zone.[19]

The Court finds *Bozeman*, though not binding on this Court, to be on point and persuasive. The challenged zoning there did not permit assisted-living centers in four of the City of Bozeman's zoning districts. *Bozeman*, 854 F. Supp. 2d at 837. Meantime, single-household dwellings were permitted as principal uses in every district in the City and so-called community residential facilities, a category arguably including assisted-living centers, and cooperative housing were permitted or conditional uses in all districts. *Id.* On this basis, the *Bozeman* Court concluded the Authorized Uses Section of the city's code "applies less favorably to a protected group, i.e., individuals who require assisted living care due to disabilities," and thus the code was facially discriminatory against the handicapped. *Id.*

Here, the Court concludes limiting assisted-living centers to only one of the City's zoning districts, the RIM district, and not permitting assisted-living centers in any of the City's 24 districts that are primarily residential in nature evidences that the City's Zoning Ordinances constitute disparate treatment against the elderly and the handicapped. As a result, the Court concludes Plaintiffs have met the *Reilly* threshold for demonstrating they are likely to succeed on the merits at trial of showing that the City's Zoning Ordinances violate the FHA.

---

[19] Defendants and amici argue the RIM district is a residential district in that apartment and condominium communities for senior citizens are permitted uses in this zone. Englewood Code § 250-72(B). The Zoning Ordinances themselves suggest the residential character of this district is minimal. *Id.* ("This district already encompasses several multifamily residential complexes . . . ."). Also, the Court determines that the flavor of this district is not residential, as the "R" in RIM stands for Research, not Residential, and the Zoning Ordinances provide, among other things, that "[l]oading areas or docks shall not be located closer than 60 feet from a residential district." *Id.* § 250-72(E)(c)(1).

Having concluded that Plaintiff would be likely to succeed on the merits of its facial discrimination claim, the Court must determine if Plaintiff meets the other *Reilly* factors for granting a preliminary injunction. The second *Reilly* prong concerns irreparable harm. Plaintiff claims irreparable harm on two grounds. First, the failure to gain the required zoning permit will cause Plaintiffs to "lose contractual control over a portion of the Property essential to carry out development of the Facility." (ECF No. 2-16 at 23 (citing ECF No. 2-1 ¶ 2, Ex. F (Contract of Sale)).) Second, Plaintiffs argue the failure of this project to win zoning approval will "delay, perhaps indefinitely, or destroy entirely, residential housing opportunities for handicapped residents in the City." (*Id.*) The Court is not persuaded the first argument constitutes irreparable harm, defined in the Third Circuit as harm that "cannot be redressed by a legal or an equitable remedy following a trial." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989). Indeed, breach-of-contract damages can be readily addressed following a trial. But, the Court is persuaded the erosion of residential housing opportunities for handicapped residents in the City is a harm contemplated by *Instant Air Freight.* Alleged discrimination in violation of the FHA "is presumed to be irreparable harm." *Easter Seal Soc. of New Jersey, Inc. v. Twp. of N. Bergen*, 798 F. Supp. 228, 236 (D.N.J. 1992) (citing *Gresham v. Windrush Partners, Ltd.,* 730 F.2d 1417, 1423–24 (11th Cir. 1984), *cert. denied,* 469 U.S. 882 (1984)).

Having determined Plaintiff has meet the first two *Reilly* factors, it is axiomatic Plaintiff has met the other *Reilly* prongs. Plaintiff meets its burden of showing a preliminary injunction to be in the public interest because the enforcement of a discriminatory law vindicates no public interest. *Assisted Living Assocs. of Moorestown, L.L.C. v. Moorestown Twp.*, 996 F. Supp. 409, 440 (D.N.J. 1998).

Likewise, the Court is persuaded by Plaintiff's argument that the balance of the equities favors Plaintiffs on their facial challenge because, in contrast to the risk of irreparable injury discussed above, the City faces no appreciable harm from an injunction. (ECF No. 3-1 at 39.) Defendants argue "every member of the public" would be deprived of their right to public notice and a hearing for development applications. (ECF No. 20-2 at 34.) But, as discussed, a preliminary injunction would not deprive the public of those rights as Plaintiffs will have to go to the Planning Board and/or other governmental agencies for site plan and other approvals.[20] Accordingly, Plaintiffs' Motion for a Preliminary Injunction enjoining Defendants from enforcing the provisions of the City's Code is **GRANTED**.

## V.    CONCLUSION

A preliminary injunction is an extraordinary remedy to be used in limited circumstances. Nevertheless, for the reasons stated above, the Court concludes Plaintiff has met its burden of demonstrating that *Reilly* factors weigh in favor of an injunction. Accordingly, Plaintiffs' Motion is **GRANTED**.


**Date: October 10, 2019**                              */s/ Brian R. Martinotti*
                                                        **HON. BRIAN R. MARTINOTTI**
                                                        **UNITED STATES DISTRICT JUDGE**

---

[20] For instance, the City's Code § 250-5 requires that the City's municipal agencies "shall hold hearings as required by N.J. [Stat. Ann.] § 40:55D-10. All procedures governing said hearings shall be established by the municipal agency in compliance with N.J. [Stat. Ann.] § 40:55D-10," *id.* § 250-5(a), while "public notice of a hearing shall be required for any site plan review" pursuant to § 250-5(b) of the Code.